Tracy L. Klestadt
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone:  (212) 972-3000
Fax:  (212) 972-2245
tklestadt@klestadt.com

Jeffrey K. Garfinkle (admitted *pro hac vice*)
BUCHALTER Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
Fax: (949) 720-0182
jgarfinkle@buchalter.com


Counsel for Defendant
McKesson Corporation


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:                                                        ) | Chapter 11 |
|                                                                  ) | |
|                                                                  ) | Case No. 15-23007 (RDD) |
| THE GREAT ATLANTIC & PACIFIC TEA     ) | |
| COMPANY, INC., *et al.*                           ) |  Jointly Administered |
|                                                                  ) | |
|                          Debtors.                      ) | |
|                                                                  ) | |
| The Official Committee of Unsecured Creditors on ) | |
| behalf of the bankruptcy estate of THE GREAT ) | |
| ATLANTIC & PACIFIC TEA COMPANY, INC., ) | |
| *et al.*                                                     ) | |
|                          Plaintiff                       ) | Adv. Proc. No. 17-08264 (RDD) |
|                                                                  ) | |
|                          v.                                  ) | |
|                                                                  ) | |
| McKESSON CORPORATION                       ) | |
|                                                                  ) | |
|                          Defendant                     ) | |
|                                                                  ) | |


**McKESSON CORPORATION'S MOTION FOR SUMMARY JUDGMENT AND**
**MEMORANDUM OF FACTS AND LAW IN SUPPORT THEREOF**

# TABLE OF CONTENTS

I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS...................... 1

II.   SUMMARY OF ARGUMENT FOR SUMMARY JUDGMENT .......................... 2

III.  STATEMENT OF FACTS ...................................................................................... 4

    A.   History of the Debtors' Relationship with McKesson ................................ 4

    B.   Supply Procedures .................................................................................... 5

        1.   Ordering and Delivery Process................................................... 5

        2.   Credit Terms and Payment Process ........................................... 7

        3.   Modification of Credit Terms .................................................... 9

        4.   Unpaid Invoices........................................................................ 11

IV.   SUMMARY JUDGMENT SHOULD BE GRANTED TO MCKESSON...................... 12

    A.   All of the Transfers Were in the Ordinary Course of Business and Thus Protected
Pursuant to Section 547(c)(2)................................................................... 13

        1.   The Debtors and McKesson have an extensive relationship governed by the
Supply Agreement ..................................................................... 15

        2.   The Debtors' payment practices during the Preference Period were consistent
with historical payment practices .............................................. 16

        3.   McKesson undertook no unusual debt collection actions ............... 18

    B.   Certain of the challenged transactions between the Debtors and McKesson are
contemporaneous and protected by Section 547(c)(1) ............................. 19

    C.   The Transfers Are Shielded from Avoidance By the New Value Defense.............. 25

    D.   Plaintiff Cannot Establish Its Prima Facie Case....................................... 27

    E.   All of McKesson's Defenses Run Concurrently ...................................... 27

    F.   No Net Benefit to the Estate...................................................................... 28

    G.   McKesson is Entitled to Summary Judgment on Plaintiff's Second Claim for Relief -
Recovery of Property................................................................................ 29

V.    CONCLUSION...................................................................................................... 30

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Anderson-Smith & Assocs. v. Xyplex* (*In re Anderson-Smith & Assoc., Inc.*),
    188 B.R. 679 (Bankr. N.D. Ala. 1995) ................................................................... 21

*Carrier Corp v. Buckley* (*In re Globe Mfg. Corp.*),
    567 F.3d 1291 (11 Cir. 2009) ................................................................................ 15

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................................. 12

*DeLuca v. Atlantic Refining Co.*,
    176 F.2d 421 (2d Cir. 1949) ................................................................................. 13

*Dye v. Rivera* (*In re Marino*),
    193 B.R. 907 (9th Cir. BAP 1996) ....................................................................... 24

*In re Baumgold Bros., Inc.*,
    103 B.R. 436 (Bankr. S.D.N.Y. 1989)................................................................... 25

*In re Coco*,
    67 B.R. 365 (Bankr. S.D.N.Y. 1986)..................................................................... 23

*In re Lewellyn & Co., Inc.*,
    929 F.2d 424 (8th Cir. 1991) ................................................................................ 23

*Jones Truck Lines v. Central States, Southeast & Southwest Areas Pension Fund* (*In re
    Jones Truck Lines*),
    130 F.3d 323 (8th Cir. 1997) ................................................................................ 23

*Lawson v. Ford Motor Co. (In re Roblin Indus.*),
    78 F.3d 30 (2d Cir. 1996) ..................................................................................... 15

*Lindquist v. Dorholt* (*In re Dorholt, Inc.*),
    224 F.3d 871 (8th Cir. 2000) ................................................................................ 23

*Matsushita Elec. Inc. Co. v. Zenith Radio*,
    475 U.S. 574 (1986).............................................................................................. 13

*McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*,
    185 B.R. 103 (Bankr. E.D.N.Y. 1995)....................................................... 12, 15, 27

*Miller v. Perini Corp. (In re A.J. Lane & Co.)*,
    164 B.R. 409 (Bankr. D. Mass. 1994) ................................................................... 17

*Official Comm. of Unsecured Creditors of Cyberrebate.com, Inc. v. Gold Force Int'l, Ltd. (In re Cyberrebate.com, Inc.),*
   296 B.R. 639 (Bankr. E.D.N.Y. 2003) ................................................................. 15

*Official Comm. Of Unsecured Creditors of Enron Corp v. Martin (In re Enron Creditors Recovery Corp.),*
   376 B.R. 442 (Bankr. S.D.N.Y. 2007) ................................................................. 14

*Official Comm. of Unsecured Creditors of Maxwell Newspapers v. Travelers Ins. Indem. Co. (In re Maxwell Newspapers, Inc.),*
   192 B.R. 633 (Bankr. S.D.N.Y. 1996) ................................................................. 25

*Official Comm. of Unsecured Creditors of Quantum Foods, LLC v. Tyson Foods, Inc. (In re Quantum Foods, LLC),*
   554 B.R. 729 (Bankr. D. Del. 2016) ................................................................. 28

*Official Committee of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs., Inc. (In re 360networks (USA) Inc.),*
   338 B.R. 194 (Bankr. S.D.N.Y. 2005) ................................................................. 23

*Peltz v. Hartford Life Ins. Co. (In re Bridge Information Sys., Inc.),*
   321 B.R. 247 (Bankr. E.D. Mo. 2005) ................................................................. 21, 22

*Pereira v. United Parcel Service of America (In re Waterford Wedgwood USA, Inc.),*
   508 B.R. 821 (Bankr. S.D.N.Y. 2014) ................................................................. 15

*Pine Top Ins. Co. v. Bank of America Nat. Trust & Sav. Ass'n,*
   969 F.2d 321 (7th Cir. 1992) ................................................................. 24

*Rave Comms. v. The Ink Spot (In re Rave Comms., Inc.),*
   128 B.R. 369 (Bankr. S.D.N.Y. 1991) ................................................................. 17

*Tennessee Valley Steel Corp. v. Rockwood Water, Wastewater & Natural Gas Sys.,*
   *(In re Tennessee Valley Steel Corp.),* 201 B.R. 927 (Bankr. E.D. Tenn. 1996) ............... 12, 27

*Tyler v. Swiss Am. Sec. (In re Lewellyn & Co., Inc.),*
   11929 F.2d 424 (8th Cir. 1991) ................................................................. 22

