RICH MICHAELSON MAGALIFF, LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
646.453.7851
Robert N. Michaelson

*Attorneys for Plaintiff The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,*

Return Date and Time:
September 16, 2019 at 10:00 AM
Objection Deadline:
September 9, 2019 at 5:00 PM

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

| | |
|---|---|
| In re: | |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | Chapter 11 |
| | Case No. 15-23007 (RDD) |
| Debtors. | |

----------------------------------------------------------------x

| | |
|---|---|
| The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | |
| Plaintiff, | Adv. Proc. No. 17-08264 (RDD) |
| v. | |
| McKESSON CORPORATION, | |
| Defendant. | |

----------------------------------------------------------------x

**THE COMMITTEE'S MEMORANDUM OF LAW OPPOSING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT UNDER FED. R. BANKR. P. 7056**

Plaintiff, The Official Committee of Unsecured Creditors ("Committee") on behalf of the bankruptcy estate of The Great Atlantic & Pacific Tea Company, Inc., *et al*, ("A&P"), responds to the motion (the "Motion") of McKesson Corporation ("McKesson") for summary judgment pursuant Bankruptcy Rule 7056 dated May 1, 2019, as follows:

**Preliminary Statement**

The Committee submits this Memorandum, along with its Response (the "Response") to McKesson Corporation's Local Rule 7056-1(b) Statement of Alleged Undisputed Facts in Support of Motion for Summary Judgment, the Declaration of Tim Carnahan (the "Carnahan Declaration"), dated September 5, 2019, and the Declaration of Dawn DeVito (the "DeVito Declaration"),[1] dated September 9, 2019, in support of its opposition to McKesson's Motion.

For the reasons discussed below, McKesson has failed to meet its burden in moving for summary judgment and has failed to establish with undisputed material facts its entitlement to summary judgment as a matter of law. Therefore, McKesson's Motion must be denied.

**Summary Judgment Standard**

Under Fed. R. Bankr.P. 7056, which incorporates Fed.R.Civ.P. 56, summary judgment should be granted only when the movant establishes that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See*, Fed. R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The movant bears the initial burden of satisfying the material elements of its claim or defense. *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Upon such a showing, the non-moving party must provide evidence of a genuine issue of material fact to defeat the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If there is any evidence in the record from any source from which a reasonable inference in the [non-moving party's] favor may be drawn, the moving party

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to those terms in the DeVito Declaration.

simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir.2007) (alteration in original).

As discussed below, McKesson failed to show the material elements of its defenses and has only shown issues that preclude to summary judgment. Accordingly, the Court must deny McKesson's Motion.

The following is a summary of McKesson's position and the Committee's response:

| **McKesson's Motion** | **The Committee's Response** |
|---|---|
| A&P paid McKesson in the ordinary course of business of the parties under the Supply Agreement. | McKesson's extreme pressure on A&P (*e.g.* threatening to stop delivery of essential goods) was not "ordinary course" within the meaning of Code § 547(c)(2).. |
| A&P paid McKesson on substantially contemporaneous terms. | A&P never intended to pay McKesson contemporaneously; McKesson unilaterally imposed reduced credit terms on A&P, knowing that A&P needed essential product. Accordingly, McKesson has not a defense under Code § 547(c)(1).. |
| McKesson provided A&P with subsequent new value after receiving preferential payments. | Any new value provided by McKesson preceded A&P's preferential payments to McKesson and, therefore, does qualify as a defense under Code § 547(c)(4).. |
| McKesson has a Code § 503(b)(9) administrative claim that affects its preference exposure. | McKesson may not, as a matter of law, evade preference liability with a virtually worthless Code § 503(b)(9) administrative claim. |
| McKesson's unexercised Code § 546(c) reclamation rights defeat the Committee's *prima facie* case with respect to transfer made within 45 days of the filing of the A&P chapter 11 cases | This argument fails because (i) McKesson waived its rights under Code § 546(c) when it failed to raise them in a timely manner and (ii) McKesson offers no evidence showing that it would have received any benefit from the exercise of those rights. |

**Response to McKesson's Local Rule 7056-1(b) Statement of
<u>Alleged Undisputed Facts</u>**

McKesson admittedly sold Merchandise[2] to A&P. A&P paid McKesson in the 90-day period (the "<u>Preference Period</u>") immediately preceding the filing of A&P's chapter 11 petitions. Those payments are avoidable under Bankruptcy Code ("<u>Code</u>") § 547 and recoverable under Code § 550.

