RICH MICHAELSON MAGALIFF, LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
646.453.7851
Robert N. Michaelson

Return Date and Time:
September 16, 2019 at 10:00 AM
Objection Deadline:
September 9, 2019 at 5:00 PM

*Attorneys for The Official Committee of Unsecured
Creditors on behalf of the bankruptcy estate of THE
GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

In re:                                                       :
                                                             :    Chapter 11
THE GREAT ATLANTIC & PACIFIC TEA                             :
COMPANY, INC., *et al.*                                      :    Case No. 15-23007 (RDD)
                                                             :
          Debtors.                                           :
                                                             :
------------------------------------------------------------- x

The Official Committee of Unsecured Creditors on            :
behalf of the bankruptcy estate of THE GREAT                :
ATLANTIC & PACIFIC TEA COMPANY, INC.,                        :
*et al.*                                                     :    Adv. Proc. No. 17-08264 (RDD)
          Plaintiff,                                         :
                                                             :
     v.                                                      :
                                                             :
McKESSON CORPORATION,                                         :
                                                             :
          Defendant.                                         :
------------------------------------------------------------- x

### RESPONSE OF PLAINTIFF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ON BEHALF OF THE BANKRUPTCY ESTATE OF THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *ET AL.* TO MCKESSON CORPORATION'S LOCAL RULE 7056-1(b) STATEMENT OF ALLEGED UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff The Official Committee of Unsecured Creditors ("Committee") on behalf of the

Bankruptcy Estate of The Great Atlantic & Pacific Tea Company, Inc. et al. ("A&P") submits this

Response to McKesson Corporation's Local Rule 7056-1(b) Statement of Alleged Undisputed

Facts in Support of Motion for Summary Judgment, pursuant to Local Rule 7056-1(c), in

opposition to the Motion for Summary Judgment filed by defendant McKesson Corporation

("McKesson") and states as follows:

{00025502v2 }

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| 1.      McKesson[1] (NYSE:MCK) is one of the largest wholesale distributors of Pharmaceuticals in the United States. | Declaration of Jenifer Towsley in Support of McKesson Corporation's Motion for Summary Judgment (the "Towsley Declaration") at ¶ 7. | The Committee responds that paragraph 1 is undisputed. |
| 2.      The Debtors were one of the nation's oldest supermarket and food retailers, operating approximately 300 supermarkets, combination food and drug stores, and specialty food stores across six Northeastern states. The Debtors' primary retail operations consisted of supermarkets operated under a variety of well-known trade names including A&P, Waldbaum's, SuperFresh, Pathmark, Food Basics, and The Food Emporium. | Case No. 15-23007 at Docket No. 4 at pg 3. | The Committee responds that paragraph 2 is undisputed. |
| 3.      A majority of these supermarkets also had in-store pharmacies and McKesson was the Debtors' primary supplier of Pharmaceuticals to those pharmacies. | Case No. 15-23007 at Docket No. 4 at pg 24; Towsley Declaration at ¶ 7. | The Committee responds that paragraph 3 is undisputed; but it requires clarification.  Under Section 1(A) of the Supply Agreement, McKesson is to supply A&P with "Merchandise", which is "all items normally stocked by McKesson drug distribution centers …, including prescription drugs ("Rx"), over the counter drugs ("OTC"), health and beauty aids and sundries."  Section 1(A) of the Supply Agreement dated December 6, 2012 (the "Supply Agreement") annexed as Exhibit "H" to the Declaration of Dawn DeVito (the "DeVito Declaration") and filed under seal.  When McKesson uses the term "Pharmaceuticals" in its Alleged Undisputed Facts, the Committee understands this to have the same definition as "Merchandise" under the Supply Agreement. |

---

[1] Defined terms herein have the same meaning set forth in McKesson's Motion for Summary Judgment.

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| 4.      Around the end of the first bankruptcy cases, in the spring of 2012, as the prior assumed supply agreement with McKesson was expiring, McKesson was informed that the Debtors were seeking alternative suppliers to McKesson. | Towsley Declaration at ¶ 12. | The Committee responds that paragraph 4 is undisputed; but it requires clarification.  The prior assumed supply agreement was set to expire on December 31, 2012. |
| 5.      In response, during the summer and fall of 2012, the Debtors and McKesson negotiated and reached an agreement for the new Supply Agreement.  The Debtors and McKesson entered into the new and operative Supply Agreement on or about December 6, 2012 and that agreement became effective on October 1, 2012. | Towsley Declaration at ¶ 7, 12, and Ex. 1. | The Committee objects to the phrase "[i]n response" as vague, ambiguous, and irrelevant.  Without waiving these or any other objections, the Committee responds that paragraph 5 is undisputed. |
| 6.      The Debtors employed an automated daily ordering and payment process.  Every day, the inventory control software at each of the Debtors' individual pharmacies would order the required Pharmaceuticals to maintain predetermined inventory levels.  McKesson would deliver the orders the following business day and the Debtors would pay McKesson with Automated Clearing House (ACH) payments debited from the Debtors' bank account on the required Friday due dates established by the terms of the Supply Agreement. | 6. Towsley Declaration at ¶ 8 and 23. | The Committee responds that paragraph 6 is undisputed; but it requires clarification.

It is the Committee's understanding that that portion of paragraph 6 which states "McKesson would deliver the orders the following business day" pertains to deliveries to pharmacies only because, under the Supply Agreement, deliveries to A&P warehouses had a different delivery arrangement.  *See* Section 3(A)(2) of the Supply Agreement annexed as Exhibit "H" to the DeVito Declaration and filed under seal. |
| 7. The Debtors contracted with McKesson to provide pharmacy enterprise software to manage the Debtors' inventory, product orders and payments. The Pharmaceuticals Management System utilized an electronic daily ordering system. | Towsley Declaration at ¶ 14. | The Committee objects to the term "Pharmaceuticals Management System" as defined in the Towsley Declaration to the extent it implies that there was solely an agreement between A&P and McKesson only for pharmacy enterprise software and ongoing professional and support services related to this software.

