Tracy L. Klestadt
Klestadt Winders Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Fax: (212) 972-2245
tklestadt@klestadt.com

Jeffrey K. Garfinkle (admitted *pro hac vice*)           Hearing Date:
BUCHALTER Professional Corporation                       September 16, 2019
18400 Von Karman Avenue, Suite 800                       1:00 pm EDT
Irvine, CA 92612
Telephone: (949) 760-1121
Fax: (949) 720-0182
jgarfinkle@buchalter.com

Counsel for Defendant
McKesson Corporation

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | Case No. 15-23007 (RDD) |
| Debtor. | Jointly Administered |
| The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | |
| Plaintiff | Adv. Proc. No. 17-08264 (RDD) |
| v. | |
| McKESSON CORPORATION | |
| Defendant | |

**REPLY OF DEFENDANT MCKESSON CORPORATION TO THE RESPONSE OF PLAINTIFF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ON BEHALF OF THE BANKRUPTCY ESTATE OF THE GREAT ATLANTIC & PACIFIC TEA COMPANY., INC., *ET AL.* TO MCKESSON CORPORATION'S LOCAL RULE 7056-1(b) STATEMENT OF ALLEGED UNDISPUTED FACTS IN SUPPORT OF <u>MOTION FOR SUMMARY JUDGMENT</u>**

1

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support | McKesson's Response |
|---|---|---|
| 1. During the pre-Preference Period, when A&P was late with a payment or McKesson thought that A&P was going to be late with a payment, A&P either paid McKesson by wire so that the payment arrived on the exact due date and was not late, or if the payment was late, A&P may have been subjected to additional charges as a result under the Supply Agreement. | Carnahan Declaration at ¶ 25, and Exhibits "G," "H," and "I;" DeVito Declaration at Exhibit "H" filed under seal, the Supply Agreement, Section 4(E). | Denied. During the pre-Preference Period, A&P was never late with payment. Rather, on two specific days, A&P arranged wire payment to McKesson: (1) On Friday, February 27, 2015, after being informed that ACH could not be processed on the due date, A&P arranged to pay amounts due by wire transfer; (2) on Friday, May 27, 2015, following McKesson's determination that the expected ACH had not been received, A&P arranged to wire transfer funds due that day. McKesson disputes the words "or McKesson thought that A&P was going to be late with a payment." Further, McKesson acknowledges that to the extent payments were late that per the terms of the Supply Agreement A&P would be charged a late fee. McKesson further responds that no late fees were charged to A&P. |
| 2. Section 4(E) of the Supply Agreement discusses how A&P will be charged by McKesson on past due balances in which there is no good faith dispute by A&P. | Carnahan Declaration at ¶ 25, and Exhibits "G," "H," and "I;" DeVito Declaration at Exhibit "H" filed under seal, the Supply Agreement, Section 4(E). | Admitted. McKesson agrees that section 4(E) of the Supply Agreement sets forth the formula for any late payment fees and how such fees would be billed. |
| 3. During the pre-Preference Period, when A&P was late with a payment or McKesson thought that A&P was going to be late with a payment, McKesson | Carnahan Declaration at ¶ 25, and Exhibits "G," "H," and "I." | Denied in part. During the entire duration of the Supply Agreement, McKesson had rights under section 2-609(1) of the Uniform Commercial Code ("UCC") and the |

2

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support | McKesson's Response |
|---|---|---|
| did not threaten A&P with non-delivery of Merchandise. | | Supply Agreement to (1) suspend deliveries of goods in the event A&P failed to make timely payment; or (2) request adequate assurance of due performance under UCC § 2-609(1). McKesson agrees that during the pre-Preference Period it did not exercise its contractual and legal rights to suspend performance under the Supply Agreement. |
| 4.    During the pre-Preference Period, senior McKesson representatives, such as Jenifer Towsley, McKesson's VP of Credit and Financial Services, U.S. Pharmaceutical, or Meg Mitchell, McKesson's Director, Strategic Solutions, McKesson Retail National Accounts, did not contact A&P a day or more in advance of a payment due date to ensure that McKesson would be paid on the exact due date. | Carnahan Declaration at ¶¶ 32, 37. | Denied. During the ten years of the supply relationship between McKesson and A&P, McKesson occasionally contacted A&P in advance of payment due dates regarding upcoming payments. Moreover, Tim Carnahan, Plaintiff's declarant, lacks personal knowledge of any interactions between McKesson and A&P prior to August 2014 when Mr. Carnahan first became employed by A&P. |
| 5.    During the Preference Period, McKesson, A&P's primary pharmaceutical supplier, repeatedly threatened A&P with non-delivery of Merchandise if A&P did not make payment to McKesson on the exact due date. | Carnahan Declaration at ¶10-40, and Exhibits "A," "B," "C," "K," and "M." | Denied. As proven by the Exhibits to Mr. Carnahan's Declaration, the communications between McKesson and A&P during the pre-petition period were limited and certainly not "repeated." The issue of suspending due performance under the Supply Agreement was only raised twice—once on May 22, 2015 and on or about June 20, 2015. |

