Tracy L. Klestadt
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone:  (212) 972-3000
Fax:  (212) 972-2245
tklestadt@klestadt.com

Jeffrey K. Garfinkle (admitted *pro hac vice*)
BUCHALTER Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
Fax: (949) 720-0182
jgarfinkle@buchalter.com


Counsel for Defendant
McKesson Corporation

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | Case No. 15-23007 (RDD) |
| | Jointly Administered |
| Debtors. | |
| The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | |
| Plaintiff | Adv. Proc. No. 17-08264 (RDD) |
| v. | |
| McKESSON CORPORATION | |
| Defendant | |

**McKESSON CORPORATION'S REPLY BRIEF IN SUPPORT OF MOTION FOR**
<u>**SUMMARY JUDGMENT**</u>

BN 37573897v4

Defendant McKesson Corporation ("McKesson"), by and through its undersigned counsel, respectfully submits this reply brief in support of its Motion for Summary Judgment (the "Motion") in response to The Committee's Memorandum of Law Opposing Defendant's Motion for Summary Judgment Under Fed. R. Bankr. P. 7056 (the "Opposition").[1]

## I. PRELIMINARY STATEMENT

The preference defenses set forth in Bankruptcy Code section 547 do not require a vendor to continue shipping product in blind ignorance of a debtor's financial troubles. Rather, they are intended to encourage a vendor to ship new product despite being acutely aware of a debtor's precarious situation. As a practical matter, to ensure its protection under those defenses before shipping new product, a vendor must be able to communicate openly with a debtor regarding the status and timing of payments, as well as the possible impacts should the debtor fail to make required payments. Yet, the Committee's argument on the ordinary course of business contends that such communications void the defense. The Committee's position is incongruous with the realities of global commerce. No vendor would ever extend new product to a customer on the verge of bankruptcy if it could not even communicate with the customer regarding its ability and intent to continue making payments. If applied by the courts, the Committee's interpretation of the ordinary course of business defense would render it a useless provision of the Bankruptcy Code.

With regard to the contemporaneous exchange defense, the Committee does not cite any legal authority undermining McKesson's application of this defense to payments made one day after the delivery of the goods. Instead, the Committee focuses on the intent element of the defense, but fails to present any credible evidence disputing the clear intent of the parties to make contemporaneous exchanges. When determining the intent of McKesson and the Debtors,

---

[1] Unless defined herein, defined terms shall have the same meaning set forth in the Motion.

1

the Court should consider objective facts such as the agreement between the parties and the actual timing of the payments, not the subjective interpretation of a single individual.  The objective evidence before the Court demonstrates that the Debtors agreed to provide substantially contemporaneous payments and in fact made such payments pursuant to the agreed terms.

McKesson also (i) holds a new value defense, (ii) challenges that the Committee has established its *prima facie* case with regard to certain payments made within 45 days of the Petition Date, and (iii) holds a significant setoff claim against any liability the Court does find.

Cognizant of the standard for granting summary judgment, this reply brief will focus on the issues of law supported by only those facts that cannot credibly be disputed in order to demonstrate that McKesson holds a complete defense to the Committee's causes of action. Should it be necessary, McKesson reserves the right to respond to the disputed factual allegations asserted by the Committee.

## II.    ORDINARY COURSE OF BUSINESS DEFENSE

The Committee's Opposition employs a significant amount of hyperbole to describe the communications between McKesson and the Debtors during the preference period as a "campaign" of "coercion."  While McKesson was admittedly an important supplier to the Debtors, it did not exercise control over the Debtors' decisions and check book.  Moreover, McKesson is not the only supplier of pharmaceuticals and the Supply Agreement did not prohibit the Debtors from purchasing product from other distributors.  Disregarding terms such as "coercion" and other hyperbole, consider the core proposition the Committee is making: By requiring a payment to be made on its due date, McKesson cannot apply the ordinary course of business defense when such payment was in fact paid on time.  Rather, the Committee argues that McKesson should have instead accepted late payments, even though such late payments would have been inconsistent with prior payment practices.  Under that hypothetical scenario,

assuredly the Committee would instead argue that such late payments fall outside the ordinary course of business. So if a vendor cannot insist upon timely payment consistent with prior payment timeframes and a vendor cannot stay silent and accept a late payment, how can a vendor ever avail itself of the ordinary course of business defense?

