**Hearing Date & Time: September 20, 2021 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Deadline: September 13, 2021 at  4:00 p.m. (Prevailing Eastern Time)**
**Reply Deadline: September 17, 2021 at  4:00 p.m. (Prevailing Eastern Time)**

GRIFFIN HAMERSKY LLP
420 Lexington Avenue, Suite 400
New York, NY 10170
(646) 998-5580
Richard K. Milin
Michael D. Hamersky

*Counsel for The Official Committee of Unsecured*
*Creditors on behalf of the bankruptcy estate of*
*The Great Atlantic & Pacific Tea Company, Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x
In re:                                                    :
                                                          :         Chapter 11
THE GREAT ATLANTIC & PACIFIC TEA          :
COMPANY, INC., *et al.*,                              :         Case No. 15-23007 (RDD)
                          Debtors.                        :
------------------------------------------------------------------------x
                                                          :
The Official Committee of Unsecured Creditors on          :
behalf of the bankruptcy estate of THE GREAT              :
ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*,   :
                                                          :         Adv. Proc. No. 17-08264 (RDD)
                          Plaintiff,                      :
          v.                                              :
                                                          :
McKESSON CORPORATION,                             :
                                                          :
                          Defendant.                      :
------------------------------------------------------------------------x

# PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO COMPEL DISCOVERY RESPONSES
## FROM DEFENDANT McKESSON CORPORATION AND FOR SANCTIONS

# Table of Contents

Page

TABLE OF CONTENTS ........................................................................................... ii

TABLE OF AUTHORITIES ..................................................................................... iv

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL BACKGROUND ....................................................................................... 5

    Procedural History .............................................................................................. 5

    The Facts and Discovery Requests at Issue ........................................................ 6

ARGUMENT ............................................................................................................... 7

PLAINTIFF SHOULD BE GRANTED AN ORDER COMPELLING
DEFENDANT TO PRODUCE DISCOVERY THAT IT HAS FAILED OR
REFUSED TO PRODUCE AND AWARDING APPROPRIATE SANCTIONS ..................... 7

    I.   Defendant Should Be Compelled to Produce Documents, Information and Testimony about
       Credits, Rebates and Its Unilateral, Post-Petition Seizure of Almost $1 Million – and an
       Undisclosed Additional Amount – of the Debtor's Property ................................. 8

        A.  Information about Medturns, the Rebate and Defendant's Seizures of Almost $1
           Million of the Debtor's Property Is Directly Relevant in This Proceeding ................... 10

        B.  Plaintiff's Third Document Request, Requests 8-17 and 23 ......................................... 12

           1. Plaintiff's Second Document Request ..................................................... 12

           2. Plaintiff's Third Document Request ...................................................... 14

           3. Defendant's Objections to Requests 8-17 and 23 .................................. 15

        C.  Interrogatory 8 ............................................................................................ 16

        D.  30(b)(6) Deposition Testimony, Topics 8-9, 11-13 and 25 ........................... 19

    II.   Defendant Should Be Compelled to Produce Documents and
       Information Concerning Defendant's and Other Pharmaceutical
       Wholesalers' Treatment of Strategic Retailers ................................................. 21

        A.  Plaintiff's Third Document Request, Requests 28, 34, 35 and 37 ................................. 22

        B.  Interrogatories 4-6 ....................................................................................... 24

        C.  30(b)(6) Deposition Testimony, Topics 17-18 and 22 ................................ 22

III. Defendant Should Be Compelled to Provide
Responses to Additional Discovery Requests ................................................................... 28

A. Documents Concerning Jennifer Towsley, Document Request 25 ............................ 28

B. Contention Interrogatories 2 and 3 Concerning
Defendant's "Contemporaneous Exchange" Defense ................................................. 29

C. Documents Concerning a "Cost of Goods Sold" Adjustment, Requests 18-20 .......... 31

D. Documents Concerning Submissions in
Other Bankruptcy Proceedings, Requests 26-27 ......................................................... 32

IV. The Court Should Require Defendant and Its Counsel to Pay for
the Reasonable Costs of This Motion, Including Attorney's Fees,
in Accord with Fed. R. Civ. P. 37 ...................................................................................... 33

CONCLUSION ............................................................................................................................ 35

## Table of Authorities

Page

**Cases**

*Am. Sav. Bank, FSB v. UBS Paine Webber, Inc. (In re Fitch, Inc.),*
  330 F.3d 104 (2d Cir. 2003) .................................................................................. 7

*Cayemittes v. City of N.Y.*, 2015 WL 9581817 (E.D.N.Y. Dec. 29, 2015) ................................... 29

*Cohen v. The Sav. Bldg. & Loan Co. (In re Bevill, Bresler &*
  *Schulman Asset Mgmt.)*, 896 F.2d 54 (3d Cir. 1990) ................................................. 11

*Convergent Systems, Inc., v. Diamond Reporting, Inc.*, 1989 WL 92038 (E.D.N.Y. 1989) ........ 31

*Convermat Corp. v. St. Paul Fire and Marine Insurance Co.*, 2007 WL 2743679
  (E.D.N.Y. Sept. 18, 2007) .......................................................................... 10-11, 19

*Cruden v. Bank of N.Y.*, 957 F.2d 961 (2d Cir. 1992) .................................................. 8

*DG Creditor Corp. v. Dabah (In re DG Acquisition Corp.)*, 151 F.3d 75 (2d Cir. 1998)............. 8

*Edwards v. Hearst Communications, Inc.*, 2017 WL 6458612 (S.D.N.Y. Dec. 18, 2017) .......... 16

*Fischer v. Forrest*, 2017 U.S. Dist. LEXIS 28102 (S.D.N.Y. Feb. 28, 2017) ........................... 16

*In re Bennett Funding Group, Inc.*, 146 F.3d 136 (2d Cir. 1998) .................................... 11

*In re Facebook, Inc.*, MDL No. 12-2389 (S.D.N.Y. May 20, 2016) .................................... 29

*In re Ionosphere Clubs, Inc.*, 164 B.R. 839 (Bankr. S.D.N.Y. 1994) ................................ 11

*In re Oppenheimer Fund, Inc.*, 437 U.S. 340 (1978) .................................................. 10

*In re PSA, Inc.*, 277 B.R. 51 (Bankr. D. Del. 2002) .................................................. 12

*Reilly v. Natwest Mkts. Group*, 181 F.3d 253 (2d Cir. 1999) ................................. 19, 20

*Roberts v. Heim*, 130 F.R.D. 424 (N.D. Cal. 1989) .................................................. 29

*Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730 (Bankr.
  S.D.N.Y. 1995) ................................................................................................ 11

*S.E.C. v. Morelli*, 143 F.R.D. 42 (S.D.N.Y. 1992) .................................................. 19

*Sobol v. Imprimis Pharms.*, 2017 U.S. Dist. LEXIS 184478 (E.D. Mich. Oct. 26, 2017) .......... 16

iv

*Tatum v. Schwartz*, 2007 WL 2220977 (E.D. Cal. Aug. 2, 2007) ................................................. 29

*Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 882 F.2d 682 (2d Cir. 1989)........................................ 10

*United States v. Sanders*, 211 F.3d 711 (2d Cir. 2000) ............................................................7-8

**<u>Statutes</u>**

11 U.S.C. § 503(b)(9) ............................................................................. 2, 3, 6, 11, 12, 15

11 U.S.C. § 553.................................................................................................................. 11

11 U.S.C. § 558........................................................................................................... 3, 11, 12

11 U.S.C. § 1102 .................................................................................................................. 5

**<u>Rules</u>**

Fed. R. Bankr. P. 7037 ................................................................................................... 4, 7, 34

Fed. R. Civ. P. 30(b)(6)............................................................ 1, 3, 6, 7, 19, 21, 24, 27, 28, 31, 34

Fed. R. Civ. P. 33(d) ........................................................................................................ 26

Fed. R. Civ. P. 34............................................................................................................. 15

Fed. R. Civ. P. 37.........................................................................................4, 7, 21, 27, 31, 33-35

S.D.N.Y. Local Bankr. Rule 7026-1 ................................................................................... 30

S.D.N.Y. Local Bankr. Rule 7030-1 ................................................................................... 17

S.D.N.Y. Local Bankr. Rule 7033-1 ................................................................................... 29

S.D.N.Y. Local Bankr. Rule 7034-1 ................................................................................... 16

S.D.N.Y. Local Civil Rule 26.3 ........................................................................................ 30

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO COMPEL DISCOVERY RESPONSES
FROM DEFENDANT McKESSON CORPORATION AND FOR SANCTIONS**

Plaintiff, The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of The Great Atlantic & Pacific Tea Company, Inc. ("the Debtor"), by its undersigned counsel, respectfully submits this Memorandum of Law in support of its Motion to Compel Discovery Responses from Defendant McKesson Corporation ("Defendant") and for Sanctions (the "Motion"). Plaintiff respectfully represents as follows:

## PRELIMINARY STATEMENT

This Motion seeks a remedy for Defendant's repeated, baseless refusals to produce centrally relevant documents, information and deposition testimony in reliance on wholly untenable objections. Parties often object to discovery requests in an attempt to negotiate a reasonable compromise in which the requesting party receives, if not everything it wants, at least what it needs. That is not what happened here.

