Hearing Date & Time: September 20, 2021 at 10:00 a.m.
**Response Deadline: September 13, 2021 at 4:00 p.m.**
**Reply Deadline: September 17, 2021 at 4:00 p.m.**

Tracy L. Klestadt
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Fax: (212) 972-2245
tklestadt@klestadt.com

Jeffrey K. Garfinkle (admitted *pro hac vice*)
BUCHALTER Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
Fax: (949) 720-0182
jgarfinkle@buchalter.com

Counsel for Defendant
McKesson Corporation

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | Case No. 15-23007 (RDD) |
| Debtors. | Jointly Administered |
| The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.* | |
| Plaintiff | Adv. Proc. No. 17-08264 (RDD) |
| v. | |
| McKESSON CORPORATION | |
| Defendant | |

**McKESSON CORPORATION'S MEMORANDUM OF FACTS AND LAW
IN OPPOSITION TO MOTION TO FILE AN AMENDED COMPLAINT**

BN 46905572v4

**TABLE OF CONTENTS**

|      |                                                                                                 | Page |
|------|-------------------------------------------------------------------------------------------------|------|
| I.   | INTRODUCTION ................................................................................. | 1    |
| II.  | KEY FOUNDATIONAL FACTS ........................................................... | 4    |
| III. | ARGUMENT .......................................................................................... | 7    |
|      | A.  Plaintiff Lacks Standing To Assert Non-Avoidance Claims........................ | 7    |
|      | B.  Plaintiff's Proposed Claims Are Barred by the Statute of Limitations ........ | 8    |
|      | C.  McKesson Would Be Substantially Prejudiced If Plaintiff Were Permitted To Amend Its Complaint ............................................................................ | 12   |
|      | D.  Plaintiff's Proposed Claims Are Substantively Flawed ............................... | 14   |
| IV.  | CONCLUSION..................................................................................... | 15   |

BN 46905572v4

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Charter Crude Oil Co. v. Exxon Co., U.S.A.* (*In re Charter Co*).,
   913 F.2d 1575 (11th Cir. 1990) ..................................................................................11

*Chartschlaa v. Nationwide Mut. Ins. Co.*,
   538 F.3d 116 (2d Cir. 2008) ........................................................................................10

*In re Coomer*,
   375 B.R. 800 (Bankr. N.D.Ohio 2007) ........................................................................10

*Dunes Hotel Assoc. v. Hyatt Corp.*,
   245 B.R. 492 (D.S.C. 2000) .........................................................................................10

*Lovald v. Falzerano* (*In re Falzerano*),
   686 F.3d 885 (8th Cir. 2012) .......................................................................................11

*Miller v. Jannetta* (*In re Irwin*),
   509 B.R. 808 (Bankr. E.D. Pa. 2014) ....................................................................11, 12

*Port Auth. Of N.Y. and N.J. v. Allied Corp.*,
   914 F. Supp. 960 (S.D.N.Y. 1995) .................................................................................8

*In re Pyatt*,
   486 F.3d 423 (8th Cir. 2007) .......................................................................................10

*Ricciuti v. Voltarc Tubes, Inc.*,
   277 F.2d 809 (2nd Cir. 1960) ......................................................................................12

*In re Springfield Furniture, Inc.*,
   145 B.R. 520 (Bankr. E.D. Va. 1992) .........................................................................10

*United States v. Inslaw, Inc.*,
   932 F.2d 1467 (D.C. Cir. 1991) ...................................................................................11

**Federal Statutes**

11 U.S.C.
   § 105 ...............................................................................................................................7
   § 363 .............................................................................................................................10
   § 363(c)(2) .....................................................................................................................7
   § 502(d) .....................................................................................................................1, 8
   § 541(a) ........................................................................................................................10
   § 542 ..................................................................................................................... *passim*

BN 46905572v4

§ 542(a) .................................................................................................................2, 9, 10, 11
§ 542(b) ...........................................................................................................................9, 11
§ 544 ..................................................................................................................................1, 8
§ 545 ..................................................................................................................................1, 8
§ 547 .............................................................................................................................1, 4, 8
§ 548 ..................................................................................................................................1, 8
§ 549 ..................................................................................................................................1, 8
§ 550 .............................................................................................................................1, 4, 8
§ 553 ..................................................................................................................................1, 8

**State Statutes**

N.Y. U.C.C.
§ 2-208 ...............................................................................................................................13
§ 2-725(1) ....................................................................................................................1, 5, 9
§ 2-725(2) ..........................................................................................................................2, 9

