**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re:                                                       :
                                                             :   Chapter 11
THE GREAT ATLANTIC & PACIFIC TEA                             :
COMPANY, INC., *et al.*,                                     :   Case No. 15-23007 (RDD)
          Debtors.                                 :
---------------------------------------------------------------x
                                                             :
The Official Committee of Unsecured Creditors on             :
behalf of the bankruptcy estate of THE GREAT                 :
ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*,              :
                                                             :   Adv. Proc. No. 17-08264 (RDD)
          Plaintiff,                               :
   v.                                                   :
                                                             :
McKESSON CORPORATION,                                        :
                                                             :
          Defendant.                               :
---------------------------------------------------------------x

## **DECLARATION OF DAWN DeVITO**

Dawn DeVito hereby declares as follows:

1. I am the Responsible Officer for Debtor The Great Atlantic & Pacific Tea Company, Inc. ("A&P" or "Debtor"). I have worked for A&P and its affiliated debtors in various accounting capacities since May 2015, just before the Debtor filed its bankruptcy petition. I am a Certified Public Accountant and a Chartered Global Management Accountant. I submit this Declaration based on my personal knowledge and my review of relevant files in support of the motion of Plaintiff The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of The Great Atlantic & Pacific Tea Company, Inc. ("Plaintiff") to amend its complaint against Defendant McKesson Corporation ("Defendant").

2. I was A&P's Senior Director of Corporate Accounting & Financial Planning and Analysis/Controller from 2015 to 2017. As Senior Director, I managed the operations of the Financial Planning & Analysis and Accounting departments of A&P's business including, but not limited to, A&P's pharmacy business.

1

3. From 2017 until I was appointed to my current position in May, 2021, I served as A&P's VP Administration. In that capacity, I managed the wind-down team for A&P's bankruptcy.

4. As Responsible Officer for A&P, my current responsibilities are to continue to wind down A&P's operations and to make any necessary payments to claimants as approved by the bankruptcy court.

5. I have reviewed Plaintiff's motion to amend the complaint and proposed amended complaint.

The Rebate

6. Based on my review of the Debtor's documents, it is my understanding, as Plaintiff's proposed amended complaint (the "Amended Complaint") alleges, that on July 16, 2015, during the week before A&P filed for bankruptcy, Defendant paid A&P $562,832.91 as a rebate on its 2015 purchases (the "Rebate") under the parties' Supply Agreement. Defendant itself computed the amount of the Rebate in a "Monthly Rebate Report" for June 2015 which it emailed to A&P two days before the Rebate was paid.

7. Documents show that Defendant took back the amount of the Rebate in November 2015 by deducting it from sums that Defendant admitted it owed to A&P at that time under the parties' Extension Agreement dated September 8, 2015.

8. The Rebate was a rebate on the prices A&P paid for merchandise it purchased from Defendant under the parties' Supply Agreement dated as of December 6, 2012.

9. Based on my review of relevant documents, substantially all of the Rebate was made up of individual rebates on the prices A&P paid Defendant for individual purchases during the preference period from April 20, 2015 until July 19, 2015 ("Preference Period"), particularly

2

during June 2015. Those purchases are alleged in Plaintiff's original July 2017 complaint as well as in its proposed Amended Complaint.

10. The Rebate also included rebates for purchases made during the twenty days before A&P's bankruptcy.

The Medturns

11. Based on my review of relevant documents, it is my understanding, as the Amended Complaint alleges, that in late July 2015, while the Supply Agreement was still in effect, Defendant decided that it would withhold A&P's credits for medical returns amounting to more than $413,000 for May, June and part of July 2015 (the "Medturns"). As far as I have been able to determine based on my review of relevant documents, Defendant did so without informing A&P that it was withholding the Medturns, why it was withholding the Medturns, or, if it decided to keep the Medturns credits, that it had done so.

12. Based on my review of relevant documents and my understanding of the parties' practices with respect to the return of merchandise, I believe that a portion of the Medturns that Defendant withheld in July 2015 arose in accord with the Supply Agreement from returns of merchandise that A&P purchased during the Preference Period in transactions alleged in Plaintiff's original July 2017 complaint as well as in its proposed Amended Complaint.

A&P's Investigation of the Facts Concerning the Rebate and Medturns

13. A&P made multiple efforts to obtain information from Defendant and engage Defendant in discussions in and after 2016 in order to reconcile the parties' records, determine the amount of Defendant's claims, and determine whether rebates, credits or other sums were due yet remained unpaid. Despite A&P's many requests, Defendant failed to provide sufficient information or engage A&P in discussion such that A&P could reconcile the parties' records.

14. It was not until mid-2021 when I was able to participate in a telephone conference with an accountant for Defendant, and the parties' counsel were included on the call. Despite my

3

requests for specific information, Defendant did not provide documents or information as a result of that conference.

15. Despite my best efforts, I could not determine whether Defendant continued to hold the Rebate in escrow, had repaid it to A&P, or had taken the money for its own account at any time before 2021.

16. Despite my best efforts, I could not determine whether Defendant held the Medturns credits in escrow, had repaid them to A&P, or had taken the money for its own account at any time before 2021.

17. As I stated in Paragraph 22 of my Declaration dated September 9, 2019, it was my understanding that $242,259.18 in Medturns should be set off against Defendant's 503(b)(9) claim. However, at the time, I had limited information, which is why I stated in my Declaration that if I were provided additional information I might adjust my analysis accordingly. I could not sufficiently reconcile Defendant's 503(b)(9) claim with the limited information I had received from Defendant. Since September 9, 2019, I have been provided more information about the Defendant's 503(b)(9) claim, and I now calculate the Medturns amount to be significantly higher. However, I still lack sufficient information from Defendant to conduct a thorough, document-based analysis of the Medturns or Defendant's 503(b)(9) claim.

18. I was only able to conclude with reasonable certainty that Defendant had taken the Rebate and Medturns and had not returned them to A&P once Defendant admitted these facts in discovery in and after June 2021.

4

In accord with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed:    Ramsey, New Jersey
September 17, 2021

By: /s/ *Dawn DeVito*
Dawn DeVito