Tracy L. Klestadt
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
tklestadt@klestadt.com

Jeffrey K. Garfinkle (admitted *pro hac vice*)
Daniel H. Slate (Cal Bar No. 78173)
BUCHALTER Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
jgarfinkle@buchalter.com

Counsel for Defendant
McKesson Corporation

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,<br><br>Debtor. | ) Chapter 11<br>)<br>) Case No. 15-23007 (lgb)<br>)<br>)<br>)<br>)<br>)<br>) |
| The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>McKESSON CORPORATION,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Adv. Proc. No. 17-08264 (lgb)<br>)<br>)<br>)<br>)<br>) |

**McKESSON CORPORATION'S MOTION FOR SUMMARY JUDGMENT**
**OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION AND**
**SUPPORTING MEMORANDUM OF FACTS AND LAW**

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................1

II.    BACKGROUND ............................................................................................5

    A.    Procedural Background............................................................................5

    B.    Background of the Business Relationship between McKesson and Debtor ...........7

III.    SUMMARY OF ARGUMENT .................................................................9

IV.    STATEMENT OF UNDISPUTED FACTS ..................................................10

    A.    Plaintiff's Avoidance Claims...............................................................10

    B.    The Undisputed Facts Supporting McKesson's "New Value" Defense Under Section 547(c)(3) ...............................................................................10

    C.    The Undisputed Facts Supporting McKesson's Section 503(b)(9) Setoff Right.................................................................................................12

V.    THE COURT SHOULD GRANT SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION..........................................14

    A.    Applying the New Value Defense, McKesson's Maximum Preference Exposure is No More than $9.7 million................................................14

    B.    Applying McKesson's Section 503(b)(9) Setoff Rights, McKesson's Maximum Preference Exposure Is No More than approximately $900,000 .........16

VI.    CONCLUSION............................................................................................20

BN 69760055v11

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Hartconn Assocs.* (*In re Adams*),
212 B.R. 703 (Bankr. D. Mass. 1997) .................................................................18

*ASM Capital, LP v. Ames Dep't Stores, Inc.* (*In re Ames Dep't Stores, Inc.*),
582 F.3d 422 (2d Cir. 2009).................................................................................17

*In re Baumgold Bros., Inc.*
103 B.R. 436,440 (Bankr. S.D.N.Y. 1989)...........................................................15

*Falcon Creditor Trust v. RightChoice Managed Care* (*In re Falcon Prods.*),
2008 U.S. Dist. LEXIS 9590 (E.D. Mo. Feb 8, 2008)..........................................19

*In re Falcon Products, Inc.*,
372 B.R. 474 (Bankr. E.D. Mo. 2007)..................................................................18

*Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*,
375 F.3d 51 (1st Cir. 2004)......................................................................4, 17, 18

*In re Hackney*,
93 B.R. 213 (Bankr. N.D. Cal. 1988) ...................................................................17

*Hall v. Chrysler Credit Corp.* (*In re JKJ Chevrolet, Inc.*),
412 F.3d 545 (4th Cir. 2005) ...............................................................................14

*Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Areas Pension
Fund (In re Jones Truck Lines, Inc.)*,
130 F.3d 323 (8th Cir. 1997) ...............................................................................15

*Kaye v. Blue Bell Creameries, Inc.* (*In re BFW Liquidation, LLC*),
899 F.3d 1178 (11th Cir. 2018) ...........................................................................15

*Laker v. Vallette* (*Matter of Toyota of Jefferson, Inc.*),
14 F.3d 1088 (5th Cir. 1994) ...............................................................................15

*In re Maxwell Newspapers, Inc.*,
192 B.R. 633 (Bankr. S.D.N.Y 1996)..............................................................14, 15

*Mosier v. Ever-Fresh Food Co.* (*In re IRFM, Inc.*),
52 F.3d 228 (9th Cir. 1995) .................................................................................15

BN 69760055v11

*Official Comm. of Unsecured Creditors of Quantum Foods, LLC v. Tyson Foods,*
*Inc.* (*In re Quantum Foods, LLC*),
554 B.R. 729 (Bankr. D. Del. 2016) ...........................................................6

*Page v. Rogers,*
211 U.S. 575 (1909) ...........................................................................19

**Federal Statutes**

11 U.S.C.
§ 502(h) .................................................................................17, 18
§ 503(b)(9) .........................................................................*passim*
§ 507(a)(4) ...................................................................................18
§ 547 ..................................................................................2, 5, 10
§ 547(a)(2) ...................................................................................14
§ 547(b) .......................................................................................15
§ 547(b)(4)(A) ..............................................................................10
§ 547(c) ..................................................................................2, 5
§ 547(c)(3) ...................................................................................10
§ 547(c)(4) ...........................................................................14, 15
§ 547(c)(4) ...................................................................................15
§550 .....................................................................................2, 5
§ 550(a) ................................................................................5, 10

**Uniform Commercial Code**

UCC § 2-102 ................................................................................8

iii

Defendant McKesson Corporation ("McKesson"), by and through its undersigned counsel, respectfully submits this Motion and Memorandum of Facts and Law in support of its Motion for Summary Judgment or, in the Alternative, Summary Adjudication (the "Motion") against plaintiff The Official Committee of Unsecured Creditors ("Plaintiff") on behalf of the bankruptcy estate of The Great Atlantic & Pacific Tea Company, Inc.  ("Debtor").[1]

## I.    INTRODUCTION

This Motion is directed to Plaintiff's causes of action in the Amended Complaint seeking to avoid thirty alleged preferential payments.  Based on the undisputed facts, the Court should grant judgment in McKesson's favor as to all but one payment for roughly $898,000.  As to this one payment, McKesson disputes it is a voidable preference but acknowledges it is subject to further resolution.

