GRIFFIN HAMERSKY LLP
420 Lexington Avenue, Suite 400
New York, NY 10170
(646) 998-5580
Richard K. Milin
Michael D. Hamersky

*Counsel for The Official Committee of Unsecured*
*Creditors on behalf of the bankruptcy estate of*
*The Great Atlantic & Pacific Tea Company, Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA | : | |
| COMPANY, INC., *et al.*, | : | Case No. 15-23007 (lgb) |
| Debtors. | : | |

-------------------------------------------------------------------x
|  |  |  |
|---|---|---|
| | : | |
| The Official Committee of Unsecured Creditors on | : | |
| behalf of the bankruptcy estate of THE GREAT | : | |
| ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*, | : | |
| | : | Adv. Proc. No. 17-08264 (lgb) |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| McKESSON CORPORATION, | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR A SUMMARY JUDGMENT DISMISSING**
<u>**PLAINTIFF'S PREFERENCE CLAIMS AS TO ALL BUT A SINGLE TRANSFER**</u>

## Table of Contents

**PRELIMINARY STATEMENT** ................................................................................ 1

**COUNTER-STATEMENT OF FACTS** .................................................................... 5

**ARGUMENT** ............................................................................................................. 8

DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE DEFENDANT
OVERSTATES THE VALUE OF THE GOODS IT DELIVERED TO THE DEBTOR
AND CANNOT PROPERLY SET OFF ITS PRE-PETITION 503(b)(9) CLAIM
AGAINST ITS CONTINGENT POST-PETITION PREFERENCE LIABILITY .................. 8

I.   Defendant Overstates Its New Value Defense, and Understates Its Potential
     Preference Liability, Based on Inflated Invoices and Unproven Deliveries..................... 10

     A.   Defendant's Subsequent New Value Calculation Improperly Includes
          $127,692.46 for Merchandise that It Cannot Show Was Actually Delivered ............ 11

     B.   Defendant's Subsequent New Value Calculation Is
          Improperly Overstated Based on Defendant's Inflated Invoices ................................ 13

II.  Defendant's Preference Liability Should Not Be Reduced by Paid New Value ............. 15

III. Defendant Cannot Properly Set Off Against Plaintiff's Preference Claims .................... 16

IV. Defendant Should Be Denied a Setoff Against Its Potential Preference Liability
    Because 503(b)(9) Claims Are Pre-Petition but Preference Claims Are Post-Petition .... 18

V.  Defendant's "Resulting" Claim under 11 U.S.C. § 502(h) Should Not Be Granted
    Administrative Priority under § 503(b)(9) Even If It Arose from Recovery of
    Preferential Payments for Goods Delivered Within 20 Days of Bankruptcy .................. 22

     A.   Defendant's Precedents Do Not Hold that § 502(h) Can Create 503(b)(9) Claims.... 22

     B.   The Text of § 502(h) Does Not Permit Creation of 503(b)(9) Claims ....................... 22

     C.   Legislative History Shows that § 503(b)(9) Was Not
          Intended to Be a Means of Eliminating Preference Liability ..................................... 23

     D.   The Court Should Harmonize §§ 502(h), 503(b)(9) and 547
          by Holding that § 502(h) Cannot Create § 503(b)(9) Claims .................................... 25

     E.   Reading § 502(h) to Create 503(b)(9) Claims Would
          Be Contrary to the Policies of the Bankruptcy Code .................................................. 25

VI. Defendant Should Be Denied a Setoff of Its Potential Preference Liability
    Because All § 502(h) Claims Are Pre-Petition and Because Defendant's
    Preference Liability and § 502(h) Claim Cannot Exist Simultaneously ........................... 26

VII. Defendant Should Be Denied a Summary Judgment Approving
a Setoff Because of Its Extensive Pattern of Inequitable Conduct ................................... 27

    A.  Defendant Seized $569,000 in Rebates which Should Be Returned to the Debtor .... 28

    B.  Defendant Seized $579,000 in Credits which Should Be Returned to the Debtor ..... 29

    C.  Defendant's $2 Million "Alternate" Account for Post-Bankruptcy Credits ............... 30

    D.  Defendant Seized $134,503.57 in Credits that Should Be Returned to the Debtor .... 31

    E.  Defendant Is Holding $44,032.76 in Credits that It Owes to the Debtor.................... 32

    F. Defendant Is Holding $22,918.39 of the Debtor's Money Without Justification......... 32

**CONCLUSION** ...................................................................................................................... 33

## Table of Authorities

**Cases**

*ASM Capital, LP v. Ames Dep't Stores, Inc.* (*In re Ames Dep't Stores, Inc.*), 582 F.3d 422 (2d Cir. 2009) .................................................................................................................. 24

*Baity v. Kralik*, 51 F. Supp. 3d 414 (S.D.N.Y. 2014) .................................................... 8

*Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294 (S.D.N.Y. 2014) ........................................................................................................... 8

*Brod v. Omya, Inc.*, 653 F.3d 156 (2d Cir. 2011) ........................................................... 8

*Brown & Cole Stores, LLC v. Associated Grocers, Inc. (In re Brown Cole Stores, LLC)*, 375 B.R. 873 (B.A.P. 9th Cir. 2007) ...................................................................... 19, 24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 8

*DiStiso v. Cook*, 691 F.3d 226 (2d Cir. 2012) ................................................................ 8

*Dunn v. Uvalde Asphalt Paving Co.*, 175 N.Y. 214 (1903) ...................................... 3, 17

*Feltman v. Noor Staffing Grp., LLC (In re Corporate Res. Servs., Inc.)*, 564 B.R. 196 (Bankr. S.D.N.Y. 2017) ................................................................................................ 17, 27

*Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51 (1st Cir. 2004) .............. 22

*Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010) ............................................................. 12

*In re Beaulieu Group, LLC*, 2021 WL 4469928 (Bankr. N.D. Ga. Sept. 29, 2021) .................... 10

*In re Bennett Funding Group, Inc.*, 212 B.R. 206 (B.A.P. 2d Cir. 1997) .................................. 27

*In re Circuit City Stores, Inc.*, 426 B.R. 560 (Bankr. E.D. Va. 2010) ........................................ 19

*In re Circuit City Stores, Inc.*, 432 B.R. 225 (Bankr. E.D. Va. 2010) ........................................ 24

*In re Dana Corp.*, No. 06-10354 (BRL), 2007 WL 1577763 (Bankr. S.D.N.Y. May 30, 2007) . 19

*In re Enron Creditors Recovery Corp.*, 376 B.R. 442 (Bankr. S.D.N.Y. 2007) ......................... 22

*In re Hackney*, 93 B.R. 213 (Bankr. N.D. Cal. 1988) ................................................... 22

*In re Ionosphere Clubs, Inc.*, 164 B.R. 839 (Bankr. S.D.N.Y. 1994) ......................................... 28

*In re Lehman Brothers Holdings Inc.*, 404 B.R. 752 (Bankr. S.D.N.Y. 2009) ............................ 27

*In re Pameco Corp.*, 356 B.R. 327 (Bankr. S.D.N.Y. 2006) ....................................................... 16

*In re Plastech Engineered Prods., Inc.*, 394 B.R. 147 (2008) ..................................................... 19

*In re Prescott*, 805 F.2d 719 (7th Cir. 1986) ............................................................................ 16

*In re Semcrude*, 416 B.R. 399 (Bankr. D. Del. 2009).................................................................. 10

*In re SRC Liquidation, LLC*, 573 B.R. 537 (Bankr. D. Del. 2017).............................................. 23

*In re Szymanski*, 413 B.R. 232 (Bankr. E.D. Pa. 2009) .............................................................. 27

*In re Teligent, Inc.*, 315 B.R. 308 (Bankr. S.D.N.Y. 2004) ........................................................ 16

*In re TI Acquisition, LLC,* 410 B.R. 742 (N.D. Ga. 2009)........................................................... 19

*In re Whimsy, Inc.*, 221 B.R. 69 (Bankr. S.D.N.Y. 1998) ........................................................... 27

*Kaye v. Blue Bell Creameries, Inc. (In re BFW Liquidation, LLC)*, 899 F.3d 1178 (11th Cir.
2018) ...................................................................................................................................... 15

*N.Y.C. Shoes Inc. v. Bentley Int'l Inc. (In re N.Y.C. Shoes Inc.)*, 880 F.2d 679 (3d Cir. 1989) ... 15

*Official Comm. of Unsecured Creditors of Quantum Foods, LLC v. Tyson Foods, Inc.* (*In re
Quantum Foods, LLC*), 554 B.R. 729 (Bankr. D. Del. 2016)............................................ 19, 21

*Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730 (Bankr.
S.D.N.Y. 1995) ............................................................................................................. 3, 17, 27

*Spodek v. Park Prop. Dev. Assocs.*, 263 A.D.2d 478 (2d Dep't 1999)........................................ 17

*Thai Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic,* Case No. 10-
CV-5256 (KMW) (DCF), 2016 WL 958640 (S.D.N.Y. Mar. 8, 2016).................................... 17

