Jeffrey K. Garfinkle (admitted *pro hac vice*)
Daniel H. Slate (California State Bar No. 78173)
BUCHALTER Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
Fax: (949) 720-0182
jgarfinkle@buchalter.com
dslate@buchalter.com

Tracy L. Klestadt
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone:  (212) 972-3000
Fax:  (212) 972-2245
tklestadt@klestadt.com

Counsel for Defendant
McKesson Corporation

Hearing Date:
May 18, 2022 at 10:00 a.m.

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. | Case No. 15-23007 (lgb) |
| Debtor. | |
| The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. | |
| Plaintiff | Adv. Proc. No. 17-08264 (lgb) |
| v. | |
| McKESSON CORPORATION | |
| Defendant | |

## McKESSON CORPORATION'S MOTION TO STRIKE PORTIONS OF THE DECLARATION OF DAWN DeVITO

Defendant McKesson Corporation ("McKesson"), by and through its undersigned counsel, respectfully moves to strike various portions of Dawn DeVito's declaration, offered in support of plaintiff The Official Committee of Unsecured Creditors' ("Plaintiff") opposition to McKesson's motions for summary judgment, as follows:

### MOTION TO STRIKE

Dawn DeVito's 38-page declaration is replete with inadmissible "testimony." This motion to strike is directed to two improprieties. First, notwithstanding that Plaintiff did not designate Ms. DeVito as an expert in this case,[1] Ms. DeVito attempts to offer many expert opinions and improper lay opinions (prohibited by Federal Rule of Evidence 701). Second, Ms. DeVito's declaration contains many hearsay statements and factual suggestions without foundation, which McKesson submits the Court should strike out of hand.

In considering this Motion to Strike, the Court should be mindful of these key points about Ms. DeVito:

- Ms. DeVito was first employed by the Debtor, as a member of its accounting department, in May 2015—two months before the bankruptcy filing;

- Ms DeVito had no role or involvement in either the negotiation of the Supply Agreement or the August/September 2015 Extension Agreement.

- Ms. DeVito had no role or involvement, whatsoever, in Debtor's pharmacy operations. Quoting Ms. DeVito: "Nobody on my team handled the pharmacy." DeVito Depo., p. 23, lines 7-8, 14. As Debtor's long-time director of pharmacy operations, Robin Page testified she never had dealings with Ms. DeVito.

- From the start of her employment through the Spring of 2016, Ms. DeVito had no involvement whatsoever with either McKesson or McKesson and Debtor's reconciliation of amounts owed or owing under the Supply Agreement. *See e.g.*, DeVito Depo., p. 88., lines 17-21 (Question: "Were you involved, at any time

---

[1] And indeed affirmatively represented that the only experts it intended to rely upon are the two previously identified and deposed.

> between November 2015 and the spring of 2016, in the reconciliation process
> between McKesson and A&P?"  Answer: "No.")

As this testimony shows, Ms. DeVito lacks any personal knowledge of Debtor's business dealings with McKesson and is not permitted to offer testimony about these dealings.

## A.   The Court should Strike Ms. DeVito's Lay and Expert Opinions and Testimony

Plaintiff did not designate Ms. DeVito as a purported expert in this case, as required by Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure.  Further, in communications between the parties regarding the identities of all experts, counsel for the Plaintiff made clear that Plaintiff was not presenting Ms. DeVito as an expert witness in this case.

Notwithstanding this, Ms. DeVito offers many expert opinions and improper lay opinions and conclusions in her declaration.  Exhibit A goes through Ms. DeVito's declaration paragraph by paragraph and identifies statements that should be stricken.   To give the court a better understanding of the erroneous language,

(1)   At page 5, lines 6-8, Ms. DeVito offers a "non-lawyer's accountant's view" of McKesson's treatment of certain monies, concluding that the treatment was "improper" and a "clear violation" of the automatic stay.

(2)   At page 5, lines 26-30, Ms. DeVito offers her opinion "as an accountant" regarding the propriety of McKesson's treatment of certain credits.

(3)   At page 11, line 2-3, Ms. DeVito offers her opinion about Mr. Berk's treatment of certain credits as "unjustifiable as a matter of fact and as a matter of accounting practice."

(4)   At page 13, paragraph 31, Ms. DeVito offers her opinions regarding the deficiency of McKesson's records "as an accounting matter."

(5)   At page 17, paragraph 46, Ms. DeVito offers a summary opinion regarding McKesson's deliveries of approximately $127,000 in Merchandise as "an accounting matter."

(6)    At page 19, paragraph 55, Ms. DeVito offers her opinion regarding the value of Defendant's Merchandise for purposes of McKesson's subsequent new value defense.

(7)    At page 20, paragraph 57, Ms. DeVito offers her belief regarding the true purchase price and fair value of McKesson Merchandise "as an accounting matter."

(8)    Notwithstanding that Plaintiff retained an expert to respond to Charles Berk's expert opinions, Ms. DeVito now offers her own opinions and separate calculations. (See paragraphs 65-68.)

