Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 15-23007-LGB

4    Adv. Case No. 17-08264-LGB

5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ON

12   BEHALF OF THE BANKRUPTCY ESTATE OF THE GREAT

13   ATLANTIC & PACIFIC TEA COMPANY, INC., et al.,

14       Plaintiffs,

15            v.

16   McKESSON CORPORATION,

17                Defendant.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20                United States Bankruptcy Court

21                One Bowling Green

22                New York, NY  10004

23

24                May 18, 2022

25                10:15 AM

1   B E F O R E :

2   HON LISA G. BECKERMAN

3   U.S. BANKRUPTCY JUDGE

4

5   ECRO:  KB

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    HEARING re 15-23007-lgb Motion for Summary Judgment on

2    Debtors First, Fifth and Thirteenth Omnibus Claim Objections

3    Seeking to Disallow 11 U.S.C. 503(b)(9) Claims (related

4    document(s)2689, 2541, 2957, 2598, 2913, 2828, 2413)

5

6    HEARING re 15-23007-lgbMotion to File Under Seal Certain

7    Exhibits to the Devito/Milin Declarations in Support of

8    Responses to Motions for Summary Judgment

9

10    HEARING re 15-23007-lgb Motion to Strike McKesson

11    Corporations Motion to Strike Portions of the Declaration of

12    Dawn DeVito (related document(s)5086)

13

14    HEARING re 17-08264-lgb Motion for Summary Judgment

15

16    HEARING re 17-08264-lgb Motion to File Under Seal Certain

17    Exhibits to the Devito/Milin Declarations in Support of

18    Responses to Motions for Summary Judgment

19

20    HEARING re 17-08264-lgb Motion to Strike McKesson

21    Corporations Motion to Strike Portions of the Declaration of

22    Dawn DeVito (related document(s)127)

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1  A P P E A R A N C E S :

2

3  BUCHALTER

4      Attorneys for McKesson Corporation

5      18400 Von Karman Avenue

6      Irvine, CA 92612

7

8  BY:  JEFFREY GARFINKLE (TELEPHONICALLY)

9

10  KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP

11      Attorneys for

12      200 West 21st Street, 17th Floor

13      New York, NY 10036

14

15  BY:  TRACY KLESTADT (TELEPHONICALLY)

16

17  GRIFFIN HAMERSKY LLP

18      Attorneys for the Official Committee of Unsecured

19      Creditors

20      420 Lexington Avenue

21      New York, NY 10170

22

23  BY:  MICHAEL HAMERSKY (TELEPHONICALLY)

24      RICHARD MILIN (TELEPHONICALLY)

25

Page 5

1    ALSO PRESENT TELEPHONICALLY:

2    BENJAMIN HILL

3    BRIAN HARVEY

4    BEN CARLSEN

5    DIVYANG PATEL

6    STEVEN WINICK

7    MICHELE BROWN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                P R O C E E D I N G S

2            THE COURT:  Okay.  The next matter before me is

3    related, obviously, to two matters on the two specific

4    cases, one adversary proceeding and obviously also the

5    underlying case.  So the matters are case number 15-23007

6    The Great Atlantic and Pacific Tea Company Inc. and

7    Adversary Proceeding No. 17-08264, the Official Committee of

8    Unsecured Creditors of the Atlantic and Pacific Tea Company

9    Inc, et al. v. McKesson Corporation.

10            So may I have appearances of counsel please?

11            MR. GARFINKLE:  Yes, Your Honor.  Jeffrey

12   Garfinkle of Buckhalter.  Also with me is Tracy Klestadt of

13   the Klestadt Winters firm on behalf of McKesson.  I'd like,

14   just before I start, Your Honor, just kind of caution the

15   Court.  I am now on about day 15 of recovering from COVID --

16            THE COURT:  Oh.

17            MR. GARFINKLE:  So I still have a slight cough,

18   but so I apologize to the Court in advance if my -- if I

19   have to cough during my presentation.

20            THE COURT:  Oh, no, that's fine.  How are you

21   feeling, more importantly?

22            MR. GARFINKLE:  Your Honor, apparently I suffered

23   the consequences of going to the ABI annual meeting where a

24   number of people came down with COVID, I understand, so --

25   but I'm actually doing quite well now, but other than having

Page 7

1    a residual cough.  Thank you, Your Honor.

2              THE COURT:  Oh, sorry to hear that.  Okay.  MR.

3    Griffin?

4              MR. HAMERSKY:  This is Mike Hamersky from Griffin

5    Hamersky for the plaintiff and also Richard Milin from

6    Griffin Hamersky is appearing and he will be handling the

7    oral argument.  It appears he's having a little bit of

8    technical difficulties right now, but if he unmutes his

9    phone, I'm sure he can appear as well.

10             THE COURT:  Mr. Milin?

11             MR. MILIN:  Well, I thought I was unmuted.  Am I?

12             THE COURT:  You are now.  We're just making a

13   little bit of a joke about your unmuting.  Sorry.

14             MR. MILIN:  That's okay.  We're all getting used

15   to the technology.  In any event, Your Honor, I'm here.  We

16   do represent plaintiffs, which is the Creditors Committee on

17   behalf of the estate of A&P, and we are in the process of

18   being retained by the estate directly as well.

19             THE COURT:  Okay.  All right, so I think the

20   matters that were before me today are first the motion to

21   file under seal certain exhibits.  Then obviously, we have

22   the summary judgment motion and then we have the motion to

23   strike.  So I was going to suggest that I deal with the

24   motion to seal first, since there doesn't seem to be any

25   opposition, and then -- to file under seal.

Page 8

1           And then I thought that we -- I would make a

2      couple of remarks myself before we get into the summary

3      judgment argument.  My suggestion, to be honest, with

4      respect to the motion to strike is that we just go through

5      the summary judgment motion first.  I'm not I'm not going to

6      rule from the bench today.  So, it's not something that

7      can't be taken up afterwards if we feel that that's

8      necessary.  Obviously, there's some dispute about that.

9           And then before I -- and then I'm going to take

10     things under advisement anyway, because obviously, as you

11     all know, we get into the summary judgment motion and as

12     some people have noted in their papers, which is correct,

13     there are a number of certainly novel issues of law in

14     connection with the summary judgment motion, ones where

15     there's not a lot of case law, ones in this district where

16     there's basically no case law, and where it's certainly, I

17     guess timely and interesting, as I believe plaintiff noted

18     in their papers, that this was the same topic in part that

19     was raised in connection with the National Moot Court

20     Competition for Duberstein this year, which I judged the

21     semifinals on for full disclosure.

22           So it's not something that I'm going to be able to

23     rule from the bench today about.  For those obvious reasons,

24     this is going to require a decision.  I would possibly

25     expect appeals in light of the cutting-edge nature of it.

Page 9

```
1    So that's why I think we can get through everything and

2    then, you know, it'll just -- I'll have to take it under

3    advisement and rule.

4            So why don't we start with the motion to file

5    under seal?  Doesn't appear that there were any objections

6    that were filed in response to that.  I understand, having

7    reviewed obviously, some of the exhibits why there's

8    commercial information where there are concerns about that.

9    So I didn't see any objection myself to filing those

10   particular exhibits under seal.  I don't know if anybody --

11   I didn't see a formal objection, but I just wanted to make

12   sure there was no opposition to that.

13           MR. GARFINKLE:  Your Honor, for McKesson, Jeff

14   Garfinkle.  No, we have no opposition to the motion to seal.

15           MR. HAMERSKY:  And Your Honor, Mike --

16           THE COURT:  Okay.

17           MR. HAMERSKY:  -- Hamersky.  There were no

18   objections.

19           THE COURT:  Yes.  I know.  We checked.  So I will

20   go ahead and grant that motion.

21           With respect to the summary judgment motion, so I

22   was trying to just -- I want to deal with one matter before

23   and then I want to sort of give you my thoughts on just the

24   legal issues.  I realize there are a lot of other issues,

25   too, here in the summary judgment motion.  So we could just
```

1    move forward with argument on that.

2            So the first thing is, I have reviewed the

3    transcript from Judge Drain's hearing in September.  That's

4    obviously been the subject of dispute as to whether he had

5    actually granted summary judgment with respect to the

6    ability to offset the 503(b)(9) claim against any --

7    503(b)(9) claim against any potential preference liability.

8            And I've reviewed the transcription.  My reading

9    of it, which is consistent with the argument that McKesson

10   made in its papers, which is that the judge decided this and

11   that this is law of the case.  And while I realize that it

12   is possible for me to reconsider, ignore the law of the case

13   et cetera, I'm not going to do that.  I think this is an

14   issue that Judge Drain did render summary judgment on.

15           What I agree with the plaintiff on though is I

16   don't think that he necessarily ruled on what the nature of

17   the 503(b)(9) claim is.  In other words, the discussion was

18   certainly about the asserted 503(b)(9) claims where proofs

19   of claim had been filed and the amounts are determined or

20   asserted.  I don't think that his decision specifically

21   dealt with the issue that is one of the issues that has to

22   be argued before me today, which is in essence, what happens

23   if there's a preference issue, a preference recovery where

24   there's a determination that there is a viable preference

25   here and whether that -- what type of claim that then gives

Page 11

1    rise to.

2            I don't think it's because claim is contingent

3    myself.  I don't I don't think that's the issue, that he

4    ruled or didn't rule on that.  I don't think there was a

5    differentiation in his ruling, but I think what he did leave

6    open is what happens if there's a -- ultimately a

7    determination of a preference here in terms of the 503(b)(9)

8    claim and how that gets adjusted.  I don't think his

9    decision went that far.

10           I do think his decision went far enough to say

11   that whatever the 503(b)(9) claim is, that it could be set

12   off, but not in the context of the issue I think that's been

13   raised before me in the summary judgment motion, which is,

14   if I -- if in fact there was a preference that was viable

15   here and ultimately determined to exist, does that give --

16   and it relates to the payments that were made in connection

17   with 503(b)(9), you know, would that give rise to a

18   503(b)(9) administrative expense claim or does that give

19   rise to something else under 502.

20           So I think that issue is still alive, but I don't

21   think that it's appropriate for me to revisit the setoff

22   concept.  I think Judge Drain, in fact, did rule on this and

23   I am not going to be revisiting that.  So I just wanted to

24   be clear with that.  I have read the whole transcript from

25   that day and I understand that that's what Judge Drain

Page 12

1    ruled.  I understand why people -- why the plaintiff had

2    issues with the ruling.  There's certainly not a lot of case

3    law on this.

4          There are arguments that plaintiff makes that,

5    that are certainly interesting, but I know that Judge Drain,

6    knowing Judge Drain, that he certainly, you know, considered

7    that.  He wouldn't have made a statement that he was

8    granting it.  His comments were clear that he didn't enter

9    an order because he just didn't think it was worth entering

10   an order on one matter, and that's why he didn't do it, but

11   I don't think that the -- his decision was unclear.  So I

12   just wanted to state that for the record so we don't spend

13   any time arguing about that.

14          MR. MILIN:  Your Honor, if I may, a point of

15   clarification because the issue whether setoff should be

16   barred for equitable reasons was not in front of the judge.

17   So in addition to the fact that he didn't rule on the

18   potential setoff for preference liability, which was not

19   before him, he also did not rule on equity and I just wanted

20   to note that as well and -- because that's what we think.

21          THE COURT:  Right.  Well, I understand.  I've read

22   your papers, so I understand that.  I agree.  I don't think

23   he had a trial or made a decision on the equities issue, at

24   least not in transcripts I've read so far, which is probably

25   not every hearing you all have had in this adversary

Page 13

1    proceeding, for certain, I'm guessing.

2         That's for sure certain, but I think what he was

3    saying is if there's an allowed 503(b)(9) claim here and

4    certainly there has been asserted both a fixed amount

5    503(b)(9) claim and a 503(b)(9) claim that was filed that

6    covers whatever the adjustments could be, and I am not

7    calling that contingent because I don't think it's

8    contingent in the sense that -- it is contingent, obviously,

9    on there being a preference determination, but it's not

10   contingent in the sense that the amounts were set forth in

11   it and it's not liquidated.

12        People understand what the amount is.  It wasn't

13   filed in an unknown amount.  It was filed in an amount that

14   takes into account whatever might happen in the decision,

15   but it covers all the possible amounts.  But I agree with

16   you that there wasn't a whole trial at least that I've seen

17   on the merits of the equities case, which I guess would be

18   something that could be raised at trial.

19        MR. MILIN:  Thank you, Your Honor.

20        THE COURT:  Okay.  Okay, so my cheat sheet of

21   issues -- that's the way I'll describe it -- I sort of look

22   at the summary judgment arguments as breaking down into a

23   couple of categories, some of which are -- and again, you

24   have to remember, I -- probably good, bad, or indifferent,

25   I'm appearing, you know, I'm coming into this case very far

Page 14

1   into it.

2           And while obviously I understand the legal issues,

3   I'm certainly not as familiar with the factual issues as

4   Judge Drain would have been because of all the years of

5   dealing with matters in these cases.  So on the legal issues

6   to me, it seems like the issues that we're going to be

7   discussing today in the summary judgment motion for the

8   legal -- what I would describe as pure legal issues are the

9   issue of the subsequent new value and whether the fact that

10  the amounts were paid is an issue for counting towards the

11  subsequent new value defense, what I would describe as the

12  interplay of 503(b)(9), 502(h) and 547.  And that brings up

13  a couple of issues.

14          It brings up the issue of what I guess I'll

15  describe as the temporal issue whether or not the 503(b)(9)

16  claims themselves, because of the nature of, I guess the

17  administrative nature of the claims but also the timing of

18  the payment really more of those claims, whether that means

19  that they can't be used in the new value defense or in

20  essence is a double counting in the context of the

21  subsequent new value defense.

22          And then the issue I've already flagged, which is

23  what happens if transfers are voided with respect to the

24  503(b)(9) claim asserted by McKesson and how does that

25  interplay with 502(h) and what happens with respect to that.

Page 15

1   There's also obviously issues about the claims allowance

2   which I put into the bucket of -- sorry to describe it --

3   less legal, more issue of whether there is a factual dispute

4   because of the fact that certainly there was -- I think

5   everybody acknowledges that there were -- there is a claim,

6   you know, that's allowed that doesn't have to do with the

7   preferential recoveries necessarily, but it's just in fact

8   owed to McKesson and then there's a dispute about what does

9   that mean and how is that determined and what's the amount.

10          And the amount of the dispute seems to me from my

11   reading the papers to have to do with whether or not the

12   calculation has been agreed to, whether or not there's

13   credits.  There also is certainly a factual dispute in

14   connection with the preference defense calculation with the

15   calculation of the new value defense on a factual basis

16   having to do with some of the issues that were already

17   raised in our brief discussion so far, which has to do with,

18   of course, whether or not there were other -- there should

19   be adjustments to the new value calculation based on things

20   other than what are actually in the invoices.

21          And then, of course, I guess the arguments about

22   whether or not there was any other sorts of defenses

23   relating to or claim -- reasons for disallowing claims

24   relating to, my words, behavior.  So that's my overview.

25   I'm sure I've missed some things, but that's the way I

Page 16

1    looked at the papers and in terms of the things that have to

2    be addressed before me, and that's obviously not taking into

3    account the motion to strike.

4            MR. MILIN:  Your Honor --

5            THE COURT:  So I'm sure there's things I've missed

6    but that's what I that's the -- my cheat sheet of things

7    that I have already gleaned out of the papers.

8            MR. GARFINKLE:  Thank you, Your Honor.  Jeff

9    Garfinkle.  Since we're the we're the moving parties, do you

10   want us to address the Court first or how would you like to

11   handle this?

12           THE COURT:   Yeah.  So I was going to --

13           MR. MILIN:  The Court --

14           THE COURT:  -- suggest.  Go ahead.

15           MR. MILIN:  Yeah.  Your Honor, before we move on

16   to the formal argument, Your Honor was just discussing

17   identification of the issues and I wanted to make sure that

18   your chambers saw a document that we circulated not long ago

19   which does the same thing and in our view would be helpful

20   to the Court and help structure the argument certainly that

21   we intend to present.

22           THE COURT:  You mean your demonstrative?

23           MR. MILIN:  Yes, Your Honor.

24           THE COURT:  Yeah, that's actually interesting

25   because I put my list together before I saw your

1   demonstrative, but I'm sure it'll still be very helpful with

2   respect --

3            MR. MILIN:  All right.

4            THE COURT:  And -- okay.  And Mr. Garfinkle, I

5   obviously don't have a -- you are the movant, so you would

6   certainly go first in the argument and you're obviously free

7   to address anything that I raised just now in my summary and

8   anything else that you think I've missed.  I have read

9   obviously all your papers, so I would appreciate though,

10  remember I'm starting this case again as I noted, you know,

11  many years into it, and so I'm sure that if Judge Drain were

12  the person on the other side of this conversation now on our

13  virtual bench, that there are many facts that he would just

14  already understand completely more than I would have because

15  I've just read papers and he's obviously lived the case for

16  years and there's no way to replace that knowledge, from my

17  experience both in practice and on the bench.

18           So anyway, but with that, I will turn the virtual

19  podium over to you.

20           MR. GARFINKLE:  Thank you Your Honor.  Again, Jeff

21  Garfinkle for McKesson Corporation.  First, let me thank the

22  Court for its time and also apologize to the Court.

23  Unbeknownst to me, again I was -- because I was still trying

24  to recover from COVID in the midst of doing these reply

25  briefs, we overlooked the Court's local rule on the length

Page 18

1    of the reply brief.  Our reply brief was 32 pages long which

2    exceeds the local rule for that.  I apologize because we did

3    not submit a motion to allow us to exceed the rule and we're

4    happy to do so retroactively.  The issues that are somewhat

5    complex in the reply, and so -- and we just overlooked the

6    rule.  So I apologize to the Court.  It is never our

7    intention to act contrary to local rules and I defer to the

8    Court on that that one point.

9              THE COURT:  Okay.

10             MR. GARFINKLE:  So --

11             THE COURT:  Mr. Garfinkle, I'm going to just allow

12   it to slide.  I've obviously read it.  You're right.

13   There's a lot of issues in connection with this matter and

14   obviously you also had to have space for your outrage.  So I

15   understand.

16             MR. GARFINKLE:  Yeah.  Let me, let me again follow

17   the Court's kind of outline of the issues.  And we

18   appreciate the Court's ruling and again, acknowledging the

19   Judge Drain did rule following the Quantum Foods decision

20   that McKesson gets a setoff issue.  What he had left

21   unresolved, as the Court read from the transcript, was --

22   and this was the issue that we were dealing with plaintiff

23   when they were represented by their prior law firm -- their

24   second law firm, I should say -- was the amount of the

25   503(b)(9) claim.

