Jeffrey K. Garfinkle (admitted *pro hac vice*)
Daniel H. Slate (California State Bar No. 78173)
BUCHALTER Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
Fax: (949) 720-0182
jgarfinkle@buchalter.com
dslate@buchalter.com

Tracy L. Klestadt
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Fax: (212) 972-2245
tklestadt@klestadt.com

Counsel for Defendant
McKesson Corporation

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. | Case No. 15-23007 (lgb) |
| Debtor. | |
| The Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. | |
| Plaintiff | Adv. Proc. No. 17-08264 (lgb) |
| v. | |
| McKESSON CORPORATION | |
| Defendant | |

# NOTICE OF RELEVANT DECISION BY ELEVENTH CIRCUIT COURT OF APPEALS

McKesson Corporation ("McKesson") advises the Court that on July 18, 2022, the Eleventh Circuit Court of Appeals issued a decision in the appeal captioned, *Auriga Polymers, Inc. v. PMCM2, LLC, as Liquidating Trustee for Beaulieu Liquidating Trust*, Case No. 20-14647 (the "*Auriga Polymers* decision"). A copy of the *Auriga Polymers* decision is attached hereto.

The *Auriga Polymers* decision overrules a decision issued by the United States Bankruptcy Court for the Northern District of Georgia in another preference lawsuit brought in the same *Beaulieu* bankruptcy case, *Beaulieu Liquidating Tr. v. Fabric Sources, Inc.* (*In re Beaulieu Grp., LLC*), 616 B.R. 857 (Bankr. N.D. Ga. 2020). As a reminder to the Court, in the Committee's oppositions to McKesson's Motion for Summary Judgment in the above-captioned adversary proceeding [Adv. Pro. ECF 115] and Motion for Summary Judgment on the Debtor's First, Fifth and Thirteenth Omnibus Claim Objections Seeking to Disallow 11 U.S.C. § 503(b)(9) Claims [Main Case ECF 5059], it argued over several pages that this Court "should adopt the reasoning of *Beaulieu*." *See* Opposition to Claim Objection Summary Judgment [Main Case ECF 5084], pp. 16-20.

DATED: July 19, 2022

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS LLP

By:  /s/ *Tracy L. Klestadt*
Tracy L. Klestadt, Esq.
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
TKlestadt@Klestadt.com

and

BUCHALTER, A Professional Corporation
Jeffrey K. Garfinkle, Esq.
(Cal Bar. No. 153496; admitted *pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Telephone: (949) 760-1121
jgarfinkle@buchalter.com

Attorneys for Defendant,
MCKESSON CORPORATION

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14647

_____

AURIGA POLYMERS INC.,

                                        Plaintiff-Appellant,

*versus*

PMCM2, LLC,

as the Liquidating Trustee for the
Beaulieu    Liquidating    Trust,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 4:17-bk-41677-BEM

_____

Before WILSON and LAGOA, Circuit Judges, and MARTINEZ,[*] District Judge.

LAGOA, Circuit Judge:

The Bankruptcy Code empowers a trustee to claw back "preferences," i.e., certain transfers made by a debtor to a creditor on the eve on bankruptcy. 11 U.S.C. § 547(b). But the creditor who gives new value to the debtor after receiving a preference may use that new value to offset its preference liability. *Id.* § 547(c)(4). This "new value" defense, however, is itself offset to the extent that the debtor later makes an "otherwise unavoidable transfer" to the creditor on account of the value received. *Id.* § 547(c)(4).(b).

This case presents an issue of first impression for this Court: whether post-petition transfers made under a 11 U.S.C. § 503(b)(9) request will reduce the creditor's new value defense. *See id.* § 547(c)(4). We hold that, for purposes of § 547(c)(4)(B), "otherwise unavoidable transfers" made after the debtor has filed for bankruptcy do not affect a creditor's new value defense. We thus affirm in part and reverse in part the bankruptcy court's order on appeal.

## I.    BACKGROUND

Beaulieu Group, LLC ("Beaulieu"), was one of the largest carpet manufacturers in North America and "engaged in the

---

[*] Honorable Jose E. Martinez, United States District Judge for the Southern District of Florida, sitting by designation.

distribution of carpet and hard surface flooring products in both residential and commercial markets in the United States and many foreign countries." Beaulieu was a pioneer in the carpet industry; it had developed vertically integrated manufacturing and distribution operations, e.g., obtaining raw materials, manufacturing carpets, and selling and distributing those carpets. Beaulieu had eight manufacturing facilities in Georgia and one in Alabama, and had three distribution facilities in Georgia, California, and Illinois. The largest manufacturing and distribution facilities—and the company headquarters—were located in Dalton, Georgia. Before filing for bankruptcy, the company had about 2,500 employees.

The carpet industry is a $10 billion market annually in the United States, but consumer preference has shifted toward hard surface flooring products while increased competition in the carpet industry has pushed carpet prices down. Over the course of ten years, Beaulieu's annual revenue declined from $1 billion in 2007 to less than $600 million in 2016, while its market share fell from 7.7 percent to 4.4 percent.

