Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 15-23007-lgb

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,

          Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Adv. Case No. 17-08264-lgb

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS on behalf of

the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC

TEA COMPANY, INC., et al.,

          Plaintiffs,

v.

McKESSON CORPORATION,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x



Page 2

Adv. Case No. 17-08265-lgb

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS on behalf of

the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC

TEA COMPANY, INC., et al.,

       Plaintiffs,

v.

McKESSON PHARMACY SYSTEMS, LLC,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Adv. Case No. 17-08266-lgb

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS on behalf of

the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA

COMPANY, INC., et al.,

       Plaintiffs,

v.

McKESSON SPECIALTY CARE DISTRIBUTION CORPORATION (Sued as

McKesson Specialty Distribution LLC),

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

United States Bankruptcy Court

One Bowling Green

New York, NY 10004

July 12, 2024

9:10 AM


B E F O R E :

HON. LISA G. BECKERMAN

U.S. BANKRUPTCY JUDGE


ECRO: F. Ferguson

Page 4

HEARING re 15-23007-lgb TRIAL

HEARING re 17-08264-lgb TRIAL

HEARING re 17-08264-lgb Motion to Disqualify McKESSON

CORPORATIONS MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF

WILLIAM J. PEDERSON

HEARING re 17-08265-lgb TRIAL

HEARING re 17-08266-lgb TRIAL

Transcribed by:  Sonya Ledanski Hyde

**Page 5**

A P P E A R A N C E S :


BUCHALTER

Attorneys for McKesson

1000 Wilshire Boulevard, Suite 1500

Los Angeles, CA 90017


BY:   DANIEL H. SLATE

STEVE WINICK

JEFF GARFINKLE

BRIAN HARVEY


MILIN LAW FIRM, PLLC

Attorneys for Plaintiff

18 East 12th Street, 2nd Floor

New York, NY 10003


BY:   RICHARD MILIN

JEREMY A. BERMAN

**Page 6**

GRIFFIN HAMERSKY, P.C.

Attorneys for Plaintiff

485 Madison Avenue, 7th Floor

New York, NY 10022


BY:  MICHAEL D. HAMERSKY


KLESTADT WINTERS JURELLER SOUTHARD & STEVENS LLP

Attorneys for McKesson Corporation

2000 West 41st Street, 17th Floor

New York, NY 10036


BY:  TRACY L. KLESTADT


ALSO PRESENT:

BEN HILL

BEN CARLSEN

UDAY GORREPATI

Page 7

I N D E X

| WITNESSES: | DIRECT: | CROSS: | REDIRECT: | RECROSS: |
|---|---|---|---|---|
| TIMOTHY KOSTY | 32 | 33 | | 185 |
| STEVEN IAMPIETRO | 116 | 118 | 1169 | 179 |

| EXHIBITS: | | PAGE: |
|---|---|---|
| MCK 169 | Declaration of Timothy Kosty | 36 |
| MCK 227 | Receivables sale agreement, July 10th, 2003 between AmerisourceBergen Drug Corporation and Amerisource Receivables Financial Corporation as buyer | 182 |
| MCK 230 | | 182 |
| MCK 231 | | 182 |
| MCK 233 | | 182 |
| PX 199 | Timothy Kosty depo transcript | 55 |
| PX 200 | Timothy Kosty declaration | 59 |
| PX 201 | Letter from McKesson to A&P changing A&P's payments terms | 66 |
| PX 202 | Steven Iampietro's declaration | 118 |
| PX 203 | AmerisourceBergen credit policies | 182 |
| PX 204 | AmerisourceBergen collection policy procedures in place in 2016 | 182 |

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400

Page 8

P R O C E E D I N G S

THE COURT:  You may be seated.  So, first of all, good morning.

ALL:  Good morning, Your Honor.

THE COURT:  And for the record, this is Judge Lisa Beckerman.  I'm going to go ahead and call the case and when I do, I'll ask for appearances of the parties.  And since we have numerous case names and numbers, you'll have to wait until I'm all done -- sorry -- for the record.

So, Case Number 15-23007, The Great Atlantic & Pacific Tea Company, Inc.; Case Number 17-08264, The Official Committee of Unsecured Creditors v. McKesson Corporation; 17-08265, The Official Committee of Unsecured Creditors v. McKesson Pharmacy Systems, LLC; and 17-08266, The Official Committee of Unsecured Creditors v. McKesson Specialty Distribution, LLC.

Now, I will take appearances.

MR. MILIN:  Your Honor, Richard Milin from Milin Law, PLLC, for Plaintiff.  With me are Jeremy Berman and Michael Hamersky.

THE COURT:  Thank you, good morning.

MR. GARFINKLE:  Good morning, Your Honor.  Jeffrey Garfinkle of the Buchalter firm.  With me at counsel table are Mr. Steven Winick of the Buchalter firm and Daniel Slate of the Buchalter firm.  Also in court today is our New York

Page 9

counsel, Mr. Tracy Klestadt of the Klestadt Winters firm.

And just the record is clear, McKesson also has present in

court two in-house counsel from McKesson, Mr. Ben Hill, as

well as Ben Carlsen.

THE COURT:  And Mr. Harvey, I believe you're also

representing McKesson.  Is that correct?

MR. HARVEY:  Yes.  Good morning, Your Honor.

Brian Harvey from Buchalter for McKesson as well.

THE COURT:  All right.  Thank you all for your

appearances.  Any further appearances?  All right.

So, I believe the way that I thought we would

proceed today, unless you all had a different perspective,

is first I would go ahead and give my ruling on the motion

in limine.  Then I guess my question was, should we proceed

with the exhibit issues, or would you rather do that later?

I don't know, for example, if the testimony for the experts

today is impacted by your disputed exhibits, so I wasn't

sure.  But I'm happy to do it either way.

I've obviously looked at everything.  I will say

to you that you're probably going to have explain some of

your objections because some of them are not obvious to me.

Some of them are, some of them aren't from having looked

through the binder, I'll just say that, and I guess USB.

Then, I believe, Mr. Milin had some objections to

Mr. Kosty's declaration that he raised last week that I

Page 10

believe we're going to have to talk about before we start the process with Mr. Kosty, who's our first witness. And then obviously, we would just proceed accordingly. That would be my thought. I don't know what -- any differing perspectives.

MR. GARFINKLE: Your Honor, on the -- Jeff Garfinkle for McKesson.

On the exhibits, I would recommend us tabling that for this morning. I think having spent more time since we prepared that initial list of the potential disputed exhibits, we've had discussions, and I think maybe we may be able to resolve it -- some of them, the objections, before -- conferring with counsel after we're done with -- during a break or after today's testimony. And then if there are still issues that are open, we can deal with that on Monday if needed.

THE COURT: Okay. I mean, that's fine, as long as it doesn't impact any of the exhibits that are going to be relied upon by today's witnesses. I mean, looking through them myself, it didn't appear that that was going to be the case. That's why I raised it because I wasn't sure.

Okay. Would that be acceptable to you, Mr. Milin?

MR. MILIN: Yes, Your Honor, that's fine. And if we end up looking at an exhibit that's been disputed, we can resolve it then, but I don't think we will raise any.

Page 11

THE COURT:  Yeah.  I didn't -- just having read everyone's -- re-read everyone's declarations and their expert reports for today, I didn't see something when I went through your list, that was obviously to me.  I could see where it will come up later with different witnesses, but I wasn't seeing it from today myself.  Okay.

All right.  So first, I'll proceed with the motion in limine.  The Defendant filed a motion in limine seeking to exclude the expert testimony of William J. Pederson at ECF 158.  The Plaintiff filed an objection to the motion in limine, which includes a cross-motion to exclude the expert testimony of Charles M. Berk and Timothy E. Kosty at ECF 177.

The Court denies the motion in limine, and the cross-motion set forth in the objection for the following reasons.

First, Mr. Pederson is qualified to testify as an expert with respect to the defenses asserted by the Defendant under Section 547(c) and in rebuttal to the expert reports issued by Charles M. Berk.

Mr. Pederson is a certified public accountant, certified in financial forensics, and accredited in business valuation, as well as a certified insolvency restructuring advisor and certified in distress business valuation.  He is a member of the AICPA, the American Bankruptcy Institute,

Page 12

the Turnaround Management Association, an association of insolvency and restructuring advisors.

Mr. Pederson has over 35 years' experience in serving clients in a wide variety of industries, which include healthcare and retail, as well as financial services. He has also served as a court appointed trustee in three different cases in Delaware where he's responsible for liquidating trusts.

The Court finds that Mr. Pederson is qualified as an expert to express opinions about accounting issues, preference issues, and the experience of financial struggling companies.

The Plaintiff may call an expert witness whose purpose is to contradict or rebut evidence given by another expert witness on the subject matter. Mr. Pederson's reports specifically state that even though he is an attorney and admitted in two bars, he is not seeking to be qualified as an expert with respect to any legal issues. Even if his reports contain any conclusions which might be considered to be legal conclusions, this is not a jury trial, and the Court is confident that it will not be swayed by any such legal conclusions.

The Court also finds Mr. Kosty and Mr. Berk to be qualified as expert witnesses and does not find a basis for excluding their testimony or their expert reports based on

Page 13

their respective credentials, education, training, and experience, including prior expert witness experience.

That's my ruling. I'll enter an order about it later, but that's what you know it is.

All right. So, then we are going to proceed with Mr. Kosty. All right. So, Mr. Milin, I believe you had raised some objections with respect to Mr. Kosty's declaration, as opposed to trying to preclude all of his testimony.

And having looked through the declaration, I believe that what you had flagged for me was the issue that comes up on value, which I think comes up the first time on 5(c), and I think it comes up again in a sentence in -- where am I here -- I guess 6 -- sorry to flag this someone here -- maybe 6 in Paragraph 6(d) -- I'm not sure -- and then Paragraphs 8 through 12, which I believe you are pointing out to me were responsive to the expert reports.

So, did I understand what your objection is properly? Actually, no -- I guess, it -- sorry. I missed -- I see 6(c), sorry, instead of 6(d).

MR. MILIN: Yes. Yes, Your Honor, there is, I think, 5(c), all of 6(c), and 8 through 12. I've also, Your Honor, a separate document listing detailed objections to Mr. Kosty's report. The issue, Your Honor, is raised as a separate supplementation issue, so...

Page 14

THE COURT:  Right.  Yeah, well, I think that was your issue actually, but I understand your issue.

Okay.  So, Mr. Garfinkle, I hadn't had any opportunity to hear from response from you or your colleagues with respect to those issues because they were just raised when we were on the call the other day.  And I obviously hadn't had an opportunity to take a look at Mr. Kosty's declaration at the time and, you know, be prepared to rule on this.  But I have now, so I don't know if you had any responses that you wanted to raise with respect to that.

MR. SLATE:  I'm afraid it's me, Your Honor.

THE COURT:  Okay.  That's all right, Mr. Slate.  Nice to see you.

MR. SLATE:  Good to see you.  Daniel Slate on behalf of McKesson.

With respect to the objections focused on pricing, there's no question that Mr. Kosty has 35 years-ish in negotiating portions of prime vendor agreements, supply agreements between wholesalers, and retailers of a variety of sizes, both strategic and mom-and-pop stores.  So, he certainly has experience in the pricing of those goods.

The question of whether the pricing should be before or after application of rebates, and whether in fact those rebates had been earned is a different question.  But that's more than the nature of the relationship between the

Page 15

parties, as opposed to his qualified expert testimony.

The language that Mr. Milin objects to, Paragraphs 8 through 12, I thought we dealt with this last week when he objected to it because it was beyond the scope of the report, and I thought the Court handled it by saying we can get all that in redirect anyway, can't we, so why bother.

THE COURT:  I did say that.  But I mean, technically, under the Rules of Evidence and under Rules 26 and 37 of the Rules of Federal Civil Procedure, I think technically Mr. Milin is right, that this should be stricken because it isn't something that was covered in his expert report, and that's technically correct.

Does that make any sense from a practical perspective and the fact that we're going to -- you're going to be able to get this in some other way by calling him as a rebuttal witness?  No.  I mean, you're right, that will be the answer.

MR. SLATE:  Right, mm hmm.

THE COURT:  But in terms of for his direct testimony, did it exceed the scope of his expert report and does that -- is that permissible.  You know, the -- I couldn't -- I'll be honest, I couldn't find a great Second Circuit case on this, but there are cases in both the Federal Circuit, the Ninth Circuit, and other circuits where it's pretty clear that, you know, if something is not

Page 16

covered in disclosures as to whether someone's going to be testifying as to something, and then not covered in the expert report, and then the expert report is either not amended prior to trial by, you know, some kind of a written agreement or disclosures aren't amended prior to trial; that then if this exceeds what his original expert report subject matter was, either through the disclosures or what's actually in the expert report that I'm supposed to strike it. Even though I know that you'll be able to get it back in when you call him as a rebuttal witness, after Mr. Iampietro's testimony if that's what you choose to do. And therefore, this is not very efficient.

But unfortunately, there are Rules of Evidence and the Rules of Civil Procedure still apply even if I don't think that's efficient.

MR. SLATE: Let me say first of all, and I forgot to say, we very much appreciate you're making Friday available to Mr. Kosty. He has family issues --

THE COURT: Right.

MR. SLATE: -- that we require that he testify today. We were hoping to get him done earlier and not have to call him after Mr. Iampietro. But --

THE COURT: I hear you, but...

MR. SLATE: But if we can't do that, then we'll just have to call him as a rebuttal witness, Your Honor.

Page 17

All right.

THE COURT:  I understand, unfortunately.  So, I -- having read the expert report, Mr. Slate, I believe that there are two sentences that probably should be stricken, other than the language of 8 through 12 that we've just discussed, which is the rebuttal part.

And I believe that it's Paragraph 5(c), because there isn't a discussion in his report about a value analysis.  It isn't that he wouldn't be qualified to do that, I think he is qualified to do that, but the scope of his expert report doesn't discuss that.  I looked through it myself.  Pricing, yes; value, no.  And that wasn't -- that isn't described in what he's supposed to be addressing at the beginning of his report; it's not described throughout it.  I -- honestly, I did look at this carefully, so I believe that sentence does have to be stricken.

And then I think the last sentence in Paragraph 6(c), before you get to one and the whole, also has to be stricken because, again, it's about value -- I guess two sentences -- value and then replacement cost.  I don't -- again, I don't think that was covered in his expert report.  I have looked through it.  I could honestly not find anything.  I'm not a big fan of marking up peoples' exhibits for, you know, three sentences.

But Mr. Milin's objection is technically correct

Page 18

based on my review, so I'm going to strike those three sentences out of his expert report -- I'm sorry, out of his declaration.  And then of course, Paragraphs 8 through 12, and with those changes, I'm going to -- after I put him -- you put him on the stand and he testifies that this is actually his declaration, I will admit it.

MR. SLATE:  Thank you, Your Honor.  And just to be clear, we'll be back on those issues.

THE COURT:  I know you will.  I understand.  I grant you this is not very efficient.  But Mr. Milin is correct as to what is permissible in terms of direct testimony by an expert witness under the circumstances, given what was covered in the disclosures and given expert disclosures and given what was covered in his expert report.

MR. SLATE:  I understand, Your Honor.  Thank you very much.

THE COURT:  Okay.

MR. MILIN:  May I be heard, Your Honor?

THE COURT:  Yes, but I'm not sure what you want to say to me because I've now just determined with this.

MR. MILIN:  Well, I would like, first of all, to point out the first sentence of Paragraph 6(c), which states, "The invoice pricing of pharmaceuticals reflects the value of the goods delivered to the retailers."  If I understood the basis of Your Honor's ruling, I believe that

Page 19

that should be struck as well.

THE COURT:  Okay.  I think you're correct.  I think his sentence on the pricing and the WAC though is clearly covered in his expert report.

MR. MILIN:  So, the other issue is I've considered Your Honor's point with respect to efficiency, and my concern is that having admitted the sections of his report that he would then be called back anyway.  If Defendant will stipulate that they will not bring him back as a rebuttal witness, then we can withdraw the objection, though Your Honor has ruled in our favor and we appreciate that, but we are trying to accommodate efficiency and Your Honor's desires on this.

THE COURT:  Okay.  Mr. Slate, how do you feel about that?

MR. SLATE:  I'm wondering why we started this process.

THE COURT:  I understand.

MR. SLATE:  We've already made changes to his travel plans, Your Honor, so he's already been -- made himself available unfortunately.  So, I think we'll just stick with it, and we'll bring it back here with rebuttal.  Thank you very much, Your Honor.

THE COURT:  All right, that's fine.  Okay.  So, I just have one other question at the moment.  So, I think

Page 20

based on this, I will -- I would suggest that you -- next up would be to call Mr. Kosty to the stand so I can swear him in and then he can just confirm that he's got his thing, unless Mr. Milin has something else I have to raise with respect to his objection.

MR. MILIN:  Well, sorry, Your Honor.

THE COURT:  I already ruled on your motion in limine, so I'm not excluding it for that reason either.

MR. MILIN:  Understood.  However, Your Honor indicated that if we had particular objections to particular -- evidentiary objections to particular parts of a witness's declaration --

THE COURT:  Yep.  True.

MR. MILIN:  -- we could either raise them at the beginning or provide them in writing.  I'm afraid -- Your Honor should not expect this with respect to other witnesses -- but there are a number of evidentiary objections, which we have in a long, but I hope clear, document to hand up if I may approach the bench and distribute it to --

THE COURT:  Yes.  All right.

MR. MILIN:  Some of it Your Honor has already ruled on.

THE COURT:  Yep.

MR. MILIN:  But rather than simply go through these for...  And we can address these at whatever time in

Page 21

whatever manner Your Honor would like.

THE COURT:  I think now is as good a time as any.
So, a few of these, Mr. Milin, are things that I had looked
at myself, but I am satisfied that I don't feel there's a
basis for this.

So, for the issue of it being reasonable,
obviously, that's Mr. Kosty's judgment.  He's an expert
witness.  He has experience as to what goes on into this
industry.  I just qualified him, told you that I denied your
motion in limine, and he's qualified to testify on these
topics, so I don't -- I'm not going to strike his statement
that it's reasonable.  You're free to ask him why he thinks
it's reasonable, what the basis for his determination as to
what is reasonable, and quite frankly, you know, that's why
we have cross-examination.  But I think he is experienced
enough to make a judgment based on his experience in the
industry as to what he thinks is reasonable or not, so I am
going to deny that objection and overrule it.

With respect to Paragraph 6(a) on the industry, I
am -- I will say to you I'm going to ask questions about
this myself.  When I read his report and his declaration,
that was definitely something that I flagged for myself to
ask him.  But he's been in the industry for years, he has
been in the pharmaceutical industry for years, so he is
going to -- he is basing that based upon his judgment.

So, whether or not that, you know, I should decide that his opinion is something I'm going to give weight to or not is going to be something that I'm going to have to decide.  Whether or not you should ask him about the bases for some of his statements in his declaration and also his expert report, you should.  I'm going to.

But I don't find that there's no foundation for him -- his statements.  And I believe that his CV and the information that came out, I guess in connection with his declaration as to his experience as well, means that I'm going to overrule that objection and you'll just have to ask him questions on cross.

Again, the supply agreement -- obviously, he's reviewed the supply agreement.  He is an expert.  It's listed as one of the things that he reviewed in preparing his expert report.

So, with respect to your Item 3, which I've now skipped to here, I don't see, you know, how he wouldn't as an expert in the field have an opinion that he's entitled to provide to the Court as to what he thinks are ordinary course or what he would think is consistent with the terms of the supply agreement because he's reviewed it.  So, I'm going to overrule that as well.

Again, I don't think that he -- that these are legal opinions.  You're right that you could take a position

Page 23

that they're legal opinions.  But you know yourself that while we're using a phrase, "ordinary course of business" in a way that has a legal meaning for the statute, it also has a meaning that is not a legal meaning, which is what happens in the pharmaceutical industry, and is this ordinary course of business for people who are in the pharmaceutical industry, not having to do with what we think ordinary course is based on the case law.

So, I don't take this statement as a legal conclusion.  I understand why somebody could argue that, but I don't think in the context here, Mr. Kosty saying that is based on that.  And -- but you can certainly cross-examine him as to what he's basing his opinion on, of course, as to that.

And then I think, again, Mr. Kosty's background is such that he certainly understands different aspects of the pharmaceutical business.  There's a discussion in his declaration itself -- it's in the declaration, if not, maybe it was in the expert report, sorry -- about other types of suppliers, including, you know, using wholesale suppliers.

So clearly to me, he understands the supply business and who is involved in providing supplies, so I think there is a foundation in his report as to why he has some background in the supply business, in addition to his industry experience, et cetera.  But I think that the

Page 24

declaration, the expert report itself discusses alternative

supply options, at least that alternative supply option.

So, I don't see why I would exclude these

provisions in his declaration.  I think you're free to ask

him what he's relying on in saying that.  But again, I don't

-- you know, this is not a circumstance where the topic

wasn't discussed with some specificity in the expert report,

so I'm going to overrule that objection too.

With respect to 5 -- sorry (indiscernible) 16.

Again, I think that he -- this is his expert opinion.  It's

based on the fact that, you know, his own experience that,

you know, suspending shipments on nonpayment is the only

effective strategy for a wholesaler.  Whether he has as much

a background in this issue as, for example, perhaps Mr.

Iampietro -- if I'm saying his name right -- does.  I mean,

that's going to go to weight of his opinion versus the

weight of the other expert's opinion.

And I think he has to be given an opportunity to,

you know, be asked what he was -- well, you have the

opportunity to ask what it was based upon.  But I don't

think it's based upon him having no experience ever dealing

with wholesalers and understanding what a wholesaler would

do because, like I said, there was already things in his

expert report that talk about alternative wholesale options.

MR. MILIN:  Your Honor, if I may briefly respond.

Page 25

THE COURT:  Sure.  Mm hmm.

MR. MILIN:  I would suggest that we table these objections so that Your Honor has some testimony to consider.  I understand Your Honor asked that we make the objection up front.  I initially said, well, I think that Your Honor will want some questioning in order to provide a basis for our objections.  And in particular, for example, Your Honor has spoken about Mr. Kosty's experience in the pharmaceutical supply industry.  That is indisputable, he does have experience.  The question is --

MR. SLATE:  Excuse me, Your Honor.  I'm having a hard time hearing Mr. Milin.

THE COURT:  Okay, sorry.

MR. MILIN:  Oh, I'm sorry.

THE COURT:  Mr. Slate is having a hard time hearing you, so you're either going to have speak up --

MR. MILIN:  Your Honor, I apologize.  The pharmaceutical industry, Your Honor, is very large with very many components.

THE COURT:  Very true.

MR. MILIN:  He does have experience in that industry.  The question is, does he have relevant experience sufficient to state a foundation and, if he does, has he stated materials he relied on in his expert report which provide that foundation.  If he relies on something other

Page 26

than his particular experience that is not in his report, he has no foundation for his statements.  And I respectfully suggest that it's very hard for Your Honor to rule on evidentiary objections without the details of that being brought out.  And I'm perfectly happy to reserve those objections and move on with the exam.

THE COURT:  All right.  Mr. Milin, to be candid with you, I really think that, you know, this isn't a person that doesn't have experienced based on their CV.  It isn't a person that hasn't written numerous articles about various parts of the pharmaceutical industry.  This isn't a person that would be unqualified as an expert witness.

So, I don't understand -- I guess, I'm not sure why these aren't just questions that go to, you know, weight as to what I should be giving the expert's testimony and credibility of the witness, and you know, as opposed to whether I should be striking things in his declaration that you're arguing don't satisfy different evidentiary standards.

Again, I think that this is a person who I have already determined has expertise in this area and is qualified to testify as an expert on the topics that were disclosed in the expert report.  And his declaration, other than the way that we just talked about, doesn't deviate from his expert report.  These issues are addressed in his expert

Page 27

report, but for the things we've already discussed and ruled on.

So, I don't see -- I guess, I don't think I'm going to be granting your evidentiary objections after the fact. But if you want to table them, we'll go there and that's fine. But I'm just saying to you if your issue is, you know, how much experience -- and, yes, some of my questions go to that too, to be candid with you -- how much experience does he have in negotiating a pharmaceutical contract. Like, you know, how many has he reviewed, how many has he ever negotiated, but those are questions you ask the witness. Those aren't questions on cross-examination or that. They're not -- you're free to ask those questions.