*Unsecured Creditors Comm. of Sparrer Sausage Co., Inc. v. Jason's Foods, Inc.,*
   826 F.3d 388 (7th Cir. 2016) ................................................................. 12, 19, 27

## **Statutory Authorities**

11 U.S.C. § 503(b)(9) ................................................................. 28

11 U.S.C. § 547 ................................................................. 1, 2

11 U.S.C. § 547(a)(2) ................................................................. 20

iii

11 U.S.C. § 547(c)(1) ............................................................................................... 20, 22

11 U.S.C. § 547(c)(2) ............................................................................................... 13

11 U.S.C. § 547(c)(4) ............................................................................................... 25

11 U.S.C. § 550 ......................................................................................................... 1

11 U.S.C. § 550(a) .................................................................................................... 2, 29

**<u>Rules and Regulations</u>**

21 C.F.R. § 1304.11 ................................................................................................. 7

Fed. R. Civ. P. 56 ..................................................................................................... 12

Fed. R. Civ. P. 56(e) ............................................................................................... 22

Fed. R. Evid. 1006 ................................................................................................... 16

Defendant McKesson Corporation ("McKesson"), by and through its undersigned counsel, respectfully submits this Memorandum of Facts and Law in support of its Motion for Summary Judgment (the "Motion") against Plaintiff The Official Committee of Unsecured Creditors ("Plaintiff") on behalf of the bankruptcy estate of the Debtors The Great Atlantic & Pacific Tea Company, Inc. *et al.* (the "Debtors"), as follows:

## I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

The Debtors[1] filed for relief under chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code") on July 19, 2015 ("Petition Date") for the second time in five years. The Court granted joint administration of the Debtors' petitions under the lead case no. 15-23007. [D.I. 57].  Currently, there is no substantive consolidation order.  Yet, for all practical purposes, the estates were substantively consolidated.  The Debtors' business assets—primarily supermarkets and pharmacies—were liquidated and the remaining cash proceeds, about $22 million, are held in consolidated accounts.  McKesson timely filed proofs of claim against all of the Debtors and, on a consolidated basis, holds an unpaid $2.6 million administrative claim pursuant to Bankruptcy Code section 503(b)(9) as well as a $1.5 million general unsecured claim.

On June 6, 2016, the Court vested Plaintiff with the authority to prosecute avoidance causes of action for the benefit of the creditors of the Debtors.  [D.I. 2868].  Plaintiff filed its *Complaint for Avoidance and Recovery of Preferential Transfers Pursuant to 11 U.S.C. § 547 & 550* [Adv. D.I. 1] (the "Complaint") on July 13, 2017 against McKesson.  The Complaint contains two causes of action for the avoidance and recovery of $67,752,943.44 in alleged

---

[1] The Debtors in these chapter 11 cases are: 2008 Broadway, Inc.; The Great Atlantic & Pacific Tea Company, Inc.; A&P Live Better, LLC; A&P Real Property, LLC; APW Supermarket Corporation; APW Supermarkets, Inc.; Borman's, Inc.; Delaware County Dairies, Inc.; Food Basics, Inc.; Kwik Save Inc.; McLean Avenue Plaza Corp.; Montvale Holdings, Inc.; Montvale-Para Holdings, Inc.; Onpoint, Inc.; Pathmark Stores, Inc.; Plainbridge LLC; Shopwell, Inc.; Super Fresh Food Markets, Inc.; The Old Wine Emporium of Westport, Inc.; Tradewell Foods of Conn., Inc.; and Waldbaum, Inc.

preferential transfers (the "Transfers") pursuant to 11 U.S.C. § 547 (the "First Claim for Relief")

and 11 U.S.C. § 550(a) (the "Second Claim for Relief").  The *Summons and Notice of Pretrial*

*Conference in an Adversary Proceeding* was served on McKesson on July 14, 2017.  McKesson

filed its answer on August 10, 2017. [Adv. D.I. 4].  In that Answer, McKesson asserted various

defenses to the avoidance and recovery of the alleged preferential transfers, including the

ordinary course of business, contemporaneous exchange, and subsequent new value defenses set

forth in Bankruptcy Code section 547(c).

McKesson and Plaintiff conducted broad discovery, each requesting extensive written

discovery and producing hundreds of communications in addition to the business records for the

thousands of purchases and payments between McKesson and the Debtors.  Commencing in

mid-January 2019 and continuing for several weeks thereafter, the parties participated in a

mediation before retired bankruptcy Judge Allan Gropper.  Ultimately, that mediation was

unsuccessful.  As permitted by this Court at a hearing held on November 16, 2018, McKesson

now files this motion for summary judgment.   It does so because there are no material factual

issues in dispute.

## II.    SUMMARY OF ARGUMENT FOR SUMMARY JUDGMENT

McKesson, one of the largest wholesale distributors of pharmaceutical products

("Pharmaceuticals") in the United States, was the Debtors' primary Pharmaceuticals supplier.

For more than three years preceding the commencement of the Debtors' bankruptcy cases,

McKesson supplied the Debtors with Pharmaceuticals on a daily basis pursuant to the terms of a

Supply Agreement entered into on December 6, 2012 (the "Supply Agreement").  (Declaration

of Jenifer Towsley in Support of McKesson Corporation's Motion for Summary Judgment (the

"Towsley Declaration"), ¶ 7).

The Debtors employed an automated daily ordering and payment process. Every day, the inventory control software at each of the Debtors' individual pharmacies would order the required Pharmaceuticals to maintain predetermined inventory levels. McKesson would deliver the orders the following business day and the Debtors would pay McKesson with Automated Clearing House (ACH) payments debited from the Debtors' bank account on the required Friday due dates established by the terms of the Supply Agreement. Such automated procedures are standard for large pharmacy chains in the United States and ensure the accurate delivery of vast quantities of Pharmaceuticals on a daily basis as well as timely payment for those Pharmaceuticals on a weekly basis. (Towsley Declaration, ¶ 8).

The Debtors continued to operate pursuant to these automated procedures until the final week leading up to the Petition Date. With the exception of four payments during that final week, every other payment made during the 90-day period preceding the Petition Date (the "Preference Period") conformed to the same credit terms and payment procedures that had been in place for the prior three years. Moreover, due to the processes relied upon by the Debtors and McKesson, every single invoice was paid on its exact due date. (Towsley Declaration, ¶ 9). As a result, each of these payments is protected by the ordinary course of business defense under Bankruptcy Code section 547(c)(2).

In the months leading up to the Debtors' bankruptcy filings, McKesson became aware that the Debtors' financial viability was deteriorating. Based on this adverse material change in the Debtors' financial condition, McKesson exercised its rights under the Supply Agreement to modify the go-forward credit terms for the sale of Pharmaceuticals to the Debtors. McKesson was willing to continue selling Pharmaceuticals to the Debtors, but required immediate payment. Following discussions with the Debtors, McKesson and the Debtors agreed that effective July

3

13, 2015, payment for all future sales of Pharmaceuticals would be contemporaneous with the delivery of new product. The new terms required payment no more than one day after delivery of Pharmaceuticals to the Debtors, providing sufficient time to process new orders, pack and ship products to the Debtors' pharmacies, post daily delivery invoices, and then permit the Debtors to remit payment after inspecting the deliveries and checking the Pharmaceuticals into inventory. (Towsley Declaration, ¶ 10).

The Debtors made four payments pursuant to these new terms prior to the Petition Date. McKesson timely received each of the four payments the day after delivering the Pharmaceuticals. (Towsley Declaration, ¶ 11). As a result, each of the four payments are protected by the contemporaneous exchange defense under Bankruptcy Code section 547(c)(1).