Numerous disputed material facts appear in McKesson's Motion. The accompanying Response, Carnahan Declaration, and DeVito Declaration contain a complete and accurate statement of facts.

<u>Argument</u>

**I.    McKESSON HAS NOT DEMONSTRATED THAT SUMMARY JUDGMENT SHOULD BE GRANTED IN ITS FAVOR UNDER THE ORDINARY COURSE <u>OF BUSINESS DEFENSE</u>**

Under Code § 547(c)(2), a transfer may not be avoided

> **(2)** to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>
> **(A)** made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
> **(B)** made according to ordinary business terms;….

Code § 547(c)(2).

Because McKesson's Motion only focuses on the so-called subjective prong of the ordinary course defense, Code § 547(c)(2)(A), and not the objective prong, the Committee only addresses herein McKesson's arguments as they pertain to the subjective test of the ordinary

---

[2] Term defined at paragraph 1(A) of the Supply Agreement, a copy of which can be found annexed as Exhibit "H" to the DeVito Declaration and filed under seal.

course defense.³ McKesson has only shown material issues of fact that mandate denial of its motion for summary judgment.

### A. *McKesson concedes that the One Day Payments were made outside the ordinary course of business under the subjective prong of the ordinary course defense.*

McKesson admits that, during the Preference Period, it received from A&P One Day Payments outside the parties' ordinary course of business:

| **Date of Obligation** | **Date of Payment** | **Amount** |
|---|---|---|
| 7/13/2015 | 7/14/2015 | $1,436,808.53 |
| 7/14/2015 | 7/15/2015 | $1,098,919.73 |
| 7/15/2015 | 7/16/2015 | $ 883,260.71 |
| 7/16/2015 | 7/17/17/2015 | $ 830,735.91 |
| **Total:** | | $4,249,724.88 |

*See* page 14 of *McKesson Corporations Motion for Summary Judgment and Memorandum of Facts and Law in Support Thereof* ("McKesson Memorandum"); *see also* DeVito Declaration at ¶16.

### B. *In response to undue coercion from McKesson, A&P made payments to McKesson during the Preference Period that were outside the ordinary course of business between the parties.*

In response to McKesson's coercion during the Preference Period, A&P made many payments to McKesson that were outside the ordinary course of business between the parties. Thus, these payments are not protected by the subjective prong of the ordinary course of business defense of Code § 547(c)(2)(A).

---

³ McKesson states at page 14 of its Memorandum that it reserves its right to assert that the alleged preferential transfers satisfy the objective prong of the ordinary course defense at a later time in the event that further litigation is required. Accordingly, the Committee reserves its right to respond to any argument or assertion by McKesson that the alleged preferential transfers satisfy the objective test requirement of Code § 547(c)(2)(B).

In determining whether a payment is made in the ordinary course of business under the subjective prong, courts examine "(i) the prior course of dealing between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment." *Buchwald Capital Advisors LLC v. Metl-Span I., Ltd. (In re Pameco Corp.)*, 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006); *see also Official Comm. of Unsecured Creditors of 360networks (USA) Inc.*, 338 B.R. 194, 210 (Bankr. S.D.N.Y. 2005). Courts will examine the time period "well before" the preference period (*i.e.* the "Pre-Preference Period") to establish the baseline for the course of conduct between the parties. *In re Quebecor World (USA), Inc.*, 518 B.R. 757, 762 (Bankr. S.D.N.Y. 2014). Then, courts will look at the time, amount, and manner in which the payment occurred. *In re Color Tile, Inc. (Color Tile v. Mfrs. Consolidation)*, 2000 Bankr. LEXIS 1048, p. 5 (Bankr. D. Del. 2000). In looking at how a debtor paid the creditor, courts recognize that a creditor can exploit a debtor's financial condition through pressuring a debtor for payment. *FBI Wind Down Inc. Liquidating Trust v. Innovatice Delivery Sys. (In re FBI Wind Down, Inc.)* 2018 Bankr. LEXIS 430, 435 (Bankr. Del. 2018) (such conduct includes "unacceptable debtor favoritism, as well as manifest selective preference period payments to designated creditors by troubled debtor"); *In re CM Holdings, Inc.*, 264 BR 141, 154 (Bankr. Del. 2000). Collection efforts by a creditor during the preference period will therefore remove a payment from the scope of the ordinary course of business defense. *See Gold Force, Int'l Ltd. v. Official Committee of Unsecured Creditors of Cyberrebate.co., Inc.*, 2004 WL 287144 at *4 (E.D.N.Y.) (affirming bankruptcy court ruling that creditor had engaged in "unusual" collection practices in context of parties prior dealings).