Without waiving these or any other objections, the Committee responds that paragraph 7 is disputed in part and undisputed in part.  To the extent paragraph 7 implies that A&P only |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | contracted with McKesson to provide pharmacy enterprise software to manage the Debtors' inventory, product orders and payments, this is disputed. A&P also contracted with McKesson's related entity McKesson Pharmacy Systems, LLC ("MPS") for pharmacy enterprise software and related support services. *See* Declaration of Tim Carnahan (the "Carnahan Declaration") at ¶5. This is further supported by MPS's filed proof of claims, such as claim number 4024, in which MPS states that "MPS licenses proprietary computer software and provides ongoing professional and support services to Debtors." <br><br> The remainder of paragraph 7 is undisputed. |
| 8.      When a customer filled a prescription with one of the Debtors' pharmacies, the pharmacy would fill that prescription from inventory on hand or place a special order with McKesson. If the customer's prescription was filled from on-hand supply, the Pharmaceuticals Management System would indicate when supplies fell below the safety stock level and would automatically place an order with McKesson. The system would build a running list of orders throughout the day for each pharmacy. At 8:00 p.m. local time the list would close and a purchase order would be transmitted to the McKesson distribution center assigned to that pharmacy. The pharmacy could also place special orders for Pharmaceuticals not normally carried in the regular inventory. | Towsley Declaration at ¶ 14. | The Committee objects to the phrase "Pharmaceuticals Management System" for the reasons set forth in the Committee's response to paragraph 7. Also, the Committee objects to the phrase "place a special order" as vague and ambiguous. Without waiving these or any other objections, the Committee responds that paragraph 8 is disputed in part and undisputed in part. <br><br> To the extent that McKesson is suggesting that A&P placed specialty drug orders with McKesson, the Committee disputes this. Specialty drug orders were placed with a McKesson affiliate McKesson Specialty Care Distribution Corporation ("MSCD"). *See* Carnahan Declaration at ¶5. This is further supported by MSCD's filed Proof of Claim, claim number 3501, in which MSCD states that "MSCD supplie[d] Debtors with a variety of specialty drugs and other pharmaceutical products on credit." <br><br> The remainder of paragraph 8 is undisputed. |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| 9.     After 8:00 p.m., the assigned McKesson distribution center would review each pharmacy's order for that day and finalize each pharmacy's list of products for delivery, generating a purchase order acknowledgment. Any orders placed through the electronic ordering system by 8:00 p.m. local time would qualify for next-business day delivery. In some instances, a product was not immediately available and delivery was delayed until the product became available. | Towsley Declaration at ¶ 15. | The Committee responds that paragraph 9 is undisputed; but it requires clarification. Paragraph 9 is undisputed to the extent it pertains to pharmacy deliveries and not warehouse deliveries, which have, among other things, different ordering deadlines and delivery schedules. *See* Section 3(A)(2) of the Supply Agreement annexed as Exhibit "H" to the DeVito Declaration and filed under seal. |
| 10.     Once the orders were packaged and an invoice prepared at the distribution center, delivery trucks would transport the Pharmaceuticals to the specific pharmacy that had placed an order. Generally, McKesson would deliver Pharmaceuticals to the Debtors' in-store pharmacies Monday through Friday, with deliveries typically arriving the morning of the next business day after an electronic order was sent to McKesson.  In rare instances, a pharmacy might require either immediate same-day delivery or non-business day delivery of a Pharmaceutical that was not in its inventory.  Subject to additional charges and product availability, McKesson would fulfill those special orders. | Towsley Declaration at ¶ 16. | The Committee responds that paragraph 10 is undisputed. |
| 11.     Upon delivery of Pharmaceuticals, an in-store employee (usually one of the pharmacists) confirmed and accepted the order through either an electronic signature or a signed paper receipt. Employees within the pharmacies would then use the invoice to check the new product into the Pharmaceuticals Management System, which would | Towsley Declaration at ¶ 17. | The Committee objects to the term "Pharmaceuticals Management System" for the reasons set forth above in the Committee's response to paragraph 7.  Without waiving these or any other objections, the Committee responds that paragraph 11 is undisputed. |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| automatically update the inventory count for each pharmacy. | | |
| 12.     The accurate maintenance of inventory records of pharmaceuticals, and related patient/customer records, is essential and strictly regulated.  McKesson strictly abides by these Federal and state laws and regulations and works with all of its customers, including the Debtors, to ensure strict compliance. | Towsley Declaration at ¶ 18. | The Committee responds that paragraph 12 is undisputed to the extent that it pertains to the general statement that accurate maintenance of records is regulated and to the extent it pertains to McKesson's interactions with A&P to ensure strict compliance with Federal and state laws and regulations.  The Committee objects to the remainder of paragraph 12 as it is irrelevant. |
| 13.     McKesson sold Pharmaceuticals to the Debtors on different credit terms based on the category of Pharmaceuticals:  (1) non-generic Pharmaceuticals, (2) generic Pharmaceuticals, and (3) in limited instances, extended dating products. | Towsley Declaration at ¶19. | The Committee responds that paragraph 13 is undisputed. |
| 14.     Payment for Branded Pharmaceuticals was due on the Friday of the week following the date of an invoice.  Branded Pharmaceuticals would therefore be paid in a range of terms from 7 days (Friday to following Friday) to 11 days (Monday to following Friday). | Towsley Declaration at ¶20. | The Committee responds that paragraph 14 is undisputed; but it requires clarification.  Pursuant to the Supply Agreement at Section 4(A), "[p]ayment for purchases of non-Generics [Branded] Merchandise shall be paid by A&P as follows:  Invoices dated from Monday through Friday are due and payable on Friday of the following week via Electronic Funds Transfer ("EFT") or Automated Clearing House ("ACH")."  Section 4(A) of the Supply Agreement annexed as Exhibit "H" to the DeVito Declaration and filed under seal.  Typically, McKesson would send A&P via email a Weekly Summary Invoice Report (defined in the below response to |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | paragraph 17), detailing among other things, all the invoices that McKesson had generated the week prior for Merchandise that was delivered to A&P, including invoices for non-Generics (Branded) Merchandise. *See* DeVito Declaration at ¶¶ 7-9, and Exhibit "A". Counting from the Saturday end date of the Weekly Summary Invoice Report to the next Friday, A&P internally recorded terms as 6 day terms for non-Generics (Branded) Merchandise. *See* DeVito Declaration at ¶¶7-12; Carnahan Declaration at ¶¶41-42. |
| 15.     Payment for Generic Pharmaceuticals was due on the sixth following Friday and would therefore be paid in a range of terms from 35 to 39 days. | Towsley Declaration at ¶ 21. | The Committee responds that paragraph 15 is undisputed in part but requires clarification, and disputed in part. |
| | | The Committee does not dispute that "[p]ayment for Generic Pharmaceuticals was due on the sixth following Friday…", but clarifies that pursuant to the Supply Agreement at Section 4(A), "[i]nvoices dated Monday through Friday were due and payable by the sixth following Friday via ETF or ACH." Section 4(A) of the Supply Agreement annexed as Exhibit "H" to the DeVito Declaration and filed under seal. |
| | | However, the Committee disputes that part of paragraph 15 which states that Generic pharmaceuticals "would therefore be paid in a range of terms from 35 to 39 days" because, this range of terms is inconsistent with the preceding statement in this sentence, the payment terms of the Supply Agreement, and other evidence. |
| | | A range of terms of 35 to 39 days suggests that payment is due about five weeks from date of invoice. *See* DeVito Declaration at ¶ 36. However, the Supply Agreement payment terms for Generics Merchandise indicates that payment is due about six weeks from date of invoice. DeVito Declaration at ¶37, and |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | Section 4(A) of the Supply Agreement annexed as Exhibit "H" and filed under seal.<br><br>Additionally, a range of terms of 35 to 39 days is inconsistent with at least one of McKesson's Weekly Summary Invoice Report for the week ending May 16, 2015 that McKesson sent to A&P.  In the Generics Merchandise Spreadsheet annexed to the Weekly Summary Invoice Report (defined in response to paragraph 17 below), 43 day terms are recorded under the column entitled, "Payment Terms Cd (CUR)."  *See* DeVito Declaration at ¶36, and Exhibit "A".<br><br>Lastly, A&P's own records reflect that Generics Merchandise was paid on 41 day terms, which is calculated by counting from that Saturday end date of a Weekly Summary Invoice Report,  to the sixth following Friday.  *See* DeVito Declaration at ¶¶ 7-12, and Exhibit "A"; Carnahan Declaration at ¶¶41-42, and Exhibits "D", "I", and "K". |
| 16.    Finally, in certain limited instances, McKesson offered longer terms for Promotional Pharmaceuticals where manufacturers of Branded Pharmaceuticals would offer McKesson extended payment terms on a limited product-by-product basis and McKesson passed those extended payment terms to its customers.  Payment on extended dating Pharmaceuticals would be due on the applicable Friday payment date for the extended payment terms. | Towsley Declaration at ¶ 22. | The Committee responds that paragraph 16 is undisputed. |
| 17.    Invoices were compiled with a billing statement and provided to the Debtors on a weekly basis.  Occasionally, there was a delay in delivering | Declaration of Lalitha Iragavarapu in Support of | The Committee objects to the phrases "billing statement" and "billing cycle statement" as vague and ambiguous.  Without |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| an invoice to the Debtors, usually due to a clerical error by McKesson. In those circumstances, the invoice would be included with the next billing cycle statement and the baseline date of the invoice would be modified so the due date of that invoice would correspond to the due date of all invoices included in the billing statement. | McKesson Corporation's Motion for Summary Judgment (the "Iragavarapu Declaration") at ¶ 7. | waiving these or any other objections, the Committee responds that paragraph 17 is undisputed; but it requires clarification.<br><br>It is unclear what exactly "billing statement" or "billing cycle statement" refers to in paragraph 17. However, it is undisputed that each week leading up to the filing of A&P's Chapter 11 bankruptcy cases, when A&P was paying McKesson on 41 day terms for Generics Merchandise and 6 day terms for non-Generics Merchandise, A&P would typically receive a weekly email from McKesson that contained excel spreadsheet attachments that would detail, among other things, all the invoices that McKesson had generated the week prior for Merchandise that was delivered to A&P ("Weekly Summary Invoice Reports"). *See* DeVito Declaration at ¶7 and Exhibit "A". Generally, the Weekly Summary Invoice Reports consisted of two excel spreadsheets attached to the weekly email; one Weekly Summary Invoice Report would pertain to non-Generics Merchandise and the other to Generics Merchandise. *See id.* at ¶8. Both excel spreadsheets would detail the invoices generated each day during a specific week. *See id.* In the body of the weekly email, McKesson generally stated what amounts A&P owed to McKesson and when these amounts were due. *See id.* Then starting on July 13, 2015, on a go-forward basis only, A&P started to receive a daily report via email from McKesson that contained all invoices for Merchandise delivered to A&P on a particular day with the total amount owed by A&P for that particular day's deliveries (the "Daily Summary Invoice Report"). *See id.* at ¶13 and Exhibit "B". |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| 18. With the exception of the four daily payments during the final week preceding the bankruptcy cases, every other payment made during the 90-day preference period conformed to the same credit terms and payment procedures that had been in place for the prior three years. | Towsley Declaration at ¶ 9; Iragavarapu Declaration at ¶ 8 and 10. | The Committee objects to the phrase "conformed to … payment procedures" as being vague and ambiguous. Without waiving these or any other objections, the Committee responds that paragraph 18 is undisputed in part but requires clarification, and disputed in part.