3

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support | McKesson's Response |
|---|---|---|
| | | Exhibits K and M to Mr. Carnahan's Declaration do not address in any way suspension of due performance or non-delivery of goods. |
| 6. On May 22, 2015, when A&P's Friday payment was due to McKesson, A&P initiated two ACH payments in the amounts of $3,840,125.40 for non-Generics Merchandise and $552,809.19 for Generics Merchandise; and, McKesson would have received these payments on May 26, 2015. | Carnahan Declaration a ¶¶ 12-13, and Exhibits "D" and "E." | Admitted. |
| 7. On May 22, 2015, when payment had not yet arrived, McKesson threatened that if it did not receive a wire payment that day, McKesson would hold A&P's shipment immediately. | Carnahan Declaration at ¶¶ 14-15, and Exhibit "A." | Denied. On May 22, 2015, pursuant to the Supply Agreement and UCC § 2-609(1), McKesson advised A&P that if it did not receive wire payment it would be "holding shipment immediately." |
| 8. Tim Carnahan, A&P's Chief Financial Officer told McKesson's Jenifer Towsley, that A&P "will be able to get the ACH notification to you today for payment Tuesday so there is no interruption of service" and apologized for the inconvenience. | Carnahan Declaration at ¶ 18, and Exhibit "B." | Admitted. |
| 9. In response, Ms. Towsley demanded that A&P "wire payment, not an ACH, today in order to continue service." | Carnahan Declaration at ¶ 19, and Exhibit "B." | Admitted. |
| 10. If A&P did not immediately wire the payment for receipt by | Carnahan Declaration at ¶ 20, and Exhibit "B." | Denied. Exhibit B does not address McKesson exercising its contractual and legal |

4

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support | McKesson's Response |
|---|---|---|
| McKesson on Friday, May 22, 2015, then McKesson would have stopped shipment of McKesson Merchandise to A&P's pharmacies. | | rights to suspend due performance under the Supply Agreement and UCC § 2-609(1), including withholding future shipments of goods. |
| 11.  To ensure that there would be no such disruptions of service, A&P had to wire its payment to McKesson that day. | Carnahan Declaration at ¶ 22, and Exhibit "B." | Denied. Under the Supply Agreement and UCC § 2-609(1), McKesson had the right to suspend due performance in event of non-payment including withholding future shipments of goods. A&P's decision to wire payment on May 22, 2015, was a decision of A&P alone. |
| 12.  A&P cancelled the ACH payments in process to McKesson and paid McKesson by wire in the total amount of $4,392,934.59 on May 22, 2015. | Carnahan Declaration at ¶ 23, and Exhibits "E" and "F." | Admitted |
| 13.  Ms. Towsley described her communications with Mr. Carnahan to her colleagues as follows: [a]fter some back and forth with Tim Callahan (sic), the company's CFO, with the added pressure of a potential shipment hold, the company has agreed to wire funds today....Cash is definitely tight on their end and they are pushing all of their vendors. I want to make sure they | Towsley Declaration at Exhibit 4. | Admitted. |