Fortunately, the case law does not support such an impassable dilemma for vendors. First and foremost, the ordinary course of business defense requires a comparison of the payment timeframes during and before the preference period. *Pereira v. United Parcel Service of America (In re Waterford Wedgwood USA, Inc.),* 508 B.R. 821, 828 (Bankr. S.D.N.Y. 2014) ("Though the subjective test compares the course of dealings of the parties, it essentially is a comparison of two sets of data over differing periods of time."). The payment history data demonstrates that all of the payments during the preference period were made on the applicable due dates. This is consistent with the payment practices leading up to the preference period where the vast majority of invoices were paid on time. The Committee's Opposition does not dispute this data and therefore there is no disputed fact on this issue. The undisputed record before the Court demonstrates that all payments during the preference period were made on the exact due date consistent with historical payment timeframes. "Timely payments made in accordance with applicable payment terms are of course the quintessential examples of 'normal financial relations' devoid of 'unusual action' by either the debtor or the creditor." *Miller v. Perini Corp. (In re A.J. Lane & Co.)*, 164 B.R. 409, 414 (Bankr. D. Mass. 1994).

Rather than address the overwhelming data in support of the ordinary course of business defense, the Opposition primarily focuses on a single internal McKesson communication to evidence its assertion of unusual collection actions. However, that May 22nd email only evidences the fact that McKesson was concerned about the possibility of a missed payment and

requested that the Debtors make the payment on the required due date. The internal email uses the word "pressure", which the Committee tries to exploit to demonstrate unusual collection actions by McKesson, but to reach that conclusion from this single email ignores the fact that it was an internal communication between McKesson employees and not evidence of specific statements to the Debtors, particularly any statements that can be construed as "coercion." At most, the email evidences that the Debtors were aware a missed payment could result in a credit hold, a right available to McKesson under the Supply Agreement, and for that reason decided to make the payment on the required due date. The Declaration of Tim Carnahan also references other communications between the Debtors and McKesson employees, but again, the alleged substance of those conversations only pertained to inquiries regarding timely payment and the possibility that the Debtors would be placed on a credit hold if a payment was not timely received.

The Committee does not present any evidence that actual enforcement steps were taken by McKesson to collect outstanding payments from the Debtors. Indeed, no final decision was ever made by McKesson to place the Debtors on a credit hold and McKesson took no actual steps to terminate the Supply Agreement or enforce its other remedies under the UCC to cutoff shipments and reclaim goods. To do so, McKesson would have been required under the terms of the Supply Agreement to issue a five day written notice to cure. See § 13.A. of the Supply Agreement. No such notice was delivered to the Debtors. Furthermore, McKesson never sent a demand for adequate assurance of future performance pursuant to § UCC 2-609. McKesson merely communicated its desire to be timely paid and advised the Debtors of McKesson's remedies under the Supply Agreement and applicable law if payment was not timely made.

Moreover, the Declaration of Tim Carnahan even admits that in prior instances when McKesson was concerned about a possible late payment, the Debtors initiated a wire to ensure timely payment of invoices:

> From what I recall, in prior instances, during the pre-Preference Period, when A&P was late with a payment or McKesson thought that A&P was going to be late with a payment, **A&P either paid McKesson by wire so that the payment arrived on the exact due date and was not late**, or if payment was late, A&P may have been subjected to additional charges as a result under the Supply Agreement.

Carnahan Declaration at ¶¶ 24-25 (emphasis added). Thus, the Committee presented evidence that McKesson's communications and request for a wire payment on May 22, 2015 were consistent with prior pre-preference period practice.