Here, Defendant refused to produce any documents at all in response to 30 of Defendant's 39 last document requests; refused to identify any relevant documents or provide numerous items of information in response to Plaintiff's 11 interrogatories; and refused to provide testimony on several topics that its corporate representative designated under Rule 30(b)(6), Fed. R. Civ. P., admitted she could not provide. Many of Defendants' refusals to provide discovery have remained unexplained, and they are all, as discussed below, unjustified.

Moreover, it seems clear that Defendant has refused to provide some of the discovery Plaintiff has requested in an effort to set up a trial by ambush. Defendant contends that the preferential transfers it received are exempt from avoidance because they were paid on "ordinary business terms." In support of that argument, Defendant's interrogatory responses identify twelve examples in which, it contends, pharmaceutical wholesalers treated major retailers just as harshly as

1

Defendant treated the Debtor.  (*See* Defendant's Responses to Interrogatories 4-6.)   Crucially, however, Defendant refused to provide key items of information about any of the twelve examples, or provide any documents about them, even though Interrogatories 4-6 specifically ask for them.

Given these facts, Defendant's strategy is plain:  it wants to offer evidence about the twelve examples at trial, but withhold the information in discovery that would enable Plaintiff to investigate and cross-examine.  Further, Defendant cannot deny that it has documents and information about its examples in its files, because otherwise Defendant could not have identified them.  At a minimum, in three of the twelve examples, the wholesaler that treated its customer harshly was Defendant itself.  Defendant did not even offer documents and information about those three.

Even more troubling, Defendant has flatly refused to provide discovery about two key instances of its own misconduct in an apparent effort to shield that misconduct and thereby deny Plaintiff a remedy.  In two separate incidents after the Petition Date, Defendant unilaterally seized a total of almost $1 million of the Debtor's property without the Debtor's consent, Court approval or a genuine justification.  Defendant admits that it unilaterally reimbursed itself after the Petition Date for a $562,000 rebate it had paid to the Debtor four months earlier (the "Rebate"), and documents show that it withheld at least $413,000 in late July 2015 that it calculated it owed to the Debtor for prepetition product returns ("Medturns").  Defendant also appears to have seized more, but it has refused to produce the documents and information Plaintiff needs to confirm the amount.

According to Defendant, its unauthorized seizures of almost $1 million from the Debtor should be ignored as "irrelevant" to this proceeding.  This obviously self-serving argument is untenable and disingenuous.  Defendant pled the equitable defenses of setoff and recoupment in its answer, and even sought, and in part obtained, a summary judgment that it can set off its $1.7 million Section 503(b)(9) administrative priority claim against its preference liability.  Defendant's improper seizure of almost $1 million from the Debtor, which amounts to conversion, provides a

2

recognized equitable defense to Defendant's proposed exercise of a setoff. Also, Plaintiff has a right to set off the amount of Defendant's improper seizures against Defendant's 503(b)(9) claim under Section 558 of the Bankruptcy Code and governing case law.

Nevertheless, Defendant has refused to provide discovery about its seizures of the Debtor's property or the Rebate and Medturns it owes. Plaintiff requested documents about these issues in its Second Document Request in March 2020 and again in its Third Document Request in May 2021. (*See* Declaration of Richard K. Milin dated August 31, 2021 ("Milin Decl."), Exhibits 1 and 2.) Defendant's response has been: "McKesson Corporation will not produce documents in response to this Request." (*See* Defendant's Response to Plaintiff's Third Document Request, Milin Decl., Exh. 3, Responses to Requests 8-17.)

Plaintiff also requested information about Defendant's seizures of the Debtor's property in an interrogatory and a notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6). (*See* Milin Decl., Exhs. 4 and 5.) Defendant did not provide the information. Defendant's final response, emailed on August 17, 2021 after weeks of negotiation, was "[w]e will not be providing documents or witnesses." (*See* Milin Decl. Exh. 6.)

Defendant's refusal to provide discovery about Medturns is not merely a violation of its obligations under the Federal Rules of Civil and Bankruptcy Procedure (the "Rules"). It is also an effort to conceal the full amount it owes to the Debtor. In September 2019, Plaintiff submitted a declaration from Dawn DeVito disputing Defendant's computation of its Section 503(b)(9) claim in opposition to summary judgment. Her declaration stated, among other things, that Defendant's claim should be "reduced by $242,259.18, which was the total amount of Merchandise returned by A&P to McKesson." (Declaration of Dawn DeVito executed September 9, 2019, Milin Decl. Exh. 7, ¶ 22.) Ms. DeVito's $242,259.18 represented Medturns for the period ending July 6, 2015, and it is part of the nearly $1 million that Defendant seized from the Debtor without authorization.

3

Crucially, Ms. DeVito's number was vastly understated because Plaintiff had only limited information at the time.  Ms. DeVito's number omitted a further $171,342.40 in Medturns that Defendant withheld for the period ending June 8, 2015.  In addition, Ms. DeVito's number omits substantial sums which may be due – in an unknown amount – for Medturns that accrued during the final two weeks before the July 19, 2015 Petition Date.  Defendant's refusal to provide discovery about Medturns therefore shields and conceals the amount it owes.

After the Court gave Plaintiff permission to file this Motion on August 24, 2021, Defendant switched to an extraordinary new tactic.  After objecting for almost eighteen months that it would not provide any discovery about rebates and credits because they are "irrelevant," Defendant is now claiming that it has *already* provided all available discovery about them.  In other words, Defendant switched from saying "we won't produce anything" to "we have already produced everything" without missing a beat – or providing the slightest evidence to support its new position. Defendant's letters, deposition transcripts, and responses to document requests and interrogatories prove otherwise.  This Court should not tolerate such frivolous conduct.

Rule 37 of the Federal Rules of Civil Procedure, made applicable here by Federal Rule of Bankruptcy Procedure 7037, provides a remedy and sanctions for a party's "[f]ailure to make disclosures or to cooperate in discovery."  As discussed in more detail below, Defendant has failed both to make disclosures and to cooperate in discovery.  Accordingly, the Court should compel Defendant to respond to the discovery requests discussed below, and should impose appropriate sanctions, including the costs and attorney's fees incurred in making this Motion.

4

# FACTUAL BACKGROUND

## A. Procedural History

On July 19, 2015 (the "Petition Date"), Plaintiff and numerous affiliated debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court. No trustee or examiner has been appointed in these Bankruptcy Cases.

On July 24, 2015, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to Section 1102 of the Bankruptcy Code. The Committee consists of (i) l 199SEIU Health Care Employees Pension Fund, (ii) Basser-Kaufman, Inc., (iii) C&S Wholesale Grocers, Inc., (iv) CBA Industries, Inc., (v) Defendant McKesson Corporation, (vi) Pension Benefit Guaranty Corporation and (vii) United Food and Commercial Workers International Union.

Pursuant to its Order (A) Approving Global Settlement Agreement and (B) Further Amending Debtors' Authority to Use Cash Collateral Pursuant to 11 U.S.C. §§ 105 and 363(c)(2) (ECF No. 2868) (the "Settlement Order"), the Court granted the Committee authority to prosecute avoidance actions on behalf of the Debtors' estates, with settlement authority to be determined by the Committee, Debtors and Lenders (collectively, the "*Review Parties*"). (*See* Settlement Order, at ¶ 5.)[1]

Pursuant to its Order Authorizing Final Resolution of Debtors' Cases and Granting Related Relief [Case Docket No. 4810] (the "Case Resolution Order"), the Court granted the Committee authority to continue to prosecute this adversary proceeding and all claims and defenses that may properly be asserted therein under applicable law on behalf of The Great Atlantic & Pacific Tea Company, Inc. in accordance with the Global Settlement Agreement. (*See* Case Resolution Order ¶ 25.)

---

[1] Terms not otherwise defined here are defined as in the Global Settlement Agreement.

Plaintiff filed its complaint commencing this adversary proceeding on July 13, 2017
[Case Docket No. 3705]. After an unsuccessful mediation, Defendant filed a motion for sum-
mary judgment on May 19, 2019 [A.P. Docket No. 24].  The Court denied Defendant's motion,
with a limited exception concerning setoff of its administrative priority claim under Section
503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claim"), at a hearing on September 16, 2019.

On December 6, 2019, the Committee asked the Court to substitute Griffin Hamersky LLP as
counsel in this action [Case Docket No. 4484].  On January 2, 2020, the Court entered an order
authorizing the Committee to do so [Case Docket No. 4493].

On August 19, 2021, Plaintiff filed a motion for leave to file an amended complaint which
asserts affirmative claims under Sections 541 and 542 of the Bankruptcy Code and state law for the
return of Medturns, the Rebate and other sums that Defendant improperly seized from the Debtor
after the Petition Date.  (*See* A.P. Docket Nos. 71-72.)

### B.  The Facts and Discovery Requests at Issue

To avoid repetition, the discovery requests at issue in this Motion, and the related facts, are
discussed in the Argument section below.  Facts concerning the parties' negotiations, and Plaintiff's
understanding of the relevant facts, are stated in this Motion to the best of counsel's knowledge,
information and belief.  They can be provided in declaration form, if disputed, to the extent required.
The relevant discovery requests are annexed to the Milin Declaration.

The fact that Defendant paid the Debtor the $562,832.91 Rebate on July 14, 2015, then
seized it back in or after November 2015, was admitted at Defendant's 30(b)(6) deposition and in its
responses to Requests for Admission 122-26.  (*See* Milin Decl., Exh. 8 and Exh. 14 at 224-28.)