**State Rules**

New York
CPLR § 213(2) ..................................................................................................................1, 8

iii

Defendant McKesson Corporation ("McKesson"), by its undersigned counsel, respectfully submits this Memorandum of Facts and Law in opposition to the Motion to File an Amended Complaint (the "Motion to Amend") filed by plaintiff The Official Committee of Unsecured Creditors ("Plaintiff") on behalf of the bankruptcy estate of the Debtors The Great Atlantic & Pacific Tea Company, Inc. *et al.* (collectively, the "Debtors"), as follows:

I.     **INTRODUCTION**

Plaintiff filed its original avoidance complaint against McKesson on July 6, 2017. Now – following the close of discovery and more than four years after Plaintiff filed its lawsuit – Plaintiff seeks to amend its complaint to assert new breach of contract claims that accrued nearly six years ago. The Court should deny Plaintiff's eleventh hour motion for at least four reasons:

First, at the threshold, Plaintiff lacks standing to pursue non-avoidance claims. Pursuant to this Court's order approving the Global Settlement Agreement in the underlying bankruptcy cases, Plaintiff only has the right to prosecute "Avoidance Actions." The Global Settlement Agreement specifically defined "Avoidance Actions" as claims of the Debtors' estates "arising under sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code or any other avoidance actions under their state law analogs." Claims under section 542 of the Bankruptcy Code or other causes of action, such as breach of contract, were not included.

Second, the governing statute of limitations bars Plaintiff's new claims. As Plaintiff itself acknowledges, the new claims arise from McKesson's contractual treatment of certain rebates and refunds in 2015 under the Supply Agreement between the parties. The statute of limitations for breach of contract for the sale of goods under New York law is four years after the cause of action has accrued. N.Y. CPLR § 213(2) and N.Y. U.C.C. Law § 2-725(1). This is true without regard to the aggrieved party's lack of knowledge of the breach. N.Y. U.C.C. Law § 2-725(2).

1

Nor can Plaintiff end-run this statute of limitations bar by disguising a breach of contract claim as a violation of Section 542 of the Bankruptcy Code. Plaintiff's new claims sound in contract. They are premised on alleged, albeit faulty, claims for breach of the Debtors' rights under the Supply Agreement. Where, as here, the Section 542 claims are premised on disputed and time-barred state law claims, the applicable statute of limitations for the state law claim applies. Plaintiff cannot use Sections 542(a) or (b) as device to revive these claims.

Third, McKesson would suffer substantial prejudice if Plaintiff were allowed to pursue these claims at this very late date for three independent reasons. First, the facts are now very stale. Plaintiff seeks the reversal of McKesson's contractual treatment of rebates and product return credits that took in 2015. Many of the individuals who were involved in these decisions are no longer associated with the parties, and, in any event, memories of negotiations, discussions, and events are fuzzy. Second, discovery has now closed, and McKesson will be greatly prejudiced by its inability to take discovery on issues related to the claims, particularly related to the course of performance and course of dealing between the parties. Third, the Debtors were well aware of the rebate and return credit issues back in 2015 (and Plaintiff knew of these issues at least by September 2018). Yet, collectively, they waited nearly six years to assert these claims. The Court should not now countenance Plaintiff's dilatory efforts.

Finally, the claims are substantively flawed. Plaintiff's description of these new claims borders on the absurd. McKesson in no uncertain terms did not "seize" the Debtors' money. Rather, McKesson applied its contractual and legal rights under the then operative Supply Agreement, as extended pursuant to the Extension Agreement, with respect to certain rebates and product return credits.

2

Specifically, as to the subject rebates, McKesson had erroneously paid certain rebates (approximately $570,000) for products the Debtors had not actually paid for. Under the parties' Supply Agreement, the Debtors did not earn the rebates unless they actually paid for the goods. McKesson nonetheless had errantly made certain rebate payments prior to the Debtors' contractual entitlement to the rebates. Given that the Debtors never made the contractual payments that entitled them to the at-issue rebates, and while the Supply Agreement was still operative, McKesson corrected the error and recouped the unearned rebates from other monies owed under that same Supply Agreement. This was detailed to the Debtors back in 2015.