In short, this is just a mathematical exercise after calculation first of McKesson's new value defense and then application of its section 503(b)(9) setoff rights.  Where, as here, it is undisputed that Plaintiff cannot recover anything except possibly this one payment, summary judgment or summary adjudication as to the twenty-nine other payments is appropriate.

Plaintiff's Avoidance Claims.

Plaintiff's first and second claims for relief in its Amended Complaint [ECF 93] seek to avoid and recover allegedly preferential transfers.  The Amended Complaint targets thirty payments (the "90-Day Payments") made to McKesson during the 90-day preference period (the "90-Day Period") in the total amount of $67,119,573.20.  [ECF 93 at Exhibit A].

---

1  On May 14, 2021, the Bankruptcy Court entered the "Order Authorizing Final Resolution of Debtors' Cases and Granting Related Relief."  [Main ECF 4810].  Pursuant to paragraph 5 of this Order, The Great Atlantic & Pacific Tea Company, Inc. was "established as the sole remaining Debtor entity in these Chapter 11 Cases ('Wind Down Co.") [and] the Chapter 11 Case of The Great Atlantic & Pacific Tea Company, Inc. Case No. 15-23007 (the 'Lead Case') shall remain open."  Consistent with this order and recent pleadings filed by Debtor's lead counsel, the caption to this adversary proceeding has been updated and all references to the debtors, A&P and its bankrupt corporate affiliates and the bankruptcy estates are in the singular.

<u>Application of McKesson's New Value Defense</u>.

Each of the 90-Day Payments was for Debtor's purchase of pharmaceutical and other goods (collectively, "<u>Merchandise</u>") from McKesson. With only a few relatively minor issues (addressed below), the parties agree the total value of the Merchandise McKesson delivered to Debtor during the 90-Day Period is $58,846,795.61.[2]

Working backward from July 19, 2015 (the "<u>Petition Date</u>"), after applying just "subsequent new value" and without considering McKesson's other two statutory defenses (ordinary course of business and contemporaneous exchange of value), all but six of the 90-Day Payments are fully shielded from avoidance. Thus, based just on application of the new value defense, McKesson's maximum potential preference exposure is $9,734,027.41.[3] That is the absolute ceiling of McKesson's potential liability on the preference aspects of Plaintiff's lawsuit. Stated another way, any and all payments from Debtor to McKesson in excess of $9.7 Million are fully shielded from avoidance under sections 547 and 550 of the Bankruptcy Code.

<u>Court's Ruling Affirming McKesson's Setoff Rights of its Section 503(b)(9) Claim</u>.

McKesson previously moved for summary judgment on May 1, 2019 (the "<u>2019 MSJ</u>"). [ECF 24]. The 2019 MSJ focused on McKesson's three statutory defenses to the preference claims, but it also addressed McKesson's setoff rights on account of its section 503(b)(9) administrative claims.

While the Court partially denied summary judgment on McKesson's statutory defenses under section 547(c) of the Bankruptcy Code, it granted summary judgment and expressly affirmed McKesson's right to set off its section 503(b)(9) claim dollar-for-dollar against any preference

---

2  The calculations in this Motion are based on the analysis undertaken by Charles Berk and CBIZ Accounting, Tax and Advisory, McKesson's expert.  Mr. Berk's declaration accompanies this Motion.
3  For simplicity's sake, in the Motion, this maximum potential preference exposure is referred to as "$9.7 Million."

liability as a matter of law in an amount to be determined later.  The Court was clear on this legal

point:

> [T]he setoff point, which I could easily grant summary judgment on today that you, to the extent you have a 503(b)(9) claim you can set off against an ultimate preference recovery. But, again, there's a factual issue as to what the claim is. …
>
> ***
>
> So I think you can assume that I'm granting summary judgment in part on the setoff point as a matter of law without quantifying what the setoff would be, relying on the same logic that Judge Carey used in the *Quantum* case, which to me made sense for the same reasons that he said.

(Transcript of September 16, 2019 Hearing, [ECF 43], p. 57, lls. 2-6; p. 58, lls. 18-22 (the "Section

503(b)(9) Setoff Ruling").)

Application of McKesson's Section 503(b)(9) Setoff Rights

The last week before the Petition Date, Debtor made six payments to McKesson totaling

$10,148,642.66.  Those six payments were as follows:

1. July 17, 2015: $830,735.91 for all Merchandise delivered on July 16; 2015;

2. July 17, 2015: $5,000,563.27 for "Branded Pharmaceuticals" delivered between July 6 and July 10, 2015;

3. July 17, 2015: $898,354.51 for "Generics" delivered between June 2 and June 6, 2015 (the "July 17 Generics Payment");

4. July 16, 2015: $883,260.71 for all Merchandise delivered on July 15;

5. July 15, 2015: $1,098,919.73 for all Merchandise delivered on July 14; and,

6. July 14, 2015: $1,436,808.53 for all Merchandise delivered on July 13.

With the sole exception of the July 17 Generics Payment for $898,354.51, each of these

payments was for Merchandise delivered within the twenty days prior to Petition Date

(collectively, the "Section 503(b)(9) Covered Payments").[4]  Each of the Section 503(b)(9) Covered Payments thus is subject to a complete setoff because the payments were on account of Merchandise that was delivered within 20 days of the Petition Date (the "20-Day Period").