*U.S. v. Arkison (In re Cascade Roads, Inc.)*, 34 F.3d 756 (9th Cir. 1994) ................................... 28

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004)........................... 8

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245 (2d Cir. 1992)......................... 21

*Watt v. Alaska*, 451 U.S. 259 (1981) ........................................................................................ 25

*Willett v. Lincolnshire Mgmt., Inc.*, 302 A.D.2d 271 (1st Dep't 2003) ........................................ 17

**Statutes**

11 U.S.C. § 502(h) ........................................................................................ 22, 24, 26

11 U.S.C. § 503(b) ........................................................................................... 2, 24, 25

11 U.S.C. § 547(a) ............................................................................................... 10, 14

11 U.S.C. § 547(c) ..................................................................................................... 23

11 U.S.C. § 553 .......................................................................................................... 16

N.Y. D.C.L. § 151 ................................................................................................. 17, 27

**Rules**

Fed. R. Bankr. P. 7056 ............................................................................................. 8, 13

Fed. R. Civ. P. 30(b) ............................................................................................. 14, 30

Fed. R. Civ. P. 56(a) ..................................................................................................... 8

Fed. R. Civ. P. 56(c) ..................................................................................................... 8

Fed. R. Civ. P. 56(f) ................................................................................................... 13

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR A SUMMARY JUDGMENT DISMISSING
PLAINTIFF'S PREFERENCE CLAIMS AS TO ALL BUT A SINGLE TRANSFER**

Plaintiff, The Official Committee of Unsecured Creditors ("Plaintiff"), on behalf of the

bankruptcy estate of The Great Atlantic & Pacific Tea Company, Inc. (the "Debtor" or "A&P"),

by its undersigned counsel, respectfully submits this Memorandum of Law in Opposition to the

Motion (the "Motion") of Defendant McKesson Corporation ("Defendant") for Summary Judg-

ment and the arguments Defendant sets forth in its Memorandum of Law ("Def. Mem."), and

respectfully represents as follows:

**PRELIMINARY STATEMENT**

Defendant's Motion, which asks the Court to reduce its preference liability from more

than $67 million to less than $1 million, is not "just a mathematical exercise" as Defendant

claims.  (See Def. Mem. at 1.)  The Motion actually asks the Court to resolve two issues of

nationwide first impression and one issue of first impression in this Court.  The Motion also asks

for a summary judgment allowing it to exercise a $9.7 million setoff as a "mathematical

exercise" without citing, let alone satisfying, the governing statute or rules.

Further, Defendant's Motion misrepresents key, dispositive facts.  For example, it asserts

that Plaintiff's Fourth Claim for Relief is "not relevant to this motion" (Def. Mem. at 6) and does

not discuss it further.  In fact, Defendant seeks what amounts to a summary judgment dismissing

that Claim.  Plaintiff's Fourth Claim for Relief is a direct challenge to the amount of Defendant's

administrative claims and to its right to exercise the setoff its Motion seeks.  Among other things,

it alleges that "Plaintiff is entitled to a judgment … reduc[ing] Defendant's [administrative]

Claims by … an amount not less than $982,860.02" and that "Defendant should be denied any

right to exercise a setoff or recoupment … because of its egregious and inequitable conduct...."

1

(Amended Complaint, Adv. Pro. Dkt. No. 93, ¶¶ 172, 177, 198.)  Defendant's right to a setoff is not, as Defendant assures the Court, "undisputed."  (*See* Def. Mem. at 1.)

The issues before the Court, and the flaws in Defendant's Motion, include the following:

- The Motion asks the Court to rule that creditors can never be held liable for preferences, no matter how much they pressure struggling companies to pay them, for goods delivered within 20 days of bankruptcy.  That unprecedented ruling is contrary to both statutory language and Congressional intent, and it would undermine the most basic purposes of the Bankruptcy Code.

- The Motion asks the Court to rely on inflated invoices in determining the "fair value" of the merchandise Defendant relies on for its subsequent new value ("SNV") defense and administrative claim pursuant to 11 U.S.C. § 503(b)(9) (the "503(b)(9) Claim"). (*See* Def. Mem. at 11.)  Defendant's invoices for generic merchandise do not reflect the Debtor's true purchase price – the invoices included a 20% mark-up which was netted out before, or in a minority of cases very soon after, the invoice was due.  As a result, Defendants' invoices overstate the true value of its deliveries by approximately $829,000 for the seven weeks before A&P's bankruptcy alone. Defendant's SNV calculation and 503(b)(9) Claim also include approximately $127,000 for merchandise that Defendant cannot prove was actually delivered.

- The Motion asks to set off Defendant's 503(b)(9) Claim, most of which it admits is "contingent" (Def. Mem. at 7), against Plaintiff's claim for preference liability, which is undeniably contingent.  However, New York law, which governs the parties' contracts (*see* Def. Mem. at 8 n.6), unambiguously holds that contingent claims cannot be set off. In fact, New York law has prohibited any setoff of contingent claims for more than a century.  *See Dunn v. Uvalde Asphalt Paving Co.*, 175 N.Y. 214, 219 (1903)

2

(holding that "there can be no such thing as a right to setoff a possible but unestablished liability, unliquidated in amount, against a liquidated legal claim that is due and payable"). *See also Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995) ("the debts to be offset … cannot be contingent").

- The Motion asks the Court to allow a setoff of a claim under § 503(b)(9), which the courts have held to be pre-petition, against preference liability, which the courts have held to be post-petition. No Court has allowed such a "non-mutual" setoff.

- The Motion asks the Court to include $1 million in goods that the Debtor has already paid for pursuant to § 503(b)(9), plus more than $1.7 million that the Debtor has reserved funds to pay for in appropriate part, in calculating Defendant's SNV defense. This "double dipping," which would enable Defendant in effect to be paid twice for the same merchandise, is improper, as four prior cases have held. Plaintiff addresses this issue in its accompanying Memorandum concerning Defendant's Claim Motion.

- The Motion asks for the equitable remedy of a setoff despite Defendant's systematic inequitable conduct in violation of the automatic stay. Plaintiff's Fourth Claim for Relief seeks to bar any setoff because Defendant unilaterally seized $569,000 from the Debtor four months after its bankruptcy, without consent or Court permission, claiming that it should not have paid the Debtor that sum as a rebate before its petition date. Plaintiff's Fourth Claim also seeks to bar any setoff because Defendant improperly seized $579,000 in credits it owed to A&P for pre-petition returns even though it promised to honor the credits in a post-petition agreement. Defendant's Motion asks the Court in effect to grant summary judgment dismissing those claims without even mentioning the relevant facts.

3

Further, it has now come to light that Defendant's Vice President Jenifer Towsley established, in her words, an "alternate account set up to capture credits we do not want to pay to A&P.  We will apply against the balances ***following the close of bankruptcy***."  (*See* Declaration of Dawn DeVito dated May 5, 2022 (the "<u>DeVito Decl.</u>"), Exh. 2 (emphasis added).) The "alternate" account, as Ms. Towsley's own words show, was an attempt to circumvent the automatic stay and the authority of this Court.

Ms. Towsley testified at her deposition that the "alternate" account had a different purpose, held only a $2 million deposit which was returned, and had no current balance.  (*See* Transcript, attached to the Declaration of Richard K. Milin dated May 5, 2022 (the "<u>Milin Decl.</u>") as Exhibit 5, at 243-50.)  In fact, according to accounting records Defendant produced in mid-2021, the account shows a $2,042,885.96 balance owed to the Debtor, and it records approximately fifty transactions apart from the return of the Debtor's deposit. Defendant's 30(b)(6) witness concerning credits testified in March 2022 that she knew nothing about the account.  (*See* Milin Decl., Exh. 4 at 340-41.)

There are, therefore, genuine issues of material fact concerning whether Defendant should be denied the equitable remedy of setoff because of its "unclean hands."  At a minimum, the Court should not determine Defendant's "maximum liability" as its Motion requests without first examining why Defendant has not paid the Debtor the $2 million which Defendant's own books and records show it owes.

For these reasons, and the reasons discussed below, Defendant is not entitled to a summary judgment that "Plaintiff's avoidance and recovery claims fail as a matter of law as to each and every 90-Day Payment with the exception of the July 17 Generics Payment."  (Def. Mem. at 20.) The undisputed facts do not establish that Defendant's potential liability net of SNV is only $9.7

4

million, that it has the right to exercise an inequitable $9.7 million setoff, or that it can properly reduce its maximum liability to less than $1 million.  The Motion should be denied.

## COUNTER-STATEMENT OF FACTS

The principal facts relevant to this Motion are stated in Ms. DeVito's Declaration.  Some, which are discussed in detail in the Argument section below, are omitted here to avoid repetition. The most important facts for purposes of this Motion are:

1. ***Defendant's preference exposure net of SNV alone is $10.6 million, not $9.7 million***. As discussed in Point I below, Defendant inflated the value of the SNV it delivered to the Debtor by relying on invoices that were overstated by 20% above the Debtor's true purchase price. Defendant's SNV calculation ignores the fact that the parties' 2012 Supply Agreement (the "Supply Agreement") mandated a two-step payment process which eliminated the 20% over-statement, most often before it was paid. (*See* DeVito Decl., p.3 and ¶¶ 48-68.)  Also, Defendant's SNV calculation includes $127,692.46 in invoices for merchandise that Defendant has not proved was actually delivered. (*See* DeVito Decl., ¶¶ 30-47.)