(9)    At page 36, paragraph 120, Ms. DeVito offers her personal opinion about the unfairness of statutory setoff, as previously ruled upon by the Court.

Because Ms. DeVito is not a designated expert in this case and lacks personal knowledge of Debtor's business dealings with McKesson, her opinions should be stricken.[2]

**B.    The Court Must Strike those Portions of Ms. DeVito's Declaration Based on Hearsay or Without Proper Foundation**

Ms. DeVito's declaration reads like counsel's argument, not a factual declaration. As is clearly evident from the declaration, many of the declaration's statements are based not on Ms. DeVito's personal knowledge, but hearsay or supposition. McKesson submits the Court should strike those portions.

Examples include the following:

(1)    At page 7, paragraph 10. Ms. DeVito declares that Debtor's CFO Tim Carnahan reached out to McKesson "personally" to obtain information necessary to reconcile McKesson's section 503(b)(9) claim, but McKesson did not provide it. This is hearsay, and Ms. DeVito offers no foundational basis for her knowledge.

---

[2]  Attached hereto as Exhibit B are a series of emails dated December 13 and 14, 2021, between Mr. Milin as counsel for the Plaintiff, and Mr. Slate, as counsel for McKesson. In Mr. Milin's December 13 email, he used the phrase "[o]ur expert" and he confirmed in an email dated December 14, that the Plaintiff did not plan to "offer any additional experts or expert reports" and that he meant Mr. Pederson was the only expert from Plaintiff that was to be deposed.

(2)   At page 7, paragraph 11, Ms. DeVito's conclusion that Debtor did not reach an agreement with McKesson as to the amount of McKesson's section 503(b)(9) claim is based on her review of unspecified written communications between Mr. Carnahan and McKesson and Mr. Carnahan's hearsay communications with Ms. DeVito. So, either Ms. DeVito is offering the hearsay comments of Mr. Carnahan or her opinion is based on hearsay communications.

(3)   At page 7, paragraph 12, Ms. DeVito opines about the basis of McKesson's final payment in June, 2016. Ms. DeVito contends that payment was made in response to requests from Mr. Carnahan. No foundation is given for this contention, and Mr. Carnahan's communications are hearsay.

(4)   At page 8, paragraph 15, Ms. DeVito claims that McKesson has been reluctant to provide information about credits and rebates, both before and after Debtor's bankruptcy. No foundation is given for this statement, and it most likely is premised on hearsay and speculation.

(5)   At page 10, paragraph 22, Ms. DeVito offers testimony of matters for which she had no personal involvement, namely McKesson depositions. Ms. DeVito offers no foundation for her statements. Ms. DeVito did not attend the referenced depositions. The statements contained in the paragraph are clearly the unsupported arguments of Plaintiff's counsel.

(6)   At page 12, paragraph 27, Ms. DeVito testifies that McKesson "began withholding" key information. There is no foundation given for this statement, and Ms. DeVito offers no evidence, let alone evidence of which she had personal knowledge, that McKesson had any duty to provide the referenced information, particularly after Debtor had deducted "unauthorized" credits. (See reference to the "unauthorized" deduction at page 12, paragraph 28.)

(7)    At page 13, paragraph 32, Ms. DeVito suggests that Debtor's pharmacies at the store level could not locate the subject deliveries. Notably, no foundation is given for this

statement. Nor has Plaintiff introduced any evidence to support this suggestion.

(8)    At page 23, paragraph 69, Ms. DeVito claims that McKesson owed Debtor a credit of more than $327,500. Ms. DeVito's claim is not based on evidence – it is just a guess based on a self-constructed conspiracy theory. She surmises that Ben Zimmerman created a secret account, but she admits she lacks personal knowledge of this. (See pp. 23-24, paragraph 70.)

(9)    At page 24, paragraph 74, Ms. DeVito testifies as to communications from Plaintiff's counsel to McKesson counsel. Not only does Ms. DeVito not have personal knowledge of these communications, but the communications are hearsay. Again, this is further support that Ms. DeVito's declaration is nothing more than plaintiff counsel's argument.

The foregoing is just a partial list. As set forth in the attached, Exhibit A, Ms. DeVito's thirty-eight page declaration is filled with improper opinions and conclusions, unsupported factual contentions, hearsay, conspiracy theories, and the arguments of its counsel. Plaintiff's goal is obvious – muddy the waters with patently inadmissible testimony.

## C.    Conclusion

The Court should look carefully at Ms. DeVito's declaration. It is not a declaration based on Ms. DeVito's personal knowledge as a percipient witness. It is an attempt to offer a host of

expert and inappropriate lay opinions, untamed contentions, and argument.  McKesson submits the Court should strike all of Ms. DeVito's proferred opinions and argument, paring the declaration down to just the facts of which she has personal knowledge.