Page 19

1           And there was a disagreement about certain

2    components of the 503(b)(9) claim that weren't, we believe,

3    very large, but they were unresolved so the judge said, you

4    guys got to try to work that out.  And I -- you people, I

5    should say.  I don't want to be gender specific.  You people

6    need to work that out.  Then we got new counsel.

7           What we did not discuss, candidly Your Honor, at

8    that at that hearing in September of 2019, was this, what I

9    will call the increasing amount of the 503(b)(9) claim by

10   virtue of any preference recoveries on account of payments

11   for 503(b)(9) goods.  That was never discussed.  It was

12   never -- we never got that far during the hearing.  We

13   actually -- as I walked out of the hearing, I recall having

14   a discussion with prior counsel saying, you understand now

15   you are suing for 503(b)(9) goods for which we're going to

16   get an increased dollar amount.

17          And let me go to that point, because it'll explain

18   why I think this whole analysis about 502(h) is really a red

19   herring.  The Circuit, the Second Circuit dealt with this in

20   part in the 502(d) analysis case, the ACS case where the

21   plaintiff in that case sought to disallow the 503(b)(9)

22   creditor's claim under 502(d).  And the Circuit said no,

23   502(d) doesn't apply to an administrative claim.  The same

24   analysis could be said about 502(h) with respect to an

25   administrative claim.

1              Administrative claims are governed by 503 of the

2      code.  503 says, A, an entity may timely file a request for

3      payment of administrative expense or may tardily file such a

4      request if permitted by the Court for cause.  And then

5      503(b) lists what are the administrative claims.

6              Now, I don't expect the Court to know this, but

7      early in the bankruptcy case, given that A&P was a retailer,

8      it asked for the establishment of a bar date including a bar

9      date for the assertion of 503(b)(9) claims.  It provided a

10     standard form that had been modified from the national form

11     for which creditors could indicate the amount of their

12     503(b)(9) claims.  And at this point, as I understand the

13     math of the case, there's about $40 million of unpaid

14     503(b)(9) claims.

15             Again, as in the winddown order which the Court

16     may be familiar with, those 503(b)(9) creditors, except for

17     McKesson, have received an approximately 20 percent

18     distribution.  There's no dispute about that.  There is a

19     possibility that that distribution could increase but

20     they've already received 20 percent and according to the

21     operating report and some representations made to Judge

22     Drain last week, approximately 20 percent of McKesson's

23     $1.75 million current 503(b)(9) claim has been reserved.

24     Has not been paid.  It's been reserved.

25             So unlike many of the cases -- and Your Honor, I

Page 21

1    also judged Duberstein this year.  I had the privilege of

2    doing it on Sunday and actually judging the winning team

3    from Howard who were amazing in my opinion.  And so I'm

4    quite familiar with the -- this temporal issue, but we don't

5    think really -- and I'll explain why we don't think it's a

6    real issue here, because in all of those cases, including

7    the Beaulieu case and Friedman's, there was actual full

8    payment of the 503(b)(9) or the administrative claims in the

9    case of Friedman's, which were employees who -- were

10   employee who had a critical vendor payment made post-

11   bankruptcy.

12          This case is not a full pay case and in fact, the

13   Beaulieu case, which plaintiff cites, in their third section

14   said the temporal limitation does not apply in a situation

15   where the creditors are getting paid in full on account of

16   their administrative claim.  That is not this case and there

17   is no case that has held this double recovery concept in

18   terms of the limitations of 547(c)(4) applies in a case

19   where the administrative creditors haven't been paid or --

20   and won't be paid their full amount.

21          So I just want the Court to understand where we're

22   coming from on that issue.  So we go to --

23          THE COURT:  Can I pause -- can we pause for a

24   second, if you don't mind?  So I understand that.  I think

25   the issue, which I hate to say it this way, but I don't

Page 22

```
 1   think -- I think the problem is that the code was amended to

 2   put in 503(b)(9) and while Congress could have made things

 3   clearer, it didn't.  And that's where you have to try to

 4   figure out how to harmonize statutes where I don't think --

 5   I don't think someone really thought about, well, how does

 6   this interface with the preference statute.  They should

 7   have, but I don't think they did.

 8           MR. GARFINKLE:  Can I address that point, Your

 9   Honor?

10           THE COURT:  Yes, of course.

11           MR. GARFINKLE:  Okay.  Yes.  Let's back up a

12   moment.  503(b)(9), and look at the case law on the

13   503(b)(9), there's no legislative kind of commentary as to

14   why 503(b)(9) was put in there.  Having litigated this issue

15   in the Sixth Circuit and won this issue in a case called

16   Phar-More v. McKesson, that was appealed to the Sixth

17   Circuit, which was decided in 2005, right as BAPCPA was

18   enacted.  503(b)(9) has many different kind of views of it.

19           One is, on the eve of bankruptcy, Debtors

20   shouldn't be buying goods on credit and we're going to

21   protect those vendors from basically fraudulent activities

22   akin to the 2702 reclamation remedy that was really becoming

23   ineffective by virtue of the floating leans on inventory.

24   And, so there's one way -- basically it's a creditor-vendor

25   protection statute.
```

1           The reason why I don't think you need to worry

2     about harmonization of 503(b)(9) payments or payments pre-

3     bankruptcy on account of 503(b)(9) goods, we're dealing with

4     a 20-day window here.  In most instances, the credit terms

5     for those are going to be extraordinarily short and so

6     you're going to fall into the contemporaneous exchange of

7     new value defense; hence why most Trustees -- in fact, I

8     can't find any reported or even talked about case in which a

9     Debtor or Trustee has ever sued for a 503(b)(9) payment

10    because the credit terms are so short, you're really falling

11    into a contemporaneous exchange of new value situation and a

12    defense in that regard.

13          As the Court knows from reading the transcript of

14    the September 2019 hearing, the payments made during the

15    week of the 13th through 17th of July 2015 for were on

16    account of one-day goods.  We point this out in our motion.

17    So we moved for summary judgment.  The Debtor filed an

18    opposition saying we didn't intend that to be

19    contemporaneous.  The judge said that's a tribal issue of

20    fact and we haven't brought that back before the Court and

21    if need be, we would try that issue at trial.

22          But what I'm kind of telling the Court is, for the

23    most part, 503(b)(9) goods never become the subject of

24    preferences because most Trustees, in fact, I would say

25    almost every Trustee or Debtor never sues to recover them

Page 24

1    because the credit terms are so short, you're going to

2    follow in the contemporaneous exchange of new value defense.

3            So -- and I don't think there's a lot of --

4    necessary to harmonize this because if the preference

5    defendant has to give back payments on account of 503(b)(9)

6    goods, 503(a) gives them the right to file administrative

7    claim either timely or tardily, and so you don't get to a

8    502(h) analysis.  But even if you do get to a 502(h)

9    analysis, we come into a bunch of cases that have all come

10   to the same conclusion.

11           We cite the Falcon Products case as an example

12   where Judge Schermer, an excellent judge in St. Louis who

13   I've appeared in front of a couple of times when he was on

14   the bench, said, no, Blue Cross Blue Shield is going to get

15   a priority claim under 507(a)(4) which is again different

16   from 502(h).  It has a priority claim for the pension

17   contributions which it paid.  Similarly, the First Circuit

18   said the same thing for a secured creditor who has 506

19   status.

20           So the Courts that have looked at this for

21   preference defendants in different contexts, albeit not in

22   the 503(b)(9) context, have said that the preference

23   defendants, it's a wash.  And this is consistent, Your

24   Honor, with basically an unbroken line of Supreme Court

25   cases on setoff dating back to 1841.  In our motion for

Page 25

1    summary judgment on the first go around, we cited to the

2    Court, the Gratiot v. U.S. case.  Cite is 40 U.S. 336

3    (1841).  Still good law.  I always loved Judge Holden in

4    Yakima, who along with Ken Klee wrote a treatise on Supreme

5    Court bankruptcy cases.  He always reminds me and others

6    that listen to him that even though they're old Supreme

7    Court cases until they're reversed still are the law of the

8    land.

9         And the Supreme Court in 1841 said, "It is but the

10   exercise of the common right which belongs to every creditor

11   to apply unappropriated monies of his Debtor in his hands in

12   extinguishment of debts due him."  That was followed up in

13   1909 by the Page v. Rogers case, another Supreme Court case.

14   And this is cited in our opening motion.  "It is entirely

15   practical to avoid the circuitous proceeding of compelling

16   one to pay into an estate only to get it back."

17        That's followed four years later by the Studley

18   decision, Studley v. Boylston National Bank.  Cite is 229

19   U.S. 523, holding that the right of setoff always allows

20   entities that owe each other money to apply their mutual

21   debts against each other, thereby avoiding the absurdity of

22   making A pay B when B owes A.  And we cited this in our

23   original summary judgment motion.

24        Again, this is unbroken Supreme Court precedent on

25   setoff in a bankruptcy case.  So when we get to -- again,

1    I'm kind of switching the order of this in the Court's

2    summary, when we get to the 502(h) issue, we don't think

3    that's really relevant because 503 is the relevant statute.

4    503 gives McKesson an administrative claim.  If it were to

5    have to pay back any of the goods which it delivered -- -

6    payments on account of goods which it delivered during the

7    20 days of bankruptcy.  It's automatic.  We can then get to

8    the value of those goods which we'll talk about in a moment.

9           And so mathematically -- and we tried in our

10   motion for summary judgment to really focus on the math.

11   When we look at the math during the week of July 13th

12   through 17th of 2015, there were six payments.  Five of

13   those payments were on account of 503(b)(9) goods.  One was

14   not.  That's -- I'm just using round numbers -- it's roughly

15   $900,000.

16          So we're not seeking a summary judgment on that

17   one.  We still think that's ordinary course of business.  It

18   was paid on its due date, all the other things that we

19   argued to Judge Drain back in September of 2019.  But as to

20   the other ones that were done that week, those are all

21   503(b)(9) claims.  We then go into, because the payments

22   happened under normal circumstances on Fridays, we then go

23   into the July 10th payments.  This is July 10, 2015.  And by

24   the way, when you do the math, Your Honor here, the payments

25   during the week of before bankruptcy aggregate $10.1

Page 27

1   million.

2          And we gave the Court Mr. Burke's calculations of

3   the new value, again, setting aside the temporal argument

4   we'll get to in a moment, is $9.7 million.  So our maximum,

5   McKesson's maximum exposure using Mr. Burke's analysis is

6   covered by that last week of payments.  Plaintiff comes back

7   now in its papers -- I'm going to set aside its

8   demonstrator, which is putting up new arguments really, at

9   some level -- says no, that number should be $10.6 million.

10  So that would mean mathematically there's another $450,000

11  of excess liability beyond the payments that were made

12  during the week before bankruptcy.  Again, I'm using round

13  numbers.  Our briefs have the precise numbers here and I --

14  just so the Court is aware of that.

15          That takes us into the 23rd payment, which

16  plaintiff is seeking to recover and that's a $3.5 million

17  payment on July 10, 2015.  That again is 503(b)(9) goods.

18  So regardless of whether -- and that's a $3.5 million.  So

19  when you do the math and you think about it just

20  arithmetically, that if we have this setoff, right, really

21  it doesn't make a difference whether we are at 10.1, 10.6,

22  11.6 because the way the math works here.  Because that

23  payment on July 10th for $3.5 million on account of

24  503(b)(9) goods would still be subject to the setoff case

25  law and Judge Drain's ultimate ruling that McKesson is

1    entitled to a setoff of its 503(b)(9) claims.

2            So I just wanted to address that structure here as

3    to why we think this is an exercise in futility because it's

4    just circular.  It's circular.  You're always getting back

5    to the same point and this is what the case law holds,

6    albeit in secured creditor status or priority claims status.

7    Yes, there's never been a case to date that's dealt with it

8    from a 503(b)(9) status, but really the analysis is

9    ultimately the same and we think that should be followed.

10           Turning to valuation of the new value.  Again, we

11   don't think the Court has to go there because of the way the

12   economics work and the math works, but as we point out on

13   the calculation, there are two issues which the plaintiff

14   raises on calculation -- in disputing our calculation of new

15   value and then I'll turn to what was the subject of the

16   Duberstein competition, the temporal issue, and then address

17   any other questions the Court has.

18           There are two issues that plaintiff raises.  One

19   is this $127,000 claim that plaintiff says you can't prove

20   or you haven't proven that you delivered these goods.  And

21   what we point out, Your Honor, is we give the Court the

22   invoices.  We give the Court Ms. Page's testimony by way of

23   declaration saying, I was director of pharmacy operations

24   for 23 years.  I've reviewed thousands and perhaps millions

25   of invoices from McKesson.  I've never had a situation where

1   McKesson had an invoice for goods that we didn't receive

2   other than once when a McKesson delivery truck was destroyed

3   during Hurricane Katrina.

4           Now, what we pointed out in Footnote 10 of our

5   reply brief is The Drug Safety Act of 2013.  And this was a

6   statute enacted out of a concern by Congress that that all

7   the parties in the in the distribution chain of

8   pharmaceuticals be able to trace those goods, should there

9   ever be a recall or other problems with the pharmaceuticals

10  and be able to, you know, trace their lineages.  So that

11  statute imposes very stringent reporting requirements and

12  inventory record requirements on all parties within the

13  chain.

14          And we cite to the Court -- give me one second,

15  Your Honor.  My computer has gone black on me.  We cite --

16          THE COURT:  Oh, no.

17          MR. GARFINKLE:  No, sorry.  It's all right.  We

18  cite to the Court -- they just -- we go dark after, if you

19  don't type in the computer for a period of time.  In

20  Footnote 10, we cite to the Court, the Drug Supply Chain

21  Security Act of 2013 which is codified at 21 USC 581 et seq.

22  And 582(d) is the section of that statute which imposed

23  record keeping obligations on every dispenser of

24  pharmaceutical products, and specifically -- and we cite to

25  a subsection, it's 582(d)(1)(A)(iii) of that statute.  And

Page 30

1    it requires every dispenser to maintain these pharmaceutical

2    product records for not less than six years.

3           Now what Ms. DeVito says is, I don't know how to

4    access those records and so I can't verify whether McKesson

5    delivered them.  On the other hand, McKesson gives its

6    records.  It gives the deposition testimony or the

7    declaration testimony of Ms. DeVito, plus one other thing.

8    We have provided the Court with the extension agreement that

9    was negotiated in late August, early September 2015.  And in

10   that extension agreement, before plaintiff, the Committee

11   got involved in this litigation in McKesson, the Debtor and

12   -- and before Ms. DeVito had any involvement in any of this,

13   the Debtor and McKesson agreed that McKesson's then

14   503(b)(9) claim was $2,780,000.

15          Now, that number went down by a million by virtue

16   of an extension fee which McKesson agreed could be applied

17   to reduce its 503(b)(9) claim.  So that takes it down to

18   $1,780,000.  Now McKesson, in its summary judgment motion on

19   the claim objection says actually we've done some more

20   calculations and that number is exactly -- and I'm again,

21   rounding, using round numbers -- $1,750,000.

22          So there's now three data points that the Court

23   has on our side of the equation for that 127.  On the other

24   side is Ms. DeVito's testimony.  It says I can't -- we're

25   unable to or don't have access to the Debtors' inventory

Page 31

1    records to show whether these pharmaceuticals were received

2    at the store level.  Now McKesson can't -- doesn't have

3    access to those records, as Ms. DeVito explained -- Ms. Page

4    explained in her supplemental declaration.  So we don't

5    think that $127,000 issue is really a alive issue.

6           We're entitled to summary judgment on it.  There's

7    just -- they have no evidence to the contrary and they have

8    a statutory obligation to have those records because it's a

9    transaction.  So they would have had to keep those records

10   for six years from the point of time, not only did they

11   receive them, but for the point in time they dispense them

12   to patients so that the patients, if there's a problem with

13   the product, can be alerted to that there's a recall.  This

14   is a very complex system governed by regulation promulgated

15   by the FDA, but it controls all pharmaceutical products.

16          So let me then go to the second item that they

17   challenged the calculation of new value, and this is the

18   contention that the invoice price shouldn't control.  Now,

19   in the extension agreement, again, before the Committee was

20   involved, before Ms. DeVito was involved, the Debtor and

21   McKesson agreed that the pricing of all deliveries before

22   the bankruptcy case was consistent with the contract and the

23   language -- we quote the language in our reply brief.

24          Now, the Committee comes back and said, under your

25   contract, the Debtor may have been entitled to rebates and

Page 32

1    so therefore your contract price should be reduced by 20

2    percent for the generic pharmaceuticals which comprised a

3    component of the new value calculation, to which we, in our

4    reply, point out, you're not entitled to them.  One, they

5    were conditional.  You didn't meet the conditions and the

6    Debtor agreed in the extension agreement that they weren't

7    entitled to them.

8            So we don't think these are real issues but again,

9    getting back to the fundamental point is even if they

10   somehow get up to $10.6 million, you're still into the 23rd

11   payment of $3.5 million, which is 503(b)(9) goods.

12           So let me turn to the Duberstein issue which was

13   one of the two issues in the Duberstein competition on the

14   temporal timing of payments under 547(c)(4).  I'm going to -

15   - unless the Court wants me to, I can go into the unpaid new

16   value case law, which I know the Second Circuit hasn't

17   issued a ruling on, but other Courts within the District,

18   bankruptcy courts have rejected the Seventh Circuit's

19   aberrant decision.  I think every Circuit now has said, no,

20   the Seventh Circuit's wrong in that regard and no one's

21   followed it since the Seventh Circuit made that decision in

22   the mid '80s.

23           So, but unless the Court wants me to address that

24   issue, I will -- I mean, I'm happy to if you want me to, on

25   unpaid new value versus paid new value.

1          THE COURT:  It's up to you.  I've obviously read

2     the cases.  This is not an issue that's new, but it is an

3     interesting issue just in the context of this, these facts

4     and the facts that frankly, were in Duberstein, because it

5     is not your typical situation because of the overlay of the

6     statute where prepetition claims are treated as

7     administrative claims, and then also in this case largely

8     paid, in the Duberstein case paid.

9          MR. GARFINKLE:  Okay.  Well, I -- the paid versus

10    unpaid new value was not in the context, and most of those

11    cases that that dealt with that is the otherwise unavoidable

12    transfer language of 547(c)(4) that dealt with, you know,

13    the situation where you have a recurring trade relationship

14    with a vendor who provides trade credit and getting paid and

15    providing goods on an ongoing basis.  And so the case law

16    has developed throughout the country mostly post that

17    Seventh Circuit decision, which has still not been reversed

18    by the Seventh Circuit, that it -- new value does not have

19    to be unpaid.