In 2016, Beaulieu added new members to its board of directors and brought in new senior management to develop a business turnaround and transformation plan. But Beaulieu had insufficient borrowing power and liquidity to complete its turnaround efforts. On July 16, 2017, Beaulieu and its affiliates each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

The bankruptcy court subsequently approved a plan of liquidation that involved transferring all of Beaulieu's assets to a

liquidating trust.  PMCM 2, LLC (the "Trustee"), is the liquidating trustee for the Beaulieu Liquidating Trust.  The creditor here is Auriga Polymers Inc. ("Auriga"), which sold Beaulieu polyester resins and specialty polymers used in a range of products, including textiles, before the bankruptcy.  We begin our background discussion by setting forth the general statutory framework as to bankruptcy under Chapter 11 before turning to the facts here.

### A.  Statutory Framework

All collection activities are automatically suspended when a Chapter 11 bankruptcy petition is filed, meaning creditors may not pursue any debts or claims that arose before the filing of the petition.  *See* 11 U.S.C. § 362(a).  This is called the "automatic stay." *Id.*  The automatic stay provides breathing room for the debtor to negotiate with its creditors and craft a plan of reorganization or liquidation.  *See id.* § 1123.

These plans categorize claims against the debtor in order of priority.  *Id.* § 507.  After certain domestic support obligations, administrative expenses are afforded the highest priority of unsecured claims, meaning they are paid out before other unsecured claims. *Id.* § 507(a).  These administrative expenses are often paid in full, while most unsecured claims receive pennies on the dollar.  *See, e.g.*, *In re Furr's Supermarkets, Inc.*, 485 B.R. 672, 692 (Bankr. D.N.M. 2012) ("But even if there were anything left to pay general unsecured creditors, it would be in the nature of pennies on the dollar.").

Filing for bankruptcy under Chapter 11 also automatically creates "the estate," which is used to pay out the debtor's obligations. 11 U.S.C. § 541(a). The estate consists of essentially all the debtor's property and rights to property. *See id.* In order to grow the estate to benefit all creditors, trustees have "avoiding" powers, which allow them to undo certain transfers of money or property made during a certain time period before the filing of the bankruptcy petition. *See id.* § 544. By avoiding a particular transfer, a trustee can essentially cancel the transaction and force the return or "disgorgement" of the payments or property. *See generally id.* §§ 544–48. These powers include § 547(b), which states:

> [Generally,] the trustee may . . . avoid any transfer of
> an interest of the debtor in property [] to or for the
> benefit of a creditor; [] for or on account of an ante-
> cedent debt . . . made while the debtor was insolvent;
> [] made [] on or within 90 days before the date of the
> filing of the petition; . . . and that enables such creditor
> to receive more than such creditor would receive [in
> a Chapter 7 liquidation].

This provision provides the general rule that a trustee can avoid preference payments — certain payments made "on or within 90 days before the date of the filing of the petition." *Id.* For transfers avoided under this provision, 11 U.S.C. § 550(a) empowers the trustee to "recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property."

Section 547(c) provides nine defenses to the § 547(b) avoiding power. Pertinent to this case, § 547(c)(4) states:

> The trustee may not avoid under this section a trans-
> fer . . . to or for the benefit of a creditor, to the extent
> that, after such transfer, such creditor gave new value
> to or for the benefit of the debtor [that was both:] (A)
> not secured by an otherwise unavoidable security in-
> terest; and (B) on account of which new value the
> debtor did not make an otherwise unavoidable trans-
> fer to or for the benefit of such creditor.

This means that a creditor who provides new value to the debtor
after receiving a preferential transfer can use that new value to off-
set its preference liability.  This is often called the "new value de-
fense." *See, e.g.*, *In re BFW Liquidation, LLC*, 899 F.3d 1178, 1188
(11th Cir. 2018).  The new value defense was enacted as part of the
Bankruptcy Code in the Bankruptcy Reform Act of 1978.  Pub. L.
No. 95–598, 92 Stat. 2549, 2598–99; *In re BFW Liquidation*, 899 F.3d
at 1190.

Congress created another avenue for creditors to recoup
some of the value they provided to a debtor on the eve of bank-
ruptcy in the 2005 amendments to the Bankruptcy Code. *See* Bank-
ruptcy Abuse Prevention and Consumer Protection Act of 2005,
Pub. L. No. 109-8, § 1227, 119 Stat. 23.  Section 503(b)(9) of the
Bankruptcy Code grants certain creditors administrative expense
priority for "the value of any goods received by the debtor within
20 days before the date of commencement of a case under [Title
11] in which the goods have been sold to the debtor in the ordinary
course of such debtor's business."  In enacting § 503(b)(9), the
Bankruptcy Code elevated a group of creditors who previously

held general unsecured claims ahead of priority unsecured creditors and all other general unsecured creditors.