They're not -- you know, that's determining not that there's no foundation because I don't think there's no foundation, but whether or not the foundation is as sound as one would expect for that, whether there's really -- whether the witness's credibility -- whether this witness is more credible than the other expert witness. Those all go to -- and the other side's expert witness. That's what that all goes to.

So, again, I think we're going to table this, but I just am saying to you I think that, you know, this isn't a jury trial, and I don't think that -- and I'm betting that between your questions and my questions -- I'm saying you

Page 28

generically because I don't know who's going to be asking

questions -- I'm sure that most of these issues are going to

be addressed in our questions.

MR. MILIN:  Thank you, Your Honor.  I'm fine with

tabling them, as I said.  The reason why we made them as

objections up front is because we don't think they're just

about credibility.  Credibility would be I looked at X and

here's what I determined from it.  I'm saying there is no

basis whatsoever and that's a foundation (indiscernible).

But having said that, I've always thought, and I'm

happy to proceed this way, that the questions will establish

the predicate for the objections, whether the Court

considers them objections to foundation or credibility, as

long as the Court considers it.

THE COURT:  Okay.  I'm guessing Mr. Slate, Mr.

Garfinkle -- sorry -- Mr. Winick, if I said that right, I

assume that you don't have any problem with us proceeding

now on to testimony because I think that's a better use of

Mr. Kosty's time.

MR. SLATE:  No, Your Honor, but it does raise a

question.  We were, of course, surprised by the last few

minutes' conversation.  But if the Court finds this at all

worthwhile, we certainly can do the same thing with respect

to Ms. DeVito's declaration, for example, where we raised

the same issues, as this Court knows.  Her declaration is

Page 29

replete with reasonable required -- all the language that Mr. Milin is objecting to with respect to Mr. Kosty, we do the same thing.

But we thought, again, this is not a jury trial, it didn't seem to be worthwhile. But if the Court believes that it would be worthwhile for us to provide written objections, we certainly can do that.

THE COURT: Well, we've got two different issues with respect to Ms. DeVito's declarations. One, you're asking me to obviously strike some of them in their entirety; that's one issue. And then there's obviously sentences or issues that you've raised or alluded to in your filing that were responded to by Mr. Milin. And obviously, I've told you all that I'm going to go ahead and rule on those Monday morning before Ms. DeVito is supposed to testify, so I think that's been dealt with.

I -- again, I think that this isn't -- I think that it's more useful for us to actually have the witnesses testify, and less useful to worry about some of these issues because, you know, in fairness to Mr. Hamersky's reply that he filed this morning, that I have read, although I will admit I have not had time to look at the case law, and there is certainly some bases for Ms. DeVito having reviewed documents and her role and other things.

And so, I think I was fairly clear when we last

Page 30

had our last pre-trial that I don't see how I'm going to be striking all of her three exhibits -- declarations. It did not seem likely to me. Ms. DeVito does have some actual knowledge. She also has a role there. And so, I don't see that. But there were obviously specific issues that were raised, and I have not sat down with her declaration and gone through it -- her three declarations -- along with the objections and the motion and the response yet, so I guess I'll leave it at that.

You know, I think, you know, unless -- by now, if parties truly thought that these witnesses shouldn't be able to be testifying here today, I would have thought this would have come up before. But I'll just leave it at that, and we're going to go on here.

MR. SLATE: Let me tell you first, Your Honor, I was not intending to revisit the issue motion to strike on Ms. DeVito, but we were educated when Mr. Milin objects to Mr. Kosty's use of the word reasonable or that the contract required because those words are replete in Ms. DeVito's declarations.

THE COURT: You're right, but -- and there are some differences in fairness.

MR. SLATE: But there is a goose and a gander here issue --

THE COURT: Yes. I agree, but I think it's best

Page 31

that we just proceed here today with Mr. Kosty and Mr. Iampietro because, you know, you pointed out to me that Mr. Kosty has a limited amount of time and you're going to have to call him twice.

MR. SLATE:  Yes.

THE COURT:  And so, let's try to accommodate him and the other expert witness.  I don't think -- I think it's clear that, you know, both parties' expert witnesses are qualified as experts to be here, whether -- you know, how their testimony comes off, how they answer questions on cross-examination, how they answer my questions, that's what the record is going to be and that's what I'm going to have to decide.

MR. SLATE:  You mean go to trial.

THE COURT:  Yes.  Yes, I'm actually trying to make that happen here.  That is the goal, yes.

MR. SLATE:  Then we would call out of order Mr. Kosty to the stand, Your Honor.

THE COURT:  Yeah, understand.

THE COURT:  Mr. Kosty.  Oh, sorry, that's the witness.  Sorry, Mr. Kosty, I didn't know who you are.  My apologies.  I was, like, are you the witness or you're not the witness.  Okay, that's great.

All right.  So, I could ask you to, yes, raises your right hand.  Do you solemnly swear that all the

testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth.

THE WITNESS:  Okay.  You may sit down.

MR. SLATE:  We're pulling his declaration, Your Honor.

THE COURT:  Yes, okay.  Do you need to -- I guess that's my question -- do you need to hand him a copy of his declaration.

MR. SLATE:  Yes, Your Honor.

THE COURT:  Okay.

MR. SLATE:  Now we're pulling the report, Your Honor.

THE COURT:  Understand.  That's okay too.  While you're saying that, I should pull mine out too.

MR. SLATE:  Your Honor, you want me to set the stage with Mr. Kosty?

THE COURT:  Yes.  I just want you to -- Mr. Milin, you can sit down for a second.  I just want Mr. Slate to ask, like, two questions, you know, is this his signature, did he review it before he signed it; the basic two or three questions and then we will tender him for cross-examination.

DIRECT EXAMINATION OF TIMOTHY KOSTY

BY MR. SLATE:

Q    Mr. Kosty, is that your signature on your declaration?

A    It is.

Page 33

Q    And did you read it before you signed it?

A    I did.

Q    And you believe it to be true and accurate in every

material respect?

A    I do.

Q    And is that your report, which is also part of that?

A    It is.

Q    And it's a true and accurate copy of the report?

A    Yes.

MR. SLATE:  Thank you.

THE COURT:  All right, Mr. Milin.

MR. MILIN:  Thank you, Your Honor.

CROSS-EXAMINATION OF TIMOTHY KOSTY

BY MR. MILIN:

Q    Good morning, Mr. Kosty.

A    Good morning.

Q    Now, Mr. Kosty, you're here as a paid expert, right?

A    Yes.

Q    And from 1996 to the present, you've worked as an

officer of Pharmacy Healthcare Solutions, right?

A    That's correct.

Q    And that's a consulting firm.

A    Yes.

Q    How much are you being paid for your work in this

matter?

Page 34

A    $450 per hour.

Q    Am I right that you're only testifying about McKesson Corp and not about the other defendants in these adversary proceedings?

A    Yes.

Q    Do you have, Mr. Kosty, a copy of the parties' exhibits in this matter?  It's not in front of you, the binder.

A    No.

MR. MILIN:  Your Honor, if I may approach the witness and provide one.

THE COURT:  Yeah.  Be sure just to make sure that counsel looks at it in agreement.

MR. MILIN:  I'm sorry, Your Honor, for the logistical issues, but it strikes me that the witnesses should all have available, both parties, the binders.

THE COURT:  I agree with you.  That's what I said the other day, but that's okay, it's not earth shattering. They don't all have to have them, all the binders sitting up there at once if they're not all going to be used, but I get your point.  It's a lot of binders for Mr. Kosty.  And while it's not a small witness stand, it's --

MR. MILIN:  I'm sorry.  Yes, we will provide the witness with it.  And I was reminded I did not move the declaration into evidence, Your Honor.

THE COURT:  Yes.  I'm going to -- Mr. Milin, I'm

Page 35

going to admit the declaration as marked up into evidence

with the understanding that you've reserved your rights to

raise these objections later on, even though you understand

that I'm not sure that's a very useful process.

MR. MILIN:  I fully understand, Your Honor.  When

we were on our last call, I thought Your Honor to --

THE COURT:  Okay.  So, we're clear -- so, we're

clear -- just so we're clear what we're doing here.

R. MILIN:  On our last call, Your Honor, I

understood Your Honor to say that we should raise

objections.

THE COURT:  Yes, I hear you, but --

MR. MILIN:  And so, I did.

THE COURT:  Yes, I understand, Mr. Milin.  So, Mr.

Milin, I'm sorry to ask you this question, but what exhibit

binder should I be looking?  Are they your exhibit binders

or are they McKesson's exhibit binders?  And, if so, which

ones should I be looking at?

MR. MILIN:  Actually, Your Honor, it -- the first

exhibit that I'm going to refer to is the declaration and

that's just been moved into evidence.

THE COURT:  Right, that's fine.  I have that.

MR. MILIN:  And has that been assigned a number or

how are we going to handle those?

THE COURT:  Oh, that's a good question.  No, it

Page 36

hasn't been assigned a number because they were obviously filed with the clerk, but I understand we should.  Where are we on the, I guess, McKesson exhibits; what's your last number?

MAN:  I believe it's 42 in the binder.

THE COURT:  So, I guess this would be -- I believe it should be then 169.

MR. MILIN:  169, is our last -- is it the last one?  The new one is 169.

THE COURT:  Okay.  So, this should be 169 is what you're saying.  So, we'll mark it as MCK 169, Mr. Milin.

MR. MILIN:  Okay.

(Exhibit MCK 169 entered into evidence)

MR. MILIN:  And the report that he incorporated.

THE COURT:  The report is already in the binders; it's MCK 42.

MR. MILIN:  Very good.

BY MR. MILIN:

Q    So, Mr. Kosty, thank you for your patience.  Please take a look at your declaration, MCK 169.

A    Okay.

Q    Do you have it in front of you?

A    I do have it.

Q    Very good.  So, did you sign MCK 169 under penalties of perjury?

Page 37

A    Yes.

Q    And everything you say in your declaration is true, correct?

A    Yes.

Q    Very good.  Now please turn to Exhibit MCK 42.  Is MCK 42 your expert report in this matter?

A    It is.

Q    And is everything you say in Exhibit MCK 42 true?

A    Yes.

Q    Now, you've submitted other expert reports in other litigations, haven't you?

A    I have.

Q    Did you submit an expert report in the Valsartan case in the U.S. District Court for New Jersey?

A    Yes.

Q    Were you deposed in Valsartan?

A    Yes.

Q    Did you testify in Valsartan?

A    I did not testify, no.

Q    Have you submitted any other expert reports since your expert report in this matter?

A    Yes.

Q    What are they please?

A    One's an ongoing litigation in a tax case.

Q    Mr. Kosty, have you updated your expert disclosures

Page 38

with respect to the Valsartan case?

A     Not since I submitted my report, no.

Q     And in the tax case?

A     Well, I've actually submitted two reports and -- strike that.  I submitted one expert report and also testified as a fact witness in that case, but the expert report was just submitted, and I'm being deposed in August on that report.

Q     Have there been any other cases in which you have submitted an expert report and have been deposed or testified?

A     I mean, there was a Loestrin case a number of years ago.  There was a PDM case in Florida where there was a dispute on an award for workers' comp program, so I submitted a report in that matter.  Unfortunately, at my advancing age, you know, I can't put exact dates on.  I can tell you it's about 10 years ago, but I couldn't tell you exactly what dates those were.

Q     But Valsartan was after your expert report in this matter, correct?

A     I'm trying to remember.  I believe it was, but I don't recall exactly what date that report was submitted.

Q     There was a court opinion about your expert testimony in 2023, wasn't there?

A     There was an opinion about me and a number of experts, yes.

Page 39

Q    And the tax case, that was after your expert report, and you testified.

A    Yeah.  I testified once and I'm testifying again.

MR. MILIN:  Your Honor, we request for a belated supplementation of Mr. Kosty's report to identify those cases as required by Rule 26, but I will move on.

BY MR. MILIN:

Q    So, is expert -- is Exhibit MCK 42 the only expert report you have ever submitted concerning preference terms?

A    Yes.

Q    The last time you worked for a retail pharmacy was 1992, correct?

A    I worked for a retail pharmacy chain until '96; the parent company was a retail pharmacy.

MR. MILIN:  I'm sorry, I can't hear Mr. --

THE WITNESS:  Your Honor, I'm just going to move the microphone.

THE COURT:  That's fine.

THE WITNESS:  I'm sorry.  I'm not usually soft spoken.

THE COURT:  Okay.  Do you want to repeat your question, Mr. Milin?

BY MR. MILIN:

Q    Mr. Kosty, the last time you worked for a retail pharmacy was 1992, correct?

Page 40

A     No.  I worked for Thrift Drug in Pittsburgh starting in '92, and Thrift Drug had at the time 1,200 retail pharmacies.  Part of the request from the CEO to me was to help create a PBM for the company, so I agreed to take that task on and completed that for the company.  The name of that company was TDI Managed Care Services, but TDI was owned by Thrift Drug, Inc.  So --

Q     So are you telling us that you last worked -- well, first, except as a consultant -- is the last time that you worked for a retail pharmacy 1992?

A     No.  I worked for Thrift Drug after 1992 and moved over to TDI Managed Care Services in '94, so as an employee of Thrift Drug.  I was still an employee of Thrift Drug even though the company subsidiary I worked for was TDI.

Q     Can you please turn to Page 16 of Exhibit 42 and show me where those facts are stated.

A     I'm sorry, what was the page number?

Q     16.  Let me give you a simpler question.  Is the information at Pages 16 and 17 about your prior experience, correct?

A     It's correct, but it's not complete.  So, in 1992, I was hired by Thrift Drug to run the third-party operations, which requires me to negotiate all the third-party contracts for the company, set up the controls and processes and procedures, accounting to manage those contracts.  So that

Page 41

was the component of my job when I first when to Thrift

Drug.

After a couple of years, Thrift Drug created TDI

Managed Care Services, which is a PBM, and I worked for TDI

but was paid out of the parent company, Thrift Drug, Inc.

Q    And that worked stopped in 1996, you moved to something

else, correct?

A    Yes.  We started our consulting business in September

of 1996 and have been doing that for 28 years.

Q    You never worked for A&P though, right?

A    Our consulting company did a project for A&P.

Q    When was that?

A    Well, it was obviously before they went bankrupt.  I

don't recall the exact time frame, but I do recall the

project is A&P bought Pathmark Pharmacies, and Pathmark

Pharmacies were on a different pharmacy dispensing system.

So, one of the tasks in the conversion process was to

convert the Pathmark stores to the A&P software.  So, I had

a consultant, Dave Schuetz, work with A&P on the data

conversion.

So, as you can imagine, it's very important if you're

converting patient information from one system to another to

be able to fill prescriptions on the new system, that must

be done correctly, accurately all the time.  So, part of

Dave's role in that conversion process was to determine the

Page 42

validity of the conversion process to make sure the Pathmark

data was converted to the format used by the A&P system.

So, that project went on probably for almost a year.

And then Dave also helped them with some pricing

information because, again, if you think about the business

aspect of it, if you're a Pathmark patient and you were

paying $10 for a prescription, then all of a sudden A&P

takes it over and you go in the next time, well, your

expectation is to pay $10.  So, part of the work that was

done was to make sure the pricing algorithms in the system

were sufficient and accurate based on what Pathmark was

doing and the A&P pricing strategy.

Q    So, the work for A&P was done by your company and by your colleague, not by you, correct?

A    That's correct.  I oversaw the project, but I was not involved in the day-to-day work.

Q    And the pricing you were mentioning is pricing to consumers, not the purchase price, correct?

A    Yes, that's what's in your pharmacy system.

Q    And the project was limited to converting software, correct?

A    That's correct.

Q    You never worked for a pharmaceutical wholesaler, did you?

A    Not as an employee, no.

Page 43

Q    So, you have experience negotiating prime vendor agreements with pharmaceutical wholesalers.  Is that right?

A    Yes.

Q    Okay.  Does your declaration or report mention any experience you've had in helping pharmaceutical wholesalers obtain payments from retailers who are experiencing financial problems?

A    It does not.

Q    Does your declaration or report mention any experience you've had in helping retailers that are experiencing financial problems resolve their wholesalers' demands for payments?

A    The report does not, no.

Q    And your declaration doesn't either, does it?

A    No, it doesn't.

Q    You didn't play any role in negotiating the supply agreement between A&P and McKesson in 2012, did you?

A    I did not.

Q    Okay.  Does the body of your expert report, MCK 42, mention any pharmaceutical retailer other than A&P?

A    No.

Q    Please turn to your declaration, which is 169, MCK 169. Does your declaration mention any pharmaceutical retailer other than A&P?

A    It does not.

Page 44

Q   So, let's turn -- I'm sorry to bounce around, but turn to your report, MCK 42 at Paragraph 29.  In that paragraph, you say that McKesson, AmerisourceBergen, and Cardinal Health had about a 92 percent market share at that time.  Is that correct?

A   Yes, based on the drug.

Q   And the market you were referring to was pharmaceutical wholesaling, right?

A   That's correct.

Q   Did McKesson, AmerisourceBergen, and Cardinal Health have an even higher market share by July 1st, 2015?

A   I don't know offhand.

Q   Does your report, MCK 42, mention AmerisourceBergen or Cardinal Health anywhere apart from Paragraph 29?

A   I don't believe so.  I'd have to go through it, but I don't recall another instance in the report.

Q   Leaving aside Paragraph 29, does your report, MCK 42, mention any other pharmaceutical wholesaler apart from McKesson?

A   No.

Q   Does your declaration mention any pharmaceutical wholesaler other than McKesson?

A   No.

Q   So, let's turn to MCK 169, Paragraph 6.  The first sentence of that paragraph states that your determinations

Page 45

in this matter were based on, and I quote, tell me if I'm wrong, "Review of the supply agreement and the various declarations and pleadings in this matter identified in the expert's report."  Is that something that's correct?

A    I'm sorry.  Could you refer me to that paragraph?  I must have misheard you.

Q    I apologize, Page 3 towards the bottom of your declaration, Paragraph 6.

A    I'm sorry.  You're in the declaration.  I was in the report.

Q    No problem.

A    No worries.  Sorry.  That was Page --

THE COURT:  3.

THE WITNESS:  3.  Okay, thank you.

BY MR. MILIN:

Q    Do you say in Paragraph 6 that your conclusions are based on your review of the supply agreements and the various declarations and pleadings identified in the expert report?

A    Yes.  That's what it reads.

Q    Okay.  So, turning to your report, MCK 42, turn to Exhibit B, which is at Page 22, please.

A    Okay, I'm there.

Q    Is Exhibit B a complete list of the materials you considered in writing your expert report?

Page 46

A    Yes.

Q    Does Exhibit B mention any pharmaceutical wholesaler other than McKesson?

A    No.

Q    Does Exhibit B mention any pharmaceutical retailer other than A&P?

A    No.

Q    You didn't review any documents about any pharmaceutical retailer other than A&P in preparing your report, did you?

A    No.  I reviewed the supply agreement between A&P and McKesson.

Q    You didn't review any documents about any pharmaceutical wholesaler other than McKesson in preparing your report, did you?

A    No.

Q    Very good.  Does your report mention any instance in which a pharmaceutical wholesaler, apart from McKesson, cut off shipments to a strategic retailer or threatened to because of financial concerns?

A    It does not.

Q    And we understand the term strategic retailer?

A    I think you've defined it in the past as for pharmacies, right?

Q    I'll get back to it.

Page 47

A   Okay.

Q   But strategic or not, you don't actually mention any instance in which a pharmaceutical wholesaler cut off shipments to any retailer in your report, right?

A   I do not.

Q   Does your report mention any instance in which a pharmaceutical wholesaler, apart from McKesson, shortened a retailer's payment terms or threatened to because of financial concerns?

A   It does not.

Q   So, let's look at Paragraph 2 of your declaration. Make sure we both have the right documents here.

A   Okay.

Q   Can you read us the first sentence of Paragraph 2, please.

A   "I know with my own personal knowledge each of the facts set forth in this declaration, except only those facts set forth on information and belief.  And as to those facts I am informed, and I believe them to be true."

Q   And the statement you just read is true, correct?

A   Yes.

Q   Now let's look at Paragraph 7(g) of your declaration.

A   Did you say 7?

Q   7(g).

A   7(g).  Okay.  I'm ready.

Page 48

Q   You're ahead of me.  Okay.  7(g).  Could you please read us the first sentence of 7(g).

A   "In March 2015, without advising McKesson, A&P simply failed to make a payment of $4,731,048.02 due on March 27th."

Q   Does your declaration indicate that the sentence you just read is only stated on information and belief?

A   Well, no, I reference 5, the Exhibit McKesson 6, that shows an email to this effect.

Q   And where do you reference those things, in the footnotes?

A   It's in Footnote Number 5.

Q   But you actually reference Footnotes 4 and 5 for different factual statements, don't you?  In fact -- I'm sorry -- let the questions...

A   I'm sorry, was there a question?

THE COURT:  Yeah, sorry.

BY MR. MILIN:

Q   Sure.  So, you said that -- so, first of all, you didn't state that 7(g) was on information and belief, correct?

A   Well, the statement up front is an all-encompassing statement for the declaration.

Q   And can you show me which statement you're referring to, please?

Page 49

A   The one I read in Paragraph 2.

Q   And you want to read exactly what language you think applies to the entire document?

A   The second sentence, "Where facts are stated upon information and belief, I know them to be true of my own personal knowledge or based upon my review of McKesson's books, records, files, and procedures."

Q   Did you state in Paragraph 7(g) that your statement was on information and belief?

A   I didn't feel I had to based upon the statement in Paragraph 2.

Q   So, should we take your entire declaration to be on information and belief?

A   That there is references throughout the declaration to specific pieces of information that support my position.

Q   So, you don't state anywhere which statements are on information and belief, do you?

A   I don't.

Q   Okay.  So, is your statement that in March 2015 -- well, let's go back to it, and you'll tell me if I'm reading it correctly.  This is in (g).  "In March 2015, without advising McKesson, A&P simply failed to make a payment of $4,731,048.02 due on March 27th."  That's what you say in 7(g), isn't it?

A   It is.

Page 50

Q    Do you cite any support for that?

A    I do not.

Q    Is that statement based on your personal knowledge?

A    Yes, a review of the documents.

Q    But you don't cite any documents here.

A    Not in this case, no.

Q    But it's based on your personal knowledge.

A    And a review of the documents, yes.

Q    Mm hmm.  And it's only based on your review of the documents, just to be clear.

A    That first sentence, yes.

Q    Very good.  Was Paragraph 7(g) an important factor in reaching your conclusions about whether McKesson's actions with respect to A&P were ordinary?

A    It was one component of my opinion.

Q    Was it an important component?

A    Well, they're all important components in my opinion.

Q    Okay.  Paragraph 7(g) doesn't mention when A&P paid the $4,731,048.02, does it?

A    It does not.

Q    When did A&P pay the $4,731,048.02?

A    The following Monday.

Q    The following Monday.

A    Yes.

Q    Okay.  That isn't true, is it?

Page 51

A     It is true.

Q     Okay.  Please turn to Paragraph 7(i) of your declaration.

A     Okay.

Q     All right.  Please read the sentence -- I guess the whole section is a sentence.  Could you please read it for us?

A     Section (i) reads, "And three weeks later on June 10th, 2015, A&P failed to set up an EFT and the funds were wired to McKesson only after McKesson representatives advised that shipments would be held if payment is not received that day."

Q     Is that sentence on information and belief?

A     Yes.

Q     Doesn't say that in your declaration, does it?

A     Paragraph 2 is the overriding part that says this is based on my knowledge and review of documents.

Q     And again, does that override the entire declaration?

A     Paragraph 2 is a lead in to, I've revied documentation and my opinions are based on my experience over the last 40 years now.

Q     Does Paragraph 2 override your entire declaration?

A     Can you define what do you mean by override?

Q     Does it apply to everything you say after Paragraph 2?

A     Yes, it's based on my belief and knowledge and

Page 52

experience and review of the documents.

Q    And was it your belief and knowledge and experience that led you to say what you say in Paragraph 7(i)?  I'm just trying to understand.