Although McKesson holds a complete defense under sections 547(c)(1) and (c)(2), McKesson continued to extend new value to the Debtors throughout the Preference Period and holds a defense under section 547(c)(4) as well. All of these defenses layer and supplement each other such that McKesson has a complete defense to the avoidance and recovery of the Transfers.

The facts supporting McKesson's defenses are not subject to dispute. The concurrently filed Declarations and accompanying exhibits provide irrefutable evidence of the agreed upon credit terms and the Debtors' payment practices. For these reasons, McKesson is entitled to summary judgment in its favor with respect to Plaintiff's First Claim for Relief and Second Claim for Relief.

## III.    STATEMENT OF FACTS

### A.    History of the Debtors' Relationship with McKesson

McKesson (NYSE: MCK) is one of the largest wholesale distributors of Pharmaceuticals in the United States. The Debtors were one of the nation's oldest supermarket and food retailers, operating approximately 300 supermarkets, combination food and drug stores, and specialty food

stores across six Northeastern states. [D.I. 4 at 3].   The Debtors' primary retail operations consisted of supermarkets operated under a variety of well-known trade names including A&P, Waldbaum's, SuperFresh, Pathmark, Food Basics, and The Food Emporium. *Id*.  A majority of these supermarkets also had in-store pharmacies and McKesson was the Debtors' primary supplier of Pharmaceuticals to those pharmacies.  (Towsley Declaration, ¶ 7).

In December 2010, the Debtors filed chapter 11 petitions, commencing their first bankruptcy cases.[2]  Around the end of the first bankruptcy cases, in the spring of 2012, as the prior assumed supply agreement with McKesson was expiring, McKesson was informed that the Debtors were seeking alternative suppliers to McKesson.  In response, during the summer and fall of 2012, the Debtors and McKesson negotiated and reached an agreement for the new Supply Agreement.  The Debtors and McKesson entered into the new and operative Supply Agreement on or about December 6, 2012 and that agreement became effective on October 1, 2012. (Towsley Declaration, ¶ 12).

  **B.**  **<u>Supply Procedures</u>**

    **1.**  **Ordering and Delivery Process**

The process for the Debtors and their in-store pharmacies to order Pharmaceuticals, pay for such products, and receive those products from McKesson was highly automated.  (Towsley Declaration, ¶ 13). The following process would occur each day:

- The Debtors contracted with McKesson to provide pharmacy enterprise software to manage the Debtors' inventory, product orders and payments (the "<u>Pharmaceuticals Management System</u>"). The Pharmaceuticals Management System utilized an electronic daily ordering system. When a customer filled a prescription with one of the Debtors' pharmacies, the pharmacy would fill that

---

[2]  See Jointly administered Case No. 10-24549.

prescription from inventory on hand or place a special order with McKesson. If the customer's prescription was filled from on-hand supply, the Pharmaceuticals Management System would indicate when supplies fell below the safety stock level[3] and would automatically place an order with McKesson. The system would build a running list of orders throughout the day for each pharmacy. At 8:00 p.m. local time, the list would close and a purchase order would be transmitted to the McKesson distribution center assigned to that pharmacy. The pharmacy could also place special orders for Pharmaceuticals not normally carried in the regular inventory. (Towsley Declaration, ¶ 14).

• After 8:00 p.m., the assigned McKesson distribution center would review each pharmacy's order for that day and finalize each pharmacy's list of products for delivery, generating a purchase order acknowledgment. Any orders placed through the electronic ordering system by 8:00 p.m. local time would qualify for next-business day delivery. In some instances, a product was not immediately available and delivery was delayed until the product became available. (Towsley Declaration, ¶ 15).

• Once the orders were packaged and an invoice prepared at the distribution center, delivery trucks would transport the Pharmaceuticals to the specific pharmacy that had placed an order. Generally, McKesson would deliver Pharmaceuticals to the Debtors' in-store pharmacies Monday through Friday, with deliveries typically

---

[3] Safety stock levels are preset levels of commonly dispensed Pharmaceuticals that each pharmacy maintains in its inventory. Safety stock levels are fixed by the pharmacy based upon expected demand for each Pharmaceutical over period of time (typically, between 10 and 14 days). Once the on-hand inventory level of a specific Pharmaceutical falls below the preset minimum level, a replenishment order automatically is transmitted to McKesson and the next business day McKesson delivers the ordered Pharmaceutical. This ensures that the pharmacy always has sufficient levels of on-hand and commonly prescribed pharmaceutical inventory to meet expected patient/customer demand.

arriving the morning of the next business day after an electronic order was sent to McKesson.  (Towsley Declaration, ¶ 16).[4]

- Upon delivery of the Pharmaceuticals, an in-store employee (usually one of the pharmacists) confirmed and accepted the order through either an electronic signature or a signed paper receipt.  Employees within the pharmacies would then use the invoice to check the new product into the Pharmaceuticals Management System, which would automatically update the inventory count for each pharmacy.  (Towsley Declaration, ¶ 17).

- The accurate maintenance of inventory records of pharmaceuticals, and related patient/customer records, is essential and strictly regulated.  Federal and state laws and regulations mandate that each pharmacy maintain complete, accurate and continuously updated inventories of all pharmaceutical products.  By way of example, 21 C.F.R. § 1304.11 sets forth certain of the Federal inventory requirements for pharmacies related to controlled substances.  Each state has its own requirements for maintenance of pharmacy inventories and patient records.  McKesson strictly abides by these Federal and state laws and regulations and works with all of its customers, including the Debtors, to ensure strict compliance.  (Towsley Declaration, ¶ 18).

### 2.    Credit Terms (Prior to July 13, 2015) and Payment Process

McKesson sold Pharmaceuticals to the Debtors on different credit terms based on the category of Pharmaceuticals:  (1) non-generic Pharmaceuticals ("Branded Pharmaceuticals"), (2)

---

[4] In rare instances, a pharmacy might require either immediate same-day delivery or non-business day delivery of a Pharmaceutical that was not in its inventory.  Subject to additional charges and product availability, McKesson would fulfill those special orders.

generic Pharmaceuticals ("Generic Pharmaceuticals"), and (3) in limited instances, extended dating products ("Promotional Pharmaceuticals"). (Towsley Declaration, ¶ 19).

- Payment for Branded Pharmaceuticals was due on the Friday of the week following the date of an invoice.  Branded Pharmaceuticals would therefore be paid in a range of terms from 7 days (Friday to following Friday) to 11 days (Monday to following Friday). (Towsley Declaration, ¶ 20).[5]

- Payment for Generic Pharmaceuticals was due on the sixth following Friday and would therefore be paid in a range of terms from 35 to 39 days. (Towsley Declaration, ¶ 21).

- Finally, in certain limited instances, McKesson offered longer terms for Promotional Pharmaceuticals where manufacturers of Branded Pharmaceuticals would offer McKesson extended payment terms on a limited product-by-product basis and McKesson passed those extended payment terms to its customers. Payment on extended dating Pharmaceuticals would be due on the applicable Friday payment date for the extended payment terms.  (Towsley Declaration, ¶ 22).