Starting May 22, 2015, to ensure that A&P prioritized its payments to McKesson over other creditors, McKesson commenced a campaign coercing A&P to make payments to it promptly by threatening A&P with non-delivery of Merchandise.

For example, on Friday, May 22, 2015, A&P initiated two payments to McKesson on May 22, 2015, by Automated Clearing House ("ACH") so that McKesson would receive funds no later than Tuesday, May 26, 2015. *See* Carnahan Declaration at ¶13. Despite assurances from A&P's Chief Financial Officer that the ACH payments were forthcoming, and despite remedies contemplated in the Supply Agreement for late payments, McKesson chose to threaten A&P with non-delivery of Merchandise if a wire payment was not received by McKesson that day, Friday, May 22, 2015. *See* Carnahan Declaration at ¶¶18-25; Devito Declaration at Exhibit "H", the Supply Agreement at Section 4(E). In response, A&P was forced to cancel these ACH payments and immediately make a wire payment that day. *See* Carnahan Declaration at ¶23. If A&P did not immediately wire the payment for receipt by McKesson on Friday, May 22, 2015, McKesson would have stopped shipment of Merchandise to A&P's pharmacies. See Carnahan Declaration at ¶¶15, 19-22.

McKesson's Towsley concedes that, on May 22, 2015, in order to ensure that McKesson received its payment from A&P on that day and to ensure A&P prioritized its payment to McKesson above other creditors, she put additional pressure on A&P by threatening it with non-delivery of Merchandise. In an email, a copy of which is annexed to the Declaration of Jenifer Towsley in Support of McKesson Corporation's Motion for Summary Judgment (the "Towsley Declaration"), she tells her McKesson colleagues:

> [a]fter some back and forth with Tim Callahan (sic), the company's CFO, **with the added pressure of a potential shipment hold**, the company has agreed to wire funds today….Cash is definitely tight on their end and they

are pushing all of their vendors. ***I want to make sure they prioritize our payment***…."

*See* annexed as **Exhibit "4"** to Towsley Declaration, a copy of an email from Jenifer Towsley, VP Credit and Financial Services, U.S. Pharmaceutical, McKesson to Britt Vitalone, McKesson; Michael J. Gallagher, McKesson; and Meg Mitchell, Director, Strategic Solutions, McKesson Retail National Accounts, McKesson (May 22, 2015 3:54:21 P.M.)(emphasis added).

McKesson, knowing that money was tight on A&P's end, admittedly used extraordinary practices (*i.e.* threatening non-delivery of essential Merchandise) to coerce A&P into prioritizing its payment to McKesson over that of other creditors.

In its Motion, McKesson mischaracterizes the May 22, 2015 e-mails as a mere inquiry about the status of the regularly scheduled payment. *See* Towsley Declaration at ¶ 32 and McKesson Memorandum at page 18. The court must reject this conclusory and self-serving mischaracterization. *See Torrech-Hernandez v. General Electric Co.*, 519 F.3d 41, 48 n.1 (1st Cir. 2008) (on summary judgment, a court is "not obliged to take at face value [a party's] subjective beliefs when they are not factually based and merely constitute conclusory, self-serving statements.").

In contrast, during the pre-Preference Period, on at least two separate occasions, when McKesson thought that A&P was going to be late or A&P was late with a payment that was due, McKesson did not threaten A&P with non-delivery of product. *See* Carnahan Declaration at ¶¶ 24-25. In such prior instances, A&P either paid McKesson by wire so that the payment was not late, or if payment was late, A&P may have been subjected to additional charges as contemplated under Section 4E of the Supply Agreement. *See id*; DeVito Declaration at Exhibit "H", the Supply Agreement at Section 4(E).

The May 22, 2015 incident was not an isolated incident. McKesson's threats of non-delivery of Merchandise persisted throughout the remainder of the Preference Period. For

{00025485v1}    8

instance, on a June 10, 2015 telephone conference call, McKesson representatives told A&P that if that week's Friday payment was not timely made, McKesson would not ship Merchandise that coming Monday.  *See* Carnahan Declaration at ¶¶ 26-27, 29.  Then, on July 1, 2015 and again on July 9, 2015, McKesson's Towsley and Mitchell, senior McKesson representatives, contacted A&P a day or more before payment was due to see if payment was going to be forthcoming that particular Friday.  *See* Carnahan Declaration at ¶¶ 30, 32-35, 37.  A&P clearly understood from these communications that if it did not make prompt payment to McKesson by a payment due date, it was not going to get its essential Merchandise shipments for its pharmacies and for its customers.  *See* Carnahan Declaration at ¶ 38.