It is undisputed that, except for payments for Promotional Merchandise and the four daily payments made during the week of July 13, 2015, payments made to McKesson for non-Generics and Generics Merchandise during the Preference Period were paid on net 6 day and net 41 day terms.

It is disputed that, with exception of the four daily payments during the week of July 13, 2015, every payment made during the Preference Period conformed to the same credit terms and payment procedures that had been in place for the prior three years.  *See* Carnahan Declaration at ¶¶ 44, 50, and Exhibits "N" and "Q".

It was not a part of the payment procedures during the pre-Preference Period for McKesson to threaten A&P with non-delivery of Merchandise if A&P did not make prompt payment on a payment due date.  *See* Carnahan Declaration at ¶¶24-25 and Exhibits "G", "H" and "I".  Nor was it a part of payment procedures during the pre-Preference Period for senior McKesson representatives to inquire a day or more before a payment due date to see if A&P was going to make prompt payment by the due date.  *See id.* at ¶¶32,37, and Exhibits "K" and "M".  Nor was it a part of the payment procedures for A&P to wire its payments to McKesson instead of sending them by ACH.  *See id.* at ¶¶ 23, 48, and Exhibits "E" and "F".

However, during the Preference Period, to ensure that McKesson received prompt payment from A&P on the exact due date and |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | that A&P prioritized McKesson's payments over other creditors, McKesson employed pressure tactics such as threatening A&P with non-delivery of Merchandise to force A&P to make wire payments to McKesson or otherwise to make prompt payments via ACH to McKesson. *See id.* at ¶¶ 10-40, 48 and Exhibits "A", "B", "C", E", "F", "K", "L" and "M"; and Towsley Declaration at Exhibit "4". |
| 19.    Due to the processes relied upon by the Debtors and McKesson, every single invoice paid during the Preference Period was paid on its exact due date. | Towsley Declaration at ¶ 9 and 23; Iragavarapu Declaration at ¶ 8 and 10. | The Committee objects to the phrase "[d]ue to the processes relied upon by the Debtors and McKesson" as it is vague and ambiguous.  Without waiving these or any other objections, the Committee responds that paragraph 19 is undisputed in part and disputed in part.<br><br>The Committee responds that it is undisputed that every single invoice paid by A&P during the Preference Period was paid on its exact due date.<br><br>It is disputed that "[d]ue to the processes relied upon by the Debtors and McKesson", A&P made these payments.  It was not in the usual course of business for McKesson to threaten A&P with non-delivery of Merchandise if it did not pay McKesson on the exact due date.  *See* Carnahan Declaration at ¶¶24-25 and Exhibits "G", "H" and "I".  During the Preference Period, on many occasions, A&P promptly paid McKesson invoices in response to mounting threats from McKesson of non-delivery of Merchandise so that A&P was ensured of the delivery of Merchandise that A&P and its customers needed.  *See* Carnahan Declaration at ¶¶10-23, 26-40, and Exhibits "F" and "L".<br><br>Even in support of its own motion for summary judgment, McKesson provided an example of this threat.  At Exhibit 4 |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | annexed to the Towsley Declaration, Jenifer Towsley, Vice President, Credit and Financial Services, U.S. Pharmaceutical, McKesson, stated to her colleagues that "[a]fter some back and forth with Tim Callahan (sic), the company's CFO, **with the added pressure of a potential shipment hold**, **the company has agreed to wire funds today**.… Cash is definitely tight on their end and they are pushing all of their vendors. **I want to make sure that they prioritize our payment** and that we do as much as we can upfront to protect potential bankruptcy exposure." (emphasis added).  Annexed as Exhibit "4" to the Towsley Declaration, a copy of an email from Jenifer Towsley, Jenifer Towsley, Vice President, Credit and Financial Services, U.S. Pharmaceutical, McKesson, to Britt Vitalone, McKesson; Michael Gallagher, McKesson; and Meg Mitchell, Director, Strategic Solutions, McKesson Retail National Accounts, McKesson.<br><br>During the Pre-Preference Period, McKesson did not employ such pressure tactics against A&P to force A&P to make payment promptly on a due date.  *See* Carnahan Declaration at ¶¶24-25 and "Exhibits "G", "H" and "I". |
| 20.     With the exception of the four daily payments during the week prior to the Petition Date, the Debtors never deviated from paying McKesson on the required Friday due date. | Towsley Declaration at ¶ 9 and 23; Iragavarapu Declaration at ¶ 8 and 10. | The Committee objects to the term "deviated" as vague and ambiguous.  Without waiving these or any other objections, the Committee responds that paragraph 20 is undisputed in part but requires clarification, and disputed in part.<br><br>With the exception of the four daily payments during the week of July 13, 2015 leading up to the Petition Date, it is undisputed that A&P paid McKesson on the required Friday due dates during the Preference Period. |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | It is disputed that A&P paid McKesson on the required Friday due dates during the Pre-Preference Period in the year leading up to A&P's Petition Date. There is at least one instance when A&P did not pay McKesson on the exact due date. *See* Carnahan Declaration at ¶25, and Exhibits "G" and "H"; and Transaction History Spreadsheets annexed to McKesson's motion for summary judgment pertaining to non-Generics and Generics invoices due February 27, 2015 but paid on March 2, 2015.<br><br>Additionally, to the extent that McKesson suggests that A&P's four daily payments made during the week prior to the Petition Date were the result of any deviation on the part of A&P, the Committee disputes this. Rather, the four daily payments were made by A&P on their exact due date as a result of McKesson unilaterally changing and compressing A&P's payment and credit terms as of July 13, 2015. Carnahan Declaration at ¶¶47-48, 52, and Exhibits "N", "O", "P" and "Q"; DeVito Declaration at ¶¶13, 16, and Exhibits "B" and "E". |
| 21.     During the one-year prepetition period, the transactions between the Debtors and McKesson resulted in 204,778 individual invoices for a total amount of $295,915,014.44. | Iragavarapu Declaration at ¶ 10. | The Committee responds that paragraph 21 is disputed. According to A&P's records, it received approximately 57 Weekly Summary Invoice Reports and Daily Summary Invoice Reports totaling approximately $196,751,299.56 in the one-year prepetition period. *See* DeVito Declaration at ¶51. |