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support | McKesson's Response |
|---|---|---|
| prioritize our payment...." | | |
| 14.    McKesson's threat of immediate non-shipment of Merchandise on May 22, 2015, was a change in the way that the parties had previously dealt with one another during the pre-Preference Period when A&P was late or it was thought A&P was going to be late with a payment to McKesson. | Carnahan Declaration at ¶¶ 24-25, and Exhibits "G," "H," and "I." | Denied. From time to time, over the ten year duration of the supply relationship between McKesson and A&P, A&P was informed that in event of non-payment of goods on the due date, McKesson would exercise its contractual and legal rights to suspend due performance, including withholding future shipments. |
| 15.    On or about June 10, 2015, McKesson representatives told A&P that if McKesson did not receive payment that Friday, then A&P would not receive its Merchandise delivery that following Monday. | Carnahan Declaration at ¶¶ 26-27, and Exhibit "C." | Denied. During the June 10, 2015 "fast call," McKesson advised A&P that if *any* Friday payment was not received on the due date, McKesson would withhold shipments for Monday delivery. |
| 16.    To ensure the continuation of its Merchandise delivery, among other things, A&P paid McKesson via ACH on the exact due date of June 12, 2015, in the amount of $4,086,597.70 for non-Generics Merchandise and in the amount of $1,595,482.76 for Generics Merchandise. | Carnahan Declaration at ¶ 28, and Exhibit "J." | Admitted. |
| 17.    Then, on July 1, 2015, Jenifer Towsley, McKesson's VP of Credit and Financial Services, U.S. Pharmaceutical, contacted A&P to ensure that McKesson would be paid on Thursday July 2, 2015, as Ms. Towsley thought that Friday, | Carnahan Declaration at ¶ 30, and Exhibit "K." | Admitted. |

6

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support | McKesson's Response |
|---|---|---|
| July 3, 2015 was a bank holiday. But, Ms. Towsley was mistaken, which was later acknowledged, as the banks were open on Friday, July 3, 2015. | | |
| 18.     A&P paid McKesson via ACH with payment arriving on the exact due date of Friday, July 3, 2015. | Carnahan Declaration at ¶ 31, and Exhibit "L." | Admitted. |
| 19.     Then, on July 9, 2015, Meg Mitchell, McKesson's Director, Strategic Solutions, McKesson Retail National Accounts, contacted A&P the day before the Friday, July 10, 2015 payment due date to ensure that McKesson would be paid by then. | Carnahan Declaration at ¶¶ 33-35, and Exhibit "M." | Admitted. |
| 20.     A&P paid McKesson via ACH with payment arriving on the exact due date of Friday, July 10, 2015. | Carnahan Declaration at ¶ 36, and Exhibit "L." | Admitted. |
| 21.     By this time, it was understood that if A&P failed to make prompt payment to McKesson by the exact due date that McKesson would not deliver Merchandise. | Carnahan Declaration at ¶ 38. | Denied.  Throughout the ten year supply relationship between McKesson and A&P, representatives of McKesson occasionally raised the possibility that failure to pay amounts on due dates would result in McKesson exercising its contractual and legal rights under the Supply Agreement and UCC § 2-609(1) to suspend due performance, including withholding future shipments. |
| 22.     A&P had to comply with McKesson's demand that A&P promptly pay McKesson by the exact due | Carnahan Declaration at ¶¶ 39-40. | Denied.  McKesson disputes that A&P had to comply with payment on contractual due dates.  A&P was free to |

7

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support | McKesson's Response |
|---|---|---|
| date to ensure that Merchandise continued to be delivered to A&P's pharmacies. This caused A&P to prioritize its payment to McKesson over other creditors. This continued up to the commencement of A&P's Chapter 11 bankruptcy cases. | | purchase Pharmaceuticals from other wholesalers or suppliers. |
| 23. As of July 13, 2015, terms were changed such that Merchandise would be delivered by McKesson on one day and payment would be received by McKesson the day after the delivery of Merchandise via wire and not ACH. | Carnahan Declaration at ¶¶ 47-48, and Exhibits "O" and "P;" DeVito Declaration at ¶¶ 13-14, and Exhibits "B" and "C." | Admitted, with the clarification that the word "terms" should be "credit terms." |
| 24. As of July 13, 2015, on a go forward basis only, A&P went from paying invoices on six (6) terms for non-Generics Merchandise and forty-one (41) terms for Generics Merchandise to one (1) day terms for Merchandise. | Carnahan Declaration at ¶¶ 43,47-48 and Exhibits "O" and "P;" DeVito Declaration at ¶¶ 13-14, and Exhibits "B" and "C;" McKesson's Transaction History Spreadsheet, "Branded Pref Period" spreadsheet, "Invoice Terms" for invoices dated July 13, 2015, to July 17, 2015. | Admitted. |
| 25. Even though McKesson drastically and unilaterally changed terms, McKesson nevertheless continued to extend credit to A&P although McKesson began to enforce a maximum daily credit limit after sending its July 2, 2015 Letter. | Carnahan Declaration at ¶53 and Exhibits "N" and "Q." | Denied. McKesson disputes it "unilaterally" changed terms. As permitted by the Supply Agreement, on July 2, 2015, McKesson provided written notice that as to any future purchases, A&P's credit terms would be reduced to one-day sales outstanding with a maximum daily credit limit of $1 million, effective on and after |