The cases cited by the Committee to support its "coercion" argument are wholly inapposite to the case at bar. *FBI Wind Down Inc. Liquidating Trust v. Innovative Delivery Sys. (In re FBI Wind Down, Inc.), 581 B.R. 387 (Bankr. D. Del. 2018)* is distinguishable because McKesson never put A&P on a credit hold or imposed any accelerated deadlines beyond the standard credit terms in the Supply Agreement. Similarly, *Gold Force, Int'l Ltd. v. Official Comm. of Unsecured Creditors of Cyberrebate.com., Inc.,* 2004 U.S. Dist. LEXIS 2089, at *16-17 (E.D.N.Y. Feb. 10, 2004) is distinguishable because, as admitted in the Declaration of Tim Carnahan, McKesson had a history of communicating with the Debtors regarding the possibility of delayed payments. The ruling in *Camelot Music, Inc. v. MHW Advertising & Public Relations Inc. (In re CM Holdings Inc.),* 264 B.R. 141, 154 (Bankr. D. Del. 2000) is distinguishable because the Debtors did not seek to pay McKesson early, rather they continued to make their payments on the exact due date in accordance with the Supply Agreement. The Committee also mistakenly relies on a Third Circuit case where the creditor emailed the debtor an "ultimatum" to

5

begin an accelerated repayment plan to cure arrearages or risk terminating the relationship. *See In re AE Liquidation*, 729 Fed. Appx 153, 157–58 (3d Cir. 2018). Unlike in *AE Liquidation*, the Debtors never fell behind on payments and McKesson did not demand accelerated repayment of outstanding amounts.

Finally, it is noteworthy that the single internal email so closely scrutinized by the Committee goes on to discuss McKesson's intent to limit its "bankruptcy exposure", which includes preference liability. Requiring timely payment consistent with prior practice is one way of limiting preference liability. Yet the Committee is trying the flip the ordinary course of business defense on its head by arguing that McKesson should have instead permitted a late payment that would have fallen outside the ordinary payment timeframes. The ordinary course of business defense was implemented to encourage vendors to continue supplying companies in financial distress. Only a distorted interpretation of that defense would penalize McKesson for communicating its willingness to continue shipping goods, but only on the condition that the Debtors continue to make timely payments consistent with prior practice.

### III.   CONTEMPORANEOUS EXCHANGE DEFENSE

The Opposition does not present any legal authority refuting McKesson's legal argument regarding the contemporaneous nature of the one-day payments. The Committee asserts a bright line rule that "A one-day delay in payment, as seen here, is not a substantially contemporaneous exchange", but the 1913 Supreme Court case cited by the Committee in no way supports this statement. *See, National City Bank v. Hotchkiss*, 231 U.S. 50 (1913). First, that case does not address the contemporaneous exchange defense under 11 U.S.C. § 547(c)(1), which was enacted 65 years later in 1978. Second, the *Hotchkiss* case solely addressed a creditor's demand for new collateral after the issuance of an unsecured loan. The Committee does not provide any actual legal authority to support its argument that a next day payment is not contemporaneous.

6

Clearly aware of the lack of authority supporting its position, the Committee primarily focuses on the intent element of the defense. Predictably, the Committee argues that the Debtors did not intend the next day payments to be contemporaneous exchanges. The only evidence presented in support of this asserted lack of intent is a single sentence in the Declaration of Tim Carnahan: "I did not understand the terms change imposed by McKesson to mean that A&P's payment for Merchandise was to be contemporaneous with the delivery of said Merchandise." Carnahan Declaration ¶54. The subjective belief of a single individual does not evidence the intent of an entire corporation.

Mr. Carnahan's *ex post facto* understanding is not credible and, more importantly, is belied by the objective facts from which the Debtors' intent can be determined. As set forth in the Declaration of Jenifer Towsley, McKesson initially informed the Debtors that future sale would be on one-day sales outstanding terms, which would have required payment the same day the goods were delivered. After negotiations with the Debtors, to address concerns regarding the logistical impossibility of paying the invoices the same day the goods were delivered, McKesson and the Debtors agreed to two-day sales outstanding terms, which required payment the day after the goods were delivered. (Towsley Declaration, ¶¶ 25-27). However, the intent was the same; the invoices were to be paid as soon as practically possible, constituting contemporaneous exchanges. The Debtors did in fact comply with these new terms and the payments were made one day after the goods were delivered.