The available facts concerning Defendant's seizure of approximately $413,000 in Medturns
can be gleaned from a variety of accounting records, some of which are designated "confidential,"
and all of which require a considerable amount of context to interpret.  Some of the key facts were

6

also the subject of questions about Exhibit 57 at Defendant's Deposition pursuant to Rule 30(b)(6).

If Defendant disputes the account of the facts provided here, and is willing to waive its confidential-

ity designation, Exhibit 57 can be provided to the Court.

This Motion has been brought in response to the Court's authorization on August 24, 2021.

The Court ruled by email that:

> Having read the parties' respective letters, I will authorize the plaintiff to file a
> motion to compel discovery and/or for discovery-related sanctions.  I will also extend
> plaintiff's discovery cutoff date.  If defendant wants to resolve this discovery dispute
> on an item-by-item basis, which its letter does not suggest, I will extend the discovery
> cutoff date further for such an attempt to be made before the motion is filed.

Subsequent to the Court's ruling, Defendant indicated that it might be willing to provide

further discovery and the parties exchanged numerous emails.  However, as of August 29, 2021,

Defendant has been unwilling to offer a witness capable of testifying about the facts at issue in

Plaintiff's 30(b)(6) deposition notice, has not offered amended interrogatory responses, and has

offered to produce only selected documents of its choosing.  Defendant's proposal, as Plaintiff

explained in the parties' email exchange, therefore provided no reason to hold off in making this

Motion.  (*See* Milin Decl. Exh. 9.)

## ARGUMENT

### PLAINTIFF SHOULD BE GRANTED AN ORDER COMPELLING
### DEFENDANT TO PRODUCE DISCOVERY THAT IT HAS FAILED
### OR REFUSED TO PRODUCE AND AWARDING APPROPRIATE SANCTIONS

Federal Rule of Civil Procedure 37, made applicable here by Federal Rule of Bankruptcy

Procedure 7037, provides that a party may move for an order to compel discovery if, among other

things, a "party fails to answer an interrogatory submitted under Rule 33, or…to produce documents

as requested under Rule 34…." Fed. R. Civ. P. 37(a)(3)(B).

A motion to compel is entrusted to the trial court's sound discretion.  *See Am. Sav. Bank,*

*FSB v. UBS Paine Webber, Inc.* (*In re Fitch, Inc.*), 330 F.3d 104, 108 (2d Cir. 2003); *United States*

*v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000). The Second Circuit has stated that a "trial court enjoys wide discretion in its handling of pre-trial discovery, and its rulings with regard to discovery are reversed only upon a clear showing of an abuse of discretion." *DG Creditor Corp. v. Dabah* (*In re DG Acquisition Corp.*), 151 F.3d 75, 79 (2d Cir. 1998) (citing *Cruden v. Bank of N.Y.*, 957 F.2d 961, 972 (2d Cir. 1992)).

Defendant should be compelled to provide further documents, deposition testimony and interrogatory answers for the reasons discussed below. Defendant's many failures to comply with its discovery obligations have been express and deliberate, and despite multiple conferences and email exchanges among counsel, Defendant has refused to remedy them. In addition, Defendant's refusals to provide discovery are not mere attempts to protect itself from undue burdens. Some, if not remedied, would convert the parties' trial into an ambush, and others are barriers to Plaintiff's efforts to pursue its claims based on a $1 million wrong.

**Point I**
**Defendant Should Be Compelled to Produce Documents, Information and Testimony about Credits, Rebates and Its Unilateral, Post-Petition Seizure of Almost $1 Million – and an Undisclosed Additional Amount – of the Debtor's Property**

As discussed above, Defendant's documents, deposition testimony and admissions indicate that Defendant unilaterally seized almost $1 million from the Debtor in two separate incidents in 2015. However, Defendant has refused to provide crucial information about its actions despite Plaintiff's numerous discovery requests – including information about the total amount of the Debtor's prepetition Medturns that Defendant improperly seized. Plaintiff's understanding of the facts, based on the evidence available to date, is as follows:

In one incident, Defendant seized $413,000 in Medturns which Defendant itself calculated to be due to the Debtor under the parties' Supply Agreement before the end of July 2015. According to the few relevant documents that Defendant has produced, it decided, after consulting with bank-

8

ruptcy counsel, that it would post approximately $413,000 to the Debtor's account for prepetition

Medturns but would not "give" the credits to the Debtor to use in purchasing Defendant's products.

Documents also indicate that the $413,000 was only for Medturns accrued through July 6,

2015. Plaintiff has been unable to determine, despite its many discovery requests, how much

Defendant owes it for Medturns that accrued between July 7 and the Petition Date of July 19, 2015.

The amount could be very substantial.

In the second incident, Defendant unilaterally seized $569,860.02 from the Debtor in or soon

after November 2015. On July 16, 2015, three days before the Debtor filed its bankruptcy petition,

Defendant paid the Debtor the Rebate of $562,832.91 for its June 2015 purchases. Defendant itself

calculated the amount of the Rebate and paid it in the ordinary course of the parties' business.

Four months later, after the Debtor filed its bankruptcy petition, Defendant seized the money

back. It did so unilaterally, without providing the Debtor with prior notice or an explanation, by

deducting the Rebate from sums Defendant admitted it owed to the Debtor under a post-petition

contract in November 2015. Defendant also took an additional $7,027.11 of the Debtor's money at

the same time in substantially the same way.

Although Plaintiff has been able to determine the foregoing facts, there are other key facts

that Plaintiff does not yet have. For example, Plaintiff is entitled to know whether Defendant seized

any other sums belonging to the Debtor, and to review documents concerning the total amount of

Medturns Defendant seized. It is unclear what the dates in the few relevant documents about the

Medturns mean, when exactly the Medturns that Defendant seized accrued, and whether Defendant

complied with its undertaking in the parties' September 2015 Extension Agreement to continue hon-

oring the Debtor's returns, whether or not the merchandise was purchased prepetition. It is similarly

unclear whether or when Defendant ever took steps to "recoup" either the Rebate or the Medturns, or

whether they remain as "open" credits in the Debtor's account, and what exactly that means.

9

Further, there is no evidence Plaintiff has been able to identify which shows that Defendant ever informed the Debtor that it had decided to keep the Rebate or Medturns rather than merely hold them pending conclusion of the Debtor's bankruptcy. Plaintiff also has very limited information about Defendant's seizure of approximately $7,000 at the time it seized the Rebate.

In addition, Defendant's counsel has asserted, though not supported, purported justifications for Defendant's seizures. For example, Defendant has asserted that the Debtor did not pay for any of the merchandise for which it received the Rebate, which is contrary to the Debtor's records. Defendant has never offered any evidence to support this assertion. Also, Defendant has provided no documents or information to contradict Plaintiff's reading of the Supply or Extension Agreements, to the extent the parties disagree. Further, the evidence indicates that Section 8 of the Extension Agreement was a fraudulent misrepresentation by Defendant which is highly material to this dispute. If Defendant contends otherwise, Plaintiff is entitled to know why.

### A. Information about Medturns, the Rebate and Defendant's Seizures of Almost $1 Million of the Debtor's Property Is Directly Relevant in This Proceeding

Defendant's flat refusal to provide any documents or substantive information at all about Medturns and the Rebate has been premised – according to its letters and stated position in conferences – on a single objection: that discovery concerning the Medturns and Rebate is purportedly "irrelevant." Defendant's position is untenable.

"Relevance" for purposes of discovery "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *In re Oppenheimer Fund, Inc.*, 437 U.S. 340, 351 (1978); *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 882 F.2d 682, 687 (2d Cir. 1989) (holding that "the broad scope of discovery delimited by the Federal Rules of Civil Procedure is designed to achieve disclosure of all the evidence relevant to the merits of a controversy"); *Convermat Corp. v. St. Paul Fire and Marine*

10

*Insurance Co.*, 2007 WL 2743679, at *1 (E.D.N.Y. Sept. 18, 2007). There is no need, however, to define "relevance" so broadly here.

The discovery Plaintiff seeks is directly relevant to some of Plaintiff's key defenses to Defendant's administrative priority claim. Defendant pleaded the affirmative defenses of setoff and recoupment in answer to Plaintiff's complaint, and it even moved for, and in part obtained, a partial summary judgment that it can set off its administrative claim under Section 503(b)(9) of the Bankruptcy Code against any preference liability. (*See* A.P. Docket Nos. 4, 24.)

Defendant's inequitable conduct in seizing the Debtor's Medturns and Rebate provides a well-established defense to Defendant's asserted right to setoff. The decision to allow a setoff is within the sound discretion of a bankruptcy court, and equitable considerations weigh heavily. *See, e.g., In re Bennett Funding Group, Inc.*, 146 F.3d 136, 140 (2d Cir. 1998); *In re Ionosphere Clubs, Inc.*, 164 B.R. 839, 841 (Bankr. S.D.N.Y. 1994). Also, a party's "unclean hands" may provide a reason to deny setoff and, more specifically, "[o]ne who converts the property of another is not entitled in equity to a right of setoff." *Cohen v. The Sav. Bldg. & Loan Co.* (*In re Bevill, Bresler & Schulman Asset Mgmt.*), 896 F.2d 54, 57-58 (3d Cir. 1990). Accordingly, Defendant's seizures of the Debtor's property, which amount to conversion and at a minimum demonstrate unclean hands, may bar Defendant from exercising the right of setoff it seeks to assert.