As to the return product claim, McKesson did not pay the Debtors the subject product return credits (approximately $415,000) because, pursuant to the express terms of the Extension Agreement of September, 2015 between the Debtors and McKesson, the Debtors agreed they were not entitled to receive the subject credits (as refunds or other amounts), which had accrued prior to the Petition Date. The extension agreement is clear and unambiguous on this point:

> 4.    **Pre-Petition Rebates and Credits**.  A&P acknowledges and agrees that it does not have a right to receive Rebates, refunds, or other amounts which accrued prior to the Petition Date . . . .

Plus, under McKesson's governing "Returned Goods Policy" in effect during 2015, the Debtors were entitled, at most, to a *credit* (as opposed to cash payment) for returned goods:

> 4. <u>Credits Issued</u>.  All refunds for returned Merchandise will be made as a **credit** to customer's account in an amount equal to the applicable percentage of the item's price.  The item's price will be determined as set out in Section 5. The applicable percentage will be as set out in the following chart. …  Notwithstanding anything in this Policy to the contrary, in the event a manufacturer/vendor fails for any reason to pay McKesson for the cost of Recalled or Unsaleable Merchandise (excluding Merchandise received by customer damaged or short-dated), or any amounts due to McKesson with respect to such Merchandise, customer shall be responsible for any such unpaid monies, and shall fully reimburse McKesson including for any credits, deductions or other forms of

3

> advance that have already been paid to or received by customer for
> such Recalled or Unsaleable Merchandise.

Overall, the lawsuit that has been pending since 2017 concerns the appropriateness of McKesson's receipt of 30 payments made within ninety days of the Petition Date. Plaintiff is now seeking to transform this lawsuit into something very different, by asserting new claims as to McKesson's contractual treatment of certain rebates and product returns that took place in 2015. For the reasons detailed in this brief, the Court should not permit this.

## II.    KEY FOUNDATIONAL FACTS

A.    The present lawsuit was filed on July 6, 2017—more than four years ago. That lawsuit asserted only two cause of action, for avoidance and recovery of 30 transfers under sections 547 and 550 of the Bankruptcy Code. It did not assert claims for breach of contract or turnover of property under Section 542 of the Bankruptcy Code. Nor did the lawsuit assert claims related to the rebates or returned products that are the basis for Plaintiff's new claims.

B.    The deadline for completion of discovery in this action was August 27, 2021. Given that there was no claim for breach of contract or turnover, McKesson did not conduct any discovery on the rebate or the product return issues. (Garfinkle Decl. ¶¶ 56-57.)

C.    As is discussed in more detail in Section III.B, the alleged breaches of contract upon which Plaintiff's new claims are premised took place in July and November of 2015. Plaintiff admits this in its motion and the proposed amended complaint:

> i.    As to the rebate issue, Plaintiff alleges in its proposed amended complaint the issue accrued in November, 2015 when McKesson "breached the Extension Agreement by refusing to pay rebates in the amount of $569,860.02." (Proposed Amended Complaint at ¶ 117; *see also* brief in support of motion for leave, p. 1.)

4

        ii.      As to the product returns issue, Plaintiff alleges the issue accrued on July 28, 2015 when McKesson "breached the Extension Agreement by failing to allow A&P to use the Medturns and Additional Medturns as credits during the Extension Period." (Amended Complaint at ¶ 120; *see also* supporting brief at p. 2.)[1]

    D.    <u>The Rebate Issue</u>.

Plaintiff wrongly contends McKesson secretly stole approximately $570,000 of the Debtors' money in July of 2015. In truth, McKesson errantly paid a rebate before the Debtors had actually paid for the goods for which the rebate was calculated. McKesson subsequently recouped this errant payment by deducting the amount of the rebate from the balance of other rebates owed to the Debtors as permitted under the then operative Supply Agreement. McKesson paid the Debtors nothing less than it was contractually obligated.

The contractual basis for the rebate is set forth in the Supply Agreement between McKesson and the Debtors. (ECF 36, Exh. H (filed under seal)). No rebate is earned unless and until the Debtors paid for certain goods. (ECF 36, Exh. H, § 11.C (right to rebate based on the "aggregate amount paid by A&P").) Indeed, the express purpose of the rebate provision is as an incentive for prompt payment:

> Any rebate, volume incentive or other similar payment based on A&P's purchase volume (collectively, "Rebates" are offered to A&P as an incentive for both volume purchases and prompt payment.