Accounting for these five Section 503(b)(9) Covered Payments, plus those payments protected by the new value defense (as discussed above), McKesson's maximum potential preference exposure is reduced to the July 17 Generics Payment in the amount of $898,354.51.[5]

Boiled down, there is no utility in determining whether the five Section 503(b)(9) Covered Payments are avoidable preference payments because any avoidance would automatically give McKesson the right to (i) increase the amount of its already-asserted section 503(b)(9) claim by the exact amount avoided, and (ii) offset the section 503(b)(9) claim dollar-for-dollar against any avoidance judgment on account of these five payments.  Given this dynamic, any further litigation would be wasteful and unnecessary.  *See Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51, 71 (1st Cir. 2004) ("The fact that Fleet would be entitled to receive exactly what it would be forced to return through avoidance renders avoidance pointless.").

<u>Summary Judgment is Warranted</u>

Based on the foregoing, the Court should rule as a matter of law that McKesson's maximum preference exposure is approximately $900,000, evidenced by the July 17 Generics Payment, thereby narrowing Plaintiff's preference claims to this one single payment, which McKesson submits is protected from avoidance under the ordinary course defense.

---

4  The twenty-day period before the Petition Date is from June 29, 2015 through July 18, 2015.
5  Again, for simplicity's sake, in the Motion, the amount of possible preference exposure after application of the new value defense and setoff pursuant to section 503(b)(9) is referred to as "approximately $900,000."

4

## II. BACKGROUND

### A. Procedural Background

Debtor's Bankruptcy Petition

For the second time in five years, Debtor filed for relief under chapter 11 of the Bankruptcy Code on the Petition Date, July 19, 2015.

Plaintiff's Avoidance Claims

On June 6, 2016, the Court vested Plaintiff with the authority to prosecute avoidance causes of action for the benefit of the Debtor's creditors. [Main ECF 2868]. On July 13, 2017, Plaintiff filed its *Complaint for Avoidance and Recovery of Preferential Transfers Pursuant to 11 U.S.C. § 547 & 550* [ECF 1] (the "Initial Complaint") against McKesson. The Initial Complaint contained two causes of action for the avoidance and recovery of $67,752,943.44 in alleged preferential transfers pursuant to section 547 (first claim for relief) and section 550(a) (second claim for relief).

In its Answer, McKesson asserted various defenses, including the ordinary course of business, contemporaneous exchange, and subsequent new value defenses set forth in section 547(c), as well as a setoff defense on account of McKesson's section 503(b)(9) administrative claim:

> 23.     As of the [Petition Date], as a result of goods sold and delivered to the Debtor[] by McKesson during the twenty days prior to the Petition Date, the Debtor [is] indebted or may become indebted to McKesson, as an administrative expense under section 503(b)(9) of the Bankruptcy Code, for the value of the goods delivered to the Debtor[] during those twenty days. …
>
> 24.     To the extent the Court determines that as a result of the claims asserted by the Plaintiff, McKesson is indebted to the Debtor[], then, in equity, the mutual debts, including those set forth in paragraph 23 of this answer, should offset one against the other, and any judgment should be the amount remaining after netting the two claims.

[ECF 4].

BN 69760055v11

Following an initial round of discovery, McKesson filed its 2019 MSJ.  At the hearing held on September 16, 2019, the Court granted in part and denied in part the 2019 MSJ.  The Court issued its Section 503(b)(9) Setoff Ruling, adopting the reasoning of *Official Comm. of Unsecured Creditors of Quantum Foods, LLC v. Tyson Foods, Inc.* (*In re Quantum Foods, LLC*), 554 B.R. 729, 733 (Bankr. D. Del. 2016).  Based on that ruling, McKesson has the right to set off its section 503(b)(9) administrative claim dollar-for-dollar against any judgment for avoidance and recovery of preferential transfers.  The Court did not, however, quantify the amount of McKesson's administrative claim at the time of the hearing on the 2019 MSJ.

After that hearing, Plaintiff engaged a new law firm (its third) and the parties embarked on a two and one half year discovery odyssey.  During this protracted discovery period, on October 6, 2021, Plaintiff filed an Amended Complaint [ECF 93], adding a third cause of action for an alleged violation of the automatic stay and a fourth cause of action for "defensive claims."  Those new claims are not relevant to this Motion.

In its Answer to the Amended Complaint, McKesson again asserted an affirmative defense for setoff rights on account of its section 503(b)(9) claims.  [ECF 109, seventh affirmative defense].

McKesson's Proof of Claim

On November 25, 2015, McKesson filed its original proof of claim.  [Claim No. 5880].  In that proof of claim, McKesson asserted an administrative claim pursuant to section 503(b)(9) for "<u>at least</u> $4,943,773.12."  (Emphasis added).  Following discussions between McKesson and Debtor, McKesson filed an amended proof of claim on March 8, 2016.  [Claim No. 9512].  In that amended proof of claim, McKesson asserted an administrative claim pursuant to section 503(b)(9) for "<u>at least</u> $1,748,115.92." (Emphasis added).