2. ***Defendant engaged in a regular pattern of inequitable conduct, improperly seizing and currently withholding millions of dollars of the Debtor's property***.  As discussed in Point III below, Defendant seized the Debtor's property in multiple transactions without consent, Court permission or justification.  Defendant's accounting records show that it currently holds more than $2 million which it owes to the Debtor, and Defendant has made no showing that it is entitled to set off that sum against its unsecured claim rather than its 503(b)(9) Claim.  Ms. Towsley's email, quoted above in the Preliminary Statement, indicates that Defendant intends to "apply" the money after the Debtor's bankruptcy case is over. (*See*, *e.g.*, DeVito Decl., ¶¶ 6, 92-124.)

3. ***Key parts of the Declarations of at least three of Defendant's declarants should not be relied on by this Court, and other parts, at a minimum, should be reviewed with caution***:

5

A. <u>Defendant's Expert Charles Berk</u>. The Declaration of Defendant's expert Charles Berk includes several statements which are not based on personal knowledge and others which depend on information from Defendant's counsel that he did not verify. Mr. Berk states, for example, that "McKesson delivered to each of A&P's pharmacy operations Monday through Friday," an overstatement he has no personal knowledge to support, and that "the Debtor made payments every Friday," which is untrue. (*See* Berk Decl., Main Case Docket No. 5060, ¶¶ 4-5; DeVito Decl., ¶ 126.) Those statements and Mr. Berk's many other statements about facts as opposed to calculations – including all of ¶ 7 of his Declaration – are neither expert opinions nor based on personal knowledge and are therefore not admissible in evidence.

In addition, Mr. Berk admitted at his deposition that he included approximately $127,000 in disputed invoices in his SNV and 503(b)(9) Claim calculations without verifying delivery or even knowing whether the "DNS" designation on the invoices meant "do not ship." (*See* Milin Decl., Exh. 2 at 186-91.) The invoices are still included in his analysis even though he has no knowledge whether the merchandise described in the invoices was actually delivered. (*See id.*)

B. <u>Jenifer Towsley</u>. The Declaration of Defendant's Vice President Ms. Towsley includes statements that are not based on personal knowledge, including her statement that "$127,692.46 in Merchandise was delivered to Debtor … on July 2nd, 3rd and 7th." (Towsley Decl., Main Case Docket No. 5062, ¶ 11; *see* DeVito Decl., ¶¶ 40-46.) That statement could only be based on personal knowledge if Ms. Towsley had verified hundreds of deliveries to hundreds of individual A&P stores on three different days, and Ms. Towsley states no grounds for believing that she did so. Moreover, as discussed below, the dates she identifies are incorrect, and correcting the dates contradicts her explanation of Defendant's failure to bill for the purported deliveries contemporaneously.

6

Ms. Towsley has made other demonstrably incorrect statements in this litigation, including her statements at her deposition about the "alternate account" as discussed above and her statement in Paragraph 19 of her Declaration, Main Case Dkt. No. 5062, that A&P did not attempt to use credits after the Extension Agreement was signed, which is discussed below. Except where she provides clear indications of personal knowledge, her statements should be deemed inadmissible, and all of her statements must be considered with great caution.

C. Robin Page.  Ms. Page states that she was A&P's "Vice President of Pharmacy" "through A&P's several series of bankruptcy cases," of which there were only two, and that "A&P designated me as its point person to interface with [McKesson]."  (Declaration of Robin Page dated April 13, 2022 ("Page Decl."), Main Case Dkt. No. 5063, ¶¶ 5-6, 10.)  She has now worked for Defendant since 2015, as she admits at the very end of her Declaration without specifying when she began doing so.  (Id. ¶ 21.)

Ms. Page makes statements in paragraphs 9, 12, and 16-18 of her Declaration which violate her fiduciary duties to the Debtor as her former employer, including her duties to maintain privilege.  Several of Ms. Page's statements are disputed by the Debtor and, even if true, could only have been based on information she obtained in her capacity as the Debtor's officer or as a result of consultations with the Debtor's officers and counsel concerning negotiations with Defendant.  Ms. Page even purports to describe the "general understanding of those in attendance" at a meeting with the parties' counsel as to an important issue, which is hearsay, but which also implies that she discussed the issue with Debtor's counsel and principal negotiators.  She has no right to provide information, let alone misinformation as she does in her Declaration, about any such discussions.  Those sections of her testimony, at a minimum, should be disregarded by the Court as inadmissible in evidence.

In addition, Plaintiff will show at trial, and can show now if the Court deems it material, that Ms. Page was already seeking a job with Defendant, with very significant assistance from her main contact there, weeks before the meeting she discusses in ¶ 17 of her Declaration.

## ARGUMENT

### DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE DEFENDANT OVERSTATES THE VALUE OF THE GOODS IT DELIVERED TO THE DEBTOR AND CANNOT PROPERLY SET OFF ITS PRE-PETITION 503(b)(9) CLAIM AGAINST ITS CONTINGENT POST-PETITION PREFERENCE LIABILITY

Rule 56(a) of the Federal Rules of Civil Procedure, made applicable here by Rule 7056, Fed. R. Bankr. P., provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In considering a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014). "It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

Further, "where a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant … is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge").

Genuine issues of material fact preclude a grant of summary judgment here. As dis-cussed below, these issues include the true value of the deliveries Defendant relies on for both its

8

SNV calculation and 503(b)(9) Claim, whether Defendant delivered $127,692.46 in merchandise even though it cannot prove it, and whether Defendant's inequitable conduct forfeited its right to exercise the equitable remedy of setoff, which, to be considered fully, would require a trial.  Defendant's Motion also depends on several novel propositions of law that this Court should reject.

Defendant's argument proceeds in two parts.  First, Defendant contends that its SNV defense leaves only $9.7 million in avoidable preferences.  (*See* Def. Mem. at 9.)  In fact, as shown in Point I below, Defendant received more than $10.6 million in avoidable preferences net of SNV, because Defendant's calculation relies on inflated invoices and non-existent deliveries.  Also, as discussed in Point II, Defendant assumes, but does not show, that it can treat paid new value as SNV.  Defendant's further assumption that it can include an alleged $2.7 million worth of merchandise both in its 503(b)(9) Claim and in its SNV calculation is contrary to precedent.  This issue is addressed in Plaintiff's accompanying Memorandum concerning Defendant's Claim Motion because, to the extent that Defendant discusses the issue at all, it is discussed there.

Second, Defendant contends that it is entitled to set off its 503(b)(9) Claim against Plaintiff's claim for preference liability, even though both claims are in part contingent, and they are not "mutual," in that the 503(b)(9) Claim is pre-petition and the Plaintiff's claim for preference liability is post-petition.  Defendant is not entitled to do so, as addressed in Points III and IV.

Defendant further argues that it cannot be held liable for any preferential payments it received for goods delivered within 20 days of bankruptcy.  It argues that avoiding those payments would simply create a "resulting" claim under § 502(h) that would have administrative priority pursuant to § 503(b)(9).  This novel argument is contrary to the statutory text, Congressional intent and sound policy, as discussed in Point V.  Further, Defendant's argument that it can set off its "resulting" claim against any preference liability is flawed because § 502(h)

9

creates only pre-petition claims, as discussed in Point VI, and any setoff must be rejected as inequitable, as discussed in Point VII.

### I.    Defendant Overstates Its New Value Defense, and Understates Its Potential Preference Liability, Based on Inflated Invoices and Unproven Deliveries

Defendant overstates the amount of its SNV defense, and understates the "maximum" amount of its preference liability, for two main reasons.  First, Defendant treats $127,692.46 in invoices as representing actual deliveries even though the facts demonstrate otherwise.  Second, Defendant overstates the value of its generic deliveries based on invoices that were inflated by approximately $829,000 in June and July 2015 alone.  Plaintiff calculates Defendant's potential liability net of SNV as $10.6 million, not $9.7 million as Defendant claims, even if the legal issues addressed below and in Plaintiff's accompanying memorandum were resolved entirely in Defendant's favor.  (*See* DeVito Decl., ¶ 68.)  The "double dipping" issue alone could decrease Defendant's SNV defense, and increase its potential liability, by at least $1.3 million.

Although research has disclosed no cases concerning inflated invoices in the SNV context, it is well established in the parallel context of valuing 503(b)(9) claims that "the invoice or purchase price is presumptively the best determinant of value," but "[t]he presumption favoring the purchase price may be rebutted by evidence indicating that, under the facts and circumstances of a particular transaction, the purchase or invoice price is not an appropriate or relevant indicator of the 'value' obtained by the Debtors."  *In re Semcrude*, 416 B.R. 399, 405 (Bankr. D. Del. 2009).  Thus, in *In re Beaulieu Group, LLC*, 2021 WL 4469928 at *45, the court held that an allegation of overcharging made it "plausible that the invoice price is not the correct value." In addition, § 547(a) defines "new value" as, in relevant part, "money or money's worth," not the purely nominal value stated on an invoice. The invoice price is clearly not the correct value here, because, as shown in Point IA2 below, it did not even reflect the Debtor's actual purchase price.