DATED: May 13, 2022

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS LLP

By:  /s/ *Tracy L. Klestadt*
Tracy L. Klestadt, Esq.
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone:  (212) 972-3000
TKlestadt@Klestadt.com

and

BUCHALTER, A Professional Corporation
Jeffrey K. Garfinkle, Esq.
(Cal Bar. No. 153496; admitted *pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
jgarfinkle@buchalter.com

Attorneys for MCKESSON
CORPORATION

**Exhibit A**

| Paragraph of Declaration | Language to be Stricken | McKesson's Reason to Strike | Ruling to Strike or not Strike |
|---|---|---|---|
| Paragraph 6 | "I have concluded … that Defendant's 503(b)(9) Claim should be reduced by approximately $941,760.84 because of the overstated claim amounts, credits due to the Debtor and improper seizure of the Debtor's assets." | Improper expert and lay testimony and opinion | |
| Paragraph 9 | "I have also concluded that Defendant's calculations for its SNV defense should be reduced because they include the $127k Overstatement and are based on inflated invoices." | Improper expert and lay testimony and opinion | |
| Paragraph 10 | "The Debtor's CFO Tim Carnahan reached out to Defendant personally to obtain the information necessary to reconcile its claim, but Defendant did not provide it." | Hearsay; Lack of Foundation | |
| Paragraph 11 | "The Debtor never agreed with Defendant on a reconciliation of Defendant's 503(b)(9) Claim" | Hearsay; Lack of Foundation; Improper lay testimony and opinion | |
| Paragraph 12 | "That payment was made in response to multiple requests from Mr. Carnahan who had left as the Debtor's CFO in March 2016, three months earlier." | Hearsay; Lack of Foundation | |
| Paragraph 13 | "However, Mr. Carnahan continued to seek payments from Defendant until June 2016. As of that time, the parties had not reached agreement with respect to the proper amount of Defendant's claims." | Hearsay; Lack of Foundation | |
| Paragraph 14 | "Mr. Carnahan was in regular contact with Defendant's officers through June 2016 …" | Hearsay; Lack of Foundation | |

| Paragraph 15 | "The truth is that Defendant has not cooperated with the Debtor in taking steps toward reconciliation." | Improper lay and expert opinion and testimony; Hearsay | |
| Paragraph 22 | "Instead, they testified from written summaries that, Plaintiff's counsel discovered, Defendant's counsel prepared to serve as the basis for their testimony." | Improper lay and expert opinions and testimony; Hearsay | |
| Paragraph 23 | "I believe that Mr. Berk's omission of specific information about the credits is unjustifiable both as a matter of fact and as a matter of accounting practice" | Improper lay and expert opinion and testimony | |
| Paragraph 26 | "For the reasons discussed below, I have now determined that Defendant's 503(b)(9) Claim is overstated by significantly more that the three sums mentioned …" | Improper lay and expert opinion and testimony | |
| Paragraph 27 | "In some cases, Defendant deducted money from sums it owed to the Debtor, and recorded a corresponding credit on its books, without explaining its actions to the Debtor." | Hearsay; Lack of Foundation; Improper lay and expert opinion and testimony | |
| Paragraph 30 | "Defendant's SNV defense and 503(b)(9) Claim are overstated because they both include the '$127k Overstatement;'" | Improper lay and expert opinion and testimony | |
| Paragraph 31 | "Defendant's statement that its own records somehow 'conclusively evidence delivery' –despite the lack of proof of shipment, delivery or receipt-is, as an accounting matter, unjustifiable and incorrect." | Improper lay and expert opinion and testimony | |
| Paragraph 32 | "I believe that, if the $127,692.46 Defendant claims it is owed represented actual deliveries, the Debtor would have a | Improper lay and expert opinion and | |

|  | | testimony | |
|---|---|---|---|
|  | record of them.    Among other things, deliveries were recorded at the individual store level, so the 355 deliveries that Defendant totals to make up the $127k Overstatement could only have been missed if each of the many pharmacies that the Defendant claims received them, allegedly on three different dates, somehow missed them." | | |
| Paragraph 33 | "I could not look at computerized pharmaceutical inventory records or the Retech system because the Debtor does not have access to them.    However, Defendant has not identified any relevant records from those sources either, even though A&P licensed its pharmacy software from McKesson." | Improper lay opinion and testimony | |
| Paragraph 34 | "Defendant's inability to prove that the Debtor owes the $127k Overstatement is due to Defendant's own actions, not the Debtors." | Improper lay and expert opinion and testimony | |
| Paragraph 39 | "Defendant has not adequately explained why the invoices, if genuine, were not billed immediately after delivery in accord with Defendant's usual practice." | Improper lay and expert opinion and testimony | |
| Paragraph 46 | "Given the foregoing facts, I believe the undisputed facts show that the Debtor does not owe Defendant the $127,692.46 it seeks.    Absent proof that Defendant actually delivered the $127,692.46 in merchandise identified in the invoices at issue, Defendant is not entitled to compensation for that merchandise, either as part of its 503(b)(9) Claim or as part of its SNV defense.  As an accounting matter, Defendant's invoices, without more, are not enough." | Improper lay and expert opinion and testimony | |
| Paragraph 47 | "Defendant overstated its deliveries to the Debtor at the time by approximately $1 million."