20          Now let's go to the second, now what was the

21    Duberstein issue, what I'll call the Duberstein issue, this

22    temporal issue on timing of payment.  The Friedman's case,

23    as I pointed out early in my argument, the Friedman's case

24    dealt with a critical vendor employee payment and then got

25    sued for a preference.  And the Third Circuit made the

Page 34

1    decision that no, the determination line for -- and that was

2    a prepetition claim that got paid post-petitions, albeit a

3    wage claim, a priority wage claim, and said no, that for

4    purposes of 547(c)(4), for that statute, that the cutoff

5    date is bankruptcy petition date.

6            And there's been other cases around the country

7    that have similarly held.  There's a couple of cases out of

8    the Middle District of Tennessee and the like.  The only

9    case or the primary case that plaintiff cites is the

10   Beaulieu case -- I think I'm pronouncing it right -- out of

11   the Northern District of Georgia and based on a decision out

12   of the 11th Circuit, the trial court -- the bankruptcy court

13   in that Court said that there is no temporal limitation.

14           But within that decision, and I pointed this out,

15   Section 3 of that decision makes clear that there must have

16   been, or in that case there was a full reserve for payment

17   of 503(b)(9) claims.  That is not this case.  All we're

18   talking about here is a potential 20 percent recovery on

19   McKesson's current $1.7 million reserve.  So McKesson is not

20   getting a double recovery here.  So, that analysis goes out

21   of the window.

22           Now, you're dealing with a partial payment,

23   contingent, partial payment, because plaintiff says, we

24   don't get any of it for lots of different reasons, what I

25   would call the whack a mole.  Every time we get an issue

Page 35

```
 1    resolved, I'm always seeing I'm relitigating it in this

 2    case.  But we're not getting that payment in full.  And so

 3    when you look at the case law on this temporal limitation,

 4    and we point this out in our reply brief, it's all on

 5    account of full paid administrative claims.

 6             I don't think, Your Honor, this distinction

 7    between pre and post nature of administrative claims really

 8    is relevant here.  I don't think Congress decided that

 9    503(b)(9) claims, prepetition claims for the delivery of

10    goods during the 20 days before bankruptcy get

11    administrative credit treatment.  Judge Drain says that's a

12    setoff right as against any preference liability that you

13    may have.

14             So I don't think this this distinction as to when

15    the claim arose, pre- or post-bankruptcy, is really relevant

16    for purposes of 547(c)(f) analysis.  I don't think the case

17    law supports that.

18             THE COURT:  Okay, can we pause there for a second?

19             MR. GARFINKLE:  Yeah.

20             THE COURT:  So I think the issue that comes up

21    with that, sort of -- no doubt this was discussed when you

22    were judging Duberstein, I'm sure by parties.  You know, the

23    issue is just that the preference period is obviously

24    delineated period that happens prior to the proceeding and

25    in every -- that's caught up as of the date of the
```

Page 36

1    proceeding, and the unique things that the 503(b)(9) statute

2    does is, A, provide for treatment of the only thing just

3    about in the Bankruptcy Code where somebody gets an

4    administrative expense claim for something that happens

5    before the bankruptcy filing, as opposed to something that

6    happens after the bankruptcy filing.

7          And number two, the fact that then there could be

8    payment of that, which in this case was partial, in some

9    cases, could have been full, that also occurs, some of that,

10   post-petition as opposed to prepetition.  Obviously here,

11   some of it occurred prepetition, and -- but in the

12   hypothetical, you know, that that was discussed there.

13   Obviously, some of it occurred post-petition in that

14   circumstance.

15          And I think that it's struggling to fit that

16   within the context of the new value defense under the

17   Bankruptcy Code and how does that work, because you're, in

18   essence, providing a unique -- you're offsetting a -- I

19   guess you're providing -- you're looking at new value from a

20   unique situation where every other new value defense, if it

21   was not ultimately determined by the Court to be valid,

22   would give rise to somebody having an unsecured preference

23   claim, and here, obviously if there was a payment, even if

24   there has been a payment prepetition, and here the issue is

25   that because you have the 503(b)(9) issue, you have a

1    possibility of that becoming an administrative claim.  And

2    then the argument that some people are making as to that

3    being sort of like a double count.

4            And I realize your argument here is that obviously

5    because even if you get this administrative claim, it's not

6    a double count because you're only going to get paid part of

7    it, a very small part of it, it's on the plan and where

8    things are at the moment, but I think that's why this issue

9    comes up and Congress obviously didn't even think about it

10   or try to harmonize it.

11           I just don't think it did.  And that's why I think

12   parties get -- you know, find this an issue to be

13   interesting because, you know, you're -- I don't want to say

14   you're mixing timeframes, but you're in part mixing time

15   frames and you're mixing payment priorities in the context

16   of something that normally only looks at either unsecured

17   claims that are all prepetition and were -- denominated

18   something as an administrative claim or something that is a,

19   you know, secured claim where you have obviously issues that

20   are different with liens.

21           So I think that's why this is an issue that --

22   it's not, you know, Congress didn't really think about this

23   issue coming up and obviously I realize here, there might

24   not be the, as you say, hundred percent recovery issue and

25   that may be a distinguishing factor here.  But you know,

1    there's still an issue of how this all fits together in the

2    context of the code.

3              MR. GARFINKLE:  Well, Your Honor, can I just

4    address that point, and I'll -- then I'll pass the podium, I

5    think, because I've spent a good deal of time, but I can

6    also address -- the current reserve for McKesson on account

7    of its $1.75 million administrative claim is $260,000.

8    Okay?  So in the -- I'm looking at the plaintiff's

9    demonstrative.  They throw in the million dollars and say

10   that is a distribution on account of McKesson's 503(b)(9)

11   claim.

12             THE COURT:  No, it's an offset under the contract,

13   I think.

14             MR. GARFINKLE:  It is not a -- it was not.  The

15   contract speaks for itself.  The extension agreement speaks

16   -- it was an extension fee.  It was not --

17             THE COURT:  Right.

18             MR. GARFINKLE:  -- account.

19             THE COURT:  Right, but you weren't paid it.

20             MR. GARFINKLE:  It was not payment on --

21             THE COURT:  You weren't paid it, as I understand.

22   It's an offset right?

23             MR. GARFINKLE:  Yes.  It was an offset against

24   future rebates that we -- and the structure was -- but once

25   that was done, we would -- McKesson would voluntarily reduce

Page 39

```
 1     its 503(b)(9) claim from $2.75 million or actually -- to

 2     what it is now 1.75.  So, McKesson never -- as to the

 3     million dollars, it never got a payment on account of its

 4     503(b)(9) claim.  Let's be clear about that.  That's number

 5     one.  The extension agreement -- as to the two -- let's take

 6     the Court's -- let's walk through the Court where it was in

 7     the temporal problem.

 8              So let's assume for argument's sake that McKesson

 9     does get a $260,000 recovery on its $1.75 million 503(b)(9)

10     claim.  Let's play that out.  That would mean that

11     McKesson's new value calculation would increase from the

12     current amount of $9.7 million has shown Mr. Burke's

13     declaration, to $9.9 -- approximately $9.96 million.  I'm

14     using round numbers again.

15              That would still put you within the week before

16     bankruptcy payments.  We have not exceeded that.  Those

17     payments again are at $10.1 million.  So we're back to this

18     this circle, Your Honor, of being that McKesson gets a

19     503(b)(9) claim for that last payment, for the payment made

20     on July 13th, which is the payment that we're now into, on

21     account of a 503(b)(9) claim.  So while this is a really

22     interesting academic exercise, I don't think the Court needs

23     to go there --

24              THE COURT:  I get what you're say --

25              MR. GARFINKLE:  -- mathematically.
```

1            THE COURT:  Okay, Mr. Garfinkle, respectfully, I

2     get what you're saying.  But the issue isn't whether I think

3     it makes sense that you all are having this argument over

4     relatively de minimus amount of money in the context of this

5     case and -- or the fact that you haven't been able to get to

6     an agreement in like three years, five years, whatever it is

7     over these matters.

8            I mean, it -- that's not the issue.  The issue is

9     you're here now.  You're stuck arguing it, whether it makes

10    sense to ever have a trial over this or get to these issues,

11    that the issue is whether I can grant a summary judgment

12    because there is an undisputed issue of law and where I'm

13    having trouble with some of these issues is I don't think

14    they're undisputed.

15           Maybe they're not disputed very well -- sorry to

16    put it that way.  Maybe there's not a lot of evidence that

17    supports the dispute, but there's disputes and that's what

18    I'm having trouble with.  So I'm trying to focus on the fact

19    that, you know, of the -- less of the math and more of the

20    law because I think at the end of the day, unfortunately,

21    whether this makes any sense or not, there's obviously

22    issues of law that I can decide that are in front of me in

23    this matter.

24           But how that works into the math is going to be a

25    different story, possibly, because you may not -- I may not

Page 41

1    be able to grant summary judgment on the math based on

2    what's before me, whether I think they're good arguments or

3    not, because the standard doesn't let me determine for

4    summary judgment motion, you know, whether or not there's,

5    you know, I think it's a winning argument or supported by

6    the preponderance of the evidence or I think that their

7    evidence is good.

8              That isn't what I'm supposed to be deciding based

9    on, and that's the problem I have with some of these

10   arguments, because there are arguments, again for summary

11   judgment on the other side and what I'm trying to understand

12   is really, you know, the legal side of this myself, because

13   again, I just think that that it's clear to me, people have

14   disputes.  Look, you may be completely right that they

15   should have access to the system, they should be able to do

16   this, they should be able to, you know, determine that you -

17   - that there was delivery of these goods.

18             Their argument back is you haven't provided them

19   with like a piece of paper that shows from the shipping

20   agent that there was -- that these were delivered and that

21   according to their records, they can't find proof of

22   delivery.  All right, well, what is that?  Is that a triable

23   issue of fact?  It might be.  Is it a waste of time because

24   at the end of the day, this ends up in a zero recovery?

25   Yeah, maybe.

Page 42

```
 1          But if people keep going down a road where there's

 2    going to be -- where there has to be a trial and spending

 3    money because there has to be a trial, yeah, you're right.

 4    You may be spending a lot of money ultimately on a trial

 5    litigating a trial where the recovery is going to be zero

 6    against your client, whether it makes any sense or not.  But

 7    that's not my -- that's not up to me.

 8          MR. GARFINKLE:  I hear Your Honor, and my point

 9    was not that you couldn't -- that there aren't some issues

10    here that are, maybe, we don't we don't think they're -- we

11    think they're ripe for summary judgment.  What we're saying

12    is even accepting plaintiff's arguments as true, based upon

13    the math, McKesson still is entitled to summary judgment.

14    That's mathematically the result and that's what we're

15    trying to argue.  Maybe I haven't explained it, articulated

16    it right.

17          We'll accept for argument's sake all of their

18    points.  But once you come back to this point of -- and it

19    kind of goes back in the circle, that if I have to pay back

20    a 503(b)(9) payment, McKesson is entitled statutorily to a

21    503(b)(9) administrative claim and we get back to Judge

22    Drain's setoff ruling.  And with all due respect to my

23    opposing counsel, Judge Drain also made a ruling when he

24    denied their motion for summary judgment, denied their

25    motion for leave to amend, and then subsequently denied our
```

Page 43

1    motion to dismiss the amended complaint, he limited the

2    equitable kind of claims that plaintiff could make to try to

3    defeat McKesson's claims in the bankruptcy case.

4           And as we point out in our apply, they're

5    relitigating those same issues and we find that one to be

6    the most, I don't know, frustrating is probably the best

7    word I can describe it, that --

8           THE COURT:  I used outrage, but that's okay.

9           MR. GARFINKLE:  It's frustrating, Your Honor,

10   because it's -- as I said earlier, I feel like it's whack a

11   mole.  Every time I get an issue I think resolved or judge -

12   - or somebody makes a ruling, I get it repackaged as a

13   different -- in a different form and fashion.  That goes to

14   these new breach of contract claims which are being asserted

15   by way of defenses to our claim, even though they never

16   filed an objection to claim based on that.

17          And I haven't talked about that summary judgment

18   motion, but again, it's just frustrating, Your Honor,

19   because I -- it is truly whack a mole with this.  Every time

20   I think I have an issue resolved and Judge Drain says, go

21   forward based upon this understanding of how I view the law,

22   I'm having to re-deal with the issue in a different form and

23   context.  And I'll just leave it at that.  So I'm happy to

24   address any other things I haven't addressed and turn the

25   podium on to my opposing counsel.

1          THE COURT:  Okay, thank you.

2          MR. GARFINKLE:  Thanks.

3          MR. MILIN:  Good morning.  Still morning, Your

4    Honor.  Welcome to A&P v. McKesson.  I'd like to begin with

5    just a few comments about what Mr. Garfinkle had to say.

6    Most of it, I will address in the course of addressing the

7    particular issues in our demonstrative, but you know, Mr.

8    Garfinkle would be frustrated less often if he took a more

9    open-minded view of what's actually been decided and what's

10   actually been conceded than he seems to.

11         For example, he misreads Judge Drain's decisions

12   on amending the complaint which you just mentioned, and I

13   may return to this, but that was about a fishing expedition,

14   not about shielding the clear inequitable conduct that we

15   have brought to the Court's attention.

16         Focusing on the facts -- on the law for a second,

17   we don't intend -- you know, we continue with our views

18   about what Judge Drain decided.  I understand Your Honor's

19   interpretation that that decision decided the setoff right

20   with respect to the fixed claim that McKesson asserts, but

21   Mr. Garfinkle suggests that that decision was following

22   Quantum Foods and my only point is that Quantum Foods was

23   about a B-1 post-petition claim, not about B-9 prepetition,

24   but I'm not going to discuss that issue further.

25         Secondly -- I'm sorry?  Secondly, Mr. Garfinkle

Page 45

1    relied as his papers rely on the ASM case, but he doesn't

2    address something that we pointed out and that we think is

3    rather important, which is in Footnote 2 of the ASM case,

4    the Court says, "Neither party has suggested that Section

5    503(b)(9) has any relevance to this appeal and we do not

6    specifically address its interaction with Section 502(d)."

7    So I just think that in looking at that case, it's important

8    to keep the Court's express limitation in mind.

9           Mr. Garfinkle said that there's no commentary on

10   the purpose of 503(b)(9).  We cite a couple of cases saying

11   otherwise and it certainly isn't the elimination of

12   preference liability, but I'll get into that in a minute.

13          The last point I just wanted to address quickly is

14   that Mr. Garfinkle says that 503(b) gives McKesson a claim.

15   It doesn't need to look to 502(h), and that's not right

16   because McKesson has been paid.  It has no valid claim under

17   503(b)(9) for the preference of the -- for the sums that we

18   seek back as preferences.

19          The only way McKesson can get a claim for those

20   sums is through 502(h), but just with those, the rest I

21   think our position will become clear as I proceed with the

22   motion.  I'm sorry I'm not sure that I announced myself as

23   Richard Milin, but I am Richard Milin on behalf of the

24   Committee, on behalf of the estate.

25          Now, first of all, since as Your Honor has

Page 46

1    recognized, there are a number of issues here.  We count

2    four subsequent new value issues, seven 503(b)(9) issues,

3    and eight setoff issues for a grand total of 19, not

4    including, as they say subparts.  And as Your Honor noted,

5    it's beginning to our -- well, something like four are

6    issues that this Court will have to decide with very little

7    guidance or no guidance from other cases, and I just wanted

8    to thank Your Honor for taking the matter on.

9            So Your Honor has seen our demonstrative.  We're

10   not asking that it be admitted into evidence.  It's not a

11   summary of our evidence.  It's not new arguments.  It's not

12   a Sur-Reply.  It's only intended to outline all of the major

13   issues as we see them and how they fit together and give a

14   guide to our oral argument and hopefully to Your Honor's

15   decision making.  So with that, I would propose to go ahead

16   and deal with individual issues in what seems the most

17   logical order, beginning with the proper amount of potential

18   liability net of subsequent new value, then discussing the

19   proper amount of the 503(b)(9) claim, and finally turning to

20   McKesson's request for setoff.

21           If the Court prefers, I can prefer in some other

22   way if any of the numerical issues about which I have very

23   little to say with the exception of the inflated invoice

24   point, I'm happy to move on from those as they come up.

25   Before I start, Your Honor, questions, comments or shall I

Page 47

1    move forward?

2            THE COURT:  No, you can move forward, please.

3            MR. MILIN:  All right, very good.  So turning then

4    to the subsequent new value issues, our analysis of

5    defendants "maximum preference liability" with one key

6    exception, starts where defendants start.  That's on the

7    second page of our demonstrative and it identifies the

8    issues and calculate their significance.  As an initial

9    matter, we have argued that -- well as an initial matter,

10   the complaint seeks to recover $67 million in preferential

11   payments but defendant's starting number is only $9.7

12   million and as Your Honor is aware, the difference results

13   from defendant's inclusion of paid new values as part of its

14   subsequent new value defense.

15           That issue, Your Honor is well familiar with.

16   There are -- not all cases in this district say that non --

17   paid new value accounts as subsequent new value.  We cite

18   Pamlico and Teligent.  The Seventh Circuit, as Mr. Garfinkle

19   said, held that new value must remain unpaid and we think

20   that it's bad policy to count paid new value, particularly

21   here, because defendant's next day payment terms which it

22   imposed unilaterally in the 20 days before bankruptcy and

23   its threats to discontinued shipment gave defendant all the

24   incentive it needed to continue doing business with A&P.

25           However, we understand that more cases and more

Page 48

1   recent cases have held that new value need not remain

2   unpaid.  Our position is simply that the Second Circuit

3   hasn't spoken and defendant isn't entitled to reduce its

4   profit liability by more than $57 million dollars unless

5   this Court rules that it can.  We have argued for the

6   reasons in our papers that it shouldn't because it's

7   inequitable, but having said that, I'll move on.

8            So even if the plaintiff is entitled to the

9   benefit of paid new value, it's not entitled to more than

10  the value the Debtor actually received and we've objected to

11  the SNV defense as the defendant has calculated on two

12  factual grounds and on an additional legal ground as our

13  demonstrative states.  I plan to address these issues

14  briefly, focusing on responding to defendant's arguments

15  unless the Court has questions.

16           So first, the defense should be reduced by

17  $742,771.88 because it's based on inflated invoices.  And

18  there's no genuine dispute about the facts.  A&P paid by a

19  two-step process as both the supply agreement and

20  defendant's 30(b)(6) witness agree.  In essence, defendant

21  marked up its invoices by 20 percent but eliminated that

22  markup with a rebate, which the supply agreement required

23  defendants to pay before the invoice was due about two-

24  thirds of the time.  Because of this two-step process, if

25  A&P received an invoice for $120,000 for one-stop generic

Page 49

1    products after the 11th of any month longer than Friday,

2    defendant paid A&P a $20,000 pre-bate; that is, A&P actually

3    had a $20,000 rebate in hand before it was required to pay

4    defendant it's $120,000.