The issue presented by this case is one of first impression for this Court and unsettled in other Circuits: whether "otherwise unavoidable transfers" affect a creditor's § 547(c)(4) new value defense when those transfers are made post-petition — made to the creditor after the debtor files for bankruptcy. The post-petition transfers at issue are § 503(b)(9) administrative claims. Thus, the specific question is "whether a creditor may reduce its [preference] liability by new value provided to a debtor within the 20 days prior to the bankruptcy filing if the creditor also files a § 503(b)(9) administrative claim seeking payment for that new value." *See In re Commissary Operations, Inc.*, 421 B.R. 873, 875 (Bankr. M.D. Tenn. 2010).

### B. Factual and Procedural Background

The facts here are largely undisputed.

In total, Auriga delivered to Beaulieu over $4.2 million in goods before Beaulieu filed for bankruptcy, for which Auriga had not been paid. Beaulieu filed for bankruptcy on July 16, 2017 (the "Petition Date").

During the ninety days before the Petition Date (i.e., the preference period), Beaulieu transferred to Auriga more than $2.2 million (the "Pre-Petition Transfers"). During that same period, Auriga delivered to Beaulieu over $3.523 million of goods (the "Goods"). At least $694,502 of those Goods were delivered within

twenty days of the Petition Date.  The Goods were sold on credit and were not secured by an otherwise unavoidable security interest.

After Beaulieu filed for bankruptcy, Auriga filed two claims against the estate that are pertinent to this case:

> (1) a general unsecured claim (Claim No. 1799, as amended) in the amount of $3.596 million, representing the difference between the $4 million total owed to Auriga and the $694,502 for which Auriga would file a § 503(b)(9) request; and

> (2) a § 503(b)(9) request in the amount of $694,502, representing the amount of Goods transferred within twenty days of the Petition Date.

Beaulieu subsequently filed, and the bankruptcy court confirmed, the First Amended Joint Plan of Liquidation (the "Plan"). Under the Plan, all of Beaulieu's assets, including its causes of action, were transferred to the Liquidating Trust, managed by the Trustee.

The Trustee then filed a complaint, seeking to avoid the $2.2 million Pre-Petition Transfers as preferences under § 547(b) and to recover that amount from Auriga under § 550 in Counts I and II. Count III of the complaint sought to reclassify any portion of Auriga's § 503(b)(9) request that was included as part of its new value defense as a general unsecured claim.  And Count IV asked the bankruptcy court to disallow any claims by Auriga until it disgorged any amounts successfully avoided by Trustee.

Auriga filed an answer and counterclaim. The counterclaim sought a declaratory judgment that (1) its use of the new value defense under § 547(c)(4) does not preclude it from using the same value to recover under § 503(b)(9) and (2) the Trustee cannot use 11 U.S.C. § 502(d) to disallow Auriga's § 503(b)(9) request for administrative expense treatment. Auriga later moved for summary judgment on all counts of the complaint and its counterclaim.

After briefing, but before the bankruptcy judge made a decision on Auriga's motion, the parties entered a joint stipulation for interim distribution. As part of the stipulation, Auriga admitted that the Pre-Petition Transfers it received from the Debtor were avoidable preferences, and the Trustee agreed that the § 547(c)(4) new value defense protected all but the last of the Pre-Petition Transfers, which occurred on June 23, 2017, in the amount of $421,119.

That $421,119 in value conveyed by Auriga to Beaulieu was part of Auriga's $694,502 § 503(b)(9) request; the parties dispute Auriga's ability to also use that $421,119 value as part of its § 547(c)(4) new value defense. The parties agreed, however, that Auriga had an allowed § 503(b)(9) claim for $273,382 (the difference between the total request for $694,502 and the $421,119 disputed portion). Thus, the Trust made an interim distribution of $273,382 to Auriga.[1] While the $421,119 disputed amount has not been paid to

---

[1] The Trust also made a payment of around 2.2% of Auriga's Claim No. 1799, as it had for all general unsecured creditors' claims.

Auriga, the Trustee has set aside reserves sufficient to pay the full amount of Auriga's § 503(b)(9) Request.

The next month, the bankruptcy court issued an order granting in part and denying in part Auriga's motion for summary judgment. Because the Trustee conceded that Auriga had a valid § 547(c)(4) defense as to all but the disputed $421,119, Auriga was entitled to summary judgment on Counts I and II of the complaint to the extent of approximately $1.8 million (the difference between the $2.2 million Pre-Petition Transfers and the disputed $421,119). As to the disputed amount, the parties agreed for purposes of the § 547(c)(4) new value defense that Auriga gave new value after receiving the transfers, but they disagreed about whether the Debtor made an "otherwise unavoidable transfer" on account of that new value.

The bankruptcy court had decided this precise issue—whether a creditor can use the same value to recover under § 503(b)(9) and offset its preference liability under § 547(c)(4)—in an earlier adversary proceeding brought by the Trustee against another creditor. *See In re Beaulieu Grp., LLC* ("*Fabric Sources*"), 616 B.R. 857 (Bankr. N.D. Ga. 2020). In *Fabric Sources*, the court held that funds held in reserve to pay § 503(b)(9) claims are "otherwise unavoidable" transfers for purposes of a § 547(c)(4) defense and cannot be used to offset preference liability. *See id.* at 878.