A    Paragraph 7(i) is a situation where when you send an EFT payment, the recipient party gets notice that the money is coming.  So, in this situation, McKesson was expecting to have notice that a payment was coming.  The TEC was a Wednesday, right, so the payment is coming on Friday.  It was due on Friday, got notice on Wednesday, expecting an EFT with the amount due on Friday.  The EFT notification was not received by McKesson, so they reached out to A&P and asked A&P is payment forthcoming, and A&P said let us check and they made sure that that payment was forthcoming and received on the 12th.

Q    And the story -- the testimony you just gave us is based on your personal knowledge.

A    And review of documents.

Q    And review of documents, so it's in part based on your personal knowledge?

A    It's based on the review of the documents and my interpretation of those documents.

Q    Now let's turn to Paragraph 9.  Can you read the second sentence?

THE COURT:  Excuse me.

Page 53

MR. MILIN:  Yes.

THE COURT:  Sorry.  Mr. Milin, you -- I struck Paragraphs 9 through 12 in their declaration when I omitted it, so I don't see how you can ask questions about Paragraph 9 when you asked me to strike it and I did.

MR. MILIN:  Thank you, Your Honor.  I will postpone any questions on that.

THE COURT:  So, you cannot ask questions about Paragraph 8 through 12 now.

MR. MILIN:  You Honor is correct.

THE COURT:  It's not part of the declaration that I admitted into evidence.

MR. MILIN:  Your Honor is correct.  I apologize.

THE COURT:  Okay, just to be clear.

MR. MILIN:  Mm hmm.

BY MR. MILIN:

Q   Could you please turn to Paragraph 33 of your report.  Can you please read the sentence beginning, "A&P and McKesson".

MR. SLATE:  I'm sorry, where are we?

MR. MILIN:  Paragraph 33 of his report, which I believe is on Page 9.

MR. SLATE:  Thank you.

BY MR. MILIN:

A   "A&P and McKesson each signed the 2012 supply agreement

Page 54

without duress, coercion, or undue pressure imposed by the

other.  Instead, it appears that each signed on their own

free will."

Q    You didn't communicate with either A&P or McKesson in

2012 about signing the supply agreement, did you?

A    I did not.

Q    Do you have personal knowledge about whether A&P and

McKesson signed this supply agreement without duress,

coercion, or undue pressure?

A    I was not in the negotiating room, no.

Q    Do you have personal knowledge about whether A&P signed

the supply agreement without duress because of your general

experience in the pharmaceutical industry or anything else?

A    Well, my general experience in the pharmaceutical

industry, signing and helping negotiate hundreds of

contracts, has been that the parties are not coerced into

signing agreements.  They each negotiate based on their

business needs and requirements.  They may not like the

terms; they can look elsewhere for other suppliers.  But at

the end of the day, the parties come to an agreement and

sign if they want to do business together.  Based on

hundreds of examples, they might not be happy, but they're

not coerced; they know what they're signing and why.

Q    And so, you know that A&P signed this contract without

duress based on your experience.

Page 55

A     Based on my experience, yes.

Q     Does your report ever state that McKesson threatened A&P?

A     I don't believe so, but I don't have the whole thing memorized.

            MR. MILIN:  Your Honor, may we approach the witness?

            THE COURT:  Yes.

            MR. MILIN:  Thank you, Your Honor.  I guess we should number them.

            THE COURT:  Yes.  So, is this your exhibit?

            MR. MILIN:  It is.

            THE COURT:  I assumed so.  Okay.  So, I think your last exhibit is 198.

            MR. MILIN:  Well remembered, yes.

            THE COURT:  198, so I think this would be 199. So, are we marking this PX 199?

            MR. MILIN:  We are.

            THE COURT:  Okay.

            MR. SLATE:  May I approach the witness, Your Honor.

            THE COURT:  Yes, you may.

            MR. SLATE:  Is it 199, is that what you're saying?

            THE COURT:  PX 199.

            (Exhibit PX 199 entered into evidence)

Page 56

BY MR. MILIN:

Q    Now, the question I just asked you before turning to this exhibit was, does your report ever state that McKesson threatened A&P, and you answered no, correct?

A    Correct.

Q    So, let's look at PX 199, Page 218.

A    Did you say 218?

Q    Page 218, yes.

A    Okay.

Q    All right.  At Lines 10 and 11, you also stated, "I do not make the statement, they threatened to withhold shipment," is that correct?

A    Yes, that's what it says.

Q    Okay.  But McKesson did threaten A&P, didn't they?

A    They did.  They threatened to withhold shipment and then A&P paid their bill.  They didn't withhold the shipment, they threatened to.

Q    But you don't state that they threatened them in your report, and you don't state it in your declaration, do you?

A    I don't.

Q    So, just to reiterate, on Page 151 of your deposition transcript if you could read us Lines 15 through 18.

A    Lines what?

Q    Lines 15 through 18.  I do apologize.  I'm doing my best.  So, can you just read us Pages 15 -- I'm sorry --

Page 57

Lines 15 to 18 on Page 151 of your declaration -- I'm sorry

-- of your deposition transcript?

A    Okay.  Line 15 starts, May 22nd, yes, they threatened

to suspend shipment of the product until payment was

received.  Subsequently, a wire was sent, payment was

received.

Q    Thank you very much.  And that's what you testified at

your deposition, right?

A    Yes.

Q    All right.  So, we talked a little bit about the

definition of strategic retailer.  Let's look at Page 8 of

your deposition transcript so that we can be using that term

consistently.  Do you remember that I defined the term

strategic account for purposes of your deposition at, let's

look at 8 and see if I did that.

     So first, I ask you at Line 8, what do those terms mean

to you, and you answered, it depends on the individual

company.  And so, at Page 22 -- I'm sorry, at Line 22, I

said, so, if I refer to a strategic retailer or a strategic

account, I'd be referring to retailers who have four or more

locations under centralized management and could generate

$100 million or more in annualized revenues.  Does that

work?  And you said yes.

A    Yes.

Q    So, we can use that definition here today as well?

Page 58

A    Sure.

Q    Very good.  Now, A&P was a strategic retailer before its bankruptcy, right?

A    Based upon this definition, yes.

Q    Is it your opinion that it was in the ordinary course of business, as you understand that term, for McKesson to threaten to discontinue shipments to a strategic retailer if a single payment wasn't paid on time?

A    Based on A&P's financial difficulties, yes, in the ordinary course of business.  If the wholesaler is working with a retailer that has more than four stores, more than $100 million in sales and they are purported to be in financial difficulties, maybe including a Chapter 11 filing, yes, I would expect in the ordinary course of business that wholesaler be watching every payment.

Q    Mm hmm.  So, let's turn to Page 192 of your deposition transcript, PX 199.

A    Okay.

Q    So, at the top of the page, I asked you, and tell me if I don't read this correctly.  Okay.  Do you have -- do you know of any other examples in which a pharmaceutical wholesaler threatened to discontinue shipments to a strategic retailer immediately if a single payment wasn't paid on time.  How did you answer that question?

A    No.

Page 59

Q    That was your testimony, correct?

A    Correct.

Q    Okay.

THE COURT:  Oh yeah, sorry.

MR. MILIN:  And to approach the witness, please?

THE COURT:  Yes, that's fine, you may.  This is PX 200.

(Exhibit PX 200 entered into evidence)

By MR. MILIN:

Q    Now, I understand that Exhibit PX 200, the content of it is in the record, but this one has an additional feature at the lower right.

MR. MILIN:  Also, if I may explain to Your Honor a disturbing feature of some of our exhibits, which is that they begin with a reference to Mr. Heymi Colon and sometimes have even more of a header than this one.  It appears that prior counsel produced documents with that header, and those headers should all be ignored.

THE COURT:  I understand.  Okay.  I understand.

MR. MILIN:  They are irrelevant to the actual content of the documents.

THE COURT:  Okay.

MR. MILIN:  Thank you very much.

THE COURT:  Thank you for explaining that.

BY MR. MILIN:

Page 60

Q    Now, Mr. Kosty, I have handed you a copy of Exhibit PX 200.  Do you recognize it?

A    I believe I may have seen it, but I'm not sure.

Q    So, I'll give you a hint.  Was this an exhibit at your deposition as indicated by the mark TK 5 on the lower right?

A    It was.

Q    Very good.  So, you have seen it before, right?

A    Indeed.

Q    Do you mention Exhibit PX 200 in your expert report?

A    No.

Q    Do you mention it in your declaration?

A    No.

Q    Okay.  Mr. Kosty does your declaration use the term pharmaceutical supply industry, your declaration.  I'll give you a hint, 5(a).

A    Thank you.  Okay.

Q    So the question is, does your declaration use the term pharmaceutical supply industry --

A    Yes.

Q    -- in Paragraph 5(a)?

A    It does.

Q    Does your declaration use that term in Paragraph 5(d)?

A    5(b), it does not.

Q    It doesn't use it in 5(d)?  Take another look at Paragraph 5(d), perhaps I'm mistaken.

Page 61

A    Did you say (d) or (b)?

Q    5(d) as in David.

A    D as in David.  Oh, I thought you meant B as in boy.

Q    Sorry.

A    (d) it does, yes.

Q    Can you show me where your report states a definition of the term pharmaceutical supply industry?

A    I don't believe I defined it in the report.

Q    And does your declaration state a definition of that term?

A    No.

Q    Thank you.  Does your declaration use the term standard in the industry, say, in Paragraph 6(a)?

A    Yes, it does.

Q    Can you show me where your declaration defines that term?

A    It doesn't define that term.

Q    In fact, it uses that term exclusively in Paragraph 6(a), doesn't it?

A    It is referenced in 6(a), yes.

Q    Does your report use the term standard in the industry in Paragraph 19?  And we're talking --

A    Yes, standard in the industry.

Q    Right.  And in Paragraph 20?

A    Yes.

Page 62

Q     And in Paragraph 23?

A     It does.

Q     And in Paragraph 35?

A     Yes.

Q     Can you show me where your report defines the term standard in the industry?

A     It doesn't define the term.

Q     Does your report use the term standard industry practices in Paragraph 58?

A     It does.

Q     Does your report define that term?

A     It does not.

Q     Does your report what industry you are referring to in Paragraph 58?

A     Not specifically, but the entire report has been about the pharmaceutical supply chain industry.

Q     Does your report use the term standard industry practices anywhere other than Paragraph 58?

A     I don't know offhand.  (Indiscernible) -0

Q     The answer is no, isn't it?

A     Not without doing a word search, I don't know offhand.

Q     Mm hmm.  And your declaration only uses the word standard once, right?

          MR. SLATE:  Excuse me, Your Honor.  Is Mr. Milin asking for a word search of the document?  I mean...

Page 63

MR. MILIN:  I am asking for clear testimony.

MR. SLATE:  The document --

MR. MILIN:  The Court understands very well what I'm asking.  If Mr. Kosty doesn't know the answer, he doesn't.

MR. SLATE:  So, you're not expecting him to read the document to --

MR. MILIN:  I am asking him to look at the document.  He knows its contents well.  If he cannot answer, he will tell us.

THE WITNESS:  Could you repeat the question?

BY MR. MILIN:

Q    Your declaration only uses the word standard once.  I thought we mentioned that before.

THE COURT:  Is that a question?

MR. MILIN:  Yes.  Is it true that --

THE COURT:  Does your declaration only use the phrase standard once; isn't that what you're saying?

MR. MILIN:  That is what I'm saying.  Thank you, Your Honor.

THE COURT:  Take your time.  Look through your whole declaration, Mr. Kosty, before you answer.

THE WITNESS:  Yeah, I'm going to.

THE COURT:  Take your time.  We're not -- you know ...

Page 64

BY MR. MILIN:

A     Well, there's one instance in 6(a) so far.

Q     Mm hmm.  You can skip 8 to 12.

THE COURT:  Right.

THE WITNESS:  Okay.

BY MR. MILIN:

Q     Have you reviewed your document, your declaration?

A     I'm still in the process.

Q     Okay, sorry.

A     It appears that 6(a) is the only one with that.

Q     Does your declaration, now that you've been through it again carefully, use the term customary in the industry in Paragraph 6(b)?

A     It does.

Q     Does your declaration contain a definition of that term?

A     It does not.

Q     Does your declaration use the term ordinary business terms in Paragraph 5(a)?

A     Yes.

Q     Does your report state a definition of that term?

A     It does not.

Q     So, does your report use the term ordinary business terms in Paragraphs 11 and 12?

A     I thought we were excluding those paragraphs.

Page 65

Q    I'm sorry, let's move on.

THE COURT:  No, it's the report, not the...

MR. MILIN:  I'm sorry, this is the report.

THE COURT:  Yeah, not the declaration.

THE WITNESS:  I'm sorry, what page was that again?

BY MR. MILIN:

Q    Does your report use the term ordinary business terms in Paragraphs 11 and 12?

A    Yes.

Q    Does your report state a definition of that term?

A    It does not.

Q    Are you aware whether the term ordinary business terms is a legal term?

A    I'm not aware.

Q    Does your report use the term customary in the industry in Paragraph 23?  Sorry to go back, but I'm told I missed the question.

A    Are we still on the report?

Q    We are on the report, Paragraph 23, does that use the term customary in the industry?

A    It does.

Q    Does your report state a definition of that term?

A    It does not.

MR. SLATE:  Copies?

MR. MILIN:  I only have a couple, I think, two of

Page 66

these left.

BY MR. MILIN:

Q    Does your declaration use the term ordinary course of business?  In fact, I'll give you a hint and speed things up.  I think you use it three times in Paragraph 5 alone.

A    It does.

Q    And once in 6(b), right?

A    It does.

Q    Does your declaration include a definition of the term ordinary course of business as you use it?

A    It does not.

Q    Does your report also use the term ordinary course of business?

A    It does.

Q    Does your report contain a definition of the term ordinary course of business?

A    It does not.

        THE COURT:  Yes.  Just for the record, this is PX 201.

        (Exhibit PX 201 entered into evidence)

BY MR. MILIN:

Q    So, Mr. Kosty, you've been handed a document marked Exhibit PX 201, correct?

A    Correct.

Q    And do you recognize Exhibit PX 201?

Page 67

A    I do.

Q    Do you see that it was marked as Exhibit 7 at your deposition?

A    I do see that.

Q    And Exhibit PX 201 was a letter from McKesson to A&P changing A&P's payments terms, wasn't it?

A    It is.

Q    Now I'd like to direct you to Page 206 of your deposition transcript, PX 199.

A    Was that 206?

Q    Yes, sir.  And you see on that Page 206, where I asked you about Exhibit 7, right?

        MR. SLATE:  Can we have a line number, Your Honor?

        MR. MILIN:  Exhibit 7 was referred to and Lines 10 and 20.  I'm just giving the witness time to review it.

BY MR. MILIN:

Q    Are you ready, Mr. Kosty?

A    I am.

Q    So, at Line 20, did I ask you, "Was McKesson sending Exhibit 7 in the ordinary course of business."

A    I said yes.

Q    And next, I asked you why, correct?

A    Yes.

Q    Can you please read your answer?

A    "Because they're working with their customer resolving

Page 68

an issue and documenting what that resolution is."

Q    That's what you answered, right?

A    That is what I answered.

Q    And that was correct, right?

A    It is correct.

Q    And that's why it was in the ordinary course.

A    Yes.  They had to provide notice under the contract at A&P that they were changing the payment terms, and they were fulfilling that obligation.

Q    Is the term ordinary course of business a legal term?

A    My understanding it is.

Q    And when you say that a particular -- that something was in the ordinary course of business, are you using that legal term?

A    No.  I'm using it in the context of how the industry works.

Q    Mm hmm.

A    So, in a supply agreement between a pharmacy chain and a wholesaler, there are a number of contract terms that are standard in the industry, standard in the contract.  Those terms are negotiated, so the verbiage within those terms may be different.  But one of the standard terms, if you change the contract, you have to provide notice to the other party.  That's in this case what McKesson was doing by sending the letter to A&P, they agreed to change the payment term and

Page 69

they memorialized it in this letter as a notice.

Q   Does either your declaration or your report specify a timeframe for its statements about what is ordinary?

A   It does not.

Q   Or customary?

A   Doesn't define the word, no.

Q   Or standard?

A   No.

Q   Do your declaration or report ever specify whether you're discussing the pharmaceutical supply business overall or whether you're discussing only business with the three largest firms, McKesson, AmerisourceBergen, and Cardinal Health?

A   It doesn't differentiate those wholesalers.

Q   So, you're saying that everything you say in your declaration and report about the pharmaceutical supply business refers to transactions between any pharmaceutical wholesaler and any retailer, including the guy on 6th Avenue or any particular pharma?

A   No.  It would be the wholesalers, the top three obviously, and there's a small tier of smaller ones left in the industry and their business practices are similar.

Q   Do you state that anywhere in your report or your declaration?

A   I don't.

Page 70

Q    Does your declaration specify whether you're only discussing national or strategic retailers?

A    No, it doesn't.

Q    Does your report specify -- I'm sorry, neither your declaration, nor your report specify whether you're discussing business only with strategic accounts, correct?

A    It doesn't state that, no.

Q    Let's turn to -- well, Paragraph 8 we're going to skip over.  There's some efficiency benefits to striking.

THE COURT:  You moved for it.

MR. MILIN:  I did.

BY MR. MILIN:

Q    Now at the beginning of your examination, I asked you about the Valsartan case, correct?

A    You did.

Q    Did the Court accept your expert testimony in Valsartan?

A    If I recall correctly, they accepted parts of it, they excluded parts of it, and the last I heard from the counsel was it was on appeal.

Q    Why did the Court exclude some of your testimony in Valsartan?

A    I don't recall the specific reasons.

Q    Does the phrase even -- that you lacked even a semi-rigorous methodology, does that refresh your recollection?

Page 71

A    It doesn't.

MR. MILIN:  Your Honor, no further questions for this witness.

THE COURT:  Okay.  I have questions.  My turn now.

THE WITNESS:  Oh, I'm sorry, Your Honor.

THE COURT:  Remember I warned you all, I'm just going to ask my questions, so you can also follow up on redirect if I ask something that you feel is necessary to expand upon further.

All right, Mr. Kosty.  So, the first thing I'm going to ask you about is in your expert report, Paragraph 33.  So, the first sentence in that paragraph, Mr. Milin asked you about other parts of this, but he didn't ask you about the first sentence.  So, it says, "The terms and conditions in the A&P supply agreement are consistent with industry practice and appear to have been the result of negotiations between the parties."  Could you explain to me what the basis is for your statement for that in the expert report?

THE WITNESS:  Yes.  It's reviewing wholesaler agreements with retailers over the past almost 30 years now.  And part of the review is there is, as I mentioned earlier and I think it's in the report, there are certain terms and conditions that are standard in all these agreement; the actual negotiated result is different.

Page 72

So, for example, you might have payment terms and the payment terms impact the discount rates the wholesalers provide. So, if I'm going to prepay up front, I should get the best price from that wholesaler because there is zero risk with them in terms of nonpayment. However, if I want 45 days payment, then the discount provided by the wholesaler is not going to be anywhere near if I prepared because they're taking on the risk for that 45 days of product that's shipped to my pharmacies that they haven't been paid for.

THE COURT: Okay, that's helpful. So, just with respect to your background, so how many pharmaceutical agreements would you say that you've actually negotiated over the years? Just a ballpark.

THE WITNESS: Probably 12. It's one of those things that these agreements are typically from three to five years long, the initial term, and then there's evergreen clauses typically one or two years, one year. Now, like the A&P agreement, their supply agreement had an evergreen that they could get two additional years at their request. So, that's the negotiated part.

The other part of our business is we help pharmacies optimize their profitability. And part of that work is to evaluate their wholesaler agreements to determine what flexibility if any do they have to, for example,

Page 73

purchase product off contract.  So, what that means is if I have to buy, you know, for example, 90 percent of my generics from the wholesaler, so that means I can buy 10 percent of my generics off contract.

So, what we would do is evaluate the contract, determine what the flexibility is, then we'd look at the claims and the drugs being dispensed through that pharmacy to determine, you know, is the juice worth the squeeze, should we go out and request bids for those generic products that would be -- that we could get better pricing perhaps and have those margin dollars accrued to the retailer as opposed to the wholesaler.

THE COURT:  Do you assist -- in your consulting business, do you assist clients with negotiating changes to their supply agreements though?

THE WITNESS:  Yes.  It's usually on a renewal basis.  So, when they're negotiating renewal, one of the components of these agreements is oftentimes they're very complex and there's a lot of value -- different value drivers to the end result.  And what we try to do as a kind of rule of thumb, is try to streamline the value drivers in the contract so you can evaluate -- and you don't need a forensic accounting degree -- to figure out if we're getting the right price.

So, part of our work is to look at where they're

Page 74

at, can they even audit the contract, but can we simplify it so it's more straightforward in the lines incentives for both parties to grow in the same direction.

THE COURT:  Okay.  And so, then in your consulting role where you're assisting clients with looking at their pharmaceutical supply agreements, how many approximately supply -- pharmaceutical supply agreements would you say you've reviewed in that role?

THE WITNESS:  At least 100.

THE COURT:  Okay, that's fine.  So, could you explain to me what about the form of the McKesson supply agreement, which I know you've reviewed because your testimony is that, seems typical to you?

THE WITNESS:  So, it's typical in regards to the different terms and outline of the contract.  You have, you know, what's the term; you have clauses, what are your deliveries schedule, what are your payment terms, what's your return goods policy, can you do a once-a-year cleanup of your pharmacies to send product that's not needed anymore.  So, you have all these different terms that get negotiated.

Oftentimes, we're asked to look at the pricing, which as I mentioned earlier, is very complex.  So, we have consultants whose expertise is to -- typically, the CFO of the company will run their analysis and ask us to run

Page 75

separate analysis.  And then we'll compare notes to say, all right, what are we seeing versus them, are we in agreement with that.

THE COURT:  Okay.  And with respect to the 2012 McKesson supply agreement, are there any terms in that agreement that struck you as unusual?

THE WITNESS:  No.

THE COURT:  All right.  With respect to your declaration -- I'm going to turn to that next.  So, I know Mr. Milin asked you about the use of the term pharmaceutical supply industry, which came up a few times in your declaration.

THE WITNESS:  Yes, Your Honor.

THE COURT:  What do you mean when you refer to that in your declaration or in your report?

THE WITNESS:  Yeah.  The pharmaceutical supply industry is just the group of companies that supply pharmacies with product, and they could be a wholesaler, it could be a direct purchase agreement with manufacturer.  The pharmacy could be a retail pharmacy chain, mail service, long-term care, all different types of flavors of pharmacies.  And it's the interaction between those entities to get product to the pharmacies who eventually dispense it to patients.

THE COURT:  Okay.  Thank you for that.  And then I

Page 76

know Mr. Milin also asked you about a couple of other things that you had had in your report and also in your declaration. So, when you referenced the term in 6(a), but it comes up in your report also, standard in industry, what do you mean by that?

THE WITNESS: It means the activity that's being undertaken is consistent with other situations of similar ilk in the industry.

THE COURT: Based on your experience.

THE WITNESS: Based on my experience, yes.

THE COURT: Okay. So in 6(a), for example, when you say that McKesson's actions and its credit decisions during 2015 were reasonable, standard in the industry, and in the ordinary course of business, which I'm going to ask you about ordinary course of business in a second because that comes up a few times, you're really referencing based on your experience of having been in the industry for this amount of time that you have been, that you think that the actions were standard based on your experience.

THE WITNESS: Yes. The industry perspective, if you don't pay your bill, you don't get supply.

THE COURT: Okay. And when you use the phrase ordinary course of business, which certainly does have legal terms, but I know you explained you were not using it that way.

Page 77

THE WITNESS:  Right.

THE COURT:  What did you mean?

THE WITNESS:  It's similar to standard in the industry.  It's the ordinary way things happen in this industry, regardless of what company you're working for, it kind of happens in a way.

THE COURT:  Okay.  And that's also just based on your experience being in the industry for all those years, right?

THE WITNESS:  Well, yes, and working with hundreds of clients on their business issues over the years.

THE COURT:  Okay, understood.  All right.  With respect to 6(d) as in dog in your declaration, could you -- what is the basis for your testimony that changes and to credit terms along the lines set forth in the July 2nd, 2015 letter are common, ordinary, and reasonable in the pharmaceutical supply business?