The payment process was as automated as the ordering and delivery process, resulting in consistent and timely payment of McKesson invoices on the required Friday due date.  Each Friday, the Debtors made automated clearing house (ACH) or (in some instances) wire transfer payments.  The payments would cover all invoices that came due that Friday.  With the

---

[5] Invoices were compiled with a billing statement and provided to the Debtors on a weekly basis.  Occasionally, there was a delay in delivering an invoice to the Debtors, usually due to a clerical error by McKesson.  In those circumstances, the invoice would be included with the next billing cycle statement and the baseline date of the invoice would be modified so the due date of that invoice would correspond to the due date of all invoices included in the billing statement.  (Declaration of Lalitha Iragavarapu in Support of McKesson Corporation's Motion for Summary Judgment (the "Iragavarapu Declaration"), ¶ 7).

exception of the four daily payments during the week prior to the Petition Date, which are addressed below, the Debtors never deviated from paying McKesson on the required Friday due date. (Towsley Declaration, ¶ 23). Exhibit A to the Complaint confirms the Debtors' strict adherence to the agreed-upon credit terms. During the Preference Period, there were thirteen (13) Fridays. On each Friday during the Preference Period, and without any deviation or exception, the Debtors paid McKesson for the aggregate amounts of Branded Pharmaceuticals, Generic Pharmaceuticals and Promotional Pharmaceuticals due that day.[6] (Towsley Declaration, ¶ 24).

### 3.  Modification of Credit Terms Effective July 13, 2015

During the spring and summer of 2015, the Debtors' financial difficulties and possible bankruptcy filing were widely reported. The decline in the Debtors' financial condition and the possible bankruptcy filing led McKesson in July of 2015 to exercise its contractual right to modify the supply terms—on a go-forward basis.[7] In a July 2, 2015 letter, McKesson notified the Debtors that due to a material adverse change in the Debtors' financial condition, effective July 13, 2015 the Debtors could purchase Pharmaceuticals from McKesson only on one-day sales outstanding terms and limited the Debtors' daily purchases to $1 million. One-day sales outstanding terms would require the Debtors to pay for Pharmaceuticals no more than one business day after placing an order. Under the supply procedures between McKesson and the Debtors, invoices were generated and product was delivered the day after an order was placed.

---

[6]  Exhibit A to the Complaint contains two columns labelled "Check Number" and "Check Date." Those labels are inaccurate. The Debtors never paid by check. In all instances, payment was either via ACH or wire transfer.

[7]  Section 4(h) of the Supply Agreements provides that McKesson may "change a payment term (including imposing the requirement of next day electronic payment for Merchandise deliveries) or limit total credit, if (i) McKesson concludes there has been a material adverse change in the A&P's financial condition or an unsatisfactory payment performance; or (ii) A&P ceases to meet McKesson's credit requirements. Upon the occurrence of any of the above-specified events, McKesson further shall be entitled to require that A&P provide adequate assurances of performance as a condition to the shipment of any additional orders to locations."

Thus, one-day sales outstanding terms would have required the Debtors to pay for new product the day it was delivered.  (Towsley Declaration, ¶ 25).

Following the notification on July 2, 2015, the Debtors and McKesson negotiated and agreed upon modified terms of up to two-day sales outstanding and limited the Debtors' daily purchases to $2 million, as memorialized by a letter dated July 15, 2015.  McKesson and the Debtors agreed to an additional day because of the logistical difficulties in ordering and delivering Pharmaceuticals, inspecting the deliveries, logging the Pharmaceuticals into inventory and then remitting payment all within 24 hours.  Due to these operational actualities, two-day sales outstanding terms were intended to require contemporaneous payment one day after delivery of new product (the "<u>Contemporaneous Payment Terms</u>").  (Towsley Declaration, ¶¶ 26 and 27).

The Contemporaneous Payment Terms became effective for purchases of Pharmaceuticals made on and after July 13, 2015.  Prior to the Petition Date, the Debtors only made four payments according to the new terms totaling approximately $4.25 million as follows:

1. Tuesday, July 14, 2015 in the amount of $1,436,808.53

2. Wednesday, July 15, 2015 in the amount of $1,098,919.73

3. Thursday, July 16, 2015 in the amount of $883,260.71

4. Friday, July 17, 2015 in the amount of $830,735.91

(Collectively, the "Contemporaneous Daily Payments") (Towsley Declaration, ¶ 28).

On those days, the Debtors paid McKesson by wire transfer the full amount due for Pharmaceuticals purchased and delivered to the Debtors' pharmacies during the prior day.  Those payments did not include any amounts due for Pharmaceuticals purchased on other terms. (Towsley Declaration, ¶ 29).

After the Debtors filed for bankruptcy on Monday, July 19, 2015, McKesson continued to supply the Debtors with Pharmaceuticals on the same Contemporaneous Payment Terms. With the Supply Agreement set to expire on August 31, 2015, McKesson and the Debtors agreed to extend the term of the Supply Agreement through January 31, 2016 but modified the agreement to incorporate the new Contemporaneous Payment Terms. McKesson further agreed that it would not modify the Contemporaneous Payment Terms under section 4(H) of the Supply Agreement for the duration of the liquidation process. The Debtors' purchase of Pharmaceuticals from McKesson continued on these terms until the liquidation of the Debtors' pharmacies was completed in early 2016. (Towsley Declaration, ¶ 30).

### 4.   Unpaid Invoices

During the week leading up to the bankruptcy filing, the Debtors purchased Pharmaceuticals under the new credit terms and made four payments. The Debtors also made their regularly scheduled Friday payment during that week. Unfortunately for McKesson, the Debtors did not pay certain invoices governed under the pre-July 13, 2015 credit terms of the Supply Agreement, nor certain invoices dated July 17, 2015, which were governed by the new credit terms. In total, $3,636,302.30 of Pharmaceuticals were delivered during the twenty days before the Petition Date (June 29, 2015 through July 18, 2015), for which payment was not received. The claim for these goods is entitled to administrative priority under Bankruptcy Code section 503(b)(9). Following the commencement of the bankruptcy cases, the Debtors and McKesson entered into that certain Extension of Compliance with Terms of Supply Agreement. (the "Extension Agreement"). Pursuant to the terms of the Extension Agreement, the Debtors paid McKesson a $1 million extension fee, which was applied to the administrative claim. The remaining balance owed on McKesson's administrative claim is $2,636,302.30 (the "Administrative Claim"). In addition to the Administrative Claim, McKesson holds a general

unsecured claim in the amount of $1,581,865.96 for Pharmaceuticals delivered prior to June 29, 2015 (the "Unsecured Claim").[8]    (Towsley Declaration, ¶ 31).

## IV.    SUMMARY JUDGMENT SHOULD BE GRANTED TO McKESSON.

McKesson is entitled to summary judgment as a matter of law as no triable issue of material fact exists with respect to the claims alleged in the Complaint.  Rule 56(c) of the Federal Rules of Civil Procedure (the "Civil Rules"), made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), directs that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any Declarations show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

McKesson is entitled to summary judgment on the two claims in the Complaint because it holds dispositive defenses with respect to each alleged preferential transfer pursuant to Bankruptcy Code section 547(c)(1) (contemporaneous exchange of new value), section 547(c)(2) (ordinary course payments) and section 547(c)(4) (new value).  As the following arguments demonstrate, McKesson can use a combination of the subsection (c) defenses in concert with one another to eliminate any preference liability associated with each individual payment or transfer. *See McCord v. Venus Foods, Inc.* (*In re Lan Yik Foods Corp.*), 185 B.R. 103, 116 (Bankr. E.D.N.Y. 1995); *see also Unsecured Creditors Comm. of Sparrer Sausage Co., Inc. v. Jason's Foods, Inc.*, 826 F.3d 388, 397 (7th Cir. 2016) (citing *Collier on Bankruptcy* ¶ 547.04[4][e] at

---

[8]  On or about November 24, 2015, McKesson timely filed a series of proofs of claim against the Debtors, which included the claims based on Pharmaceuticals received by the Debtors during the Administrative Claim Period.  On March 8, 2016, McKesson filed its first amended proofs of claims against each of the Debtors for both the Administrative Claim and the Unsecured Claim (collectively, as amended, the "Proofs of Claim").  While reviewing the Debtors' payment history and analyzing the ordinary course of business and new value defenses, McKesson determined that the amounts stated in the Proofs of Claim are incorrect.  McKesson intends to further amend its Proofs of Claim to assert the claim amounts set forth herein.