  A&P treated McKesson's threats of non-delivery very seriously.  *See* Carnahan Declaration at ¶21.  Being that McKesson was A&P's primary pharmaceutical supplier, and that A&P was trying preserve the value of its business and continue to satisfy customer needs, A&P could not risk non-delivery of essential Merchandise for its customers and for the business that it was trying to preserve.  *See* Carnahan Declaration at ¶¶ 22, 39.  Thus, in response to these mounting threats from McKesson, A&P was forced to comply with McKesson's demands in order to ensure that Merchandise continued to be delivered to its pharmacies.  *See* Carnahan Declaration at ¶ 40.  McKesson's pressure tactics forced A&P to prioritize payments to McKesson over other creditors.  *See id.*  McKesson's coercion during the Preference Period removed A&P's payments from the scope of the ordinary course of business defense.

  Given McKesson's coercion and its change in the prior course of dealings between the parties, McKesson's ordinary course of business defense fails. A&P paid McKesson in response to McKesson's undue pressure.

## II. McKESSON HAS NO SUBSTANTIALLY CONTEMPORANEOUS EXCHANGE DEFENSE

Code § 547(c)(1) provides that a transfer cannot be avoided "to the extent that such transfer was – (A) *intended* by the debtor *and* the creditor to or for whose benefit such transfer as made to be contemporaneous exchange for new value given by the debtor; and (B) in fact a contemporaneous exchange." (emphasis added). Unless all elements of this affirmative defense are met, it fails. *In re 360Networks (USA) Inc.*, 338 B.R., 194, 204 (Bankr. S.D.N.Y. 2005); *In re Pameco*, 356 B.R. 327, 338 (Bankr. S.D.N.Y.) (each holding that the lack of mutual intent that a transfer be contemporaneous was fatal to the creditor's effort to use section 547(c)(1) as a defense). Here, despite McKesson's reliance on the substantially contemporaneous defense of Code § 547(c)(1) to insulate the One Day Payments[4] from avoidance, ample evidence shows that the parties never intended the One Day Payments to be a substantially contemporaneous exchange.[5]

Beyond McKesson's self-serving mischaracterizing of the One Day Payments as "Contemporaneous Daily Payments", including Towsley's unsupported representation that McKesson applied payments, including the four One Day Payments, to specifically identified

---

[4] One Day Payments refer to the same four payments that McKesson characterizes as "Contemporaneous Daily Payments". McKesson's mischaracterization of these four payments is conclusory and self-serving. *See Joyner* at 2007 U.S. Dist. LEXIS 7700, at *3 n.1.

[5] McKesson asserts that the contemporaneous exchange defense also applies to "the regular Friday payments on Branded (non-Generics) Pharmaceuticals (which were paid between 7 and 11 days of delivery)". Yet, it refrained from engaging in further discussion on this point in its Motion, and reserved the right to demonstrate that these payments are protected by the contemporaneous exchange defense should further litigation be needed. McKesson offers no support for this position because there is none. Nevertheless, the Committee reserves its right to respond to any argument or assertion by McKesson that these payments are protected by the contemporaneous exchange defense should further litigation be needed.

invoices and not to any other debts[6], McKesson has failed to show, with sufficient evidence that the alleged contemporaneous exchanges were for new value. *See* Towsley Declaration at ¶29.

Additionally, McKesson undermines its own contemporaneous exchange argument by arguing how each of the One Day Payments "was applied to invoices for goods received the previous day." *See* McKesson Memorandum at page 24. This is demonstrated at page 26 of the McKesson Memorandum. In discussing the new value defense, McKesson relies in part on a chart, that shows for example that on July 15, 2015, A&P allegedly received delivered product in the amount of $891,779.14 and A&P paid $1,098,919.73 for product that was delivered <u>the day prior</u> on July 14, 2015. *See also,* McKesson Memorandum at pages 24-26. So, aside from McKesson's self-serving description of events as "contemporaneous", McKesson still admits that each of the One Day Payments were for antecedent debts incurred by A&P for a shipment of Merchandise it received the day prior.