| 22.     During the Preference Period, there were thirteen (13) Fridays. On each Friday during the Preference Period, and without any deviation or exception, the Debtors paid McKesson for the aggregate amounts of Branded Pharmaceuticals, Generic Pharmaceuticals and Promotional Pharmaceuticals due that day. | Towsley Declaration at ¶ 24; Iragavarapu Declaration at ¶ 8 and 10. | The Committee objects to the phrase "without any deviation or exception" as being vague and ambiguous. Without waiving these or any other objections, the Committee responds that paragraph 22 is undisputed in part and disputed in part.<br><br>It is undisputed that there were 13 Fridays during the Preference Period and that during the Preference Period, A&P paid McKesson for the aggregate amounts of non-Generics |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | Merchandise, Generics Merchandise and any Promotional Merchandise due that particular Friday.<br><br>It is disputed that these payments were made "without any deviation or exception" as the Committee maintains that A&P made a number of these payments leading up to the Petition Date under the threat of non-delivery of Merchandise from McKesson, among other things, as discussed in further detail by the Committee in its response to paragraph 19 above. *See* Carnahan Declaration at ¶¶10-40, and Exhibits "A", "B", "C", "K", and "M". |
| 23.    The Debtors never paid by check.  In all instances, payment was either via ACH or wire transfer. | Towsley Declaration at ¶ 24. | The Committee responds that paragraph 23 is undisputed; but it requires clarification.  It is undisputed that A&P never paid by check.  It was A&P's standard practice to pay McKesson by ACH.  *See* Carnahan Declaration at ¶48, and Exhibits "J" and "L".  A&P only wired payment to McKesson when McKesson demanded that A&P make payment by wire.  *See* Carnahan Declaration at ¶¶12-13, 18-23, 47-48, and Exhibits "B", "F" and"I". |
| 24.    During the spring and summer of 2015, the Debtors' financial difficulties and possible bankruptcy filing were widely reported.  The decline in the Debtors' financial condition and the possible bankruptcy filing led McKesson in July of 2015 to exercise its contractual right to modify the supply terms—on a go-forward basis. | Towsley Declaration at ¶ 10 and 25. | The Committee objects to the phrases "widely reported" and "supply terms" as these are vague and ambiguous.  Additionally, the Committee objects to paragraph 24 to the extent that it asserts legal conclusion and not a material fact.  Without waiving these or any other objections, the Committee responds that paragraph 24 is undisputed in part and disputed in part.<br><br>It is undisputed that during the spring and summer of 2015, A&P's financial difficulties and possible bankruptcy filings were reported.<br><br>The remainder of paragraph 24 is disputed.  In a letter dated July 2, 2015, McKesson communicated that its reason for reducing A&P's "credits terms" was "[b]ased upon the increased risks to |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | McKesson due to the adverse material change in A&P's financial situation and the fact that A&P ceased to meet McKesson's credit requirements, McKesson … determined effective on and after July 13, 2015, as to all future purchases, A&P's credit terms are reduced to one (1) day sales outstanding ("**DSO**") with a maximum daily credit limit of $1 million." *See* Carnahan Declaration at Exhibit "N".<br><br>To the extent McKesson is asserting that it had a contractual right to modify any terms of the Supply Agreement, such an issue is a legal one to be resolved by this Court and is improper for a Local Rule 7056-1(b) statement of alleged undisputed facts.  Thus, no response is required. |
| 25. Section 4(h) of the Supply Agreements provides that McKesson may "change a payment term (including imposing the requirement of next day electronic payment for Merchandise deliveries) or limit total credit, if (i) McKesson concludes there has been a material adverse change in the A&P's financial condition or an unsatisfactory payment performance; or (ii) A&P ceases to meet McKesson's credit requirements. Upon the occurrence of any of the above-specified events, McKesson further shall be entitled to require that A&P provide adequate assurances of performance as a condition to the shipment of any additional orders to locations." | Towsley Declaration at ¶ 25, fn. 3. | The Committee responds that paragraph 25 is undisputed; but it requires clarification.  The last word of the quote from Section 4(H)(1) should read "Locations." |
| 26.      In a July 2, 2015 letter, McKesson notified the Debtors that due to a material adverse change in the Debtors' financial condition, effective July 13, 2015 the Debtors could purchase Pharmaceuticals from McKesson only on one-day | Towsley Declaration at ¶ 25, Ex. 2. | The Committee responds that paragraph 26 is disputed.<br><br>The McKesson July 2, 2015 letter expressly states that "[b]ased upon the increased risks to McKesson due to the adverse material change in A&P's financial situation and the fact that A&P has ceased to meet McKesson's credit |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| sales outstanding terms and limited the Debtors' daily purchases to $1 million. | | requirements, McKesson has determined that effective on and after July 13, 2015, as to all future purchases, A&P's credit terms are reduced to one (1) day sales outstanding ("**DSO**") with a maximum daily credit limit of $1 million." *See* Carnahan Declaration at Exhibit "N". |
| 27.    One-day sales outstanding terms would require the Debtors to pay for Pharmaceuticals no more than one business day after placing an order. | Towsley Declaration at ¶ 25. | The Committee responds that paragraph 27 is undisputed in part and disputed in part.<br><br>It is undisputed based on McKesson's representations herein and based on the fact that McKesson drafted the July 2, 2015 letter, that McKesson understood that "[o]ne-day sales outstanding terms would require A&P to pay for pharmaceuticals no more than one business day after placing an order."<br><br>It is disputed that upon receipt of the July 2, 2015 letter that A&P understood one-day sales outstanding terms would require A&P to pay for Merchandise no more than one business day after placing an order. *See* Carnahan Declaration at ¶45. However, A&P understood that McKesson was demanding the unilateral and drastic compression of A&P's payment and credit terms. *See id.* |
| 28.    Under the supply procedures between McKesson and the Debtors, invoices were generated and product was delivered the day after an order was placed. Thus, one-day sales outstanding terms would have required the Debtors to pay for new product the day it was delivered. | Towsley Declaration at ¶ 25. | The Committee objects to the phrase "[u]nder the supply procedures between McKesson and Debtors" as being vague and ambiguous. Without waiving these or any other objections, the Committee responds that Paragraph 28 is undisputed in part but requires clarification, and is disputed in part.<br><br>It is undisputed that generally invoices were generated, and Merchandise was delivered to pharmacies the day after an order was placed. |