8

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support | McKesson's Response |
|---|---|---|
| | | July 13, 2015. This Notice provided A&P with 11 days to either continue to purchase from McKesson under reduced credit terms or purchase the goods from alternative vendors. Ultimately, McKesson and A&P negotiated and agreed to alternative reduced credit terms as reflected in the July 15, 2015 Letter. |
| 26.    A&P did not understand the terms change imposed by McKesson to mean that A&P's payment for Merchandise was to be contemporaneous with the delivery of said Merchandise. | Carnahan Declaration at ¶54. | Denied. A&P agreed to the one-day sales outstanding credit terms and, under an objective analysis, the payments made in accordance with agreed upon credit terms as set forth in the July 15, 2015 Letter were intended by A&P to be a contemporaneous exchange of new value for the product purchased by A&P. |
| 27. McKesson's change in terms constrained A&P's ability to manage its cash flow since the payments to McKesson were one of the largest vendor payments that A&P had to make on an ongoing basis. | Carnahan Declaration at ¶55 and Exhibits "L" and "M;" Towsley Declaration at Exhibit 4. | Admitted. |
| 28.    When McKesson imposed these new terms, (1) A&P was looking to renew its contract or extend its terms with McKesson, as the Supply Agreement was set to expire on August 31, 2015; (2) McKesson relayed that it would not be able to move forward with contract | Carnahan Declaration at ¶¶ 52, 57, and Exhibits "R" and "S." | Denied. McKesson did not impose new credit terms. New credit terms were negotiated and agreed to as set forth in the July 15, 2015 Letter. Under the Supply Agreement, the initial term was for 35 months, commencing October 1, 2012. Following the initial |

9

| **The Committee's Alleged Additional Disputed Material Facts** | **The Committee's Evidentiary Support** | **McKesson's Response** |
|---|---|---|
| renewal discussions given the status of A&P's finances and McKesson's concerns; and (3) at this time, A&P's ability to find an alternate primary pharmaceutical vendor would be extremely difficult if not impossible. | | term, A&P had the option to renew the Supply Agreement for up to two one-year periods by providing written notice to McKesson at least 90 days prior to the end of the initial 35-month term. A&P did not exercise that extension option. Because A&P did not exercise its extension option in accordance with provisions of the Supply Agreement and due to A&P's then current financial condition, McKesson was unwilling to negotiate an extension of the Supply Agreement beyond August 31, 2015. Moreover, McKesson disputes A&P's contention that it could not find an alternative primary Pharmaceutical vendor. Numerous alternative vendors existed, but A&P was unwilling to purchase goods from those alternative vendors due to the higher cost imposed by those alternative vendors. |
| 29.    In order to continue to make McKesson's payments on six (6) and forty-one (41) day terms and now meet the one (1) day terms imposed as of July 13, 2015 by McKesson on a go-forward basis, A&P was put in a position where it was forced to accommodate McKesson and prioritize payments to | Carnahan Declaration at ¶¶ 40, 58. | Denied. McKesson denies that A&P was "put in a position where it was forced to accommodate McKesson and prioritize payments to McKesson over other creditors." A&P could have sourced any needed inventory from other alternative vendors. |