The Opposition states that the Debtors were "forced to acquiesce" to the new payment terms because "A&P wanted to renew its contract" with McKesson. First, the Opposition repeatedly states that McKesson "forced" the Debtors to take various actions. This characterization of the Debtors' independent decisions should be disregarded by the Court. The

7

Debtors were autonomous corporate entities run by experienced corporate officers. McKesson could not "force" those officers to do anything. The Debtors, through their officers, made certain business decisions based on present circumstances. In this instance, they chose to agree to and comply with the new terms because they wanted to renew their contract with McKesson.

Moving past the Committee's lack of free will arguments, the intent to make a contemporaneous exchange is not eliminated merely because one party is unhappy with the new terms. The requisite intent is demonstrated by the objective fact that the Debtors chose to comply with the new terms. As cited in McKesson's Motion, the *Bridge Information* court rejected a similar lack of intent argument:

> Plan Administrator counters by arguing [against contemporaneous exchange] that because he has not stipulated to Bridge's intent in making the Wire Transfers, there are material facts in dispute on this issue. The objective circumstances surrounding the parties' relationship, however, such as any written agreement between the parties and the parties' past course of dealing, is evidence of whether the parties intended for the challenged transfer to be an contemporaneous exchange for new value under 11 U.S.C. § 547(c)(1). *Tyler v. Swiss Am. Sec.* (*In re Lewellyn & Co., Inc.*), 11929 F.2d 424, 427 (8th Cir. 1991).
>
> Here, the summary judgment record establishes that the parties' agreement required Bridge to remit the Wire Transfers to Hartford the day after receiving the Claims Summary. Also the evidence in the summary judgment record indicates that Bridge invariably remitted the Wire Transfers to Hartford in accordance with the terms of the agreement. And Plan Administrator's naked assertion that he cannot stipulate to Bridge's intent in remitting the Wire Transfers is not sufficient to create a genuine issue of material fact for trial under Fed. R. Civ. P. 56(e). Accordingly, the Court finds that there are no material facts in dispute for trial on the issue of whether the parties intended for the Wire Transfers to be a contemporaneous exchange for new value.

321 B.R. at 256.

Lastly, the Opposition contends that McKesson failed to show with sufficient evidence that the four payments during the final week were applied to goods delivered the previous day. That argument simply ignores the evidence before the Court. The Declaration of Jenifer Towsley states that the four payments received on July 14 through July 17, 2015 were applied to the invoices for product delivered the prior date. Towsley Declaration, ¶ 28-29. Ms. Towsley's declaration is based on her review of McKesson's records, which evidence the dates payments were received and how they were applied. In addition, the Declaration of Lalitha Iragavarapu similarly provides that the payments were applied to the invoices generated the prior day. Iragavarapu Declaration, ¶ 11. As with Ms. Towsley's declaration, Ms. Iragavarapu's declaration is based upon her review of McKesson's records. Finally, McKesson provided the Committee with a spreadsheet derived from the same computer records reviewed by Ms. Towsley and Ms. Iragavarapu. That spreadsheet reflects the dates that the invoices were generated and paid in the final week preceding the bankruptcy filing. The Committee questions the sufficiency of this evidence, but does not provide any evidence of its own to dispute how the payments were applied in the final week. Accordingly, the undisputed evidence before the Court demonstrates that the four one-day payments were applied to the invoices for goods delivered the prior day.

## IV.    NEW VALUE AND CALCULATION OF MCKESSON'S 503(B)(9) CLAIM

In light of its ordinary course of business defense, McKesson's Motion did not address the application of new value except as to the final four payments. McKesson reserved its rights to assert its complete new value defense, should the need arise. Focusing on the application of new value to the final payments, the Committee has raised certain factual issues concerning the timing of delivery of goods during the final week preceding the Petition Date.