Moreover, Plaintiff itself has a right of setoff. Under Section 558 of the Bankruptcy Code, Plaintiff has the right to assert "any defense available to the Debtor," including the defense of setoff. 11 U.S.C. § 558. In addition, in contrast to a setoff under Section 553, Plaintiff is not required to show that the debts it proposes to set off are both prepetition. *See Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730, 739-40 (Bankr. S.D.N.Y. 1995) ("Section 558 of the Bankruptcy Code…preserves any right to setoff the debtor may have" and, applying New York law, a debtor "does not have to establish that the debts between the parties are both prepetition"). A

11

Debtor even has the right under Section 558 to set off a prepetition receivable such as the Medturns against a creditor's administrative expense claim. *See In re PSA, Inc.*, 277 B.R. 51, 53-54 (Bankr. D. Del. 2002). Plaintiff is therefore undeniably entitled to discovery about the relevant facts.

Thus, though it seems very clear why Defendant wants to shield its inequitable conduct in this proceeding, that conduct is by no means "irrelevant." Plaintiff is entitled to the discovery it seeks.

## B.  Plaintiff's Third Document Request, Requests 8-17 and 23

Defendant should be compelled to produce documents in response to Requests 8-17 and 23 of Defendant's Third Document Request, which relate to Medturns and the Rebate.

### 1.  Plaintiff's Second Document Request

On March 11, 2020, soon after the undersigned counsel was retained, Plaintiff served a substantial Second Document Request. At the time, Plaintiff knew that rebates and credits could be a significant issue in the proceeding because, at a minimum, they could provide a substantial offset against Defendant's claim under Section 503(b)(9) of the Bankruptcy Code. Plaintiff also knew that credits had been deducted from some of the preferential payments alleged in Plaintiff's complaint and sought to determine whether other credits were due, but not deducted, in a departure from past practice during the preference period.

Accordingly, Plaintiff's Second Document Request sought documents concerning credit and rebate issues. Plaintiff requested five categories of documents concerning those issues, including "[a]ll documents concerning any rebate or credit owed, earned, paid or to be paid – or potentially owed, earned, paid or to be paid – to A&P." Plaintiff also requested, "[a]ll documents concerning communications between or among A&P and Erin Hughes – or … anyone working with Erin Hughes … concerning any credits, rebates or payments on account of returns due, actually or potentially, to A&P." (*See* Milin Decl., Exh. 1, Requests 11, 17-20.) Erin Hughes was an employee

of Defendant who forwarded its June 2015 Monthly Rebate Report, which calculated the

$562,832.91 Rebate, to the Debtor on July 14, 2015.

Defendant refused to produce documents in response to four of these requests, asserting point

blank that "McKesson Corporation is not producing any documents in response to this Request."

(*See* Response to Plaintiff's Second Document Request, Milin Decl., Exh. 10, Requests 17-20.)

Defendant did agree to provide some documents in response to Request 11, but its response

concealed crucial facts.  Purporting to resolve an ambiguity, Defendant agreed to produce documents

about rebates and credits actually paid – but ***not*** the Medturns it had withheld.

After the parties exchanged correspondence and conferred about Plaintiff's document

request, Defendant did appear willing to produce some documents about rebates and credits.  On

June 4, 2020, Plaintiff wrote to Defendant as follows:

> Your letter … states that McKesson will produce its non-privileged documents
> generated by searches concerning returns, credits and rebates, which we appreciate.
> We note, however, your letter does not specifically state whether it is withdrawing the
> objections we questioned in our correspondence or will produce all documents
> responsive to RFPs 11 and 17-20. Nevertheless, your letter can fairly be interpreted as
> an agreement to do so, and we will interpret it in that way….If our interpretations are
> inaccurate, please let us know.

(*See* Letter from R. Milin to J. Garfinkle dated June 4, 2020, Milin Decl., Exh. 11.)

Defendant did not expressly contradict these interpretations, but it did not produce all respon-

sive documents.  Defendant had agreed on June 2, 2020 to "produc[e] its accounting database for

A&P."  (*See* Milin Decl., Exh. 12.)  However, Defendant's accounting records could not and did not

fully inform Plaintiff about the withheld Medturns, what notice Defendant provided of its actions,

the rationale for those actions, or other issues that Plaintiff did not yet know enough to raise.

In addition, Plaintiff's searches in the documents Defendant produced did not identify

documents sufficient for Plaintiff to determine what happened to the Debtor's $562,832.91, whether

Defendant had ever paid the money back, or why Defendant had seized the Debtor's money unilat-

13

erally and without consent or Court permission in the first place. Further, Plaintiff has been unable

to confirm important facts about the Medturns, or even about Defendant's accounting information,

because the records are inadequately identified and were merely provided in a "data dump."

In any event, Defendant admitted that it did not produce all records about returns, credits and

rebates, because it stated, when it alone knew the facts: "If the Committee has any factual basis for

it[s] contention of unaccounted for returns, credits and rebates, let us know what it is so McKesson

Corp. can then conduct a proper investigation." (*See* Milin Decl., Exh. 12.)

Of course, once Plaintiff actually had a factual basis for its contention, Defendant refused to

provide further information. On April 14, 2021, the parties' counsel discussed McKesson's seizure

of the $562,832.91. Plaintiff's counsel followed up by emailing some of the few relevant documents

Plaintiff could locate to Defendant's counsel and requesting further information. Defendant's

counsel did not provide further information.

2. Plaintiff's Third Document Request

On May 21, 2021, Plaintiff served its Third Request for Documents. In it, Plaintiff specific-

ally requested documents about the $562,832.91 Rebate in nine separate requests. (*See* Milin Decl.,

Exh. 2, Requests 8-16.) These Requests asked for: "All documents concerning McKesson's actions

… concerning or in connection with, its payment to the Debtor of $562,832.91, or substantially that

amount, in June or July 2015, including any action to adjust or reduce a postpetition payment to the

Debtor." The Requests also asked for, "[a]ll documents concerning any action McKesson took to

pay, credit or reimburse itself, or set off, any payment that Defendant had previously made to A&P,

including any action to pay, credit or reimburse itself, or set off, approximately $562,000." Defen-

dant responded to all nine of Plaintiff's Requests about the Rebate in the same way: "McKesson

Corporation will not produce documents in response to this Request." (*See* Milin Decl., Exh. 3.)

14

Plaintiff's Third Request also asked for documents about the Medturns: "All documents concerning any rebate or credit due, or potentially due, to A&P, irrespective of whether McKesson determined to pay the rebate or credit or determined that payment was not in fact due." (*See* Milin Decl., Exh. 2, Request 17.)  In addition, Plaintiff's Request 23 called for documents concerning "[a]ny sums that any Defendant segregated for possible credit or payment to, or because of actual or potential claims by, A&P, and the sources, disposition and current location of those funds." McKesson responded: "McKesson Corporation will not produce documents in response to this Request."  (*See* Milin Decl., Exh. 3, Responses to Requests 17 and 23.)

The parties exchanged letters and conferred about Defendant's response to Plaintiff's Third Request.  Plaintiff pointed out that the documents concerned Defendant's inequitable conduct and were relevant, at a minimum, to Defendant's claim under Section 503(b)(9) of the Bankruptcy Code and alleged right to exercise an equitable setoff.  To date, Defendant has produced no documents concerning the Medturns or the Rebate in response to Plaintiff's Third Request and, in a conference and email on August 17, 2021, it confirmed that it will not do so.

3.  Defendant's Objections to Requests 8-17 and 23

Defendant's Objections to Requests 8-17 and 23 are without merit.  Defendant objected to all of Requests 8-17 and 23 on the same four grounds.  First, Defendant objects to each request as "beyond the scope of the pleadings" and "irrelevant," which is untenable for reasons discussed above.

Second, Defendant objects that each Request is "ambiguous and impermissibly vague," "unreasonably broad," and "seeks a voluminous amount of information" – without providing any detail at all.  (See Milin Decl., Exh. 3.)  These objections all must be rejected under Fed. R. Civ. P. 34 and the applicable Local Bankruptcy Rules because they do not "state with specificity the grounds for objecting to the request": Defendant did not identify a single ambiguous word or a single set of documents that are responsive but irrelevant.  Boilerplate objections are meaningless, the

15

courts have held, and "will be deemed a waiver." *Fischer v. Forrest*, 2017 U.S. Dist. LEXIS 28102,

at *9 (S.D.N.Y. Feb. 28, 2017). *See Edwards v. Hearst Communications, Inc.*, 2017 WL 6458612,

at *6 (S.D.N.Y. Dec. 18, 2017) (following *Fischer*); *Sobol v. Imprimis Pharms.*, 2017 U.S. Dist.

LEXIS 184478, at *11 (E.D. Mich. Oct. 26, 2017) ("boilerplate objections are legally meaningless

and amount to a waiver of an objection"); S.D.N.Y. Local Bankruptcy Rule 7034-1 ("If an

objection…is made with respect to any document request or portion thereof, the objection…shall

state all grounds with specificity. Any ground not stated in the objection…within the time

provided…shall be deemed waived").

Therefore, for all of the foregoing reasons, Defendant should be compelled to produce the

documents requested in Plaintiff's Third Request, Requests 8-17 and 23.

### C. <u>Interrogatory 8</u>

On June 16, 2021, Plaintiff served its single set of 11 interrogatories on Defendants.