---

[1]     "Medturns" is a term that appears in the Debtors' books and records, which McKesson has been advised means pharmaceutical product returns. On September 19, 2018, Plaintiff filed the Declaration of Dawn DeVito in opposition to McKesson's Summary Judgment Motion. (ECF 36). Ms. DeVito is the Debtors' VP, Administration and is administrating the Debtors' wind-down. Exhibit G to Ms. DeVito's declaration contains 18 "Medturns" line entries during June and July 2015. In her declaration, Ms. DeVito described Exhibit G as follows: "A true and correct copy of a register of A&P's unpaid McKesson invoices between January 1, 2015 to July 19, 2015 that was generated in A&P's regular course of business by running a SBT query for on hold McKesson invoices (the '2015 Unpaid Invoices Register')." (DeVito Declaration, Paragraph 17.)

5

(ECF 36, Exh. H, § 21.M.)

Noticeably absent from Plaintiff's complaint are allegations that a) the Debtors actually paid for the product supporting the subject rebate; b) McKesson recouped more than the unearned rebate; or c) McKesson was not entitled to recoup the unearned rebate. In short, far from the wrongful portrayal that McKesson stole the Debtors' property, it is actually the estates, through Plaintiff, which are seeking a $570,000 unearned windfall at the expense of McKesson.

E.  The Return Product Credit Issue.

Plaintiff wrongly contends McKesson wrongfully "seized" approximately $413,000 of the Debtors' money in July of 2015 by virtue of McKesson's refusal to pay refunds for pre-petition returns of product. Again, the facts matter. This is a contact dispute, not conversion. McKesson had a contractual right not to pay the Debtors the subject refunds because under the parties' Extension Agreement, the Debtors waived their right to any pre-petition refunds or other amounts owed under the Supply Agreement.

The Extension Agreement is clear in this respect:

> **Pre-Petition Rebates and Credits.** A&P acknowledges and agrees that it does not have a right to receive Rebates, refunds, or other amounts which accrued prior to the Petition Date . . .

(Garfinkle Decl. ¶ 9, Exh. A.) Plus, pursuant to the clear terms of McKesson's then in-effect returned goods policy (see quoted provision at pages 3-4 of this brief), the Debtors at most were entitled to a *credit* against their account for the value of the returned goods.[2]

---

[2] As with every aspect of the pharmaceutical distribution business, the product return process is complex and strictly regulated. It involves not only the purchaser (here, the Debtors) and the distributor (here, McKesson), but also third party pharmaceutical return companies (here, Medturn/Inmar, Inc.) and the pharmaceutical manufacturers. McKesson's returned goods policy was incorporated in the Supply Agreement. McKesson's returned goods policy connects to the return policies of all of the manufacturers whose products McKesson distributes. And, every manufacturer has its own product return policy. *See e.g.* Purdue and Associated U.S. Companies, *Return Goods Policy for Prescription Products Effective June 1, 2017,* https://www.purduepharma.com/wp-content/pdfs/purdue-return-goods-policy-for-prescription-products.pdf. The product return process typically takes several months from when the third party returns processor receives the product until the final amount of the return credit is ascertained.

6

Noticeably absent from Plaintiff's complaint are allegations that a) the subject refunds had not accrued prior to the Petition Date; or b) McKesson failed to pay the Debtors anything more than the pre-petition return goods credit. Again, far from the wrongful portrayal that McKesson stole the Debtors' property, it is actually Plaintiff which is now seeking a $413,000 unearned windfall at the expense of McKesson.

### III. ARGUMENT

#### A. Plaintiff Lacks Standing To Assert Non-Avoidance Claims

In May 2016, the Debtors, the Committee and certain of the secured creditors entered into the Global Settlement Agreement in the underlying Bankruptcy Action. (Docket No. 2786, Exh. A) (the "Global Settlement Agreement"). On June 6, 2016, this Court approved the Global Settlement Agreement pursuant to the "Order (A) Approving Global Settlement Agreement and (B) Further Amended Debtors' Authority to Use Cash Collateral Pursuant to 11 U.S.C. §§ 105 and 363(c)(2)" (the "Global Settlement Approval Order.") (Docket No. 2868).

Paragraph 5 of the Global Settlement Approval Order addressed "Avoidance Actions." That paragraph reads, "Following the Effective Date, the Avoidance Actions shall be prosecuted by the Creditors' Committee, which shall have full standing to do so on behalf of the Debtors' estates[.] The term "Avoidance Actions" is defined in the Global Settlement Agreement. Avoidance Actions are limited to "action[s] or other claim[s] of the Debtors' estates arising under sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code or any other avoidance actions under their state law analogs." Notably absent from the definition of "Avoidance Actions" are actions or claims under section 542 of the Bankruptcy Code or other causes of action, such as breach of contract.