On June 15, 2021, McKesson filed a supplemental administrative claim to address the claims asserted in the Initial and Amended Complaints and McKesson's contingent section 503(b)(9) administrative claim [Claim No. 9800] (the "Supplemental Administrative Claim").  As set forth in the Supplemental Administrative Claim:

> 3.      [There] are several claims asserted against McKesson in an adversary proceeding pending in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "Bankruptcy Court") as Adv. Pro. No. 17-08264 (RDD) (the "McKesson Preference Action").
>
> 4.      Debtor [is] indebted to McKesson in the aggregate amount of at least $1,750,731.87 (the "Administrative Claim") for Goods received by the Debtor[] during the 20 days before the Petition Date, which dates are from June 29, 2015 through July 18, 2015 (the "Administrative Claim Period"), per the terms of the Supply Agreement and as reduced by the One Million Dollars ($1,000,000) Extension Fee per the terms of the "Extension of Compliance with Terms of Supply Agreement".  … The Administrative Claim is entitled to administrative expense priority pursuant to 11 U.S.C. § 503(b)(9).  Moreover, McKesson is entitled to and demands immediate payment on its Administrative Claim.
>
> 5.      In addition, to the extent that any of the payments received by McKesson during the Administrative Claim Period are determined to be avoidable as a preference or otherwise, then, to the extent so determined, the Administrative Claim to which McKesson is entitled should be increased by that amount.  Without limiting the generality of the foregoing sentence, McKesson received four payments within the Administrative Claim Period that total $4,249,724.88 (the "Four Next Day Payments").  If it is determined that one or more of the Four Next Day Payments may be avoidable, then the Administrative Claim will be increased by such amount.  If each of the Four Next Day Payments is determined to be avoidable, then McKesson's Administrative Claim will total $6,000,456.75 (the sum of $1,750,731.87 and $4,249,724.88).

**B.      Background of the Business Relationship between McKesson and Debtor**

The business relationship between McKesson and Debtor was generally governed by the Supply Agreement, dated December 6, 2012 (as amended, the "Supply Agreement") and New

York law, particularly the provisions and principles of Article 2 of New York's Uniform Commercial Code (UCC).[6]  (Towsley Decl. ¶¶ 3-4.)

Under the Supply Agreement, McKesson supplied Debtor's pharmacies with "Merchandise," defined in the Supply Agreement as "all items normally stocked by McKesson drug distribution centers … including prescription drugs (Rx), over the counter drugs (OTC), health and beauty aids and sundries."  Among other things, the Supply Agreement set forth the obligations of the parties regarding deliveries of Merchandise and payment terms.  (Towsley Decl. ¶ 4; Supply Agreement §§ 1.A & 4.)

At the day-to-day operational level, each of Debtor's pharmacies placed orders for Merchandise using an electronic daily ordering system.  If a pharmacy placed an order before 8:00 p.m. local time, McKesson would deliver to the ordered Merchandise by the following morning, Monday through Friday.

Under the original terms of the Supply Agreement, Debtor was obliged to pay for Merchandise as follows:

(i)      For non-Generics Merchandise:  "Invoices dated from Monday through Friday are due and payable by Friday of the following week via Electronic Funds Transfer ("EFT") or Automated Clearing House ("ACH")."

(ii)     For Generics Merchandise:  "Invoices dated from Monday through Friday are due and payable by sixth following Friday EFT or ACH."[7]

---

6  The Supply Agreement is governed by New York law.  While not directly germane to the issues in this Motion, for other aspects of the underlying litigation, it is important to recognize the Supply Agreement involved the sale of goods.  As such, New York's adopted version of Article 2 of the UCC overlays the Supply Agreement.  *See* UCC § 2-102 ("[T]his Article applies to transactions in goods[.]").  A redacted copy of the Supply Agreement was previously filed in this action.  [ECF 25, Exh. 1]  At the request of the Court, McKesson will file an unredacted copy of the Supply Agreement under seal.  Plaintiff possesses an unredacted copy of the Supply Agreement.

7  During the week immediately prior to the Petition Date, these credit terms were reduced to "one day sales outstanding" (1 DSO).  As performed by the parties, this meant Debtor paid for Merchandise the day after it was delivered.

(Towsley Decl. ¶ 4; Supply Agreement §§ 4.A & 4.B.)  Without regard to whether the payment was for Generic or non-Generics Merchandise, the term "due and payable" meant that A&P was obliged to make the required payment "on such earlier date as shall be required to provide McKesson with good funds in hand on each of the designated due dates specified in this Payment Terms section of this Agreement."  (Id.)

During the three years of performance under the Supply Agreement, until the week immediately preceding the Petition Date, McKesson would send Debtor an email on Wednesday of each week and attach what was called a "Pathmark report" covering the prior week's deliveries. The email and Pathmark report would identify the delivery dates for the Merchandise and detail the amount to be paid by Debtor by a designated date.[8] (Towsley Decl. ¶¶ 5-6.)

## III.  SUMMARY OF ARGUMENT

McKesson makes this summary judgment motion on the following grounds:

(i)  the subsequent new value defense applies and shields from avoidance, each of the twenty-four payments made prior to July 14, 2015;[9] and

(ii)  McKesson's setoff rights under section 503(b)(9) shield any possible liability for avoidance of the payments for Merchandise delivered and paid for during the 20-day Period.