10

A.  Defendant's Subsequent New Value Calculation Improperly Includes
    $127,692.46 for Merchandise that It Cannot Show Was Actually Delivered

Defendant's SNV calculation is overstated by more than $127,692.46 (the "$127k Over-

statement") because it includes merchandise that, based on the factual record, was never actually

delivered.  Ms. DeVito has summarized some of the key relevant facts as follows:

> Despite Plaintiff's repeated requests, Defendant has offered no proof that the
> goods were actually delivered, and I have found none.  Defendant's expert
> Charles Berk, who calculated its 503(b)(9) Claim, did not review any delivery
> records and did not know whether the invoices represented actual deliveries.
> Also, the invoices Defendant relies on are suspect: they seek payment for goods
> sold to "Inactive" pharmacies, specify a delivery route of "DNS" with stop "000,"
> and demand payment on terms that do not match the Debtor's actual payment
> terms.  Mr. Berk testified that he did not even know whether "DNS" meant "Do
> Not Ship."  Most importantly, if Defendant's invoices represented actual deliver-
> ies, it should have been able to provide proof of delivery from its shipping
> company.  It has not done so.

(DeVito Decl. at pp. 2-3.)

Plaintiff has repeatedly informed Defendant that it objects to Defendant's $127k Over-

statement because Defendant has failed to prove delivery, a point Plaintiff made in its letter to

Court on March 25, 2022.  (*See* Adv. Pro. Dkt. No. 112).  The Debtor has searched for, and

found, no proof of delivery in its own records and Defendant's invoices cannot be relied on for

reasons including those quoted above.  (*See* DeVito Decl. at pp. 2-3, ¶¶ 30-47.)  Further, the

Debtor could only have missed the 355 purported deliveries comprising the $127k Overstatement

if each of more than 100 individual stores failed to record the deliveries on the three different

dates specified in Defendant's invoices.  (*See* DeVito Decl. ¶¶ 41-42, Towsley Decl. Exh. 2.)

Despite these facts, Plaintiff's March 25th letter, and Plaintiff's multiple emails to counsel

(*see* DeVito Decl., ¶¶ 19-20, 24-25), Defendant tells the Court that, "[w]ith only a few relatively

minor issues (addressed below), the parties agree [on] the total value of the Merchandise

11

McKesson delivered to Debtor." (Def. Mem. at 2.) Defendant's Memorandum does not actually address Plaintiff's objections to the $127k Overstatement, and its statement is untrue.

Nevertheless, Defendant's expert Charles Berk included the $127k Overstatement in his SNV calculation, noting that fact only in a vague footnote. (*See* Berk. Decl., Main Case Dkt. No. 5060, Exh. B n.8.) Further, Defendant's motion papers offer no proof of delivery and no answer to Plaintiff's objections. Defendant should have been able to produce delivery records from the shipper identified on the invoices if the merchandise had actually been shipped. It did not do so.

Instead, Defendant offers conclusory statements from Ms. Towsley about how Defendant generates invoices and an *ipse dixit* – which is ***not*** based on personal knowledge – that the invoices represent "Merchandise delivered to Debtor." (*See* Towsley Decl. ¶ 11.) Ms. Towsley states no foundation for or facts to support her *ipse dixit*, and the Court should ignore it as self-serving and conclusory. *See*, *e.g.*, *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). Also, her statement that the merchandise was delivered on July 2, 3 and 7, 2015, does not square with the actual invoice dates, making her statement that A&P was not billed contemporaneously because payment would have been due after A&P's (then unknown) bankruptcy date not only illogical, but also – given A&P's next-day terms on the true invoice date of July 13 – factually incorrect. (*See* Towsley Decl. ¶ 11, Exh. 2.) At a minimum, as Ms. DeVito's Declaration shows, Ms. Towsley's Declaration attaches Pathmark reports which billed A&P for deliveries to exactly the same stores on exactly the same dates as the merchandise included in the $127k Overstatement, so her explanation for Defendant's failure to bill for the $127k Overstatement at the time of delivery does not accord with the facts. (*See* DeVito Decl., ¶¶ 44-45.)

Discovery has now closed. The invoices on which Defendant bases its $127k Overstatement are problematic, and there is, and at this point can be, no genuine proof that Defendant delivered the $127,692.46 in merchandise to A&P. Both Defendant's SNV calculation and its

12

503(b)(9) Claim should therefore be reduced by the amount of the $127k Overstatement. Under Fed. R. Civ. P. 56(f) and Bankruptcy Rule 7056, the Court may, after notice and an opportunity to respond, grant summary judgment to Plaintiff on this issue. Doing so would eliminate unnecessary issues from the trial of this matter.

    B.  **Defendant's Subsequent New Value Calculation Is**
          <u>**Improperly Overstated Based on Defendant's Inflated Invoices**</u>

Defendant has calculated its SNV defense based on invoices which, it asserts, represent the "fair value" of its deliveries. (*See* Def. Mem. at 11.) In fact, those invoices were systematically inflated. A&P paid Defendant for Primary One Stop ("OS") generic merchandise by a two-step process. First, A&P paid Defendant's invoice, which Defendant had marked up by 20% over the manufacturer's invoice. Second, Defendant paid a "SynerGX" or "SGX" rebate of 16.667% on A&P's 120% payment, thereby eliminating the 20% mark-up entirely. (*See* DeVito Decl., Exh. 7 at § 11(C); Milin Decl., Exh. 3 at 63, 71-72.) However, for approximately two-thirds of the Debtor's purchases, the two steps did not occur in that order.

Both steps in the parties' payment process are specified in the parties' 2012 Supply Agreement, which also specifies their timing: A&P owed Defendant on the sixth following Friday for its purchases, and Defendant owed A&P its rebate 15 days after the month in which its purchases were made. (*See* DeVito Decl., Exh. 7, at §§ 4(A) and 11(C).) As a result, for all purchases during – and many before – the second half of each month, A&P received a "***prebate***": Defendant paid A&P the rebate ***before*** A&P was required to pay Defendant's invoice. In fact, if the Debtor purchased goods on the 10th of a 30-day month, or on the 11th of a 31-day month, the rebate would be due in 35 days, on the 15th of the following month, but payment would not be due for 36-42 days, on the sixth following Friday. Even for purchases on the first of the month, given the contractually specified timing, A&P never had long to wait.

13

Defendant's corporate witness pursuant to Rule 30(b)(6), Fed. R. Civ. P., confirmed the essential facts: "if A&P purchased product on January 30, McKesson would as to the practice of rebates pay out that rebate on February 15. A&P is not required to pay for that product until the sixth – the sixth Friday following that January 30th week…" (Milin Decl., Exh. 3 at 94-96.) Defendant's witness added that "McKesson paid rebates on the 15th of the month. The[re] were products that A&P had likely not paid for … by that … date." (*Id.*)

Given the parties' two-step payment process, Defendant's invoices for OS generic merchandise did not represent the fair value of that merchandise. A&P did not actually pay the invoice amount. A&P's "prebate" meant that, before it paid an invoice of, for example, $120,000 for purchases after the 10th of the month, A&P already had its $20,000 rebate in hand. As a result, A&P's out of pocket cost was only the net amount of $100,000. That, and not the artificially marked-up invoice amount, was clearly its true purchase price.

In these circumstances, the true value, and the true "money's worth" of Defendant's merchandise, was not the amount written on Defendant's invoices; it was the amount that, as a practical matter, A&P actually paid. *See* 11 U.S.C. § 547(a) (defining "new value" as "money's worth"). To conclude otherwise would be to ignore both the substance of the parties' transactions and their contracts, because the "prebate" system and its timing were specified there. Not surprisingly, Defendant's monthly "Rebate Reports" did not only calculate the amount of the rebates A&P was owed for its purchases. They also calculated A&P's true "Net Price."

Defendant's two-step payment process remained in effect until A&P's bankruptcy. After that, two things changed. First, Defendant withheld A&P's OS generic rebate for the period from July 1 through July 18, 2015, which Defendant itself calculated as $311,632.72. Second, in November, 2015, Defendant seized back the rebate of $562,832.91 it had paid to A&P on July 16, 2015, a few days before its bankruptcy filing. Defendant calculated $517,367 of that amount

14

as a rebate on Defendant's June 2015 OS generic purchases.  (*See* DeVito Decl., ¶ 56.) As a result, Defendant's invoices for June and July, 2015, and its SNV calculations based on those invoices, are inflated by $517,367 for June purchases and $311,632.72 for July, totaling almost exactly $829,000.  (*See id.*)

For the foregoing reasons, Defendant's SNV calculations for the period from June 1 through July 19, 2015, should be reduced by $742,771.88, as calculated in Ms. DeVito's Declaration to reflect A&P's actual purchase price.  (*See* DeVito Decl., ¶¶ 64-68 and Exh. 10.)  The SNV calculations should also be reduced by $127,692.46 to correct for the $127k Overstatement.  (*See id.*)  Defendant's "maximum potential preference liability," net of its SNV defense, is therefore $10,604,491.75.  (*See* DeVito Decl., Exh. 10.)