"I believe Defendant's claim for | Improper expert testimony | |

|  | | | |
|---|---|---|---|
|  | $127,692.46, for which neither Defendant nor Mr. Berk have been able to provide proof, is similarly inaccurate." | | |
| Paragraph 48 | "Defendant's calculation of its 503(b)(9) claim assumes that its invoice amount correctly reflects A&P's purchase price and the fair value of the merchandise A&P received from Defendant.    That assumption is incorrect because of the two-step process by which A&P paid Defendant for OS generic merchandise. In accord with the parties' contract, A&P's invoices were systematically inflated by 20%, which an automatic rebate reimbursed in full, usually *before* A&P paid the invoice amount." | Improper lay and expert opinions testimony | |
| Paragraph 50 | "In fact, those invoices were systematically inflated." | Improper lay and expert opinion and testimony | |
| Paragraph 53 | "Given the parties' two-step payment process, I believe that Defendant's invoices for OS generic merchandise did not represent the fair value of that merchandise."<br><br>"As a result, A&P's out of pocket cost was only the net amount of $100,000. That, and not the artificially inflated invoice amount, was the true purchase price in my view." | Improper lay and expert opinion and testimony | |
| Paragraph 54 | "I understand that Defendant made its profit on generic sales to A&P from discounts and incentives it received from manufacturers.    In other words, my understanding is that the invoices that Defendant received from manufacturers, which it then marked up by 20% for A&P and in effect marked down with rebates, were themselves inflated above Defendant's actual cost." | Lack of Foundation; Improper lay and expert opinion and testimony | |
| Paragraph 55 | "In these circumstances, I believe that the | Lack of | |

| | | | |
|---|---|---|---|
| | value of Defendant's merchandise was not the amount written on Defendant's invoices; it was the amount that, as a practical matter, A&P actually paid." | Foundation; Improper lay and expert testimony and testimony | |
| Paragraph 56 | "As a result [of recovering June and withholding July rebates], Defendant's invoices for June and July, 2015, and its SNV calculations based on those invoices, are inflated by $517,367 for June purchases, and $311,632.72 for July, totaling approximately $829,000" | Lack of Foundation; Improper lay and expert opinion and testimony | |
| Paragraph 57 | "I believe that as an accounting matter, and to reflect the true purchase price and fair value of the OS generic merchandise A&P received, Defendant's 503(b)(9) Claim and SNV amounts both should be adjusted." | Lack of Foundation; Improper lay and expert opinion and testimony | |
| Paragraph 63 | "Given these facts, Defendant's 503(b)(9) Claim is overstated by $311,632.72 for July 1-18, minus four days for A&P's payments from July 14-17, plus two days for June 29 and 30. In other words, a fair estimate is that Defendant's 503(b)(9) Claim is overstated by $311,632.72 minus two days." <br><br> "Accordingly, a fair estimate of the amount by which Defendant overstated its claim is $311,632.72 minus $34,624 or approximately $277,000." | Lack of Foundation; Improper lay and expert opinion and testimony | |
| Paragraph 64 | "I have also calculated the amount by which Defendant's SNV defense is overstated because of inflated invoices. That amount is $742,771.88 …" | Lack of Foundation; Improper lay and expert opinion and testimony | |
| Paragraph 65 | "As discussed above, the rebate was essentially equivalent to the 20% inflation of Defendant's invoices for OS generic merchandise." | Lack of Foundation; Best Evidence | |

| | | Rule; Improper lay and expert opinion and testimony | |
|---|---|---|---|
| Paragraph 66 | "As a result, the full overstatement inflated Defendant's SNV amount, and decreased Defendant's calculation of its preference exposure, dollar for dollar."<br><br>"Defendant's inflation of its invoices had a smaller effect on Defendant's 503(b)(9) Claim because the 503(b)(9) Claim only includes goods that the Debtor did not pay for, whereas the SNV calculations (if a defendant gets credit for paid new value) include all of the merchandise Debtor received." | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony | |
| Paragraph 67 | "The second table also adjusts Mr. Berk's calculation for Defendant's inflation of its June 2015 OS generic invoices. Defendant itself calculated A&P's rebate for OS generic purchases in June to be $517,367, as stated above, which is substantially equivalent to the amount by which it overstated its June 2015 invoices. However, Defendant's net preference exposure decreases to zero as of June 5, 2015 because of Defendant's deliveries that morning. Also correcting Mr. Berk's calculations by reducing the value of Defendant's deliveries before June 6 would not increase Defendant's net preference exposure above zero as of June 5. The second table therefore ignores Defendant's overstatement for June 1 through June 5, and only deducts Defendant's overstatement of its invoices from the new value calculation from its new value calculation for the period from June 6 through June 30, which is 5/6 of the month." | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony | |
| Paragraph 68 | "As the table shows, adjusting Defendant's potential preference exposure | Lack of Foundation; | |