5            As a result, A&P's out of pocket cost and the true

6    price it paid and the actual value of the merchandise

7    purchased is only the net amount of $100,000.  And even when

8    A&P purchased earlier in the month, the two-step payment

9    process and contractually specified payment dates meant that

10   A&P received its rebate very soon after it paid its invoice.

11   The rebate was paid every month until the petition date.

12   These facts are in the DeVito declaration, Paragraph 48 to

13   68, and in the exhibits and testimony she cites.

14           Crucially, defendant offers no facts to the

15   contrary.  Instead, defendant tries to claim with no

16   citation to anything, that the rebates were somehow

17   contingent, but it doesn't identify a single occasion before

18   the petition date on which the rebate wasn't paid.  Now

19   defendant did unilaterally take the June 2015 rebate back

20   without consent or Court permission, four months after

21   bankruptcy.  And it also withheld the July rebate which was

22   due in August after A&P's bankruptcy and before the

23   extension agreement restarted the rebate program.

24           But that doesn't change how the parties actually

25   did business before the petition date or the true value of

Page 50

1    the goods defendant delivered or the fact that the rebates

2    were not truly contingent.  In fact, defendant itself

3    calculated A&P's net price in its rebate reports as shown on

4    DeVito Exhibit 9.  So defendant argues that the Court should

5    ignore the substance of the parties' transactions and rely

6    on inflated invoice prices instead for three untenable

7    reasons.

8            First, defendant relies on the Bethlehem Steel

9    case for the proposition that "where a contract exists, the

10   contractual rate is the reasonable value of the goods."

11   There's a couple problems with that.  First, Bethlehem Steel

12   only establishes a "initial assumption" in favor of the

13   contract price, which is only "viable" unless the Debtor

14   introduces convincing evidence to the contrary.  And we rely

15   on the words of the contract itself and defendant's 30(b)(6)

16   witness.  Evidence doesn't get more convincing than that.

17           But even more importantly, we don't dispute the

18   contract price.  Our point is that the invoice price and the

19   contract price are not the same because the contract

20   specifies that two-part payment process and it says that A&P

21   will pay the invoice minus the markup.  By the way,

22   defendant also relies on Globe Metallurgical, but that case

23   actually scheduled an evidentiary hearing to determine

24   whether the contract rate correctly reflected the value of

25   the goods at issue.

Page 51

1              Defendant's second argument is that "Plaintiff

2      must show that in the open market, Debtor could have

3      purchased those same goods at their proposed discount

4      pricing rather than at the contract rate in the invoices."

5      In fact, neither of the cases defendant cites even comes

6      close to supporting that proposition.  Gonzalez merely

7      finds, based on very different facts, that the invoice price

8      at issue represented what a willing buyer would pay a

9      willing seller.

10             And Pilgrim's Pride concerned a mixture of goods

11     and services, so there was no relevant contract rate or

12     invoice price for the goods and issues at issue, and that's

13     why the Court had no option except to look at the market and

14     that's in Footnote 13 of the case as well as elsewhere.

15             So even if defendant's proposition were correct,

16     it doesn't apply here.  We aren't arguing that defendant's

17     invoices don't reflect true value because they are above the

18     market rate.  We're arguing that defendant's invoices don't

19     reflect the discounts in defendant's own contracts.  Market

20     price is simply irrelevant.

21             So finally, on this point, defendant makes several

22     arguments premised on the notion that plaintiff seeks to

23     reduce its SNV calculation because of rebates.  Defendant's

24     confused.  Plaintiff seeks to reduce the SNV calculation

25     because it is based on overstated invoices.  We're not

Page 52

1    asking defendants to turn over a rebate in response to the

2    current motion.  We're only asking that it should not

3    overstate the value of the goods it delivered.  The rebates

4    are only relevant because they equal the amount of the

5    overstatement, not because we're asking defendants to give

6    them back, at least not today.

7            So the next correction as the -- as our

8    demonstrative shows, is the $127,000 for unproven

9    deliveries.  Your Honor stated the issue very well.  I don't

10   know that I have much to add.  It's very simple.  We asked

11   them to prove that the goods were actually delivered and

12   they've never been able to do so.  Instead, they pronounced

13   their invoices as conclusive, even though they were issued

14   late, have the wrong payment dates, include shipments to

15   inactive pharmacies, and specify DNS, which may mean do not

16   ship, as the shipper's (indiscernible).

17           The defendant also tries to blame Ms. DeVito for

18   not searching records she doesn't have, but fundamentally,

19   defendant can't escape its own burden of proof.  If you want

20   someone to pay you for goods that you say you sent them, you

21   have to be able to prove that the goods were actually

22   delivered.  That's all there is to it.  And because

23   discovery is now closed, we respectfully suggest that

24   judgment should be entered in plaintiff's favor because

25   there's no genuine issue here for trial.  All of the

Page 53

1     evidence is before Your Honor.

2              So if I may take it quick drink because my throat

3     is gone.

4              Last challenge to defendant's SNV defense is that

5     defendant should not be allowed to double dip and we heard a

6     little bit about that earlier.  As the Court knows, there's

7     been a lot of debate about it, it's the subject of the

8     Duberstein court competition and it's squarely presented

9     here with more than $1 million dollars at stake.  Second

10    Circuit hasn't addressed it.

11             Now, defendant wants to double dip by including

12    all of the goods in its 503(b)(9) claims as part of its SNV

13    defense as well.  If a creditor can do that, it will receive

14    twice the value of its merchandise.  First, it will receive

15    full value, absent administrative insolvency, which I'll

16    turn to later, because it will have an administrative

17    priority claim under section 503(b)(9).  And second, it will

18    receive full value again because it can use the same

19    merchandise as SNV to reduce its preference liability dollar

20    for dollar.

21             Given how many creditors receive little or nothing

22    in bankruptcy proceedings, it's unconscionable to allow any

23    creditor to receive the value of its merchandise twice.  And

24    yes, defendant won't get the full value, but again, I'll

25    come to that.  As a statutory matter, the question before

Page 54

1    the Court, as Your Honor, knows is how to interpret the

2    requirement in the SNV Statute, Section 547(c)(4), that a

3    creditor can only use new value as a defense to the extent

4    that on account of the new value, "the Debtor did not make

5    an otherwise unavoidable transfer to or for the benefit of

6    such creditor."  As applied here, the decision before the

7    Court is whether when a Debtor pays a creditor's 503(b)(9)

8    claim, it's making an otherwise avoidable transfer.

9            So fortunately, the key relevant arguments have

10   been identified and discussed at length.  There are all

11   those Duberstein briefs which Your Honor had to read and

12   there's Friedmans, which is a Third Circuit case about wage

13   orders, which defendant relies on.  We rely on Beaulieu

14   which I think the French would pronounce Beaulieu, which is

15   a later Georgia bankruptcy case that analyzes and

16   specifically rejects the Third Circuit's argument.

17           Both Friedman's and Beaulieu agree about most of

18   the key issues.  For example, they both conclude that a

19   distribution can be a transfer and that a Debtor -- the word

20   Debtor can refer to the post-petition Debtor as well as the

21   prepetition entity.  But Friedman's concludes that post-

22   petition payments can't be considered based on the context

23   of the statute and Beaulieu concludes that post-petition

24   payments can reduce the preference liability based on the

25   plain statutory language, sound bankruptcy policy, and of

Page 55

1    the analysis and rejection of Friedman's counter arguments.

2          We submit that the statutory language is

3    controlling as most courts have held; for example, in

4    deciding to pay new value -- I'm sorry.  We submit that the

5    statutory language is controlling as most Courts have held

6    in ruling on paid new value issue.  We also submit that the

7    inequity of double payment makes following Beaulieu and

8    barring double payment, the only just course.

9          So there are a couple of relevant facts which were

10   discussed before.  First, as Your Honor noted, defendant was

11   already paid a full $1 million of its 503(b)(9) claim back

12   in 2016, dollar for dollar.  The fact that it was paid by

13   setting off against the rebates is -- makes no difference.

14   What defendant wants to argue is it should be allowed to

15   keep the million dollars and claim it as SNV which would be

16   full double payment by describing it as a fee.  But names

17   don't matter.

18         The Debtor did not agree to pay defendant a

19   million dollars as the price of continuing to do business.

20   The Debtor agreed to pay a million dollars of defendant's

21   503(b)(9) claim as a price of doing business.  Defendants,

22   in essence, trying to renegotiate that now and that's the

23   basis -- that million dollars is the basis for what the

24   demonstrator calls a first correction for double dipping.

25         The second correction, uses an uncertain amount,

1   because it depends on the allowed amount of defendant's

2   503(b)(9) claim and there are, as we'll discuss, some issues

3   about that.  Also, although administrative creditors are

4   only receiving about 20 percent of their claims, we are only

5   seeking to reduce defendant's SNV defense by the amount it

6   actually gets paid under Section 503(b)(9).  After all, the

7   statute -- so the statute says that you don't get SNV credit

8   if you've received an otherwise unavoidable payment.  That

9   can only relate, in our view, to the amount they actually

10   get paid and that's all we're looking to stop the defendant

11   from recovering twice.

12           And as to the fact that it won't receive a full

13   double payment, we don't think that affects the Beaulieu

14   analysis in the slightest.  Beaulieu refers rather than just

15   a double payment, it focuses on what it calls payment plus.

16   Here, defendant wants full value for its claim in subsequent

17   new value analysis, and we'll get at least 20 percent of its

18   claim under 503(b)(9).  So defendant will still receive

19   payment plus if the Court adopts defendant's position.

20           So that, I think, with the exception of our note

21   which is there, sort of covers the issues on subsequent new

22   value and maximum preference liability from our perspective.

23   Happy to address any questions about those issues or to move

24   on to setoff, as Your Honor directs.

25           THE COURT:  Okay I think we can move on to setoff.

1            MR. MILIN:  Okay.  So we've raised seven issues

2      about setoff, all listed on demonstrative Page 3.

3      Fortunately, all seven are purely factual and I've already

4      addressed issues A-1 and A-2, overstated invoices and

5      unproven deliveries.  The correction based on overstated

6      invoices is only $277,000 in the 503(b)(9) context, by the

7      way, as Ms. DeVito's declaration explains, because 503(b)(9)

8      claim only stretches back 20 days and because it only

9      includes unpaid goods.

10           So issue 503(b)(9) -- issue A-3 is a $44,000 issue

11     that like defendant's invoices and unproven deliveries, we

12     think presents no genuine issue for trial and should be

13     resolved in our favor.  Defendant's records indicate and

14     Your Honor has been provided with those records that

15     $44,032.76 is owed to the Debtor for returns after the

16     debtor closed its pharmacies.  Section 7 of the parties'

17     extension agreement states that if those sums are not

18     returned to the Debtor they must be deducted from

19     defendant's 503(b)(9) claim.

20           But defendant hasn't deducted it from their

21     503(b)(9) claim, and yet it doesn't deny the facts as Ms.

22     DeVito states them.  So we think the undisputed facts show

23     that the claims should be reduced by that amount.

24           Next, and these are numerical issues but can also

25     be discussed quickly, we list four additional corrections

1    which should reduce the 503(b)(9) claim as B-1 through B-4.

2    Now, defendant fails to address these issues on the merits

3    and offers no facts to dispute plaintiff's position, and we

4    therefore think it should be denied at summary judgment in

5    any amount that doesn't correct for B-1 through B-4.

6              Also, defendant reserves the right to seek the

7    full sums at issue in cash rather than just as a reduction

8    of 503(b)(9) claim, depending on what the full factual

9    record shows because just applying it to 503(b)(9) lets

10   defendant in essence keep 80 percent of the sums at issue

11   and some of them certainly were taken in violation of the

12   stay.  So --

13             THE COURT:  Okay, so let me ask you stop there for

14   a second.  Sorry.  I have a couple of questions about that

15   because I was -- when I read your papers, I think what I was

16   having trouble understanding is how this ends up being --

17   and if it's factually correct, an offset against the

18   503(b)(9) claim as opposed to an offset against any other

19   claim, because I don't think I have enough data.  I might I

20   might be wrong.  You may tell me I do, explaining that this

21   relates to the 20-day period and those specific invoices as

22   opposed to it relating to returns that could be goods that

23   were shipped prepetition but not in the 20-day because when

24   you get a whole bunch of returns, you don't necessarily know

25   that, or for example the -- I guess there's, you know, there

Page 59

1  were some discrepancies, et cetera in their -- defendant's

2  accounting records allegedly, but they filed a claim and so

3  was this part of your objection to their -- the Debtor's

4  objection to their 503(b)(9) claim?  I don't recall seeing

5  that.

6         MR. MILIN:  Right.  So a couple of things.  These

7  sums, just to be clear, $44,000 and B-1 Through B-4, are all

8  post-petition sums.  With respect to the Debtor's objection

9  --

10        THE COURT:  What does that mean though?  Because

11 you could have returns that happened in 2015, but how is

12 that post-petition sums?  Is it relating to goods that were

13 shipped post-petition and it's traceable or --

14        MR. MILIN:  Yeah.

15        THE COURT:  -- is it something else?

16        MR. MILIN:  No.  These claims are for sums that

17 were owed -- the parties continued to do business after

18 bankruptcy.  All of the five sums that I've just identified

19 appear to relate and we believe do relate to the post-

20 petition transactions.  So Your Honor --

21        THE COURT:  Okay, but then let me stop.  Let me

22 stop there for a second.  But then why is that a 503(b)(9)

23 claim?  Again, this is a little tricky but you understand

24 the issue.  I mean their 503(b)(9) is treated as an

25 administrative claim, but obviously it relates to

Page 60

1   transactions that occurred prepetition.  If post-petition

2   there were other administrative relationships and

3   administrative claim relationships between McKesson and the

4   Debtor which you're saying occurred because they continued

5   to do business post-petition with each other, then wouldn't

6   this be an issue where either it would be offset against a -

7   - sorry, the transactions that occurred post-petition or you

8   would have possibly sued to recover it?

9            MR. MILIN:  So --

10           THE COURT:  On some theory other than as a

11   preference, like they just showed it to you under the

12   contract?

13           MR. MILIN:  Understood, Your Honor.  So there are

14   a couple of things.  First, this is a motion for summary

15   judgment and being how they read decisions, we -- so long as

16   our right to seek these claims is generally preserved, then

17   we can figure out whether that should be done by objection

18   to the claim or some other way.  However, there is also a

19   fact --

20           THE COURT:  Let's stop there for a second.  So the

21   first thing is, no disrespect to the Debtor or for that

22   matter of the Creditors Committee, but I haven't really

23   typically seen three sets of claims objections, none of

24   which got adjudicated relating to an administrative claim.

25   That's odd.  I'll just say to start with.

Page 61

1              And if this isn't in those objections to the

2     503(b)(9) claim, I don't see how this relates to the

3     503(b)(9) claim for allowance purposes of the 503(b)(9)

4     claim, at least certainly for the ones that have been

5     asserted.

6              It might be that -- and I don't think your

7     complaint, but again, you're going to be more familiar with

8     it than me.  I don't think that the complaint that's been

9     filed already has to do with recovering amounts by the

10    Debtor for theories that were not preferential that are just

11    amounts due and owing under the contract for post-petition,

12    I guess, claims and I don't -- I suppose I don't -- I would

13    have to go back and look what law governs the contract.

14             But I mean, obviously there's a period of time for

15    suing for failure to pay something under an agreement and

16    that may not have passed.  Certainly in New York, it

17    wouldn't have passed yet, but I don't know if that's

18    actually been commenced.  And it -- I don't think it's part

19    of this litigation, let's put it that way, from my review of

20    it.  And I -- if there was an affirmative recovery owed, I

21    would think that that would have been asserted at some point

22    already.

23             It isn't in the claims objection for the 503(b)(9)

24    and, respectfully, there -- that's happened.  You know,

25    these claims were asserted a long time ago.  There were

Page 62

1    objections filed.  This isn't in that.  It's not in your

2    complaint.  I'm not saying it's time barred under applicable

3    law, because I have no idea without looking at the complaint

4    again.  It may not be in New York.  As I said, it wouldn't

5    necessarily be if the transactions were 2017 because the

6    six-year statute of limitations wouldn't have ended for, you

7    know, contractual obligations.

8            But I don't -- I'm not sure I understand how this

9    is a defense to the 503(b)(9) claim.  That's what I'm really

10   just trying to understand because it hasn't been raised in

11   the claims objection.  It hasn't been raised in this

12   litigation as an affirmative claim.  The judge has clearly

13   already -- I mean we're at this late stage of this case, so

14   it's not in this complaint that I'm aware of.  So that's why

15   I'm just trying to understand how does this fit in.

16           MR. MILIN:  Sure.  So Your Honor has raised a

17   number of issues.  I will try to (sound drops) them all.

18   First of all, the amended complaint is not limited to

19   preference period.  It specifically seeks two sums, one for

20   rebates, one for credits, for violation of the automatic

21   stay and is a setoff against the 503(b)(9) claim for

22   defendant's actions in taking $569,000 in rebates back four

23   months after the --

24           THE COURT:  Mm hmm.

25           MR. MILIN:  -- and for withholding credits that

Page 63

1    were due for return.  So that's what -- the amended

2    complaint does include affirmative recovery, seek

3    affirmative recovery for post-petition acts.  And secondly,

4    there are some fact issues that I need to clarify for Your

5    Honor because the -- first of all, the $44,000, I divided

6    out the two sets of sums for a reason.

7           The $44,000 is specifically required by

8    defendant's contract to be deducted from the 503(b)(9)

9    claim.  So that's why --

10          THE COURT:  Understood.

11          MR. MILIN:  All right.  So the 327 may be the same

12   thing.  It's -- can't tell from the information the Debtor

13   provided -- I'm sorry, the defendant provided.  So it may

14   relate for that reason.  Also the 134 in part relates to

15   prepetition issues because what happened there is in post-

16   petition transactions, McKesson decided they must have given

17   us a rebate for stuff we bought before the petition date and

18   didn't pay for and just took $134,000.

19          So I'm just providing the facts on that.  After --

20   as to timeliness, if Your Honor decides that we can't simply

21   offset them as we would in a reconciliation process, I

22   think, then we may seek to amend the complaint with respect

23   to them.  I'd hate to do that.  Or we may decide that they

24   should be taken into account with the total of six

25   violations of the stay that defendant committed as an

1    argument why it should equitably be denied a setoff.

2            As to the objection, the objection states that the

3    defendant had failed to justify -- provide documentation to

4    justify its claim.  Now it's clear from 2019 that the Debtor

5    had tried to get information about the credits as well.  You

6    know, defendant reads the objection to sufficient

7    documentation to say, as if we were objecting only

8    concerning facts supporting defendant's position, but in our

9    view, the objection to insufficient documentation also

10   includes issues concerning offsets and credits that might

11   reduce defendant's claim.