The bankruptcy court adopted its reasoning in *Fabric Sources* and held that Auriga could not use the same value to seek payment under § 503(b)(9) and to offset its preference liability

under § 547(c)(4). Thus, as to Counts I and II seeking to avoid and recover the Pre-Petition Transfers, the court denied summary judgment because the disputed $421,119 could be used as either part of Auriga's § 503(b)(9) request or its § 547(c)(4) subsequent new value defense, but not both. On Count III, seeking to reclassify Auriga's § 503(b)(9) request as a general unsecured claim, the court denied summary judgment for the same reason. On Counterclaim I, seeking declaratory judgment that Auriga was entitled to recover under § 503(b)(9) an amount that was part of its subsequent new value defense, the court denied summary judgment as to the § 503(b)(9) request.[2] On Count IV, seeking to disallow Claim No. 1799 until Auriga disgorged any avoided amounts, the court denied summary judgment because Auriga could not show it had a complete preference defense, i.e., because Auriga admitted that the Pre-Petition Transfers were avoidable and because the court concluded that Auriga's subsequent new value defense was limited to the extent to which it sought payment under § 503(b)(9). Finally, on Counterclaim II, the court granted summary judgment, holding that Auriga's § 503(b)(9) request cannot be contingent on Auriga's disgorging avoided preferences.

Auriga timely filed a notice of appeal to the district court. Finding this case involves novel questions of law, and that an immediate appeal to the Eleventh Circuit would materially advance

---

[2] The court granted summary judgment on Counterclaim I as to the general unsecured Claim No. 1799.

the case, the district court stayed the case pursuant to 28 U.S.C.
§ 158(d)(2)(A) for a direct appeal to this Court.

The precise question warranting direct appeal is:

whether a Liquidation Trustee's post-petition reser-
vation of funds sufficient to pay a defendant's admin-
istrative expense claim under § 503(b)(9) amounts to
an "otherwise unavoidable transfer" within the
meaning of § 547(c)(4) such that it precludes the use
of such new value as part of the defendant's affirma-
tive defense of subsequent new value under
§ 547(c)(4) of the Bankruptcy Code.

## II.     STANDARD OF REVIEW

We review a district court's ruling on a motion for summary
judgment de novo, applying the same legal standards used by the
court below.  *Yarbrough v. Decatur Hous. Auth.*, 941 F.3d 1022,
1026 (11th Cir. 2019).  Summary judgment is warranted where the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law.  Fed.
R. Civ. P. 56(a).

Questions of statutory interpretation, including interpreta-
tion of the Bankruptcy Code, are reviewed de novo.  *In re BFW
Liquidation*, 899 F.3d at 1187; *Pollitzer v. Gebhardt*, 860 F.3d 1334,
1338 (11th Cir. 2017).

## III.   ANALYSIS

We begin our analysis by examining the relevant statutory language. *In re BFW Liquidation*, 899 F.3d at 1188. As explained above, § 547(b) states that:

> [e]xcept as provided in subsections (c), (i), and (j) of this section, the trustee may . . . avoid any transfer of an interest of the debtor in property[] (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made[] on or within 90 days before the date of the filing of the petition; . . . and (5) that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title . . . .

This provision gives bankruptcy trustees the power to avoid "preferences," i.e., certain transfers made from the debtor to a creditor within ninety days of filing a bankruptcy petition. Section 547(c) provides nine defenses that creditors can use to prevent § 547(b) avoidance. One such defense is set forth in § 547(c)(4):

> (c) The trustee may not avoid under this section a transfer—
>
> . . .
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security
interest; and

(B) on account of which new value the debtor did not
make an otherwise unavoidable transfer to or for the
benefit of such creditor.

This defense protects a creditor who provided new value after re-
ceiving a preference payment. There are three elements to this de-
fense: (1) the creditor must have given new value; (2) the new value
was not secured by an otherwise unavoidable security interest; and
(3) the debtor did not make an otherwise unavoidable transfer to
or for the benefit of the creditor on account of the new value. *See
id.*

There is no dispute that Auriga provided new value to the
Debtor after the final preferential transfer of $421,119 or that the
new value Auriga provided was not secured by an unavoidable se-
curity interest. The issue is whether the funds the Trustee has in
reserve to pay Auriga's § 503(b)(9) request constitute an "otherwise
unavoidable transfer" that would offset Auriga's preference de-
fense to the extent of that amount.

Our decision today is not written on a completely clean
slate. Though this issue was not before the Court, the Trustee
seems to imply that our decision in *In re BFW Liquidation* binds us
to decide in his favor. In *In re BFW Liquidation*, we held that
"[n]othing in the language of § 547(c)(4) indicates that an offset to
a creditor's § 547(b) preference liability is available only for new
value that remains unpaid." 899 F.3d at 1189. Instead, we stated:

> the plain language of [§ 547(c)(4)] requires only that
> (1) any new value given by the creditor must not be
> secured by an otherwise unavoidable security interest
> and (2) the debtor must not have made an otherwise
> unavoidable transfer to or for the benefit of the cred-
> itor on account of the new value given.

*Id.* The Trustee claims that, "[b]y the very same logic, nothing in [§] 547(c)(4) indicates that the 'otherwise unavoidable transfer' had to have occurred pre-petition."