THE WITNESS:  So, the comment is based upon each wholesaler agreement will have a term that would explain what happens if you're paying or appear not to be paying.  Again, that's standard; that's just a recourse available to the wholesaler.  I read a contract this week from one of our current clients and their nonpayment was we will shut you down immediately.  So, each one is different, but it's all part of that negotiation.

Page 78

THE COURT:  And then in 7(j), which I know Mr. Milin asked about you -- asked a little bit about this, it says, the last sentence, "not only are those rights in the supply agreement," meaning the right to shorten the credit terms and require timely payment, "I am of the opinion that they are customary, reasonable, and in the ordinary course of business between A&P and McKesson."  What is that based upon?

THE WITNESS:  It's based upon the agreement that they both agreed to.

THE COURT:  Okay.  That's all my questions.

THE WITNESS:  Okay.

THE COURT:  Thank you for answering them by the way.

MR. SLATE:  My turn, Your Honor?

THE COURT:  Your turn, Mr. Slate.

REDIRECT EXAMINATION OF TIMOTHY KOSTY

BY MR. SLATE:

Q    Unfortunately, the Judge asked you questions that I was planning on asking.  So, I'm going to try to avoid repetition, but I may slip from time to time.  Is there -- in your experience, do you believe there is a separate wholesale distributor industry associated with just strategic retailers, as opposed to every other retailer?

A    No, there's not.  The wholesaler industry will supply

any size pharmacy that's willing to purchase product from them.

Q    And agreements are comparable between the two groups, aren't they?

A    They are comparable.  Our clients include chains from, well, one independent pharmacy all the way up to hundreds of pharmacies that all have supply agreements with their wholesaler.

Q    And when you use phrases -- excuse, if I'm -- standard in the industry, the pharmaceutical supply industry, standard industry practices, as is typical in the industry, customary in the industry, you're meaning all the same thing, aren't you?

          MR. MILIN:  Objection.

BY MR. SLATE:

A    Yes.

          THE COURT:  Okay.  Sorry.  What's the objection?

          MR. MILIN:  Objection.  Compound, ambiguous.

          THE COURT:  Okay.  I think you just have to ask every question.  Sorry.

          MR. SLATE:  All right.  I'm trying.

          THE COURT:  I know.  I hear you.  But just -- yeah, stick with one.

          MR. SLATE:  Standard in the industry.

BY MR. SLATE:

Page 80

Q    That refers to the pharmaceutical supply industry generally.  Is that correct?

A    Yes.

Q    The pharmaceutical supply industry, that refers to the pharmaceutical supply industry in general.  Is that correct?

A    Yes.

Q    Standard industry practices, that refers to the practices imposed generally in the pharmaceutical supply industry.  Is that correct?

A    That is correct.

Q    As is typical in the industry, that refers to the industry of pharmaceutical supply businesses generally.  Is that correct?

A    Yes.

Q    And customary in the industry, does that refer to customary in the pharmaceutical distribution supply industry?  Is that correct?

A    Yes.

Q    You used the phrase, different value drivers.  What did you mean by that?

A    Within a wholesale agreement, there are --

        MR. MILIN:  Wait.  I didn't hear that question. I'm sorry?

        MR. SLATE:  You're doing that just because I do it to you.

Page 81

MR. MILIN:  Ah, that's why.

MR. SLATE:  I asked what the phrase different value drivers (indiscernible).  He used it in his (indiscernible).

THE COURT:  Yeah, he did.  I wrote it down. That's right.

MR. MILIN:  Very good.

BY MR. SLATE:

A    So, different value drivers within a wholesale supply agreement are pricing metrics, could be rebates.  It could be differential payment terms between brand and generics like we saw in the A&P supply agreement, that brands were due the following Friday and payment for the generics were due six Fridays from that week.

So those value drivers are financial components of the contract that our company helps our clients evaluate because of the complexity, to say how much value are we getting from each driver and which ones do we want to negotiate out of the contract, which ones do we want to enhance, because we can drive that, and which ones are value drivers that we have no control over?

And so, those value drivers inform the retailer on what their discounts are going to be through that agreement.

Q    And wouldn't a value driver -- let me go bac.

The percentage under the contract that is to be bought,

Page 82

a branded Rye XL, is that a value driver?

A    It is a component of value creation because it determines your flexibility as a retailer to buy only through that agreement or off contract through other suppliers.

Q    And if the percentage were 80 percent as opposed to 90 percent, would there be different value -- would the economic differences be material?

A    Yes.  If you're required to buy 90 percent through the wholesaler, you're going to get deeper pricing discounts than you were if you're going to -- required to buy by 80 percent, because that additional 10 percent is value to the wholesaler because then they can include it in their purchasing and perhaps negotiate better rates.

Q    And the parties, the wholesaler, and the retailer, negotiate that percentage up front, don't they?

A    Yes, absolutely.

Q    And that's a term that is typical in supply agreements?

A    Yes, absolutely.

Q    Supply agreements wouldn't say you can buy whatever you want to from us.  It would say you've got to buy so much percentage.  Is that correct?

A    Yes.  There's typically a percent because if you think about it, each party wants to understand what the value of this agreement is.  You know, I focused on the retail, but

Page 83

if you look at the wholesale, well, they want to know what the estimated buying purchased for the next year or the next five years, depending on the length of the agreement, is going to go through that contract.  And so, it's materially different if it's an 80 percent brand rate or requirement versus a 90 or 95 percent brand requirement.

Q    And we're talking about brand Rx, but the same thing would be true with generics Rx, wouldn't it?

A    Yes.

MR. MILIN:  Objection.  Leading.

MR. SLATE:  Sorry.

THE COURT:  Sustained.

BY MR. SLATE:

Q    Does it apply with respect to generics percentages as well?

A    The same concepts apply to generics, yes.

Q    And again, these provisions are typical in the supply agreement?

A    They are very typical, yes.  It's standard in all of them I've read.

Q    Is it typical to have a -- are you familiar with the phrase, MAC clause, material adverse change?

A    Not typical in a wholesale agreement.  MAC is defined as Maximum Allowable Cost.  So that typically comes in in the payment aspect.  So, if I'm a pharmacy and I contract

Page 84

with the payer, their perspective is, you know, there might be 20 suppliers of metformin.  The payer doesn't care who you buy it from.  That's your decision.  What they say to you is my MAC price is X.  That's all I'm going to pay you for wherever you buy.

Q    I think we have a potato/potato problem here.

A    Oh, do we?  Okay.  What am missing?

Q    Let me back up.  Does a supply agreement typically allow for a renegotiation of terms if there's a material adverse change in the financial condition of the region?

A    Yes.

Q    That's what I call a MAC clause.

A    Okay.  Sorry.  I'm not a pharmacist.

Q    And it's typical, yes?

A    Yes.

Q    And typically, there are default provisions in the supply agreement, yes?

A    There are, yes.

Q    And typically, the bulk of the provisions expressly identify consequences of default.  Is that correct?

A    Yes.

Q    And what could those consequences be in a typical supply agreement?

A    It could be a change --

          MR. MILIN:  Objection.

Page 85

BY MR. SLATE:

A    -- in payment terms.

THE COURT:  Okay.  Sorry.  Yes?  Objection?

MR. MILIN:  Leading, ambiguous.  Not leading this time, but it's certainly ambiguous.

THE COURT:  All right.  Maybe...

BY MR. SLATE:

Q    Can you describe what default provisions would be associated with, or rather, what consequences would be associated with a payment default, for example?

A    That it could be non-shipment of product.  It could be change in payment terms.  It could require a meeting of senior executive leaders of both organizations to work through the issues.  So, there's a number of components that could be in those agreements.

Q    And you'd expect to see those provisions in typical supply rooms?

A    Yes.

MR. MILIN:  Objection.  Relevance.

MR. SLATE:  That's okay.

THE COURT:  I'm sorry.

MR. SLATE:  Withdrawn.

THE COURT:  Withdrawn?  Okay.  Go ahead, (indiscernible).

BY MR. SLATE:

Page 86

Q    We've been bouncing between the report and the declaration so much I don't know what paragraph I'm referring to.  I believe you referenced in 6(a) of the declaration...  Yes, it is (a), Paragraph 6(a), if you have it, on Page 3?

A    Yes.

Q    You said McKesson's actions and its credit decisions during calendar 2015 were -- and then you described descriptions for it -- you are familiar with the back and -- let me back up.

Your conclusion here is based upon your understanding of the payment issues presented with A&P.  Is that correct?

A    Yes.

Q    And what payment issues were presented?

MR. MILIN:  Objection.

THE COURT:  Okay, what --

MR. MILIN:  Ambiguous.  I also can't hear.

THE COURT:  Oh.

MR. MILIN:  If you could provide some context, Mr. Slate?

MR. SLATE:  Well, I'm trying to flesh out what is meant in Paragraph 6(a).  McKesson's actions during calendar 2015 were reasonable, standard in the industry and in the ordinary course of business.  And I want to know what actions and what credit decisions?  That's what I'm asking.

Page 87

THE COURT:  Okay.  Well, that sounds like a question.

MR. SLATE:  It is a question.

THE COURT:  What actions were you referencing in your declaration in Paragraph 6(a)?

BY MR. SLATE:

A    Right.  There were a series of issues in 2015 with delayed payments.  There was a question about the one in March that came Monday when it was due on Friday.  There was a missed payment that was reconciled.  There was the EFT that didn't appear to be set up correctly to pay.  And there was the situation around Memorial Day that year when A&P was going to delay payment from a Friday to the following Tuesday, and McKesson called them and said no, the contract says funds in hand today, we need a wire transfer, so we have that, and they effected that wire transfer.  So, all of those events happened during 2015 to inform on the changes that were made.

The other component that informed those changes that McKesson made was they'd received the financial statements from A&P's auditor, PricewaterhouseCoopers.  And based on those financial statements, some of the changes in A&P's financial conditions were outlined in the 7/2 letter from McKesson to A&P that indicated -- you know, the one that sticks out in my mind, they lost 67 -- $60-plus million in

Page 88

fiscal 2014.

The next year, they lost $305 million.  So, obviously, there's a substantial decrease in financial -- I'm looking for the right words -- the ability to finance and continue as a going concern because of those losses.

Q    And you believe that McKesson's actions in the face of all of those activities were reasonable?

A    Yes.

Q    And they were all, frankly, within the standard of the pharmaceutical distribution industry?

MR. MILIN:  Objection.  Leading.

BY MR. SLATE:

Q    Were they?

A    They were standard within the industry.  And they were specific to the agreement negotiated by McKesson and A&P.

Q    And the terms of the agreement you also -- well, in fact, do you believe the terms of the agreement were also typical and standard in the industry with respect to rights upon these kinds of events?

A    Yes.

MR. SLATE:  I have no further --

MR. MILIN:  (Indiscernible) --

MR. SLATE:  Oh, I have one more question, Your Honor.

THE COURT:  Sure.

Page 89

MR. SLATE:  I lied.  I misrepresented.  I have a few more questions.

BY MR. SLATE:

Q    In your years of involvement in negotiating supply agreements, have you negotiated supply agreements in which Cardinal was the wholesale supplier?

A    Yes.

Q    Have you negotiated supply agreements or been in the negotiation of supply agreements in which AmerisourceBergen was the supplier?

A    Yes.

MR. MILIN:  Objection.  Ambiguous.

THE COURT:  Sorry?

MR. MILIN:  Ambiguous.  Vague, misleading.

THE COURT:  How about -- sustained.  But I think you can ask your question --

MR. SLATE:  Yes, Your Honor.

THE COURT:  -- clearly.  I think you could ask whether they were the contract counterparty, for example --

MR. SLATE:  I will do that.

THE COURT:  -- in a contract.  That's not ambiguous as to what role they're playing.  How about that?

BY MR. SLATE:

Q    Were you involved in negotiations in which AmerisourceBergen was the supplier counterparty?

Page 90

A     Yes.  We assist our clients with their negotiations.

Q     You've also been involved in situations in which the retailer is in some -- is in financial distress.  Is that correct?

        MR. MILIN:  Objection.  Ambiguous.  Also leading.

        THE COURT:  Okay.  So --

        MR. SLATE:  All right, Your Honor.  I'm trying to move this along.  But if we're going to do that, we'll do that.

BY MR. SLATE:

Q     Have you been involved in negotiations on behalf of a retailer that's in financial distress?

A     Yes.

Q     Have you been in -- have you represented Fred's in its financial issues?

A     We did.  Fred's was a client of ours.  There were a chain of 600 pharmacies, mainly in the southeast.  And Fred's -- I mean, their business challenge was they had pharmacies in a lot of small towns.

        MR. MILIN:  Objection, Your Honor.  This is beyond the scope of the report.

        THE COURT:  It is true.  It is also beyond the scope of the direct.  So, I'm going to sustain the objection.

        MR. SLATE:  All right, Your Honor.

Page 91

BY MR. SLATE:

Q    Have you had experience, Mr. Kosty, in which you have observed the exercise of default rights by other wholesalers?

A    Yes.

Q    And what have you observed other wholesalers to do in in those situations?

MR. MILIN:  Objection.  This is also beyond the scope of the report.  None of this was mentioned in the report.

MR. SLATE:  Your Honor, he's been involved in the industry for 35 years.  He's seen soup to nuts of the relationship within wholesalers.  I'm asking about the situation in which we find ourselves, when these -- when Mr. Milin is criticizing him for not being informed about the strategic retailer, and I'm asking what he has seen on the street, with the exercise of his rights and remedies.

THE COURT:  Mr. Milin, I'm going to partially grant your objection, and partially not.  I do think that the report and the -- and his declaration do talk about situations where the financial condition of the retailer changes, or where there is a failure to perform under the contract.  That is actually covered, because part of what he says in his agreement is that this is ordinary and somebody who has problems starts -- you know, if you miss a shipment,

Page 92

this is what's going to happen.

So, I think you could ask about defaults.  I think that's fine.  I don't think that's out of -- outside of direct because of the nature of what's in his report and also in the declaration with respect to a situation where somebody doesn't, you know, perform under a credit agreement.  So that is a default.  If that's what you mean by default.

MR. SLATE:  Yes, Your Honor.

THE COURT:  So, maybe we could talk about that, if you want to be specific about if somebody fails to make payments in accordance with the terms, I definitely think that his report covers his opinion on what happens to payments if someone does that.

You're standing up, Mr. Milin.

MR. MILIN:  Your Honor, my objection is this.

THE COURT:  Okay.

MR. MILIN:  I am entitled to cross-examine an expert witness and to depose an expert witness about the facts he is going to state at trial --

THE COURT:  Mm hmm.

MR. MILIN:  -- and the basis for those -- for the opinions he's going to state at trial.  If he starts volunteering examples now that were not in his report that I could not depose him about, and that I cannot question him

about now with a documentary basis, they're prejudice, and that's the basis of my objection.

THE COURT:  Okay.  But you do understand, Mr. Milin, that the -- that your witness is going to talk about situations with financial distress and what is typical, and then we're going to have a rebuttal witness.  I mean, again, I keep saying this to you because it's just true.  We're probably going to get into some of these topics.  Maybe now is not correct because it is not covered by the direct testimony.  But I don't think that we're not going to get into these sections because your own witness testifies about that when we get into it.

And so, for rebuttal purposes, in terms of what happens when somebody's in distress or somebody who's a wholesaler, what would they do if somebody misses a payment, that is clearly in the scope of what your expert's testimony is and clearly subject to rebuttal testimony.  Okay?

So, I'm just telling you this now, that I'm going to sustain your objection here, but that doesn't mean that Mr. Slate isn't going to be asking these other questions in a completely different context later today.

MR. SLATE:  Can I clarify --

MR. MILIN:  Understood, Your Honor.

MR. SLATE:  -- the record, Your Honor?

THE COURT:  Yeah.

Page 94

MR. SLATE:  I'm sitting here looking at the deposition of Mr. Kosty, in which Fred's is referenced 15 times.  Question on Page 133.  "All you know is that Fred's was cut off.  Yes."  It's there.  He questioned about it. He asked about default issues.  So, I'm going to -- if I may continue to ask questions about exercising rights on default, in payment defaults?

Mr. Milin is just wrong when he said he didn't have an opportunity to cross-examine Mr. Kosty about Fred's.

MR. MILIN:  Your Honor, Fred's was first mentioned at deposition.  It was mentioned in a limited way and was brought to the witness' attention over lunch by counsel, if I remember correctly.  So, Your Honor, we do object.

MR. SLATE:  I don't know where on the record that statement comes from, Your Honor.

THE COURT:  I don't know either because I obviously haven't read the whole deposition transcript, Mr. Slate, when I'm sitting here today.  But what I'm going to suggest is that, you know, you can ask him, as far as I'm concerned, about his testimony as to why he's determined that this would be a reasonable and, I guess, typical standard action on the part of McKesson.  Because I think that is in the report.  I'm just looking at Mr. Milin and pointing that out in the declaration.

And I think the rest of these questions you may

Page 95

have to wait until we have to have round two today because they are covered in Mr. Iampietro's -- sorry, Pietro -- I'm sure I'm mispronouncing his name.

MR. SLATE:  He says Iampietro.

THE COURT:  Iampietro.  I'm very sorry.  I will get it right, I promise you.

MR. MILIN:  Thank you for that (indiscernible).

THE COURT:  So, anyway, and then this will have to come up in the context of possibly rebuttal testimony.

MR. SLATE:  All right, Your Honor.

THE COURT:  And it won't be a shock to Mr. Milin that that that would be rebuttal testimony because Mr. Milin has certainly heard something -- I don't know what, because I haven't read the deposition transcript, about Fred's. Okay.

BY MR. SLATE:

Q    Mr. Kosty, you said that McKesson's actions were reasonable.  What's the basis for that?

A    The basis, my experience in the industry and recognizing the different terms -- you know, the default terms or change in payment terms that I've read in wholesaler agreements.

Q    And you have experience observing the exercise of default remedies by wholesalers?

A    I do.

Page 96

Q     And can you describe what those -- what they do in the
exercise of them, an example of what they do.

A     One example would be one of our clients was cut off
from their primary wholesaler.  And obviously, they were
concerned about an ongoing, can we supply our patients that
need these medications.  So, they had had to wait for the
financial resolution of the corporate because, you know, the
pharmacy people don't manage the -- you know, they're not
financial folks paying the bills.  They're the ones
approving bills to be paid.  So, they were kind of stuck in
limbo waiting for a response from the C-Suite on what the
resolution was going to be.

          THE COURT:  Wait.  Mr. Milin?

          MR. MILIN:  As Your Honor no doubt knows, my
objection is that no examples are mentioned in his report or
in his declaration other than McKesson and A&P.  It is
inappropriate for him to testify then now, supplementing his
report through redirect.

          THE COURT:  Okay.  I don't view this as
supplementing his report, Mr. Milin, because I think the
question was what's -- why is he -- what's the reason that
he says it's reasonable?  And I mean, that's the issue.

          MR. MILIN:  That I don't object to Your Honor.
But do you -- did you have experience with a client who was
cut off is supplementing and beyond the scope.

Page 97

THE COURT:  Okay.  I am not sure it's supplementing it because, again, it says -- sorry, let me just find my -- where is my declaration here?  All right. So, I believe that in the declaration, Mr. Kosty says that -- looking for here -- that McKesson's actions and credit decisions to systems during calendar 2014 were reasonable, standard in the industry and in the ordinary course of business.  That's one thing.

Then it says, the steps taken by McKesson were entirely consistent with terms and conditions of the supply. In the pharmaceutical supply business, the wholesaler must monitor customers' things to avoid substantial write-offs. And then it talks about a diligent review of payments from financial pharmacy change to be experiencing financial issues reasonable and customary, and suspending shipments upon nonpayment is the only effective strategy.

So, I think he is talking about in his report what happens, not just in McKesson's situation, Mr. Milin.

MR. MILIN:  The problem, Your Honor, is this.  He does make grand generalizations, but he identifies no documents and no examples.  So, we have these grand generalizations with no foundation, which was the point I tried to make earlier.

THE COURT:  Mm hmm.  Yep.

MR. MILIN:  That foundation should not be

Page 98

supplemented now by mentioning examples that I could not

depose him about, that are not mentioned in the document

list in his expert report, that are not mentioned in his

expert report, and are not mentioned in his declaration.

Your Honor, we have not been provided with the

notice we are required to be provided with under Rule 26 of

the basis for Mr. Kosty's opinions.  And to come up with new

bases now is prejudicial, and we object.

THE COURT:  Okay.  And I am overruling your

objection, at least with respect to this question because I

don't think that it's outside of what is covered in Section

6(b) of his declaration.  And the reason that -- I think

that's right; Section 6(b) -- and the reason that I am

saying that is because he has already testified before that

this is based on his experience, his negotiation experience

with parties, and this specifically refers to suspending

shipments upon nonpayment is the only effective strategy

available to the wholesaler to avoid losses.  I mean, that's

what we're talking about here.

MR. MILIN:  You're right, Your Honor.  And there's

no basis for it.  There's no foundation for it.  It's being

supplied now for the first time.

THE COURT:  Okay.  And I disagree with you because

it's his experience that is the basis for it.  I asked him

how many financial -- how many pharmaceutical industry

contracts have you been involved in the negotiation with, how many clients have you represented in connection with negotiating and helping them negotiate terms, how many clients have you helped renegotiate terms.  So, it's based on that experience, respectfully.  So, I'm overruling your objection with respect to this question.

MR. MILIN:  Okay.

THE COURT:  Thank you.

MR. SLATE:  I'm ashamed to admit I forgot the question.

THE COURT:  I think you were asking him about whether -- these false remedies.

BY MR. SLATE:

Q   So your -- you've -- in your year 35 years in the pharmaceutical supply business, you have observed the exercise of default remedies by wholesalers?

A   I have.

Q   And those remedies include the remedies that McKesson was executing in 2015?

A   Yes.

Q   So, McKesson's actions in 2015, at least in your experience, are consistent with the way you understand the pharmaceutical business to work.  Is that correct?

A   Yes, they are consistent.

MR. SLATE:  No further questions, Your Honor.

Page 100

THE COURT:  Okay.  Mr. Milin, recross?

MR. MILIN:  Thank you, Your Honor.

THE COURT:  Mm hmm.

RECROSS-EXAMINATION OF TIMOTHY KOSTY

BY MR. MILIN:

Q    So, I kind of feel like going back to where we were at

the beginning.  You've negotiated a lot of contracts, right?

A    I have.

Q    But you don't reference any experience with struggling

companies in your report, do you?

A    I do not, so --

Q    Other than A&P?  And you don't reference any experience

dealing with struggling companies in your declaration, do

you, other than A&P?

A    Other than A&P, no.

Q    So, you know what people say in their contracts, but

you don't have experience in dealing with what happens when

they are alleged to have violated those contracts?

A    That's not true.  I've had a couple of clients that

didn't pay their bills.

Q    You've had a couple of clients --

A    That's right.

Q    -- that didn't pay their bills.

A    Yeah, most of our clients pay their bills, which is a

good thing.  So, in the example of Fred's, they weren't

Page 101

paying their bill, so they got cut off.  And the other

pharmacy chain was Kmart.

Q    Two examples?

A    That's correct.

Q    And those were both with...  And what exactly was your

engagement for Kmart?

A    We helped them negotiate their successor Cardinal

agreement after the default.

Q    Their successor?  Sorry?

A    So, they had to put a new agreement in place that

changed the terms and conditions because they defaulted.

And we helped them evaluate their options.

Q    Okay.  So, you helped them with a new contract, but you

didn't help them resolve their issues under the default or

the old contract, correct?

A    Well, the resolution of the old issues was a new

contract.

Q    So, after they defaulted, Kmart, right, you negotiated

a -- you helped them negotiate a new contract?

A    Yeah, they needed a supply agreement because they

decided after the Chapter 11, they were going to keep a few

pharmacies open, so they needed to supply those pharmacies.

So, we helped them negotiate the successor agreement to the

one they defaulted on.

Q    So, they defaulted, they filed for bankruptcy, and then

Page 102

you helped them negotiate a new agreement.  Is that right?

A    I don't recall a specific sequence of timing.