565-69)("§ 547(c) defenses may be used cumulatively"); *see also Tennessee Valley Steel Corp. v. Rockwood Water, Wastewater & Natural Gas Sys.* (*In re Tennessee Valley Steel Corp.*), 201 B.R. 927, 943 (Bankr. E.D. Tenn. 1996).

The concurrently filed Declarations and exhibits demonstrate there is no genuine dispute regarding the facts supporting McKesson's defenses. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Inc. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (citing *DeLuca v. Atlantic Refining Co.*, 176 F.2d 421, 423 (2d Cir. 1949)). Rather, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting Fed. Rule Civ. Proc. 56(e)). Plaintiff will be unable to cite specific disputed facts warranting trial on McKesson's defenses. Accordingly, a ruling as a matter of law on McKesson's defenses is appropriate. The following discussions regarding the ordinary course of business, contemporaneous exchange and new value defenses demonstrate that McKesson is entitled to judgment in its favor with respect to each of the causes of action asserted by Plaintiff.

A.   **All of the Transfers Were in the Ordinary Course of Business and Thus Protected Pursuant to Section 547(c)(2)**

The ordinary course defense to preference liability is met if the "transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee," and such transfer was either "(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms." 11 U.S.C. § 547(c)(2). Thus the ordinary course defense shields payments

made in the Debtors' ordinary course of business with McKesson (the subjective test) or made according to ordinary business terms (the objective test).[9]

With the exception of the four Contemporaneous Daily Payments, each payment by the Debtors to McKesson during the Preference Period satisfies the subjective test of the ordinary course of business defense.   The payments (i) were made in the ordinary course of dealings between McKesson and the Debtors, (ii) were made pursuant to the agreed upon terms contained in the Supply Agreement and (iii) followed the usual pattern and practice of the Debtors' historical relationship with McKesson.

McKesson also believes that every payment, including the Contemporaneous Daily Payments, are protected by the objective test of the ordinary course of business defense because they followed standard business terms for the Pharmaceuticals industry.   Due to the dispositive overlapping defenses discussed herein, this motion focuses on the subjective test and McKesson reserves the right to assert a defense under section 547(c)(2)(B) in the event that further litigation is required.

"The ordinary course of business exception to the avoidance powers protects recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtors and the debtors' transferee."   *Official Comm. Of Unsecured Creditors of Enron Corp v. Martin* (*In re Enron Creditors Recovery Corp.*), 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007)(quotation omitted).   The 2005 amendments to the Bankruptcy Code made it easier to

---

[9]   While McKesson believes it holds a dispositive defense with respect to each alleged preferential transfer under section 547(c)(2)(A) for purposes of this Motion, McKesson reserves the right to assert as a defense that the alleged preferential transfer satisfy the objective test requirements of section 547(c)(2)(B) in the event that further litigation is required.

invoke the ordinary course defense since the defendant no longer needs to satisfy both the objective and subjective prongs of the statute.[10]

In applying the subjective test, courts consider factors such as: (i) the prior course of dealing between the parties, (ii) payment practices including the amount of the payment, the timing of the payment, or changes in the means of payment, and (iii) the presence of unusual debt collection practices. *Official Comm. of Unsecured Creditors of Cyberrebate.com, Inc. v. Gold Force Int'l, Ltd.* (*In re Cyberrebate.com, Inc.*), 296 B.R. 639, 642-43 (Bankr. E.D.N.Y. 2003). To determine whether a payment is within the ordinary course of business, courts will compare the history of transactions in the pre-preference and preference periods. *Pereira v. United Parcel Service of America (In re Waterford Wedgwood USA, Inc.),* 508 B.R. 821, 828 (Bankr. S.D.N.Y. 2014) ("Though the subjective test compares the course of dealings of the parties, it essentially is a comparison of two sets of data over differing periods of time.").

### 1.     The Debtors and McKesson have an extensive relationship governed by the Supply Agreement

The lengthy business relationship and corresponding transaction history between McKesson and the Debtors establishes a baseline against which the Court can judge whether the Transfers fall within the ordinary course of business. *See In re Lan Yik Foods Corp.*, 185 B.R. at 111-112. McKesson was the Debtors' primary supplier of Pharmaceuticals for over a decade, and the Supply Agreement governing this relationship was in place for nearly three years—from October 2012 through the Petition Date. (Towsley Declaration, ¶ 7). During this period McKesson and the Debtors conducted extensive daily transactions (purchases and payments) resulting in hundreds of thousands of invoices. In the Preference Period alone, the transactions

---

[10] Under the previous version of section 547, a creditor's ordinary course defense required that all protected transfers be made according to the ordinary industry practices. *Lawson v. Ford Motor Co. (In re Roblin Indus.*), 78 F.3d 30, 40 (2d Cir. 1996). By contrast, "[t]he 2005 amendment allows a creditor to prevail by showing either that the course or the terms were ordinary" by simplifying the Code provision and changing an "and" to an "or." *Carrier Corp v. Buckley* (*In re Globe Mfg. Corp.*), 567 F.3d 1291, 1298, n.3 (11th Cir. 2009).

between the Debtors and McKesson generated over 49,000 invoices for the Pharmaceuticals purchased by the Debtors' pharmacies.  (Iragavarapu Declaration, ¶ 6).[11]

Based on the length of this relationship and the thousands of transactions between the parties, it is beyond dispute that the relationship was of sufficient length to establish an ordinary course of dealing between the parties.

**2.    The Debtors' payment practices during the Preference Period were consistent with historical payment practices**

Under the Supply Agreement, the Debtors purchased Pharmaceuticals from McKesson under three types of payment terms: (i) Branded Pharmaceuticals were paid on 7 to 11 day terms (payment due on the Friday of the following week), (ii) Generic Pharmaceuticals were paid on 35 to 39 day terms (payment due the following sixth Friday), and (iii) certain extended dating products received extended payment terms on a product by product basis, typically in the range of an additional 30 to 45 days, but still paid on the applicable Friday due date.  With the exception of the negotiated and agreed-upon Contemporaneous Payment Terms implemented during the final week prior to the Petition Date, the pre-preference period credit terms for the three product types did not change during the Preference Period.  Moreover, during the Preference Period the Debtors continued to follow the standard automated ordering and payment procedures discussed above.  (Towsley Declaration, ¶ 9).

McKesson analyzed the Debtors' payment history for one year prior to the commencement of the Debtors' bankruptcy cases.  During this one-year prepetition period, the transactions between the Debtors and McKesson resulted in 204,778 individual invoices for a

---

[11] McKesson prepared an Excel spreadsheet summarizing over 200,000 transactions that occurred during the one-year period leading up to the Petition Date (the "Transaction History Spreadsheet").  Federal Rule of Evidence 1006 permits "use [of] a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  Were it to be printed, the Transaction History Spreadsheet would be over 8,000 pages.  An electronic copy of the Transaction History Spreadsheet was provided to counsel for Plaintiff and will be provided to the Court in electronic format upon request.

total amount of $295,915,014.44.  For each of these invoices, McKesson analyzed the invoice amount, due date, payment date, form and amount of payment, and then calculated the number of days between the due date and payment date.  Despite the enormous number of transactions, the results of this analysis revealed rigid adherence to the agreed-upon credit terms and astonishing clockwork like consistency in payment practices.  **Every single invoice paid during the Preference Period was paid on its exact due date.**  (Iragavarapu Declaration, ¶ 10).