Additionally, McKesson has not shown that the parties intended a contemporaneous exchange with respect to these four One Day Payments. The presence of requisite intent is a question of fact. *See In re Lewellyn & Co., Inc.*, 929 F.2d. 427, 428 (8th Cir. 1991) ("[t]he existence of intent, contemporaneousness, and new value are questions of fact."). At the very least, as set forth in the Carnahan Declaration, questions exist of fact on this point.

McKesson unilaterally and drastically reduced payment terms from 41 and 6 day terms to 1 day terms, as of July 13, 2015. A one-day delay in payment, as seen here, is not a substantially contemporaneous exchange. *See e.g., National City Bank v. Hotchkiss*, 231 U.S. 50 (1913) (unsecured loan made at 10:00 a.m., but creditor demanded and obtained collateral at 2:00 p.m.

---

[6] McKesson has not provided any documentary evidence showing how it applied A&P payments to McKesson invoices. McKesson's Transaction History Spreadsheets generally show the amount of a particular invoice and acknowledgement that payment was received. But these Spreadsheets do not set forth the actual payment amount received from A&P or how McKesson applied A&P's payments against McKesson invoices.

of same day after learning of borrower's financial problems; held, transfer of collateral made for antecedent debt was preferential). Further, by drastically reducing payment terms, McKesson imposed new limits on A&P, but still continued to extend credit to A&P for its purchases. *See* Carnahan at ¶ 53; McKesson's Memorandum at pages 18, 20. Certainly, a one-day delay in payment when credit continues to be extended to the debtor is not a substantially contemporaneous exchange. In fact, McKesson discussed "credit terms" throughout both of its letters dated July 2, 2015 and July 15, 2015 that it drafted and sent to A&P advising of terms changes. *See* Carnahan Declaration at ¶¶44-45.

Moreover, A&P did not understand the terms change imposed by McKesson to mean that A&P's payment for Merchandise was to be contemporaneous with the delivery of Merchandise. *See* Carnahan Declaration at ¶54.

A&P was forced to acquiesce to McKesson's demand for a change in terms. *See* Carnahan Declaration at ¶¶52, 58 At the time these new terms were imposed, A&P wanted to renew its contract or extend its terms with McKesson, its primary pharmaceutical supplier, for the Supply Agreement was set to expire on August 31, 2015. *See* Carnahan Declaration at ¶57. Around the time of these imposed term changes, McKesson suggested that it would be unable to move forward with contract renewal discussions given the status of A&P's finances and McKesson's concerns. *See id.* All of this occurred at a time when A&P's ability to find an alternate primary pharmaceutical vendor would be difficult if not impossible. . *See id.* Thus, A&P had no choice but to accept McKesson's new, unilateral, compressed credit terms. *See* Carnahan Declaration at ¶¶52, 58.

Accordingly, McKesson's one-day payment credit scheme is not a substantially contemporaneous exchange as a matter of law. Also, both parties did not intend the One Day

Payments to be substantially contemporaneous with the delivery of Merchandise. All of this precludes McKesson's summary judgment motion.

McKesson's cases cited in support of its position are all distinguishable from the circumstances of this case. In *Peltz v. Hartford Life Ins. Co. (In re Bridge Information Sys., Inc.,* 321 B.R. 247 (Bankr. E.D. Mo. 2005), both parties intended the transfer to be treated as substantially contemporaneous. The same finding was made in *Anderson-Smith & Associates v. Xyplex (In re Anderson-Smith & Assoc. Inc.*) 188 B.R. 679 (Bankr. N.D. Ala. 1995). That critical factor is missing here.

The other cases cited by McKesson such as *Lindquist v. Dorholt, (In re Dorholt, Inc.),* 224 F.3d 871 (8th Cir. 2000); *Jones Truck Lines v. Central States, Southeast & Southwest Areas Pension Fund, (In re Jones Truck Lines),* 130 F.3d 323, 327 (8th Cir. 1997); *Dye v. Rivera (In re Marino),* 193 B.R. 907, 916 (9th Cir. BAP 1996); and *Pine Top Ins. Co. v. Bank of America Nat. Trust & Sav. Ass'n*, 969 F.2d 321, 328 (7th Cir. 1992)) are equally unpersuasive. These cases only address the issue of how long is too long for a transfer to be deemed substantially contemporaneous. Here, McKesson cannot even get past the mutual intent hurdle.

### III. McKESSON FAILED TO MEET ITS BURDEN IN ASSERTING ITS NEW VALUE DEFENSE

Code § 547(c)(4) states that a transfer may not be avoided

> **(4)** to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> **(A)** not secured by an otherwise unavoidable security interest; and
>
> **(B)** on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor….