{00025502v2 }

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | It is further undisputed that based on the representations herein that McKesson understood that "one-day sales outstanding terms would have required A&P to pay for new product the day it was delivered." |
| | | It is disputed that upon receipt of the July 2, 2015 letter that A&P understood one-day sales outstanding terms would require A&P to pay for Merchandise no more than one business day after placing an order. *See* Carnahan Declaration at ¶45. However, A&P understood that McKesson was demanding the unilateral and drastic compression of A&P's payment and credit terms. *See id.* |
| 29.    Following the notification on July 2, 2015, the Debtors and McKesson negotiated and agreed upon modified terms of up to two-day sales outstanding and limited the Debtors' daily purchases to $2 million, as memorialized by a letter dated July 15, 2015. | Towsley Declaration at ¶ 26 and 27, Ex. 3. | The Committee responds that paragraph 29 is disputed.<br><br>McKesson's July 15, 2015 letter states in pertinent part, "[f]ollowing the July 2, 2015 letter, McKesson and A&P have spoken about these credit terms [one (1) day sales outstanding ("DSO") with a maximum daily credit limit of $1 million] and the resulting logistical issues from these terms. To address these issues, A&P's credit terms are increased to two (2) DSO with a maximum daily credit limit of $2 million." Carnahan Declaration at Exhibit "Q". This letter does not state that A&P willingly consented to these compressed terms. *See id.* at ¶51, and Exhibit "Q". A&P was put in a position where it was forced to acquiesce to McKesson's demand for a change in terms, and thus, A&P had no choice but to accept these new, unilateral, compressed terms. *See id.* at ¶52. |
| 30.    McKesson and the Debtors agreed to an additional day because of the logistical difficulties in ordering and delivering Pharmaceuticals, inspecting the deliveries, logging the Pharmaceuticals into inventory and then remitting | Towsley Declaration at ¶ 10 and 27. | The Committee objects to the term "Contemporaneous Payment Terms" as vague, ambiguous, and patently conclusory and self-serving. This phrase is merely McKesson's self-serving characterization of events, which is disputed by the Committee. Therefore, the Committee requests that paragraph 30 be stricken. |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| payment all within 24 hours.  Due to these operational actualities, two-day sales outstanding terms were intended to require contemporaneous payment one day after delivery of new product (the "Contemporaneous Payment Terms"). | | Without waiving these or any other objections, the Committee responds that paragraph 30 is disputed in part and undisputed in part.<br><br>The Committee disputes that A&P freely agreed to the change in terms and that A&P understood the change in terms imposed by McKesson to mean that A&P's payment for Merchandise was to be contemporaneous with the delivery of said Merchandise.  *See* Carnahan Declaration at ¶¶51-55.  The Committee maintains that, McKesson unilaterally imposed these drastic and compressed changed terms on A&P, and A&P had no choice but to accept them.  *See id.*  Even with these changed, compressed terms, McKesson continued to extend credit to A&P although McKesson began to enforce a maximum daily credit limit after sending the July 2, 2015 Letter.  *See id.* at ¶53, and Exhibit "N".<br><br>It is undisputed though that the change in terms took into consideration "logistical difficulties in ordering and delivering Pharmaceuticals, inspecting the deliveries, logging the Pharmaceuticals into inventory and then remitting payment all within 24 hours." |
| 31.     The Contemporaneous Payment Terms became effective for purchases of Pharmaceuticals made on and after July 13, 2015. | Towsley Declaration at ¶ 28, Ex. 3. | The Committee objects to the term "Contemporaneous Payment Terms" for the reasons set forth in the Committee's response to paragraph 30 above.  For these reasons, the Committee requests that paragraph 31 be stricken.<br><br>Without waiving these or any other objections, the Committee responds that paragraph 31 is disputed.<br><br>As of July 13, 2015, Merchandise would be delivered by McKesson on one day and payment would be received by McKesson the day after the delivery of Merchandise via wire |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | and not ACH.  *See* Carnahan Declaration at ¶¶47-48,53-54, and Exhibits "O", and "P".  So, Merchandise was to be paid on one day terms.  *See* DeVito Declaration at ¶¶13-14,16, and  Exhibits "B", "C","D", and "E"; McKesson's Transaction History Spreadsheet, "Branded Pref period" spreadsheet, "Invoice Terms" for invoices dated July 13, 2015 to July 17, 2015. |
| 32.    Prior to the Petition Date, the Debtors purchased Pharmaceuticals and made four payments according to the new terms totaling approximately $4.25 million as follows:<br>• Tuesday, July 14, 2015 in the amount of $1,436,808.53<br>• Wednesday, July 15, 2015 in the amount of $1,098,919.73<br>• Thursday, July 16, 2015 in the amount of $883,260.71<br>• Friday, July 17, 2015 in the amount of $830,735.91 | Towsley Declaration at ¶ 11 and 28, Iragavarapu Declaration at ¶ 11. | The Committee objects to the phrase "new terms" as vague and ambiguous.  Without waiving these objections or any others, A&P responds that paragraph 32 is undisputed. |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| 33.    The four Contemporaneous Daily Payments made between July 14 and 17 were applied to invoices for Pharmaceuticals delivered the previous day as follows:<br><br>| Date of Invoices | Date of Payment | Wire Number | Payment Amount |<br>\|---\|---\|---\|---\|<br>\| 7/13/2015 \| 7/14/2015 \| 4043222 \| 1,436,808.53 \|<br>\| 7/14/2015 \| 7/15/2015 \| 4043267 \| 1,098,919.73 \|<br>\| 7/15/2015 \| 7/16/2015 \| 4043333 \| 883,260.71 \|<br>\| 7/16/2015 \| 7/17/2015 \| 4043354 \| 830,735.91 \|<br>\| \| \| Total: \| $4,249,724.88 \| | Iragavarapu Declaration at ¶ 11. | The Committee objects to the term "Contemporaneous Daily Payments" as vague, ambiguous, and patently conclusory and self-serving.  This phrase is merely McKesson's self-serving characterization of events, which is disputed by the Committee.  For these reasons, the Committee requests that paragraph 33 be stricken.<br><br>Without waiving these or any other objections, the Committee responds that paragraph 33 is disputed.<br><br>McKesson has not adequately demonstrated how it internally applied the four payments set forth in paragraph 32 above.  *See* DeVito Declaration at ¶¶27-28.  With that being said, it is A&P's understanding that the payments it made as set forth in paragraphs 32 and 33 satisfied in full the amount owed for the deliveries of Merchandise made the prior day.  *See* DeVito Declaration at ¶16, fn.3. |
| 34.    Between July 14, 2015 and July 17, 2015, McKesson generated invoices and delivered Pharmaceuticals to the Debtors in the total amount of $4,654,546.87 as follows:<br>• July 14, 2015 - $1,108,103.36<br>• July 15, 2015 - $891,779.14<br>• July 16, 2015 - $842,705.17<br>• July 17, 2015 - $1,811,959.20 | Iragavarapu Declaration at ¶ 12. | The Committee responds that it objects to the phrase "generated invoices and delivered Pharmaceuticals to A&P in the total amount of $4,654,546.87" as vague, ambiguous, and conclusory.  Without waiving these or any other objections, the Committee responds that paragraph 34 is disputed.<br><br>Unlike the allegedly generated invoices and delivered amounts for "Pharmaceuticals" for July 14, 2015  through to July 16, 2015, which are not exact but approximately the amount ultimately invoiced to A&P by McKesson, A&P did not receive any Weekly or Daily Summary Invoice Report from McKesson where the total amount of invoiced McKesson Merchandise was $1,811,959.20 or any number close to this amount with payment being due on July 17, 2015.  *See* DeVito Declaration at ¶¶16, 16, fn. 3, 40, and Exhibit "C".  At most, A&P received a Daily Summary Invoice Report invoice dated July 19, 2015 in amount |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | of $883,298.00 for Merchandise allegedly delivered between July 17, 2015 and July 19, 2015. *See id.* at ¶48-49, and Exhibit "L". Moreover, McKesson does not explain how it determined that "Pharmaceuticals" in the amount of $1,811,959.20 on July 17, 2015 were invoiced and delivered to A&P. *See id.* at ¶41. |
| 35.     Between July 14, 2015 and July 17, 2015, the Debtors paid McKesson by wire transfer the full amount due for Pharmaceuticals purchased and delivered to the Debtors' pharmacies during the prior day.  Those payments did not include any amounts due for Pharmaceuticals purchased on other terms. | Towsley Declaration at ¶ 29. | The Committee objects to the phrases "[p]harmaceuticals purchased and delivered to the Debtors' pharmacies during the prior day" and "pharmaceuticals purchased on other terms" as vague and ambiguous.  Additionally, the Committee objects to paragraph 24 to the extent that it asserts legal conclusion and not a material fact.  Without waiving these or any other objections, the Committee responds that paragraph 35 is disputed in part and undisputed in part. |
| | | The Committee disputes that during July 14, 2015 and July 17, 2015, A&P "purchased" pharmaceuticals the day prior to when payment was actually due.  A&P made four payments to McKesson via wire, which are discussed above at paragraph 32 for the amount due as per McKesson for Merchandise invoiced and delivered to A&P the day prior.  *See* DeVito Declaration at ¶16, and Exhibit "E".  A&P made these four payments on one (1) day terms.  *See id.* |
| | | It is undisputed that these four payments did not include payment for Merchandise that was previously invoiced and delivered to A&P prior to July 13, 2015. |
| 36.     All of the payments at issue in the lawsuit, including the four Contemporaneous Daily Payments, were applied to specifically identified invoices and not any other debts. | Towsley Declaration at ¶ 29. | The Committee objects to the term "Contemporaneous Daily Payments" for the reasons set forth in the Committee's response to paragraph 33 above.  For these reasons, the Committee requests that paragraph 36 be stricken. |

| McKesson Alleged Undisputed Facts | McKesson's Evidentiary Support | The Committee's Response |
|---|---|---|
| | | Without waiving these or any other objections, the Committee responds that paragraph 36 is disputed. McKesson has not provided any documentary support as to how it applied payments to its invoices. *See* DeVito Declaration at ¶¶27-28. |
| 37.    After the Debtors filed for bankruptcy on Monday, July 19, 2015, McKesson continued to supply the Debtors with Pharmaceuticals on the same Contemporaneous Payment Terms. | Towsley Declaration at ¶ 30. | The Committee objects to the term "Contemporaneous Payment Terms" for the reasons set forth in the Committee's response to paragraph 30 above. For these reasons, the Committee requests that paragraph 37 be stricken.

Without waiving these or any other objections, the Committee responds that paragraph 37 is disputed.

According to A&P's records, after A&P filed for bankruptcy on Sunday, July 19, 2015, Merchandise continued to be delivered by McKesson on one day and payment would be received by McKesson the day after the delivery of Merchandise via wire and not ACH. *See* DeVito Declaration at ¶¶13-15, and Exhibit "B" and "D". |

| 38.    With the Supply Agreement set to expire on August 31, 2015, McKesson and the Debtors agreed to extend the term of the Supply Agreement through January 31, 2016 but modified the agreement to incorporate the new Contemporaneous Payment Terms. | Towsley Declaration at ¶ 30. | The Committee objects to the term "Contemporaneous Payment Terms" for the reasons set forth in the Committee's response to paragraph 30 above. For these reasons, the Committee requests that paragraph 38 be stricken. The Committee further objects as the Extension of Compliance with Terms of Supply Agreement ("Extension Agreement") speaks for itself.