10

| **The Committee's Alleged Additional Disputed Material Facts** | **The Committee's Evidentiary Support** | **McKesson's Response** |
|---|---|---|
| McKesson over other creditors. | | |
| 30.  According to A&P's records, A&P paid McKesson the following four payments via wire during the week of July 13, 2015 on one day terms:<br>• $1,436,808.53 for Merchandise invoiced on July 13, 2015, with the wire being initiated in and around 12:09 P.M. CT on Tuesday, July 14, 2015, with payment to be received on Tuesday, July 14, 2015;<br>• $1,098,919.73 for Merchandise invoiced on July 14, 2015, with the wire being initiated in and around 14:05 P.M. CT on Wednesday, July 15, 2015, with payment be received on Wednesday, July 15, 2015;<br>• $883,260.71 for Merchandise invoiced on July 15, 2015, with the wire being initiated in and around 14:06 P.M. CT on Thursday, July 16, 2015, with payment to be received on Thursday, July 16, 2015; and | DeVito Declaration at ¶ 16, and Exhibit "E." | Admitted. |

| **The Committee's Alleged Additional Disputed Material Facts** | **The Committee's Evidentiary Support** | **McKesson's Response** |
|---|---|---|
| • $830,735.91 for Merchandise invoiced on July 16, 2015, with the wire being initiated in and around 13:02P.M. CT on Friday, July 17, 2015, with payment to be received on Friday, July 17, 2015. | | |
| 31.    McKesson's Transaction History Spreadsheet does not set forth the actual payment amount received from A&P or how McKesson applied A&P's payments against McKesson invoices. | DeVito Declaration at ¶ 27. | Denied in part.  McKesson's Transaction History Spreadsheet shows how payments were applied, including the amount of each invoice paid.  A&P may have been entitled to credits, which were deducted from aggregated payments covering multiple invoices.  The Transaction History Spreadsheet does not list the amount of aggregated payments. |
| 32.    The Transaction History Spreadsheet does not include information pertaining to credit memos, like for returned Merchandise. | DeVito Declaration at ¶ 27. | Admitted. |
| 33.    The "Generics-Pref" spreadsheet of the Transaction History Spreadsheet fails to include two payments that A&P made to McKesson. These two payments are (1) $859,138.86 on July 3, 2015 for a Weekly Summary Invoice Report with an end date of May 23, 2015, for Generics | DeVito Declaration at ¶ 31, and Exhibit "J." | McKesson is still investigating the Committee's assertions and is unable to admit or deny at this time. |

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support | McKesson's Response |
|---|---|---|
| Merchandise, and (2) $865,317.11 on July 10, 2015, for a Weekly Summary Invoice Report with an end date of May 30, 2015 for Generics Merchandise. | | |
| 34.     The dates listed under the column header "Doc Dates" of the Generics spreadsheets of the Transaction History Spreadsheet do not correlate to the dates of the corresponding McKesson Weekly Summary Invoice Reports for Generics Merchandise. | DeVito Declaration at ¶¶ 32-35, and Exhibits "H" and "K." | McKesson is still investigating the Committee's assertions and is unable to admit or deny at this time. |
| 35.     Generic Merchandise in the amount of $919,511.12 was for Merchandise invoiced by McKesson to A&P during the week of July 5, 2015, through July 11, 2015. | DeVito Declaration at ¶43, and Exhibits "F" and "K." | McKesson is still investigating the Committee's assertions and is unable to admit or deny at this time. |
| 36.     Generics Merchandise in the amount of $919,511.12 invoiced during the week of July 5, 2015, through July 11, 2015, should have been delivered to A&P's pharmacies during the week of July 5, 2015, through July 11, 2015. | DeVito Declaration at ¶43. | McKesson is still investigating the Committee's assertions and is unable to admit or deny at this time. |
| 37.     McKesson did not deliver Generic Merchandise in the amount of $919,511.12 to A&P on July 17, 2015. | DeVito Declaration at ¶¶ 44-45. | McKesson is still investigating the Committee's assertions and is unable to admit or deny at this time. |
| 38.     A&P did not receive any Weekly or Daily Summary Invoice Report from McKesson where the | DeVito Declaration at ¶40. | McKesson is still investigating the Committee's assertions and is |

13

| The Committee's Alleged Additional Disputed Material Facts | The Committee's Evidentiary Support | McKesson's Response |
|---|---|---|
| total amount of invoiced McKesson Merchandise was $1,811,959.20 with payment being due on July 17, 2015. | | unable to admit or deny at this time. |

DATED: September 12, 2019

BUCHALTER
A Professional Corporation

By: /s/ *Jeffrey K. Garfinkle*
Jeffrey K. Garfinkle, Esq.
(Cal Bar. No. 153496; admitted *pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
Fax: (949) 720-0182
jgarfinkle@buchalter.com

Attorneys for MCKESSON CORPORATION