As a matter of law, McKesson does not believe it should be required to calculate the time

9

of delivery down to the minute, which would be a practical impossibility. The purpose of the new value defense is to reward creditors who continue to ship product to a financially distressed entity. In light of the incentivizing purpose behind the new value defense, it should be sufficient for McKesson to demonstrate, as it has, that goods were delivered on a particular day and then receive new value credit for those deliveries against any payments received through that same day. Calculating the new value defense in this manner will promote the purpose of the defense and encourage vendors to ship new goods. Alternatively, requiring a vendor to monitor and direct the exact time of delivery to ensure that goods are not delivered until at least one minute after a payment is made would undermine the purpose of the defense. Imposing such a herculean task would undoubtedly dissuade vendors from advancing new goods. For this policy reason, the Court should grant McKesson new value credit against payments received the same day the goods were delivered.

To the extent the Court disagrees, McKesson reserves its right to investigate the exact timing of delivery and, to the extent it can, provide additional information in support of its new value defense.

The Committee has also already raised factual disputes regarding the date of delivery of certain generic product that may impact the new value defense and the calculation of McKesson's section 503(b)(9) administrative claim. McKesson is attempting to reconcile the issues raised by the Committee and reserves its rights to present additional information to the Court at a later date. For purposes of summary judgment, to the extent McKesson's setoff rights are required to shield any potential preference liability (as discussed below), the amount of that setoff is no less than the amount of McKesson's section 503(b)(9) claim calculated by the Committee: $1,407,657.68.

**V.      HYPOTHETICAL LIQUIDATION TEST**

In its Motion, McKesson argued the Committee failed to establish its *prima facie* case because McKesson did not receive more than in would in a hypothetical chapter 7 liquidation on account of McKesson's reclamation rights.  In response, the Committee argues that McKesson failed to actually make a reclamation claim within the requisite timeframe, and thus its reclamation rights do not impact the liquidation test under section 547(b)(5).  The Committee's position ignores the hypothetical nature of the test.  *See, In re Teligent, Inc.*, 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008)(plaintiff "must construct a hypothetical chapter 7 case, and determine the percentage distribution that the defendant would have received on the petition date").  As of the Petition Date, McKesson held reclamation rights.  A payment made to a party with full recourse in the event of nonpayment (by way of a lien or reclamation) cannot be avoided in a preference action.  *See The Official Committee of Unsecured Creditors of 360Networks (USA) Inc. v. AAF–McQuay, Inc. (In re 360nettworks (USA) Inc.)*, 327 B.R. 187, 190 (Bankr. S.D.N.Y. 2005)("payment is not preferential where 'the payment merely avoids the bite of a lien which the trustee could not have successfully attacked.'").

In *360networks*, the defendants provided construction materials entitling them to a mechanic's lien.  The debtors then paid the defendants during the preference period and before the defendants perfected their liens.  The court held that because the filing and exercising of the lien would not have been preferential, any payment on a claim subject to these lien rights likewise was not preferential.  Therefore, because defendants could have been fully secured, the plaintiffs could not meet the *prima facie* requirement of section 547(b)(5) and the court granted partial summary judgment.  *In re 360networks (USA) Inc.)*, 327 B.R. at 189-91.

Here, McKesson held a similar right to reclaim goods.  McKesson could have and would have exercised its reclamation rights in a hypothetical liquidation.  Consequently, the Committee

cannot establish its *prima facie* case for avoidance of any payment applied to invoices for goods received by the Debtors during the 45-day period prior to the Petition Date.

## VI.     MCKESSON'S SETOFF RIGHTS

In the Motion, McKesson explains why the preference claims on account of payments for goods delivered to the Debtors during the 20 days immediately before the Petition Date and, in particular the four final payments, fail. Specifically, avoidance of the payments on account of these 20-day goods would result in a corresponding increase in the amount of McKesson's § 503(b)(9) claim and thus there is no net benefit to the estates in pursuit of preference claims related to payments on account of these goods. That increased § 503(b)(9) claim is available to be used by McKesson as a complete offset of any potential preference liability, including the payments received during the week before the Petition Date. *Official Comm. of Unsecured Creditors of Quantum Foods, LLC v. Tyson Foods, Inc. (In re Quantum Foods, LLC)*, 554 B.R. 729, 733 (Bankr. D. Del. 2016).