Interrogatory 8 expressly asked about "credits and rebates" such as the Medturns and Rebate at issue

here. Its full text is as follows:

> Identify and calculate all credits and rebates A&P would have been entitled to receive under
> its Supply Agreement with McKesson for June and July 2015, assuming that A&P did not
> breach or had not breached the Supply Agreement, and describe:
>
> > (a) how much A&P was owed for those credits and rebates,
> >
> > (b) whether and how much A&P was paid for those credits and rebates,
> >
> > (c) how and when A&P was paid for those credits and rebates,
> >
> > (d) when A&P would have been entitled to be paid for those credits and rebates if it
> > had not breached the Supply Agreement,
> >
> > (e) whether any of those credits or rebates were segregated by McKesson in a specific
> > account,
> >
> > (f) whether and when McKesson decided not to pay any sums to A&P that had
> > previously been calculated or segregated by McKesson as actually or potentially due
> > to A&P,
> >
> > (g) whether McKesson took any steps to reimburse itself for any credits or rebates
> > that it paid to A&P before July 19, 2015, and

16

> (h) if McKesson took any steps to reimburse itself for any credits or rebates that it paid to A&P before July 19, 2015, describe those steps, including what those steps were, when they took place, why those steps were taken, when and how any of the money was transferred into or out of any account, where the money was located when it was transferred, where the money was transferred to, when the money was recorded as definitively belonging to McKesson rather than A&P, and what notice McKesson provided to A&P concerning McKesson's determination that the money definitively belonged to McKesson.

(Milin Decl., Exh 4.)

After an exchange of letters and a conference, Defendant agreed that it would respond to Plaintiff's interrogatories. It did so, in part and subject to numerous objections, on August 5, 2021. (*See* Milin Decl., Exh. 13.) However, Defendant's only substantive response to Interrogatory 8 was, "McKesson answers that it mistakenly paid A&P approximately $562,000 in July, 2015. This was an error. A&P was not entitled to this payment under the Supply Agreement." Defendant does not state why. Defendant also fails to address the Medturns, which fall within the scope of Interrogatory 8. (*See* Milin Decl., Exh. 13.)

Because Defendant's response provides almost none of the information Interrogatory 8 requests, Defendant should be compelled to provide that information promptly. For example, Defendant's response does not mention the Medturns at all, and Plaintiff plainly needs the requested information to support or evaluate its claim for approximately $413,000. Plaintiff also needs the information to determine whether Defendant withheld yet more prepetition Medturns.

Plaintiff's obvious need for the information about Medturns requested by Interrogatory 8 greatly outweighs Defendant's baseless, boilerplate objections that Interrogatory 8 is "unduly burdensome," an "incomplete hypothetical," "requires McKesson to speculate," and seeks unspecified "privileged information." Also, these objections are not specific, and therefore are without merit under Local Bankruptcy Rule 7030-1 ("the objection shall state all grounds with specificity"). And after all, Defendant's own documents show that it calculated more than $400,000 in Medturns due to the Debtor and, as far as Plaintiff has been able to determine, Defendant still owes that money.

17

With respect to the Rebate, the responses to items 8(a) through 8(d) should be easy for Defendant to provide. The report Erin Hughes sent to Plaintiff in July 2015 and Defendant's admissions provide much of the information, though subject to various objections. Defendant should be required to admit the facts expressly without improper hedges or objections. (*See* Milin Decl., Exh. 8, Responses 122-26.)  Alternatively, if Defendant has changed its views, it should provide information concerning its current position instead.  Either way, the information is important, a great deal of money is at stake, and the burden of providing the information is minimal.

With respect to item 8(e), Defendant has repeatedly maintained orally that it did not segregate any funds, but at least one document Plaintiff located recently states that Defendant intended to place the Rebate in an "unrelated account" until the conclusion of the Debtor's bankruptcy because it could not exercise a setoff until then.  Given that document, item 8(f) becomes crucial:  "whether and when McKesson decided not to pay any sums to A&P that had previously been calculated or segregated by McKesson as actually or potentially due to A&P."  McKesson has admitted that it withheld the Rebate from sums due to the Debtor in November 2015, but it has not admitted when it decided to keep the money rather than merely segregate it.

Given these facts, there can be no valid objection to setting the record straight, especially given the relevance of the information to, among other things, Defendant's threatened statute of limitations defense.  Also, Defendant has in effect admitted item 8(g), though subject to hedges. (*See* Milin Decl., Exh. 8, Responses to Requests for Admission 122-26.)  Defendant should be required to answer item 8(g) without the inappropriate hedges.

Finally, item 8(h) asks for crucial details about Defendant's improper, post-petition seizure of the Debtor's money:  What exactly Defendant did to "reimburse" itself without permission, when it did so, why it did so, what notice it provided, and so on.  Defendant's boilerplate objections provide no grounds for withholding this information, shielding Defendant's inequitable conduct, or

potentially denying Plaintiff a $562,000 remedy.  Accordingly, Defendant should be compelled to provide a thorough, substantive response to Interrogatory 8.

### D.  30(b)(6) Deposition Testimony, Topics 8-9, 11-13 and 25

On May 14, 2021, Plaintiff served a notice of deposition under Rule 30(b)(6), Fed. R. Civ. P., on Defendant.  The issues Plaintiff specified in the notice included, in various formulations, issues concerning the Medturns and Rebate.  (*See* Milin Decl. Exh. 5.)

Defendant designated Jenifer Towsley as its corporate witness as to all of the issues.  Ms. Towsley testified at her deposition that she was prepared to testify about all of the topics in Plaintiff's notice under Rule 30(b)(6).  (*See* Milin Decl. Exh. 14, Towsley Tr. at 19.)  However, she also testified that she had not seen the notice before and had not reviewed any documents to prepare for her deposition apart from her own Declaration.  (*See* Milin Decl. Exh. 14, Towsley Tr. at 22.)  That Declaration did not discuss Medturns or the Rebate.  (*See* A.P. Docket No.36.)

Given her lack of preparation, Ms. Towsley proved unable to testify in any significant detail about the Medturns or Rebate, and Defendant therefore failed to comply with its discovery obligations.  The Second Circuit has held that, "[t]o satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available 'such number of persons as will' be able 'to give complete, knowledgeable and binding answers' on its behalf."  *Reilly v. Natwest Mkts. Group*, 181 F.3d 253, 268 (2d Cir. 1999) (quoting *S.E.C. v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y. 1992)); *see Convermat Corp. v. St. Paul Fire and Marine Ins. Co.*, 2007 WL 2743679, at *2 (E.D.N.Y. Sept. 18, 2007).  Ms. Towsley was unable to provide complete or knowledgeable answers about the Medturns and Rebate.

Because of Ms. Towsley's inability to provide required testimony, Plaintiff wrote to Defendant on August 4, 2021 as follows:

> Notice Topic 8: "Each Defendant's payments to, or transfer of funds to, A&P."
> Notice Topic 9: "Any credits or rebates that any Defendant owed to, or paid to, or currently may owe to, A&P."

19

Notice Topic 11: "Any sums that any Defendant segregated for possible credit or payment to, or because of actual or potential claims by, A&P, and the sources, disposition and current location of those funds."

Notice Topic 12: "Any payment any Defendant made to A&P, or credit it gave to A&P, in June or July 2015 on account of, or in connection with, rebates or credits of approximately $562,000."

Notice Topic 13: "Any action any Defendant took to pay or credit itself, or set off, any payment that the Defendant had previously made to A&P, including any action to pay or credit itself, or set off, approximately $562,000."

Notice Topic 25: "Transactions and contracts between any Defendant and A&P after the commencement of this bankruptcy case."

- Ms. Towsley was questioned at length about credits and rebates due, or potentially due, to A&P. The questions concerned McKesson's treatment of credits generally, including credits in the approximate amounts of $400,000 and $134,000, as well as McKesson's actions in paying A&P approximately $562,000 for June rebates before the Petition Date, then taking the money back without consent or Court approval in or after November 2015. (*See* Towsley Tr. at 224-36, 245-46, 252-54.)

Ms. Towsley was unprepared to answer a large number of key questions about these topics. For example, Ms. Towsley testified that McKesson took the $562,000 but did not know when McKesson took the money or whether it has been segregated or mingled with McKesson's other accounts for general use. She also testified that she did not know why McKesson believed it was entitled to take the money or whether McKesson had provided A&P with a contractual justification for its decision to take the $562,000 in response to A&P's request for that justification. Instead, she referred Plaintiff to McKesson's "rebates department" for further information about the $562,000. (*See* Towsley Tr. at 224-36.)

Ms. Towsley also testified about a $400,000 credit that, according to a McKesson document, was "issued to [A&P's] account" but not "given" to A&P. Ms Towsley did not know whether the money was ever given to A&P or instead was being held by McKesson and "waiting for a setoff if appropriate." (*See* Towsley Tr. at 252-54.)

These are very important issues to A&P, and they may be worth approximately $1 million. Accordingly, please designate someone to testify about them who will truly be knowledgeable, or educate Ms. Towsley about them, so that we can continue our 30(b)(6) deposition with respect to those issues. We are willing to consider an alternative mode of proceeding, however, if McKesson can propose a suitable means of providing a documented account of the relevant facts.

(Letter from R. Milin to J. Garfinkle dated August 4, 2021, Milin Decl., Exh. 15.)