7

Because the Global Settlement Agreement does not grant the Committee standing over causes of action under section 542 or breach of contract, the Committee lacks the legal ability to amend the complaint to include these two new causes of action against McKesson.

### B. Plaintiff's Proposed Claims Are Barred by the Statute of Limitations

Plaintiff's new claims are nothing more than breach of contract claims. With respect to the rebate issue, Plaintiff contends McKesson "breached the Extension Agreement by refusing to pay rebates in the amount of $560,860.02." (Proposed Complaint ¶ 117.) And, with respect to the product returns issue, Plaintiff contends McKesson "breached the Extension Agreement by failing to allow A&P to use the Medturns and Additional Medturns as credits during the Extension Period." (Proposed Complaint ¶ 120.)

The statute of limitations for a breach of contract claim for the sale of goods is four years under New York law.[3] Where a claim for a breach of contract relates to the sale of goods, New York law adopts the statute of limitations set forth in the Uniform Commercial Code. N.Y. CPLR § 213(2); *Port Auth. Of N.Y. and N.J. v. Allied Corp.*, 914 F. Supp. 960, 962 (S.D.N.Y. 1995). Section 2-725(1) of the New York Uniform Commercial Code provides that an action for breach of any contract for sale "must be commenced within four years after the cause of action has accrued." Section 2-725(2) further provides that a "cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."

Here, Plaintiff readily admits the alleged breaches occurred more than four years ago. As to the returned products issue, Plaintiff asserts that McKesson breached its contractual obligations in November, 2015. (Proposed Amended Complaint ¶ 117.) And as to the refund

---

[3] New York law governs the parties' dispute by virtue of the choice of law provision in the governing Supply Agreement. (ECF 36, Exh. H, § 21.E at p. 32.)

BN 46905572v4

issue, Plaintiff asserts that McKesson breached its contractual obligations no later than July 28, 2015. (Proposed Amended Complaint ¶ 120.)

Plaintiff suggests it was unware of the breach until sometime later. Under New York law, knowledge of the breach is legally irrelevant to the statute of limitations analysis. N.Y. U.C.C. Law § 2-725(2). The operative question is when did the breach occur, not when, or whether, the aggrieved party knew of the breach.

In any event, Plaintiff was well aware of the rebate and refund issues in 2015. For instance, on November 24, 2015, Tim Carnahan, the Debtors' Chief Financial Officer, wrote Meg Mitchell of McKesson complaining about the rebate issue. (Garfinkle Decl. ¶ 59, Exh. H ("[W]e cannot find the contractual justification for the $562K pre-petition adjustment [referenced in the attached reconciliation provided by McKesson.").) So too, Plaintiff was aware, or certainly should have been aware, of the refund issue in 2015 given that the Debtors never received payment from McKesson for the subject returns. Also, in the week before August 31, 2015, there was a group meeting between representatives of McKesson and the Debtors, including outside counsel. At that meeting, the parties discussed the issue of pre-petition credits, and it was agreed that the Debtors would waive the refund claims. (Garfinkle Decl. ¶ 8.)[4]

Plaintiff cannot avoid this statute of limitations bar by dressing up its breach of contact claim as a Section 542 turnover action, under either Section 542(a) or Section 542(b) of the Bankruptcy Code—the two subsections of Section 542 partially quoted in the proposed Amended Complaint. (Proposed Amended Complaint, ¶ 97)

---

4    The Debtors' knowledge of these claims continued through to the Plaintiff. As evidenced by the DeVito Declaration (see footnote 1 of this brief), Plaintiff, and its counsel, well knew of the "Medturns" and the return product credit issues before September 2018, but yet Plaintiff continued to sit on its hands for years.

9

A claim under Section 542(a) is premised and dependent on the existence of "property of the estate" in the possession of McKesson, which does not exist here. Section 542(a) provides in pertinent part:

> [A]n entity … in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease **under section 363** of this title … shall deliver to the trustee, and account for, such property or the value of such property ….

Under Section 363 of the Bankruptcy Code, a trustee (or debtor) may only use, sell or lease "property of the estate."