The Motion is in two steps.  First, applying McKesson's subsequent new value defense reduces McKesson's total preference exposure from $67.1 Million to $9.7 Million.  Second, applying McKesson's setoff rights on account of its additional section 503(b)(9) claim (for goods

---

8  During the week immediately prior to the Petition Date, the Pathmark Reports on account of 1 DSO purchases of Merchandise were sent daily.  Payment was made the next day.  (Towsley Decl. ¶ 7.)
9  As listed on Exhibit A to the Amended Complaint.

delivered and paid for during the 20-Day Period) further reduces McKesson's total preference exposure to approximately $900,000.

Granting this Motion simplifies the issues for future resolution and avoids unnecessary legal expense while preserving judicial resources. Indeed, after application of the subsequent new value defense and setting off McKesson's section 503(b)(9) claims, Plaintiff's avoidance claims are narrowed to just one payment (made on its due date, two days before Debtor filed for bankruptcy).

## IV.   STATEMENT OF UNDISPUTED FACTS

### A.   Plaintiff's Avoidance Claims

Plaintiff seeks to avoid and recover $67,119,573.20 in alleged preferential transfers pursuant to sections 547 and 550(a) of the Bankruptcy Code. [ECF 93, First and Second Claims for Relief]. Plaintiff targets 30 payments made to McKesson during the 90-Day Period. [ECF 93 at Exh. A].

### B.   The Undisputed Facts Supporting McKesson's "New Value" Defense Under Section 547(c)(3)

1.   Debtor commenced its chapter 11 case on the Petition Date, July 19, 2015. [Main ECF 1]. The 90-Day Period described in section 547(b)(4)(A) commenced on April 20, 2015.

2.   The Amended Complaint identifies 30 payments to McKesson in the total amount of $67,119,573.20 made during the 90-Day Period (the "90-Day Payments"). [ECF 93, Exh. A]

3.   During the 90-Day Period, and until the week before the Petition Date, McKesson sent a weekly transmittal email to Debtor, attaching what was called a "Pathmark report" for the previous week's deliveries of Merchandise. Each Pathmark report identified and compiled, among other things, the delivery dates for all Merchandise delivered to Debtor for the prior week and the value of the Merchandise. (Towsley Decl. ¶¶ 5-6.)

4.   For the week immediately prior to the Petition Date, McKesson sent a daily transmittal email to Debtor on each of the five business days during the week before the Petition Date, attaching a Pathmark report identifying, among other things, the deliveries made the prior day and the value of the

subject Merchandise. The email identified the delivery dates for McKesson Merchandise. (Towsley Decl. ¶ 7.)

5.  The Pathmark reports quantify all deliveries of Merchandise to Debtor during the 90-Day Period with the exception of $127,692.46 in Merchandise that was delivered to Debtor but never incorporated in a Pathmark report. (Towsley Decl. ¶ 11.)

6.  During the 90-Day Period, McKesson delivered to Debtor Merchandise with a fair value in the amounts and on the dates set forth below:

| Dates of Deliveries to Debtor | Value of the Merchandise |
| --- | --- |
| April 25-30, 2015 | $4,635,582.73 |
| May 1, 2015 | $ 774,381.20 |
| May 2-7, 2015 | $4,102,560.89 |
| May 8, 2015 | $ 776,996.14 |
| May 9-14, 2015 | $3,921,757.61 |
| May 15, 2015 | $ 804,896.95 |
| May 16-21, 2015 | $4,097,585.05 |
| May 22, 2015 | $ 813,698.06 |
| May 23-28, 2015 | $3,493,423.33 |
| May 29, 2015 | $ 909,118.06 |
| May 30 to June 4, 2015 | $4,182,929.58 |
| June 5, 2015 | $ 824,426.09 |
| June 6-11, 2015 | $3,924,060.86 |
| June 12, 2015 | $ 789,712.50 |
| June 13-18, 2015 | $3,817,872.39 |
| June 19, 2015 | $ 741,785.01 |
| June 20-25, 2015 | $3,926,765.57 |
| June 26, 2015 | $ 804,111.40 |
| June 27 to July 2, 2015 | $4,321,063.37 |
| July 2, 2015 | $ 122,852.16 |
| July 3, 2015 | $ 3,430.68 |
| July 7, 2015 | $ 535.66 |
| July 4-9, 2015 | $5,023,685.93 |
| July 10, 2015 | $ 896,236.61 |
| July 12-13, 2015 | $1,436,808.53 |
| July 13, 2015 | $ 4,304.64 |
| July 14, 2015 | $1,098,919.73 |
| July 15, 2015 | $ 883,260.71 |
| July 16, 2015 | $ 830,735.91 |
| July 17, 2015 | $ 883,298.31 |

(Towsley Decl. ¶ 12.)

7.  Charles M. Berk of CBIZ Accounting, Tax & Advisory of New York, LLC undertook an analysis of McKesson's new value defense. Mr. Berk reviewed, among other things, all of the Pathmark reports available for the 90-Day Period and the invoices supporting the additional delivery of $127,692.46 of Merchandise that was not reflected in the Pathmark reports. Mr. Berk compiled the Merchandise delivered to Debtor following and in relation to the 90-Day Payments and made a new value calculation. Mr.

Berk's new value compilation and calculation is set forth in Mr. Berk's declaration and attached spreadsheet, filed herewith.  (Berk Decl. ¶ 9.)

8.      Pursuant to Mr. Berk's new value compilation and calculation, after application of only the new value defense to Plaintiff's preference claims, McKesson's maximum preference exposure is $9,734,027.41.  (Berk Decl. ¶ 9.)