## II.  Defendant's Preference Liability Should Not Be Reduced by Paid New Value

Defendant correctly states that, "a majority of Circuit Courts to address the issue have concluded that a creditor is entitled to set off against a preference period transfer all subsequent advances of new value, even if the new value was later paid by the debtor, so long as it was not paid with an otherwise unavoidable transfer." (Def. Mem. at 14.)  However, Defendant is also correct that "the Second Circuit has not yet weighed in." (*Id.* at 15.)

The Courts which have held that subsequent new value shields preferential transfers, even if the new value has been paid for, have generally adopted a "plain language" approach to the relevant statutory language: "Nothing in the language of § 547(c)(4) indicates that an offset … is available only for value that remains unpaid." *Kaye v. Blue Bell Creameries, Inc. (In re BFW Liquidation, LLC)*, 899 F.3d 1178, 1189 (11th Cir. 2018).  The courts which have disagreed, in the Southern District of New York and elsewhere, have read the statute more broadly or have focused on policy considerations.  *See*, *e.g.*, *N.Y.C. Shoes Inc. v. Bentley Int'l Inc. (In re N.Y.C. Shoes Inc.)*, 880 F.2d 679, 680 (3d Cir. 1989) (the SNV defense requires that "the debtor

must not have fully compensated the creditor for the 'new value' as of the date that it filed its
bankruptcy petition"); *In re Prescott*, 805 F.2d 719 (7th Cir. 1986) (holding that new value must
remain unpaid and collecting cases); *In re Pameco Corp.*, 356 B.R. 327 (Bankr. S.D.N.Y. 2006)
(new value must remain unpaid, focusing on whether the estate was replenished); *In re Teligent,
Inc.*, 315 B.R. 308, 317 (Bankr. S.D.N.Y. 2004) ("the relevant inquiry in 'new value' litigation is
whether the defendant 'replenished' the debtor's estate").

      This case shows that there are sound policy reasons to require SNV to remain unpaid.  As
of July 13, 2015, Defendant unilaterally changed A&P's contractual payment terms to require
next day payment and threatened to stop shipping immediately if A&P did not pay in full.  (*See*
DeVito Decl., ¶ 127.)  As a result, Plaintiff respectfully suggests that Defendant needed no fur-
ther incentives to extend credit to A&P.  Further, Defendant's new value did not replenish the
estate; each transaction was a wash.  Giving Defendant credit against its preference liability for
deliveries that were fully paid for – and that it knew would be fully paid for unless A&P filed a
bankruptcy petition the very next day – would therefore diminish the Debtor's estate to the
detriment of other creditors without a corresponding benefit, and it would, in effect, pay Defen-
dant twice. Paid new value should not reduce Defendant's preference exposure.

## III.    **Defendant Cannot Properly Set Off Against Plaintiff's Preference Claims**

      Defendant has no right to exercise a setoff against Plaintiff's preference claims for a
simple, dispositive reason: New York law does not permit setoffs against contingent claims.
That may be why Defendant fails to cite either 11 U.S.C. § 553, which states that the Bankruptcy
Code "does not affect any right of a creditor to offset a mutual debt," or the underlying law on
which Defendant's alleged setoff right relies, though it has the burden of doing so: "In order to
establish a right to setoff under section 553, a creditor must first demonstrate a preexisting right

16

of setoff under nonbankruptcy or state law." *Feltman v. Noor Staffing Grp., LLC (In re Corporate Res. Servs., Inc.)*, 564 B.R. 196, 203 (Bankr. S.D.N.Y. 2017).

For more than a century, the New York Courts have held that contingent claims cannot be set off. *See Dunn v. Uvalde Asphalt Paving Co.*, 175 N.Y. 214, 219 (1903) (holding that "there can be no such thing as a right to setoff a possible but unestablished liability, unliquidated in amount, against a liquidated legal claim that is due and payable"). *See also Willett v. Lincolnshire Mgmt., Inc.*, 302 A.D.2d 271, 271 (1st Dep't 2003) ("'there is no right to set off a possible, unliquidated liability against a liquidated claim that is due and payable.'") (quoting *Spodek v. Park Prop. Dev. Assocs.*, 263 A.D.2d 478, 478-79 (2d Dep't 1999)); N.Y. D.C.L. § 151 (allowing post-bankruptcy setoffs only of amounts "owing").

The courts in this District have also held repeatedly that creditors cannot set off contingent debts under New York law. *See, e.g.*, *Thai Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic,* Case No. 10-CV-5256 (KMW) (DCF), 2016 WL 958640 (S.D.N.Y. Mar. 8, 2016) at *3 n.3 ("Both New York state courts and courts in this Circuit are in agreement that DCL § 151 does not authorize the setoff of a contingent obligation."); *Feltman*, 564 B.R. at 204 ("New York law does not recognize a right of setoff for contingent claims"); *In re Westchester Structures, Inc.*, 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995) (under New York law, the debts to be set off cannot be contingent, meaning that they are "marked by uncertainty as to whether any obligation will ever arise").

In addition, the courts have explained that "[a] claim is contingent and ineligible to be set off under New York law when it is dependent on some future event that may never happen or has not yet accrued." *Feltman v. Noor Staffing Grp., LLC (In re Corporate Res. Servs., Inc.)*, 564 B.R. 196, 201 (Bankr. S.D.N.Y. 2017); *see Westchester Structures, Inc.*, 181 B.R. at 740.

There can be no dispute that Plaintiff's preference claims here are contingent, both as to whether Defendant will be found liable and as to the amount of its liability. Also, Defendant admits that its hypothetical 503(b)(9) Claim, to the extent it is based on preference liability, is "contingent." (*See* Def. Mem. at 7.) Defendant similarly admits that New York law governs its contracts with the Debtor. (*See* Def. Mem. at 7-8 & n.6.)

Thus, Defendant has no right to set off its 503(b)(9) Claim, part of which it admits is contingent, against its potential preference liability, which is wholly contingent. No such setoff is permitted under New York law or the Bankruptcy Code. Further, although it is possible that Defendant seeks a declaration or something else that would be less than a judgment permitting it to exercise a setoff in advance of trial, Defendant's Motion fails either to clarify or to justify what that might be. Accordingly, Defendant's Motion must be denied.

**IV.    Defendant Should Be Denied a Setoff Against Its Potential Preference Liability Because 503(b)(9) Claims Are Pre-Petition but Preference Claims Are Post-Petition**

Defendant cannot set off its 503(b)(9) Claim against Plaintiff's preference claims for an additional reason: § 553 of the Bankruptcy Code only allows "mutual" setoffs of pre-petition claims against pre-petition claims. It provides:

> …[T]his title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case.

Defendant's proposed setoff does not satisfy § 553 because, whereas its 503(b)(9) Claim "arose before the commencement of the case," Plaintiff's preference claims, and Defendant's potential liability based on those claims, did not.

Plaintiff's Motion raises an issue of nationwide first impression: it cites, and research has disclosed, no case authorizing a setoff of a 503(b)(9) claim against preference liability. Nevertheless, Defendant's argument for its proposed setoff is almost non-existent: "in light of the Court's

ruling allowing a dollar-for-dollar setoff of McKesson's section 503(b)(9) claims against Plaintiff's preference claims, it logically follows that McKesson has no net preference exposure except as to the approximately $900,000 payment on July 17, 2015." (Def. Mem. at 17.)  Defendant makes no effort to justify what it refers to as this Court's "Setoff Ruling," except to state that Judge Drain "adopted the reasoning of *Official Comm. of Unsecured Creditors of Quantum Foods, LLC v. Tyson Foods, Inc. (In re Quantum Foods, LLC)*, 554 B.R. 729, 733 (Bankr. D. Del. 2016)." (Def. Mem. at 6.)  However, that is inaccurate, and the Judge was misled.

*Quantum Foods*, on which both Judge Drain and Defendant appear to rely, squarely held that preference claims are post-petition. The Court reasoned that, "The Bankruptcy Code defines 'claim' as a 'right to payment.'  A preference 'right to payment,' or preference claim, necessarily arises only post-petition…" *Id.* at 735.  Plaintiff agrees.

Defendant's 503(b)(9) Claim, however, is pre-petition.  With one exception, case law appears to be unanimous on this point.  *See, e.g., In re Circuit City Stores*, *Inc.*, 426 B.R. 560, 577 (Bankr. E.D. Va. 2010) (distinguishing between "prepetition § 503(b)(9) administrative expense claims and other types of postpetition administrative expense claims"); *In re Plastech Engineered Prods., Inc.*, 394 B.R. 147, 163-64 (2008) (§ 503(b)(9) claims are pre-petition claims); *In re Dana Corp.*, No. 06-10354 (BRL), 2007 WL 1577763, at *5 (Bankr. S.D.N.Y. May 30, 2007) ("The 503(b)(9) claims are prepetition claims").  *See also In re TI Acquisition, LLC,* 410 B.R. 742, 750 (N.D. Ga. 2009) ("an administrative expense under § 503(b)(9) is for a pre-petition debt").