| | | | |
|---|---|---|---|
| | "for both the $127k Credit and Defendant's inflated invoices leaves Defendant with a potential preference exposure of $10.6 million, not $9.7 million. It also means that avoiding seven transfers, not just six, could yield a recovery in this proceeding, even if Defendant's other assumptions and legal positions are accepted." | Best Evidence Rule; Improper lay and expert opinion and testimony | |
| Paragraph 69 | "Defendant's 503(b)(9) Claim is overstated because it fails to subtract the '$327k Credit' of $327,561.90 which appears on Defendant's own records as owing to the Debtor." | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony | |
| Paragraph 77 | "Despite Defendant's failure to explain the $327k Credit, its records provide a clear indication of what the Credit is for. Defendant's accounting records designate the Credit as from the 'Buyback Program.'" | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony; Hearsay | |
| Paragraph 80 | "Despite the terms of the Extension Agreement, the documentary record indicates that Defendant's procedures changed in two relevant ways. First, Defendant appears to have decided that it would only pay the Debtor after Defendant had already received cash for the Debtor's returns." | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony | |
| Paragraph 82 | "Given the changes in Defendant's procedures, and Defendant's testimony that manufacturers could withhold return credits for substantial periods of time, it seems likely that the $327k Credit is made up of sums that Defendant received from manufacturers for the Debtor's post- | Lack of Foundation; Improper lay and expert opinion and testimony | |

| | | | |
|---|---|---|---|
| | petition returns after Defendant's last payment in June 2016 and did not pay to the Debtor. Whether or not this explanation is correct, however, the fact remains that Defendant's own records show that it owes the $327k Credit to the Debtor because of the parties' Buy-Bank Program" | | |
| Paragraph 83 | "The documents I have reviewed indicate that the $327k Credit is not due on account of prepetition returns. Defendant calculated and recorded credits owed to A&P for prepetition credits elsewhere in its books, including three groups of credits totaling more than $579,000 which Plaintiff seeks to recover in the Amended Complaint." | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony | |
| Paragraph 84 | "For these reasons, I believe that Defendant owed the Debtor the $327k Credit which should either be paid to the Debtor or be deducted from Defendant's 503(b)(9) Claim." | Lack of Foundation; Improper lay and expert opinion and testimony | |
| Paragraph 86 | "The fact that the $44k Credit appears in Defendant's accounting records as owed to the Debtor suffices, in my view to establish that it is actually owed to the Debtor absent a clear factual demonstration to the contrary. I am aware of no facts to the contrary. Instead, the documentary record provides evidence to support my conclusion that the $44k Credit is owed to the Debtor and should, at a minimum, reduce Defendant's 503(b)(9) Claim" | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony | |
| Paragraph 90 | "In reviewing the parties' documents and accounting records, I have seen no evidence that the $44k Credit was ever paid to the Debtor." | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and | |

| | | testimony | |
|---|---|---|---|
| Paragraph 91 | "For these reasons, I believe that the undisputed facts demonstrate that Defendant owed the Debtor the $44k Credit which, if not refunded, should be deducted from Defendant's 503(b)(9) Claim." | Lack of Foundation; Improper lay and expert opinion and testimony | |
| Paragraph 92 | "Defendant's accounting records show that it owed the Debtor the "$134k Credit" of $124,503.57 because Defendant unilaterally deducted that amount from a deposit it was required to return to the Debtor at the conclusion of their post-petition transactions. For the reasons set forth below, I believe Defendant's deduction was improper." | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony | |
| Paragraph 93 | "The $134k Credit represents the value of merchandise that was in A&P's possession before its bankruptcy which A&P returned to Defendant after its bankruptcy in the expectation of receiving credit pursuant to the parties' agreements and usual course of business."<br><br>Whether or not A&P paid, however, Defendant took valuable property from A&P's bankruptcy estate after its Petition Date—without consent or permission—in order to apply the value to Debtor's pre-petition debts. In my non-lawyer's view, that appears to be a clear violation of the automatic stay." | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony | |
| Paragraph 94 | "The emails show that she had decided that Defendant must have given the Debtor return credits after its Petition Date for goods that the Debtor had not paid for because of the bankruptcy. She did not have proof, so she made up a formula which, in her view, estimated the amount Defendant had paid in credits for goods that A&P returned but did not pay for. She then unilaterally deducted $134,503.57 from sums Defendant admitted it owed to | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony Hearsay | |