12           I mean, that's how claims reconciliation is

13   supposed to work, and we respectfully suggest that there's

14   no reason to disallow plaintiff's objections based on the

15   defendant's narrow view, especially in the circumstances

16   because, you know, we have evidence of concealment.  We know

17   that defendant decided to take that $134,000 back, not only

18   without consent or Court permission, but to move it into an

19   alternate account to keep credits that they don't want to

20   give A&P and that they intend to take after the bankruptcy.

21           So, we think that's very problematic for obvious

22   reasons.  We should also point out the defendant's argument

23   based on the objection's timeliness is disingenuous because

24   the Debtor has been requesting documents about credits and

25   defendant's been refusing to provide them for at least two-

Page 65

1     and-a-half years, since at least September 2019.  That

2     history is related in Ms. DeVito's declaration Paragraph 10

3     to Paragraph 29 and if the issues plaintiffs raised are

4     indeed new, that's only because defendant refused to put the

5     relevant -- provide the relevant information and refused the

6     Debtor's efforts to reconcile its claim on several prior

7     occasions and worse.

8            Ms. Towsley misrepresented the facts about this

9     key account that has the 134 in it and the 327 in it at her

10    deposition.  So we don't think that defendant's objection --

11    that the Debtor's objection should be interpreted narrowly.

12    I'm not sure that addressed everything Your Honor, but if it

13    didn't, I will attempt to answer it.

14            THE COURT:  No, I think you explained to me why

15    you're offsetting it, at least your theory for why it should

16    be offset.

17            MR. MILIN:  And -- I understand.  I understand

18    Your Honor.  One other point that I (sound drops) about this

19    because defendant has asserted it many times, including

20    today, and that's what they keep saying that the extension

21    agreement agreed that section -- their 503(b)(9) claim

22    aggregates approximately $2,786,000.  But that's not what it

23    says.  It actually only says, "A&P shall pay to McKesson an

24    extension fee of $1 million on account of McKesson's

25    503(b)(9) claim which aggregates approximately $2,786,000."

1              That's an acknowledgment the defendant has

2      asserted a claim.  It's not an acknowledgement that that

3      claim is valid or a waiver of the right to challenge it.  So

4      we think that that's a plain red herring.  Ad as to, you

5      know, Judge Drain's ruling which they rely on, that's

6      clearly an apposite.  It's based on -- their argument's

7      based on a single out of context paragraph concerning

8      standing to assert breach of contract claims based on

9      prepetition rebates and credits and their argument's

10     incorrect for a lot of reasons.

11             The relevant facts are different.  The standing

12     issue is different because Debtor has asked plaintiff to

13     pursue its claim objections.  The statute of limitations and

14     tolling issues before Judge Drain of course were different,

15     too.  And as I pointed out, we have new evidence of

16     affirmative concealment by the defendant.  Also, Judge Drain

17     specifically authorized plaintiffs to pursue issues just

18     like those presented here, stay violations -- and we've

19     identified several -- as well as defensive claims by way of

20     setoff against defendant's 503(b)(9) claim.

21             And we think that the issues we've raised, whether

22     or not Your Honor decides that that's appropriate by the way

23     of an offset to the 503(b)(9) claim on this motion,

24     certainly have a right to assert those claims.  So you know,

25     we conclude, based on the arguments we've just been through,

Page 67

1    that defendant is not entitled to a judgment allowing it's

2    503(b)(9) claim in the amount of $1.7 million.

3           At a minimum, the fact (sound drops) $108,971.03

4    as calculated in defendant's demonstrative and as we state

5    in the note on Page 3, that number may be reduced to zero

6    based on the allegations in plaintiff's fourth claim for

7    relief, which Judge Drain approved by denying summary

8    judgment.

9           So that's kind of what I have on the 503(b)(9)

10   issues.  If Your Honor wants, would prefer, I'll move on to

11   setoff issues or we can do whatever --

12           THE COURT:  Yes, that's fine.

13           MR. MILIN:  All right.  Okay.  So we've discussed

14   four SNV issues, seven 503(b)(9) issues.  That leaves eight

15   setoff issues, but I believe with a bit of background all

16   but one of those can be addressed quite quickly.

17           So by way of context, which I think is clear from

18   the beginning of this argument, but we've been through a lot

19   since, defendant's setoff motion seeks to set off

20   defendant's potential preference liability against

21   plaintiff's potential preference recovery, thereby

22   eliminating defendant's preference liability altogether

23   except for a single transfer.  But defendant also asserts

24   the fixed claim of $1.7 million which we've just been

25   discussing.

Page 68

1          As Your Honor, recognized only the fixed claim was

2    before the court back in 2019 when defendant made what --

3    when Judge Drain made what defendant calls the setoff

4    ruling, and presumably defendant will want to set off its

5    fixed 503(b)(9) claim against any additional liability in

6    this proceeding as well.

7          So all of the five issues we identify in the last

8    page of our demonstrative as issues A-1 through A-5, apply

9    both to any fixed claim setoff and any potential preference

10   liability setoff.  The three issues identified as B-1

11   through B-3 relate only to a setoff of potential preference

12   liability.

13         So the first setoff issue, given that we're on a

14   motion for summary judgment, is the defendant has failed to

15   prove a right to setoff under non-bankruptcy law.  As we

16   showed Pages 16 to 17 of our setoff brief, defendant has the

17   burden of establishing its right to a setoff under non-

18   bankruptcy law, but it's made no effort to do so.  Instead,

19   it dropped Footnote 13 in its reply stating that it is

20   "extremely doubtful New York law governs this issue."

21         Defendant didn't then go on to try to show that it

22   meets the requirements for setoff under any governing law.

23   Defendant's motion for a setoff therefore should be denied.

24   This Court can't authorize defendant to execute a setoff

25   without defendant even taking a position as to what law

Page 69

1    governs, let alone showing that his proposed setoff

2    satisfies the law's requirements.  Nevertheless, we

3    respectfully suggest that the Court should deny setoff on

4    additional grounds as well, in order to provide the

5    plaintiffs with some much-needed guidance.

6         So the second issue, as we show at Pages 18 to 22

7    of our setoff brief, is that defendant requested setoff

8    would be non-mutual under 553.  We pointed out the Quantum

9    Foods issue and let me see whether we have something to say

10   about that, that doesn't run afoul of Your Honor's

11   indication at the beginning of this hearing that -- intent

12   to follow Judge Drain's setoff ruling.

13        I should say that, you know, our time, we didn't

14   have a requirement to try to appeal or change that ruling

15   because it didn't affect anything really going forward.  But

16   also, defendant relies on Local Rule 9023-1 but that only

17   required a motion to reconsider within 14 days of entry of

18   an order, and the judge did not enter an order.  So we

19   continue to believe that our position is stated in papers

20   about Judge Drain's ruling is correct, but we will move on,

21   unless there's something that Your Honor would like to ask

22   about before I move forward.

23        I'm sorry, should I move forward, Your Honor, or -

24   - Your Honor?

25        THE COURT:  I'm sorry.  My apologies.  I had hit a

Page 70

1    button on my phone.  Sorry.  What I was saying is so I've

2    now done the muted problem sorry, muted myself on my phone,

3    not actually on the website.  But what I was saying to you

4    is no, I don't have any issues or things we need to discuss

5    that further, so you can go ahead and move forward.  So I

6    was saying that, and you are clearly not hearing me.  My

7    apologies there.

8             MR. MILIN:  That true.  Thank you, Your Honor.

9    All right.  So the third and fourth setoff issues listed A-3

10   and A-4, are whether factual issues concerning defendant's

11   inequitable conduct, some set out in plaintiff's fourth

12   claim for relief and some newly discovered, require a denial

13   of the summary judgment permitting setoff.  We show that

14   they do at Pages 1 through 4 and 27 to 32 of our setoff

15   brief and as you've recognized, Judge Drain did not address

16   that issue.  And, even if he had, he went on to approve the

17   fourth claim for relief two years later, which expressly

18   seeks to deny defendant a setoff because of its unclean

19   hands.

20            And it's significant, I think, the defendant's

21   reply neither denies its inequitable conduct nor discusses

22   the allegations in plaintiff's fourth claim for relief, nor

23   cites a single case.  That reply at 30 to 32.  So again,

24   they rely on Judge Drain, but that was two years before

25   Judge Drain approved our right to raise equitable issues.

Page 71

1          Plaintiff also argues that -- I'm sorry, defendant

2     also argues that we can't seek to bar setoff based on newly

3     discovered inequitable conduct, relying on excerpts from a

4     hearing transcript taken out of context.  So we know Mr.

5     Garfinkle is frustrated about that, but Judge Drain actually

6     sought to prevent a discovery fishing expedition, not to

7     shield blatant misconduct such as defendant's concealing

8     what appeared to be up to $2 million in sums owed to the

9     Debtor with the stated intention of applying that money

10    after the bankruptcy is "closed."

11         Judge Drain also was unaware, as we were unaware,

12    that Ms. Towsley had misrepresented the relevant facts at

13    her deposition.  That's DeVito declaration, Paragraphs 120

14    to 125 and Exhibit 2.  So one way or the other, plaintiff's

15    fourth claim for relief as Judge Drain has already ruled,

16    states facts which could justify denying defendant a setoff

17    and defendant provides no grounds for dismissing that claim,

18    so it should be denied a summary judgment for that reason

19    alone.

20         The next issue is contingency and Your Honor

21    expressed some skepticism about that.  We understand and

22    indeed recognize that this is only an issue because of the

23    specific relief defendant seeks and it's timing.  So we

24    showed at Pages 16 to 18 of our setoff brief that even if

25    defendant were entitled to some kind of relief, it can't be

Page 72

1    authorized to exercise an immediate setoff.  For more than

2    100 years, New York law has held that setoffs of contingent

3    claims are not allowed.  Both defendant's debt to the Debtor

4    for preference liability and the Debtor's potential debt to

5    defendant under 502(h) of the Bankruptcy Code are

6    contingent.

7            Consequently, defendant isn't entitled to exercise

8    a setoff.  We understand the limits of that argument.  We

9    said so on Page 18 of our brief, but you know, given the

10   procedural context and the remedy defendant seeks, it's

11   dispositive, at least for now.  Certainly, defendant's

12   response does nothing to solve the problem.  It tries to

13   distinguish three, but only three of the five cases we've

14   cite, and it still has to admit that contingent claims can

15   be set off.  That's at Pages 11 to 13 of their reply.

16           Accordingly, they argue instead that they're still

17   entitled to a setoff because it's claims are "undisputed"

18   and "not dependent on future events," but as we've been

19   through and as Page 2 of our demonstrative and its note

20   point out, plaintiff actually disputes -- it may be Page 3 -

21   - but we actually dispute the entirety of defendant's fixed

22   503(b)(9) claim and any 502(h) claim necessarily depends on

23   future events.

24           Now, they also assert that they can assert a

25   setoff -- argue that they can exercise a setoff because

1    their claim is "not contingent."  Well, that's what the

2    reply says, but the defendant's original setoff motion said

3    the opposite at the top of Page 7 and so did its claim

4    motion in Paragraph 7 at page 3.  And even if defendant were

5    correct that his claim is contingent, and it isn't,

6    defendant fails to address whether plaintiff's claim for

7    preference liability is currently contingent, because of

8    course it is.

9          So we sort of come back to where we started.  New

10   York law does not allow the setoff defendant seeks because

11   both parties' claims are currently contingent and

12   hypothetical, and the motion as it stands seeking the relief

13   it seeks should be denied.

14         So next, unless Your Honor has questions.  There

15   are two grounds for denying a setoff specifically against

16   potential preference liability, which defendant simply fails

17   to address.  These are points B-1 and B-2 on the last page

18   of the demonstrative.  Your Honor will have recognized that

19   I'm play the hard issue to last, but I kind of think that we

20   should go through simpler issues first.

21         So one of the arguments is at Page 26 of the

22   setoff brief where we show that 502(h) can only create

23   prepetition claims because that's what its plain text says.

24   It says that the claims it creates are allowed as if they

25   arose before the filing of the petition.  Accordingly,

Page 74

1     502(h) claims, whether or not they can be granted

2     administrative priority, can't be set off against post-

3     petition preference liability and defendant offers no

4     response.

5             Second, plaintiff shows at Pages 26 and 27 of its

6     setoff brief that a 502(h) claim can't be set off against

7     preference liability because the two debts can't exist

8     simultaneously.  502(h) won't give defendant a claim until

9     it is paid its preference liability and at that point,

10    defendant won't owe plaintiff a debt.  It can be set off.

11    So again defendant offers no response.  I understand that

12    that feels kind of technical, but if it's not right, there

13    should be a reason for it and normally after all -- and New

14    York law holds, you should be setting off actual coexisting

15    claims, and that won't happen here with preference

16    liability.

17            Someone's phone is ringing and I don't think it's

18    mine.

19            THE COURT:  Mine.  I'm sorry -- my phone on mute.

20    Sorry about that.  It's my phone -- not my phone that I'm

21    on.  It's our Court phone because I'm actually in chambers

22    and I'm just hoping it stops, if you give me a second.

23    There we go.  Hopefully.  I'm not answering it obviously.  I

24    have a couple questions for you, though, about that while

25    we're on the 502(h) front, so let's -- I might as well just

Page 75

1    stop now since we stopped for a second and talk about them.

2           So I guess, you know, I think the argument that's

3    being made and I'm sure Mr. Garfinkle will jump in in his,

4    you know, response, rebuttal argument, but -- is that, you

5    know, two things.  One, while it says that it's arisen as of

6    the date of the filing of the petition, this is one of those

7    ones where I think Congress didn't do a very good job in

8    harmonizing what it meant.  In theory, you know, because of

9    the 503(b)(9) claim being a prepetition claim but still

10   being entitled to administrative expense claim, it doesn't

11   seem like it would necessarily preclude that, as odd as that

12   would be technically.

13          It doesn't say what the priority is of the

14   prepetition claim.  It just says it's treated as a

15   prepetition claim, which I know sounds odd because we always

16   think of prepetition claims as being unsecured claims or

17   priority claims.  We don't think of this for 503(b)(9), but

18   technically it's a claim that arose prior to the petition

19   date oftentimes, but has a different priority.  So that's

20   one argument I could see someone making about this.

21          And then the argument that I think was clearly

22   being made by Mr. Garfinkle is that, you know, because of

23   the nature of 503(b)(9), if the payment that was being

24   avoided was a originally a payment made in accordance with

25   503(b)(9) which otherwise would have been and was for goods

1    received within the 20 days before the commencement of the

2    case, that if that's avoided, that it doesn't -- you can't,

3    I guess, read out the fact that that's treated in a

4    different way.  In other words, it's not just to be treated

5    as if it was an unsecured claim because the code provides

6    for that sort of claim and that in theory, you know, that

7    claim could still be asserted.

8              I'd be interested in your thoughts on that.  I

9    think that gets into the third argument you were getting to

10   probably more --

11             MR. MILIN:  Yeah.

12             THE COURT:  -- than anything else for item three,

13   but that's where I think that -- again, I readily -- I am of

14   the view that Congress didn't think this through very well

15   on how these statutes were -- no disrespect to Congress --

16   about how these statutes were supposed to harmonize because

17   they were just changing something to deal with reclamation

18   issues and doing 503(b)(9) and I don't think they thought

19   through, how does this harmonize with other provisions of

20   the code very clearly.  And that's not meant disrespectfully

21   to anyone's argument here today, because none of us, you

22   know, we're stuck with what the statute says.

23             But I think that, you know, the issue is that

24   there's -- you're right that it wouldn't create an

25   administrative priority claim for -- that arose, you know,

Page 77

1    that related to post-petition -- like a post-petition

2    administrative priority claim for sure, but it just says as

3    if it arose prior to the petition date.  That doesn't mean

4    that it couldn't -- if Congress did something unusual like,

5    which it did here, in creating an administrative priority

6    claim where the facts that gave rise to that and the

7    transactions that gave rise to it were all prepetition, I

8    don't know that the code is very clear on this point.

9          Again, I don't think that's the way I normally

10   think of 502(h).  It's not the way I, my entire career in

11   practice was really dealing with 502(h).  And that's not how

12   502(h) is traditionally applied, but I'm not sure it's

13   prohibited from the language.

14         MR. MILIN:  Understood, Your Honor, and I will

15   move on in a second to present our position on that issue

16   which I hope will help Your Honor's decision-making process.

17   But I think that there is some important validity to the --

18   one of the two arguments I just meant -- made briefly

19   because, look, 502(h) says that the claims it creates have

20   to be treated as if they arose before the filing of the

21   petition.

22         So whatever Judge Drain may have ruled about

23   503(b)(9) and whatever this Court holds with respect to

24   503(b)(9) generally, we're saying if a 503(b)(9) claim is

25   created under 502(h), 502(h) makes it a prepetition claim

Page 78

1     that can be set off against post-petition preference

2     liability.  So I may just -- saying the same thing over, but

3     I really think that that's a very powerful and important

4     point.

5              But -- so let me try to address Your Honor's

6     broader concern.  We've talked about now 18 issues.  There's

7     only this one issue for denying a set off left to discuss,

8     and that's the hard issue whether 502(h) can create

9     administrative priority claims under 503(b)(9) which is an

10    issue of nationwide first impression.  If the Court resolves

11    any issues -- I'm sorry.

12             THE COURT:  No.  Go right ahead.

13             MR. MILIN:  Okay.  So if the Court resolves any of

14    the seven issues just discussed on plaintiff's favor

15    deciding this issue may be unnecessary at least for now.

16    Also we think the issue is pretty thoroughly discussed in

17    our brief, but I'd like to summarize it for you.

18             Defendant's motion asked the Court to rule that

19    creditors can never be held liable for preferences no matter

20    how much they pressure struggling companies to pay them for

21    goods delivered within 20 days of bankruptcy.  Defendant

22    admits that pretty clearly at reply Page 28, and that

23    unprecedented ruling, it would be contrary to the statutory

24    language, congressional intent, and undermine the most basic

25    purposes of the Bankruptcy Code.

1              So in our papers we make four key points.  First,

2      defendant's two cases, Bank (indiscernible) and Hackney and

3      I know they've now added Falcon, don't concern 503(b)(9) and

4      they don't concern preserving the priority of a creditor's

5      claim if the priority depends on timing.  Bank

6      (indiscernible) concerned a fully secured claim.  Hackney

7      concerned a non-dischargeability claim.  I forget, I guess

8      which of the priorities Falcon concerned.  Mr. Garfinkle

9      informed us of that.