After concluding "new value" need not remain un-paid, the *In re BFW Liquidation* Court took up the trustee's alterna-tive argument that the word "otherwise" in "otherwise unavoidable transfer" means that the avoidability of a debtor's payment could not be derived from § 547. *Id.* at 1198. We dismissed this argument and held that "otherwise unavoidable transfer" means "transfers that are unavoidable for reasons other than § 547(c)(4)'s subse-quent-new-value defense." *Id.* For example, we noted that trans-fers made unavoidable under one of the other § 547(c) defenses could "naturally be said to be 'otherwise unavoidable' for purposes of" § 547(c)(4)(B). *Id.* at 1198–99. The Trustee here claims this hold-ing implies that a transfer that is unavoidable for *any* reason other than § 547(c)(4) is an "otherwise unavoidable transfer," i.e., there is no other limit on which unavoidable transfers will affect a creditor's new value defense.

None of the language cited by Trustee holds what he would like it to; instead, he extrapolates from our narrow holdings on both issues: (1) that "new value" need not remain unpaid; and (2) that

preferences are avoidable transfers for purposes of § 547(c)(4)(B). And "regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010). Because the transfers at issue in *In re BFW Liquidation* were made *pre*-petition, this Court had no reason to hold—and regardless, the facts would not permit it to hold—that *post*-petition transfers could be used to offset a creditor's new value defense. Moreover, because—as we hold in this case—an "otherwise unavoidable transfer" in the context of § 547(c)(4)(B) has pre-petition meaning, it would have been superfluous for the *In re BFW Liquidation* Court to refer to these transfers as "otherwise unavoidable transfers *made pre-petition*." For these reasons, our decision in *In re BFW Liquidation* does not resolve the issue presented by this case.

We now turn to the issue presented to us. Only three courts have considered the precise question of whether a creditor can use § 503(b)(9) and § 547(c)(4) for the same underlying value,[3] but more have considered the broader issue of whether *any* post-petition

---

[3] *Compare In re Commissary Operations*, 421 B.R. at 878–79 (finding payment under § 503(b)(9) does not impact the new value defense), *with In re TI Acquisition, LLC*, 429 B.R. 377, 385 (Bankr. N.D. Ga. 2010) (determining payment under § 503(b)(9) reduces a creditor's new value defense), *In re Circuit City Stores, Inc.* ("*Circuit City I*"), No. 08-35653, 2010 WL 4956022, at *9 (Bankr. E.D. Va. Dec. 1, 2010) (same), *and In re Circuit City Stores, Inc.* ("*Circuit City II*"), 515 B.R. 302, 314 (Bankr. E.D. Va. 2014) (same).

payments affect a creditor's subsequent new value defense.[4] Of our sister circuits, only the Third Circuit has directly weighed in on either question, holding that only pre-petition "otherwise unavoidable transfers" can offset a creditor's § 547(c)(4) new value defense.[5] *See In re Friedman's Inc.*, 738 F.3d 547, 549 (3d Cir. 2013).

The bankruptcy court here disagreed with the Third Circuit's reasoning in *In re Friedman's*. It denied in part Auriga's

---

[4] *Compare In re Friedman's Inc.*, 738 F.3d 547, 549 (3d Cir. 2013) ("We hold that where 'an otherwise unavoidable transfer' is made after the filing of a bankruptcy petition, it does not affect the new value defense."), *In re Phoenix Rest. Grp., Inc.*, 373 B.R. 541, 547–48 (M.D. Tenn. 2007) (holding that post-petition payments made pursuant to critical vendor order could not be used to offset pre-petition new value), *and In re Energy Coop., Inc.*, 130 B.R. 781, 789 (N.D. Ill. 1991) (finding that post-bankruptcy payments by debtor do not limit new value defense), *with In re Furr's Supermarkets, Inc.*, 485 B.R. 672, 733–34 (Bankr. D.N.M. 2012) (holding that cutting off preference calculation at petition date "makes no economic sense"), *In re Login Bros. Book Co.*, 294 B.R. 297, 300 (Bankr. N.D. Ill. 2003) ("[B]oth the plain language and policy behind the statute indicate that the timing of a repayment of new value is irrelevant."), *In re MMR Holding Corp.*, 203 B.R. 605, 609 (Bankr. M.D. La. 1996) (holding that post-petition transfers "should limit the use of § 547(c)(4) by the amount of the unavoidable transfer" to avoid "double use of the new value" (emphasis omitted)), *and In re D.J. Mgmt. Grp.*, 161 B.R. 5, 8 (Bankr. W.D.N.Y. 1993) (holding that post-petition payments on new value must be considered under § 547(c)(4)).

[5] *But see In re JKJ Chevrolet, Inc.*, 412 F.3d 545, 553 & n.6 (4th Cir. 2005) (stating in dicta that "post-petition transfers may be considered under section 547(c)(4)(B)" and citing an out-of-circuit bankruptcy court decision before remanding to the district court to decide whether certain transfers were avoidable).

motion for summary judgment after concluding § 547(c)(4) does not limit when an "otherwise unavoidable transfer" will offset a creditor's new value defense.[6]  The bankruptcy court's interpretation relied heavily on the statute's "silence" *see Fabric Sources*, 616 B.R. at 872, as well as our decision in *In re BFW Liquidation*.