Q    Fred's.  Were you representing Fred's in negotiations after the default?

A    Not with their wholesaler.  One of our activities for Fred's was they hired our company to buy generic products off contract.  So, we managed the purchasing process for 100 generic products that they purchased from other suppliers other than a wholesaler at lower prices.  So, we managed that whole process, did the bids, worked with their wholesale -- or their warehousing people to get the product into their wholesale -- or into their warehouse for distribution to their pharmacies.

So, once they defaulted on the contract, then that business, as you would expect, went away because those manufacturers said, well, am I going to continue to supply them when they're in distress or not.  And so, the majority of them said, we're not going to continue to supply.  So that activity that we provided for Fred's went away.

Q    So, the activity you provided -- I didn't hear the end.

A    It went away for our company, Pharmacy Healthcare Solutions.  It was a service we provided to Fred's for about five years, where we managed their generic purchase -- off contract purchasing.

Q    I see.  But you didn't work with the wholesaler to

Page 103

resolve the default issues?  You just came up with a replacement or a solution afterwards, correct?

A     Not in Fred's situation.  In Kmart's situation, yes. But in Fred's situation, we were doing something ancillary to their wholesaler agreement, so that ancillary activity went away.  Then they were able to resolve some of their -- they got some financing to pay their bills, and then they were able to get additional shipments.

Q     Mm hmm.  Now, you talked about generic pricing being based on volume.  Is that something that you addressed with Mr. Slate?

A     I did.

Q     All right.  Let's look at Exhibit PX 27.  Okay.  It may be MCK 1.  Why don't we see if it's MCK 1.

A     Okay.

Q     The supply agreement?

A     (Indiscernible) --

Q     All right.  We'll work with MCK 1.

        THE COURT:  Okay.

BY MR. MILIN:

Q     Do you have MCK 1?

A     I don't believe so, no.

        THE COURT:  No.

BY MR. MILIN:

A     Is that the supply agreement?

Page 104

Q    Yes.

A    Okay.

Q    There we go.  So, first of all, Mr. Kosty, if I understood you, you said that there were no terms in the McKesson agreement that weren't typical.  Is that right?

A    Yes.

Q    What percent of branded merchandise did A&P have to purchase under that contract from McKesson?

A    95 percent.

Q    Is that typical in the industry?

A    It depends.  It depends on --

Q    Isn't it -- yeah.

A    It depends on the structure of the agreement.  So, like I answered a question earlier about is it 80 percent, is it 90 percent, is it 95 percent, that's all part of the negotiations.  But the structure of the agreement requires that there's a percent determined that will be purchased under this agreement, so both parties can value it.  So that term is standard in the industry.  The actual numbers are part of the negotiation.

Q    Understood.  How common is 95 percent?

A    I've seen it a number of times.  I've seen a lot of 85 -- 80, 85, 90.  I've never seen anything below 80 percent.

Q    Thank you.  Have you seen a 95 percent purchase requirement in more than 50 percent of the prime vendor

Page 105

agreements you have reviewed?

A    I don't know.  I'd be speculating.  I don't keep track

of that information on a spreadsheet to give me the answer.

Q    So, in addition to being a term of the negotiation,

does it affect a wholesaler's leverage for (indiscernible)?

A    No, I wouldn't call it leverage.  It affects the deal

they've agreed to.

Q    Is it harder for a retailer to replace the wholesaler

if they are locked into 95 percent?

A    No.

Q    It's not?

A    It's not.

Q    Is it harder for a struggling retailer to purchase

branded merchandise from someone else if they have a 95

percent requirement?

A    Well, as opposed to a 90 percent?  Yes.  But 95

percent, they still have a five percent opportunity if they

still want to exercise it.

Q    Is it harder to find a secondary supplier of branded

merchandise if you're required to buy 95 percent from your

wholesaler instead of, say, 80 percent?

A    Well, there's less opportunity.  But what you fail to

mention here is they agreed to that.  They agreed to the 95

percent requirement.

Q    They did.  But you also said that there were no

Page 106

atypical provisions in the McKesson supply agreement.  But I understood you to say that you didn't know whether a 95 percent requirement was in more than half of the requirements -- the agreements that you've looked at.  Is that correct?

MR. SLATE:  Your Honor --

THE COURT:  I'm sorry.  You're objecting?

MR. SLATE:  I just want to clarify, prior testimony was that there were no unusual terms, not that they were not typical terms.

MR. MILIN:  Thank you.  And understood.  So, let me see if I can rephrase.

BY MR. MILIN:

Q    What percent of the wholesaler agreements with strategic retailers that you have seen included a requirement of 95 percent or more as a requirement for purchase of branded merchandise?

A    Like I answered before, I don't track that metric to give you a percentage.  But I have seen it in contracts. It's just -- it's like I mentioned, it's been between 80 and 95 percent.

Q    Isn't 80 to 90 percent the usual range?

A    It depends.  It depends on the negotiation.  It depends on the generic purchasing.  It depends on the payment terms. It depends on the delivery schedule.  So, all these factors

Page 107

are comprised and the decision whether -- what's important to you.

So, part of the process is the wholesaler is going to say, well, what is more important to you, a deeper brand discount rate, or a better generic rate.  It really depends on that retailer's, in this example, mix of business.  If they're filling 95 percent generics and five percent brand drugs, then they're more worried about profitability for their generic products.  But if they're filling 20 percent generics and 80 percent brand drugs, then they're going to have a different perspective on the issue.

Q    Did you tell the Court that you've reviewed more than 100 supply agreements?

A    I did.

Q    How many of those included the 95 percent purchase requirement?

A    I don't know because I don't track that.

Q    Can you name any?

A    No, not off hand.

Q    Thank you.  Does the supply agreement, MCK 1, have a provision which provides for cutting off deliveries upon nonpayment?

A    No.

Q    Is that an uncommon, unusual term?

A    Is what an unusual term?

Page 108

Q     Failure to specify that you can cut off upon nonpayment.

A     No, it's not an unusual term.  It's a remedy for nonpayment that's included, and those remedies vary, including cutting them off.

Q     Do most supply agreements include a cut off provision?

A     They include a default provision or a breach of contract provision that would -- nonpayment being a material breach.  That's standard.  And I believe this agreement has that in it also.

Q     Is it common...  Please turn to -- please turn to Section 11 of the supply agreement, MCK 1.

A     Okay.

Q     Does Section 11 of MCK 1 specify that the amount of generic rebates depends on volume -- purchase volume?

MR. SLATE:  Excuse me.  We're well beyond his report.  We're talking about when he (indiscernible) that.

MR. MILIN:  He testified -- I'm sorry for interrupting.  So, he testified on your redirect that it is standard for generic pricing to be based on volume.  I'm pointing out that this rebate is not based on volume unless I'm corrected by the witness.

MR. SLATE:  He did not testify with respect to rebate volumes, Your Honor.  He testified with respect to pricing generally.

Page 109

THE COURT:  That's true.

MR. MILIN:  And rebates are part of pricing.

THE COURT:  Well, maybe you need to ask him what he meant by pricing if that's what you want.

BY MR. MILIN:

Q    So, when you were stating the price of generics was based on volume, were you referring to pricing, including rebates?

A    Yes.

Q    So, please show me in Paragraph 11 of the supplier agreement where the amount of generic rebates was contingent on volume.

MR. SLATE:  I'm sorry, Your Honor.  Now I'm not understanding the question.  Is --

THE COURT:  He's asking about generics.

MR. SLATE:  And whether they are contingent on volume.  And he's asking is the percentage go up with a greater volume?  Are there -- do you have to hit certain thresholds?

THE COURT:  I think he asked about pricing, whether -- where rebates were provided in -- with greater volume in Section 11.

MR. MILIN:  That's the question.

MR. SLATE:  I'm sorry, I --

THE COURT:  Okay.  So, he's asking with respect to

Page 110

generics, as opposed to, for example, branded.

MR. SLATE:  Yes.

THE COURT:  So -- or non-generics.  So, and in Paragraph 11 of the contract, he was asking the witness where the -- you know, with respect to the pricing, you know, where in this provision is there discussion about rebates being tied to -- which is he just said was included in pricing -- tied to volume.

MR. SLATE:  All right.  So, whether this paragraph is triggered by reaching certain volumes or...

THE COURT:  No.

MR. MILIN:  The question is, does the amount of rebate under Paragraph 11 change based on purchase volume?

MR. SLATE:  Does the dollar amount of the rebate go up if volume goes up?  Is that the question?

MR. MILIN:  No, it is not.  It is a percentage.

MR. SLATE:  All right.  Now I understand the question, Your Honor.  Thank you.

THE COURT:  Okay.

BY MR. MILIN:

A     So, I'd refer you to 11(a)(2) --

Q     Mm hmm.

A     -- primary OneStop Generics --

Q     Mm hmm.

A     -- whereby A&P elects in its discretion to purchase

Page 111

from McKesson at least 95 percent of its chain-wide requirements per item for one of the more products through the OneStop Generic program for all A&P's purchase requirements.  So, they're requiring 95 percent purchase through the OneStop program.

Q    Mm hmm.  Can you show me where that changes the percentage of rebate, which I believe is in 11(c)?

A    Well, if they don't meet that 95 percent threshold, then they're not going to get the rebate.

Q    Any other way?

A    No, that's how the contract's written.

Q    There are no other volume-linked -- the amount of the rebate, the percentage of the rebate, isn't linked to volume, is it, apart from -- we can look at that later.

A    Well, it's indirectly related to it because if you know what the purchase of generic volume is, if they want the rebate, 95 percent of that purchase amount has got to be OneStop Generics.  So, you could back into the volume requirement, based upon what A&P was purchasing.

Q    Mm hmm.  So, are you telling the Court that A&P was required to buy 95 percent of its generics from McKesson?

A    No.  What I'm telling the Court is if they wanted that rebate, they needed to buy 95 percent of their generics through the OneStop McKesson program.

Q    And that's what happened, because A&P only got rebates

Page 112

for generics if it purchased 95 percent from McKesson.  Is that right?

A     That was the threshold, yes.

Q     Mm hmm.  Now, it says that A&P agrees that any election to buy 95 percent of specific products, if I'm reading 11(a)(2) correctly, has to be made every 60 days, right?

MR. SLATE:  Objection.  Misstates the language, Your Honor.

MR. MILIN:  All right.

BY MR. MILIN:

Q     Does 11(a)(2) say, A&P agrees that each such election shall be for a minimum period of no less than 60 days?

A     That is what the last sentence says.  Yes.

Q     How many elections did A&P make?

A     I don't know.

Q     All right.  And your testimony is that it was required to elect 95 percent in order to earn a rebate on generics?

A     Yes.

Q     But it was a yes or no thing, right?  Either you made 95 percent, and you got it, you got the rebate, or you didn't?

A     That's what the --

Q     It was a yes, or no?

A     -- contract says.  Mm hmm.

Q     Now, again coming back to a point at the beginning, but

it's important, your report doesn't specify that you have reviewed any documents about (indiscernible) companies other than A&P.  Correct?

A    Correct, in the report.

Q    Is that correct?

A    That's correct.

Q    So, whatever you say about struggling companies is not based on review of documents?

A    Well, it's based on a review of documents in other projects.  But it's not referenced or talked about in the report.

Q    Okay.

MR. MILIN:  No further questions, Your Honor.

THE COURT:  All right.  Thank you.

MR. MILIN:  Thank you for your indulgence, Mr. Kosty.  And I hope we haven't interfered with your travel.

THE COURT:  I don't think we're finished with him for the day, Mr. Milin, just temporarily.

MR. MILIN:  Oh, that's true.

THE COURT:  All right.  Mr. Slate, nothing further?

MR. SLATE:  No, Your Honor.

THE COURT:  Okay.  All right.  So, Mr. Kosty, you can step down from the witness stand for now.

MR. SLATE:  For now.  Okay.

Page 114

THE COURT:  Okay.

MR. SLATE:  Your Honor --

THE COURT:  Question about would people like a break?  That was what I was going to ask.

MR. SLATE:  Your Honor, I just -- hold on --

THE COURT:  Yes.

MR. SLATE:  I just wanted to -- I always -- I've had this happen to me.  I'd like to admonish the witness that he --

THE COURT:  Yes.

MR. SLATE:  -- can't talk about his testimony.

THE COURT:  Yes.

MR. SLATE:  (Indiscernible) --

THE COURT:  You cannot talk about your testimony.  You cannot consult with anybody else about your testimony.  And you can -- I allow people who are experts to stay in the court, so you can go sit in the back.  I didn't preclude that --

THE WITNESS:  (Indiscernible) --

THE COURT:  -- listening to that.  But you're not to discuss the testimony with anybody else.

THE WITNESS:  I'm sorry, Your Honor.  I didn't mean to take away the Judge's function in that, but I've had situations where --

THE COURT:  No, I understand.  You're not wrong,

Page 115

especially when people go to lunch and things like that., you're not wrong.

So, my next question for you all is we obviously have our next witness. I don't know -- I know because I'm aware of Ms. DeVito having, you know, sugar issues and things, I didn't know if we needed to just take a break, how long a break we needed to take, what people wanted to do.

I'm one of those people that I'd probably just sit here all day, remain. So, I'm not a good person to judge from when you need to take a break, but I usually remember to ask other people because not everybody is like that. Usually once I get in the groove, it's just that's what it is with me. I could sit here for, you know, whatever, 10 hours. But that's not really good for everybody else. So, I understand that.

MR. MILIN: 45 minutes should suffice.

THE COURT: Okay. So, you'd like a 45-minute break?

MR. MILIN: Yes.

THE COURT: Okay.

MR. SLATE: Thank you, Your Honor.

THE COURT: So, is that acceptable --

MR. SLATE: That's acceptable.

THE COURT: -- to the other side too? Okay, fine.

MR. MILIN: Thank you very much, Your Honor.

Page 116

THE COURT: All right. So --

MR. SLATE: Thank you, Your Honor.

THE COURT: That's fine.

(Recess)

THE COURT: You may be seated. All right. So, we're back on the record. I believe the next witness that was going to be called was Mr. Iampietro.

MR. MILIN: You have copies, right? Yeah, you were going to number them.

THE COURT: Raise your right hand. Do you solemnly swear that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURT: Thank you. You can sit.

MR. MILIN: A preliminary question, Mr. Iampietro. Apparently, you raised your left hand instead of your right hand. Do you -- nonetheless (indiscernible)...

THE WITNESS: I'm just nervous.

MR. MILIN: Very good. So, Your Honor, would you like -- Your Honor like to question him with respect to his declaration and report, or shall I?

THE COURT: No, you can ask him your questions. Just the preliminary ones.

DIRECT EXAMINATION OF STEVEN IAMPIETRO
BY MR. MILIN:

Page 117

Q   All right.  Is Exhibit PX 202 your declaration?

A   It looks to be, yes.  Yes.

Q   And you need to speak into the microphone.

A   Yes.

THE COURT:  Oh, Mr. Milin, the problem is that your questions aren't going to get recorded if you stand over there.  So, you've got to stand by a microphone.  Sorry, I understand what you're saying now.  My apologies.

BY MR. MILIN:

Q   Mr. Iampietro, is Exhibit 202 your declaration and report?

A   Yes, it is.

Q   And that declaration is under oath, correct?

A   Yes.

Q   Do you believe both the declaration and the report to be true?

A   Yes.

MR. MILIN:  Your Honor, I move them into evidence.

THE COURT:  Okay.  All right.  Any objections?

MR. SLATE:  The only question, Your Honor, is did you sign the declaration?

THE WITNESS:  No.

MR. SLATE:  You did not?  I don't believe I have a signature on it.

MR. MILIN:  Your Honor, an electronic signature.

Page 118

THE WITNESS:  Yes, I did.

THE COURT:  There is actually on my copy a signed signature.  So, on Page 14, there is a signature.  I don't know if that's for the report as opposed to the declaration technically, but it is signed by Mr. Iampietro.

MR. MILIN:  Yes, the declaration has an electronic signature.

THE COURT:  Right.

MR. MILIN:  The report has a hand signature.

THE COURT:  Yes.

MR. MILIN:  Or -- I mean -- okay.  Is there an objection --

THE COURT:  Well, I'm just saying the report is a hand signature, yes.  Okay?  Does that satisfy you?

MR. SLATE:  Yes, Your Honor.

THE COURT:  Okay, just making sure.  Okay.

MR. MILIN:  So, submitted in evidence?

THE COURT:  Yes, submitted into evidence.

(Exhibit 202 entered into evidence)

THE COURT:  And Mr. Slate?

MR. SLATE:  Thank you, Your Honor.  All right, guys, it's note time.

CROSS EXAMINATION OF STEVEN IAMPIETRO

BY MR. SLATE:

Q    Mr. Iampietro, I confessed earlier that I'd learned how

Page 119

to pronounce your name just in the last day or two, so I'm going to mess it up -- a little tolerance, thank you.

A    I can't hear.  I apologize.

MR. MILIN:  I have the same problem.

THE COURT:  Okay.  So, I mean, what he asked was -- he just apologized for having learned his name a couple days ago, and if he messes it up, to please be forgiven. That's all you've missed.

MR. SLATE:  That changes everything.

BY MR. SLATE:

Q    Mr. Iampietro, you prepared a report.  Is that correct?

A    Yes.

Q    And you listed in that report all the documents that you reviewed to prepare the report.  Is that correct?

A    Yes.

Q    And what did you review to prepare for trial today?

A    The majority of the documents that I've listed plus my executive dissertation.  And I also read Mr. Kosty's.

MR. MILIN:  You have to speak into the microphone. I'm sorry.

MR. SLATE:  Move the microphone closer to you. The base of the microphone can be moved.

THE WITNESS:  Can you hear me now?

MR. MILIN:  Yes, sir.

THE COURT:  Yes.

Page 120

BY MR. SLATE:

A     So, I reviewed all of the documentations that are listed in my executive brief, and I also read Mr. Kosty's, and I reviewed the supply agreement.

Q     Did you review your deposition?

A     I did.

Q     And how long did it take you to do all that review?

A     I would say probably four, maybe five hours.

Q     And did you talk with anybody about your testimony today?

A     I did not.

Q     I'm going to go briefly through your work experience, which is attached to your report.  And I'm going to try to move quickly.  So, 1984 to 1990, you were a retail account manager with Maintaining Market Share.  Is that correct?

A     Yes.

Q     From 1990 to '96 you were with (indiscernible) Drug, area sales manager and then promoted to regional sales manager.  Is that correct?

A     That's correct.

Q     In '96 to 2000, you were at Newman Distributors, and until '97, you were the director of retail sales, and then you were promoted to senior executive director for retail sales.  Is that correct?

A     Yes, sir.

Page 121

Q    And then in 2000, you went to AmerisourceBergen.

A    Amerisource, sir.  It wasn't -- it was still Amerisource at the time.

Q    It was Amerisource?

A    Yes, sir.

Q    With your indulgence, I'm still calling it ABC.  Can -- does that work for you?

A    It does.

Q    You were a regional key accounts manager who would then manage all aspects of sales of retailers.  Is that correct?

A    Yes, sir.

Q    And then in 2002 to 2005, you were the director of business development responsible for managing an actual sales territory.  Is that correct?

A    That was after the acquisition or the merger, however you want to look at it, of Amerisource and Bergen, correct.

Q    So, that's when it became ABC?

A    Yes.

Q    And you managed during that time frame, 2002 to 2005, between eight and 15 accounts.  Is that correct?

A    Roughly, yes.

Q    And -- roughly, more or less, could be 25?

A    No, sir.  It was under 20.

Q    Under 20, okay.  And in 2005 to 2012, you were the vice president of six strategic accounts.  And during that seven-

Page 122

year period of time, you managed about 15 or less accounts. Is that correct?

A     Yes.

Q     And how many other accounts during that period of time had financial difficulty, through that seven-year period of time?

A     Can you define financial difficulties?

Q     Well, I'd refer you to your deposition, Page 28.  Are you getting that up?  We'll just put it on the screen.

THE COURT:  Okay.

MR. SLATE:  I don't know when it's on the screen.

MR. MILIN:  Wait, give us one...

MR. SLATE:  I'm assuming this screen?

THE COURT:  Yes.

CLERK:  (Indiscernible).

MR. SLATE:  Page 28.

MR. MILIN:  Are you -- will we be provided with a copy of this exhibit?

MR. SLATE:  Right now, I'm just trying to -- the answer is we can certainly provide you with a copy of the deposition transcript, if you prefer.

MR. MILIN:  Yes.

CLERK:  (Indiscernible).

THE COURT:  (Indiscernible).  Okay.  Sorry, we have to check with our court deputy I understand.

Page 123

MR. SLATE:  While that's happening...

THE COURT:  It worked.

MR. SLATE:  Is it up?

THE COURT:  It's working.

MR. SLATE:  There it is.

THE COURT:  Yeah, it is, it's launching.  There it is up on the screen, and behind you too, and over there.  Okay?

MR. MILIN:  Yeah, we need a copy of the deposition transcript.  Not just the pages.

THE COURT:  Okay.

MR. SLATE:  Do you have a hardcopy available?

CLERK:  (Indiscernible) copy?

MR. SLATE:  Yes, that'd be fine.

MR. MILIN:  We need the sealed copy.

CLERK:  (Indiscernible).

THE COURT:  If it's a problem and you want us to print it, you can email it to my --

MR. MILIN:  We have a copy, Your Honor.

THE COURT:  Okay, that's fine.  Because you can email it to my law clerk.

MR. MILIN:  (Indiscernible).

THE COURT:  Can you -- sorry, would you -- Ms. Bartholomew, sorry, would you mind sending it to my law clerk, Ilayna, and she'll take care of printing it?

Page 124

MR. SLATE:  We're going to print copies for you.

THE COURT:  Yeah, so you have it as well.

MR. MILIN:  And what page are you projecting?  I can't...

MR. SLATE:  28.

MR. MILIN:  28?  Okay, I still can't see it.  I'm old.  I cannot see it.  I really can't.

MR. SLATE:  Let me know when you're ready.

MR. MILIN:  Unfortunately, the display is rather --

MR. SLATE:  Blurry.

MR. MILIN:  Blurry, yes.  Okay, Page 28.

BY MR. SLATE:

Q    All right.  Turning to Lines 22-25, Mr. Iampietro, you asked what I mean by financial problems.  And the answer is whatever you meant when you answered that question.

A    Thank you.

Q    And so, you said you would say two or three.  Is that correct?

A    That's correct.

Q    And instead of identifying these problems by name, you went to East Coast Company A and B, do you remember that?

A    Yes, sir.

Q    And in East Coast Company B -- I'm sorry.  In East Coast Company A, Page 33 of the deposition.  One second.

Page 125

MR. MILIN:  So, while he's looking, I will state an objection based on completion, which is easily resolved, which is simply the reason why Mr. Iampietro referred to the companies as A and B was for confidentiality reasons.

MR. SLATE:  Yeah, yeah.  The same reason that Mr. Kosty didn't identify by name his clients (indiscernible)...

MR. MILIN:  So, you said.  I'm testifying from the transcript.

BY MR. SLATE:

Q    All right.  Are we on Page 33 now?

A    Yes.

Q    Lines 16 to the end of the page and then onto Page 34.  But question.  Going back to the East Coast company, how did -- let me ask the question.  How did AmerisourceBergen determine that a company was having financial issues?

A    Customer communication.

Q    And your answer was a direct line of communication.  But you spoke to each other, correct?

A    That's correct.

Q    And how many missed payments did they have?  And then the question is, Mr. Layton, your answer, and then -- none of them were missed but they were late.  And how frequently were they late?  And your response was it depends on seasonality.  Yes, all that true?

A    Yes, sir.

Page 126

Q    And then the question is on Page 34, these are late payments with or without communication.  That was your answer.  And then Mr. Garfinkle said yes.  So, he wanted to know both.  Is that correct?

A    That's correct.

Q    And then your response is without communication, presumably, never.

A    Correct.

Q    You never had a missed payment or late payment without communication in advance?

A    Not in those instances.

Q    Pardon?

A    Not in those instances.

Q    All right.  And then you had six or so when there was with communication.  Is that right?

        MR. MILIN:  Objection.  First of all, it's unclear.  Secondly, you've been mischaracterizing the testimony.  I don't mind summaries of testimony that move things along but you're not doing that.