It is axiomatic that payment of an invoice on its precise due date according to longstanding credit terms constitutes a payment within the ordinary course of dealings.  *Miller v. Perini Corp.* (*In re A.J. Lane & Co.*), 164 B.R. 409, 414 (Bankr. D. Mass. 1994) ("Timely payments made in accordance with applicable payment terms are of course the quintessential examples of 'normal financial relations' devoid of 'unusual action' by either the debtor or the creditor.").  In such a situation, no unusual collection activities are taking place and no pressure is applied to compel payment of past due obligations; the debtor is simply paying invoices precisely on time.  This is the exact type of continuing credit transactions that the ordinary course of business defenses protects. *See Rave Comms. v. The Ink Spot* (*In re Rave Comms., Inc.*), 128 B.R. 369, 372 (Bankr. S.D.N.Y. 1991) ("Otherwise, trade creditors, such as Ink Spot, might cease ordinary trade with any customer who appeared to be experiencing financial difficulty, thus hastening its slide into bankruptcy."); *See also* S.REP. No. 989, 95th Cong., 2d Sess. 88 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5874); accord H.R.REP. No. 595, 95th Cong., 1st Sess. 373 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6329 ("The purpose of the exception is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy").

17

### 3.     McKesson undertook no unusual debt collection actions

McKesson did not undertake any debt collection actions.  Rather, as the transaction history indicates, McKesson continued to sell Pharmaceuticals and extend credit to the Debtors up to and even after the commencement of the bankruptcy cases.  Even when the parties agreed to the modified supply terms, that was for go-forward purchases.  McKesson did not retroactively change the old credit terms.

In response to discovery requests by Plaintiff, McKesson produced over 300 email communications.  Several of those emails relate to the payment made by the Debtors on May 22, 2015.  The emails, which are both internal and between certain employees of McKesson and the Debtors, discuss the fact that the Debtors did not initially make the May 22, 2015 payment.  McKesson anticipates that Plaintiff will contend these communications evidence debt collection activities outside of the ordinary course of business.  To the contrary, these limited May 22, 2015 communications only demonstrate that McKesson was concerned about the Debtors potentially missing a required payment on that specific day.  Understandably, McKesson contacted the Debtors to inquire about the status of the regularly scheduled Friday payment and whether the Debtors intended to continue adhering to the terms of the Supply Agreement.  Otherwise, McKesson would need to reevaluate making future shipments to the Debtors.  Such communications between a supplier and its customer are not unusual debt collection activities, but rather a common sense business practice.  Later that same day, the Debtors timely made the May 22nd payment and thereafter continued to timely pay invoices on each Friday due date throughout the Preference Period.  (Towsley Declaration, ¶ 32).  And McKesson continued to provide new product to the Debtors throughout the Preference Period, exactly what the ordinary course of business defense is intended to encourage.

In one of the internal McKesson emails written by Jennifer Towsley (McKesson's Vice President of Credit and Financial Services), Ms. Towsley refers to several incidences of missed payments.   To address any possible confusion, that statement refers to several late payments made to one or both of the McKesson corporate affiliates that had entirely separate supply and logistical agreements with the Debtors.    (Towsley Declaration, ¶ 33).    Those entities are defendants in two separate and relatively small preference lawsuits.[12]   Again, as discussed herein, during the Preference Period, the Debtors paid every McKesson Corporation invoice on its exact Friday due date.  **No Friday payments were ever missed or late, even by one day.**

**B.      Certain of the challenged transactions between the Debtors and McKesson are contemporaneous and protected by Section 547(c)(1)**

Two subsets of the Transfers were contemporaneous exchanges for new value.  The two subsets are i) the four Contemporaneous Daily Payments made during the week preceding the Petition Date and ii) the regular Friday payments on Branded Pharmaceuticals (which were paid between 7 and 11 days of delivery).   Because the regular Friday payments on Branded Pharmaceuticals are protected from recovery under both the ordinary course of business defense and the subsequent extension of new value defense, this Motion only addresses the contemporaneous exchange defense as it pertains to the four Contemporaneous Daily Payments made during the week immediately preceding the Petition Date.[13]

Each of those four payments by the Debtors to McKesson and each corresponding transfer of Pharmaceuticals by McKesson to the Debtors was a contemporaneous exchange of new value satisfying the requirements of section 547(c)(1).  Section 547(c)(1) provides:

---

[12] Those cases are *The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of the Debtors Great Atlantic & Pacific Tea Company, Inc. v. McKesson Pharmacy Systems, LLC*, Adv. Proc. No. 17-08265-rdd and *The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of the Debtors Great Atlantic & Pacific Tea Company, Inc. v. McKesson Specialty Distribution  LLC*, Adv. Proc. No. 17-08266-rdd.

[13] McKesson reserves the right to demonstrate that the payment of Branded Pharmaceuticals is protected by the contemporaneous exchange defense should further litigation be necessary.

    (c)     The trustee may not avoid under this section a transfer—

        (1)     to the extent such transfer was—

            (A)    intended by the Debtors and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

            (B)    in fact a substantially contemporaneous exchange[.]

11 U.S.C. § 547(c)(1). "New value" is defined to be money or money's worth in goods, services, or new credit . . . ." 11 U.S.C. § 547(a)(2).

Between July 13, 2015 and July 16, 2015, the Debtors purchased, and McKesson delivered, roughly $4.25 million in Pharmaceuticals, satisfying this requirement. As is McKesson's standard business practice, all of the payments at issue in this lawsuit, including the four Contemporaneous Daily Payments, were applied to specifically identified invoices and not any other debts. (Towsley Declaration, ¶ 29). Consequently, there is no question that the exchanges were for new value, and not an antecedent debt, satisfying this portion of the inquiry.

In addition, there is no objective dispute that McKesson and the Debtors also intended the four exchanges to be contemporaneous as demonstrated by the actions of the parties with respect to each transfer. The parties' intention for the exchanges to be substantially contemporaneous can be ascertained from the Supply Agreement and the new credit terms required by McKesson and agreed to by the Debtors. The correspondences from McKesson to the Debtors outlining the new credit terms make clear that if the Debtors wished to continue purchasing Pharmaceuticals from McKesson, they would need to pay the next business day after receipt of the goods. As in any free market, the Debtors could have sought different supply and credit terms with another pharmaceutical wholesaler. There is no question that the Debtors agreed to the terms required by McKesson and strictly abided by those substantially contemporaneous terms during the last week of the Preference Period, as well as during the bankruptcy case.

Finally, the exchanges were in fact substantially contemporaneous. The practical realities of continuous daily orders of Pharmaceuticals and deliveries to the Debtors' 178 pharmacies prohibits cash-on-delivery or other simultaneous payment mechanisms as a practical impossibility. For instance, delivery drivers, who are delivering Pharmaceuticals to the Debtors' 178 pharmacies on a daily basis, would not be able collect multiple cash payments for hundreds of thousands of dollars of delivered Pharmaceuticals. The two-day sales outstanding terms allowed the delivered Pharmaceuticals to be inspected, accepted and registered by in-pharmacy employees at each of the 178 locations on a daily basis, with payment the next day. (Towsley Declaration, ¶ 27).