Code § 547(c)(4).

McKesson may have provided A&P with some subsequent new value during the Preference Period, but McKesson's entire new value analysis is flawed. Significantly, McKesson's new value defense lacks support from the record before this Court.

McKesson's new value defense analysis with respect to the One Day Payments, such as the chart manufactured by McKesson at page 26 of the McKesson Memorandum, has a glaring problem. McKesson baldly assumes, without any supporting evidence, that A&P's One Day Payment on a particular day preceded any delivery of McKesson Merchandise that same day. This erroneous assumption runs throughout this entire chart and McKesson's analysis. This is critical omission since the new value defense, as plainly set forth in Code § 547, requires that new value be provided after an otherwise avoidable transfer.

To support of its flawed, analysis McKesson cites to paragraphs 10-12 of the *Declaration of Lalitha Iragavarapu in Support of McKesson Corporation's Motion for Summary Judgment* ("Iragavarapu Declaration"), but the Iragavarapu Declaration fails to show when deliveries of McKesson Merchandise were made in relation to McKesson's receipt of the One Day Payments. The *Declaration of Jenifer Towsley in Support of McKesson Corporation's Motion for Summary Judgment* (Towsley Declaration), Towsley states that "[g]enerally, McKesson would deliver Pharmaceuticals[7] to the Debtors' in-store pharmacies Monday through Friday, with deliveries typically arriving the morning of the next business day …." *See* Towsley Declaration at ¶16. Aside from this representation, McKesson produced no additional support for when McKesson actually delivered Merchandise to A&P on July 14, 2015 through July 17, 2015. Significantly, A&P's wire transaction documentation for July 14, 2015 through July 17, 2015 shows that A&P's wire payments were initiated generally in the afternoon with the earliest of these One

---

[7] "Pharmaceuticals" here apparently has the same meaning as Merchandise, as defined in the Supply Agreement.

Day Payments being initiated at 12:09 P.M. CT on July 14, 2015. *See* DeVito Declaration at ¶16. A&P's wire transaction reports and Towsley's Declaration about the morning deliveries of Merchandise together suggest that, on any given day between July 14, 2015 through July 17, 2015, at least some, if not all, of McKesson Merchandise deliveries preceded A&P's One Day Payment to McKesson on that particular day.

In order to assert that McKesson Merchandise was delivered after A&P made a One Day Payment to McKesson, thereby providing new value to the A&P, McKesson had to produce evidence of when it made its deliveries on July 14, 2015 through July 17, 2015 in relation to when the One Day Payments were received by McKesson. McKesson has provided this Court with no support, not even delivery records, showing when it received A&P's wire payments. Without this evidence, which is completely missing from its Motion papers, McKesson fails to show what new value it provided to A&P. At the very least, Towsley's own undisputed representation about the deliveries of Merchandise occurring in the morning, along with A&P's wire transaction confirmations raise material questions of fact about the timing of deliveries to A&P in relation to the timing of payments received by McKesson on July 14, 2015 through July 17, 2015. In particular, it calls into question what Merchandise was subsequently delivered to A&P after it made its One Day Payment of $830,735.91 to McKesson on Friday, July 17, 2015, a wire transaction that was initiated at 13:02 P.M. CT. *See* DeVito Declaration at ¶16.

Another glaring problem with McKesson's new value chart and analysis is its unsubstantiated representation that $1,811,959.20 of Merchandise was delivered to A&P on July 17, 2015. The Iragavarapu Declaration, which McKesson relies upon for the data contained in this chart, fails to show how McKesson determined that "Pharmaceuticals" in the amount of $1,811,959.20 were invoiced and delivered to A&P on July 17, 2015. A&P's records do not

reflect that it received McKesson Merchandise in the total amount of $1,811,959.20 on July 17, 2015. A&P received no Weekly or Daily Summary Invoice Report from McKesson showing the total amount of invoiced McKesson Merchandise to be $1,811,959.20, requiring payment on July 17, 2015. *See* DeVito Declaration at ¶40. At most, A&P's records reflect that it received a Daily Summary Invoice Report from McKesson, dated July 19, 2015, for $883,298.00 of Merchandise allegedly delivered on July 17, 2015. *See* DeVito Declaration at ¶48.