Without waiving these or any other objections, the Committee responds that paragraph 38 is undisputed in part but requires clarification, and disputed in part. |

| | | |
|---|---|---|
| | | The Committee responds that paragraph 38 is undisputed in part but requires clarification in that the Supply Agreement was set to expire on August 31, 2015 and by consent of both McKesson and A&P, the Supply Agreement was extended on an interim basis through September 8, 2015.  The parties then entered into the Extension Agreement.  The Supply Agreement, as modified by the Extension Agreement, was to go through January 31, 2016.  *See* DeVito Declaration at Exhibit "H" and filed under seal.<br><br>The Committee further responds that that part of paragraph 38 stating that the Supply Agreement was modified to incorporate "the new Contemporaneous Payment Terms" is disputed.  Rather, the Extension Agreement, at Paragraph 2, modified the Supply Agreement such that "[n]otwithstanding the Expiration Date, the Parties shall continue to perform the terms of the Agreement as modified herein from the Extension Effective Date through January 31, 2016."  Under Paragraph 5 of the Extension Agreement, "[a]ll amounts due under the Agreement from the Petition Date through and including the end of the Extension Term must be paid by A&P on two days sales outstanding with immediately available Federal funds received by McKesson no later than 2:00 p.m. Central Time."  *See* DeVito Declaration at Exhibit "H" and filed under seal.  There is no mention of the word "contemporaneous" in the Extension Agreement.  *See id.* |
| 39.     McKesson further agreed that it would not modify the Contemporaneous Payment Terms under section 4(H) of the Supply Agreement for the duration of the liquidation process. | Towsley Declaration at ¶ 30. | The Committee objects to the term "Contemporaneous Payment Terms" for the reasons set forth in the Committee's response to paragraph 30 above.  For these reasons, the Committee requests that paragraph 39 be stricken.  The Committee further objects as the Extension Agreement speaks for itself.<br><br>Without waiving these or any other objections, the Committee responds that paragraph 39 is disputed.  Under the Extension Agreement at paragraph 2, McKesson agreed that "[a]ny rights of McKesson under the Agreement to unilaterally modify payment terms or suspend performance, including pursuant to sections 4(G) or 4(H), shall be unenforceable as to Merchandise |

| | | delivered from and after the Extension Effective Date." *See* DeVito Declaration at Exhibit "H" and filed under seal. |
|---|---|---|
| 40.    The Debtors' purchase of Pharmaceuticals from McKesson continued on these terms until the liquidation of the Debtors' pharmacies was completed in early 2016. | Towsley Declaration at ¶ 30. | The Committee objects to the term "these terms" as vague and ambiguous.<br><br>Without waiving these or any other objections, the Committee responds that paragraph 40 is disputed.  McKesson continued to deliver Merchandise on one day and A&P would pay McKesson one day after the Merchandise delivery via wire (one day terms) until A&P ceased operating its pharmacy stores, which occurred around late November 2015.  *See* DeVito Declaration at ¶15 and Exhibit "D".  The last payment A&P made to McKesson for Merchandise was in and around November 23, 2015.  *See id.* |
| 41.    The Debtors did not pay certain invoices governed under the pre-July 13, 2015 credit terms of the Supply Agreement, nor certain invoices dated July 17, 2015, which were governed by the new credit terms. | Towsley Declaration at ¶ 31. | The Committee objects to the phrase "certain invoices dated July 17, 2015, which were governed by the new credit terms" as being vague and ambiguous.  Without waiving these or any other objections, the Committee responds that paragraph 41 is undisputed in part but requires clarification, and disputed in part.<br><br>It is undisputed that A&P did not pay five Weekly Summary Invoice Reports for Generics Merchandise only, which were to be paid on net 41 day terms, and one Daily Summary Invoice Report dated July 19, 2015, which was to be paid on net 1 day terms, for deliveries of Merchandise allegedly made to A&P prior to filing for bankruptcy.  *See* DeVito Declaration at ¶17 and Exhibits "F" and "G".<br><br>These Reports include the following:<br>• A&P/Pathmark report for week ending 06/13/15 with "[d]oc dates" of 06/07/15 through 06/13/15 for Generics Merchandise only in the amount of $802,725.96 and due on 07/24/15; |

| | | |
|---|---|---|
| | | <ul><li>A&P/Pathmark report for week ending 06/20/15 with "[d]oc dates" of 06/14/15 through to 06/20/15 for Generics Merchandise only in the amount of $779,140.00 and due on 07/31/15;</li><li>A&P/Pathmark report for week ending 06/27/15 with "[d]oc dates" of 06/21/15 through to 06/27/15 for Generics Merchandise only in the amount of $846,593.47and due on 08/07/15;</li><li>A&P/Pathmark report for week ending 07/04/15 with "[d]oc dates" of 06/28/15 through to 07/04/15 for Generics Merchandise only in the amount of $847,107.43 and due on 08/14/15;</li><li>A&P/Pathmark report for week ending 07/11/15 with "[d]oc dates" of 07/05/15 through to 07/11/15 for Generics Merchandise only in the amount of $919,511.12 and due on 08/21/15; and</li><li>A&P/Pathmark report for the day ending 07/19/15 with "[d]oc dates" of 07/17/15 through to 07/19/15 for Merchandise in the amount of $883,298.31 and due on 07/20/15.</li></ul><br>*See id.* at ¶17 and Exhibit "F".<br><br>If McKesson is asserting that A&P did not pay certain invoices dated July 17, 2015, which were not included in the Daily Summary Invoice Report dated July 19, 2015 in the amount of $883,298.31 and due on July 20, 2015, then this is disputed. *See id.* at ¶¶39-50. |
| 42.    In total, $3,636,302.30 of Pharmaceuticals were delivered during the twenty days before the Petition Date (June 29, 2015 through July 18, 2015), for which payment was not received. | Towsley Declaration at ¶ 31. | The Committee responds that paragraph 42 is disputed.<br><br>A&P did not pay the following Summary Invoice Reports for Merchandise delivered within 20 days of A&P's commencement of its Chapter 11 cases on July 19, 2015: |

{00025502v2 }

| | | |
|---|---|---|
| | | • A&P/Pathmark report for week ending 07/04/15 with Doc dates of 06/28/15 through to 07/04/15 for Generics Merchandise only in the amount of $847,107.43 and due on 08/14/15; <br> • A&P/Pathmark report for week ending 07/11/15 with Doc dates of 07/05/15 through to 07/11/15 for Generics Merchandise only in the amount of $919,511.12 and due on 08/21/15; and <br> • A&P/Pathmark report for the day ending 07/19/15 with Doc dates of 07/17/15 through to 07/19/15 for Merchandise in the amount of $883,298.31 and due on 07/20/15. <br><br> *See* DeVito Declaration at ¶18 and Exhibit "F". <br><br> This would mean that McKesson did not receive payment for $2,649,916.86 of Merchandise allegedly delivered to A&P during the twenty days before A&P's commencement of its Chapter 11 cases on July 19, 2015, and not $3,636,302.30 as McKesson asserts. *See id.* |
| 43.    Following the commencement of the bankruptcy cases, the Debtors and McKesson entered into that certain Extension of Compliance with Terms of Supply Agreement. Pursuant to the terms of the Extension Agreement, the Debtors paid McKesson a $1 million extension fee, which was applied to McKesson's administrative claim. | Towsley Declaration at ¶ 31. | The Committee objects to paragraph 43 as the Extension Agreement speaks for itself. Without waiving these or any other objections, the Committee responds that paragraph 43 is undisputed; but it requires clarification. <br><br> The Extension Agreement expressly states that "…A&P shall pay to McKesson an extension fee of One Million Dollars ($1,000,000) … on account of McKesson's § 503(b)(9) claim, which aggregates approximately $2,786,000. This Extension Fee shall be satisfied by way of an offset against Rebates accrued after the Petition Date in favor of A&P as a result of sale of Merchandise generated on and after the Petition Date.…Upon receipt of the Extension Fee, McKesson's § 503(b)(9) claim will be automatically reduced by and waived in the amount of One Million Dollars ($1,000,000)." *See* Extension Agreement |

| | | annexed to the DeVito Declaration at Exhibit "H", Section 3, and filed under seal.

A&P did pay this One Million Dollars to McKesson. *See* DeVito Declaration at ¶22. |
|---|---|---|
| 44.    The remaining balance owed on McKesson's administrative claim is $2,636,302.30. In addition to the Administrative Claim, McKesson holds a general unsecured claim in the amount of $1,581,865.96 for Pharmaceuticals delivered prior to June 29, 2015. | Towsley Declaration at ¶ 31. | The Committee responds that paragraph 44 is disputed.