*Quantum Foods* is a case with nearly identical facts to this lawsuit. Like A&P, *Quantum Foods* was an administratively insolvent case. The *Quantum Foods* creditors' committee sued a vendor—Tyson Foods ("Tyson")—for preferential transfers and Tyson counterclaimed that its $2.6 million unpaid § 503(b)(9) administrative claim could be used to offset any preference liability. *Id*. at 732. The creditors' committee brought a summary judgment motion on Tyson's counterclaim only. *Id.*

In ruling in favor of Tyson and rejecting the committee's disguised new value argument (and Bankruptcy Code § 502(d) argument), the *Quantum Foods* court stated as follows:

> I am not persuaded by the Committee's argument that Tyson's claim is a disguised new value defense because it has the effect of reducing the amount of preferential transfers returned to the estate. Tyson's setoff claim does not affect the bottom line of the preference calculation; rather, setting off Tyson's Administrative

12

> Claim effects only the amount paid to the estate. Tyson's Administrative Claim affects the preference claim externally, not internally. This distinction is not merely semantic but rather evinces the nature of Tyson's claim.
>
> Tyson's claim fits squarely into the definition of "setoff," which is "[a] counterclaim demand which defendant holds against plaintiff, arising out of a transaction that is extrinsic of plaintiff's cause of action." Here, the Committee's cause of action is the § 547(b) preference action, whereas Tyson's counterclaim is an independent, pre-existing and wholly unrelated postpetition administrative expense claim.

*Id*. at 733–734 (footnote omitted). Based on this analysis, the *Quantum Foods* court concluded that Tyson was entitled to use its § 503(b)(9) administrative claim as a complete setoff against any potential preference liability and, importantly, it was entitled to do so notwithstanding the administrative insolvency of the *Quantum Foods* estate.

The Committee, in its Opposition, ignores the *Quantum Foods* decision and McKesson's argument concerning the lack of any net benefit to the estate from avoiding payments for goods delivered within the 20 days preceding the case. Instead, the Committee cites *Circuit City Stores, Inc. v. Mitsubishi Digital Electronics America, Inc. (In re Circuit City Stores, Inc.)*, 2010 WL 4956022 (Bankr. E.D. VA 2010), in response to an argument that McKesson does not actually raise: the application of new value using the same invoices supporting the setoff claim. The *Circuit City* decision has no bearing on the setoff issue raised by McKesson. In fact, the word setoff only appears twice in the *Circuit City* decision—both times in reference to the preference defendant's asserted setoff rights on account of pre-petition counterclaims. McKesson's arguments – like those raised in *Quantum Foods* - involve post-petition setoff rights.

Unlike *Quantum Foods* and the A&P bankruptcy case, the debtor in *Circuit City* confirmed a liquidating chapter 11 plan that paid all administrative claims in full. *Id*. at p. 3 ("…

13

Debtors do not object to the payment of agreed [§] 503(b)(9) Claim," which will be paid out of a "fully funded reserve"). The preference defendant—Mitsubishi—argued that it was able use its § 503(b)(9) claim for purposes of its new value defense even though the § 503(b)(9) would be paid in full. The *Circuit City* court disagreed on the grounds that Mitsubishi's § 503(b)(9) claim ultimately would be paid out of the reserve funds and thus could not be used for purposes of the new value defense. *Id*. at p. 5.

In stark contrast to *Circuit City*, McKesson's current unpaid § 503(b)(9) claim will not be paid in full. The Committee concedes this point. "The A&P estate is administratively insolvent and the treatment of administrative claims has yet to be determined. Payment of administrative claims may be so low that McKesson's section 503(b)(9) claim is reduced to a de minimis level. . . ." Opp., p. 19. This unpaid administrative claim, plus any additional unpaid administrative claims resulting from the avoidance of payment for goods delivered during the 20 days prior to the Petition Date, including the four final payments, are available as a setoff against any preference liability. That is the holding of *Quantum Foods*.