Defendant did not respond to these points in writing and refused to discuss them in multiple

conferences with Defendant's counsel. Finally, on August 17, Defendant flatly refused to provide

additional information or testimony about the Medturns and Rebate or, indeed, further 30(b)(6) testimony about anything else.  Defendant did not explain why.

For the foregoing reasons, Defendant has "[f]ailed to make disclosures or to cooperate in discovery" with respect to returns, rebates and credits as Rule 37, Fed. R. Civ. P., requires. Defendant should be compelled to do so by providing further deposition testimony, answering Interrogatory 8 and producing documents in response to Plaintiff's Third Document Request, Requests 8-17 and 23, as discussed above.

## Point II
### Defendant Should Be Compelled to Produce Documents and Information Concerning Defendant's and Other Pharmaceutical Wholesalers' Treatment of Strategic Retailers

Defendant's refusal to provide discovery concerning its treatment of strategic retailers, or other wholesalers' treatment of strategic retailers, is a clear violation of its obligations under the Rules.  If this refusal continues, Defendant will be able to conduct a trial by ambush and obtain an unfair advantage. This Court should not allow it to do so.

Defendant has gone to considerable lengths to argue that the preferential transfers at issue in this proceeding cannot be avoided because they were made on "ordinary business terms."  Defendant first raised the issue on April 5, 2021, by submitting an expert report from Timothy Kosty. According to Mr. Kosty, all of Defendant's credit decisions concerning the Debtor were "standard in the industry" and so is "[w]ithholding further shipments of product in the face of the customer's failure to make timely payments."  (*See* Kosty Report ¶¶ 19-20, Milin Decl. Exh. 16.)  Mr. Kosty also makes many other, similar pronouncements about what is "standard" in the business of pharmaceutical supply.

Of course, Mr. Kosty could only cite a single retailer other than the Debtor to support his view that withholding shipments is "standard," and he did not mention that retailer – or any other –

21

in his report.  Indeed, Mr. Kosty testified that he first saw that retailer's contract when Defendant's counsel tried to educate him about it during a break at his deposition.  (Kosty Tr. at 134-35, 157, Milin Decl. Exh. 17.)  In any event, that retailer's financial troubles occurred years after the Debtor's, and Plaintiff's expert, who has more direct experience, strongly disagrees with Mr. Kosty. For these reasons, as the Court will recall, Defendant belatedly subpoenaed one of its competitors, and sought to file an untimely rebuttal report, in an effort to rehabilitate Mr. Kosty.

Clearly, Defendant wants to argue to this Court that other pharmaceutical suppliers treat their large, "strategic" retail customers as harshly as the Debtor treated A&P.  Nevertheless, as discussed below, Defendant has flatly refused to provide significant discovery concerning that issue. Accordingly, the Court should order Defendant either to provide prompt and complete discovery in response to Plaintiff's discovery requests about pharmaceutical wholesalers' treatment of strategic retailers or preclude Defendant from offering evidence concerning that issue at trial.

**A.  Plaintiff's Third Document Request, Requests 28, 34, 35 and 37**

Plaintiff served its Third Document Request after it received Mr. Kosty's expert report. Accordingly, Plaintiff included Requests about Defendant's treatment of strategic retailers other than the Debtor and the extent of those retailers' bargaining power.  These Requests included:

> 28.  Each of McKesson's contracts with significant customers with whom McKesson did business during any part of the period from January 1, 2014 through the Petition Date, including the provisions of those contracts or any amendments of those contracts with respect to (a) the customer's actual or possible financial difficulty or (b) McKesson's payment or credit terms, (c) McKesson's right to change payment or credit terms and (d) the customer's actual or potential failure or inability to pay any sum when due.

> 34. Documents sufficient to identify any customer who negotiated, or attempted to negotiate, contractual provisions different from A&P's concerning (a) the customer's actual or possible financial difficulty or (b) a Defendant's right to change payment or credit terms, or (c) the customer's actual or potential failure or inability to pay any sum when due.

35. Documents sufficient to identify each of McKesson's significant customers whose payment or credit terms changed between January 1, 2014 and April 17, 2020 and, for each such customer, documents sufficient to identify: (a) how the payment terms were changed, (b) whether the customer ever objected to the change, and on what grounds, (c) whether the parties negotiated concerning the change in payment terms; and (d) the final payment terms which McKesson imposed or to which the parties agreed.

37. Documents sufficient to identify each of McKesson's significant customers whose credit terms at any time required them to prepay, pay C.O.D., pay on the same day as merchandise was delivered, or pay within one day after merchandise was delivered. For each such customer, produce contracts, agreements, correspondence or other document or communications sufficient to identify the significant customer's payment terms, any reasons for those terms, and any reasons for any change in those terms.

(*See* Milin Decl., Exh. 2, Requests 28, 34, 35, 37.)

Defendant's response to all four of these Requests was the same flat refusal: "McKesson Corporation will not produce any documents in response to this Request." (Milin Decl. Exh. 3, Responses to Requests 28, 34, 35 and 37.)

The discovery Plaintiff seeks in these four Requests is obviously directly relevant to whether Defendant's harsh treatment of the Debtor was, as Mr. Kosty claimed, "standard in the industry." Indeed, the entire relevant "industry" consists only of Defendant and two competitors.

Nevertheless, Defendant has objected, even more strenuously than it objected to providing discovery about Medturns and the Rebate, that the discovery Plaintiff seeks is irrelevant. According to Defendant, each of the quoted requests is "vexatious with no probative value." (*See* Milin Decl. Exh. 3, Responses to Requests 28, 34, 35 and 37.)

Defendant's objection is absurd on its face and, given Defendant's reliance on Mr. Kosty's report, disingenuous. However, if Defendant is willing to agree that pharmaceutical wholesalers' treatment of strategic retailers other than the Debtor is of "no probative value," and that it will not attempt to present any evidence about it at trial, Plaintiff is inclined to withdraw its Requests and

23

consent.  Absent such an agreement, however, Defendant' refusal to respond to the quoted Requests

violates its obligations under the Rules and is a highly prejudicial prelude to trial by ambush.

It should be noted that Plaintiff's Requests may appear to be broadly worded, but they are

not.  Requests 28, 35 and 37 apply only to a very small group of retailers, identified as "significant

customers," and defined as "a customer of McKesson that was managed by any of the same

relationship managers as A&P, or which had four or more locations and purchased more than $50

million from McKesson in any year."  (*See* Milin Decl., Exh. 2 at 5.)  Defendant's witness pursuant

to Rule 30(b)(6) testified that Defendant had only "[g]ive or take, 20" strategic retail customers in

2015.  (*See* Milin Decl., Exh. 14, Towsley Tr. at 62.)  Plaintiff is also willing to limit Request 34 to

"significant customers," which is a roughly equivalent term. Accordingly, Requests 28, 34, 35 and

37 are not, as Defendant' objected, "unreasonably broad" or requests for a "voluminous amount of

information."  (*See* Milin Decl. Exh. 3, Responses to Requests 28, 34, 35 and 37.)  Moreover, to the

extent that facts of which Plaintiff is unaware truly does make one of these requests overly broad –

though Defendant's boilerplate objections provide no reason to think so – Plaintiff is willing to

negotiate with Defendant in good faith to alleviate any unnecessary burdens.  The Court should

therefore compel Defendants to produce documents in response to these Requests.

## B.  Interrogatories 4-6

Plaintiff has also attempted to obtain discovery about pharmaceutical wholesalers' treatment

of major, struggling retailers like the Debtor – an issue about which Defendant has a great deal of

institutional knowledge but Plaintiff does not – in Interrogatories 4-6.  These Interrogatories ask:

> 4. Identify any strategic retail customer of a major pharmaceutical wholesaler to which
> that wholesaler discontinued shipments at any time between January 1, 2013 and July
> 1, 2016 because the strategic retail customer failed to make one or more payments on
> time. For each such discontinuation:
>
> > a) Identify the wholesaler, the retail customer, and the date on which the wholesaler
> > discontinued shipments.

24

b) State the amount of any payments that were not made on time and the amount of the retail customer's average annual purchases from the wholesaler during the prior two years.

c) Produce any contracts in effect between the wholesaler and retail customer at the time.

d) Describe any negotiations between the wholesaler and the retail customer before shipments were discontinued.

e) Describe how any issues concerning the retail customer's failure to make timely payment were resolved.

f) Produce all documents concerning the discontinuation or, if the wholesaler was McKesson, produce documents sufficient to establish the facts concerning the discontinuation.

5. Identify any strategic retail customer of a major pharmaceutical wholesaler to which that wholesaler threatened to discontinue shipments at any time between January 1, 2013 and July 1, 2016 because the strategic retail customer failed to make one or more payments. For each such threat:

a) Identify the wholesaler, the retail customer, and the date on which the wholesaler threatened to discontinue shipments.

b) State the amount of any payments that were not made on time and the amount of the retail customer's average annual purchases from the wholesaler during the prior two years.

c) Produce any contracts in effect between the wholesaler and retail customer at the time.

d) Describe any negotiations between the wholesaler and the retail customer before the threat to discontinue shipments.

e) Describe how any issues concerning the retail customer's failure to make timely payment were resolved.

f) Produce all documents concerning the threat or, if the wholesaler was McKesson, produce documents sufficient to establish the facts concerning the threat.