Thus, to trigger a turnover obligation under Section § 542(a), there must be an "entity" (i.e., a "person, estate, trust, governmental unit,[or] United States trustee") that is in possession of "property of the estate." *See In re Pyatt*, 486 F.3d 423, 427 (8th Cir. 2007) ("By referring to § 363 . . . the drafters of § 542(a) made it clear that the turnover obligation applies to property of the estate."); *In re Coomer*, 375 B.R. 800, 803-04 (Bankr. N.D. Ohio 2007) ("although not specifically stated in § 542, fundamental to the concept of 'Turnover' is that the asset to be turned over must be property of the debtor's bankruptcy estate") (citing *In re Sims*, 278 B.R. 457, 475 (Bankr. E.D. Tenn. 2002)); *Dunes Hotel Assoc. v. Hyatt Corp.*, 245 B.R. 492, 505 (D.S.C. 2000) ("§ 542 mandates only the turnover of 'property of the estate' to a bankruptcy trustee") (quoting *In re Springfield Furniture, Inc.*, 145 B.R. 520, 529 (Bankr. E.D. Va. 1992)) (internal marks omitted).

"Property of the estate" for purposes of § 541(a) consists of "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, . . . [including] causes of action owned by the debtor or arising from property of the estate." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008).

10

In the present instance, the full extent of the purported new claims against McKesson is just an unliquidated and time-barred breach of contract claim for alleged non-payment, or for improper recoupment of rebates and non-payment of product return credits arising the Supply Agreement. There is thus no "property of the estate" to turnover.

Likewise, Plaintiff's purported claim under Section 542(b) also fails. A claim under Section 542(b) is premised and dependent on the defendant owing a "debt" to the debtor that is both "property of the estate" and "*matured, payable on demand, or payable on ord*er."

A contract claim does not meet these requirements. It is well established that Section 542(b) cannot be used to liquidate contract disputes. *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991) ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute."), *cert. denied*, 502 U.S. 1048 (1992); *Charter Crude Oil Co. v. Exxon Co., U.S.A.* (*In re Charter Co.*), 913 F.2d 1575, 1579 (11th Cir. 1990) ("Clearly, Congress envisioned the turnover provision of § 542 of the Code, 11 U.S.C. § 542 (1988), to apply to tangible property and money due to the debtor without dispute which are fully matured and payable on demand."); *see also Lovald v. Falzerano* (*In re Falzerano*), 686 F.3d 885, 886–87 (8th Cir. 2012) (claims for unjust enrichment based on a disputed debt are beyond the scope of section 542(a)).

Likewise, where the predicate claim is time-barred, a plaintiff cannot revive that claim by restating it as a 542 claim. See *Miller v. Jannetta* (*In re Irwin*), 509 B.R. 808 (Bankr. E.D. Pa. 2014). *Miller* is a case with analogous facts. In *Miller*, the debtor's liquidating agent brought suit under Section 542 for the "turnover" of funds the debtor advanced to the defendant 20 years before the bankruptcy case. *Id*. at 813. "As one might expect, the central issue in the litigation is the applicability of the affirmative defense of the statute of limitations." *Id*. In its analysis, the

11

*Miller* court ruled that the statute of limitations of the underlying predicate act is applicable to the Section 542 claim. "[T]o the extent that a statute of limitations defense would defeat the Debtor's claim against [defendant] in a non-bankruptcy court proceeding, that defense is available to [defendant] in [the liquidating agent's] adversary proceeding in this court." *Id*. at 817. Because the debtor's breach of contract claim was time-barred, the *Miller* court entered judgment on the section 542 cause of action in favor of the defendant. *Id*. at 822.

For the same reasons, in this case with time-barred and legally futile claims arising under the Supply Agreement, the Motion to Amend must be denied. Plaintiff cannot amend its four-year old complaint to assert six-year old contract claims that are clearly time-barred under New York law.

### C. McKesson Would Be Substantially Prejudiced If Plaintiff Were Permitted To Amend Its Complaint

The Court should also deny Plaintiff's motion because McKesson would be substantially prejudiced by having to defend against new eleventh-hour claims more than four years after the litigation began following the close of discovery. Where a party would be substantially prejudiced by the allowance of a proposed amendment, the Court is well within its discretion to deny the request. *Ricciuti v. Voltarc Tubes, Inc.*, 277 F.2d 809, 814 (2nd Cir. 1960).