**C.      The Undisputed Facts Supporting McKesson's Section 503(b)(9) Setoff Right**

1.      Debtor commenced its chapter 11 case on the Petition Date, July 19, 2015. [Main ECF 1].  The 20-Day Period was from June 29, 2015 through July 18, 2015.

2.      In several proofs of claim, filed in accordance with the claim procedures established in Debtor's bankruptcy case, and in the Seventh Affirmative Defense to the Amended Complaint, McKesson asserted an administrative claim on account of the Section 503(b)(9) Covered Payments.  [Claims 5880, 9512, & 9800]

3.      For the three years preceding the 2015 commencement of Debtor's bankruptcy case, McKesson supplied Debtor with Merchandise.  (Towsley Decl. ¶ 3.)

4.      The only 90-Day Payments that are left uncovered after application of the new value defense are the six payments set forth below:

| Date of Payment | Amount of Payment |
| --- | --- |
| July 14, 2015 | $1,436,808.53 |
| July 15, 2015 | $1,098,919.73 |
| July 16, 2015 | $ 883,260.71 |
| July 17, 2015 | $5,000,563.27 |
| July 17, 2015 | $ 898,354.51 |
| July 17, 2015 | $ 830,735.91 |

(Berk Decl. ¶¶ 13, 14.)

5.      Debtor paid McKesson the following amounts with respect to Merchandise delivered to Debtor within the 20-Day Period (the Section 503(b)(9) Covered Payments):

| Date of Payment | Amount of Payment | Merchandise Delivery Date |
| --- | --- | --- |
| July 14, 2015 | $1,436,808.53 | July 12-13, 2015 |
| July 15, 2015 | $1,098,919.73 | July 14, 2015 |
| July 16, 2015 | $ 883,260.71 | July 15, 2015 |
| July 17, 2015 | $5,000,563.27 | July 4-11, 2015 |

| July 17, 2015 | $ 830,735.91 | July 16, 2015 |
|---|---|---|
| Total: | $9,250,288.15 | |

[ECF 93, Exh. A and Towsley Decl. ¶ 12.]

6.     Each of the five payments listed in the preceding subsection C.5 was made during the 20-Day Period for Merchandise delivered during the 20-Day Period. The only payment excluded from the six payments listed in subsection C.4 is the July 17, 2015 payment of $898,354.51. (Compare subsection C.5 to subsection C.4.)

7.     The Court granted summary judgment affirming McKesson's right to set off its section 503(b)(9) claim:

> "[T]he setoff point, which I could easily grant summary judgment on today that you, to the extent you have a 503(b)(9) claim you can set off against an ultimate preference recovery. But, again, there's a factual issue as to what the claim is. …
>
> ***
>
> So I think you can assume that I'm granting summary judgment in part on the setoff point as a matter of law without quantifying what the setoff would be, relying on the same logic that Judge Carey used in the *Quantum* case, which to me made sense for the same reasons that he said."

(Transcript of September 16, 2019 Hearing, p. 57, lls. 2-6; p. 58, lls. 18-22.)

8.     Each of the Section 503(b)(9) Covered Payments is subject to a complete setoff because the payments were on account of Merchandise that was delivered within 20 days of the Petition Date.

9.     McKesson's maximum potential preference exposure after taking into account McKesson's new value defense and its setoff rights on account of its section 503(b)(9) claim is $898,354.51—the amount of the payment made on July 17, 2015 for Generic Pharmaceuticals delivered between June 2 and June 6, 2015.

10.    Concurrently with this Motion, McKesson is filing for summary judgment with respect to Debtor's three pending objections to the administrative portion of McKesson's proofs of claim. As established in that summary judgment motion, the current fixed amount of McKesson's administrative claim is $1,750,731.87. If, for any reason, the Section 503(b)(9) Covered

13

Payments are recovered as preferential transfers, McKesson's current administrative claim would increase by $9,250,288.15.

## V. THE COURT SHOULD GRANT SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

### A. Applying the New Value Defense, McKesson's Maximum Preference Exposure is No More than $9.7 Million

Pursuant to section 547(c)(4) of the Bankruptcy Code, an alleged preferential transfer to a creditor may not be avoided to the "to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor" and the new value was both (i) "not secured by an otherwise unavoidable security interest" and (ii) "on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor." "New value" is defined to include "money or money's worth in goods . . . in a transaction that is neither void nor voidable by the debtor or the trustee . . . but does not include an obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2).

"The 'new value' defense is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of the other creditors." *In re Maxwell Newspapers, Inc.*, 192 B.R. 633, 635 (Bankr. S.D.N.Y 1996). The defense is "fundamental to the 'rehabilitative' policy goal of the preference law, which is intended to encourage creditors to deal with troubled businesses." *Id.* at 636.