The leading case on point is *In re Brown & Cole Stores*, LLC, 375 B.R. 873, 879 (B.A.P. 9th Cir. 2007), which held that the Debtor could set off pre-petition obligations against a creditor's § 503(b)(9) claim because they were both pre-petition.  The Court held:

19

Unlike all of the other subsections of § 503, subsection(b)(9) applies to prepetition debt. Congress has simply moved those claims up higher on the priority ladder. All of the other subsections of § 503 create administrative priority for postpetition debt. This is a crucial difference when applying the setoff provisions of the Bankruptcy Code….the provisions of § 553(a), which provide for setoff of mutual debts which arise before bankruptcy, do not apply to most administrative priority claims but do apply to twenty-day sales claims, which by definition arise prepetition.

Research has disclosed only a single ruling that § 503(b)(9) claims are post-petition – by Judge Drain in this matter.  However, Judge Drain's ruling was preliminary and not supported by relevant precedent.  The Judge stated that "I could easily grant summary judgment on [that] today," implying that he is not actually granting summary judgment, and that "you can assume I'm granting summary judgment on the setoff point," but not when.  The Judge then instructed the parties not to submit an order, and that they should instead "keep in mind that that's how I ruled and move ahead with the rest of the litigation." (*See* Milin Decl., Exh. 1 at 58-59.)

Judge Drain offered only a very brief explanation of his ruling.  He stated: "[I am] relying on the same logic that Judge Carey used in the *Quantum* case, which to me made sense for the same reasons that he said."  (Milin Decl., Exh. 1 at 58.)  Unfortunately, Judge Drain appears to have been misled about what *Quantum* actually held based on the following dialogue with Defendant's counsel:

> MR. GARFINKLE: I was involved in *Quantum*, so actually, it was part of the kind of discussion that took place. But it was administratively insol-vent, and it was all a 503(b)(9) claim that Tyson had, which was 2.6 million -- their claim was 4.8. It had been reduced down to 2.6. It was all for 503(b)(9), which was not getting paid in full. And Quantum -- and Tyson said, Judge, we get to use this as a setoff whatever our preference liability may be. And Judge Carey agreed, yes, you can. And that's the ruling of Quantum.
> THE COURT: So it was prepetition.
> MR. GARFINKLE: It was -- it was a 503(b)(9).
> THE COURT: All right.
> MR. GARFINKLE: Sorry, just to clarify that point.
> THE COURT: Right.

(Milin Decl., Exh. 1 at 53-54.)

In fact, *Quantum* did not concern a § 503(b)(9) claim. Tyson asserted a claim under § 503(b)(1) based on post-petition deliveries: "Approximately two months after the Petition Date, Tyson supplied meat products to the Debtors." 554 B.R. at 731. Further, the issue in *Quantum* was: "Whether an allowed ***post-petition*** administrative expense claim can be used to set off preference liability." *Id.* at 732 (emphasis added). The Court began by stating that "Tyson's Administrative Claim is clearly a post-petition obligation of Debtor," which appears to have been undisputed. The court then held that preference liability was post-petition, as discussed above. Finally, the Court concluded that setoff of preference liability against an offsetting post-petition debt would be permissible.

Clearly, *Quantum* did not hold that a 503(b)(9) claim can be set off against preference liability, as Judge Drain apparently believed. Further, nothing in Judge Drain's "Setoff Ruling" justifies extending *Quantum* to 503(b)(9) claims. Judge Drain's only further statement on point was "it does seem to me that this is meant to be a post-petition claim; that's why Congress puts it in the post-petition category, which would, to me, allow a setoff whatever the amount is." (Milin Decl., Exh. 1 at 54) The Judge did not offer any further citations or analysis, and case law disagrees.

Given the clear weight of precedent, and the nature of Judge Drain's bench ruling, this Court should hold that § 503(b)(9) claims are pre-petition claims that cannot be set off against preference liability. The "Setoff Ruling" is not binding; whether to apply a ruling as "law of the case" is entirely within the Court's discretion. *See, e.g., Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("'the law of the case … is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment'"). Further, reconsideration can be appropriate "to correct a clear error or prevent manifest injustice." *Id.*

21

We respectfully suggest that both are sufficient grounds to revisit the "Setoff Ruling" here.

Defendant's Motion should be denied.

### V.   Defendant's "Resulting" Claim under 11 U.S.C. § 502(h) Should Not Be Granted Administrative Priority under § 503(b)(9) Even If It Arose from Recovery of Preferential Payments for Goods Delivered Within 20 Days of Bankruptcy

Defendant's Motion asks the Court to rule in its favor on a second issue of nationwide

first impression, once more providing only a minimal argument and citing no case on point.

Defendant argues that, if it is held liable for receiving a preference for goods delivered within 20

days of bankruptcy, its "resulting" claim will be entitled to administrative expense priority pursu-

ant to § 503(b)(9).  If that were true, creditors could never be held liable for preferences, no

matter how they pressured struggling companies to pay them, for goods delivered within 20 days

of bankruptcy.  That ruling would be contrary to the text of the Bankruptcy Code, Congress'

intent and sound bankruptcy policy.

### A.   Defendant's Precedents Do Not Hold that § 502(h) Can Create 503(b)(9) Claims

Defendant cites only two cases for the proposition that § 502(h) can create 503(b)(9)

claims:  *In re Hackney*, 93 B.R. 213 (Bankr. N.D. Cal. 1988), an inapplicable case about reviving

non-dischargeable claims against a debtor rather than an estate, and *Fleet Nat'l Bank v. Gray (In

re Bankvest Capital Corp.)*, 375 F.3d 51 (1st Cir. 2004), which holds that "the 502(h) claim takes

on the characteristics of the original claim, including, in this case, its secured status."  (*See* Def.

Mem. at 17.)  *Fleet* does not concern § 503(b)(9), however, was not decided in this Circuit, and

was cited here only once – to support reinstatement under § 502(h) of an unsecured pre-petition

claim.  *See In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 465 (Bankr. S.D.N.Y. 2007).

### B.   The Text of § 502(h) Does Not Permit Creation of 503(b)(9) Claims

The most important consideration in determining whether § 502(h) creates administrative

priority claims under § 503(b)(9) is, of course, the statute's text.  Section 502(h) reads: "A claim

arising from the recovery of property under section … 550 … shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition." This text shows that the issue here is very different from the issue in *Fleet*.  Indeed, it appears to be an issue of nationwide first impression.

*Fleet*'s holding that § 502(h) reinstates a claim's secured status is consistent with the statutory text because the text is silent about claims' status.  Section 502(h) is not silent about timing, however.  It specifies that a claim should be determined and allowed "as if such claim had arisen before the date of the filing of the petition."  That language creates a pre-petition claim, but it says nothing about valuing claims as of the day before the petition date, or 20 days before bankruptcy, or any other specific date.  Moreover, Congress easily could have been specific about the date.

The natural reading of the statutory language, therefore, is that it creates pre-petition claims, but does not grant them any special priority based on timing.  Defendant's Motion in effect asks the Court to rewrite the statute to read: "as if such claim had arisen ***on the date on which it originally arose*** before the filing of the petition."  But that is not what it says.  Accordingly, the same "plain language" approach to statutory interpretation which led courts to reject the addition of an "unpaid" requirement to the subsequent new value statute, 11 U.S.C. § 547(c)(4), mandates rejection of an addition to § 502(h) that would require claims to be valued as of the day they arose.  Congress easily could have specified that, but it did not do so.

C.  Legislative History Shows that § 503(b)(9) Was Not
    Intended to Be a Means of Eliminating Preference Liability

Congress' intention in passing § 503(b)(9) was to "enhance certain reclamation claims" in specified ways.  *See*, *e.g.*, *In re SRC Liquidation, LLC*, 573 B.R. 537 (Bankr. D. Del. 2017); *In*

*re Circuit City Stores, Inc.*, 432 B.R. 225 (Bankr. E.D. Va. 2010); 11 U.S.C. 546(c). In particular, "[t]he legislative history of § 503(b)(9) 'suggests that it was aimed at providing relief to sellers of goods who fail to give the required notice under the reclamation provision of section 546(c)[.]'" *Brown & Cole Stores, LLC v. Associated Grocers, Inc. (In re Brown Cole Stores, LLC)*, 375 B.R. 873, 875 n.3 (B.A.P. 9th Cir. 2007) (quoting Cho, *The Intersection of Critical Vendor Orders and Bankruptcy Code § 503(b)(9),* 29 *Cal Bankr.J. 7*, 11 (2007)).