|  |  |  |  |
|---|---|---|---|
|  | the Debtor based on her estimate, claiming that the $134,503.57 reflected 'overfunded returns.'" |  |  |
| Paragraph 96 | "Although Ms. Towsley's email states that she had discussed her calculation with 'the A&P CFO,' Mr. Carnahan has informed me that he did not agree with Ms. Towsley …'" | Lack of Foundation; Hearsay |  |
| Paragraph 99 | "Ms. Towsley's formula for estimating how much Defendant had paid to A&P in credit for goods purportedly not paid for, in my view, was not a sound basis for an estimate." | Improper lay and expert opinion and testimony |  |
| Paragraph 100 | "Defendant's role in the Debtor's returns was essentially that of middleman, crediting Debtor for a percentage of its returns and obtaining its own credit for the returns from manufacturers." | Lack of Foundation; Improper lay and expert opinion and testimony |  |
| Paragraph 101 | "In addition, Ms. Towsley's formula does not take into account the fact that Defendant had already withheld $579,000 in credits for merchandise purchased and returned before A&P's bankruptcy. Unless Defendant is prepared to show that A&P paid for all of he merchandise on which Defendant withheld the $579,000 in credits, Defendant withheld credits on some merchandise twice." | Lack of Foundation; Improper lay and expert opinion and testimony |  |
| Paragraph 102 | "Whether or not Ms. Towsley's calculation was a reasonable estimate of credits Defendant allegedly paid for returned goods that the Debtor did not pay for, I believe her unilateral actions, for which she cited no contractual support and provided no factual documentation, were improper as a matter of business and accounting practice. I also believe that Ms. Towsley did not have the legal right to take the Debtor's post-petition property with the express intention of applying it to the Debtor's pre-petition debts." | Lack of Foundation; Improper lay and expert opinion and testimony |  |

| Paragraph 103 | "Further, Ms. Towsley's actions appear to violate Section 8 of the Extension …" | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony | |
|---|---|---|---|
| Paragraph 104 | "Given the foregoing facts, I believe the undisputed facts establish that it was improper for Defendant to deduct $134,503.57 from the deposit it owed to the Debtor. In my view, the $134k Credit should be paid to the Debtor or, at a minimum, deducted from Defendant's 503(b)(9) Claim." | Lack of Foundation; Best Evidence Rule; Improper lay and expert opinion and testimony | |
| Paragraph 115 | "In July and August 2015, soon after A&P's bankruptcy, Defendant decided that it would not pay A&P approximately $413,000 in credits that Defendant owed it for returned merchandise. Defendant did not inform A&P in writing at the time." | Lack of Foundation; Improper lay and expert opinion and testimony; Hearsay | |
| Paragraph 119 | "Defendant has kept approximately $579,000 in return credits that I believe it owes the Debtor, as recorded on Defendant's books and records, without the Debtor's consent or Court permission." | Lack of Foundation; Improper lay and expert opinion and testimony | |
| Paragraph 120 | "In my view, it would be unfair to allow Defendant to exercise a setoff against the sums it owes the Debtor because of Defendant's repeated actions in taking the Debtor's money without the Debtor's consent, Court permission or what I consider a plausible justification." | Lack of Foundation; Improper lay and expert opinion and testimony | |
| Paragraph 124 | "In my view, Defendant should be | Lack of | |

| | | | |
|---|---|---|---|
| | required to explain why it has not paid the Debtor the $2 million that Defendant's own books and records show to be owed." | Foundation Improper lay and expert opinion and testimony | |
| | | | |

EXHIBIT B

## Slate, Daniel H.

| | |
|---|---|
| **From:** | Richard Milin <rmilin@grifflegal.com> |
| **Sent:** | Tuesday, December 14, 2021 12:52 PM |
| **To:** | Slate, Daniel H. |
| **Cc:** | Michael Hamersky; Garfinkle, Jeffrey K.; Harvey, Brian T.; Winick, Steven H.; Tracy Klestadt |
| **Subject:** | Re: reply to your response to 12.13.21 supplement to 11.30.21 list of unanswered questions to Plaintiff [IWOV-BN.FID1434304] |
| **Attachments:** | Griffin v1.png |

This message has originated from an **External Email**. rmilin@grifflegal.com <rmilin@grifflegal.com>:

See below.

I agree that truth matters, Richard. In that vein, tell me what is meant in your 12.1.21 email by the phrase: "your list of questions in your prior email also includes questions we have no obligation to answer." Sounds like a refusal to me. And, of course, not until your email received late yesterday afternoon have you addressed any of those questions raised in my emails from 11.4, 11.12, 11.23 or 11.24.

Your statement is disingenuous at best. I said, as recorded in this email, "Your statement that I have "refused" to discuss **the topics you mention** is wrong, as are other statements in your email, some of which are corrected below." (emphasis added). That is fully consistent with my statement, which I assume you quote correctly, that "your list of questions in your prior email also **includes** questions we have no obligation to answer." (emphasis added). As you will note, the two statements are fully consistent and there has been no refusal to to respond when we are obligated or it is appropriate to do so. Some questions you ask are questions we have no obligation to answer, but questions about deposition scheduling are appropriate, and we have answered them.

By now you should have received the link to pdfs of the most recent production.

Yes, thanks.