10             But none of those are about timing.  They're about

11     the inherent status of the claims and the issues come out

12     differently as to statutory language, policy, and

13     congressional intent.  They all change when timing

14     determines priorities.  The statutory of language of 502(h)

15     as Your Honor knows, doesn't mention the claim status, but

16     it does specifically address timing.  It says that a claim

17     that will be allowed as if it had arisen before the petition

18     date, not as if it had arisen on the date on which it

19     originally rose because 502(h) specifically addresses timing

20     and doesn't preserve the timing of the original claim, even

21     though Congress could have said so.

22             The plain language of the statute must be

23     interpreted to mean that it doesn't preserve the priority of

24     claims if that priority depends on timing.  Defendant's

25     reading of the statute would assert insert additional

Page 80

1   language that isn't there, contrary to the very plain

2   language approach defendant asks the Court to take with

3   respect to paid new value.

4          Third, the legislative history of 503(b)(9)

5   indicates that it was intended to provide an alternative

6   remedy for recognition or reclamation claims, not to

7   eliminate preference liability whenever goods are delivered

8   within 20 days of bankruptcy.  Nothing defendant says

9   establishes the contrary, including its mention of an

10  inapplicable Latin fallacy followed by what's clearly a non

11  sequitur.  That's at Page 28.  There is simply no evidence.

12  There's a lot of debate about what Congress intended in

13  503(b)(9).

14         We cite a couple of cases which explained that.

15  One of them cites an article which addresses it.  I won't

16  say definitively what the purpose was, but there's certainly

17  no evidence that it wanted to eliminate all preference

18  liability whenever goods were delivered within 20 days of

19  bankruptcy, and I may be preempting something that I was

20  planning to say in a bit, but one way to see that is that

21  the liability would be eliminated only for deliveries of

22  goods, not for delivery of services, because services can't

23  be reclaimed and therefore aren't relevant to the problem

24  that 503(b)(9) was clearly intending to solve.

25         So interpreting 502(h) to create a 503(b)(9)

Page 81

1    claim, it doesn't serve Congress's purposes.  It would

2    directly conflict with the preference statue, and in

3    contrast, interpreting it to preserve claims security or

4    other special status in the cases that defendant relies on

5    is fully consistent with Congress's purposes.  So the

6    purpose is different.  The statute's different.  The effect

7    is different.

8           And given the conflict between -- the defendant's

9    argument would create between 502(h) and 547, as Your Honor

10   mentioned earlier, the Court should try to harmonize those

11   statutes and it can do that simply by rejecting defendant's

12   interpretation of 502(h).  So finally, interpreting 502 --

13          THE COURT:  Mr. Milin?

14          MR. MILIN:  Yes.

15          THE COURT:  Do you mind for a second?  I think

16   actually the interesting thing about this case, in addition

17   to this obviously being a case of first impression, is that

18   in most circumstances where the 503(b)(9) claims, if you did

19   discount your argument and you applied a 503(b)(9) claim and

20   determined that that's what arises under 502(h) because it's

21   still a prepetition claim, if somebody did that, that

22   normally wouldn't matter because it'd be paid a hundred

23   cents.

24          So it's literally like the party who had the

25   preference claim, have to pay the money to Debtor and then

Page 82

1    the Debtor would have to pay the money to the party at a

2    hundred cents.  The issue here is that under the theory that

3    you're operating or that I'm operating, hypothetically, the

4    party would have to pay the preference liability and then

5    the party would only get paid 20 cents even if it was a

6    503(b)(9) claim that it got, because of your distribution.

7         So that's probably why the setoff issue is such an

8    issue because it's not the same result.  You really get the

9    same result in most cases, even if you applied it because

10   you wouldn't -- as a setoff would because you'd just be

11   running money around the table at hundred-cents dollars and

12   that's not what we have here.

13            MR. MILIN:  Right.

14            THE COURT:  Even if you did go as far as applying

15   that in the statute, just factually.

16            MR. MILIN:  That's one of the reasons why what

17   defendant's asking the Court to do is so dangerous.  The

18   only reason why defendant doesn't get completely off the

19   hook for changing the Debtor's payment terms from the

20   contract unilaterally ten days before bankruptcy and

21   threatening it repeatedly that if it didn't pay, it would

22   discontinue the next day, knowing that that would disrupt

23   the Debtor's ability to ship; the only reason why that

24   conduct may not be fully insulated is because of the fact

25   that this is an administratively insolvent case.

Page 83

1          If Your Honor rules the way they want you to rule

2     that 502(h) does create an administrative claim, it would

3     insulate all kinds of bad conduct for the 20 days before

4     bankruptcy.  They're expressly trying to do that and it's a

5     disaster as a policy matter.  It's not consistent with what

6     the statute says.  It's clearly not what Congress intended.

7     And as I was about to say, it would be inequitable and

8     contrary to other goals.

9          It's inequitable because it only eliminates

10    preference liability for sellers of goods and not sellers of

11    services.  So, you know, the seller of the goods can

12    pressure the heck out of its customer, but the shipper

13    can't.  That's not what Congress intended.  It's not

14    equitable.  It's contrary to the goals of equity in the

15    Bankruptcy Code.

16         But worse, perhaps, it would give sellers of goods

17    an incentive to exert extreme pressure on struggling

18    companies because so long as those companies filed

19    bankruptcy soon, the payments this seller extracts will be

20    immune.  So, you know, defendant argues that it doesn't need

21    to rely on -- anyway.  That's the policy issue.

22         I was just going to address also the notion that

23    defendant doesn't need to rely on 502(h) because it's

24    already asserted claim, but obviously that doesn't work.

25    Asserting a claim doesn't give you a claim you can set off.

Page 84

1    They've been paid in full for these, for the goods at issue

2    on the preference setoff.  So it's only if they get an

3    actual claim that a setoff is possible and the only way to

4    get an actual claim is 502(h).

5              They argue that it's unjust to allow defendant

6    Debtors to reduce the status of the 503(b)(9) claim just by

7    avoiding it.  Well, that may be true for a secured claim or

8    for a spousal support claim or a claim like that, but those

9    claims are different.  They don't depend on timing and the

10   behavior of the creditor isn't going to make a big

11   difference to the status of the claim.  But here, allowing

12   creditors to lose any potential 503(b)(9) priority if they

13   pressure their struggling customers, would give them a

14   valuable incentive not to do that.  It would therefore serve

15   a core purpose of the Bankruptcy Code by helping struggling

16   companies to survive.

17             After all, as I said, defendant itself moved A&P

18   from 40-day terms to one-day terms and threatened to

19   discontinue shipments if A&P was only one day late.  That's

20   precisely the conduct that preference law attempts to

21   discourage and there would be nothing unjust in stripping

22   creditors of 503(b)(9) priority for conduct like that.  You

23   know, more generally, their arguments that 20-day payments

24   for 20 days deliveries should be immunized in order to

25   encourage sellers to do business with struggling companies

1    is mistaken.

2           Encouraging creditors to deal with struggling

3    companies by promising full payment and sound policy.

4    Bankruptcy Code does that a couple places.  That's good

5    policy but immunizing creditors even if they pressure their

6    customers into bankruptcy, is not.

7           Those are, I think the main points I had on this

8    issue.  I hope they addressed Your Honor's concerns, but I'm

9    happy to try to address further questions if Your Honor has

10   them.

11          THE COURT:  I don't.  I think you addressed my

12   questions.  Okay.  Thank you, Mr. Milin.  I guess Mr.

13   Garfinkle --

14          MR. MILIN:  (indiscernible).

15          THE COURT:  -- assume you want to have rebuttal.

16          MR. GARFINKLE:  I do, Your Honor.

17          THE COURT:  That's fine.

18          MR. GARFINKLE:  Let me start by -- I don't want to

19   get into the gutter here in terms of these, what I think are

20   spurious allegations of inequitable conduct and the like.

21   What I would say, to be thinking about where the inequitable

22   conduct was in terms of the way 503(b)(9), the statute was

23   enacted and its predecessor and underlying reclamation of

24   2702.  And if you look at cases from the 1960s, there's the

25   Federated case out of the Sixth Circuit, there's the Mel

Page 86

1    Gordon case followed in 2008 by the Phar-Mor case.  They're

2    all based upon the notion that when a Debtor buys bankruptcy

3    -- buys goods on the eve of bankruptcy, they're committing

4    fraud.  A&P did not wake up on July 17th, Sunday -- I think

5    was July 17th or July 19th, sorry.  July 19th, Sunday, and

6    file bankruptcy for its 180 stores, its 180 pharmacies, file

7    18 cases.

8         Weil Gotshal did not file that without lots of

9    pre-planning.  So as they're pre-planning their bankruptcy

10   filing, they're still buying goods on credit from McKesson

11   and a whole bunch of other vendors.  That is the fraud that

12   is taking place here.  It is the fraud which 503(b)(9) is

13   meant to remedy by giving the sellers of goods on the eve of

14   bankruptcy an administrative -- an automatic administrative

15   claim for the value of the goods delivered.

16        And if you look at the case law, that's what it

17   speaks to.  Now, Mr. Milin indicated that there's some sort

18   of legislative history here.  We cite on Page 27 and I'll

19   read exactly the language another Court ruled, the Skylar

20   Exploration case.  "There is no Congressional history

21   explaining 503(b)(9) or its terminology when it was enacted

22   as part of BAPCPA.  As such, any reference to Congressional

23   intent is dubious at best."  All we're left with is a

24   statute which automatically awards sellers of goods on the

25   eve of bankruptcy, within 20 days, an automatic

Page 87

1    administrative claim.

2             And the issue before the Court, as the Court has

3    framed it, is okay, if you're going to get -- seek

4    preference recovery for payments on account of those goods,

5    what is the priority status afforded to those goods and is

6    it a wash?  My opposing counsel has spent a good deal of

7    time in their briefs and in their argument today talking

8    about New York law.

9             New York law, let me be clear about this, does not

10   apply.  We have a statute under Bankruptcy Code at

11   503(b)(9).  That gives a claim.  We have potential

12   preference liability under 547 and 550 for McKesson, which

13   may give the Debtor a corresponding claim.  Those are two

14   bankruptcy statutes.  This is a federal law issue.

15            What my opposing counsel did not mention was, and

16   I said this at the beginning of the argument and in our

17   briefing, there is an unbroken chain of Supreme Court cases

18   on setoff in bankruptcy from 1841 all the way into 1913.

19   The Gratiot case, the Page v. Rogers case, and finally the

20   Studley v. Boylston National Bank case.  All of them hold

21   that in this situation where A owes B and B owes A, there's

22   a setoff that arises and there's no equitable defenses to it

23   any Court has ever recognized in a bankruptcy context.

24            Now, that line of cases finds its way into the

25   Bankruptcy Code and the preference lawsuits that then rose

1   and we cite to the Court, both in our opening briefing -- it

2   shouldn't have come as any surprise to anybody.  Plaintiff

3   didn't respond to it in their opposition brief -- the Falcon

4   cases.  One was by Judge Schermer, the bankruptcy judge, and

5   affirmed by the District Court.

6              And I commend to the Court the language of the

7   District Court in the Falcon case.  And Falcon was a

8   507(a)4(a) wage priority claim or benefits claim asserted by

9   Blue Cross Blue Shield.  Now, that's a priority, not under

10  502(h) but under a different section of the code.  And the

11  Falcon court said in very clear language that it's a wash

12  and the bankruptcy court properly granted summary judgment

13  in favor of Blue Cross Blue Shield in this circumstance

14  because this is a pointless exercise of trying to recover

15  preferences when the creditor gets to do a dollar-for-dollar

16  setoff, and that's the main point on -- that we've tried to

17  make clear here and put at issue.

18             Now, I want to go back to our original summary

19  judgment motion.  I think the Court has at least a basis to

20  rule today that the first 23 payments that are the subject

21  of the preference lawsuit, by plaintiff's own admission,

22  excepting aside from the paid new value argument, which has

23  been widely rejected over the years (indiscernible) summary

24  judgment on those.  Let's narrow this down and I know the

25  Court's going to take this under advisement as to the other

1    issues, but as to the 23 if the Court's going to rule in our

2    favor, so be it.

3              I want to address one point that the Court made

4    and I'm sorry to correct the Court because the Court was

5    slightly in error on a legal point, and I'll explain what it

6    is.  The Court said that breach of contract claims could be

7    asserted, referencing New York law of six years.  That's

8    incorrect, Your Honor, and this was a point that was (sound

9    drops) Judge Drain early in the case and I'll give the Court

10   the reference to it.

11             This is the sale of goods.  It's governed by

12   Article 2 of the Uniform Commercial Code, Section 2-725(1)

13   of the Uniform Commercial Code has a four-year statute of

14   limitations for any breach of contract claim related to the

15   sale of goods.  We are now past, well past the four-year

16   statute of limitations periods and Judge Drain ruled exactly

17   that at a hearing held on December 20th, 2021.  Probably the

18   Court has not looked at it, but I'm going to give the Court

19   the cite.  It's Docket Entry 106.  It's the transcript from

20   the December 20th, 2021 hearing on McKesson's motion to

21   dismiss the amended complaint.

22             And during that hearing, plaintiff made the same

23   exact arguments it's making today.  We have all these breach

24   of contract claims for McKesson's supposed bad acts and we

25   want to assert them and the judge said, no they are -- I'm

Page 90

1   sorry that was not -- there's also there's a prior hearing.

2   My apologies.  It's the hearing on -- it was the motion to

3   amend.  My apologies.  I think it's the motion to amend.

4   I'm just looking at my notes here.  There's another

5   transcript on December 20th, 2021.  They did a motion to

6   amend and tried to assert all these breach of contract

7   claims.  Judge Drain said statute of limitations of 2-725

8   bars these claims.  You can't bring them.  You can't bring

9   them either directly as a breach of contract claim or as a

10  turnover action.

11          That issue was litigated and decided.  Again, I'm

12  playing whack a mole here because now I'm getting it by an

13  assertion or McKesson is getting it by way of an assertion

14  of an unfiled, basically a quasi-claim objection.  And the

15  Court noted six years ago the Debtor filed three claim

16  objections, when I was dealing with the Weil firm and I

17  said, guys, do you know what you're doing.  Okay, two of

18  them, as we say, are moot.  One where they were joint and

19  several liability of the administrative claims.  This is the

20  first and fifth claim objections filed by the Debtor then

21  represented by the Weil Gotshal firm.

22          By virtue of the winddown order, all the Debtor's,

23  other cases have been dismissed leaving one case, the main

24  case, the A&P case, which is called Wind Down Company.  That

25  is the only case.  So the first two claim objections are

Page 91

1    moot.  The third claim objection was an insufficient

2    documentation objection.  Nothing more, nothing less.  Now,

3    I've over the years wondered whether an insufficient

4    documentation claim is a legitimate claim objection under

5    502.  502 sets forth the basis for disallowance of claims

6    and it says, under 502(b), only way -- 502(b)(1).  "Such

7    claim is unenforceable against the Debtor under any

8    agreement or applicable law."

9            They didn't file an objection like that.  They

10   &02:54:11 filed it, that somehow we breached the contract

11   and therefore you shouldn't get a claim.  Had they brought

12   that claim, and if they do bring that claim, we're going to

13   be making the same arguments that we made in front of Judge

14   Drain last fall, that these claims are barred by the statue

15   of limitations of 2-725.  But the Court need not address

16   that, because all the Court has in front of it is an

17   insufficient documentation claim objection.

18           And we have provided the documents, the invoices

19   showing delivery.  Now, there's conjecture on the part of my

20   opposing counsel, what does DNS mean?  Do not ship?  How

21   about do not -- did not supply.  The invoices speak for

22   themselves.  They show the drug codes.  They show the drug

23   names, the quantity, and the price.  They show where the

24   product was shipped to, all of these, and there are 355 of

25   them during the month of July of 2015, are attached to Ms.

Page 92

1    Towsley's declaration.

2          We also submit the declaration of the Debtor's

3    director of pharmacy operations and she testified that she

4    never was aware of an invoice that McKesson generated for

5    which a product wasn't shipped.  And we cite the language

6    that plaintiff's counsel cites in the extension agreement,

7    which he says, that's about McKesson's claim.  I think a

8    correct reading and the actual only reading is that the

9    parties were in agreement.  Again, this is Paragraph 3 of

10   the extension agreement.  As of the effective date, A&P

11   shall pay to McKesson an extension fee of $1 million dollars

12   on account of McKesson's 503(b)(9) claim, which aggregates

13   approximately $2,786,000.

14          This is both sides agreeing to that amount.  Now,

15   what we've heard today from plaintiff's counsel is well,

16   Judge, they're in breach of this extension agreement.  When

17   they think that the extension agreement benefits them,

18   they'll point to it.  On the other hand, they'll ignore

19   other provisions of the extension agreement, in particular,

20   Paragraph 4 of the extension agreement.  And I'm going to

21   read that for the record because it's critical here in the

22   Court's analysis of these motions for summary judgment.

23          Paragraph 4.  "Prepetition rebates and credits."

24   That's the heading.  "A&P acknowledges and agrees that it

25   does not have right to receive capital Rebates, refunds, or

1    other amounts which accrued prior to the petition date and

2    such amounts may not be used to reduce any of McKesson's

3    claims in the bankruptcy case, including its 503(b)(9)

4    claim."  That was the deal McKesson and the Debtor agreed to

5    and lived by and abided by during the course of the

6    bankruptcy case, only now to have the Committee come back

7    and said, well we don't really want to look at that.  We

8    think we should get credit for these rebates which the

9    Debtor agreed they weren't entitled to.

10             No, Your Honor.  That is wrong.  The parties

11    reached agreement.  That agreement is enforceable.  It was

12    complied with and abided by during the course of the

13    bankruptcy case and any claims of breach of contract

14    relating to that agreement are now time barred.  So for all

15    these reasons, Your Honor, McKesson is entitled to summary

16    judgment on both motions.  And again, I go back to the math.

17             Plaintiff is saying there's $10.6 million dollars

18    or potentially $11.6 million dollars of liability.  That

19    puts us into only the 23rd payment of $3.5 million.  And

20    again, that payment was on account of goods delivered within

21    20 days of bankruptcy.  Following -- and by the way,

22    plaintiff doesn't cite any cases that have refused to allow

23    this circular setoff kind of concept in preferences.  None.

24             We've cited five or six of them, Judge, all in

25    different contexts.  One was non-dischargeability.  One was

1    a secured creditor status.  One was a 507(a)(4) priority.

2    We're just now -- the only nuance of this case versus the

3    other cases that all similarly held, is this is an

4    administrative claim.  Under 503(b), McKesson has asserted a

5    proof of claim for goods delivered.  We quoted the proofs of

6    claim language and it uses the language very deliberately,

7    at least in an amount.