On appeal, Auriga argues that there has been no "transfer" at all because the funds held in reserve have not been paid.  Auriga further argues that, even if there were a "transfer," the statute's silence is not dispositive, and the text and context of § 547(c)(4) cannot support the bankruptcy court's interpretation.

As to Auriga's contention that no transfer has occurred, we agree with the bankruptcy court that there has been a "transfer."[7]

---

[6] The court adopted its reasoning from an earlier adversary proceeding in the same bankruptcy.  *See Fabric Sources*, 616 B.R. 857.

[7] As an initial matter, there has been a "transfer"; that the funds have not actually been paid is immaterial.  Auriga argues that holding reserves for payment of an administrative claim is not a "transfer" within the meaning of § 547(c)(4)(B) and that reserves should only be considered "transfers" when they are actually paid.  The Bankruptcy Code defines "transfer" as including "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an *interest in property*." 11 U.S.C. § 101(54)(D) (emphasis added).  At least one bankruptcy court has concluded that this broad definition includes funds held in reserve.  *See Circuit City II*, 515 B.R. at 314 n.9 (Bankr. E.D. Va. 2014); *Circuit City I*, 2010 WL 4956022, at *6 (Bankr. E.D. Va. Dec. 1, 2010).  In doing so, that court explained that "[t]he establishment of the reserve fund is absolute," and the debtor has "parted with [its] *interest in the monies* that have been set aside in

But, for these reasons, we agree with Auriga that such transfers made post-petition will not affect a creditor's new value defense.

## A.    The "Plain Silence" of the Statute

When the language of a statute has "'a plain and unambiguous meaning with regard to the particular dispute in the case,' and 'the statutory scheme is coherent and consistent,' the inquiry is over." *In re BFW Liquidation*, 899 F.3d at 1188 (quoting *Bankston v. Then*, 615 F.3d 1364, 1367 (11th Cir. 2010)).  Of course, we cannot import words into a statute where the plain language is clear. *Bankston*, 615 F.3d at 1367.  But a statute's silence does not give us permission ignore its context.  *Id.*

The bankruptcy court below relied heavily on the statute's silence in reaching its conclusion, explaining that "the plain language of the statute includes no requirement that the otherwise unavoidable transfer occur pre-petition."  But the Supreme Court has encouraged courts to take a broader, contextual view when examining provisions of the Bankruptcy Code, and to "not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."  *See Kelly v. Robinson*, 479 U.S. 36, 43 (1986) (quoting *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 222 (1986)); *Bankston*, 615 F.3d at 1367.

---

the reserve fund."  *Circuit City I*, 2010 WL 4956022, at *6. (emphasis added). Thus, it is properly considered a "transfer."

Transfers made under § 503(b)(9) are not avoidable by the Trustee.  Thus, there has been an "otherwise unavoidable transfer."

In *In re BFW Liquidation*, which the bankruptcy court relied on in interpreting § 547(c)(4), this Court had to decide whether "new value" had to remain unpaid for a creditor to use it as part of a § 547(c)(4) subsequent new value defense. The Court looked no further than the plain language of the statute:

> Nothing in the language of § 547(c)(4) indicates that an offset to a creditor's § 547(b) preference liability is available only for new value that remains unpaid. Instead, the plain language of the statute requires only that (1) any new value given by the creditor must not be secured by an otherwise unavoidable security interest and (2) the debtor must not have made an otherwise unavoidable transfer to or for the benefit of the creditor on account of the new value given. *See id.*

> By its plain terms, then, the statute only excludes "paid" new value that is paid for with "an otherwise unavoidable transfer." *See id.* § 547(c)(4)(B).

*In re BFW Liquidation*, 899 F.3d at 1189.

Under this reasoning, the bankruptcy court found that "[n]othing in the language of § 547(c)(4) indicates" any pre-petition limit on "otherwise unavoidable transfers." But Auriga correctly notes that the bankruptcy court's reliance on *In re BFW Liquidation* was misplaced. As we explained above, we said nothing in that case about the timing of "otherwise unavoidable transfers." Because *In re BFW Liquidation* is not dispositive to the issue presented before us, we turn to the statutory language.

## B. The Text, in Context

"In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *accord Bankston*, 615 F.3d at 1367 ("In determining whether a statute is plain or ambiguous, we consider 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" (quoting *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009))); *see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (interpreting the Bankruptcy Code and noting that its construction "is a holistic endeavor," as "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme"). For the following reasons, reading the text of § 547(c)(4) *in context* of the Bankruptcy Code, it is clear that "otherwise unavoidable transfers" means pre-petition transfers.

1. *The word "transfer" should be presumed to bear the same meaning throughout § 547(c)(4).*

As defined by the Bankruptcy Code, and as noted by the bankruptcy court, there is no temporal limit on when a "transfer" occurs. But Auriga argues that the word "transfer" as used in § 547(c)(4) refers back to § 547(b), which states that, in order for a transfer to be avoidable, it must have occurred on or within the ninety days before the petition date. Thus, Auriga asserts, the later use of "transfer" must also be modified by the ninety-day phrase.