        THE COURT:  Okay.  Well, it's -- I can't -- having not read the whole deposition transcript, Mr. Milin, it's hard for me to know whether he's summarizing or not.

        MR. MILIN:  Let me clarify, Your Honor, that Mr. Slate is summarizing the testimony on Page 34 of the deposition and it's not quite accurate.  And for the sake of

an accurate record, it would be better if we either read it or --

MR. SLATE:  I'll read it, Your Honor.

THE COURT:  Okay, you don't mind reading it?  All right, fine.

BY MR. SLATE:

Q    Question:  Concerning Line 1, in any given year, how often were they late?  Answer:  With or without communication?  That's your question.  Answer:  Question from Mr. Garfinkle:  Yes.  Answer:  Without, never. Question:  With?  Answer:  With communication, I would say less than six.  Did I accurately read the transcript?

A    You did.

Q    So, you were in the -- from 2012 to 2015, you were the national vice president strategic accounts.  Is that right?

A    Yes, sir.

Q    And strategic retailers, what does that term mean to you?

A    A strategic retailer by definition of NACDS, National Association of Chain Drug Stores, is four or more locations, centrally managed, and their dollar values can vary by wholesaler.  AmerisourceBergen, we plugged it at $100 million per annum.

Q    And you dealt only with strategic retailers.  Is that right?

Page 128

A    That's correct.

Q    So, and between 2002 and 2012, you had somewhere between eight and 15 retailers within your stable.  Is that right?

A    Yes.

Q    So, you would have no idea how AmerisourceBergen dealt with paying the delinquencies for any of the other accounts other than that small segment that you dealt with.  Is that correct?

MR. MILIN:  Objection.  Argumentative.

BY MR. SLATE:

A    There was an AmerisourceBergen --

THE COURT:  Sorry -- sustained.

THE WITNESS:  I'm sorry?

THE COURT:  No, stop for a second.  Sorry.  Mr. Milin, overruled.  I didn't find that argumentative.  Go ahead.  Sorry.

MR. MILIN:  Okay.  Can we do something about the mic?  Can you just move it towards you?

MR. SLATE:  Me or him?

MR. MILIN:  Both of you.

THE WITNESS:  Can you hear me now?

MR. MILIN:  Much better.

THE WITNESS:  Is there a way to turn this up?  Sensitivity?

Page 129

MR. MILIN:  I think what you just did helped.

MR. SLATE:  Okay.

MR. MILIN:  But you shouldn't have to --

MR. SLATE:  I'll get very close.  All right, are we back on?

BY MR. SLATE:

A     Yes.  I just want to make a clarification, counsel. From 2012 to 2015, national vice president of strategic accounts, there's a hyphen there.  It says new business development at AmerisourceBergen.  So, I was no longer maintaining strategic accounts; I was actually working with prospective customers that would become AmerisourceBergen accounts at that time.

Q     Okay, thank you.  And the question I asked, which I will admit was not in my style, was reading from the deposition transcript, so I wanted to be clear on getting your answer.  So, I'm reading from deposition, Page 153, starting at Line 2.

THE COURT:  Okay, it's not yet up on the screen.

BY MR. SLATE:

Q     Sir, the question is, beginning at Line 2, so you would have no idea how AmerisourceBergen dealt with payment delinquencies for any of the other accounts other than those small segment that you dealt with?  Question.  And the answer is that would have been our internal policies to have

Page 130

department heads or division leads deal with credit and finance within their own sandbox. Is that correct?

A    That's correct.

Q    And as you just clarified, you were not involved in account management; you were involved in -- you were not managing existing accounts?

MR. MILIN:  Objection.  Misstates prior testimony and that it failed to specify a date.

THE COURT:  Okay, that's sustained.  So, you just have to specify.  I think you meant 2012 to 2015.

MR. SLATE:  Yes, Your Honor.

BY MR. SLATE:

Q    From 2012 to 2015, you were not involved -- you were involved with businesses development, not account management.  Is that correct?

A    Yes.

Q    And during 2015, about how many customers did ABC have?

A    Within strategic accounts?

Q    All customers.

A    Thousands.

Q    Thousands?

A    Thousands.

Q    And it was at about this time, wasn't it, Mr. Iampietro, that Ms. Page -- in April of 2015, Robin Page reached out to you.  Is that correct?

Page 131

A     Yes.

Q     And she talked with you about ABC possibly doing
business with A&P.  Is that right?

A     That would be correct.

Q     And how did you respond to that inquiry?

A     Not in a very positive way.  We had a lot of detailed
work to do if we were going to be looking at any type of
opportunity there.  Obviously, they were in some -- having
some financial struggles and some headwinds.  You know, it
was on our radar screen, it was public knowledge they were
having financial struggles.

Q     It was on your radar screen...

A     They were having financial struggles.

Q     Having financial troubles?  I fact, I think you used in
your deposition, they were in financial choppy waters.  Does
that phrase sound familiar?

A     Headwinds.

Q     Headwinds?  Okay.  It's either above the bowline or
below.

A     It's not a good thing.

Q     No.  And then -- but you didn't respond to her question
at that time, did you?  You said we'd get back to you or
words to that effect?

A     More or less to that effect.

Q     And sometime later, I believe you came to -- you and

Page 132

your credit people came to a decision to not be interested in working with A&P.  Is that correct?

A    It was more than just credit people.  We operate at AmerisourceBergen with transparent lines at the executive level, so there would've been not only executive administration, sales, credit, logistics, operations would've been involved in those decisions.

Q    And even though between April and mid-July she didn't reach out to you, you did testify in your deposition that you knew what you were going to tell her, isn't that right?

A    We had made a decision at AmerisourceBergen, yes.

Q    And what was that decision?

A    The decision was to take a pass on A&P.

Q    To take a pass on it or to require prepayment?

A    It would've been a prepayment, a substantial prepayment, and actual cash on delivery terms.

Q    And that determination was because your assessment that A&P was in a "real catastrophic financial situation" at that point in time.  Is that right?

A    They had been.  They had transitioned out of a prior chapter back in '10 or '11 and very quickly got back into, you know, financial headwinds.

Q    And she did reach back to you in August of 2015.  Isn't that right?

A    She got a hold of my administrator.

Page 133

Q    And so you didn't speak with her in August?

A    We had made plans to meet at a conference, an NACDS

conference, I believe it was in San Diego.  That meeting

never took place.

Q    But the word got back to her that ABC was not

interested in financing?

A    It did.

Q    Are you familiar with the Enterprise System?

A    Yes, sir.

Q    And do you know who -- what does the Enterprise System

do?

A    The Enterprise System is a wholly owned computer system

of McKesson Corporation.  It is a pharmacy software system

which not only produces and assists pharmacists in getting

prescriptions ready, it also has an inventory component on

it and that inventory component is tied to actual fills of

prescriptions, and it has reorder points, quantity reorder

points that would automatically go into an accumulator.

That accumulator would then transmit an order to the

McKesson distribution center at a prescribed time of day,

automatic replenishment.

Q    Who sets the inventory controls?  Do you know?

A    The customer would set the inventory points.

Q    So, if A&P had access to the Enterprise System, A&P

would be setting the inventory controls on a per pharmacy

Page 134

basis, wouldn't it?

A     Per location.

Q     And they could change it any time, couldn't they?

A     In a chain environment, back in '12 when this was first installed, I believe, it would've had to have been done location by location.  I don't believe or I may be speculating here, that it couldn't be done chain wide.  You could direct purchases from other distributors outside of that but as far as being able to not have an awful lot of maintenance to change those reorder points per location, it would've been --

Q     And A&P could've said at this location on this street corner, I want less of this.

A     Yes, sir.

Q     And they could do that for any location.

A     I assume so.

Q     And you're familiar with the supply agreement in this case, aren't you?

A     Yes, sir.

Q     And there are some terms in that supply agreement you found -- or you said imposed pressure on A&P.  Do you remember that?

A     Yes.

Q     And two of those pressure points I believe you identified.  One was the 95 percent requirement for branded

Page 135

RX.  Do you remember that?

A    Yes, sir.

Q    And you said in your experience with wholesale contracts, you typically impose purchase requirements in the 80 to 90 percent rate.  Is that right?

A    That's correct.  In 2012, 95 percent was unheard of unless you had an auto-replenishment system.

Q    But the other term that you found imposed pressure wasn't really a term in the supply agreement, but it was the Enterprise System, right?

A    Yes, sir.

Q    And you describe the Enterprise System as truly shackled A&P to McKesson.  Is that right?

A    That's correct.

Q    And you use and said -- you said, they not only informed A&P's pharmacies exactly what they could purchase but they also automatically purchase products from McKesson daily to maintain the pharmacy's inventory.  Who is the they that informed A&P's pharmacies what they could purchase?

A    The Enterprise System.  That's called auto-replenishment, what you just described.

Q    And again, who could choose what could be purchased and what the volume you would expect?

A    The -- at the time, the AI or the algorithms within that system would be put into what's called an accumulator.

Page 136

So, you would set reorder quantities based on the amount of tablets that were being dispensed at the time.  And your reorder point would be when that bottle on the shelf in the pharmacy got to a certain level.  The system would automatically replenish that particular product for next-day delivery.

Q    The point I'm making is if a pharmacy sells -- I will confess I can't think of a drug -- Xanax.  I've heard (indiscernible), Your Honor.  And the pharmacy fills the prescription, and they are now less than 100 tabs of Xanax.  And that would -- because of the inventory level that A&P set, they would require a replenishment up to the 150 or whatever their level was.  Is that correct?

A    Xanax is a bad example.  It's a controlled substance.  But yeah, that's the gist of what you --

Q    Well, my alternative was Advil.

A    (Indiscernible).

Q    Okay.  Something easy to pronounce.

A    Amoxicillin.

Q    All right.  So, other than a controlled substance --

A    Yeah.

Q    But A&P could say no, I don't want 150 at this location; I only want 100?

A    I don't know how that parameter was set -- whether that was a corporate parameter or whether that was at the

Page 137

individual store location.  There would've been a big

difference.

Q    You were also critical of -- and the word you used was

bullying.  And I had an older brother, so I know what that

means.  When you said that McKesson was bullying A&P, it was

really relating to the threat to not ship for nonpayment.

Is that correct?

A    Yes.

Q    And you expressed concerns on Page 7 of your report

that cutting off a major customer is likely to be

counterproductive?  Do you see that?

A    Yes.

Q    And their consequences to a strategic retailer could be

highly dramatic, yes?

A    Yes, sir.

Q    Would the consequences be similarly dramatic for a

nonstrategic retailer?

A    I don't think so.  And I'll tell you why.  Because what

we neglect to realize here is the end patient, somebody who

is not feeling well or chronic or critically ill, needs to

get a prescription.  So, when you start threatening to shut

a customer off, you have an end patient that is going to go

without -- your mother, your grandmother, your sister, your

brother.  That's what we do in the wholesale business, we

supply pharmaceuticals to make people who are not feeling

Page 138

well feel better.

Q    Isn't it true -- isn't that also true with the mom-and-pop pharmacy, though?

A    Absolutely.  That's why I said there's not a lot of difference.

Q    So -- oh, I'm sorry, I thought you said that there was a substantial difference.  There's no difference between strategic and nonstrategic?

A    That's what I said.

Q    I'm sorry.  But again, your experience is only with strategic retailers, correct?

A    And counsel, that's by design.  That's AmerisourceBergen.  That's how we facilitated our go-to-market strategy.  I was managing $45 billion worth of business with 37 accounts, so it was one of the largest revenue producers for AmerisourceBergen at the time.  It was also independent pharmacies, which was separate, which was your mom and pops, it was long-term care.  There's acute care, there's alternate care.  So, all of these different operating capacities within our channel of our distribution pipeline were all separate.  They were amalgamated at the top.  We all -- we had conversations in meetings, but it was separate, and it was separate for good reason.

Q    I don't mean in the slightest bit to diminish your impact on this system.  And I recognize that you handle very

Page 139

large accounts with lots of zeroes associated with them.

A    That's true.

Q    But the question I'm asking is, you didn't know how ABC acted with respect to nonstrategic retailers?

A    With regards to what?

Q    To a payment quote.

A    There's a corporate policy that we would all abide by that was published by credit and finance.  Did the different segments have customization or the ability to be able to communicate with either prospective customers or existing customers during our re-sign methodologies that would allow us to more custom fabricate an agreement for that particular segment or that particular customer?  And the answer to that is yes, we had that ability to do that.

Q    But that's not within your personal experience, is it?  It's institutional?

A    Rephrase.  I'm not tracking your logic, sir.

Q    Well, what I'm really asking you is, did you personally have experience dealing with default situations or dealing with anything relating to nonstrategic retailers?

A    I would not have.

Q    Now, you were in the courtroom this morning when we talked about Fred's, weren't you?

A    I was.

Q    And you know Fred's filed bankruptcy in September of

Page 140

'19, correct?

A    Yes.

Q    And they had been a long-term customer of yours, correct?

A    Correct.

Q    And sometime in 2015, I believe, ABC stopped being the primary supplier of Fred's.  Is that right?

A    Yes, sir.

Q    Do you know why they stopped?

A    Yes.

Q    And why was that?

A    They were deducting horrific amounts of money from their payments.  We'd get paid but there were big deductions.  We had many conversations with Fred's and Fred's executive management to curtail the activity, and we were putting in some mitigation measures to help Fred's. Fred's elected, at that point in time, to go with a competitor of ours, and we stepped aside.

Q    And that competitor was Cardinal?

A    Yes, sir.

Q    And when Fred's filed bankruptcy, they owed Cardinal $23 million, didn't they?

A    That's correct.

Q    And do you know where that money came from, where that debt came from?

Page 141

A    I believe it was the assumption of the Amerisource --
some of the AmerisourceBergen debt that was owed to
Amerisource when they took over the prime vendor agreement.

Q    And you're familiar with KMRX.  Is that correct?

A    No, sir.

Q    I'm sorry.

MR. SLATE:  Why don't we hit Exhibit 232?
If I may approach, Your Honor.

THE COURT:  Yes, you may.

MR. SLATE:  Did I give you 232?  Excuse me, Mr.
Milin, did I give you 232?  Just want to make sure.

MR. MILIN:  Yes.

MR. SLATE:  Okay.

BY MR. SLATE:

Q    Do you have 232 in front of you, Mr. Iampietro?

A    Yes.

MR. SLATE:  Your Honor, I request judicial notice
of this document.  It's evidence that a pleading that was
filed in Delaware with the United States Bankruptcy Court.

THE COURT:  Okay.  Just give me a moment --

MR. MILIN:  Objection, Your Honor.

THE COURT:  Okay.

MR. MILIN:  The document may be authentic, but we
can't tell whether its contents are true.

THE COURT:  Okay, let me just take a look at this.

Page 142

And I don't know, without looking online if this is accurate, but I should be able to verify it by looking online, Mr. Milin.

MR. MILIN:  Your Honor, I'm not questioning whether it's an authentic document.  The question is whether the document --

THE COURT:  It's complete.  Are you asking whether it's complete?  I should be able to see that as well.

MR. MILIN:  I am asking -- I am objecting that it not be admitted for its truth simply because it has been filed on the docket.

THE COURT:  Okay.  Well, I don't know -- I guess I'll ask Mr. Slate.  What is the purpose that you're seeking to have this admitted into evidence, or to have me take judicial notice of it?

MR. SLATE:  ABC, Your Honor, is listed as the largest unsecured creditor of KMRX, just shy of $10 million.

THE COURT:  Okay.  All right.

MR. MILIN:  With that clarification, Your Honor, I don't see any way that we can assume that to be true merely from the fact that it's filed on the docket.

THE COURT:  Well, in fairness, Mr. Milin, you and I know there's other ways of figuring that out.  But, Mr. Slate, if you want to ask Mr. Iampietro if he's ever seen this, that's fine from my perspective.  And you know, and if

Page 143

he has, because he was involved in the case or something like that in his position, then Mr. Milin might have some actual basis for why this looks correct.  If not, Mr. Slate, there could also be proofs of claim filed.  Maybe Mr. Iampietro assigned them, I don't know.

MR. SLATE:  The short answer, Your Honor, is that in his deposition he did not acknowledge having been familiar with KMRX.

THE COURT:  Okay.  Well, then I'm not sure why this would refresh his recollection if he wasn't --

MR. MILIN:  It would not refresh his recollection.

THE COURT:  Correct.

MR. MILIN:  He does not have a recollection.

THE COURT:  Exactly, that's my point.  Okay?

MR. SLATE:  So, we shall move on.

THE COURT:  All right, we'll move on.

MR. SLATE:  234.

MR. GARFINKLE:  233 -- I gave you 234.

MR. SLATE:  234.  It's the Diplomat document.

MR. GARFINKLE:  Oh, I've got 4.  I gave the incorrect one.

THE COURT:  Oh, you gave us the wrong document?  Okay, I'll give it back.

MR. GARFINKLE:  My apologies.

THE COURT:  No, that's all right, I'll just give it

Page 144

back to you.  Here you go.

MR. GARFINKLE:  My apologies.

THE COURT:  No, that's fine.

MR. GARFINKLE:  No, I did it on purpose.

THE COURT:  Yeah, I was wondering how you got that job, Mr. Garfinkle.

MR. SLATE:  It's by default, Your Honor.

MR. GARFINKLE:  Sorry, my apologies.

THE COURT:  Thank you.

MR. MILIN:  Thank you.

MR. SLATE:  Now it's I that's trying to find it. May I have a moment, Your Honor?

THE COURT:  Yes, of course.

MR. MILIN:  So, again, I object to this document without a foundation being established, for its knowledge about --

THE COURT:  All right.  I understand.  I'm guessing that there would be a way to do that, but I don't know about this witness.

MR. SLATE:  Well, there's two bases for a foundation, Your Honor.  One is -- this is --

THE COURT:  No, I understand it was taken from your SEC reports.  I mean, it says that at the top.  I get that.

MR. SLATE:  Yes.

Page 145

THE COURT:  But how does Mr. Iampietro have any knowledge or understanding about the accuracy of it?  He didn't sign it.  That is the first thing I looked at.

MR. SLATE:  Well, he was familiar with the account, Your Honor.

THE COURT:  Okay.  Well, I guess you can ask him if he's ever seen it before.  That seems reasonable.

BY MR. SLATE:

Q    Mr. Iampietro, you are familiar with Diplomat.  Is that correct?

A    Yes, sir.

Q    It was one of your eight to 15 accounts during that time?

A    It was.

Q    Have you ever seen the prime vendor agreement?

A    I did not.

THE COURT:  Okay.

BY MR. SLATE:

Q    You were familiar with the account, but you've never seen this agreement?

A    No, sir.  I didn't sign it.  Being familiar and having responsibility for an account are two different things.  This is 2012.

Q    I'll be the first to admit I don't know what I had for lunch yesterday, but when you have -- well, I won't argue

Page 146

with you.  Did you mention Diplomat in your report?

A     I did not.

Q     Was Diplomat a strategic account?

A     It was.

Q     Did it have financial difficulties?

A     It struggled from time to time.

Q     But you weren't involved in efforts to work that out, so to speak, were you?

A     Not at the time.  And this is -- again, Diplomat, just so everybody's clear here in court, Diplomat is a specialty pharmacy purveyor.  It's very specific, a very specific part of the pharmacy trade.  It has huge, huge debt receivables involved with it, and it's a very difficult business for really any good businesspeople to maintain and to survive.

Q     You're familiar with Article UCC -- or Uniform Commercial Code.  Is that correct?

A     Yes.  I'm not an attorney but I do understand.

Q     You understand that as a vendor of goods, the seller has certain rights?

A     Yes.

Q     And do you know if ABC ever exercised those rights during the years 2010 to 2015?

A     With?

Q     Pardon me?

A     With a specific customer?

Page 147

Q    With any customer.

A    Can you be specific?

Q    Well, I don't know how to be more specific than are you familiar -- are you aware that ABC ever exercised its UCC rights with respect to any customer during that five-year period of time?

MR. MILIN:  Objection.

THE COURT:  When you say UCC rights, that's too vague.

MR. SLATE:  Under Article 2.

THE COURT:  Okay, Article 2.

BY MR. SLATE:

Q    You can suspend the liberties when there's been nonpayment of UCC.  Are you familiar with that?

A    If the customer signs the UCC, yes.

Q    So, your understanding is it requires the customer to sign a piece of paper in order to give these rights to the customer -- to the vendor, rather?

A    There's a number of agreements that are -- were existing at the time that would have standard boilerplate language contractually, and not have necessary documentation follow it.

THE COURT:  All right.  Excuse me for a second. If someone wants to approach, I can hand them the clean full copy of the document that we printed out.

Page 148

BY MR. SLATE:

Q    You started that comment, Mr. Iampietro, by bragging

that you're not a lawyer, and I appreciate that.  We're not

--

MR. MILIN:  Objection.

THE COURT:  Objection?  What's the basis?  He

hasn't even gotten to the question yet, Mr. Milin.

MR. MILIN:  The word bragging is argumentative and

inappropriate.

THE COURT:  Okay.  All right.

MR. SLATE:  It was meant to be light, Your Honor.

MR. MILIN:  It wasn't.

THE COURT:  Okay.  So, how about rephrase?  You

stated you were not a lawyer.

MR. SLATE:  Pardon?

THE COURT:  How about you stated you were not a

lawyer?

BY MR. SLATE:

Q    You stated you were not a lawyer.  Is that correct?

A    That's correct.

Q    Do you know the difference between having a security

interest in personal property or having the rights of a

vendor under the Uniform Commercial Code?

A    No.

MR. SLATE:  A few seconds?

Page 149

BY MR. SLATE:

Q    Have you seen MCK 227 before?

THE COURT:  My suggestion is that you look through it before you answer.

MR. SLATE:  Well, Mr. Milin gave a hint that it was an exhibit in his deposition.  So, this was in -- I'll represent this is an exhibit in your deposition.

BY MR. SLATE:

A    Counselor, if I'm looking at this, I don't know if I have a grasp of familiarity.  This is a 2003 document, and if I reviewed this several years ago, I would need to go back in and read this thing in its entirety.

Q    I'm sorry.  You remember having seen it but several years ago.  Is that what you're saying?

A    What I reviewed and if I was looking at this as a document to be reviewed, I'm not -- I would have to go back and reread through this this whole thing.

Q    So, you've reviewed it, you just don't remember what it says.  Is that correct, Mr. Iampietro?

A    I can assume that I reviewed this.

Q    Well, let me refresh your recollection.  On Pages 134 and 135 of the deposition...

MR. MILIN:  Is there a question pending?

MR. SLATE:  I'm waiting for him to get the page.

THE COURT:  I think he's also waiting for it to

Page 150

get pulled up.  Sorry.

MR. MILIN:  All right.

THE COURT:  I can't see what he's going to be asking about myself yet.  Okay.

MR. SLATE:  Are you ready, Mr. --

THE WITNESS:  Page 135?

THE COURT:  Yes.

BY MR. SLATE:

Q    Page 134, beginning at Lines 19, Document 15, it's this one -- is a receivables sale agreement dated July 10th, 2003 between AmerisourceBergen Drug Corporation and Amerisource Receivables Financial Corporation as buyer.  Have you see this agreement before?  Answer:  I have not read through it in its entirety.  I've seen the document.  Does that refresh your recollection, Mr. Iampietro?

A    It would, yes.

Q    Now, did you review this document in preparation for your report?

A    I can't recall.

Q    All right.  Page 135, begin Lines 12.  Did you review this document in preparation of your report?  I did not.  Does that refresh your recollection, Mr. Iampietro?

A    It does.

Q    I'd like you to turn to Page 50 of 69, and the page number is in the lower righthand corner.

Page 151

A     Sorry, which page?

Q     50 of 69.

A     I'm there.

Q     Section 10.0, Collection Procedures, do you see that?

A     Yes, sir.

Q     You didn't review this in preparation for your report.

Is that right?

A     That would be correct.

Q     Turn to the next page, Page 51 of 69.  This purports to

be the credit procedures and policies of AmerisourceBergen.

Is that correct?

A     From 2003, yes.

Q     Okay.  And turn to Page 51 of 69.  Do you see the item

10.4, First Delinquent Payment, do you see that?