Case law supports the conclusion that goods sold on one or two days sales outstanding terms are contemporaneous exchanges of new value. In *Peltz v. Hartford Life Ins. Co.* (*In re Bridge Information Sys., Inc.*), 321 B.R. 247, 256 (Bankr. E.D. Mo. 2005), on summary judgment, a bankruptcy court found that the parties intended a contemporaneous exchange for new value when they agreed that the debtor would pay the creditor within one business day following its receipt of an invoice for services provided the previous week. Likewise, in *Anderson-Smith & Assocs. v. Xyplex* (*In re Anderson-Smith & Assoc., Inc.*), 188 B.R. 679, 689 (Bankr. N.D. Ala. 1995), the bankruptcy court found the parties intended a contemporaneous exchange for new value when a creditor refused to deliver goods without the debtor's assurance of payment. McKesson was unable to locate a single reported decision which holds that next day payment for goods or services is not a contemporaneous exchange under section 547(c)(1).

McKesson anticipates Plaintiff will argue that McKesson has not established the Debtors' intent that the four at-issue payments were "intended to be contemporaneous exchanges" for the

Pharmaceuticals delivered the previous day. The *Bridge Information* court summarily rejected this exact argument:

> Plan Administrator counters by arguing [against contemporaneous exchange] that because he has not stipulated to Bridge's intent in making the Wire Transfers, there are material facts in dispute on this issue.  The objective circumstances surrounding the parties' relationship, however, such as any written agreement between the parties and the parties' past course of dealing, is evidence of whether the parties intended for the challenged transfer to be an contemporaneous exchange for new value under 11 U.S.C. § 547(c)(1). *Tyler v. Swiss Am. Sec.* (*In re Lewellyn & Co., Inc.*), 11929 F.2d 424, 427 (8th Cir. 1991).
>
> Here, the summary judgment record establishes that the parties' agreement required Bridge to remit the Wire Transfers to Hartford the day after receiving the Claims Summary.  Also the evidence in the summary judgment record indicates that Bridge invariably remitted the Wire Transfers to Hartford in accordance with the terms of the agreement.  And Plan Administrator's naked assertion that he cannot stipulate to Bridge's intent in remitting the Wire Transfers is not sufficient to create a genuine issue of material fact for trial under Fed. R. Civ. P. 56(e).  Accordingly, the Court finds that there are no material facts in dispute for trial on the issue of whether the parties intended for the Wire Transfers to be a contemporaneous exchange for new value.

321 B.R. at 256.  Like the *Bridge Information* court, this Court should reject any similar argument by Plaintiff regarding a lack of proof of intent by the Debtors when remitting the four Contemporaneous Daily Payments.

McKesson recognizes that certain courts also examine the actions of the parties surrounding each transfer when determining whether the exchange was in fact contemporaneous. But, those courts faced situations were payment was due a short time (typically between one week and one month) after delivery of the goods and services—as opposed to next day payment. As a threshold matter, there is no hard rule that a "substantially contemporaneous exchange" need be immediately simultaneous. *Official Committee of Unsecured Creditors of 360networks*

(USA) Inc. v. U.S. Relocation Servs., Inc. (*In re 360networks (USA) Inc.*), 338 B.R. 194, 209
(Bankr. S.D.N.Y. 2005) (discussing "that there is no requirement that a 'contemporaneous
exchange' be an instantaneous exchange.").   Nevertheless, as is the situation between the
Debtors and McKesson during the week before bankruptcy, payment for goods one day after
delivery must be viewed for what it is:  immediate and contemporaneous.

Even if the four at-issues payments are not considered immediate and contemporaneous,
they still were substantially contemporaneous. That is all that is required in order for McKesson
to prevail.  In *Lindquist v. Dorholt* (*In re Dorholt, Inc.*), 224 F.3d 871 (8th Cir. 2000), the Eighth
Circuit Court of Appeals analyzed the legislative history of section 547(c)(1) and concluded "the
plain language of the statute is at odds with the trustee's bright-line test.  The statute uses a more
elastic term, substantially contemporaneous. . . . Congress knew how to adopt a specific time
limit; it did so in the purchase money security interest exception, § 547(c)(3).  It chose a less
rigid standard for § 547(c)(1), no doubt because that provision governs a wider variety of loans
and credit transactions. We must construe the statute accordingly."  *Id*. at 874.

The language of the statute has permitted this Court to find a one week difference
between an exchange and payment to be substantially contemporaneous.  In *In re Coco*, 67 B.R.
365, 371 (Bankr. S.D.N.Y. 1986) (one week between exchange and payment substantially
contemporaneous, but 34 and 64 days are not).  Other courts have echoed this Court's flexibility
and found a wide range of time periods to be "substantially contemporaneous".  *See Jones Truck
Lines v. Central States, Southeast & Southwest Areas Pension Fund* (*In re Jones Truck Lines*),
130 F.3d 323, 327 (8th Cir. 1997) (weekly payments found to be contemporaneous); *In re
Lewellyn & Co., Inc*., 929 F.2d 424, 427 (8th Cir. 1991) (seven day settlement on stock
purchases held to be substantially contemporaneous); *Dye v. Rivera* (*In re Marino*), 193 B.R.

907, 916 (9th Cir. BAP 1996) ("[we] affirm the court's determination that the 14-day delay was substantially contemporaneous in fact"); *Pine Top Ins. Co. v. Bank of America Nat. Trust & Sav. Ass'n*, 969 F.2d 321, 328 (7th Cir. 1992) ("We conclude that the two- to three-week delay here did not defeat the substantially contemporaneous nature of this exchange.").

In this case, the four Contemporaneous Daily Payments made between July 14 and 17 were tendered pursuant to the two-day sales outstanding terms agreed to by the Debtors and McKesson and were timely payments for the Pharmaceuticals delivered the previous day. As shown by the following chart, each payment was applied to invoices for goods received the previous day:

| Date of Invoices | Date of Payment | Wire Number | Payment Amount |
|---|---|---|---|
| 7/13/2015 | 7/14/2015 | 4043222 | 1,436,808.53 |
| 7/14/2015 | 7/15/2015 | 4043267 | 1,098,919.73 |
| 7/15/2015 | 7/16/2015 | 4043333 | 883,260.71 |
| 7/16/2015 | 7/17/2015 | 4043354 | 830,735.91 |
|  |  | Total: | $4,249,724.88 |

(Iragavarapu Declaration, ¶ 11).

As memorialized in the July 2 and 15 letters, the parties intended these transactions to be contemporaneous. If the Debtors disliked the go-forward credit terms offered by McKesson, the Debtors could have sourced Pharmaceuticals from other wholesalers or from manufacturers directly. Instead, the Debtors ordered new product from McKesson pursuant to the new terms and paid exactly as required. Accordingly, McKesson has a dispositive defense under section 547(c)(1) with respect to the four Contemporaneous Daily Payments.

### C.    The Transfers Are Shielded from Avoidance By the New Value Defense

While the contemporaneous exchange and ordinary course of business defenses of section 547(c)(1) and (2) provide a complete defense, the Transfers are also protected by the new value defense of section 547(c)(4).  A trustee may not avoid a transfer

> (4)    to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor–
>
> > (A)    not secured by an otherwise unavoidable security interest; and
> >
> > (B)    on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

11 U.S.C. § 547(c)(4).

New value does not need to remain unpaid and may be deducted from all preceding transfers.  *Official Comm. of Unsecured Creditors of Maxwell Newspapers v. Travelers Ins. Indem. Co.* (*In re Maxwell Newspapers, Inc.*), 192 B.R. 633, 639 (Bankr. S.D.N.Y. 1996); *In re Baumgold Bros.*, Inc., 103 B.R. 436, 439-40 (Bankr. S.D.N.Y. 1989) ("If a creditor were not allowed to set off subsequent new value against a net balance of all prior preferences, there would be little incentive for him to continue shipping any new value to the debtor in excess of the immediately preceding payment, regardless of the amount of prior payments by the debtor."). After each of the payments received during the Preference Period, McKesson delivered new product to the Debtors.  Consequently, section 547(c)(4) protects the Transfers from avoidance because McKesson subsequently advanced "new value" to the Debtors.