McKesson may have arrived at this $1,811,959.20 figure by adding $919,511.12, which is the total amount of a Generic Merchandise Weekly Summary Invoice Report for the week ending July 11, 2015, to $892,448.08, which is the total amount of McKesson Merchandise that McKesson alleges it invoiced A&P on July 17, 2015 under the "Branded Pref period" in McKesson's Transaction History Spreadsheets found annexed to McKesson's Motion.[8] *See* DeVito Declaration at ¶42. If this is how McKesson arrived at this figure of $1,811,959.20, then McKesson made an error in reaching this conclusion. According to A&P's records, including a McKesson email to A&P dated July 15, 2015, the $919,511.12 was for Generic Merchandise invoiced for the week ending July 11, 2015. *See* DeVito Declaration at ¶¶43-47. If invoices for Merchandise were issued by McKesson in an around the day the Merchandise was actually delivered, as indicated by the Towsley Declaration at paragraphs 14-16, then the Generics Merchandise invoiced during the week of July 5, 2015-July 11, 2015 should have been delivered during the week of July 5, 2015 through July 11, 2015, but not on July 17, 2015. *See* Towsley Declaration at paragraphs 14-16. Additionally, A&P has no record that $919,511.12 of Generic Merchandise was actually received by A&P on July 17, 2015. *See* DeVito Declaration at ¶44. Therefore, assuming McKesson incorporated this $919, 511.12 as Merchandise that was

---

[8] These spreadsheets were not filed with McKesson's Motion but electronic copies were provided to the Committee and the McKesson's Motion says that they will be provided to the Court in electronic form upon request.

delivered on July 17, 2015 in its new value analysis, then this is an error on the part of McKesson.[9]

To the extent that McKesson asserts that A&P received $892,448.08 of Merchandise on July 17, 2015, it may be that this alleged $892,448.08 is the $883,298.00 of Merchandise for which A&P received a Daily Summary Invoice Report dated July 19, 2015 from McKesson.[10] *See* DeVito Declaration at ¶¶48-49. However, without more information, like the complete Daily Summary Invoice Reports that McKesson provided A&P during the week of July 13, 2015 and a listing of each individual Generic invoice generated by McKesson (a listing which McKesson was able to provide for its Branded and Promotional Spreadsheets that are a part of its Transaction History Spreadsheets), this determination cannot be made. *See e.g.,* DeVito Declaration at ¶50. Again, for the new value analysis, a court would need to know when this Merchandise was actually delivered in relationship to the One Day Payment of $830,735.91 received by McKesson on Friday, July 17, 2015, a transaction that was initiated by A&P at 13:02 P.M. CT. *See* DeVito Declaration at ¶16.

Lastly, excluding the four One Day Payments during the Preference Period, A&P's payments to McKesson that took place at least on and after May 22, 2015 were transfers that fell outside the ordinary course of business for the reasons discussed. Therefore, the court should include these payments in any new value analysis.

---

[9] McKesson may claim that it relied upon the information contained in the "Generics-Pref" Spreadsheet of McKesson's Payment History Spreadsheets that $919,511.12 was delivered on July 17, 2015. As discussed in the DeVito Declaration, the "Generics-Pref" Spreadsheets contain inconsistencies, discrepancies, and deficiencies that call into question the method and manner in which information was gathered, prepared, and summarized by McKesson for this Spreadsheet. *See* DeVito Declaration at ¶¶30-38.

[10] The other alleged amounts of Merchandise that were delivered July 14 through July 16, 2015 are disputed by the Committee as well. But, on these dates, the amount of product McKesson delivered compared what McKesson invoiced for the delivery is somewhat comparable.

McKesson failed to meet its burden in moving for summary judgment on its new value defense. Speculation and conjecture do not suffice. Moreover, A&P paid McKesson it did not receive any subsequent new value from McKesson. Accordingly, McKesson's request for relief on this point should be denied.

### IV. McKESSON MAY NOT SET OFF ITS CLAIM UNDER CODE § 503(b)(9) AND AGAINST ANY PREFERENCE LIABILITY

Code § 503(b)(9) allows an administrative expense claim for the value of goods "received by the debtor within 20 days before the commencement of the case," provided those goods have been "sold to the debtor in the ordinary course of such debtor's business." McKesson, asserting an amended Code § 503(b)(9) claim totaling $1,748,115.92[11], maintains that it can employ the value of this amended Code § 503(b)(9) claim as a common law setoff against its net preference exposure under section 547 and also use those claims as a new value defense. The court rejected an essentially identical argument in *In re Circuit City Stores, Inc.* 515 B.R. 302 (Bankr. E.D. Va. 2014). In that case the court denied a summary judgment motion when a creditor attempted to use its section 503(b)(9) claim as a new value defense and have it paid. The court reasoned that to allow a creditor to use a section 503(b)(9) claim as new value defense and also have that claim paid as an administrative claim would result in an unjust double recovery for the creditor. The same reasoning was earlier used by the same court in *In re Circuit City Stores, Inc.*, (*Circuit City Stores, Inc. v. Mitsubishi*) 2010 WL 4956022 at *9 (Bankr. E.D. Va.) to deny a similar effort by a preference defendant to achieve a double recovery. The later