After the application of the One Million Dollars fee, and reconciling McKesson's 11 U.S.C. § 503(b)(9) claim based on A&P's records, A&P determined that McKesson's 11 U.S.C. § 503(b)(9) claim is no more than $1,407,657.68 for Merchandise. *See* DeVito Declaration at ¶¶19-24 and Exhibits "H" filed under seal and "I". |
| 45.    On or about November 24, 2015, McKesson timely filed a series of proofs of claim against the Debtors, which included the claims based on Pharmaceuticals received by the Debtors during the Administrative Claim Period.  On March 8, 2016, McKesson filed its first amended proofs of claims against each of the Debtors both the Administrative Claim and the Unsecured Claim. | Claim Numbers 5880 and 9512. | The Committee responds that paragraph 45 is undisputed. |
| 46.    McKesson produced to the Debtors several emails from May 22, 2015 discussing the fact that the Debtors did not initially make the payment due May 22, 2015. | Towsley Declaration at ¶ 32, Ex. 4. | The Committee objects to paragraph 46 as the emails from May 22, 2015 speaks for themselves.  Without waiving these or any other objections, the Committee responds that paragraph 46 is undisputed in part and disputed in part.

The Committee responds that it is undisputed that McKesson produced during the course of discovery several emails dated in and around May 22, 2015.

The Committee responds that McKesson's characterization that these emails just discussed "the fact that the Debtors did not initially make the payment due May 22, 2015" is disputed.  The emails speak for themselves as the May 22, 2015 emails discuss a number of matters including but not limited to the following: |

| | | |
|---|---|---|
| | | (1) the fact that McKesson had not received payment from A&P and advised that "[i]f …[McKesson] did not receive wire payment today, …[McKesson] will be holding shipment immediately;<br><br>(2) the fact that A&P sent payment on May 22, 2015 via ACH for arrival to McKesson on May 26, 2015;<br><br>(3) A&P could provide McKesson with the ACH notification indicating that payment would arrive on May 26, 2015 so there is no interruption of McKesson's service;<br><br>(4) McKesson wanted payment from A&P by wire on May 22, 2015, and not ACH, in order to continue McKesson's service;<br><br>(5) McKesson acknowledgement that with "the added pressure of a shipment hold, the company has agreed to wire funds today" and that it wanted to make sure that A&P prioritized McKesson's payment; and<br><br>(6) the fact that ultimately A&P wired the May 22, 2015 payment.<br><br>Carnahan Declaration at ¶¶14-16,18-19, 22-23, and Exhibits "A" and "B"; Towsley Declaration at Exhibit "4". |
| 47.     McKesson contacted the Debtors to inquire about the status of the May 22, 2015 payment and whether the Debtors intended to continue adhering to the terms of the Supply Agreement. | Towsley Declaration at ¶ 32, Ex. 4. | The Committee objects to paragraph 47 as the emails from May 22, 2015 speaks for themselves.  Without waiving these or any other objections, the Committee responds that, for the reasons set forth in paragraph 46 above, paragraph 47 is disputed. |
| 48.     The Debtors timely made the May 22nd payment and thereafter continued to timely pay invoices throughout the Preference Period. | Towsley Declaration at ¶ 32. | The Committee responds that paragraph 48 is undisputed; but it requires clarification.  It is undisputed that A&P made the May 22, 2015 payment on the exact due date and continued thereafter to make payments to McKesson on the exact due date for the remainder of the Preference Period.  However, this was done in response to pressure tactics implemented by McKesson to ensure that A&P made payment to McKesson on the exact due date, including but not limited to threats of non-delivery of |

| | | Merchandise. *See* Carnahan Declaration at ¶¶ 10-40 and Exhibits "A", "B", "C", "K", and "M". |
|---|---|---|
| 49.      In one of the internal McKesson emails written by Jennifer Towsley (McKesson's Vice President of Credit and Financial Services) on May 22, 2015, Ms. Towsley refers to several incidences of missed payments.  That statement refers to several late payments made to one or both of the McKesson corporate affiliates that had entirely separate supply and logistical agreements with the Debtors.  Those entities, McKesson Pharmacy Systems, LLC and McKesson Specialty Distribution LLC, are defendants in two separate preference lawsuits. | Towsley Declaration at ¶ 33. | The Committee responds that paragraph 49 is undisputed. |

**THE COMMITTEE'S STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO
WHICH THERE EXISTS GENUINE ISSUES TO BE TRIED**

The Committee hereby submits this Statement of Additional Facts As To Which There Exists Genuine Issues To Be Tried ("Statement of Additional Disputed Material Facts"), pursuant to Local Rule 7056-1(c), and incorporates by reference the following documents submitted in along with this Statement of Additional Disputed Material Facts: (i) its Response set forth above; (ii) the Carnahan Declaration and the exhibits thereto, and (iii) the DeVito Declaration and the exhibits thereto, and additionally states as follows:

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support |
|---|---|
| 1.      During the pre-Preference Period, when A&P was late with a payment or McKesson thought that A&P was going to be late with a payment, A&P either paid McKesson by wire so that the payment arrived on the exact due date and was not late, or if payment was late, A&P may have been subjected to additional charges as a result under the Supply Agreement. | Carnahan Declaration at ¶ 25, and Exhibits "G", "H", and "I"; DeVito Declaration at Exhibit "H" filed under seal, the Supply Agreement, Section 4(E). |
| 2.      Section 4(E) of the Supply Agreement discusses how A&P will be charged by McKesson on past due balances in which there is no good faith dispute by A&P. | Carnahan Declaration at ¶ 25, and Exhibits "G", "H", and "I"; DeVito Declaration at Exhibit "H" filed under seal, the Supply Agreement, Section 4(E). |
| 3.      During the pre-Preference Period, when A&P was late with a payment or McKesson thought that A&P was going to be late with a payment, McKesson did not threaten A&P with non-delivery of Merchandise. | Carnahan Declaration at ¶ 25, and Exhibits "G", "H", and "I". |
| 4.      During the pre-Preference Period, senior McKesson representatives, such as Jenifer Towsley, McKesson's VP Credit and Financial Services, U.S. Pharmaceutical, or Meg Mitchell, McKesson's Director, Strategic Solutions, McKesson Retail National Accounts, did not contact A&P a day or more in advance of a payment due date to ensure that McKesson would be paid on the exact due date. | Carnahan Declaration at ¶¶32, 37. |
| 5.      During the Preference Period, McKesson, A&P's primary pharmaceutical supplier, repeatedly threatened A&P with non-delivery of Merchandise if A&P did not make payment to McKesson on the exact due date. | Carnahan Declaration at ¶10-40, and Exhibits "A", "B", "C", "K", and "M". |
| 6.      On May 22, 2015, when A&P's Friday payment was due to McKesson, A&P initiated two ACH payments in the amounts of $3,840,125.40 for non-Generics Merchandise and $552,809.19 for Generics Merchandise; and, McKesson would have received these payments on May 26, 2015. | Carnahan Declaration at ¶¶ 12-13, and Exhibits "D" and "E". |

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support |
|---|---|
| 7.      On May 22, 2015, when payment had not yet arrived, McKesson threatened that if it did not receive a wire payment that day, McKesson would hold A&P's shipment immediately. | Carnahan Declaration at ¶¶ 14-15, and Exhibit "A". |
| 8.      Tim Carnahan, A&P's Chief Financial Officer told McKesson's Jenifer Towsley, that A&P "will be able to get the ACH notification to you today for payment Tuesday so there is no interruption of service" and apologized for the inconvenience. | Carnahan Declaration at ¶ 18, and Exhibit "B". |
| 9.      In response, Ms. Towsley demanded that A&P "wire payment, not an ACH, today in order to continue service." | Carnahan Declaration at ¶ 19, and Exhibit "B". |
| 10.     If A&P did not immediately wire the payment for receipt by McKesson on Friday, May 22, 2015, then McKesson would have stopped shipment of McKesson Merchandise to A&P's pharmacies. | Carnahan Declaration at ¶ 20, and Exhibit "B". |
| 11.     To ensure that there would be no such disruptions of service, A&P had to wire its payment to McKesson that day. | Carnahan Declaration at ¶ 22, and Exhibit "B". |
| 12.     A&P cancelled the ACH payments in process to McKesson and paid McKesson by wire in the total amount of $4,392,934.59 on May 22, 2015. | Carnahan Declaration at ¶ 23, and Exhibits "E" and"F". |
| 13.     Ms. Towsley described her communications with Mr. Carnahan to her colleagues as follows:  [a]fter some back and forth with Tim Callahan (sic), the company's CFO, with the added pressure of a potential shipment hold, the company has agreed to wire funds today….Cash is definitely tight on their end and they are pushing all of their vendors.  I want to make sure they prioritize our payment…." | Towsley Declaration at Exhibit 4. |