Moreover, at least one circuit court disagrees with the *Circuit City* decision and holds that new value does not need to remain unpaid post-petition. *See, Friedman's Liquidating Trust v. Roth Staffing Cos. LP (In re Friedman's Inc.)*, 738 F.3d 547, 557 (3d Cir. 2013)("Post-petition payments by a debtor do not affect a creditor's new value defense."); see also *Pirinate Consulting Group, LLC v. Styron LLC (In re NewPage Corp.)*, 2014 Bankr. LEXIS 4270, *51 (Bankr. D. Del. Oct. 1, 2014) ("Following the Third Circuit's decision in *Friedman's*, it is clear that a court-authorized post-petition payment by the debtor does not affect a creditor's new value defense."); *In re Murray, Inc.*, 2007 WL 5595447, *2 (Bankr. M.D. Tenn. Jun. 6, 2007) ("In essence, the Trustee would have the Court conclude that post-petition payments remain in play

while post-petition advances of new value are excluded from the analysis under [section] 547(c)(4). Logically, and as a matter of statutory consistency, the Trustee's argument fails."). The post-petition payment of a section 503(b)(9) claim is equivalent to a setoff based on the same claim; the impact on the estate is the same. As a result, under the reasoning set forth in *Friedman's*, McKesson should be entitled to assert both a new value defense and a setoff claim for the goods received by the Debtors in the 20 days preceding the bankruptcy filing.

In its Opposition, and without any authority, the Committee suggests that due to the estate's gross administrative insolvency, McKesson's setoff needs to be "correspondingly limited." Opp., p. 19. The law on setoff is to the contrary. The Supreme Court in *Citizen's Bank v. Strumpf*, 516 U.S. 16, 18–19 (1995) said "[a]lthough no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." The Supreme Court also referenced section "553(a)'s general rule that the Bankruptcy Code does not affect the right of setoff . . ." *Id.* at 19. This ruling is consistent with two centuries of Supreme Court unbroken jurisprudence on setoff. For example, in 1841, the Supreme Court in *Gratiot v. United States*, 40 U.S. 336, 370 (1841) ruled: "It is but the exercise of the common right, which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." *See also Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528 (1913) (holding that the right of setoff allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A.") The ability of B to pay A does not factor into the analysis, the mutual and offsetting debts exist regardless of the ability to pay.

Consistent with this controlling Supreme Court case law, McKesson is entitled to setoff

15

the full amount of its unpaid § 503(b)(9) administrative claim—including any additional amounts for avoided payments on account of 20-day goods, such as the four final payments—against any preference recoveries. For these reasons, McKesson is entitled to summary judgment on the setoff and no net benefit to the estate issues.

## VII.  CONCLUSION

For the foregoing reasons, McKesson respectfully requests (i) that the Motion be granted, (ii) that the Court enter summary judgment in its favor with respect to the First and Second Claims asserted in the Complaint, (iii) that the adversary proceeding be dismissed with prejudice, and (iv) that the Court grant such other relief as is just and proper.

DATED: September 13, 2019

                                              KLESTADT WINTERS JURELLER
                                              SOUTHARD & STEVENS LLP

                                              By: */s/ Tracy L. Klestadt*
                                              Tracy L. Klestadt, Esq.
                                              200 West 41st Street, 17th Floor
                                              New York, New York 10036
                                              Telephone:  (212) 972-3000
                                              TKlestadt@Klestadt.com

                                              and

                                              BUCHALTER, A Professional Corporation

                                              Jeffrey K. Garfinkle, Esq.
                                              (Cal Bar. No. 153496; admitted *pro hac vice*)
                                              18400 Von Karman Avenue, Suite 800
                                              Irvine, CA 92612
                                              Telephone: (949) 760-1121
                                              jgarfinkle@buchalter.com

                                              Attorneys for Defendant, MCKESSON CORPORATION