6. Identify any strategic retail customer of a major pharmaceutical wholesaler to which that wholesaler threatened to discontinue shipments at any time between January 1, 2013 and July 1, 2016 because the major pharmaceutical wholesaler was concerned that the strategic retail customer might be unable to pay the wholesaler's invoices in the near future or because the wholesaler determined that the retail customer's financial position had materially changed. For each such threat:

a) Identify the wholesaler, the retail customer, and the date on which the wholesaler threatened to discontinued shipments

b) State the amount of any payments that were not made on time and the amount of the retail customer's average annual purchases from the wholesaler during the prior two years.

c) Produce any contracts in effect between the wholesaler and retail customer at the time.

d) Describe any negotiations between the wholesaler and the retail customer before the threat to discontinue shipments.

e) Describe how any issues concerning the retail customer's failure to make timely payment were resolved.

f) Produce all documents concerning the threat or, if the wholesaler was McKesson, produce documents sufficient to establish the facts concerning the threat.

25

In response to each of these Interrogatories, Defendant identified the same 12 retailers apart from the Debtor with the names of their wholesalers and the dates of their respective bankruptcies. (*See* Defendant's Response to Interrogatories, Milin Decl. Exh. 13, Responses 4-6.)

Significantly, the dates of those bankruptcies range from 2001 to 2019, far beyond the 2013 to 2016 range specified in Plaintiff's Interrogatories. Defendant appears to be providing this additional information in an effort to strengthen its ambush: It wants to justify admitting evidence about all twelve retailers at trial, but it has withheld substantially all of the documents and information that Plaintiff's interrogatories ask for about them.

For example, Defendant did not identify, with respect to any of the twelve retailers, the date on which the wholesaler threatened to discontinue shipments or did so, the amount of any overdue payments, or the contracts in effect between the parties. Defendant also refused to describe the parties' negotiations or how payment issues between the wholesaler and retailer were resolved. Moreover, Defendant refused to produce any documents at all about any of the parties' disputes, apparently in reliance on inapplicable California State Court practice relating to "special interrogatories."

Defendant refused to produce any of the requested documents and information even though its responses imply that Defendant must have relevant documents and information in its files. And it did so even though, for three of the twelve retailers, Defendant itself was the wholesaler.

Plaintiff asks only that the Court level the playing field and prevent a trial by ambush. Plaintiff seeks, necessarily, only documents and information within Defendant's possession, custody or control. To the extent that the requested information is stated in documents and the burden of deriving or ascertaining the answer would be substantially the same for both parties, Plaintiff agrees that the documents can be treated as business records and will accept responses that comply with Fed. R. Civ. P. 33(d) and applicable Local Rules.

26

However, Defendant's cavalier objection that Plaintiff should be forced to seek out the documents in public records on its own even though Defendant already has them in its files, when the burden of Plaintiff's doing so would far exceed Defendant's burden in producing the documents, is patently improper and unreasonable.  Moreover, Plaintiff could have no assurance that its search in public records would locate all and only the responsive documents Defendant already has and intends to rely on, especially given that some of those documents are twenty years old.

For the foregoing reasons, Defendant should be ordered to produce the documents and items of information in its possession, custody or control that respond to Interrogatories 4-6.  Further, to prevent a trial by ambush, if Defendant fails to produce any documents or items of information that are responsive to Interrogatories 4-6, Defendant should be placed on notice that it will be precluded from admitting those documents and items of information at trial.  *See* Fed. R. Civ. P. 37(c).

### C.  30(b)(6) Deposition Testimony, Topics 17-18 and 22

Defendant's designated 30(b)(6) witness Ms. Towsley proved not to be knowledgeable about key aspects of Defendant's treatment of customers who were experiencing financial difficulty. Accordingly, Plaintiff wrote to Defendant on August 4, 2021:

> Notice Topic 17: "McKesson's conduct concerning, and procedures for addressing, customers' actual or potential financial distress."
>
> Notice Topic 18: "Each Defendant's actions and procedures for addressing concerns about the financial condition of A&P or any other customer, or a customer's failure or potential failure to make payment when due."
>
> Notice Topic 22: "The differences between the Defendants' contract with, or method of doing business with, or conduct with respect to, A&P and other customers."
>
> • Ms. Towsley was asked several questions concerning McKesson's treatment of strategic retailers other than A&P that were having financial difficulty. However, she remembered very little. For example, she did not know which strategic retailers McKesson gave more time to pay their debts before May 22, 2015, though she testified that had occurred. She also was not certain whether McKesson had stopped shipping to any of its strategic retail customers other than Phar-Mor between 2014 and 2016, or whether McKesson threatened to stop shipping to any strategic retail customers before May 22, 2015, and if so, which they were. (*See* Towsley Tr. at 53, 98-100.)

27

> Given McKesson's contention that it treated A&P just as it treated other similar customers – and its submission of an entire expert report on that topic – Ms. Towsley's inability to testify about McKesson's treatment of other strategic retailers is highly material….

(Letter from R. Milin to J. Garfinkle dated August 4, 2021, Milin Decl., Exh. 15.)  The letter also offered to consider accepting a written response, but Defendant rejected the offer.

Testimony from a witness capable of providing "complete, knowledgeable and binding answers" on Defendant's behalf concerning its treatment of struggling strategic retailers is likely to be crucial to Plaintiff's ability to oppose Defendant's argument that it and other wholesalers treated their customers with uniform harshness.  Even Ms. Towsley testified to some extent to the contrary, though she was not fully informed.  Defendant should therefore be compelled to provide further testimony concerning 30(b)(6) Topics 17, 18 and 22 as discussed in the letter quoted above.  *See Reilly v. Natwest Mkts. Group*, 181 F.3d 253, 268 (2d Cir. 1999).

**Point III**
**Defendant Should Be Compelled to Provide**
**Responses to Additional Discovery Requests**

Defendant should be compelled to produce documents concerning Jenifer Towsley, answer two contention interrogatories and respond to other discovery requests as discussed below.

**A.  Documents Concerning Jenifer Towsley, Document Request 25**

Plaintiff's Third Document Request requested the deposition transcripts and declarations of Defendant's corporate representative Jenifer Towsley, who was a key actor in the events at issue and has been a declarant in this adversary proceeding.   Request 25 stated:

> All depositions transcripts and declarations that McKesson submitted from Jenifer Towsley in any other bankruptcy case or adversary proceeding, or appeal from a bankruptcy case or adversary proceeding, after January 1, 2015.

(*See* Milin Decl. Exh. 2, Request 25.)

28

Defendant responded that "McKesson Corporation will produce two declarations from significant bankruptcy cases" – which, over Plaintiff's objection, it would choose unilaterally. Defendant also stated boilerplate objections, including that this "impermissibly vague" and "unreasonably broad" request "seeks a voluminous amount of information," which implies that Defendant is withholding several responsive documents.

More recently, Defendant notified Plaintiff by email that it was cutting its production in response to Request 25 in half: it would produce only one declaration and no transcripts. Defendant may have grounds for restricting its production, because Ms. Towsley apparently participated in bankruptcy proceedings before the time period specified in the Request. However, Plaintiff has no way to know for certain, and Defendant has not explained. Given Ms. Towsley's central role in this proceeding, Defendant should be compelled to produce all documents responsive to this narrow request, including any declarations.

### B.  Contention Interrogatories 2 and 3 Concerning Defendant's "Contemporaneous Exchange" Defense

The Local Bankruptcy Rules expressly authorize contention interrogatories: "at the conclusion of each party's discovery, and at least thirty (30) days prior to the discovery cut-off date, interrogatories seeking the claims and contentions of the opposing party may be served." S.D.N.Y. Local Bankruptcy Rule 7033-1. As Judge Sweet noted in *In re Facebook, Inc.*, MDL No. 12-2389 (S.D.N.Y. May 20, 2016), "[c]ontention interrogatories properly serve as tools to streamline litigation." The Courts, accordingly, have often compelled answers to contention interrogatories that are reasonably tailored to specific issues. *See, e.g., Cayemittes v. City of N.Y.*, 2015 WL 9581817, at *3 (E.D.N.Y. Dec. 29, 2015); *Tatum v. Schwartz*, 2007 WL 2220977, at *1-3 (E.D. Cal. Aug. 2, 2007); *Roberts v. Heim*, 130 F.R.D. 424, 427-28 (N.D. Cal. 1989).

29

The Local Rules also implicitly recognize that requests to identify documents are proper:

S.D.N.Y. Local Civil Rule 26.3, which applies here under Local Bankruptcy Rule 7026-1, includes a

definition of "Identify (with respect to documents)."  Nevertheless, according to Defendant, it does

not have to identify documents and it does not have to answer.

Plaintiff served the following contention interrogatories on Defendant concerning each of the

parties' intent relative to Defendant's "contemporaneous exchange" defense:

> 2.  If you contend that any Defendant intended any payment or Transfer identified in
> any of Plaintiff's Complaints to be a contemporaneous exchange for new value given to
> the Debtor, state all facts and identify all documents concerning or supporting that
> contention.

> 3.  If you contend that the Debtor intended any payment or Transfer identified in any of
> Plaintiff's Complaints to be a contemporaneous exchange for new value given to the
> Debtor, state all facts and identify all documents concerning or supporting that
> contention.