Putting aside the dispositive statute of limitations problems, allowing Plaintiff to reframe its lawsuit at this late date would be prejudicial in several ways. First, the purported contract claims are now grossly stale, since they relate to facts and actions taken six years ago. Many of the key witnesses are no longer readily available, including Meg Mitchell, a former McKesson employee who was in charge of the day-to-day business relationship with the Debtors, and Nirup Krishnamurthy, a former executive of the Debtors who participated in the negotiation of the

12

Extension Agreement. (Garfinkle Decl. ¶ 58.) And even if they were, their memories would now be fuzzy.

Second, McKesson would be substantially prejudiced because discovery has now closed. Had McKesson been defending against the purported breach of contract claim, it would have taken extensive discovery as to the contract claims. Discovery would have included written discovery (both document requests, interrogatories, and requests for admissions), broader depositions of previously deposed Debtors representatives on the refund and return issues, discovery related to the course of performance and course of dealings between McKesson and the Debtors, as wells as usage of trade,[5] the depositions of persons who were involved in the negotiation of the Extension Agreement, and discovery related to specific defenses, such as the statute of limitations, and laches (why Plaintiff waited six years to assert a breach of contract claim). (Garfinkle Decl. ¶ 58.)

It would be grossly unfair and unjust to allow Plaintiff to assert new claims years late without re-opening discovery. And yet, McKesson would also be prejudiced by the reopening of discovery and the substantial costs that would be associated with a new and significant round of discovery.

Overall, the prejudice to McKesson of allowing Plaintiff to assert new claims at this late date would be substantial. Add to this Debtors' and then Plaintiff's six year delay in pursuing these claims. Both Debtors and Plaintiff well knew that McKesson had reversed the subject rebate and not paid it for the subject returns years ago, and yet for the last four years, Plaintiff only asserted an avoidance claim. Based on these facts, McKesson submits that justice warrants a denial of Plaintiff's motion.

---

[5]   The course of performance and course of dealings between contractual parties and usage of trade are relevant to determine the meaning of a sales agreement pursuant to the Uniform Commercial Code. N.Y. U.C.C. Law § 2-208.

13

### D. Plaintiff's Proposed Claims Are Substantively Flawed

Plaintiff's purported new contract claims revolve around two issues: 1) whether the Debtors were entitled to payment for unearned rebates arising from the Debtors' failure to pay for the underlying goods, and 2) whether the Debtors were entitled to payment for certain pre-petition refunds for return products following the entry of the Extension Agreement, pursuant to which the Debtors expressly waived their right to such refunds.

McKesson submits these claims are fundamentally flawed on the merits. McKesson refers the Court to the facts underlying these claims as detailed in Section II, subsections D & E of this brief. Boiled down, the substantive error of the claims can be summarized as follows:

- As to the purported rebate claim, Plaintiff has not, and cannot, assert that the Debtors actually paid for the goods for which Plaintiff now claims warrant the rebate. The illogic of this argument cannot be understated. The Debtors were not entitled to a payment rebate for goods that they did not pay for. Had the Debtors paid for the goods they would have received the rebate, but because the Debtors did not pay, McKesson was legally justified to reverse the payment.

- As to the purported product return refund claim, Plaintiff simply ignores the express waiver of pre-petition refund claims in section four of the Extension Agreement (The Debtors "acknowledges and agrees it does not have a right to receive . . . refunds . . . or other amounts which accrued prior to the Petition Date.") and the product return policy (which expressly limits products returns to an account credit). Based on these two contract provisions, McKesson was legally justified in not paying any refunds for the at-issue return products.

McKesson's actions were consistent with and in compliance with the parties' contract. This probably is the reason why the Debtors never asserted contract breach claims in 2015, or thereafter. Plaintiff—the Committee—does not get to rewrite the underling Supply Agreement contract, the business dealings between the Debtors and McKesson, and the history in order to assert these new claims.

### IV.   CONCLUSION

For the foregoing reasons, McKesson respectfully requests the Court deny Plaintiff's motion for leave to file an amended complaint.

DATED: September 13, 2021

KLESTADT WINDERS JURELLER
SOUTHARD & STEVENS LLP


By:   /s/ *Tracy L. Klestadt*
Tracy L. Klestadt, Esq.
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone:  (212) 972-3000
TKlestadt@Klestadt.com

and

BUCHALTER, A Professional Corporation

Jeffrey K. Garfinkle, Esq.
(Cal Bar. No. 153496; admitted *pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
jgarfinkle@buchalter.com

Attorneys for Defendant, MCKESSON CORPORATION