When calculating the new value defense, a majority of the Circuit Courts to address the issue have concluded that a creditor is entitled to set off against a preference period transfer all subsequent advances of new value, even if the new value was later paid by the debtor, so long as it was not paid with an otherwise unavoidable transfer. *See Hall v. Chrysler Credit Corp.* (*In re JKJ Chevrolet, Inc.*), 412 F.3d 545, 552 (4th Cir. 2005) ("A creditor is entitled to offset preference payments through the extension of new value to the debtor so long as the debtor does not make an

otherwise unavoidable transfer on account of the new value. Thus, even if [the debtor] repaid all of the new value, under the plain terms of the statute whether those payments deprive [the creditor] of its new value defense depends on whether the payments were otherwise unavoidable."); *Laker v. Vallette* (*Matter of Toyota of Jefferson, Inc.*), 14 F.3d 1088 (5th Cir. 1994); *Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund* (*In re Jones Truck Lines, Inc.*), 130 F.3d 323 (8th Cir. 1997); *Mosier v. Ever-Fresh Food Co.* (*In re IRFM, Inc.*), 52 F.3d 228 (9th Cir. 1995); *Kaye v. Blue Bell Creameries, Inc.* (*In re BFW Liquidation, LLC*), 899 F.3d 1178, 1189 (11th Cir. 2018) ("Nothing in the language of § 547(c)(4) indicates that an offset to a creditor's § 547(b) preference liability is available only for new value that remains unpaid … In reaching this conclusion, we find common ground with the Fourth, Fifth, Eighth, and Ninth Circuits.").

While the Second Circuit has not yet weighed in, several Bankruptcy Courts in the Southern District of New York have applied the majority "subsequent advance" approach. In *In re Baumgold Bros., Inc.* 103 B.R. 436,440 (Bankr. S.D.N.Y. 1989), the court rejected that plaintiff's argument that new value must remain unpaid, reasoning "[t]his interpretation is clearly at odds with § 547(c)(4)'s purpose of encouraging creditors to continue doing business with troubled debtors." The *Baumgold* court went on to hold the new value exception was not "designed to limit credit for subsequent advances only to advances that remained unpaid… such an interpretation would limit the exemption in § 547(c)(4) to one subsequent advance when Congress clearly contemplated its application to more than one exchange." *Id.*; *see also In re Maxwell Newspapers*, 192 B.R. 633, 639 (Bankr. S.D.N.Y. 1996) (rejecting the argument that a subsequent new value must be unpaid to qualify under section 547(c)(4), and stating "it bears noting, however,

that most of the courts that are cited as requiring that subsequent new value be 'unpaid,' have not actually held as much, but, like *Jet Florida*, have only repeated that requirement in dicta").

Here, it is undisputed that (a) McKesson delivered substantial Merchandise to Debtor during the 90-Day Period from April 20, 2015 to the Petition Date; and (b) McKesson's delivery of that Merchandise was not secured by an otherwise unavoidable security interest.[10]  Based on a compilation of McKesson's accounting and business records detailing payments made by Debtor and deliveries of Merchandise to McKesson, McKesson's expert Charles M. Berk arithmetically calculated that after application of only the new value defense to Plaintiff's preference claims, McKesson's maximum preference exposure is $9.7 Million.

**B.  Applying McKesson's Section 503(b)(9) Setoff Rights, McKesson's Maximum Preference Exposure Is No More than approximately $900,000**

Pursuant to section 503(b)(9) of the Bankruptcy Code, a creditor has a valid administrative expense claim for "the value of any goods received by the debtor within 20 days before the date of commencement of a [bankruptcy] case . . . in which the goods have been sold to the debtor in the ordinary course of such debtor's business."

The purpose of section 503(b)(9) is to encourage vendors to continue providing goods and services to a distressed debtor, thereby helping the debtor to successfully maneuver through bankruptcy to the benefit of all creditors.  As the Second Circuit explained:

> [T]he Bankruptcy Code gives a higher priority to requests for administrative expenses than to prepetition claims in order to encourage third parties to supply goods and services on credit to the estate, to the benefit of all of the estate's creditors.  That intent would be frustrated by allowing a debtor automatically to forestall or avoid payment of administrative expenses by alleging that the vendor had been the recipient of a preferential transfer . . .  [I]f trade vendors

---

[10]  McKesson submits that the 90-Day Payments are also protected by the ordinary course of business and contemporaneous exchange defenses, but this Motion focuses on the new value defense.  Accordingly, solely for purposes of calculating McKesson's maximum liability after application of only the new value defense, the Court may also conclude that the new value was not paid with an otherwise unavoidable transfer.

felt that a preference could be used to prevent the payment of their administrative claims, they would be extremely reluctant to extend post-petition credit to a chapter 11 debtor.

*ASM Capital, LP v. Ames Dep't Stores, Inc.* (*In re Ames Dep't Stores, Inc.*), 582 F.3d 422, 431 (2d Cir. 2009).

Here, it is undisputed that after accounting for McKesson's new value defense, there are just six payments, made during the week before the Petition Date, that remain at issue. All of the other 24 payments are shielded from recovery. Of the remaining six 90-Day Payments, five of those were for Merchandise delivered to Debtor in the ordinary course of Debtor's business during the 20-Day Period. Accordingly, in the event these five payments are avoided as preferential payments, McKesson's existing section 503(b)(9) administrative claim would increase by the total amount of those five payments ($9,250,288.15). *See Bankvest Capital Corp.*, 375 F.3d at 67 (finding "the 502(h) claim takes on the characteristics of the original claim, including, in this case, its secured status" and reasoning "we can see no reason, nor any indication of legislative intent in § 502(h), to strip a secured creditor of its secured claim in these circumstances. Indeed, to do so would seem manifestly unfair."); *see also In re Hackney*, 93 B.R. 213 (Bankr. N.D. Cal. 1988).