Of course, Defendant tells the Court that § 503(b)(9) has a different purpose – "encouraging vendors to continue providing goods and services to a distressed debtor" – and purports to support that statement with a long quotation from *ASM Capital, LP v. Ames Dep't Stores, Inc.* (*In re Ames Dep't Stores, Inc.*), 582 F.3d 422, 431 (2d Cir. 2009). (*See* Def. Mem. 16-17.) In fact, *ASM Capital* expressly states that "[n]either party has suggested that section 503(b)(9) has any relevance to this appeal." 582 F.3d at 424 n.2. Also, Defendant's long quotation actually and expressly concerns "extend[ing] ***post-petition credit to a chapter 11 debtor***," not pre-petition credit to distressed companies. (*See* Def. Mem. at 16-17 (quoting *ASM Capital*).)

Nothing in the legislative history of § 503(b)(9), even as Defendant describes it, indicates that Congress considered how § 503(b)(9) would interact with the preference statute, 11 U.S.C. § 547, or that it intended to eliminate preference liability for any class of creditors. Yet if § 502(h) creates 503(b)(9) claims whenever preferential payments for goods delivered within 20 days of bankruptcy are recovered, that would immunize those payments entirely. The recovered payments would simply be replaced with 503(b)(9) claims under § 502(h), thereby ensuring full payment (absent administrative insolvency), and rendering preference actions futile. As a result, creditors could never be held liable for preferences, no matter how they pressured struggling customers to pay them, for goods delivered within 20 days of bankruptcy. That plainly is not what Congress intended.

24

D.  The Court Should Harmonize §§ 502(h), 503(b)(9) and 547
     by Holding that § 502(h) Cannot Create § 503(b)(9) Claims

The Supreme Court has mandated that Courts should resolve statutory conflicts "to give effect to each if we can do so while preserving their sense and purpose." *Watt v. Alaska*, 451 U.S. 259, 267 (1981). That is easy to do here. Because Congress did not intend § 503(b)(9) to eliminate preference liability for goods delivered within 20 days of bankruptcy, or to effectuate an implicit repeal of § 547 for an important class of creditors, the Court should hold that § 502(h) does not create 503(b)(9) claims. It should be noted that reading § 502(h) to preserve the status of claims, such as secured claims or claims for wages or child support, normally effectuates Congress' intent to afford those claims special priority. Reading § 502(h) to eliminate preference liability for creditors who deliver goods within 20 days of bankruptcy, in contrast, does not effectuate Congress' intent.

E.  Reading § 502(h) to Create 503(b)(9) Claims
     Would Be Contrary to the Policies of the Bankruptcy Code

**Defendant's argument** should also be rejected as a matter of sound bankruptcy policy. If suppliers of goods can never be liable for pressuring struggling companies to pay them for goods delivered within 20 days of bankruptcy, they are very likely to exert that pressure when a company seems unlikely to survive. Also, because the date of a future bankruptcy is rarely certain, the pressure may start early. At a minimum, once a struggling customer has paid its creditor for a recent shipment, the creditor would likely be better off if the customer did not survive much longer. Thus, eliminating preference liability for goods delivered within 20 days of bankruptcy would likely precipitate bankruptcies rather than forestall them.

Eliminating preference liability for shippers of goods within 20 days of bankruptcy would also be inequitable. Section 503(b)(9) protects sellers of goods, but not of services, because it was intended as an alternative mechanism of reclamation and services cannot be

25

reclaimed.  However, if § 503(b)(9) can be used to eliminate preference liability, it will give suppliers of goods, as opposed to parties who ship those goods or provide other services, an unfair advantage.  They will be free to pressure their near-bankrupt customers to pay them as soon as possible with no fear of preference liability, whereas providers of services will not.

For all of the foregoing reasons – statutory, legislative history, and policy – this Court should reject Defendant's argument that § 502(h) can create administrative priority claims under § 503(b)(9), thereby eliminating preference liability for sellers of goods delivered within 20 days of bankruptcy.

### VI.    Defendant Should Be Denied a Setoff of Its Potential Preference Liability Because All § 502(h) Claims Are Pre-Petition and Because Defendant's Preference Liability and § 502(h) Claim Cannot Exist Simultaneously

Even if this Court were to determine that § 502(h) could create administrative priority claims under § 503(b)(9), and that, contrary to case law, 503(b)(9) claims should be considered post-petition, Defendant still would not be entitled to the setoff it seeks.  Section 502(h) provides that the claims it creates "shall be determined, and … allowed … or disallowed … the same as if such claim had arisen before the date of the filing of the petition."  This language could not be clearer: All § 502(h) claims are to be allowed as if they are pre-petition.  Consequently, even if 503(b)(9) claims were normally post-petition – and they are not for the reasons stated above – they would be pre-petition if created by § 502(h), and therefore ineligible for a setoff against post-petition preference liability.  In addition, it should be noted that Judge Drain did not consider this issue, because his "Setoff Ruling" only concerned a potential setoff of Defendant's "fixed" § 503(b)(9) claim for delivering goods pre-petition, ***not*** setoff of a hypothetical § 503(b)(9) claim created by § 502(h).

Defendant's setoff argument also suffers from a fundamental flaw: Defendant's preference liability and 502(h) claim cannot be set off, because they cannot exist at the same

time.  Currently, Defendant owes the Debtor a contingent potential preference liability of $10.6

million, but the Debtor does not owe Defendant a § 502(h) claim.  The Debtor will not owe

Defendant a § 502(h) claim until after Defendant pays its preference liability, because a § 502(h)

claim, as that statute states, is "a claim arising from the **recovery** of property." (Emphasis added).

Consequently, Defendant's preference liability and Debtor's obligation under § 502(h) will never

exist simultaneously and, as a simple matter of logic, they cannot be set off.  ""[F]or setoff pur-

poses [under section 553 ], a claim – even a contingent one – arises when "all transactions neces-

sary for liability occur.""" *Feltman v. Noor Staffing Grp., LLC (In re Corporate Res. Servs.,

Inc.)*, 564 B.R. 196, 207 (Bankr. S.D.N.Y. 2017). *See* N.Y. D.C.L. § 151 (allowing setoffs only

of amounts "owing").  At a minimum, Defendant has not shown that it would have the right to

set off claims that cannot exist simultaneously.  Defendant's Motion should therefore be denied.

### VII.   Defendant Should Be Denied a Summary Judgment Approving a Setoff Because of Its Extensive Pattern of Inequitable Conduct

Defendant should be denied a summary judgment allowing it to exercise a setoff because

it engaged in an extensive pattern of inequitable conduct.  It is well established that, "[t]he deci-

sion to allow setoff is within the sound discretion of the bankruptcy court." *In re Lehman Broth-

ers Holdings Inc.*, 404 B.R. 752, 757 (Bankr. S.D.N.Y. 2009). Further, setoff is an equitable

remedy that can be denied for compelling reasons such as inequitable conduct.  *See*, *e.g.*, *In re

Bennett Funding Group, Inc.*, 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997) ("the right of setoff is

within the bankruptcy court's discretion, and it may 'invoke equity to bend the rules,' if required,

to avert injustice.") (quoting *Scherling v. Hellman Elec. Corp. (In re Westchester Structures,

Inc.)*, 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995)); *In re Szymanski*, 413 B.R. 232, 243 (Bankr.

E.D. Pa. 2009) (setoff can be denied "where the creditor has committed inequitable, illegal or

fraudulent acts"); *In re Whimsy, Inc.*, 221 B.R. 69, 74 (Bankr. S.D.N.Y. 1998) (setoff can be

denied based on "compelling circumstances"); *In re Ionosphere Clubs, Inc.*, 164 B.R. 839, 841

(Bankr. S.D.N.Y. 1994) ("Once these technical requirements of setoff are satisfied, 'the

bankruptcy judge must scrutinize the right of setoff in light of the Bankruptcy Code's goals and

objectives. These goals include . . . equitable treatment of all creditors.'").  In *U.S. v. Arkison (In*

*re Cascade Roads, Inc.)*, 34 F.3d 756 (9th Cir. 1994), the Ninth Circuit even held that the U.S.

government should be barred from exercising a setoff due to its inequitable conduct.

This Court should have an opportunity to consider the full facts about Defendant's pat-

tern of inequitable conduct, which almost certainly will require a trial, before exercising its

discretion whether to allow Defendant a setoff.  At a minimum, Defendant should not be granted

what amounts to a summary judgment on Plaintiff's Fourth Claim for Relief, as to which there

remain disputed facts, or allowed to exercise a setoff while holding approximately $2 million of

the Debtor's money without proper justification, as described below.  The evidence of Defen-

dant's inequitable conduct, as described in Ms. DeVito's Declaration, includes:

A.  Defendant Seized $569,000 in Rebates which Should Be Returned to the Debtor.

Defendant paid A&P a rebate of approximately $562,000 on July 16, 2015, mainly for its

June generic purchases.  In November 2015, four months after the Debtor's Petition Date,

Defendant seized the money back, without the Debtor's consent or court permission, by unilat-

erally deducting it from sums it owed to the Debtor's after the parties ceased doing business.