I apparently misunderstood your use of the new term "Workman documents" to mean the Pathmark Reports that you had asked me about back on November 3. In any event, I said that we have asked Consilio to provide Bates stamp information for the Pathmark Reports, and we expect they will provide that information. Nothing more. Your attempt to broaden that to include anything other than the reports is rejected. It is our hope that your receipt of the Bates information will put to rest your false assertions that the Pathmark reports were not produced.

1

You are obligated to provide us with whatever you provided to your expert.  If that was more than the Pathmark Reports -- that is, the emails and attachments -- then we are entitled to them.  Your "rejection" is meaningless.  Will you or will you not provide us, as the Rules and our document requests require, with every arguable "Workman document" you provided to your expert?  Again, if we need to go to the Court over this issue, we will.  Also, I note that you give no reason for providing Bates numbers instead of documents except to impose additional costs on us and delay depositions.  By the way, I never made the "false assertion" you state; again, you misrepresent and exaggerate what I actually said.

As to depositions,

a.   Please direct me to any statement from me that suggests that "expert depositions would address the new claims."  Please identify what experts you intend to use with respect to these claims.

I asked to move ahead with depositions, saying that I didn't believe the experts had anything to say about the new claims.  You disagreed.  We do not plan to offer any additional experts or expert reports and assume you don't either.  We have dealt with this issue with the Court before.

b.   1.   Please confirm that your reference to "[y]our expert" means Mr. Pederson. **Yes.**
     2.   When you ask about the availability of McKesson's, I assume you mean Mr. Berk of CBIZ. **Yes.**

c.   1.   We received this morning an email from you entitled "Our 30(b)(6) Topics" and will get back to you with any questions or concerns.  One immediate clarification.  We will construe the word "credits" is to mean only "product return credits."
     2.   This is the first time you have indicated an interest in deposing Ms. Workman.  McKesson reserves all of its rights with respect to that interest.  **I'm not sure you're right about our not mentioning Ms. Workman before, but our review of documents does show her role to be central.  Of course you reserve your rights, as we reserve ours.**

d.   You confirm that Plaintiff will not introduce any fact witness other than Mr. Carnahan on the topics of rebates and product return credits.  That said, you acknowledge that McKesson has the right to depose Ms. DeVito.  So there is no confusion, McKesson intends to depose Ms. DeVito.

No - that's not at all what I said, and you should not be misrepresenting my statements like that.  I thought you expressed agreement that truth matters...

Here's what I actually said, recorded in this email chain, under the topic heading "as to depositions":  "We do not propose to offer other fact witnesses *for deposition* on the topic." (emphasis added).  You inappropriately omitted the reference to depositions and changed my words to "introduce," which refers to trial.

We don't plan to provide deposition witnesses other than DeVito and Carnahan.  We do not know whether we will need to "introduce" additional fact witnesses at trial, particularly given that the documents

2

you just produced haven't yet been reviewed. We also do not know whether Mr. Carnahan has information relevant to the rebates and credits.

For the record, silence does not mean consent.

Richard

Richard K. Milin (Bio)
Griffin Hamersky LLP
420 Lexington Avenue | Suite 400 | New York, NY 10170
T: 646.998.5580 | F: 646.998.8284 I C: 917.975.1326
Email: rmilin@grifflegal.com
Website: www.grifflegal.com

On Tue, Dec 14, 2021 at 2:13 PM Slate, Daniel H. <dslate@buchalter.com> wrote:

I agree that truth matters, Richard. In that vein, tell me what is meant in your 12.1.21 email by the phrase: "your list of questions in your prior email also includes questions we have no obligation to answer." Sounds like a refusal to me. And, of course, not until your email received late yesterday afternoon have you addressed any of those questions raised in my emails from 11.4, 11.12, 11.23 or 11.24.

By now you should have received the link to pdfs of the most recent production.

I apparently misunderstood your use of the new term "Workman documents" to mean the Pathmark Reports that you had asked me about back on November 3. In any event, I said that we have asked Consilio to provide Bates stamp information for the Pathmark Reports, and we expect they will provide that information. Nothing more. Your attempt to broaden that to include anything other than the reports is rejected. It is our hope that your receipt of the Bates information will put to rest your false assertions that the Pathmark reports were not produced.

As to depositions,

a.    Please direct me to any statement from me that suggests that "expert depositions would address the new claims." Please identify what experts you intend to use with respect to these claims.

b.    1.        Please confirm that your reference to "[y]our expert" means Mr. Pederson.

        2.        When you ask about the availability of McKesson's, I assume you mean Mr. Berk of CBIZ.

c.  1.      We received this morning an email from you entitled "Our 30(b)(6) Topics" and will get back to you with any questions or concerns.  One immediate clarification.  We will construe the word "credits" is to mean only "product return credits."

2.  This is the first time you have indicated an interest in deposing Ms. Workman.  McKesson reserves all of its rights with respect to that interest.

d.  You confirm that Plaintiff will not introduce any fact witness other than Mr. Carnahan on the topics of rebates and product return credits.  That said, you acknowledge that McKesson has the right to depose Ms. DeVito.  So there is no confusion, McKesson intends to depose Ms. DeVito.