8              So if McKesson by happenstance of the outcome of

9    this preference litigation has to give back money, its

10   503(b)(9) claim amount correspondingly increases.  McKesson

11   does not need to rely upon 502(h).  It already has existing

12   claims in this case which are prima facia valid and that's

13   the point we're trying to get at, Your Honor, and that's the

14   point that the Falcon case and the other cases similarly

15   hold, but this is just wasteful litigation because at the

16   end of the day the creditor gets what it gets and Judge

17   Drain ruled it's a dollar-for-dollar setoff of liability

18   against the 503 claim.

19             Now, the fixed amount, we think is beyond dispute.

20   Again, quoting the language and applying the language in

21   Section 4 of the extension agreement, such amounts, meaning

22   the rebates, refunds, or other amounts cannot be used to

23   reduce the 503(b)(9) claim.  Yet, that is the entire

24   gravamen of plaintiff's position.  We've got all these other

25   claims out there, Your Honor, and we get to reduce the claim

Page 95

1    of 503(b)(9) even though the Debtor agreed otherwise

2            That wasn't the deal that we reached and abided

3    by.  I'm happy to address any other questions the Court has,

4    or comments.

5            THE COURT:  Yeah, I have a few.  Okay.  So let's

6    just stick with the fixed 503(b)(9) claim for the moment and

7    the arguments that are being made with respect to that.

8    Okay, I get the argument that there's no rebates post-

9    petition so you're just basically saying there can't be

10   inflated invoice amounts because you won't have rebates and

11   that's what they're really arguing about.  Unproven

12   deliveries, you've talked about that.  Everybody has talked

13   about that.

14           What about the returns after they closed the

15   pharmacy?  I don't think the agreement says you can't -- if

16   there's a return.  Did that actually occur?

17           MR. GARFINKLE:  Your Honor, we have never really -

18   - this is a $44,000 issue.  We have not really delved into

19   that issue, I -- you know, in any great detail.  What I told

20   the Court when this came up saying McKesson abides by its

21   agreements.  Now, I haven't looked at whether they're

22   entitled to a $44,000 reduction and I will pledge to the

23   Court that we will look into that and if they're entitled to

24   it contractually, we'd abide by that, that $44,000

25   reduction.  It's -- given the dollars at stake in a 20

Page 96

1   percent case, you're only talking about $8,800.  I'll spend

2   more money fighting that or trying to research that than

3   probably worth in a 20 percent --

4              THE COURT:  I understand.

5              MR. GARFINKLE:  -- 20 percent administrative case.

6   But you know, I can look into it and try to figure it out.

7   It wasn't something we spent a good deal of time trying to

8   figure it out.

9              THE COURT:  Okay.

10             MR. GARFINKLE:  I do have one -- I know the Court,

11  we haven't talked about the motion to strike.  I do have

12  one, just a quick follow on the motion to strike when the

13  Court deems it appropriate.

14             THE COURT:  Okay, that's fine.  I just want to

15  keep my questions here because we're going to get to a point

16  where probably I'm best at betting in half an hour at most,

17  my clerk's going to tell me or my courtroom deputy that

18  we're going to have to take a break because we're going to

19  otherwise lose recording and we'll have to dial back in.

20  That's just how this works, but --

21             MR. GARFINKLE:  I'll try to be quick, Your Honor.

22             THE COURT:  No, no.  I don't think that's possible

23  with a motion to strike.  But anyway, let's keep going.  So

24  --

25             MR. GARFINKLE:  I -- sorry.

Page 97

1           THE COURT:  No.  Can I keep going, my questions?

2           MR. GARFINKLE:  Yes, Your Honor.

3           THE COURT:  Okay.  So the question that I had is

4    obviously there's a lot of issues that have been raised

5    apparently in connection with, I guess I'll just say that

6    you're saying are basically, Judge Drain's already ruled are

7    barred time-wise and they're arguing is included in their

8    complaint.  How do I square that?

9           MR. GARFINKLE:  Your Honor, the complaint speaks

10   for itself.  Judge Drain was very clear as to what claims

11   could be brought and they're in the complaint and we're not

12   seeking summary judgment on those.  They are two alleged

13   breaches of the automatic stay.  One involves what are

14   called met -- what the plaintiff calls medturns.  These are

15   goods that were returned for which McKesson did not give the

16   Debtor those funds or allow them to be used for post-

17   petition purchases.  That's number one.

18          The second item is this November of 2015 rebate

19   issue of approximately $240,000.  That was the whole scope

20   of what Judge Drain permitted to be asserted as a violation

21   of the automatic stay or correspondingly a deduct against

22   McKesson's 503(b)(9) claim.  We are not asking today for the

23   Court to make a ruling on those two issues at all.  Anything

24   beyond those two discrete automatic state violations are

25   beyond the scope of the lawsuit that's pending and to which

Page 98

1    Judge Drain ruled could not be asserted by way of a breach

2    of contract or a turnover action.

3              THE COURT:   Okay.

4              MR. GARFINKLE:   So that --

5              THE COURT:   What about, though, the argument about

6    the inequities in the set off argument?  I guess, is that

7    something that he also precluded that from being utilized in

8    connection with?  I'm --

9              MR. GARFINKLE:   We believe --

10             THE COURT:   -- clearly going to have to go read

11   like 25 transcripts now after this hearing, but that's okay.

12             MR. GARFINKLE:   Yes, Your Honor.  We do believe

13   that those are precluded by virtue of Judge Drain's rulings.

14   He was quite clear that this fishing expedition of equitable

15   throwing away, things are just -- the point I'm making here,

16   Your Honor, is we looked.  We can't find any case in a

17   bankruptcy context where this kind of netting or setoff was

18   denied for equitable reasons.

19             In fact, we can't find any federal cases that

20   support this theory of plaintiff in that regard.  It just

21   doesn't exist in this context, and --

22             THE COURT:   Yeah, I mean, you may be right.  It's

23   not something I've seen a lot of either in my practice, so

24   when I was -- before I was on the bench, so it's certainly

25   not something that is common; I'll grant you that.  I have

1   seen it once before.  It wasn't in the context of a federal

2   setoff.  It wasn't in the context of a state law setoff.  I

3   -- so that's obviously something I'll have to look at.  I

4   agree with you that Section 553 itself doesn't reference

5   anything about equities.

6           MR. GARFINKLE:  I don't even know that 553 truly

7   applies here in that this is -- you're dealing with post-

8   petition claims and post-petition liability, so 553 --

9           THE COURT:  Yeah, well, no.  I think there is case

10  law that actually -- that's where I disagree with you, Mr.

11  Garfinkle.  I think there is case law that that does apply

12  it in the context of post-petition versus post-petition.  It

13  does exist.

14          MR. GARFINKLE:  Okay --

15          THE COURT:  It probably was not in this context, I

16  will say, that that's for sure, but it -- that exists.  So -

17  -

18          MR. GARFINKLE:  And I'm --

19          THE COURT:  I don't think that --

20          MR. GARFINKLE:  Sorry.

21          THE COURT:  Yeah, I don't think that's it.  It's

22  the point about the equitable issue I was really raising

23  because I again, I have not seen that in the context of

24  somebody seeking to utilize federal law, whether it's the

25  553 or some kind of federal common law argument.  I haven't

Page 100

1    seen that, but that doesn't mean it doesn't exist.  It's

2    just I have not seen it.

3              MR. GARFINKLE:  And again, I go back to --

4              THE COURT:  That's definitely --

5              MR. GARFINKLE:  Sorry.  Talking over each other.

6              THE COURT:  No, go ahead.

7              MR. GARFINKLE:  I go back to the line of Supreme

8    Court cases that I've cited throughout the hearing.  So

9    that's all I would say.

10             THE COURT:  Yes.  No, I hear you.  I understand.

11   All right.  Just give me a second here and see what else I

12   might have to ask you about.  I think the reason I'm -- by

13   the way, the reason I'm asking you about these questions is

14   you really are asking me to find with respect to your claims

15   objection.  And so that's why some of this stuff would be

16   relevant because they're asserting its defense to your

17   claim, whether they've actually raised that or not in the

18   context of the objection is a different issue.  But that's

19   what they're arguing.

20             Okay.  Question for you.  So, if I understand your

21   argument, you are arguing that because there was a bar date

22   and you filed a claim before the bar date -- and I'm saying

23   an administrative claims bar date, by the way, just to be

24   clear -- for any 503(b)(9) claims that could arise out of

25   the -- as a result of additional claims as a result of the

Page 101

1    preference process or otherwise for 503(b)(9), basically

2    you're saying because you filed a claim in that process that

3    even though there's going to be a 547 preference process,

4    there is not a 502(h) claim that arises.

5              MR. GARFINKLE:  Well, I think you could have a 502

6    -- you know, the way we, McKesson -- I will speak to

7    McKesson specifically.  We draft our proofs of claim and I

8    think the way we do it, did in this case, is to the extent a

9    503(b)(9) claim is disallowed, that McKesson asserts a

10   general unsecured claim under 502.  So in this circumstance,

11   it's kind of a double kind of -- you don't need 502(h) to

12   get to where the Court -- where we think you need to go

13   because we've already filed the claim.

14             But even if we hadn't filed the claim or the Court

15   says that claim is insufficient, 502(h) would give McKesson

16   a claim and it enjoys whatever priority status that claim

17   would have under the Bankruptcy Code, be it secure -- if it

18   was secured or 507(a)(4) as in the case of, the Falcon

19   Products case or in McKesson's case a 503(b)(9) claim.  It

20   has --

21             THE COURT:  Yeah.

22             MR. GARFINKLE:  -- all the attributes of the

23   claim.  It doesn't -- and this is what the case law holds in

24   that regard and there's nothing untoward about that.

25             THE COURT:  Well, there's obviously a few cases

1    that have looked at this in other contexts and I get that

2    and I understand why somebody might reach that conclusion.

3         It's interesting because I completely understand

4    why you filed a proof of claim or would have filed a proof

5    of claim under the circumstances for the administrative bar

6    date to make sure that there was a claim, but I'm not sure

7    that if there's actually a preference action that occurs and

8    someone's successful in an avoidance calculation, again,

9    that obviously makes a lot of assumptions here that we've

10   been talking about hypothetically, then that doesn't, you

11   know, always give rise to a 502(h) claim just by virtue of

12   it.

13        And then the only issue is what does the 502(h)

14   claim mean.  Does it mean that it's the same priority as it

15   would have been prepetition, which in this case would be a

16   502(b)(9) and in the cases you cited to would have been

17   either priority claims under 507(a)(4) or a secured claim,

18   but also as of the rising of the petition and I guess the

19   question I don't think you've addressed which is really a

20   public policy argument that Mr. Milin was making, although

21   it, I think you know, made it in a way that certainly calls

22   into question some things, is do you really think that

23   Congress intended people to get -- who have the benefit of

24   503(b)(9) to get the benefit of immunity?

25        That's really what he's arguing about because I

Page 103

1    think that's actually the most troubling thing about trying

2    to harmonize these statutes, in part, because I don't really

3    think Congress intended that nobody could ever get sued for

4    a preference relating to 503(b)(9).  I just, I don't think

5    they thought about it and maybe if they had that would have

6    been the answer, but I just don't think there's anything in

7    the legislative history that indicates that they ever

8    thought about in any way, shape or form.

9            And I guess you're going to say to me it's a

10   similar thing for someone getting a preference who would had

11   to have had a priority claim or a secured claim.  You know,

12   are you trying to -- you know, you're trying to just put

13   someone back in the position that they would have been, even

14   if it's an unsecured claim that they're getting, meaning

15   unsecured otherwise or a prepetition claim.

16           My courtroom deputy is telling me, how long?  Five

17   minutes.  Okay.  Five minutes we're going to have to take a

18   break.  That's what she's telling me.

19           MR. GARFINKLE:  Okay.

20           THE COURT:  Because we have to stop Court

21   recording and re-record.

22           MR. GARFINKLE:  Yes.

23           THE COURT:  Anyway, so I just -- I'd be interested

24   in the immunity argument because I do -- I find if I read

25   the statutes in the way that I think might make sense to

Page 104

1      harmonize this, there are some odd things about this case.

2      One is that obviously you end up with an administrative

3      claim under 503(b)(9) but -- possibly.  And in this case,

4      you don't get paid 100 cents, but in other cases somebody

5      might.  And so in this case, you're not really getting the

6      type of windfall that I think the policy argument for

7      immunity is saying because you obviously provided goods and

8      you're only going to recover 20 cents.

9            So that is, pardon me for saying this, that is

10     obviously in some ways punishing somebody for, you know, or

11     providing them with something that isn't 100 cents in the

12     context of a preference.  But if this was an

13     administratively solvent case, you would in essence under

14     that argument be getting 100 cents and you would in essence

15     be immune from suit.  Not -- you would have been sued.

16     Money would've been running around the table like I said

17     before, it would have been 100 cent recovery back.

18           So I would be interested in your thoughts on that

19     and then I'm going to have to say we're probably going to

20     have to take a break.

21           MR. GARFINKLE:  Yeah.  Let me quickly, hopefully

22     before time runs out.  I don't think it immunizes, nor does

23     it harm.  Preference law is not meant to punish.  It's meant

24     to restore parties' position where they were had they not

25     gotten unusual payments.  So in this situation, the estate

1    has benefited.  It got the goods.  Congress has said those

2    goods entitle to administrative priority.  It's not

3    immunizing.  Congress has already said these parties are

4    entitled to higher priority treatment.  And so the creditors

5    generally aren't penalized here by virtue of requiring that

6    those goods be paid for either by way of a 503(b)(9)

7    increased claim or just don't pursue the preference.

8                This is why Trustees never -- in fact, I can't

9    find a report or any kind of decision where a Trustee has

10   ever in this country sued for a 503(b)(9) payment and argued

11   it's preference because it's a foolish argument.  It's a

12   circle.  And that's the point --

13               THE COURT:  You know --

14               MR. GARFINKLE:  -- public policy standpoint.

15               THE COURT:  And yes, and the reason for that is

16   probably the practical aspect I just said to you, which is

17   that in most cases it's foolish because it's hundred-cent

18   dollar.  They going to sue and spend money.  They're going

19   to get a judgment.  And then the party's going to -- the

20   argument would be if you're trying to harmonize these

21   statutes in the way we're discussing it hypothetically, that

22   then the party is going to get -- have to get paid 100 cents

23   on the new claim that arises under this and that would

24   certainly deter people from doing it.

25               But if it's 20 cents on the dollar then maybe it's

Page 106

1    a different situation.  You know, it's not 100 cents.  I get

2    that may be why no one ever did it, because it wasn't an

3    administrative insolvent case and they were going to have to

4    pay 100 cents, and why would they litigate just to get 100

5    cents back?  That wouldn't make sense.

6             MR. GARFINKLE:  Plus, you have all these other

7    administrative creditors who similarly may have gotten

8    payments for other goods that maybe weren't sued for this.

9    I don't know, Your Honor.  So why should those people get

10   the windfall at the expense of McKesson?

11            THE COURT:  Yeah.

12            MR. GARFINKLE:  We're dealing --

13            THE COURT:  I understand what you're saying.

14   Okay, I think we're going to have to take a break.

15            MR. GARFINKLE:  Okay.

16            THE COURT:  My suggestion would be 15 minutes

17   unless people have a different perspective.

18            MR. GARFINKLE:  That's fine, Your Honor.  Fine.

19            THE COURT:  Okay.  All right, so that would be --

20   sorry, let me look on my phone.  Okay, so it's 1:07 on my

21   phone right now, so how about we'll do 1:25, if that's all

22   right.

23            MR. GARFINKLE:  Can we leave the line -- can we

24   leave the line open, Your Honor, or do we need to call back

25   in?

1          THE COURT:  No, we actually, I think, have to

2     disconnect because recording is

3          MR. GARFINKLE:  Okay.

4          THE COURT:  -- going to stop.  Sorry.

5          MR. GARFINKLE:  Okay.

6          THE COURT:  That's what we have to do.  Okay, so

7     why don't we dial back in at 1:25 then.  Okay?

8          MR. GARFINKLE:  All right.

9          THE COURT:  Thank you.

10         MR. MILIN:  Thank you, Your Honor.

11         (Recess)

12         THE COURT:  Good afternoon.  This is Judge

13    Beckerman.  We are reconvening from our adjournment and

14    Court is back in session.

15         Mr. Garfinkle, I think we had finished our

16    discussion but I wasn't sure before we get onto the next

17    item on the agenda, which is the motion to strike.

18         MR. GARFINKLE:  I think so, Your Honor.  Just to

19    wrap up just one comment.  I think when you look at this, to

20    repeat, McKesson's liability is maxed out at $10.6 million

21    under -- as the Debtor admitted in its reply.  They now take

22    it up to 11.7.  I think the Court, at a minimum, should

23    grant summary judgment on everything in excess of that.

24    Anyway, I'll just leave it at that and I know the Court's

25    going to take this under advisement.

1            On the motion to strike, I just want to point the

2   Court --

3            MR. MILIN:  If I may, before we move on.  Your

4   Honor, may I respond to the discussion the Court just had

5   with Mr. Garfinkle about the summary judgment motion?

6            MR. GARFINKLE:  Your Honor --

7            THE COURT:  What do you need to respond to Mr.

8   Milin?  Because we -- I don't think we discussed anything

9   that was new.

10            MR. MILIN:  I think, Your Honor, that you did.  I

11   have about 13 points.  I don't intend to repeat myself and

12   they will go very quickly --

13            THE COURT:  Thirteen points?  Now about --

14            MR. MILIN:  I know, I know.  I know, I know.

15            MR. GARFINKLE:  Your Honor, there's no way --

16            THE COURT:  -- five minutes.

17            MR. GARFINKLE:  There's not a right of Sur-Reply

18   in oral argument.

19            THE COURT:  I know.  I understand.

20            MR. MILIN:  I'll be very quick.

21            THE COURT:  -- possible.  Five minutes.

22            MR. MILIN:  You got it.  So first, Mr. Garfinkle

23   said that the amount reserved was 260.  That's not true.  My

24   client wanted to make sure Your Honor knew it was more than

25   that and she says it's adequate in her declaration.  With

Page 109

1    respect to legislative history, Mr. Garfinkle cited the case

2    that says there isn't any.  We cited two cases that say the

3    contrary.  Also, the purpose is clear from the effect and

4    there's certainly no indication that the intent was to

5    immunize claims.

6            Mr. Garfinkle relied on federal cases, but there's

7    no federal setoff law, and although he didn't discuss what

8    underlying setoff law the cases he cited relied on, the

9    Court should please not assume that federal law is going to

10   control here in any straightforward way and we still don't

11   know what its requirements are because he didn't say.