20                      Opinion of the Court                    20-14647

Though the Third Circuit has decided in line with our deci-
sion here that only pre-petition "otherwise unavoidable transfers"
affect a creditor's new value defense, it found this particular argu-
ment unavailing. *See In re Friedman's*, 738 F.3d at 555. We disa-
gree.

A word is presumed to bear the same meaning throughout
a text. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* § 25
(2012). This canon is especially persuasive where, as here, the term
is used within the same sentence. *See Hylton v. U.S. Att'y Gen.*,
992 F.3d 1154, 1159 (11th Cir. 2021) ("We presume that 'word[s]
. . . bear the same meaning throughout a text,' and that presump-
tion is strengthened 'the more connection the cited [provision] has
with the [provision] under consideration.'" (alterations in original)
(quoting Scalia & Garner, *supra*, § 25, at 170, 173)).

Recall the language of § 547(c)(4):

(c) The trustee may not avoid under this section a
*transfer*—

. . .

(4) to or for the benefit of a creditor, to the extent that,
after such *transfer*, such creditor gave new value to or
for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security
interest; and

(B) on account of which new value the debtor did not
make an otherwise unavoidable *transfer* to or for the
benefit of such creditor.

(emphasis added).

The statute uses the word "transfer" three times.  The first two uses must refer to transfers that qualify as preferences, as the only preferences that can be avoided "under this section," § 547, are "preferences," which by definition are pre-petition transfers. *See* § 547(b) ("[M]ade . . . on or within 90 days before the date of the filing of the petition . . . .").  We should likewise read the third use of "transfer" to refer to preference transfers, which necessarily occur pre-petition.

2.  *The statute's title suggests it concerns transactions occurring during the preference period.*

"[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text." *I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 189 (1991).  "But they cannot undo or limit that which the text makes plain." *Bhd. of R.R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 529 (1947).  That § 547 is titled "Preferences" suggests that it concerns transactions occurring during the preference period, which is by definition pre-petition, i.e., the 90 days before the filing of the petition.  *See In re Friedman's*, 738 F.3d at 555.  As the Third Circuit observed, "[i]t would make sense that the calculation of the amount of the preference, and application of any new value reduced by subsequent transfers, would relate to that time period." *Id.* This reasoning is strengthened because post-petition transactions and the avoidance of post-petition transfers are separately dealt with in 11 U.S.C. § 549 of the Code.

### 3. *If "new value" must be given pre-petition, so too must "otherwise unavoidable transfers."*

Notwithstanding the lack of an explicit pre-petition limit, most courts have concluded that new value advanced after the petition date does not increase a creditor's new value defense. *See In re Friedman's*, 738 F.3d at 557 (collecting cases); *see also* 4 Norton Bankr. L. & Prac. 3d § 66:36 (2013) ("[P]ostpetition extensions of unsecured credit to the debtor are not encompassed by § 547(c)(4) and may not be utilized to protect prior preferential transfers."). If the statute does not allow post-petition extensions of new value to become part of a creditor's new value defense, then logically it does not allow post-petition payments to affect the preference analysis.

### 4. *The statute of limitations for preference actions begins to run on the petition date.*

The statute of limitations for filing an avoidance action under § 547 in a voluntary bankruptcy case begins to run on the petition date. *See* 11 U.S.C. §§ 301(b), 546(a). If we read § 547(c)(4)(B) to allow post-petition payments to defeat a new value defense, the calculation of preference liability could change depending on when the preference avoidance action was filed. *See In re Friedman's*, 738 F.3d at 556.

The bankruptcy court conceded that the statute of limitations cuts against its reading. *See Fabric Sources*, 616 B.R. at 874–75. The court's only response to this point was that "generally, the preference analysis cannot be done at the petition date—even when § 509(b)(3) claims are absent from the calculus—because of

many unknowns with respect to the exact amount of payments, when payments cleared, and when checks or other payments were initiated." *Id.* But that the analysis cannot be performed on the petition date does not mean that is not the date against which it should be calculated. We therefore find the bankruptcy court's reasoning unpersuasive.

5. *That another § 547(c) defense includes the phrase "as of the petition date" is not dispositive, especially where its use is necessary to differentiate between two moments in time.*

On appeal, the Trustee claims that "Congress knew how to impose a temporal limitation when it intended to do so," pointing to § 547(c)(5), and argues that its omission from § 547(c)(4) was intentional. Section 574(c)(5) "provides a defense from preference liability for a creditor with a floating lien on a debtor's inventory and receivables, so long as the creditor did not improve its position during the preference period" and includes the phrase "as of the date of the filing of the petition." *In re Friedman's*, 738 F.3d at 556. Section 547(c)(5) provides:

> (c) The trustee may not avoid under this section a transfer—
>
> . . .
>
> (5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, *as of the date of the filing of the petition* . . . , of any amount by which the

> debt secured by such security interest exceeded the
> value of all security interests for such debt on the later
> of—
>
> (A) (i) with respect to a transfer to which subsection
> (b)(4)(A) of this section applies, 90 days before the
> date of the filing of the petition; or
>
> (ii) with respect to a transfer to which subsection
> (b)(4)(B) of this section applies, one year before the
> date of the filing of the petition; or
>
> (B) the date on which new value was first given under
> the security agreement creating such security inter-
> est.