A     Yes.

Q     And then within one day of the first missed payment,

the appropriate customer contact person is to be called to

arrange payment.  Is that correct?

A     That's what it says.

Q     Turn to the next page, 52 of 69.  10.5, do you see

that?

A     Yes, sir.

Q     Can you read that title and then what Section A says?

A     Second Delinquency Payments.  All accounts will be

placed on a COD or credit hold.  The choice between the two

is at the discretion of the RDC or designee.

Q    Who is the RDC?

A    Regional Director of Credit.  We were decentralized.
We were a regional company at this time, '03.

Q    Turn to Page 54 of 69, please.

A    I'm there.

Q    In 11.2, Price Adjustment, do you see that?

A    Yes, sir.

Q    Could you read that section to me?

A    Price Adjustment.  To the extent permitted by
applicable state and federal laws as well as the purchase
contract provisions, all accounts that have not paid within
the agreed upon terms will lose their reduction in cost of
goods if any.

Q    That says that the price would go up if there's a
payment default.  Is that right?

A    That's how I would interpret that.

Q    So, back in 2003, this was the express policy of ABC.
Is that correct with respect to retailers?

A    I would assume that it would be back in '03, yes.

Q    And again, you didn't -- well, let me back up.  In your
report on Page 10 you made a number of suggestions that you
believe should've been implemented with a distressed
retailer.  Do you recall that in your report?

A    Of course.

Page 153

Q     Pardon?

A     Of course, yes.

Q     And those suggestions include meeting with the customer and seeing if you can take goods back, and that kind of thing?

A     That's correct.

Q     Were any of those suggestions in this credit report, this policy?

A     No.  But if you read and you look at the discretion of RDC or designee, there's an interpretation there that obviously other conversations besides that written policy are going to take place.

Q     But it says COD or credit hold, choice being between the RDC.  Is that correct?

A     The choice being up to the Regional Director of Credit or designee, how they want to proceed.  That's the interpretation.

Q     The second sentence of that section on Page 52 says, the choice between the two, meaning COD or credit hold is at the discretion of the RDC or designee.  Is that correct?

A     That's correct.

Q     So, there's no discretion of the RDC to not impose COD or credit hold?

A     Back in '03?  I think as a regional company at the time, I do believe that there would've been escalation

Page 154

internally dependent upon who the account was and what the severity of the financial infractions were.

Q    So, in your interpretation of the word bullying, Mr. Iampietro, would compliance with Section 10.5 be bullying?

A    The way I'm going to answer this is I don't believe in some instances it would be bullying; in some instances, it would.

Q    Well, let me tell you how you answered this in your deposition, Mr. Iampietro.

A    Sure.

Q    Page 144 and 145.  Are we up?  144.  Starting on Line 15.  So -- Question:  So, would the enforcement of this provision in 2003 be bullying in your view?  Answer:  Which? Question:  The second delinquent payment of placing an account on COD or credit hold after its second delinquent payment, would that be bullying, using your word?  Answer: I think it would be absolutely.

Now, it goes on to say so, it would've been ABC's policy in 2003 that you consider bullying.  Answer:  On a second, I think it would be more minor bullying on a second delinquent payment because, obviously, you would hope to have the financial arrangement worked out with the first delinquent payment or short payment in the prior statement.

A    As I just previously stated.

Q    So, it's bullying but maybe minor bullying?

Page 155

A     I just said you could have, you know, a point of bullying, and dependent upon the circumstances it would be something else entirely different.  I think the, you know, the corporate policies and procedures are written; they're written for a reason.  I also think that we're dealing with customers and companies that are our customer and we also have the downstream application and understanding that there are patients at the other end.  So...

Q     You have a credit agreement in front of you.  Is that correct, Mr. Iampietro?

A     That's what it says.

Q     And it's signed by an applicant as Marsh Drugs, LLC, by Laura S. Gretencord, G-R-E-T-E-N-C-O-R-D.  Is that correct?

A     I see that, yes.

Q     And you're familiar with Marsh Drugs, aren't you?

A     Yes, I am.

Q     Is this one of your accounts?

A     It was.

Q     And are you -- you're generally familiar with the terms of this agreement?

A     Yes.

Q     Could you look at Paragraph Number 4 of this agreement?  Are you there, Mr. Iampietro?

A     Yes, I am.

          MR. GARFINKLE:  Dan, it's expanded on the screen

Page 156

now.

MR. SLATE:  Oh, okay.  Not for my eyes.

BY MR. SLATE:

Q    Reading from Paragraph 4, and I'm going to -- okay, the occurrence of any of the following will be an event of default under the credit agreement.  A, applicant fails to pay when due any amount owed to ABDC or its affiliates within 10 days of applicant's receipt of notice -- it says form, but I think it means from ABDC -- as to such failure to pay.  Provided, however, ABDC will immediately suspend shipment of product upon applicant's failure to pay when due any amounts owing to ABDC or its affiliates; and further provided that ABDC will not suspend shipment of product if applicant requests daily shipment of product on COD terms via wire transfer.  Do you see those words?

A    Yes, sir.

Q    And then on Paragraph 5 of that same page:  Upon the occurrence of an event of default ABDC may accelerate or declare all obligations immediately due and payable without notice on demand -- on demand of notice.  Is that correct?

A    That's what it says.

Q    231?  Are you familiar with that document, Mr. Iampietro?

A    Yes.

Q    It's a prime creditor prime vendor agreement dated

Page 157

October 1, 2014 between AmerisourceBergen and Marsh Drugs.

Is that correct?

A    Yes, it is.

Q    A couple of points in this that I want to point out to

you.  Paragraph 1A provides that customer will purchase or

may BDC for each facility, at least 95 percent of all

generic RX products and 95 percent of all brand RX products.

Is that correct?

A    That's what it says.

Q    Now, the supply agreement we were looking at earlier

for McKesson and A&P only required 95 percent of generics.

Is that correct?  Or branding, I'm sorry, branding.

A    There's a 95 percent threshold for them to receive a

rebate credit.

Q    That's for the generics.  But for the branded, the

requirement is 95 percent?

A    Yes.  That's correct.

Q    And in this agreement, it's 95 percent of both, isn't

it?

A    That's correct.  This is also dated 2014.  2012, as I

said earlier, it's very unheard of if it had 95 percent.

Q    Turn the page, Paragraph 10.  It's on Page Number 5.

Do you have it?

A    Yes, sir.

Q    Late Payment.  All payments must be received in ABDC's

Page 158

account during normal business hours on the date due.  Price

of goods reflects a prompt payment discount.  If payment is

not received by the due date, ABDC will (A) invoice a

customer -- I'm going to stick some language and go down to

the parent (B), may withhold any payments or deliveries to

customer.  Do you see that language?

A     I do but you skipped over --

Q     Oh, the invoicing and unearned discount, etc.?

A     Yeah, I think that's kind of important to the

conversation.

Q     But B is not important then?

A     It's all important.

Q     All right.  So, I want to bring you to B because B

allows ABDC to withhold any payments or deliveries to

customer upon nonpayment.  Isn't that correct?

A     That's what it says, counselor.

          MR. SLATE:  233, please.

          MR. GARFINKLE:  Which one?

          MR. SLATE:  233.

BY MR. SLATE:

Q     Have you seen 233 before, Mr. Iampietro?

A     Yes.

Q     It's a proof of claim form, isn't it, filed in the

Marsh bankruptcy case?

A     That's correct.

Page 159

Q    And it's for AmerisourceBergen?

A    That's correct.

Q    A couple things on this Proof of Claim.  One is I notice the address is for Morton Branzburg.  Do you know who Mr. Branzburg is?

A    I believe he was the attorney that handled the claim.

Q    Did you know him at the time that you were deposed?

A    I was not.

Q    And the firm Klehr Harrison, are you familiar with them?

A    I am not, only by this document.

Q    And this reflects a proof of claim in the amount of $3.8 million, ballpark.  Is that correct?

A    That's correct, sir.

Q    Now, when you prepared your report about the A&P case, did you talk with Mr. Branzburg?

A    I did not.

Q    Did you talk with anybody at Klehr Harrison about the privileges under ABC?

A    I did not.

        MR. SLATE:  I have no further questions, Your Honor.

        THE COURT:  All right.  Mr. Iampietro, my questions now before your redirect.  So, the first thing, maybe you can tell me a little bit about your -- a little

Page 160

bit more about your background.  So, could you tell me, over the course of your career, how many supply agreements were you involved in the negotiation of?  Like, just a range.

THE WITNESS:  New or renewals?

THE COURT:  Any.

THE WITNESS:  I would say if you put them all together, it would be a little under 100.

THE COURT:  Okay, that's fine, that's fine.  And how many supply agreements would you say that you've reviewed?

THE WITNESS:  A lot.  I would say --

THE COURT:  More than 100?

THE WITNESS:  I would say at least 100.  I don't want to over-exaggerate but --

THE COURT:  Mm hmm.  I understood.  Okay.  And then since you left, I guess we're calling it ABC or ABDC, whatever it is -- since you left your company and went out on your own, have you been involved in helping companies negotiate supply agreements?

THE WITNESS:  I have, yes.

THE COURT:  Okay.  And during your consulting period, how many supply agreements would you say you've reviewed, you know, with clients?

THE WITNESS:  Two.

THE COURT:  Two?  Okay.  All right.  Now, I'm

Page 161

going to take you back a little bit to the McKesson supply agreement, which is Exhibit 1 in the binder, the MCK 1 that I think you were asked about a little bit before.

In your report and also in your declaration -- or really in your report, there was a discussion about, you know, the contract and how some things -- you know, about the terms of the contract. So, my question is having reviewed the supply agreement, you know, what provisions of that contract do you think are not consistent with industry practice at that time?

THE WITNESS: I think we're consistent with industry practice. There are certain missing elements to this agreement. I also think that if you look in the rearview mirror, this was a retailer that had some significant financial issues back in '10 and going into chapter, I believe, in 2011, reemerging. And they re-signed with their existing wholesaler -- the prior wholesaler was McKesson, and then the new wholesaler for their new term of emergence was McKesson as well.

I think that there probably would've been some external dialogue -- I mean, internal dialogue around credit, a little bit more compliant. I think there should be some dispute and resolution language in this agreement that is noticeably absent, you know, which would give clear escalation to a better understanding should financial

Page 162

default or headwinds occur again.

THE COURT:  Okay.  All right.  Listening to the questions that were asked about the software system, it seemed like, if I understood your testimony correctly, what you were -- what you had agreed with was that McKesson isn't the party that sets the inventory level.  Obviously, it's not, you know, clear if it's the corporate part of A&P that was setting it or individual pharmacists, that you don't know that.  But what we do know is, right, that McKesson wasn't the person setting it at that table -- there's no evidence of that, right?

THE WITNESS:  I think the initial sets, Your Honor, are done in collaboration with one another.

THE COURT:  Mm hmm.

THE WITNESS:  That would be a collaboration between McKesson Enterprise and the customer to set those parameters.  Future adjustments I believe can be made at the vendor level, the customer level.

THE COURT:  Okay.  And could you explain to me how you have firsthand knowledge about how McKesson's software system works?  Because, you know, your -- the reason I'm asking the question is that you clearly didn't work for McKesson.  It's not on your resume.  And that you did -- at least any time around this time that we're talking about.  So, I was wondering how you knew about -- you know, how you

Page 163

had knowledge of their system.

THE WITNESS:  It's a great question.  McKesson sells their system to any retailer that would like to purchase it.  So, we had existing customers that were on the Enterprise System.

THE COURT:  Mm hmm.

THE WITNESS:  So, the values of what the system could or could not do and how the system may have a propensity to inflate inventories were relevant to us because we were on the receiving end of a lot of returns.

THE COURT:  Okay, understood.  Did you ever -- it doesn't seem from your resume like you ever worked for Cardinal.  Is that also correct?

THE WITNESS:  That is.  I have a number of associate friends that are still with --

THE COURT:  I understand.  It's like in our industry.  You know everybody.  I get that.

THE WITNESS:  It's a small fraternity.

THE COURT:  So, could you explain to me what the basis for the statements in your expert report on Pages 8 and 9 of your expert report as to what leverage Cardinal might or might not have had over retailers that it supplies or what actions Cardinal might take?  I understand why you could testify as to what your own organization would do because you were in it for so long, you had multiple

Page 164

positions, you've been in the industry.  But you never worked for Cardinal.  So, I was wondering where you got -- you know, what the basis of your testimony was for that.

THE WITNESS:  Wholesalers talk amongst themselves.  We have careful conversations.  Conversations sometimes are about each other.  Sometimes they're about what we're witnessing.  At the time, back in 2012 or you know, 2010 to 2015, McKesson was -- and rightly so -- a dominant player within the industry.  They were number one, and they were number one for a good reason.  They're a good wholesaler, they have tremendously talented people, and really, really good management from the CEO on down.

The also had invested in, you know, many platforms of IT, which gave them the ability to really separate from us, ABC, and from Cardinal, even though we were -- you know, tens of billions of dollars companies in our own right, you know, Cardinal was bigger than AmerisourceBergen back then.  So, we played in the number three spot.  And it just -- the technology advantages that McKesson had back at that time, Your Honor, were significant.  And it was very, very difficult.  There wasn't a lot of churn in the industry, at least in strategic accounts.  You know, customers that were ABC's, or Cardinal's, or McKesson's pretty much stayed where they were.

THE COURT:  Okay.  On Page 12 of your expert

Page 165

report, there's a statement that says -- (indiscernible) -- yes.  McKesson's drastic and unilateral change in A&P's payment terms was not standard or ordinary in the wholesale pharmaceutical industry.  Could you explain to me what the basis of your opinion is for that?

THE WITNESS:  Yes.  It was drastic, and it wasn't within the ordinary of business.  Again, strategic accounts are very large complex customers.  Shutting off a strategic account is a -- it would be a catastrophe within the industry itself, and the harm that it would cause the end user, the patient, would be immeasurable.  It just -- it didn't happen.  You know, if you want to saber rattle, go ahead.  But at the end of the day, veiled threats of shutting somebody off that's a strategic account, I never witnessed.

THE COURT:  All right, thank you.  Those are my questions.

THE WITNESS:  You're welcome.

MR. MILIN:  Thank you, Your Honor.  How are we on the exhibits?

MR. SLATE:  Your Honor, I do have a few follow-ups.  I'm sorry for interrupting.  I can follow Mr. --

THE COURT:  You're going to have to follow Mr. Milin.

MR. MILIN:  So, earlier, I believe, there was an

offer to print.  Should we have the documents printed or do you want to display them?

THE COURT:  Didn't I hand you a pile of documents, the deposition transcript?  I thought --

MR. MILIN:  What we have are the later credit policies of AmerisourceBergen.

THE COURT:  Oh.  Oh, sorry, I didn't --

MR. MILIN:  Yeah, we did not know --

MR. GARFINKLE:  We were going to electronically project a couple of the exhibits.

THE COURT:  Okay.

MR. GARFINKLE:  So, the question is should we also send them for printing to share with the Court?

THE COURT:  Sure.  I think actually let's talk about two different things.  So, electronically projecting through sharing the screen for Zoom, is that --

MR. GARFINKLE:  Yeah.  Yes.

THE COURT:  So, we need to change the person. Okay, so you need to tell Chantel.  And who is going to be your person, is that you?  Okay.  All right, so you need to do that, because otherwise that won't work for sure.

And then in terms of copies --

MR. GARFINKLE:  (Indiscernible).  It works now. It works.

THE COURT:  Oh, it works?  You're good?  Okay, it

Page 167

works, I guess.  Okay.  And then for copies, I guess a question for you all.  Do you have a copy of what we're talking about?  Do you need a copy?

MR. MILIN:  Yes, we do.

MR. SLATE:  Yes, we would need copies, Your Honor.

THE COURT:  Okay, they need copies.  Okay.  So, then you have to send them to Ilayna to print.  Ilayna, more printing things, sorry.  All right, so...

MR. GARFINKLE:  Let me stop sharing and sending...

THE COURT:  Okay, that's fine.

MR. MILIN:  The documents are short.

THE COURT:  That's fine.  Okay, how many copies would you like before Ilayna leaves?

MR. MILIN:  How many do we need?  Like, eight?  Is that what we've been doing?

MR. SLATE:  One, two, three, four, five...  We need six.  Unless you guys want --

THE COURT:  Okay, that's your answer.  Seven, Ilayna, and then they'll have to email it to you.  You have her email address?

MR. GARFINKLE:  Yeah.  Thank you.

MR. MILIN:  Thank you, Your Honor.

THE COURT:  No problem.  (Indiscernible).

MR. SLATE:  We're waiting for printing, is that what we're doing?

Page 168

THE COURT:  Pardon?  Yes, we're waiting for printing.  Sorry to interrupt.  Are you all right or would you like some water?

MR. MILIN:  I'd love a glass of water.

THE COURT:  Sure.

MR. SLATE:  Your Honor, we have a bottle of water.

THE COURT:  Okay, fine.

MR. SLATE:  May I approach, please?

THE COURT:  Yes, you may, that's fine.

MR. MILIN:  Thank you, Your Honor.  We do have some tags so (indiscernible).

MR. SLATE:  I apologize to everyone in the room for my handwriting but...

MR. MILIN:  Do you need a break?

MR. GARFINKLE:  No, I'm fine.  Thank you.

MR. MILIN:  Your Honor, may we pitch a five-minute recess?

THE COURT:  Yes, we may.

MR. SLATE:  Five minutes?

THE COURT:  Yes, sure, that's fine, okay.

(Recess)

THE COURT:  Okay.  So, we're back on the record. We have the document up on the screen.

MR. MILIN:  May I approach the witness?

THE COURT:  Yes, you may.

Page 169

MR. MILIN:  (Indiscernible) of exhibits (indiscernible).  Have they been distributed to the Court and everyone?

THE COURT:  Yes.

MR. MILIN:  203 is on the screen.

REDIRECT EXAMINATION OF STEVEN IAMPIETRO

BY MR. MILIN:

Q    Mr. Iampietro, have you had occasion to see Exhibit PX 203 before?

A    Yes.

Q    What is it?

A    It is a credit --

MR. SLATE:  Your Honor, can we see if this is -- did he rely upon it for the preparation of his report?

THE COURT:  Sorry?

MR. SLATE:  Has he reviewed it in order to prepare his report?  Did he reference it in his report?

THE COURT:  Okay.  So, I don't think that he -- it's referenced in his report.  But I'm not sure -- this says 2014.  He was working for the institution.  I think it's sufficient if they want to ask if he's ever seen it before because it might be their policies.  He discussed the credit policies previously in his testimony, and you know, they had their own credit policies.  And he discussed the fact that they had -- that they were -- there was a set one

Page 170

from corporate and then you had certain rights of deviation.

That was all part of his testimony.

So, if this is what it is, then I think that it's

reasonable to ask questions about the credit policy.  But

the question is -- because he certainly considered that, he

discussed the credit policy at Amerisource.  Sorry.

MR. MILIN:  If I may, just one other important

fact, which is that these are Bates numbered, and they're

Bates numbered because after Mr. Iampietro's report was

submitted, McKesson subpoenaed AmerisourceBergen, and this -

- these documents are part of the production that they

provided in response to McKesson's subpoena.

THE COURT:  Okay.  Well, you've seen that document

before.

MR. SLATE:  Your Honor, there's no question that

they were produced among the vying documents.  The question

though is --

THE COURT:  Whether he relied on it in connection

with his report.  But I think the way that he would've

relied on it, Mr. Slate, respectfully, is because it was

part of his role in what he did in his job and that's --

that his knowledge from that -- yes, if he had -- again,

that's why I said I think the question has to be asked.  It

says he's seen it before, but I think the question is, why

does he have familiarity with it.  And that does need to be

Page 171

asked about.  But if it is because of his job, again,

because he did mention these specific things, then I'm going

to allow it because I don't think it's really out of the --

outside of what he has told you already in his expert report

he was relying on, which is what Amerisource used to do and

their policies.  So, again, I -- that's where I am on this.

MR. SLATE:  Well, I'm not going to belabor Your

Honor, but I do notice that nothing is listed in his report

regarding the documents that he relied upon to prepare the

report.

THE COURT:  Okay.  What you're saying is, these

documents were not listed that he relied upon to prepare the

report?

MR. SLATE:  Yes.

THE COURT:  Okay.  I agree with you.  But I think

I was making a slightly different point, which is his

declaration does certainly -- and his, more importantly, I

guess, his report does talk about the fact that there were -

- that he obviously relied on his experience at Amerisource

and what Amerisource did -- sorry, ABC, whatever we want to

call them -- did.  And in his testimony what came up is that

it's because they had corporate collection and credit

procedure guidelines, and you asked him about those

procedure guidelines.

MR. SLATE:  Yes.

Page 172

THE COURT:  And so, the fact that on redirect, Mr. Milin wants to see if these are the ones that you asked him about and ask if he has any familiarity, that's not out of the realm of what's permissible here.

MR. SLATE:  Okay.  If the question is are these what I referred to, terrific.  But I --

THE COURT:  Well, I don't know either, but he hasn't gotten a chance to ask him about that.  So, let's let him ask the foundational questions here.

MR. SLATE:  All right, Your Honor.

THE COURT:  Because I don't -- again, respectfully, there were corporate policies that you asked about that the -- they had internally and that he clearly, when he was considering what was market and not market, he talked about the fact that it was what they used to do at their institution.  I specifically asked him, for example, about those questions that involved both his own institution and Cardinal, because I have my own questions about how he could talk about what Cardinal does -- and he gave me an answer but I'm just explaining go you.  That's why I asked the question.

But it wasn't unclear to me about why he would know that from his own employer, especially if, as he already testified, they all worked together with credit when they were looking for new companies.

Page 173

I mean, again, respectfully, we know these things existed and he testified, and you asked him about it.  So, let's find out if this is what you were asking him about.

MR. SLATE:  All right, Your Honor.  So, the question's going to be whether these documents were the documents that I was asking about --

THE COURT:  No.  The question's going to be -- when he was referring to credit and collection procedural guidelines that were in place in his institution, is this what he was referring to.  Because that's what you asked him.

MR. SLATE:  All right, Your Honor.  Thank you.

BY MR. MILIN:

Q    Mr. Iampietro, do you understand the Judge's question as to whether these were the policies that were in place when you were there?

A    They were.

Q    Thank you, Your Honor.  I mean, thank you, Mr. Iampietro.  All right.  So, these policies are different from what happened between A&P and McKesson, aren't they?

A    They are.

Q    Can you tell us some of the ways in which they are different?

A    It clearly articulates the policies and procedures of escalation and mitigation of some of the harder lines that

Page 174

may be in the corporate policies, that we had the ability to have discussions and do different things with our customers that may be facing some financial headwinds.

Q    And does this policy require involving the sales representative as well as the credit department in resolving issues?

A    It does.

Q    Was that an important part of the ABC approach?

A    It was, as explained in my deposition, that we were on various committees.  I was on a credit and collection committee.  Some of these suggestions in here are actually -- they've come to life post the 2003 written document provided by McKesson.  This was, I believe, in 2014 and then there's a 2016, more contemporized.

Q    So, the policies in effect in 2014 are those reflected here on Exhibit PX 203, correct?

A    That's correct, sir.

Q    And they are very different from the policies in effect in 2003 that McKesson asked you about, correct?

A    That's correct, sir.

Q    All right.  Now, you mentioned that you are on a committee discussing that policies.  Is that correct?

A    That would be correct.

Q    Can you tell us about that?

A    We had representation from legal, finance, executive,

Page 175

administration, operations, sales.  These were all individuals that were either VP or SVP, may even be divisional president, that would have these conversations as far as how we could move to better serve our customers, and certainly protect our organization.

Q    And did those committees have input into the credit procedures we just looked at from 2014.

A    To a point.  We could be vocal, and we'd get our points across.

Q    Were you vocal -- were you on the committee?

A    I was.  I think sales play an important and crucial role in the dynamic between a customer who's facing some financial hardships, and being a multi-billion-dollar corporation, what we can do to assist them in trying to help them mitigate their financial issues.

Q    And in that committee, people talked about financial issues and payment issues that ABC was facing, correct?

A    That's correct.