The daily delivery of Pharmaceuticals during the week following each regular Friday payment provides new value to shield the avoidance of the preceding payments.  However, given that all of the Transfers during the Preference Period other than the four Contemporaneous Daily Payments are protected by the subjective prong of the ordinary course of business defense, this brief will not calculate the application of new value for all of the approximately 49,000

transactions that occurred during the Preference Period. McKesson reserves its rights to demonstrate the calculation of new value to protect those transactions, but for purposes of this motion, McKesson will solely focus on the application of new value to the four Contemporaneous Daily Payments received in the final week before the bankruptcy filings.

As discussed herein, during the week before the Petition Date, McKesson was paid approximately $4.25 million in four daily payments pursuant to new Contemporaneous Payment Terms accepted by the Debtors. After each payment, McKesson continued to deliver new value to the Debtors in the form of new Pharmaceuticals deliveries. The following chart calculates the application of the new value defense to the Contemporaneous Daily Payments:

| | | |
|---|---|---|
| July 14, 2015 Payment | $1,436,808.53 | |
| July 14, 2015 Delivered Product | -$1,108,103.36 | |
| Potential Avoidable Balance | | $328,705.17 |
| July 15, 2015 Payment | $1,098,919.73 | |
| July 15, 2015 Delivered Product | -$891,779.14 | |
| Potential Avoidable Balance | | $535,845.76 |
| July 16, 2015 Payment | $883,260.71 | |
| July 16, 2015 Delivered Product | -$842,705.17 | |
| Potential Avoidable Balance | | $576,401.30 |
| July 17, 2015 Payment | $830,735.91 | |
| July 17, 2015 Delivered Product | -$1,811,959.20 | |
| **Potential Avoidable Balance** | | **$0** |

(Iragavarapu Declaration, ¶¶ 10-12).

As the above chart demonstrates, McKesson is entitled to a complete new value offset against the Contemporaneous Daily Payments received during the final week before the Petition Date. Accordingly, even if the Court finds that the contemporaneous exchange defense does not apply, those final four payments are still insulated from avoidance under section 547(c).

### D.    Plaintiff Cannot Establish Its Prima Facie Case

In addition to providing a new value defense, a portion of the goods delivered to the Debtors during the Preference Period would have been subject to McKesson's right to reclaim such goods had payment not been received prior to the Petition Date. Bankruptcy Code section 547(c)(5) only permits Plaintiff to avoid a transfer that enables McKesson to receive more than it would have in a hypothetical chapter 7 bankruptcy case. Under such a hypothetical scenario, had the payments not been made, McKesson would have been entitled to exercise its reclamation rights pursuant to Bankruptcy Code section 546(c) for any Pharmaceuticals delivered within 45 days of the Petition Date. As a result, Plaintiff cannot establish its prima facie case for avoidance of any payments applied to invoices for goods received by the Debtors during that 45 day period.

### E.    All of McKesson's Defenses Run Concurrently

All of the Bankruptcy Code section "547(c) defenses may be used cumulatively." *Creditors Comm. of Sparrer Sausage Company, Inc. v. Jason's Foods, Inc.*, 826 F.3d at 397 (layering new value and ordinary course of business to create a complete defense); *In re Lan Yik Foods Corp.*, 185 B.R. at 116 (applying new value to the majority of alleged preferential transfers, and the ordinary course of business to the remainder); *Tennessee Valley Steel Corp. v. Rockwood Water, Wastewater & Natural Gas Sys.* (*In re Tennessee Valley Steel Corp.*), 201 B.R. at 939 (applying a combination of new value and ordinary course of business as a dispositive

defense).  In the present case, McKesson holds a contemporaneous exchange defense pursuant to section 547(c)(1), an ordinary course of business defense under section 547(c)(2) and a new value defense under section 547(c)(4).  To the extent the Court disagrees about the applicability of any one defense, the overlapping armor of all of McKesson's defenses still shields the Transfers from avoidance.

### F.    No Net Benefit to the Estate

Finally, even if the Court finds the four Contemporaneous Daily Payments are not entitled to protection under section 547(c)(1) and Plaintiff prevails in avoiding them, McKesson's Administrative Claim would simply increase by the value of those avoided transfers.  All four of the Contemporaneous Daily Payments were payments for Pharmaceuticals delivered within the 20 days preceding the Petition Date.  If those payments (or any other payments for goods delivered in the 20 days leading up to the bankruptcy) are avoided, McKesson's claim for the unpaid invoices would be added to McKesson's $2.6 million administrative claim under 11 U.S.C. § 503(b)(9) and afforded administrative priority and treatment in this Chapter 11 case.

There is no net benefit to a Chapter 11 estate in avoiding payments on account of goods sold during the 20-day period covered by 11 U.S.C. § 503(b)(9).  *See Official Comm. of Unsecured Creditors of Quantum Foods, LLC v. Tyson Foods, Inc.* (*In re Quantum Foods, LLC*), 554 B.R. 729, 733 (Bankr. D. Del. 2016) (holding that a creditor's allowed administrative expense claim may be set off against the creditor's liability for a preferential transfer).  For this reason, preference claims for payments on account of goods delivered during the § 503(b)(9) period generally are not asserted.  If the four Contemporaneous Daily Payments are not insulated from avoidance under the contemporaneous exchange of new value defense, the subsequent extension of new credit defense or any other applicable defense, McKesson is entitled to (i)

28

increase its § 503(b)(9) claim by the value of the goods delivered from July 13 through July 16, and (ii) assert its setoff rights for the increased amount of the § 503(b)(9) claim against any preference recovery for the four Contemporaneous Daily Payments.  This is yet another reason why summary judgment should be granted in favor of McKesson.

### G.      McKesson is Entitled to Summary Judgment on Plaintiff's Second Claim for Relief - Recovery of Property

Since there are no avoidable transfers under section 547, there can be no recovery under section 550. Section 550 complements the Bankruptcy Code's set of avoidance powers by establishing when and from whom transfers can be recovered.  As a prerequisite, there must be an avoided transfer under sections 544, 545, 547, 548, 549, 553(b), or 724(a). 11 U.S.C. § 550(a).  As shown above, McKesson has dispositive defenses with respect to each of Plaintiff's claims under section 547 for each of the transfers. Consequently, Plaintiff's second cause of action also fails because none of the Transfers are avoidable.  Accordingly, McKesson is entitled to summary judgment in its favor with respect to Plaintiff's claim for recovery of avoided transfers under Bankruptcy Code section 550.

/ / /

/ / /

/ / /

## V.      CONCLUSION

For the foregoing reasons, McKesson respectfully requests (i) that the Motion be granted,

(ii) that the Court enter summary judgment in its favor with respect to the First and Second

Claims asserted in the Complaint, (iii) that the adversary proceeding be dismissed with prejudice,

and (iv) that the court grant such other relief as is just and proper.


DATED:        May 1, 2019

KLESTADT WINDERS JURELLER
SOUTHARD & STEVENS LLP


By:  /s/ Tracy L. Klestadt
Tracy L. Klestadt, Esq.
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone:  (212) 972-3000
TKlestadt@Klestadt.com

and

BUCHALTER, A Professional Corporation

Jeffrey K. Garfinkle, Esq.
(Cal Bar. No. 153496; admitted *pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
jgarfinkle@buchalter.com

Attorneys for Defendant, MCKESSON
CORPORATION