---

[11] McKesson suggests in its Motion that it may further amend its Code § 503(b)(9) claim by increasing it from $1,748,115.92 to $2,649,916.68. This alleged increase cannot be supported by McKesson. After a review of its own records, A&P determined that the maximum value of McKesson's Code § 503(b)(9) claim is no more than $1,407,657.68. See DeVito Declaration at ¶24.

{00025485v1}    18

*Circuit City* ruling expressly relied on the following language from the earlier *Mitsubishi* decision:

> [T]hat because the payment of a creditor's Bankruptcy Code § 503(b)(9) administrative claim for the value of goods transferred to a debtor in the twenty-day period immediately preceding the commencement of a bankruptcy case is an "otherwise unavoidable transfer" as that term in used in § 547(c)(4)(B) of the Bankruptcy Code, the recipient of such a payment is not entitled to utilize the value of those same goods as the basis for a new value defense under § 547(c)(4).

The A&P estate is administratively insolvent and the treatment of administrative claims has yet to be determined. Payment of administrative claims may be so low that McKesson's section 503(b)(9) claim is reduced to a *de minimis* level, making McKesson's proposed use of the claims as a setoff would be correspondingly limited. Therefore, any asserted setoff cannot be calculated. For the same reason, McKesson's argument that avoidance of the One Day Payments will provide no benefit to the A&P estate is groundless and conclusory. That argument rests on a presumption that the section 503(b)(9) claims have a greater value than all competent evidence suggests. This uncertainty precludes summary judgment on this point.

## V. McKESSON'S HYPOTHETHICAL CHAPTER 7 SCENARIO IS NOT SUPPORTED BY ANY EVIDENCE

McKesson posits, with no evidence, that the Committee has not established a *prima facie* case for avoidance of payments applied to invoices for goods received within 45 days of the filing of the A&P chapter 11 cases by reason of the Committee's alleged failure to show that those payments enabled McKesson to receive more than it would have in hypothetical chapter 7 case as required by Code § 547(b)(5).

This argument is premised on the naked assertion that, because Code § 546(c) preserved McKesson's right to reclaim any goods it sold to A&P within 45 days of the chapter 11 filings, if McKesson had exercised that right the issue of the avoidance of payments for goods received by

{00025485v1}                                                    19

A&P would not exist. McKesson conveniently ignores the fact that Code § 546(c) permits reclamation **only** if a proper demand is made within 10 days of the receipt of the goods or, if such 10 day period expires after the commencement of a case, before 20 day after the receipt of the goods and that McKesson never exercised that right.  Thus, in *Phar-Mor Inc. v. McKesson Corp.*, 534 F.3d 502, 504 (6th Cir. 2008) it was held that McKesson was able to assert a reclamation claim because it made a timely demand. Further, a reclamation claim cannot succeed if the goods are no longer in the possession of the debtor or if the value of the goods does not exceed the amount of a prior lien.  *In re Dana Corp*. 367 B.R. 409, 417 (Bankr. S.D.N.Y. 2007) ("Clearly, Congress could not have intended to permit reclamation of goods that had been sold to consumers or other good faith purchasers"). Setting aside the fact that McKesson knowingly declined to make a reclamation claim, it does not even allege that a timely reclamation claim would have succeeded.  At the very least, the consequence of what would have happened if McKesson has exercised any reclamation rights is a question of fact for which McKesson offers no evidence and, therefore, precludes a grant of summary judgment.

## Conclusion

For the preceding reasons, McKesson is not entitled to summary judgment as a matter of law.  Accordingly, this Court should deny the Motion.

Dated:   September 9, 2019            RICH MICHAELSON MAGALIFF, LLP
*Counsel for* Plaintiff The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,

By: /s/ *Robert N. Michaelson*
      Robert N. Michaelson
335 Madison Avenue, 9th Floor
New York, New York 10017
646.453.7851
rmichaelson@r3mlaw.com