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support |
|---|---|
| 14.      McKesson's threat of immediate non-shipment of Merchandise on May 22, 2015 was a change in the way that the parties had previously dealt with one another during the pre-Preference Period when A&P was late or it was thought A&P was going to be late with a payment to McKesson. | Carnahan Declaration at ¶¶ 24-25, and Exhibits "G","H", and "I". |
| 15.      On or about June 10, 2015, McKesson representatives told A&P that if McKesson did not receive payment that Friday, then A&P would not receive its Merchandise delivery that following Monday. | Carnahan Declaration at ¶¶ 26-27, and Exhibit "C". |
| 16.      To ensure the continuation of its Merchandise delivery, among other things, A&P paid McKesson via ACH on the exact due date of June 12, 2015 in the amount of $4,086,597.70 for non-Generics Merchandise and in the amount of $1,595,482.76 for Generics Merchandise. | Carnahan Declaration at ¶ 28, and Exhibit "J". |
| 17.      Then, on July 1, 2015, Jenifer Towsley, McKesson's VP Credit and Financial Services, U.S. Pharmaceutical, contacted A&P to ensure that McKesson would be paid on Thursday July 2, 2015, as Ms. Towsley thought that Friday, July 3, 2015 was a bank holiday.  But, Ms. Towsley was mistaken, which was later acknowledged, as the banks were opened on Friday, July 3, 2015. | Carnahan Declaration at ¶ 30, and Exhibit "K". |
| 18.      A&P paid McKesson via ACH with payment arriving on the exact due date of Friday, July 3, 2015. | Carnahan Declaration at ¶ 31, and Exhibit "L". |
| 19.      Then, on July 9, 2015, Meg Mitchell, McKesson's Director, Strategic Solutions, McKesson Retail National Accounts, contacted A&P the day before the Friday, July 10, 2015 payment due date to ensure that McKesson would be paid by then. | Carnahan Declaration at ¶¶ 33-35, and Exhibit "M". |
| 20.      A&P paid McKesson via ACH with payment arriving on the exact due date of Friday, July 10, 2015. | Carnahan Declaration at ¶ 36, and Exhibit "L". |

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support |
|---|---|
| 21.     By this time, it was understood that if A&P failed to make prompt payment to McKesson by the exact due date that McKesson would not deliver Merchandise. | Carnahan Declaration at ¶ 38. |
| 22.     A&P had to comply with McKesson's demand that A&P promptly pay McKesson by the exact due date to ensure that Merchandise continued to be delivered to A&P's pharmacies.  This caused A&P to prioritize its payment to McKesson over other creditors. This continued up to the commencement of A&P's Chapter 11 bankruptcy cases. | Carnahan Declaration at ¶¶ 39-40. |
| 23.     As of July 13, 2015, terms were changed such that Merchandise would be delivered by McKesson on one day and payment would be received by McKesson the day after the delivery of Merchandise via wire and not ACH. | Carnahan Declaration at ¶¶47-48, and Exhibits "O" and "P"; DeVito Declaration at ¶¶13-14, and Exhibits "B" and "C". |
| 24.     As of July 13, 2015, on a go forward basis only, A&P went from paying invoices on six (6) terms for non-Generics Merchandise and forty-one (41) terms for Generics Merchandise to one (1) day terms for Merchandise. | Carnahan Declaration at ¶¶43,47-48 and Exhibits "O" and "P"; DeVito Declaration at ¶¶13-14, and Exhibits "B" and "C"; McKesson's Transaction History Spreadsheet, "Branded Pref period" spreadsheet, "Invoice Terms" for invoices dated July 13, 2015 to July 17, 2015. |
| 25.     Even though McKesson drastically and unilaterally changed terms, McKesson nevertheless continued to extend credit to A&P although McKesson began to enforce a maximum daily credit limit after sending its July 2, 2015 Letter. | Carnahan Declaration at ¶53 and Exhibits "N" and "Q". |
| 26.     A&P did not understand the terms change imposed by McKesson to mean that A&P's payment for Merchandise was to be contemporaneous with the delivery of said Merchandise. | Carnahan Declaration at ¶54. |
| 27.     McKesson's change in terms constrained A&P's ability to manage its cash flow since the payments to McKesson were one of the largest vendor payments that A&P had to make on an ongoing basis. | Carnahan Declaration at ¶55 and Exhibits "L" and "M"; Towsley Declaration at Exhibit 4. |

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support |
|---|---|
| | |
| 28. When McKesson imposed these new terms, (1) A&P was looking to renew its contract or extend its terms with McKesson, as the Supply Agreement was set to expire on August 31, 2015; (2) McKesson relayed that it would not be able to move forward with contract renewal discussions given the status of A&P's finances and McKesson's concerns; and (3) at this time, A&P's ability to find an alternate primary pharmaceutical vendor would be extremely difficult if not impossible. | Carnahan Declaration at ¶¶ 52, 57, and Exhibits "R" and "S". |
| 29. In order to continue to make McKesson's payments on six (6) and forty-one (41) day terms and now meet the one (1) day terms imposed as of July 13, 2015 by McKesson on a go-forward basis, A&P was put in a position where it was forced to accommodate McKesson and prioritize payments to McKesson over other creditors. | Carnahan Declaration at ¶¶ 40, 58. |
| 30. According to A&P's records, A&P paid McKesson the following four payments via wire during the week of July 13, 2015 on one day terms:<br>• $1,436,808.53 for Merchandise invoiced on July 13, 2015, with the wire being initiated in and around 12:09 P.M. CT on Tuesday, July 14, 2015 with payment to be received on Tuesday, July 14, 2015;<br>• $1,098,919.73 for Merchandise invoiced on July 14, 2015, with the wire being initiated in and around 14:05 P.M. CT on Wednesday, July 15, 2015 with payment be received on Wednesday, July 15, 2015;<br>• $883,260.71 for Merchandise invoiced on July 15, 2015, with the wire being initiated in and around 14:06 P.M. CT on Thursday, July 16, 2015 with payment to be received on Thursday, July 16, 2015; and<br>• $830,735.91 for Merchandise invoiced on July 16, 2015, with the wire being initiated in and around 13:02P.M. CT on Friday, July 17, 2015 with payment to be received on Friday, July 17, 2015. | DeVito Declaration at ¶ 16, and Exhibit "E". |
| 31. McKesson's Transaction History Spreadsheet does not set forth the actual payment amount received from A&P or how McKesson applied A&P's payments against McKesson invoices. | DeVito Declaration at ¶ 27. |

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support |
|---|---|
|  |  |
| 32.     The Transaction History Spreadsheet does not include information pertaining to credit memos, like for returned Merchandise. | DeVito Declaration at ¶ 27. |
| 33.     The "Generics-Pref" spreadsheet of the Transaction History Spreadsheet fails to include two payments that A&P made to McKesson.  These two payments are (1) $859,138.86 on July 3, 2015 for a Weekly Summary Invoice Report with an end date of May 23, 2015 for Generics Merchandise, and (2) $865,317.11 on July 10, 2015 for a Weekly Summary Invoice Report with an end date of May 30, 2015 for Generics Merchandise. | DeVito Declaration at ¶ 31, and Exhibit "J". |
| 34.     The dates listed under the column header "Doc Dates" of the Generics spreadsheets of the Transaction History Spreadsheet do not correlate to the dates of the corresponding McKesson Weekly Summary Invoice Reports for Generics Merchandise. | DeVito Declaration at ¶¶32-35, and Exhibits "H" and "K". |
| 35.     Generic Merchandise in the amount of $919,511.12 was for Merchandise invoiced by McKesson to A&P during the week of July 5, 2015 through July 11, 2015. | DeVito Declaration at ¶43, and Exhibits "F"and"K" |
| 36.     Generics Merchandise in the amount of $919,511.12 invoiced during the week of July 5, 2015 through July 11, 2015 should have been delivered to A&P's pharmacies during the week of July 5, 2015 through July 11, 2015. | DeVito Declaration at ¶43. |
| 37.     McKesson did not deliver Generic Merchandise in the amount of $919,511.12 to A&P on July 17, 2015. | DeVito Declaration at ¶¶44-45. |
| 38.     A&P did not receive any Weekly or Daily Summary Invoice Report from McKesson where the total amount of invoiced McKesson Merchandise was $1,811,959.20 with payment being due on July 17, 2015. | DeVito Declaration at ¶40. |

DATED: New York, New York
      September _____, 2019

                              RICH MICHAELSON MAGALIFF, LLP

*Counsel for* Plaintiff *The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,*

By: */s/ Robert N. Michaelson*
                Robert N. Michaelson
335 Madison Avenue, 9th Floor
New York, New York 10017
646.453.7851
rmichaelson@r3mlaw.com