Defendant's "contemporaneous exchange" defense is a central issue in this proceeding which

Defendant asserts with respect to four transfers totaling more than $4 million.  In Plaintiff's view,

the evidence indicates unambiguously that neither party intended the four transfers at issue to be

contemporaneous exchanges for new value, so it asked what evidence Defendant intends to rely on

in its favor.  Yet Defendant's response to both of these interrogatories was, in essence, "I'm not

telling":

> McKesson answers that McKesson does contend that certain payments constitute a
> contemporaneous exchange for new value given to the Debtor. The specific payments
> are identified and detailed in the expert report of Charles M. Berk, CBIZ Accounting,
> Tax & Advisory of New York (see, in particular, pages 32-33 of Mr. Berk's report) or
> McKesson's papers filed in support of its motion for summary judgment, filed May 1,
> 2019, docket nos. 24-27. McKesson objects to specifically identifying each supporting
> document, other than to confirm that all supporting documents have been produced in
> the course of discovery, are referenced in Mr. Berk's expert report, or are referenced in
> McKesson's motion for summary judgment and supporting papers.

This response is completely non-substantive, and it does not identify any of the called-for documents. Consequently, Defendant's response does not satisfy its discovery obligations under the Rules.

*Convergent Systems, Inc., v. Diamond Reporting, Inc.*, 1989 WL 92038 (E.D.N.Y. 1989), is particularly instructive. In compelling an answer to a contention interrogatory in that case, the court noted that there was "nothing improper" in "[s]eeking the facts and documents which support a particular allegation in a complaint," and that an interrogatory which does so "violates neither the attorney-client or work product privileges as defendants contend." Also, although Defendant seeks to justify its failure to answer on the ground that Plaintiff's 11 interrogatories are too many and too burdensome, "[i]t is … insufficient to broadly assert that the number of interrogatories is too great or to claim that to answer would require expending valuable resources in the form of time, labor and money." The court added, "I further note that a general statement that information can be found in a mass of documents is an unsatisfactory response under Fed.R.Civ.P. 37(a)." Yet that is exactly the response that Defendant provided.

Once again, Defendant seeks to conduct a trial by ambush, in which it relies on documents and testimony that it is unwilling to disclose through discovery. Accordingly, the Court should compel Defendant to provide a genuine response to Interrogatories 2 and 3. The Court should also place Defendant on notice that it will be precluded from introducing any evidence at trial that it does not identify in response to these interrogatories. *See* Fed. R. Civ. P. 37(c).

### C.  **Documents Concerning a "Cost of Goods Sold" Adjustment, Requests 18-20**

Certain of Defendant's documents, including some that were used as exhibits at Ms. Towsley's deposition pursuant to Rule 30(b)(6), indicated that the Debtor was entitled to a "cost of goods sold" adjustment after Defendant unilaterally reduced its payment terms from 6 and 41 days to

31

"2 days sales outstanding" in July 2015.  Accordingly, Plaintiff's Third Document Request included

the following Requests:

> 18. All documents concerning whether A&P was due, entitled to, potentially due, or
> potentially entitled to – or was given or credited for – a price or cost of goods sold
> reduction because of its payment in accord with McKesson's revised credit terms in
> July 2015.
>
> 19. All documents concerning whether A&P should be given a discount price or cost of
> goods sold reduction because it paid any invoice in July 2015 more promptly than A&P
> had typically paid its invoices before McKesson changed A&P's payment terms.
>
> 20. All documents concerning the "COGS" or "cost of goods sold" adjustment
> referenced in Documents McKesson-0001471, McKesson-0102424 or McKesson-
> 0104927, including all documents concerning whether A&P was ever provided with a
> cost of goods sold adjustment in or after July 2015.

(Milin Decl., Exh. 2.)

Defendant refused to produce documents in response to any of Requests 18-20.  Instead, it

objected to each on the same boilerplate grounds that it was beyond the scope of the pleadings,

irrelevant, ambiguous, overbroad and called for "a voluminous amount of information."  As

discussed above, boilerplate objections such as these, which do not identify any specific problem in

a document request, are invalid and constitute a waiver.

Further, Defendant's objection that the documents sought are "irrelevant" is disingenuous.

Defendant has argued that the preferential transfers it received were "in the ordinary course of

business" because Defendant always complied with the parties' contract, even when it took

Draconian steps to force the Debtor to pay its bills and drastically and unilaterally reduced the

Debtor's payment terms.  Consequently, the question whether the Debtor was contractually entitled

to a price adjustment it did not receive is undeniably relevant to the issues in dispute – especially if

the Debtor was, in fact, overcharged.  Consequently, Defendant should be compelled to produce

documents in response to Requests 18-20.

32

**D.  Documents Concerning Submissions in
    Other Bankruptcy Proceedings, Requests 26-27**

As discussed above, Defendant has made pharmaceutical wholesalers' treatment of finan-

cially struggling retailers an issue in this proceeding, and Defendant is one of only three relevantly

similar pharmaceutical wholesalers.  Accordingly, Plaintiff's Third Document Request included

requests for deposition transcripts and declarations submitted in bankruptcy cases mentioning

Defendant's business, credit or payment terms or accusing it of contributing to a debtor's financial

problems.  Requests 26 and 27 asked for:

> 26. All deposition[] transcripts and declarations that McKesson submitted after
> January 1, 2015 in any other bankruptcy case or adversary proceeding, or appeal
> from a bankruptcy case or adversary proceeding, mentioning or concerning
> McKesson's business, credit or payment terms, or any change in those terms.

> 27. All declarations submitted in a bankruptcy court by any party after January 1,
> 2015 which state or allege, in substance, that McKesson's conduct contributed to
> the debtor's financial problems or was one of the causes of its bankruptcy.

These Requests, Plaintiff believes, only call for a small set of documents, and if Defendant

had identified a class of documents that might be responsive but irrelevant, Plaintiff could have

consented to exclude them from production.  Instead, Defendant responded by making the same four

boilerplate objections it made to Requests 24-25 and other Requests and announced that it would

produce only two declarations of its choosing from "significant bankruptcy cases" and nothing else.

Plaintiff is unable to determine whether the two declarations Defendant offers is a complete

production of the responsive documents in its possession, custody or control, but that seems

unlikely.  Accordingly, Defendant should be compelled to produce all documents responsive to

Requests 26 and 27.

**Point IV**
**The Court Should Require Defendant and Its Counsel to Pay for the Reasonable**
**Costs of This Motion, Including Attorney's Fees, in Accord with Fed. R. Civ. P. 37**

The mandate of Rule 37(a)(5)(A), Fed. R. Civ. P., made applicable here by Federal Rule of

Bankruptcy Procedure 7037, could not be clearer:

> If the motion [for an order compelling disclosure or discovery] is granted—or if the
> disclosure or requested discovery is provided after the motion was filed—the court
> must, after giving an opportunity to be heard, require the party or deponent whose
> conduct necessitated the motion, the party or attorney advising that conduct, or both
> to pay the movant's reasonable expenses incurred in making the motion, including
> attorney's fees.

Further, although Rule 37(a)(5)(A) lists three exceptions, none of them apply here.  First,

Plaintiff did not "file the motion before attempting in good faith to obtain the disclosure or discovery

without court action." Fed. R. Civ. P. 37(a)(5)(A)(1).  The Exhibits to the Milin Declaration record

some, but not all, of Plaintiff's repeated, failed attempts to convince Defendant to provide the

discovery it owes.

Second, Defendant's failure to provide discovery responses or cooperate in discovery was

not "substantially justified."  Fed. R. Civ. P. 37(a)(5)(A)(2).  Defendant has refused to provide

discovery concerning the Medturns and Rebate based on the untenable objection that the discovery is

"irrelevant" when Defendant is actually seeking to conceal its improper, post-petition seizure of

almost $1 million of the Debtor's assets for which Plaintiff seeks a remedy.  Defendant has refused

to provide discovery concerning its own argument that pharmaceutical wholesalers typically treat

their strategic retail customers just as harshly as Defendant treated A&P, even though it plainly has

ample information about its own conduct and other wholesalers', in an effort to set up a trial by

ambush.  Defendant has relied over and over again on baseless boilerplate objections that, under the

Rules and governing case law, are always without merit.  It has even refused to provide deposition

testimony it owes under Rule 30(b)(6) without providing any reason whatsoever.  Defendant's

34

conduct, therefore, has been far from justified.  Rather, it shows undisguised contempt for

Defendant's discovery obligations.

Finally, no "other circumstances make an award of expenses unjust."  Fed. R. Civ. P.

37(a)(5)(A)(3).  Defendant is a huge, ultra-sophisticated corporation, with extremely sophisticated

counsel, and both have extensive experience in litigation.  Nevertheless, Defendant has not hesitated

to make frivolous arguments or to make multiple, demonstrable misrepresentations to the Court, as

the parties' correspondence concerning this discovery dispute makes clear.  Plaintiff respectfully

suggests that sanctions for the sake of deterrence, and certainly compensation for the time Plaintiff

has been forced to spend on a discovery dispute that arose only because of Defendant's many

untenable positions, are more than appropriate.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should grant Plaintiff's Motion in its entirety and

grant it an order compelling discovery responses and sanctions, and such other and further relief as

may be just and proper.

Dated:  August 31, 2021

GRIFFIN HAMERSKY LLP

By: /s/ ***Richard Milin***
Scott A. Griffin
Michael D. Hamersky
Richard K. Milin
420 Lexington Avenue, Suite 400
New York, New York 10170
rmilin@grifflegal.com
Telephone: (646) 998-5580
Facsimile:  (646) 998-8284

*Counsel for The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of The Great Atlantic & Pacific Tea Company, Inc., et al.*

35