The one remaining payment is the approximately $900,000 payment made on July 17, 2015. This is the one and only payment not covered by either McKesson's new value defense or for which McKesson would not have a correspondingly-increased section 503(b)(9) claim in the event the five Section 503(b)(9) Covered Payments were avoided. And, in light of the Court's ruling allowing a dollar-for-dollar setoff of McKesson's section 503(b)(9) claims against Plaintiff's preference claims, it logically follows that McKesson has no net preference exposure except as to the approximately $900,000 payment on July 17, 2015.

17

Summary judgment in McKesson's favor as to each of the 20-Day Payments except for the approximately $900,000 payment on July 17, 2015 is appropriate. The outcome remains the same whether the five Section 503(b)(9) Covered Payments are preferential or not. Either the payments are not preferential, in which case Plaintiff is not entitled to avoid the payments, or the payments are preferential and avoidable, in which case McKesson's existing section 503(b)(9) claim will increase by $9,250,288.15. Under either scenario, summary judgment is appropriate. *See Bankvest Capital Corp.*, 375 F.3d at 71 ("The fact that Fleet would be entitled to receive exactly what it would be forced to return through avoidance renders avoidance pointless."); *see also Adams v. Hartconn Assocs.* (*In re Adams*), 212 B.R. 703, 714 (Bankr. D. Mass. 1997) ("[N]othing would be achieved by recovering payment to a [] creditor who in any event is entitled to the payment ahead of other creditors.") (citing *Weiss v. People Sav. Bank* (*In re Three Partners*), 199 B.R. 230, 237 (Bankr. D. Mass. 1995) ("If the payments would be returned ultimately to the Bank upon disbursement of the assets of the estate, no benefit to the estate would accrue by their avoidance.")).

The case of *Falcon Creditor Trust v. Rightchoice Managed Care d/b/a Blue Cross Blue Shield* (*In re Falcon Products, Inc.*) is directly on point. In that case, a District Court in the Eastern District of Missouri affirmed a Bankruptcy Court's grant of summary judgment in favor of a creditor (Blue Cross) as to alleged preferential transfers on the ground that the creditor would have a priority unsecured claim under section 507(a)(4) of equal value if the subject transfers were avoided.[11] Rejecting the plaintiff's argument that section 502(h) reduces all claims for avoided transfers to unsecured claims, the court held:

> The Trust's argument posits that a preference claimant who was undisputedly entitled to priority prior to bankruptcy should be stripped to mere general unsecured status if it has to surrender its

---

[11] The bankruptcy court's decision granting Blue Cross Blue Shield's summary judgment is reported at *In re Falcon Products, Inc.*, 372 B.R. 474 (Bankr. E.D. Mo. 2007).

> payments during the bankruptcy case. Nothing in the language of section 502(h) leads to this result. The plain language of the statute places the preference claimant in the same position it would have been in prior to bankruptcy had it never been paid, thus treating all claimants equally, and not in the unequal manner urged by the Trust. As Blue Cross observes, the Trust's theory would allow and encourage debtors to pay priority creditors just before filing bankruptcy, only to turn around and sue them after bankruptcy to recover these payments, thereby reducing the former priority creditors to general unsecured status.

*Falcon Creditor Trust v. RightChoice Managed Care* (*In re Falcon Prods.*), 2008 U.S. Dist. LEXIS 9590, *17-18 (E.D. Mo. Feb 8, 2008). The court then confirmed, "The Bankruptcy Court properly recognized the futility of going through the exercise of avoiding the Transfers and then paying them back to Blue Cross, as a 'waste of judicial resources' which would 'impose unnecessary litigation costs on both Blue Cross and the Debtors' unsecured creditors who are the beneficiaries of the Trust[.]'" *Id.* at *25-26 (relying on *Page v. Rogers*, 211 U.S. 575, 581 (1909) ("[I]t is entirely practicable to avoid the circuitous proceeding of compelling the defendant to paying into the bankruptcy court the full amount of the preference which he has received, and then to resort to the same court to obtain part of it back by way of dividend.")).

Where, as here, resolving Debtor's preference claims would be futile and unnecessary given that any avoidance would lead to an equivalent increase in McKesson's administrative section 503(b)(9) claim and a corresponding identical increase in the amount of McKesson's setoff right, summary judgment is appropriate.

19

## VI. CONCLUSION

In summary, the subsequent new value defense shields 24 of the payments (those made prior to July 14, 2015) from recovery, and the five Section 503(b)(9) Covered Payments are subject to a dollar-for-dollar setoff, should the Court determine that these payments are avoidable as preferential transfers. For the same reasons that the *Falcon Products* courts granted and affirmed summary judgment in favor of that preference defendant, continued prosecution of the preference lawsuit as to the subject 29 payments would be a futile and pointless, a waste of judicial resources, and impose unnecessary litigation costs on McKesson and the estate.

McKesson is thus entitled to summary judgment, or in the alternative, summary adjudication in its favor. The Court should rule that Plaintiff's avoidance and recovery claims fail as a matter of law as to each and every 90-Day Payment with the exception of the July 17 Generics Payment.

DATED: April 15, 2022

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS LLP


By: /s/ *Tracy L. Klestadt*
Tracy L. Klestadt, Esq.
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
TKlestadt@Klestadt.com

and

BUCHALTER, A Professional Corporation

Jeffrey K. Garfinkle, Esq.
(Cal Bar. No. 153496; admitted *pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
jgarfinkle@buchalter.com

Attorneys for Defendant, MCKESSON
CORPORATION