When the Debtor's CFO objected, Defendant cited a contractual provision which, as the CFO

promptly pointed out, did not apply.  Later, Defendant claimed that the Debtor had not earned

the rebate, but it has never offered proof, and Defendant itself calculated and paid the rebate

before the Debtor's bankruptcy.  Also, Defendant has never explained why it took back an

additional $7,000.  (*See* DeVito Decl., ¶¶ 112-14.)

Defendant's inequitable conduct with respect to the $569,000 in rebates appears to be a clear violation of the automatic stay and provides equitable grounds for denying Defendant a setoff. At a minimum, Defendant's Motion does not state facts sufficient to justify a summary judgment dismissing Plaintiff's Fourth Claim for Relief, which seeks to deny Defendant a setoff based on its seizure of the rebate. Defendant's Memorandum does not even mention the issue.

B. <u>Defendant Seized $579,000 in Credits which Should Be Returned to the Debtor.</u>

In July and August 2015, soon after the Debtor's bankruptcy, Defendant decided that it would not pay the Debtor $413,000 in credits that Defendant owed it for returned merchandise. Defendant did not inform the Debtor in writing at the time. (*See* DeVito Decl., ¶ 115.)

As of September 8, 2015, the parties entered into a new "Extension Agreement" which stated that Defendant "will continue to honor exchanges and returns in the ordinary course of business, as it did under the [2012 Supply] Agreement, regardless of whether the Merchandise to be returned … was purchased before or after the Extension Effective Date…." (DeVito Decl., Exh. 1, § 8.). Nevertheless, Defendant did not give A&P its $413,000 or notify A&P in writing that it would not do so. (*See* DeVito Decl., ¶ 116.)

Six days after entering into the Extension Agreement, A&P attempted to use $166,164.49 in credits for pre-petition returns to pay Defendant's invoice. Defendant refused to accept the credits and forced A&P to pay in cash instead. Its only explanation was:

> Payment in the amount of $1,179,660.95 is due today, 09/16/15…This total includes $166,164.49 for partial payback for an unauthorized deduction taken on 9/14/15 for returns credits dated 7/7/15 through [the Petition Date of] 7/19/15. Under the terms of the bankruptcy, A&P is not entitled to take this portion of the credit amount for these dates.

(Devito Decl., Exh. 17.) A&P had already been told, as Defendant's Ms. Workman put it, that "they had to pay the <u>exact</u> amount that I tell them to pay each morning, or, Jenifer Towsley will immediately stop shipping them." (DeVito Decl., Exh. 18.) A&P paid. (DeVito Decl., ¶ 118.)

29

Defendant has kept approximately $579,000 in return credits that it owes A&P under the parties' contracts, as recorded on Defendant's own books and records, without A&P's consent or Court permission. Defendant's inequitable conduct with respect to the $579,000 in credits, like its conduct with respect to the $569,000 in rebates, appears to be a clear violation of the automatic stay and provides equitable grounds for denying Defendant a setoff.  At a minimum, Defendant's Motion does not state facts sufficient to justify a summary judgment dismissing Plaintiff's Fourth Claim for Relief, which seeks to reduce the amount of Defendant's 503(b)(9) Claim and to deny Defendant a setoff based on its seizure of the credits as well as the rebate discussed above.  Once more, Defendant's Memorandum of law does not address the issue.

Jenifer Towsley states in her Declaration in support of the Motion that, "At no time from execution of the Extension, through … April 2016 … did Debtor ask for … credits for Merchandise returned prior to the Petition Date…" (*See* Towsley Decl., Main Case Docket No. 5062-18, ¶ 19.)  Apparently, Ms. Towsley is trying to show that A&P agreed with Defendant's interpretation of the Extension Agreement which would deny A&P its right to the credits. Given A&P's attempt to use $166,164.49 in "returns credits dated 7/7/15 through 7/19/15" a few days after the execution of the Extension Agreement as just discussed, however, Ms. Towsley's statement is undeniably untrue.

C.   Defendant's $2 Million "Alternate" Account for Post-Bankruptcy Credits

As of December 15, 2015, Ms. Towsley directed that approximately $134,000 "should remain on the alternate account set up to capture credits we do not want to pay to A&P.  We will apply against the balances ***following the close of bankruptcy***."  (DeVito Decl., Exh. 2 (emphasis added).)  Nevertheless, Ms. Towsley testified at her Rule 30(b)(6) deposition that the "alternate account" had a different purpose, held only a $2 million deposit that was returned, and had no current balance.  (*See* Milin Decl., Exh. 5 at 243-50.)

In fact, according to documents that Defendant produced in mid-2021, the "alternate" account records approximately 50 transactions in addition to the return of A&P's $2 million deposit and its balance, as of mid-2021, showed $2,042,885.96 owed to the Debtor. (*See* DeVito Decl., ¶ 123.)  Defendant's Rule 30(b)(6) witness for credit issues testified that she did not know about the account.  (*See* Milin Decl., Exh. 4 at 340-41.)

Despite Plaintiff's efforts, the "alternate" account and a significant portion of its $2 million balance remains unexplained.  That money, according to Defendant's books and records, is owed to A&P, and it is grossly inequitable – and an apparent violation of the automatic stay – for Defendant to keep it.  Nevertheless, it appears that Defendant has been holding at least the credits portion of the $2 million to execute a setoff against its unsecured claim. (*See* Milin Decl., Exh. 4 at 234-35, 256-59, 287-89.)  It would be inequitable to allow Defendant to apply that money to reduce its unsecured claim – rather repaying it or at least applying it against its § 503(b)(9) Claim – without justifying its right to do so.

D.    <u>Defendant Seized $134,503.57 in Credits that Should Be Returned to the Debtor.</u>

As Ms. DeVito's Declaration explains, in late 2015, Defendant deducted $134,503.57 (the "$134k Credit") from sums it owed to the Debtor without A&P's consent or Court permission. After Defendant stopped doing business with the Debtor, it decided that it had paid the Debtor credits during post-petition transactions for goods that the Debtor had returned after the Petition Date, but purchased pre-petition and did not pay for.  Defendant offered no proof; it simply seized $134,503.57 from a deposit it was required to return to the Debtor based on a factually unjustified estimate of what it called "overfunded" returns.  Defendant then placed the $134,503.57 in its "alternate account set up to capture credits we do not want to pay to A&P" to "apply against the balances following the close of bankruptcy." (DeVito Decl. at pp. 4-5, ¶¶ 92-104, Exh. 2.)  The $134k Credit was still in Defendant's "alternate account" in mid-2021.

31

(DeVito Decl., ¶ 98.)  It would be inequitable to allow Defendant to apply the $134k Credit

against its unsecured claim without justifying its right to do so.

E.    Defendant Is Holding $44,032.76 in Credits that It Owes to the Debtor.

The parties' September 8, 2015 Extension Agreement states that, if credits for goods

returned after the Debtor stopped its pharmacy business were not refunded to the Debtor, they

were "to be applied in partial satisfaction of McKesson's § 503(b)(9) claim."  (DeVito Decl.

Exh. 1, ¶ 7.)  Ms. DeVito's Declaration sets out the facts indicating that Defendant's books and

records include a credit of $44,032.76 ("$44k Credit") designated as owed to the Debtor for

goods returned after it stopped its pharmacy business.  (*See* DeVito Decl., ¶¶ 85-91.)  However,

neither Defendant nor its expert deducted the $44k Credit from Defendant's § 503(b)(9) Claim,

and it remains on Defendant's books, presumably to be applied against its unsecured claim or

after A&P's bankruptcy instead.  (*Id.*)  It would be inequitable to allow Defendant to apply the

$44k Credit against its unsecured claim, contrary to its express contractual commitment, without

even justifying its right to do so.  Yet that would be the effect of granting Defendant's motions.

F.    Defendant Is Holding $22,918.39 of the Debtor's Money Without Justification.

Defendant deducted $22,918.39 from its final payment to the Debtor in June 2016 and

recorded a credit on its books in that amount.  Plaintiff has not found any communications from

Defendant to the Debtor explaining this unilateral deduction.  Internal McKesson emails provide

a potential explanation, but not a justification.  (*See* DeVito Decl., ¶¶ 105-09.)

Based on the foregoing six instances of the Defendant's inequitable conduct, Defendant

should be denied a summary judgment allowing it to exercise any setoff in any amount against

either its "fixed" 503(b)(9) Claim or its potential preference liability.  There are, at a minimum,

genuine issues of material fact that the Court should consider – based on a full factual record –

before granting Defendant an equitable remedy.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should deny Defendant's Motion in its entirety

and grant such other and further relief as may be just and proper.

Dated:  May 6, 2022

GRIFFIN HAMERSKY LLP

By: <u>*/s/ Richard Milin*</u>
Scott A. Griffin
Michael D. Hamersky
Richard K. Milin
420 Lexington Avenue, Suite 400
New York, New York 10170
rmilin@grifflegal.com
Telephone: (646) 998-5580
Facsimile:  (646) 998-8284

*Counsel for The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of The Great Atlantic & Pacific Tea Company, Inc., et al.*