**Daniel Slate**
**T** (213) 891-5444
**C** (213) 716-5227

# Buchalter

**Daniel H. Slate**
Shareholder
**T** (213) 891-5444
**F** (213) 630-5640
dslate@buchalter.com

1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
www.buchalter.com | Bio | LinkedIn

**From:** Richard Milin <rmilin@grifflegal.com>
**Sent:** Monday, December 13, 2021 4:57 PM
**To:** Slate, Daniel H. <dslate@buchalter.com>
**Cc:** Michael Hamersky <mhamersky@grifflegal.com>; Garfinkle, Jeffrey K. <jgarfinkle@Buchalter.com>; Tracy Klestadt <TKlestadt@klestadt.com>; Winick, Steven H. <swinick@buchalter.com>; Harvey, Brian T. <bharvey@buchalter.com>
**Subject:** Re: 12.13.21 supplement to 11.30.21 list of unanswered questions to Plaintiff [IWOV-BN.FID1434304]

This message has originated from an **External Email**. rmilin@grifflegal.com <rmilin@grifflegal.com>:

Dan:

Less "tit for tat" and fewer self-serving statements would be helpful. Your statement that I have "refused" to discuss the topics you mention is wrong, as are other statements in your email, some of which are corrected below. Truth matters, and we request that you stick to it in future.

We also request that McKesson stop the "McKesson two-step" game your email plays yet again: First McKesson denies us the information we need to answer its questions -- in this case, the documents you did not produce until Thursday night in a form that needs to be uploaded by a service provider -- then it complains that we do not answer.

In any event:

1. Thank you for agreeing to identify the Workman documents, which are the Workman emails, the Pathmark attachments and any related documents or communications you provided to your expert. However, it would be simpler just to send us a link to what you uploaded for your expert. I can give you info on the date by which the upload was complete in 2020 if you want, and we object to your procedure because it risks (a) not identifying some of the documents and correspondence you provided to your expert and (b) causing additional delays. Indeed, you specifically warn of delays in your email. As far as I can tell, your decision to give us only Bates numbers rather than documents is intended only to cause us unnecessary labor. No other purpose would be served by your picking the Bates numbers off the documents and sending the numbers alone. Accordingly, we object.

2, As to depositions:

(a) You previously indicated that expert depositions would address the new claims, so I needed (and need) McKesson's document production to schedule depositions, as I have indicated in the past. The PDFs Brian agreed to provide last Friday should simplify matters.

(b) Our expert says he can be available in the first week of January. When is yours available? I think we need those dates as the core of our deposition schedule for the other witnesses.

(c) Of course the rebate and credits will come up in depositions; there has never been any question about that since September 20. I plan to send you further specifications as to the topics for the 30(b)(6) by tomorrow. Also, you named two individuals as witnesses, and I don't have the right to specify for you, as I have previously indicated. However, it looks like Claire Workman will be an essential witness to answer the questions. That's one reason we need the Workman documents promptly.

(d)  As to fact witnesses for the rebate and credit issues, we need all of the witnesses McKesson provides to be educated and able to speak for McKesson pursuant to Rule 30(b)(6).  As to our witnesses, you designated Tim Carnahan on Sept. 20, and the Court agreed.  We do not propose to offer other fact witnesses for deposition on the topic, though you still have the right to depose Dawn DeVito, who we believe to be knowledgeable about the accounting issues.

Richard

Richard K. Milin (Bio)
Griffin Hamersky LLP
420 Lexington Avenue  |  Suite 400  |  New York, NY 10170
T: 646.998.5580 | F: 646.998.8284 | C: 917.975.1326
Email: rmilin@grifflegal.com
Website: www.grifflegal.com

**On Mon, Dec 13, 2021 at 6:20 PM Slate, Daniel H. <dslate@buchalter.com> wrote:**

Let me assure you, Richard, this is certainly not a game; far from it.  We are trying to prepare for a trial with a January 7 discovery cutoff and for several weeks now I have asked repeatedly and you refused to discuss (i) scheduling depositions, (ii) whether you want depositions related to the rebate issue and the product return credits and if so, the specific areas you have questions for 30(b)(6) witnesses; and (iii) the identity of fact witnesses related to the new issues raised in the Amended Complaint.

We provided you a large volume of documents on December 9, and you asked for pdfs of those documents.  On December 10, Brian advised you that Consilio is "preparing another link to documents in pdf format."  Brian also advised you that will have that when it is ready.

And finally, as to the Pathmark reports (which you call the "Workman documents"), I don't know how many times we have advised you that they have all been produced.  You have them.

You might recall that on November 3, you asked me to forward all of them to you again because, you said, there were "gaps" in them.  On November 4, I emailed you and asked you to "[l]et me know specifically which reports you say you don't have and I will see if we can accommodate you."  Since then, I have asked on several occasions, and you have not responded at all, much less specifically letting me know what reports you do not have.