12           The statute of limitations is not at issue here,

13   but Mr. Garfinkle talked about it at length.  He says it's

14   four years under the UCC.  We understand that.  However,

15   this is a case about successful concealment of taking money

16   back and there are issues of tolling.  There are issues of

17   revival under New York state law which says if you sue

18   somebody, it revives all time barred claims and Judge

19   Drain's ruling was on conduct no later than November 15.

20   The conduct issue now is later.

21           Invoices.  Mr. Garfinkle talked about that again.

22   Our only point is he hasn't explained why there isn't proof

23   of delivery, and by this point certainly should.   Next

24   point, and the -- Your Honor seemed to be slightly confused

25   about this, so I think it's important.  Mr. Garfinkle relies

Page 110

1    on Section 4 of the extension agreement.  That is only about

2    rebates by its express terms that accrued before the

3    petition date.  It's not relevant here in any way.  The

4    Section 8 of that agreement, as we discussed in our amended

5    complaint promises credits to be paid separately from the

6    rebate.  So there's a big issue there.

7            What accrual means in the context is a big issue.

8    Our -- my client has testified that rebates didn't accrue

9    until they were paid.  It sounds odd, but that's the way

10   they did things.  So Section 4 isn't relevant and besides we

11   aren't seeking to reduce subsequent new value by rebates.

12   We are seeking to reduce subsequent new value by the

13   overstatement, which just happens to equal the amount of the

14   rebates.

15           Just a couple more quick points.  Mr. Garfinkle

16   said he'd look into the $44,000 And that it's only $8,000

17   because of the amount admin claimants are being paid.  In

18   fact, if he received a setoff, it'll be full value of

19   $44,000, but what's more, the defendant hasn't explained the

20   $327,000 which may fall in the same bucket.  So we would ask

21   that he investigate and explain that as well.

22           Clarify something that I may have miss -- been

23   unclear about.  The amended complaint does not include the

24   items B-1 through B-4.  Our point is that the same analysis

25   would let us assert those by way of stay violations, which I

Page 111

1    believe are not subject to a time bar and also as setoffs to

2    their claims.

3           Now the setoff cases, there was some discussion

4    that Mr. Garfinkle said he didn't know any case that

5    actually denied a setoff for equitable grounds.  We refer to

6    the Artisan case and other cases we cited at Page 27 of our

7    brief.  Certainly, Artisan denied a setoff.

8           And I am almost done.  So this argument about

9    their 503 filed claim, 503(b) filed claim is, we suggest,

10   entirely a red herring.  We can move to dismiss it because

11   the goods were paid for.  The question is whether we would

12   need to do that in order to deny defendant setoff.  I think

13   that would not be useful but their current claim is invalid.

14   They got paid.  There is no valid claim for those amounts.

15          So unless Your Honor has questions, I hope I've

16   been within the five minutes.  I've certainly done my best

17   to abide by it.

18          THE COURT:  Okay.  Thank you, Mr. Milin.  All

19   right.  So let's go on to the motion to strike.

20          MR. MILIN:  Okay.

21          THE COURT:  Obviously, this is a very lengthy

22   request to strike lots of things out of this declaration.

23          MR. GARFINKLE:  Yes, Your Honor.

24          THE COURT:  And while I have done that in trial

25   where I've stricken things out, I honestly haven't seen this

1       in summary judgment myself.  So that's the first thing I

2       wanted to ask because I don't think, you know, it's -- the

3       purpose of affidavits in summary judgment are, you know,

4       slightly different usually than they are, as I think I noted

5       before to you, Mr. Garfinkle, as they are in some ways --

6       than they are in trial.

7              I mean, this is in trial testimony.  It's

8       obviously to provide evidence to me that there is a dispute

9       as to material -- any material fact and that that's the

10      issue.  And it can -- it has.  I have seen this where it's

11      not just, it's basically to show whether there is -- to

12      demonstrate that there is not -- I guess double negative --

13      that there is a genuine dispute.

14             And sometimes if the adverse party can ultimately

15      produce evidence that would be reliable at trial then, I've

16      certainly seen that.  It's not required that at this point.

17      You know, I'm really trying to determine if there's a

18      factual dispute.  So, and it and it is a judge, not a jury.

19      Another point I will make.

20             So, I guess I would I would like to discuss the

21      purpose of the motion to strike.  If you'd asked me to

22      strike a few modest things in this, I probably would look at

23      this differently than what you're doing because I'm not sure

24      we should be going through every single one of these

25      evidentiary issues right now for purposes -- my purpose,

Page 113

1    because this isn't getting -- this isn't her testimony at

2    trial.

3            MR. GARFINKLE:  Your Honor, can I -- you want me

4    to respond --

5            MR. MILIN:  First if we could just clarify.  Your

6    Honor, you did receive, I hope, our written response last

7    night.

8            THE COURT:  I did.  And I've read --

9            MR. MILIN:  Very good.  Okay.  Thank you.

10           MR. GARFINKLE:  Your Honor, we debated whether to

11   file this motion to strike.  The declaration as you know, of

12   Ms. DeVito is 129 paragraphs long.  I would commend the

13   Court a excellent decision out of this district by Judge

14   Gerber from 2008.  The cite is --

15           THE COURT:  Okay.

16           MR. GARFINKLE:  -- In re:  Perry Koplik Sons, Inc.

17   The cite is 382 B.R. 599 (S.D.N.Y. 2008).  And Judge Gerber

18   dealt with almost an exactly similar situation albeit in the

19   context of a trial declaration.

20           THE COURT:  Yeah, well I --

21           MR. GARFINKLE:  So we --

22           THE COURT:  -- I have stricken -- I'm stopping you

23   there, because I have stricken things out of people's trial

24   declarations, particularly because in my chambers rules all

25   direct testimony, just like Judge Drain does and some other

Page 114

1   people in our district, is in the form of a declaration.  So

2   then that is relevant.  So I need to understand why this is

3   necessary now.  That's what I'm just trying to understand

4   because this is not trial testimony.

5            MR. GARFINKLE:  But it is evidence that would be

6   akin to what trial, for the purposes of a Rule 56 motion.

7   And I just want to point out what Judge -- in that case, the

8   liquidating Trustee submitted a lengthy trial declaration.

9   He was an accountant, a CPA, just like Ms. DeVito.  And what

10   -- and there was a 701 challenge to that declaration and

11   what Judge Gerber said was that the Trustee could testify as

12   to what happened, but he can't testify as to -- I'm going to

13   quote the language exactly because it's important -- "as to

14   her perception of right and wrong, nor could he testify as

15   to what should have been done, cannot testify as to

16   customary business practice or what his training and

17   experience tells him about appropriate conduct."

18            And unfortunately, the declaration that was

19   submitted runs afoul of all those teachings of Judge Gerber

20   in the Koplik case.  And that's why we filed the

21   declaration.  I can give you example after example, but

22   claiming that we -- that she knows that we violated the

23   automatic stay or that this was wrongful conduct and it goes

24   on and on, 129 paragraphs.  And so in our view, Judge, most

25   of her testimony or good portion of it, needs to be stricken

Page 115

1    because it's inappropriate for that kind of declaration.

2            She can testify as to facts, what happened.  But

3    what she can't testify are all these -- I can't even say it

4    --

5            THE COURT:  Disparaging.

6            MR. GARFINKLE:  Wrongful allegations, disparaging

7    allegations or violations of the law or her conclusions.

8    No.  That's inappropriate.  It's inappropriate for trial and

9    it's inappropriate for Rule 56 motion.  And that's our

10   point, Your Honor.  Let's just say that I -- let's just say

11   I agree with you.  Mr. Milin makes a good point which I

12   think is right.

13           Actually there's actually two points I would make

14   to this.  Number one, I'm -- you know, I have to figure out

15   if there's actually a dispute of fact.  That's really the

16   purpose of this.  We have a number of issues that are really

17   legal issues, like completely legal issues here in these

18   motions.  And then we have some issues that are not just

19   legal issues.  And then I have to figure out if there's a

20   dispute of fact between the parties.  That's all I have to

21   decide.

22           I don't have to decide whether, if there's a, you

23   know, whether or not somebody did anything wrong or didn't

24   do anything wrong or alleged wrongdoing.  I just have to

25   find out if they're -- parties are disputing a genuine issue

Page 116

1    of material fact.  I don't think that I need to, you know, I

2    think I can use my own judgment when reading this,

3    especially given the fact that you have now provided me with

4    this lengthy list of all the things that you think are wrong

5    in every single paragraph, when I go back and reread her

6    declaration for purposes of this.

7            I just don't -- to be honest with you, I don't see

8    how I'm going to be relying on this other than that there's

9    a dispute, that she's saying there's a dispute.  I'm not

10    determining whether someone did anything wrong in connection

11    with the summary judgment motion.  That's not what's before

12    me, no disrespect for this type of summary judgment motion.

13            I mean, this is an issue of what did Congress

14    mean, you know, what was -- you know, what is the subsequent

15    new value defense and how does that, you know, the

16    subsequent new value defense, do I look at, you know, paid

17    amount?  Okay, that's a legal issue.  How do I interpret

18    Section 547(c)(4) of the code?  I'm going to have to look

19    at, you know, issues of how do I reconcile 547, 502, in your

20    case, 503(b)(9), and possibly even because you invoked it,

21    you know, like, 503(a).

22            But you know, I'm not I'm not looking into whether

23    somebody did anything wrong.  There's really just a question

24    of the facts that you've alleged and the facts that you've

25    alleged in support of the motion to dismiss, obviously don't

1    have to do with wrongdoing and that's not what you're asking

2    me to find.  You're not asking me to find you didn't do

3    anything wrong.  You were just asking me to find things in

4    connection with this motion as to calculation of the

5    subsequent new value defense as to setoff rights.

6              Now, it's true that they've raised the issue of

7    equities in connection with the setoff right.  But I -- if I

8    found that there was a dispute about that or if I found that

9    the law allowed that type of argument, I guess that's the

10   first issue, what's the setoff law to the extent it's

11   relevant.  I don't think I'm going to get into whether

12   they'll -- what the equities are or not in connection with

13   this.  I mean that's just not how I read your papers and no

14   disrespect to Mr. Millan or Ms. DeVito, no matter what they

15   want to put in their papers, I mean, you're asking me to

16   rule on some very specific things for summary judgment and I

17   don't think that they have to do with that.

18             I mean there -- look, there are some things where

19   in my opinion it does look like it's possible that people

20   have a genuine dispute on the facts and that may be

21   something I can grant summary judgment for if I find that

22   based on her declaration, but I'm not sure that the facts

23   that are in dispute are because of hearsay issues, I mean,

24   or improper lay opinion, which is probably a good chunk of

25   this or her trying to be an expert which I grant you is an

1    issue and if that comes in trial that's going to be an

2    issue.  Because either the parties have to treat her like an

3    expert and they have to go through the process for expert

4    disclosures and reports -- no disrespect to Mr. Milin -- or

5    they're not.

6            But I don't think that's what I have before me

7    today.  All right, well, I berated you enough.  I'll let Mr.

8    Milin tell me anything I've, you know, failed to consider.

9            MR. MILIN:  Your Honor, I think you more or less

10   covered it.  I mean, Ms. DeVito states what her view is.

11   The Court doesn't need to agree with it or rely on it.  The

12   Court should pay attention to the facts she states and come

13   to its own conclusions.  So, you know, I've stated in some

14   detail why I believe Mr. Garfinkle's firm has misunderstood

15   the applicable law, but fundamentally, Your Honor can just

16   make her own decision about what to believe and what not to

17   believe in Ms. DeVito's declaration.

18           THE COURT:  Yeah.  And look, Mr. Garfinkle, I

19   don't think this is a wasted exercise for a couple of

20   reasons.  And let me just be clear about that for the

21   record.  Number one, I will certainly look at your issues

22   that you've raised when I'm reading -- rereading her

23   declaration.  But I highly doubt, to be candid, having

24   looked at your -- the issues that you raised in the

25   objection that 90 percent of this is probably not -- at

1   least, it's probably not something that I would be relying

2   on for my purposes at all, because I don't think those are

3   what you're asking me to decide.

4           I do think Mr. Milin, and just note this for -- I

5   think I've said it now already, but I'm going to say it

6   again, just so you're aware -- I do think that some of the

7   descriptions in here, and again, this is not the purpose of

8   this affidavit.  It's not her trial testimony.  But I do

9   think there are some issues with possibly some improper lay

10  opinion, you know, lay testimony and opinion.

11          And I do think that for sure if somebody is going

12  to want to have her treated as an expert for purposes of

13  that, then as I've already told you, you're going to have to

14  comply with the rules relating to that before me and I'm not

15  going to take the position that she doesn't need to file

16  expert disclosures or expert report or any of that, none of

17  which has happened.  So I -- and she'd have to qualify as an

18  expert, but I don't think that's the purpose you put in this

19  declaration.

20          MR. GARFINKLE:  Right.

21          THE COURT:  So I'm not looking at it that way.

22  I'm looking at it as this is -- it's a factual dispute issue

23  because that's what the purpose of summary judgment is, is

24  for me to decide if there's some kind of genuine issue.  And

25  it may be that if I went determined that there was a dispute

Page 120

1    and then we went to trial and then you offered the same

2    document up, just -- I know that wouldn't be what happened.

3    But I'm just being hypothetical again.  That I would have to

4    strike some of this because I do think there are some issues

5    about both, you know, the lay opinion, the expert issue, and

6    some hearsay issues, but that's not where we are now.

7    That's not the purpose here.  So --

8              MR. GARFINKLE:  Thank you --

9              THE COURT:  Again, it's just to show a genuine

10   whether there's a dispute.  It's not for me to determine

11   that this is true.

12             MR. GARFINKLE:  Right.  My only comment, Your

13   Honor, is that the Rule 26 doesn't actually require full

14   disclosure from Ms. DeVito, we think, as we cited in our

15   papers, but that's not an issue for today.

16             THE COURT:  Yeah, understood.  Okay.  Well, Mr.

17   Garfinkle, I'm going deny your motion to dismiss but I

18   promise you for the record that I am going to look at -- and

19   my clerks will look at every single issue you've raised in

20   connection with each paragraph when we reread her

21   declaration, when we're looking at decision and we'll

22   obviously consider what makes sense or not.  And that as

23   I've noted, I think most of the purpose of this affidavit is

24   such that it's not her trial testimony, but it's just to

25   demonstrate that there's actually -- whether or not there

Page 121

1    are issues of material fact.

2             And as I noted, your motions for summary judgment

3    don't require me to determine wrongdoing or any of those

4    things.  That's not what your motions are related to.

5    They're completely related to either -- I don't mean this in

6    any way disparaging or critical, but they're either genuine

7    issues of law or they're a combination of fact and law

8    issues that have to do with calculations of claims and not

9    issues of the wrongdoing.

10            I'm not being asked to find whether anything you

11   did was inequitable or not or your client did here.  That's

12   what I mean.

13            MR. MILIN:  Thank you, Your Honor.

14            MR. GARFINKLE:  Thank you, Your Honor.

15            THE COURT:  Okay.  All right.  Well, thank you

16   very much.  I appreciate all the argument and the hard work

17   that went into this and this will be a, I'm sure, a fun

18   project for me and my law clerks to have to wrestle with

19   areas of the law that obviously in some cases no one's

20   raised, I mean no one's actually written an opinion on.  So

21   that will be interesting for us.  Very challenging and fun.

22            But that's why I decided to apply for this job.

23   So it's a good -- I don't mean that in a negative way.

24            MR. MILIN:  Your Honor, could you give us any kind

25   of indication as to timing given that there are a lot of

Page 122

```
1    witnesses and experts and folks who are going to want to

2    know?  Can we -- I mean, there won't be a trial before X

3    date or whatever guidance Your Honor can provide.

4              THE COURT:  Well, I can give you the guidance that

5    I have a trial on Monday and Tuesday.  So I'm clearly -- no

6    disrespect to you all, but I'm clear, this is not going to

7    be something I'm going to be like turning my attention to

8    this -- the rest of this week because I have to prepare for

9    my trial on Monday and Tuesday in addition to other things.

10   But that -- like for example, my mega case that filed two

11   days ago and I had first days yesterday that I squeezed in

12   for two-and-a-half hours and the person that probably

13   stopped to have a epileptic fit because I haven't yet

14   entered their interim DIP order, which is only due to the

15   fact I haven't been able to get off the phone and read the

16   red line.  Things like that.

17             But aside from that, no, I don't think I can give

18   you guidance.  We obviously won't have a trial that sneaks

19   up on anybody.  I don't do that.  I will I say to you that,

20   obviously if -- when we get to that stage, I'm sure we'll

21   have a number of discussions about it and it will have to be

22   planned.  I don't even have any sense of how many witnesses

23   we'd be talking about just because you know, obviously I

24   looked at the summary judgment motion.

25             I haven't had to try to figure out what else we're
```

Page 123

1    going to have.  So I would have a sense of what you'd be

2    calling for the issues in this matter, but that, that's not

3    everything, as you all noted.

4              MR. MILIN:  Right.

5              THE COURT:  So I don't think I could --

6              MR. MILIN:  -- no sneaking is really all I'm

7    asking for, so thank you.

8              THE COURT:  Yeah.  Yeah, sorry.  Just that and I

9    will, if we get to that stage, we'll certainly be

10   discussing, how we're going to be doing that.  I've been

11   trying to get people to come in person for trials and

12   evidentiary hearings.  I'm batting about maybe 50 percent or

13   less at this point where I have had an in-person trial.

14   This is not my first one.  My second.  But I -- and I've had

15   -- but everything else, I've had, trials and evidentiary

16   hearings, I have otherwise had to have on Zoom because it's

17   just -- you know, so far, I haven't gotten to the point

18   where I forced anyone to come to Court.

19             So just because people aren't comfortable.  So

20   I've been, every time that happened, I we've gone to Zoom,

21   but some of my colleagues are doing hybrid.  So I haven't

22   tried that.  That might be possible at some point.  And

23   obviously with cases going up again, unfortunately, I'm

24   hoping everything stays good because I wouldn't want us to

25   be -- go back to where we were a couple of months ago where

Page 124

1    we couldn't even come into Court.

2          So stay tuned.  All right.  Well, that's my answer

3    to your question.  Sorry.

4          MR. MILIN:  Thank you.

5          THE COURT:  All right, well, if there's any -- is

6    there anything else that I need to address today with

7    respect to this matter?

8          MR. MILIN:  I don't think so.

9          MR. GARFINKLE:  Not from McKesson, Your Honor.

10          MR. HAMERSKY:  No, Your Honor.

11          THE COURT:  Okay.  All right, well thank you all

12    very much and I wish you a good rest of the day.

13          MR. MILIN:  Thank you.

14          MR. GARFINKLE:  Goodbye.

15          THE COURT:  Goodbye.

16          (Whereupon these proceedings were concluded at

17    1:54 PM)

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3                          RULINGS

4                                              Page        Line

5    Motion to seal                            9           19

6

7    Motion to dismiss                         120         17

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 126

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  May 23, 2022