11 U.S.C. § 547(c)(5) (emphasis added).  But unlike § 547(c)(4), this
defense pinpoints two moments in time between which the aggre-
gate effect of transfers is measured, and so to be intelligible, it has
to explicitly define those two moments.  There is no similar need
for an express temporal limitation to interpret § 547(c)(4).  We thus
reject the Trustee's argument.

### 6.  *Amendments to the statute are uninformative.*

The Trustee's argument about the statute's history is even
less convincing.  Section 60(c) of the Bankruptcy Act of 1898, codi-
fied at 11 U.S.C. § 96(c) (1976), preceded § 547(c)(4) and stated:

> If a creditor has been preferred, and afterward in good
> faith gives the debtor further credit without security
> of any kind for property which becomes a part of the
> debtor's estate, the amount of such new credit *re-*
> *maining unpaid at the time of the adjudication* in

bankruptcy may be set off against the amount which
would otherwise be recoverable from him.

11 U.S.C. § 96(c) (1976) (emphasis added).

In *In re BFW Liquidation*, we stated that "in the absence of
any evidence to the contrary, one can plausibly infer that, by re-
placing § 60(c)'s 'remaining unpaid' language with new language
that omits any such requirement, Congress intended to eliminate
[11 U.S.C. § 96(c) (1976)'s] requirement that new value remain un-
paid," and intended "to replace that requirement with something
substantively different." 899 F.3d at 1191. The Trustee, relying on
this reasoning, argues the same can be said of Congress's omission
of "time of the adjudication" language in § 547(c)(4).

But the "at the time of adjudication language" was clearly
tied to the provision of "new value." The prior iteration of § 547
did not even contemplate subsequent transfers from the debtor to
the creditor, only whether the new value was encumbered by a se-
curity interest. We are, again, unpersuaded.

## C. Bankruptcy Policy

Section 547(b) was enacted to prevent creditors from racing
to the courthouse to dismantle a financially distressed debtor,
which in turn promotes equality of distribution among similarly
situated creditors. *In re BFW Liquidation*, 899 F.3d at 1193; *In re
Friedman's*, 738 F.3d at 557–58. The preference defenses in § 547(c)
were enacted to encourage creditors to continue doing business
with such debtors under usual practices. *See In re BFW*

*Liquidation*, 899 F.3d at 1193. The two subsections have different policy considerations that should not be conflated. *See Barnhill v. Johnson*, 503 U.S. 393, 401–02 (1992).

The bankruptcy court worried that "[i]f creditors who have advanced new value in goods or services post-petition were also permitted to use this new value to reduce preference liability under § 547(c)(4)[,] they would be receiving payment plus reducing the amount of preference liability owed to the estate." *Fabric Sources*, 616 B.R. at 877. It claimed that "[t]his 'payment plus' directly undercuts the policy of equality of distribution that is the most important policy underpinning § 547 of the Code and an animating policy for the entire Code." *Id.* And the Trustee goes so far as to call it a "double payment."

But there is no such risk of "double payment." To clarify, asserting a new value defense does not result in any payment to the creditor; it merely prevents disgorgement of monies previously paid. Before the Petition Date, Auriga delivered a substantial amount of goods to Beaulieu. Both Auriga's general unsecured claim and its § 503(b)(9) request only seek payment for *unpaid* invoices.

More importantly, equity of distribution does not mean equal distribution, as the bankruptcy code treats many kinds of creditors differently. *See* 11 U.S.C. § 507 (listing the priority position of different creditors); *id.* § 503 (affording administrative expense priority to certain kinds of creditors). Congress chose to

afford creditors who ship goods to a debtor within twenty days of a bankruptcy filing with statutory priority. *Id.* § 503(b)(9).

As Auriga notes, "[a]ll of these code provisions are themselves the result of independent policy choices made by Congress, all of which are entitled to judicial respect." Indeed, the Supreme Court has cautioned that it is not the court's role to second guess how Congress has balanced the Bankruptcy Code's sometimes competing policies in different provisions of the Code. *Union Bank v. Wolas,* 502 U.S. 151, 162 (1991) ("Whether Congress has wisely balanced the sometimes conflicting policies underlying § 547 is not a question that we are authorized to decide."). We will not do so, especially where, as here, the context provides a pre-petition limit on when "otherwise unavoidable transfers" will affect a creditor's new value defense.

## IV.    CONCLUSION

Reading the plain language of the statute in context clarifies that § 547(c)(4)(B)'s silence on the timing of "otherwise unavoidable transfers" is not determinative and that only pre-petition transfers will affect a creditor's subsequent new value defense. Thus, we reverse the bankruptcy court's order denying in part of summary judgment to Auriga and remand for further proceedings.

**REVERSED AND REMANDED.**