Q    Okay.  Now, McKesson took you through some agreements between ABC and Marsh that had collection procedures that allow cut off and so on.  Is that correct?

A    That's correct.

Q    Did ABC always insist on its rights under the contracts or was it procedure to try to work things out first?

          MR. SLATE:  Objection.  Ambiguous, Your Honor.

Page 176

THE COURT:  Yes.  So, in what context are you asking this question?  Are you asking this question with respect to Marsh?  Are you asking the question with respect to some other circumstance?  So, sustained your objection.

BY MR. MILIN:

Q   So, let me see if I can -- thank you -- provide some context.  Let's start with Marsh.  Did ABC simply insist on the word of the contracts or did it try to work things out with Marsh?

MR. SLATE:  Objection.  Ambiguous, Your Honor.

THE COURT:  Okay.  Are you maybe -- I think --

MR. MILIN:  All right.  Let me try more, Judge.

THE COURT:  Do you want to try one more time or should I try?

MR. MILIN:  No.  Glad to be old (indiscernible).

THE COURT:  No, that's all right.  I think what you were -- I think Mr. Slate, you can tell me if I'm wrong.  But I think the question is if he was asking when, you know, when Marsh, when there were problems under the agreement were actions taken strictly in accordance with the terms of the contract or were there other actions taken otherwise?  Isn't that what you're asking about whether the contract --

MR. MILIN:  That's what I was asking.  But also, did he take those actions.

THE COURT:  Okay, fine.

Page 177

BY MR. MILIN:

Q     Which you can answer.

A     Yes.  Marsh, I believe, early 2017, we learned about their financial headwinds sometime around January, maybe February.  These policy guidelines were in place at that point in time.  We had very collaborative conversations with Marsh.  We were meeting with Marsh every couple of days.

THE COURT:  When you say, we --

BY MR. MILIN:

Q     Who's the we?

THE COURT:  Yeah, that's where I was going.

BY MR. MILIN:

A     AmerisourceBergen.  That would be our credit, finance, legal and sales.

THE COURT:  (Indiscernible).  Did that include you?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. MILIN:

A     We instituted a number -- sales, finance, legal, operations, executive, we instituted a mitigation program for Marsh to help them restructure their debt with us to a point where we were taking back saleable merchandise to reduce our exposure without really limiting or harming Marsh's potential to serve their patients.  We were helping

Page 178

them move merchandise from stores that were -- they were going to go dark on to stores that were still going to be productive, all in an effort to again minimize -- it was not a vacuum.  AmerisourceBergen would do this.  We were trying to minimize our exposure, our financial exposure at the time.  We were trying to help Marsh, at least Marsh pharmacies, maybe not the supermarket, which we didn't have any intervention with, but help the pharmacies be able to sustain themselves until they could find a ready buyer.

Q    Sales, you were representing sales when you were (indiscernible)?

A    I was.

Q    It wasn't just credit?

A    No.  And legal was involved as well.

Q    Thank you, Mr. Iampietro.  I think let's please look at Exhibit PX 204.  And my question for you is, Does Exhibit PX 204 represent the ABC collection policy procedures in place in 2016?

A    Yes.

Q    Thank you.  And you were familiar with this by virtue with document -- with Exhibit PX 204 by virtue of your work at ABC?

A    Yes, sir.

        MR. MILIN:  Thank you.  No further questions.

        THE COURT:  Okay.  Mr. Slate.

Page 179

RECROSS-EXAMINATION OF STEVEN IAMPIETRO

BY MR. SLATE:

Q    You didn't review this -- and I'm looking at the May 2014 document as part of your report, right?

A    I was employed by the organization at the time.

Q    I understand, but when you prepared your report, you did not review this document to prepare your report?

A    Well, I understood this to be the credit policies and procedures of AmerisourceBergen.

Q    Did you use this to prepare your report, or you had it in your body of knowledge?

A    Yes, sir.

Q    And what I'm asking is, did you look at this document?

A    No, I knew what that document was, sir.

Q    Did you -- if I read this correct, and tell me where I'm wrong here, Mr. Iampietro.  In the event a customer is determined to be unable to make timely payment or if the customer has failed to make payments as promised, a recommendation to place the account on credit hold is reviewed and authorized by the direct manager of credit collection or designee.  Is that correct?  Is that the policy?

        MR. MILIN:  Your Honor, I object.  Can you please clarify which exhibit you're looking at and where you are reading from?

Page 180

MR. SLATE:  The language is identical and it's in the third paragraph of both documents.

MR. MILIN:  So, which one are we using?

MR. SLATE:  I'm looking at the 2014.

MR. MILIN:  Okay.

BY MR. SLATE:

Q    Is that the policy?

A    That was the policy.

Q    If I also read it right -- it's three paragraphs down -- the decision to continue selling to an account with an unpaid AR under these delinquency criteria must be approved by DPF Segment Sales, Senior Director of CAR, and Senior VP Business Segment.  Is that correct?

A    Yes, sir.

MR. MILIN:  Your Honor --

BY MR. SLATE:

Q    So, the suggestion is that you just -- when you are assigned credit hold, the customer is notified.  Is that correct?

A    That would have been the policy or the procedure. Sure.  They're not going to get goods the next day.

Q    I don't know if you still have it, Mr. Iampietro, Exhibit 233.  It's a proof of claim from Marsh.

A    I have it, sir.

Q    Take a look at the second page at the bottom.  It

Page 181

references to the claim of rights setoff.  Do you see that?

A    Yes, I do.

Q    AmerisourceBergen is holding approximately $922,688 as of July 14, 2017, in credits to which AmerisourceBergen claimed a right to setoff and recoupment.  Is that right?

          MR. MILIN:   Objection.  Beyond the scope.

          THE COURT:  Beyond the scope of what?

          MR. MILIN:   Beyond the scope of direct and redirect.

          THE COURT:  With respect, he was asked about this proof of claim.  He said he'd seen it before.  He said he was familiar with it because this is Marsh.  I don't see why questions can be asked about the proof of claim.  It's not outside of the document.  It's just asking whether -- so far, he's all he's asked is about the agreement.  If this gets beyond the agreement, I understand where you're going with this, Mr. Milin, but I'm overruling your objection right now.

          MR. MILIN:   Thank you, Your Honor.

BY MR. SLATE:

Q    Do you know where those, those kinds of offsets came from?

A    Returns and credits.

Q    So, ABC took back credits and then is asserting claim of offset production?

Page 182

MR. MILIN:  Objection.  Beyond the scope.

THE COURT:  Okay.  Again, Mr. Milin, he is familiar with the proof of claim.  He's familiar with the account.  You know, I think that he's allowed to -- I'm going to overrule your objection.

MR. SLATE:  Thank you, Your Honor.

BY MR. SLATE:

Q    Is that correct, Mr. Iampietro?

A    Those would have been some of the mitigation practices we put into place to take back saleable return merchandise that we had sold -- originally sold Marsh that was on their pharmacy shelves.  We were taking those products back and turning them into cash for Marsh.

Q    All right.

MR. SLATE:  The other thing, Your Honor, I failed to move into evidence McKesson's 227, 230, 231, 233.

THE COURT:  Is there any objection to those Mr. Milin?

MR. MILIN:  No.  And we similarly move into evidence Exhibits PX 203 and 204.  Did we?  I don't know.

THE COURT:  All right.  They're all admitted into evidence.

(Exhibits MCK 227, MCK 230, MCK 231, MCK 233 and PX 203 and PX 204 entered into evidence)

MR. SLATE:  Thank you.

THE COURT:  All right.  So, I assume no further questions, right, Mr. Milin?

MR. MILIN:  Right.

THE COURT:  All right.  So, Mr. Iampietro, you can step down.  Thank you for coming and appreciate your testimony for today.  That's helpful.

All right, Mr. Slate.  I guess the next question is, what are you planning to do next?

MR. SLATE:  We're going to recall Mr. Kosty, right?

THE COURT:  Okay.  All right.  Mr. Kosty, I'm just going to remind you, you're still under oath.

THE WITNESS:  Yes.

MR. SLATE:  Can we have a moment?

THE COURT:  Yes, absolutely.  Go right ahead.

MR. HARVEY:  Your Honor, Mr. Milin and I suggest that we move forward with this on the assumption that we reintroduce Paragraphs 8, 9, 10, 11, and 12 of the declaration, and then Mr. Milin has cross-examination.

THE COURT:  Okay.  That's unusual, but I'll -- if the parties want to do that, I'll allow it.  That's fine. The other alternative is I suppose you could ask me for permission to file a late rebuttal of the declaration and cut and paste it in my -- in your conference room.  But I hear what you're saying.

Page 184

MR. HARVEY:  I kind of think we're reviving the declaration.  There's enough -- if there's a better way that you would prefer, Your Honor, we certainly can do that.

THE COURT:  No, that's fine.  I will go ahead and understand and admit Paragraphs 8 through 12.  That still does not, does not admit the other three sentences or whatever it was I crossed out before.

MR. HARVEY:  Yes.

THE COURT:  I understand.  Okay.  That's fine.

MR. HARVEY:  Thank you.

THE COURT:  That's all right with you, Mr. Milin?  Just asking for the record here.

MR. MILIN:  Yes, we're only reinstating the testimony about Mr. Iampietro and 8 through 12.

THE COURT:  Yes.

MR. MILIN:  And to simplify matters, I'm going to accept that as Mr. Kosty's direct testimony on those issues.

THE COURT:  Okay.

MR. MILIN:  My concern that you would both have the report, and the rebuttal has been answered.

THE COURT:  Okay.

MR. MILIN:  I'm going to need a minute to --

THE COURT:  Would you like to --

MR. MILIN:  Yeah, sure.

THE COURT:  What do you need?

**Page 185**

MR. MILIN:  Five minutes.

THE COURT:  What do you want?

MR. MILIN:  10 minutes.

THE COURT:  10 minutes.  That's fine.  So, we'll take a 10-minute break.  That's fine.  Just so he can get his questions together.

MR. SLATE:  Thank you, Your Honor.

MR. MILIN:  Thank you.

MR. HARVEY:  Does the Court need the actual exhibits that the witness was using, a chain of custody issue?

THE COURT:  No, as long as I have one, we have a copy, that's sufficient.  I don't have to have the actual one.

MR. HARVEY:  Got it.  Thank you.

(Recess)

THE COURT:  All right.  You may be seated.

RE-RECROSS-EXAMINATION OF TIMOTHY KOSTY

BY MR. MILIN:

Q    Okay.  If we could go back to your declaration, Mr. Kosty, which is Exhibit 169, MK 169.

A    MCK.

Q    MCK.

THE COURT:  Do you still have a copy in front of you?

Page 186

THE WITNESS:  I do.

THE COURT:  Okay.  Just making sure, Mr. Kosty.

BY MR. MILIN:

Q    Thank you.  If you could look at Paragraph 9.

A    Okay.

Q    Could you read the second sentence for us?

A    It is my understanding that in the spring of 2015, A&P had already engaged bankruptcy advisors and was planning a whole chain liquidation and losing all of its pharmacies.

Q    But you don't know what A&P was planning to do?

A    I know they had hired bankruptcy, turnaround agents, FTI, it's a consulting company.

Q    And what's the basis for your statement that they were planning a whole chain liquidation including all of its pharmacies in the spring of 2015?

A    Other than what I just mentioned about the bankruptcy advisors, that was it.

Q    But you didn't -- did your declaration state that that sentence is on information and belief or are we back under Paragraph 2 of this?

A    We're back under Paragraph 2.

Q    Okay.  Thank you.  And you don't really have any personal knowledge of whether that -- whether that sentence you read is true?

A    I was not in the room with A&P management, no.

Page 187

Q    Let's look at 10(e) of your declaration.  You say that -- is it your testimony that A&P's system, automatic reordering system, was set entirely and controlled by A&P?

A    Yes.

Q    Now, we just heard, didn't we, that setting parameters can happen between the retailer and the wholesaler.  Do you know whether that happened for A&P?

A    For A&P, whether they and the wholesaler set them?

Q    Mm hmm, together?

A    Originally, no.

Q    You don't know whether that --

A    No.  But I do know that A&P has full control over that process.

Q    Mm hmm.  How often did A&P manually change its automatic orders in 2015?

A    I don't know.  I was not running A&P.

Q    Okay.  So, pull up on -- so, we definitely need that. So, let us turn then to -- so, let's turn to Paragraph 8 of your declaration.

A    Okay.

Q    Could you read the last sentence?

A    I am of the opinion that Mr. Iampietro's suggestions would do nothing to address or resolve the financial issues faced by A&P.

Q    Right.  But you never -- how many times did you work

Page 188

out issues between a struggling retailer and its wholesaler in your experience?  How many times?

A     A couple of times we did.  Yes.

Q     Right.  And that's Fred's and Kmart, that's what you said.

A     Right.

Q     But was it Fred's that what you did was come up with a new agreement after the bankruptcy?

A     No, that was Kmart.

Q     That was Kmart.  And in Fred's, did you do anything in direct negotiation with the wholesaler?

A     Not direct, no.

Q     Right.  And you -- and you didn't in Kmart either because the default had already happened and they were already in bankruptcy, correct?

A     I don't recall a specific sequence of events, but we did help them negotiate a contract that would provide product to the pharmacies.

Q     So, your experience is really in negotiating contracts rather than working out distressed situations (indiscernible)?

A     Well, the basis of my statement is A&P in Fiscal 2014 had lost $60-plus million, and in 2015 fiscal year, they lost over $300 million.  So, you have a $230-40 million loss and these suggestions by Mr. Iampietro, while they may

Page 189

reduce inventory, it's not going to solve the problem that

A&P had with those losses in their business.  That's the

point of that sentence.

Q    But you don't really know, right?

A    I do know --

Q    You don't know hypothetically whether a strategy helps

or not?

A    I do know that these strategies that are listed based

on work that we've done for our clients, my personal

experience managing pharmacies, are not going to create a

difference that would make any difference in the outcome for

A&P.

Q    When was your last experience managing a pharmacy?

A    Oh, personally, in -- I had 25 pharmacies for Rite Aid.

But over the years, we've helped a number of clients manage

their inventory using the different systems that are in this

report to free up capital so they can have less investment

in their pharmacy.

So, you know, for example, you know, if a pharmacy has

costs of goods of a million dollars a month and they have a

million dollars of inventory on their shelves, they're

turning in that inventory once a month or 12 times per year.

So, part of what we would help a client do is figure out how

do we get them from 12 turns a year to 18 turns a year.  So,

if you do that, you free up 33 percent of the dollars

Page 190

invested in inventory.

So, and the way you do that is you adjust your min and max values that are in the system.  And part of those calculations embedded is an assumed inventory turn per year.  So, you adjust your min max values to increase your inventory turns per year.  You implement them in the system and over about four months, you will reduce your inventory by that one-third.

Q     And Mr. Iampietro had done that too, correct?

A     That's my point.  There was nothing that McKesson did that A&P in their power should have done by themselves.

Q     And if McKesson had come (indiscernible) you and said, you know what, let's readjust their inventory to reduce both your problems and mine.  That might work, right?

A     No, because McKesson doesn't run A&P's pharmacy.  And your assumption here is they have a power over the management of A&P to dictate how they run the pharmacies.  It's been my experience the wholesaler doesn't have that power.

Q     With respect, what I am suggesting is that they do it consensually, meeting together and trying to work it out together.  Are you telling me that's impossible?

A     I didn't say that.  What I said is A&P could have done this all on their own.

Q     Sure.  And McKesson could have helped them, right?

Page 191

A    If they were asked.  I don't know if they were asked or not.  I mean, certainly if they would have come to McKesson and asked for assistance, then I imagine it would have been provided.  I don't know if those conversations ever had -- have taken place.

Q    Right.  So, what's the exhibit number of Mr. Iampietro's report?  It's not going to be there in MCK.

MAN 1:  (Indiscernible).

MR. MILIN:  (Indiscernible).  Sorry, Your Honor.

MAN 1:  Oh, 202.  202.

BY MR. MILIN:

Q    Could I direct your attention to Exhibit 202, Paragraph -- I'm sorry, I might need to -- I may have a different -- I see, all right.  Let's turn to Page 10 of the exhibit I just referenced, Mr. Iampietro's report.

MR. SLATE:  Could I get a copy, please?

MR. MILIN:  Sure.  Do we have one?  It should have been there.  ABC filed it.  I should have asked for permission.  I apologize.

THE COURT:  That's all right.

BY MR. MILIN:

Q    So let's look at Page 10 of Mr. Iampietro's report. Can you please read to us the first sentence on the top of Page 10?

MR. SLATE:  The first complete sentence?

Page 192

BY MR. MILIN:

A    The first step is simply to start negotiations between the wholesaler and retailer to try to identify strategies for addressing the problem in their mutual interest.

Q    Thank you.  Counsel, did you --

MR. SLATE:  I was just asking.  There's an incomplete sentence and then the first --

MR. MILIN:  Yeah.  He read the first full sentence.

THE COURT:  The first full sentence, just for the record.

BY MR. MILIN:

Q    So, do you address that in your report?

A    Not that specific point, no.

Q    Right.

MR. MILIN:  So, I may not have very much, Your Honor.  Give me one moment, please.

BY MR. MILIN:

Q    Does your report list any instances in which negotiations were started between a wholesaler and a retailer but failed?

A    No.

Q    Does your declaration list any instances in which such negotiations were started but failed?

A    It does not, no.

Page 193

Q    Okay.  Does your declaration list any instances in which any of the strategies you list in Paragraph 10 of your report, I'm sorry -- Paragraph 10 of one of -- in which any of the strategies Mr. Iampietro identifies were tried but failed?

A    Could you repeat the question?

Q    Yeah.  I'm going to need to find a paragraph to reference for you.  I apologize.

          MR. MILIN:  A moment.  Should I go back to something?  Okay.  Thank you.

BY MR. MILIN:

Q    So, Paragraph -- let's look at Paragraph 10 of your declaration.  Does it state reasons for your opinion that Mr. Iampietro's strategies would "do nothing"?

A    It does not.

Q    Right.

          MR. MILIN:  No further questions for the witness, Your Honor.

          THE COURT:  I don't have any questions for the witness.

          MR. SLATE:  No questions, Judge.

          THE COURT:  All right.  So, you may be excused, Mr. Kosty.  Thank you for coming.

          So, I guess we should talk about Monday a little bit.

Page 194

MR. MILIN:  The exhibits, if -- are we doing --

THE COURT:  Yes, exhibits.  So, have you had any chance to have a discussion about the exhibits?  I was guessing not, but --

MR. MILIN:  Not yet; not yet.

MR. SLATE:  First, I'd like to make clear that Mr. Kosty is excused, Your Honor.

THE COURT:  Yes, he is excused.  Sorry.  You make be excused from my court.

MR. MILIN:  And Steve?

THE COURT:  And yes, Mr. Iampietro, thank you.

MR. MILIN:  There is a McKesson employee named Lolita (indiscernible).  Nobody knows how to pronounce the last name.  I'm not sure she does because I deposed her. Everybody calls her by her first name.  And that's all anybody can (indiscernible), so...

THE COURT:  Okay.  So -- sorry, before everybody starts packing up.  So, I think my understanding was from Mr. Garfinkle that you all were having discussions about the exhibits and that we would take them up on Monday.  Not now, even though I offered to do it now, because you all might work something out, which is fine, at least about some of them.  I will just say, as I said before, I have honestly looked at every single one of them in there, and there are obviously some of the exhibits I can probably guess what the

Page 195

objection is, but there are a bunch I have no idea what your objections are.  So, I guess you'll have to tell me when the time comes.  I don't know what else to say about that.  I assume you want additional time.

MR. MILIN:  Your Honor, I want to sit down with counsel at some point.

THE COURT:  No.  I'm asking you.

MR. MILIN:  Yes, Your Honor.  We'll take this opportunity -- it's now 3:30, it shouldn't take us that long to go through them and figure out what's still at issue.  I think we're going to withdraw some concerns we had about exhibits and hopefully they will do likewise.  We've had -- already had one meeting to confer on it.  I want to take the burden off the Court.

THE COURT:  Okay.  I mean, that's fine.  Like I said, I -- some of them I would be interested in hearing what they are because I could not figure it out.  But that doesn't mean anything.  I mean, that's certainly not perfect.  So, if I don't -- didn't figure it out, it's because it just wasn't intuitively obvious when I looked at the spreadsheets what the problem was for example.  But that's ok.

All right.  So that's what we're going to do about that.  I have obviously received your request to strike Ms. DeVito's declarations.  I have received your response.  I

Page 196

will be prepared to rule on that on Monday morning, as I told you I would.  So that will happen.

I didn't know, because of the schedule, and I'm not trying to open up another exciting can of worms, but I noticed that the next possible -- possibly that the other witness for Monday, if we got through Ms. DeVito, which we might not, but we'll see, would be Ms. Towsley.  So, I didn't know where things stood with respect to, I guess, her declarations -- declaration.

MR. MILIN:  Based on --

THE COURT:  Are you going to have a million objections to it?  Mr. --

MR. MILIN:  Based -- I'm just trying to follow Your Honor's advice.  Okay?  Your Honor has advised that we should limit objections.  I don't think so.

THE COURT:  Okay.  Just trying to figure out --

MR. MILIN:  Mr. --

THE COURT:  -- do I need you to specify those to me if we're going to actually have testimony or am I going to go be sitting in my office like trying to look at all that what we break?  I'm just trying to have some idea what my Monday is like.  I mean I already have on my Saturday projects, obviously, the issue, the motions before me and the opposition.  And I also have on my Saturday project getting all my questions together for Monday for the

possible two witnesses.  And I was just trying to figure out what else has to be on my Saturday project.  I'm saying Saturday project because Sunday, I'm spending with my in-laws.  So, my Saturday, it is my Saturday and today project.  So that's why I'm just asking.

MR. SLATE:  You referred Sunday as, as your Doris Day as I recall, which I love that phrase.

THE COURT:  Yes.  I do have a Doris Day on Sunday.  So, especially because I couldn't actually see my in-laws two weeks ago, or for that matter, on my -- go to my mother-in-law's 95th birthday party because of my COVID.

MR. SLATE:  Oh, that --

THE COURT:  I still had not tested.  I was fine.  My symptoms were over by the time of her birthday party, but I still tested like the slightest bit positive.  The next day I tested negative, but it just wasn't to be that day.  And I obviously had canceled all my plans with them as soon as I heard that Friday night.  I was supposed to see them on Sunday, and I had canceled my plan, so I didn't expose myself further to them.

I try not to be the cause of problems, especially since I'm one of our two family members who has point with them.  So, I try not to be a problem.

So, anyway.  All right.  Is there anything else that you wanted to discuss before Monday while we're all

Page 198

here?

MR. MILIN:  A tiny issue, which is, we do have replacement or supplemental tabbed pages for the Court's binder.

THE COURT:  Okay.

MR. MILIN:  So, if you want them, we can give them, we can fill them in.  There are these folders.

THE COURT:  Okay.  I'm going to let my law clerk take them and she'll figure out what we're going to do.

MR. SLATE:  Monday at 9:00?

THE COURT:  Yes.  Monday at 9:00.  Anything else that people wanted to talk about?  I think if you're going to have documents to hand up, it would be better if you maybe had enough copies the next time that we're here because we don't mind making them.  But we -- it would be great if you're going to bring them but bring enough copies.  So, hopefully -- no, that's true for both of you.  It's not just one of you.  So, I'm just saying, you know, we're obviously happy to deal with it if that isn't the case, but just saying that would be helpful since we now kind of have a sense of what is required.  So that's good.

I don't know.  Is there anything else you all wanted to talk to me about before --

MR. SLATE:  No, Your Honor.

MR. MILIN:  Thank you, Your Honor.  Okay.  All

**Page 199**

right.  Well, I wish you all a good weekend and, I guess court is officially adjourned.

(Whereupon these proceedings were concluded at 3:32 PM)

**Page 200**

**I N D E X**

| RULINGS | Page | Line |
|---|---|---|
| The Court denies the motion in limine and the cross-motion set forth in the objection | 11 | 14 |

Page 201

**C E R T I F I C A T I O N**

I, Sonya Ledanski Hyde, certified that the foregoing

transcript is a true and accurate record of the proceedings.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  July 24, 2024