**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

In re:

    THE GREAT ATLANTIC & PACIFIC
    TEA COMPANY, INC., *et al.*

                Debtors.

----------------------------------------------------------------x

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS on behalf of the bankruptcy estate of
THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., *et al*.,

                Plaintiff,

        - against -

McKESSON CORPORATION,

                Defendant.

----------------------------------------------------------------x

**FOR PUBLICATION**
Chapter 11
Case No. 15-23007 (LGB)

Adv. Proc. No. 17-08264 (LGB)

**<u>MEMORANDUM OPINION REGARDING
PREFERENCE ALLEGATIONS, RELATED DEFENSES,
AND ALLEGED AUTOMATIC STAY VIOLATIONS</u>**

**<u>APPEARANCES</u>**

BUCHALTER
*Attorneys for McKesson Corporation*
18400 Von Karman Avenue
Irvine, CA 92612
By:    Jeffrey Garfinkle

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
*Attorneys for McKesson Corporation*
200 West 21st Street, 17th Floor
New York, NY 10036
By:    Tracy Klestadt

MILIN LAW PLLC
*Attorneys for the Official Committee of Unsecured Creditors and Special Counsel for the Debtor*
18 East 12th Street, 2nd Floor
New York, NY 10003
By:    Michael Hamersky
       Richard Milin

**TABLE OF CONTENTS**

I.    PROCEDURAL HISTORY.................................................................................................2

    A.    The 2019 Summary Judgment Motion....................................................................2

    B.    The Amended Complaint and McKesson's Motion to Dismiss...............................4

    C.    The 2022 Summary Judgment Motion....................................................................4

    D.    The Parties Proceed to Trial on Remaining Issues.................................................5

II.    RELEVANT FACTUAL BACKGROUND......................................................................6

    A.    Contractual Relationship Between the Debtor and McKesson ...............................6

        1.    The Supply Agreement.................................................................................6

        2.    The Extension Agreement ............................................................................8

    B.    The Debtor and McKesson's Course of Performance as Relevant to the Plaintiff's Preference Allegations................................................................................................................ 10

III.    STATEMENT OF ISSUES ......................................................................................... 12

IV.    DISCUSSION ........................................................................................................... 13

    A.    Did the Transfers Enable McKesson to Receive More Than It Would Have Recovered in a Chapter 7 Liquidation, As Required Under § 547(b)(5)? ......................................................... 13

        1.    Analysis of Hypothetical Chapter 7 Recovery for Unsecured Claims ...................................... 15

        2.    Analysis of Hypothetical Chapter 7 Recovery for § 503(b)(9) Claims ................................... 16

    B.    Were the Next-Day Payments Intended to be Contemporaneous Exchanges for New Value, as Required Under § 547(c)(1)(a)?......................................................................................... 21

        1.    Receipt of New Value................................................................................. 22

        2.    Intended Contemporaneous Exchange ........................................................ 23

        3.    Actual Contemporaneous Exchange........................................................... 28

    C.    Were any of the Transfers Made in the Ordinary Course of Business? ......................................... 29

        1.    The Subjective Test .................................................................................... 30

        2.    The Objective Test ..................................................................................... 40

    D.    To What Extent is McKesson's Preference Liability Reduced on Account of its Provision of Subsequent New Value? ........................................................................................................ 44

        1.    What is the Proper Method of Valuing the Invoiced Merchandise Delivered to A&P for Purposes of McKesson's SNV Defense? ............................................................................... 45

        2.    Was the Merchandise Underlying the "355 Invoices" Actually Delivered? ........................... 48

        3.    Subsequent New Value Defense Calculations............................................. 50

    E.    Does § 349(b) Insulate McKesson from Preference Liability? ........................................................ 53

    F.    Alleged Automatic Stay Violations ......................................................................... 58

1.      The $413k Medturns Credits & $166k Additional Medturns Credits for Products Returned Prepetition ........................................................................................................................ 58

2.      The $562k Unearned Rebate Reversal ...................................................................... 66

3.      The $7k Unearned Credits Reversal .......................................................................... 77

V.      CONCLUSION ................................................................................................................ 78

**HON. LISA G. BECKERMAN**
**UNITED STATES BANKRUPTCY JUDGE**

After a long and winding procedural journey, this adversary proceeding (the "Primary Proceeding") between the Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of The Great Atlantic & Pacific Tea Company (the "Committee" or "Plaintiff") and McKesson Corporation d/b/a McKesson Drug Co. (the "Defendant" or "McKesson", and together with the Committee, the "Parties") comes to an end.[1]  The Court held a trial from July 12 through July 18, 2024 (the "Trial") and heard fact and expert witness testimony.  The Court heard the Parties' final legal arguments at a hearing held on October 9, 2024.  Now, the Court's decision on the surviving issues shall be set forth in a series of four interrelated opinions.[2]  This first opinion (the "Preference Opinion") shall resolve: (i) whether the various payments made from the Debtor to McKesson during the 90-day period prior to the Petition Date (the "Preference Period") were preferential transfers, and whether McKesson has valid defenses to those allegations; (ii) the proper method of valuing the goods delivered from McKesson to the Debtor for purposes of McKesson's subsequent new value defense; (iii) whether the purported deliveries recorded on the

---

[1] On July 19, 2015 (the "Petition Date"), The Great Atlantic & Pacific Tea Company, Inc. ("A&P") and several of its affiliated entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *In re The Great Atlantic & Pacific Tea Company, Inc.*, No. 15-23007 (Bankr. S.D.N.Y. 2015) [ECF No. 1] (the "Main Case").  The Debtors' Chapter 11 cases were jointly administered under Case No. 15-23007 (RDD). (Am. Compl. ¶ 13).  The only remaining Debtor is The Great Atlantic & Pacific Tea Company, Inc. (Am. Compl. ¶¶ 6 and 13).  On July 24, 2015, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors pursuant to section 1102 of the Bankruptcy Code. (Am. Compl. ¶ 4).  The Committee consists of (i) 1199SEIU Health Care Employees Pension Fund, (ii) Basser-Kaufman, Inc., (iii) C&S Wholesale Grocers, Inc., (iv) CBA Industries, Inc., (v) McKesson Corporation, (vi) Pension Benefit Guaranty Corporation and (vii) United Food and Commercial Workers International Union. (Am. Compl. ¶ 4).  On June 6, 2016, the Court authorized the Committee to prosecute avoidance actions on behalf of the Debtors' estates. (Am. Compl. ¶ 5).

[2] In addition to this Preference Opinion, the Court shall issue the: (i) "Claims Opinion" on the dockets of the Primary Proceeding and the Main Case, (ii) "Specialty Opinion" on the docket of Adv. Proc. No. 17-08266 (LGB) (the "Specialty Proceeding"), and (iii) "Systems Opinion" on the docket of Adv. Proc. No. 17-08265 (LGB) (the "Systems Proceeding").

"355 Invoices" in fact existed;[3] and (iv) whether various prepetition and postpetition amounts allegedly withheld from McKesson by the Debtor constituted violations of the automatic stay under §§ 362(a)(3), (6) and/or (7) of the Bankruptcy Code, and to what extent the Debtor is entitled to recover any damages as a result of any such violation.

## I.  PROCEDURAL HISTORY

On July 13, 2017, the Plaintiff initiated this Primary Proceeding by filing its Complaint against McKesson.  *See* Compl. [ECF No. 1].[4]  The Complaint sought the avoidance and recovery of 30 payments made by the Debtor to McKesson, totaling $67,752,943.44, during the Preference Period.  *See id.* at ¶ 14.  The first claim for relief is brought pursuant to section 547 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), and the second is brought pursuant to section 550(a) of the Bankruptcy Code.  *See id.* at ¶¶ 14–22, 24–26.

On August 10, 2017, McKesson filed its Answer to the Complaint.  McKesson's Answer to Compl. [ECF No. 4] (the "Answer").  McKesson asserted various defenses set forth in section 547(c) of the Bankruptcy Code, including the ordinary course of business, contemporaneous exchange, and subsequent new value defenses, as well as a setoff defense on account of McKesson's administrative claim pursuant to section 503(b)(9) of the Bankruptcy Code.  *See* Answer at ¶¶ 16, 18, 21, 24.

### A.  The 2019 Summary Judgment Motion

Following the filing of the Answer, the Committee and McKesson conducted an initial round of discovery and participated in a mediation that was ultimately unsuccessful.  *See* Mem. of

---

[3] Defined in corresponding discussion *infra.*

[4] Unless otherwise specified, all citations are to the Primary Proceeding: *The Official Committee of Unsecured Creditors on Behalf of the Bankruptcy Estate of The Great Atlantic & Pacific Tea Company Inc., et al. v. McKesson Corporation*, No. 17-08264 (Bankr. S.D.N.Y. 2017).

2

Mediator Allan L. Gropper [ECF No. 23].  On May 1, 2019, as permitted by this Court at a hearing held on November 16, 2018, McKesson filed a Motion for Summary Judgment (the "2019 MSJ") seeking a determination that the alleged preferential transfers were shielded via the defenses McKesson asserted in its Answer, specifically: (1) section 547(c) contemporaneous exchange, ordinary course of business, and subsequent new value defenses, and (2) a right to set off its non-contingent section 503(b)(9) administrative claim against any judgment for avoidance and recovery of preferential transfers.  *See* McKesson Corp.'s Mot. for Summ. Judg. and Mem. of Facts and Law in Support Thereof [ECF No. 24], at 4, 28–29.  The Plaintiff subsequently filed an opposition to the 2019 MSJ.  Comm.'s Mem. of Law Opposing Def.'s Mot. for Summ. Judg. Under Fed. R. Bankr. P. 7056 [ECF No. 34].  McKesson also filed a responsive reply thereto.  Reply of Def. McKesson Corp. to Response of Pl. Off. Comm. of Unsecured Creditors [ECF No. 40].

At a hearing held on September 16, 2019 (the "September 2019 Hearing") Judge Drain granted in part and denied in part the 2019 MSJ, adopting the reasoning set forth in *Official Comm. of Unsecured Creditors of Quantum Foods, LLC v. Tyson Foods, Inc. (In re Quantum Foods, LLC)*, 554 B.R. 729, 733 (Bankr. D. Del. 2016).  Judge Drain ruled that McKesson had the right to set off its section 503(b)(9) administrative claim against any judgment for avoidance and recovery of preferential transfers.  *See* Sept. 16, 2019 Hr'g Tr. [ECF No. 43] (the "2019 MSJ Bench Ruling"), at 54, 57–58.  Judge Drain also ruled that the four payments made by the Debtor under the Modified Credit Terms[5], which were made within one day of delivery, were substantially contemporaneous, but he reserved until trial the issues of intent and coercion with respect to section 547(c)(1) of the Bankruptcy Code.  *See id.* at 57–59.

---

[5] Defined *infra*.

**B.   The Amended Complaint and McKesson's Motion to Dismiss**

Following the September 2019 Hearing, the parties conducted another round of discovery, during which the Committee filed an Amended Complaint, adding two new additional causes of action: a third claim alleging willful violations of the automatic stay, and a fourth claim alleging the right to assert defensive claims for violations of the automatic stay and 11 U.S.C. § 542 as a defense to, or setoff or recoupment against, claims asserted by McKesson, including claims under section 503(b)(9) of the Bankruptcy Code.  *See* Am. Compl. [ECF No. 93] ¶¶ 131–69, 170–200. The Amended Complaint also adjusted the total amount sought to be avoided from $67,752,943.44 to not less than $67,119,573.00 during the Preference Period.  *See id.* at ¶ 118.

On October 25, 2021, McKesson filed a Motion to Dismiss the Amended Complaint (the "Motion to Dismiss"), addressing in particular the two new additional causes of action.  McKesson Corp.'s Mot. to Dismiss Pl's Am. Compl. and Mem. of Facts and Law in Support Thereof [ECF No. 99].  On December 27, 2021, the Motion to Dismiss was denied by the Court, except to clarify that the Plaintiff's claim asserting various defensive claims for alleged violations of sections 362(a) and 542 "shall only seek relief as a defense, setoff or recoupment, against [McKesson's] allowed claims, including any allowed administrative priority claims under section 503(b)(9)."  Order on Mot. to Dismiss Am. Compl. [ECF No. 107] at ¶ 2.

**C.   The 2022 Summary Judgment Motion**

On April 15, 2022, McKesson filed its *Motion for Summary Judgment or, in the Alternative, Summary Adjudication and Supporting Memorandum of Facts and Law* [ECF No. 115] (the "2022 MSJ") in the Primary Proceeding.  In the 2022 MSJ, McKesson asserted that its subsequent new value defense reduces its preference exposure to a maximum of $9.7 million. McKesson also asserted that its right to setoff its section 503(b)(9) administrative claim against

4

any amount avoided further reduces McKesson's preference exposure to no more than $898,354.51. *See* 2022 MSJ at 2, 4.

The 2022 MSJ argued that McKesson delivered substantial merchandise to the Debtor on credit during the Preference Period totaling $58,846,795.61 in value, which shields all but six of the payments targeted by the Amended Complaint. *See id.* at 2, 17. As to five of the six remaining unshielded payments, McKesson further argued that, in light of the Court's previous ruling at the September 2019 Hearing allowing a dollar-for-dollar setoff of McKesson's section 503(b)(9) claims against the Plaintiff's preference claims, McKesson's administrative claim would correspondingly increase by any amount avoided. *See id.* at 17. McKesson argued that only one payment from July 17, 2015, in the amount of approximately $900,000, was uncovered by either the subsequent new value defense or its right to increase its section 503(b)(9) claim by any amount avoided. *See id.*

At a hearing held on May 18, 2022, this Court heard oral argument on the 2022 MSJ. Subsequently, on January 18, 2024, this Court issued an opinion granting in part and denying in part the 2022 MSJ [ECF No. 141] (the "2022 MSJ Opinion"). The Court held, *inter alia*, that McKesson's subsequent new value defense is valid to the extent of the value of the additional goods delivered by McKesson to the Debtor during the Preference Period. *See id.* at 15–16. The Court however reserved for trial the resolution of a factual dispute over the exact amount of the value of those delivered goods supporting McKesson's subsequent new value defense. *See id.* at 16.

### D. The Parties Proceed to Trial on Remaining Issues

On July 1, 2024, McKesson filed its Opening Trial Brief [ECF No. 161]. On July 2, 2024, the Court entered the First Amended Pretrial Order [ECF No. 168], ordering that a trial be

conducted (the "Trial") on all the remaining issues between the Parties across the Primary Proceeding, the Specialty Proceeding, the Systems Proceeding, and the Main Case. On July 8, 2025, the Committee filed its Pre-Trial Memorandum of Law [ECF No. 169].

The Trial was held from July 12, 2024, to July 18, 2024. Following the Trial, the Court ordered the parties to submit post-trial briefing and scheduled closing arguments. *See* Order Scheduling Post-Trial Briefing and Closing Arguments [ECF No. 184]. On September 16, 2024, McKesson filed its Post-Trial Brief Submitted by the McKesson Entities [ECF No. 190], and its Request for Judicial Notice Submitted by McKesson Entities in Support of Post-Trial Brief [ECF No. 191]. On the same day, the Committee filed its Post-Trial Memorandum of Law [ECF No. 192]. The Court heard the Parties' closing arguments on October 9, 2024. *See* Oct. 9, 2024 Hr'g Tr. [ECF No. 193].

## II. RELEVANT FACTUAL BACKGROUND

### A. Contractual Relationship Between the Debtor and McKesson

1. The Supply Agreement

The business relationship between McKesson and the Debtor was generally governed by a Supply Agreement dated December 6, 2012 (the "Supply Agreement") and New York state law. Am. Compl. ¶¶ 19–20. Under the Supply Agreement, McKesson supplied the Debtor's pharmacies with "Merchandise," defined in the Supply Agreement to include "prescription drugs, over the counter drugs, health and beauty aids, and sundries" (collectively, the "Merchandise") *See* PX 27 at § 1.A.

a. *Rebates*

The Supply Agreement entitled the Debtor to a rebate on certain purchases of various non-generic pharmaceuticals ("Branded Pharmaceuticals") and generic pharmaceuticals ("Generic

6

Pharmaceuticals") if the Debtor was current on certain payment obligations to McKesson. Am. Compl. ¶¶ 20–21. The Plaintiff alleges that, pursuant to the Supply Agreement, "the Debtor paid [McKesson] for 'One Stop' generic merchandise ("OS Generic Merchandise") by a two-step process: [f]irst, the Debtor paid McKesson's invoice, which was marked up by 20% over the manufacturer's invoice," and "[s]econd, [McKesson] paid a rebate of 16.667% on the Debtor's 120% payment, thereby eliminating the 20% mark-up entirely." Claim Opp'n. [ECF No. 126] at 9. The Supply Agreement specified the timing of the payment and rebate process, stating that the Debtor owed McKesson on the sixth following Friday for its purchases of Generic Pharmaceuticals and the Friday of the week following the date of an invoice for Branded Pharmaceuticals. Supply Agreement § 4.A. McKesson owed the Debtor its rebate 15 days after the end of the month in which its purchases were made. Claim Opp'n. [ECF No. 126] at 9.

The Debtor often received a "prebate" for all purchases during, and many before, the second half of each month, because McKesson often paid the Debtor the rebate before the Debtor was required to pay McKesson's invoice. *See id.* The Amended Complaint asserts that Section 21(M) was the only provision of the Supply Agreement requiring payment as a condition of the Debtor's right to rebates and did not require the Debtor to have paid for the specific merchandise on which rebates were granted as a condition of paying those rebates. Am. Compl. ¶ 22. Rather, the Debtor was merely required to be current on the broader class of "payments due and owing to McKesson" as of the date the rebate was due. *See id*. Section 21(M) of the Supply Agreement states:

> Any rebate, volume incentive, or other similar payment based on A&P's purchases and prompt payment…[I]n the event that A&P on the payment date for any such Rebate ("Rebate Payment Date") is not current with respect to A&P's payments due and owing to McKesson pursuant to this agreement…McKesson shall have no obligation hereunder to pay any such rebate either on the Rebate Payment Date or at any time thereafter.

7

By agreeing to Section 21(M), the Plaintiff asserts that McKesson agreed to pay rebates to the Debtor for merchandise the Debtor had not yet paid for in exchange for the Debtor being current on its obligations to McKesson when they came due. Am. Compl. ¶ 23.

The Amended Complaint states that the Supply Agreement gave the Debtor a contractual right to interest equivalent to 18% per year on certain sums, including rebates, that McKesson owed to the Debtor. *See id.* The Supply Agreement stated:

> McKesson will pay A&P at the rate of .0493% per day (the equivalent to 18% per annum on a 365-day year) from the date that the amount was due under Sections 5.E, 6.B, 8.D, and 11.C until the time payment is received by A&P in immediately available funds. Payments under these Sections are due within 30 days of the end of the month in which incurred.

Am. Compl. ¶ 23; Supply Agreement § 21(V). Any late payments by the Debtor to McKesson were also subject to interest at the same rate in certain circumstances. Am. Compl. ¶ 23; Supply Agreement § 4.E.

### b. *Medturns*

The Amended Complaint states that, under the Supply Agreement, McKesson had regularly credited the Debtor from 2012 through mid-July 2015 for medturns through a process whereby the Debtor's individual stores would return merchandise, as permitted by the Supply Agreement, and McKesson would calculate the amount of credit the Debtor was due for the returns and permit the Debtor to use the credits to reduce the amounts paid for subsequent purchases. Am. Compl. ¶ 88. McKesson informed the Debtor via email of how much it owed for its purchases and how much it could deduct for medturns credits. *See id.*

### 2. The Extension Agreement

The Supply Agreement was set to expire on August 31, 2015, and by consent of the parties, the Supply Agreement was extended on an interim basis through September 8, 2015. On

8

September 8, 2015, eight days after the expiration date of the Supply Agreement, the Debtor and McKesson entered into an agreement titled, Extension of Compliance with Terms of Supply Agreement (the "Extension Agreement[6]"), pursuant to which the parties' compliance with the terms of the Supply Agreement was extended to January 31, 2016, and the Debtor paid McKesson an extension fee in the amount of $1 million to be applied to reduce McKesson's administrative claim. Am. Compl. ¶ 36; McKesson's Statement at 6[7]; Committee's Statement at 12. The Extension Agreement states: "A&P has requested McKesson to continue to supply Merchandise to A&P under the same terms and conditions as are set forth in the Agreement, except as otherwise set forth in this Extension."

The Extension Agreement provided that McKesson shall pay "all accrued Postpetition Rebates when due to be paid on the terms set forth in the [Supply] Agreement, including this Extension, but without regard to section 21(M) or any other provision of the [Supply] Agreement that would prohibit, condition, or suspend the payment of such Postpetition Rebates." Am. Compl. ¶ 40; Extension Agreement § 5. The Extension Agreement defined Postpetition Rebates as rebates "accrued after the Petition Date in favor of A&P as a result of sales of Merchandise generated on and after the Petition Date." Am. Compl. ¶ 40. The Extension Agreement further provided that, "After A&P notifies McKesson that it has ceased pharmacy operations, the final Rebate amount will be expedited and paid by McKesson as soon as practicable." Am. Compl. ¶ 42. Further, the Extension Agreement expressly permitted McKesson to deduct "any post-petition amounts due" before returning a $2 million deposit to the Debtor, but did not expressly permit McKesson to deduct prepetition amounts due. Am. Compl. ¶ 40; Extension Agreement § 5.

---

[6] *See* McK 25.

[7] Defined *infra*.

B. **The Debtor and McKesson's Course of Performance as Relevant to the Plaintiff's Preference Allegations**

Pursuant to the terms of the Supply Agreement, the Debtor placed daily orders with McKesson through an electronic system and McKesson delivered Merchandise to the Debtor's pharmacies five days per week, Monday through Friday. *See* Decl. of Jennifer Towsley in Support of Mots. for Summ. Judg. Filed by McKesson Corp. [ECF No. 118] at ¶ 4. As outlined above, McKesson sold Merchandise to the Debtor on different credit terms based on the category of the Merchandise, of which the most commonly ordered categories were the Branded Pharmaceuticals and the Generic Pharmaceuticals. *See id*. Payment for Branded Pharmaceuticals was due on the Friday of the week following the date of an order's invoice. *See* Decl. of Dawn DeVito in Support of Responses to Summ. Judg. Mots. Filed by McKesson Corp. [ECF No. 127], Ex. 7 at p. 3–4 (Supply Agreement § 4.A). As for payment for Generic Pharmaceuticals, payment was due on the sixth Friday following the date of the invoice. *See* First Amended Pretrial Order [ECF No. 168] at ¶ 9.

In the months leading up to the Petition Date, McKesson became aware that the Debtor was experiencing financial difficulties. *See* Decl. of Jenifer Towsley in Support of McKesson Corp.'s Mot. for Summ. Judg. [ECF No. 25] at ¶ 10. Dating from at least 2012, McKesson sent weekly emails to the Debtor attaching a report ("Pathmark Report") for the previous week's deliveries of Merchandise, identifying delivery dates and an invoice amount. *See* McKesson Corp.'s Local Rule 7056-1(b) Statement of Undisputed Facts and Conclusions of Law in Support of Mots. For Summ. Judg. [ECF No. 120] ("McKesson's Statement") at 1; Decl. of Jenifer Towsley in Support of Mots. for Summ. Judg. Filed by McKesson Corp. [ECF No. 118] at 2-3. Pathmark Reports were sent to the Debtor for the duration of the Preference Period. *See* McKesson's Statement at 1.

10

On July 2, 2015, McKesson notified the Debtor that the credit terms governing Generic and Branded Pharmaceuticals would be modified on a go-forward basis. *See* Decl. of Jenifer Towsley in Support of McKesson Corp.'s Mot. for Summ. Judg. [ECF No. 25] at ¶ 10; Decl. of Tim Carnahan [ECF No. 35] at ¶ 44. Shortly thereafter, McKesson demanded payment on both Generic and Branded Pharmaceuticals no later than one day after delivery starting on July 13, 2015, with payment made via wire rather than the Debtors' standard procedure of automatic clearing house payments (the "Modified Credit Terms"). *See id.* at ¶ 10; Decl. of Tim Carnahan [ECF No. 35] at ¶ 48; McKesson's Statement at 1. In the week prior to the Petition Date, McKesson also began sending the Debtor daily Pathmark Reports as opposed to weekly. *See* McKesson's Statement at 1. Additionally, pursuant to the Supply Agreement, and as reiterated in the July 2 letter, McKesson conditioned shipment of additional orders on A&P's full compliance with the Modified Credit Terms. *See* First Amended Pretrial Order [ECF No. 168] at ¶ 21.

In the days following McKesson's July 2 letter, the Parties discussed the logistical issues of those terms and, on July 15, agreed to two days' sales outstanding, effective immediately.[8] *See id.* at ¶ 22. The Debtor made four payments under the Modified Credit Terms (the "Next-Day Payments") totaling $4,249,724.88. *See id.* at ¶ 45. On Monday, July 19, 2015, the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code. *See* McKesson's Statement at 1.

---

[8] Under these terms, the Debtor was required to pay McKesson for Merchandise received on the immediately preceding day but would still receive their daily shipment prior to making such payment. *See* Decl. of Jenifer Towsley Direct Trial Testimony Proffered by the McKesson Entities [ECF No. 162] at ¶¶ 60, 62-63.

### III.  **STATEMENT OF ISSUES**

This Preference Opinion will resolve the below "Issues To Be Tried" listed on the First
Amended Pretrial Order [ECF No. 168].[9]  The remaining Issues to Be Tried listed on the First
Amended Pretrial Order will be resolved in separate, forthcoming opinions.

1. As to each of the Transfers in the Primary Proceeding, can Plaintiff avoid and recover such transfers?
2. As to each of the Transfers in the Primary Proceeding, did the Transfer enable McKesson to receive more than it would receive if the Main Case were a case under chapter 7, the Transfer had not been made, and McKesson received payment on such debt to the extent provided by the provisions of the Bankruptcy Code?
3. As to each of the Next-Day Transfers, did the parties intend the transfer to be substantially contemporaneous with an exchange for new value given to A&P?
4. Were each of the Transfers in the Primary Proceeding made in the ordinary course of business or financial affairs of A&P and McKesson?
5. As to each of the Transfers in the Primary Proceeding, was such Transfer made according to ordinary business terms?
6. To what extent were each of the Transfers in the Primary Proceeding shielded by new value under section 547(c)(4) to or for the benefit of the Debtor?
7. To what extent did McKesson violate the automatic stay under Section 362(a)(3), (6) and (7)?
8. To what extent is the Debtor entitled to recover any damages as a result of any violation of the automatic stay?

In resolving issue 6 (the extent of McKesson's subsequent new value defense), the Court
will: (1) establish the proper method of valuing the Merchandise delivered to A&P; and (2)
determine whether the alleged deliveries recorded on the "355 Invoices" (defined below) were in
fact delivered for purposes of calculating the exact amount of the value of goods delivered by
McKesson during the Preference Period.  Finally, the Court will also resolve McKesson's
arguments from their post-trial briefing that section 349(b) of the Bankruptcy Code insulates
McKesson from any preference liability.  *See* Post-Trial Brief Submitted by the McKesson Entities
[ECF No. 190] at 48, 49.

---

[9] The numbering of this list of issues corresponds to the "Issues to be Tried" section of the First Amended Pretrial
Order [ECF No. 168].

IV.  **DISCUSSION**

   A.  **Did the Transfers Enable McKesson to Receive More Than It Would Have
      Otherwise Recovered in a Chapter 7 Liquidation, As Required Under Section
      547(b)(5)?**

McKesson contends that, regardless of the sufficiency of any preference defense under

section 547(c), none of the transfers should be considered preferential because the transfers did

not exceed the amount McKesson would have recovered if A&P liquidated under Chapter 7 instead

of pursuing Chapter 11 reorganization.  *See* First Amended Pretrial Order [ECF No. 168] at 5.  As

analyzed below, the Court finds this argument without merit in light of the evidence provided

regarding the Debtor's available assets for distribution and the Debtor's liabilities at the time of

bankruptcy filing.

Under section 547(b), the Plaintiff may avoid any transfer of an interest of the debtor in

property: (1) to or for the benefit of the creditor; (2) for or on account of an antecedent debt; (3)

made while the debtor is insolvent; (4) made on or within 90 days prior to the filing of the petition;

and (5) that enables such creditor to receive more than they would have received if: (a) the debtor

had liquidated under Chapter 7; (b) such transfer had not been made, and (c) such creditor received

payment of such debt to the extent provided under the Bankruptcy Code.  11 U.S.C. § 547(b).  The

Plaintiff bears the burden of proving each element of section 547(b) by a preponderance of the

evidence.  *See In re Roblin Indus., Inc.*, 78 F.3d 30, 34 (2d Cir. 1996).

In this case, the Parties do not contest that the first four requirements under section 547(b)

are met here.  *See* First Amended Pretrial Order [ECF No. 168] at ¶ 41, 43, 44.  Thus, the transfers

are *prima facie* preferential if the Plaintiff shows that McKesson recovered more through each of

the transfers than it would have in a hypothetical Chapter 7 case on either their section 503(b)(9)

13

administrative claims or their general unsecured claims. *See In re NWL Holdings, Inc.*, No. 08-12847 (MFW), Adv. No. 10-53535 (MFW), 2013 WL 2436667, at *2 (Bankr. D. Del. 2013).

Each transfer's preferential status is to be determined "not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results." *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229 (1936). The party seeking avoidance has the initial burden of showing that the creditor would have recovered less in liquidation than the value of the pre-petition transfers by "construct[ing] a hypothetical Chapter 7 case and determin[ing] the percentage distribution [each class of claims] would have received on the petition date." *In re Wonderwork, Inc.*, 611 B.R. 169, 213 (Bankr. S.D.N.Y. 2020).

When the creditor-transferee is not secured and claims within the same priority class would not fully recover in the hypothetical Chapter 7 distribution, any transfers made during the preference period on account of the creditor-transferee are deemed to have allowed excessive recovery. *See Hassett v. Goetzmann (In re CIS Corp.)*, 195 B.R. 251, 262 (*citing Elliott v. Frontier Properties/LP (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1421 (9th Cir. 1985) ("[A]s long as the distribution in bankruptcy is less than one hundred percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made."). Further, any costs that would be associated with administering the Chapter 7 proceeding must be included in the priority distribution. *See In re Candor Diamond Corp.*, 68 B.R. 588, 595 (Bankr. S.D.N.Y. 1986). Critically, the Chapter 7 trustee fee of roughly 3% of the total funds disbursed must be satisfied prior to other priority or non-priority unsecured debt, including any section 503(b) administrative claims. 11 U.S.C. § 507(a)(1)(C-D).

14

This Court has allowed fact-finders to utilize many forms of evidentiary support to construct the hypothetical Chapter 7 case and determine proper distributions. *See Candor Diamond,* 68 B.R. at 595 (combining deposition testimony, filed claims and prior court orders to estimate distributions and conclude excessive recovery); *see also In re Teligent, Inc.,* 380 B.R. 324, 339-42 (Bankr. S.D.N.Y. 2008) (examining Plan, Disclosure Statement, Confirmation Order, monthly operating reports, and various Riders to the Statement of Financial Affairs to determine whether information was sufficient to construct hypothetical Chapter 7 liquidation); *CIS Corp.,* 195 B.R. at 262-63 (calculating hypothetical recovery and finding insolvency when trustee testified to contents of valuation studies, accounts receivable billing, and remarketing agreements).

1.   Analysis of Hypothetical Chapter 7 Recovery for Unsecured Claims

To the extent the allegedly preferential transfers were on account of otherwise-unsecured, non-priority claims, the Court concludes that McKesson would, more likely than not, have recovered nothing in a chapter 7 liquidation. At the time of filing, the Debtor's schedules show assets of $601,441,108.28, burdened by approximately $925 million in secured debt and $1.2 billion of general unsecured claims. *See* Summary of Schedules, Schedules of Assets and Liabilities and Stmt. of Fin. Affairs for the Great Atl. and Pac. Tea Co. [Main Case ECF No. 720] at 37. In a chapter 7 liquidation, the Debtor's available assets would have had to be liquidated in a fire sale, and the proceeds would have to be applied to satisfy the $925 million in secured debt. Since most of the Debtor's assets were subject to the secured lender's liens,[10] the Court finds it highly implausible that the Debtor would have been able to generate asset sale proceeds to pay

---

[10] *See*, *e.g.*, Motion of Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Use Cash Collateral Pursuant to 11 U.S.C. 363(c)(2), (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) [Main Case ECF No. 18] at ¶ 5.

100% of not only the $925 million in secured debt, but also 100% of the approximately $1.2 billion general unsecured claims pool.

Thus, to the extent the allegedly preferential transfers to McKesson were on account of otherwise-unsecured, non-priority claims, the Court finds that the Plaintiff has shown by a preponderance of the evidence that McKesson's receipt of the allegedly preferential transfers would have resulted in an outsized recovery for McKesson, and so the Plaintiff has met their burden to establish a *prima facie* preference claim with respect to those allegedly preferential transfers.

2. Analysis of Hypothetical Chapter 7 Recovery for 503(b)(9) Claims

a. The Hypothetical Administrative Claims & Chapter 7 Expenses Pool

McKesson also asserts that administrative claimants would have been paid in full in a hypothetical chapter 7 liquidation case. McKesson's Schedule 2-A to their Request for Judicial Notice, which lays out all the filed, allowed, and as-yet-unpaid section 503(b)(9) claims in the case, indicates that in this actual chapter 11 case, there is a total pool of section 503(b)(9) claims of $11,825,385.74, of which $2,748,115.92 was McKesson's section 503(b)(9) claim. *See* Request for Judicial Notice Submitted by McKesson Entities in Support of Post-Trial Brief [ECF No. 191], Schedule 2-A; Oct. 9, 2024 Hr'g Tr. [ECF No. 193] at 11:15-18. Also, as the Plaintiff pointed out at the post-trial hearing, the record indicates that approximately $22.7 million of section 503(b)(9) claims were already paid out to the Debtor's critical vendors during an earlier period of this chapter 11 case. *See id.* at 27:18-23.[11]

---

[11] *See also* Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 503(b)(9) for Interim and Final Authority to Pay Certain Prepetition Obligations to Critical Vendors, Approval of Related Procedures, and Related Relief [Main Case ECF No. 9] at ¶ 20, 36; Declaration of Michael Nowlan in Support of Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 503(b)(9) for Interim and Final Authority to Pay Certain Prepetition Obligations to Critical Vendors, Approval of Related Procedures, and Related Relief [Main Case ECF No. 10] at ¶ 14; Amended Interim

16

Additionally, the Parties agree that to the extent any of the payments made to McKesson on account of goods delivered to the Debtor during the 20-day 503(b)(9) period are avoided, those avoided amounts would increase McKesson's 503(b)(9) claim dollar for dollar.[12]   *See* Pl. Post-Trial Br. [ECF No. 192] at 28; Berk Decl. [Main Case ECF No. 5060] at ¶¶ 13, 15.   Plaintiff contends that McKesson received six transfers totaling $12,754,542.22 on account of goods delivered to the Debtor in the 20-day 503(b)(9) period.   Alternatively, McKesson claims that only five transfers totaling $9,250,288.15 were made on account of goods delivered to the Debtor in the 20-day 503(b)(9) period.   *See* Decl. of Charles M. Berk in Support of Mots. For Summ. Judg. Filed by McKesson Corp. [Main Case ECF No. 5060] at ¶ 13.

Adding these amounts together, the total pool of section 503(b)(9) administrative claims in a hypothetical chapter 7 case would have been approximately $47,279,927.96 or $43,775,673.89, depending on whether McKesson's or the Plaintiff's contentions as to the potentially avoided additional 503(b)(9) claims in the chapter 11 case is credited.

Additionally, the Court must hypothesize as to what the trustee's statutory fee and professional fees incurred by the trustee's professionals would have been in a chapter 7 liquidation, which would have been paid out before payment of any section 503(b)(9) claims.   Here, the Plaintiff essentially contends that the trustee's statutory fee and professional fees would have totaled approximately $3.28 million, whereas McKesson contends that it would have totaled

---

Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 503(b)(9) Authorizing the Debtors to Pay Certain Prepetition Obligations to Critical Vendors, Approval of Related Procedures, and Related Relief [Main Case ECF No. 95]; First Interim Fee Application of FTI Consulting, Inc., Financial Advisor to the Debtors, for Compensation and Reimbursement of Expenses for the Period from July 19, 2015 Through November 30, 2015 [Main Case ECF No. 2292] at ¶ 29.

[12] To the contrary, per this Court's summary judgment opinion in this case, McKesson would have unsecured claims for any 503(b)(9) amounts avoided (not otherwise applied for setoff against the judgment amount), assuming that McKesson paid the balance of any determined preference judgment. *See* 2022 MSJ Opinion at 25.

somewhere between $1 million and $5 million.[13]  *See* Oct. 9, 2024 Hr'g Tr. [ECF No. 193] 29:13-30:14; Def. Trial Ex. ("McK") 235.

> b.  The Hypothetical Chapter 7 Distributable Assets Pool

Although almost all of the Debtor's assets were subject to a secured lien as of the Petition Date, the Parties acknowledge that there could have been several unencumbered assets available for distribution to section 503(b)(9) claims in a hypothetical chapter 7 liquidation.  To start, the Parties agree that on the Petition Date, the Debtor's only concrete asset available for § 503(b)(9) distribution was $19,655,971.35 in cash.  *See* Oct. 9 Hr'g Tr. [ECF No. 193] at 30:15-17, 81:5-6.

Next, the Parties contest the validity of a number of other hypothetical sources of recoveries for administrative creditors in a hypothetical chapter 7 case.  First, McKesson refers the Court to certain post-petition litigation settlement amounts in the chapter 11 case, including certain preference lawsuits ($2,400,000), the "Pepsi lawsuit" ($6,500,000), and the "Yorktown lawsuit" ($1,660,540.40), as evidence of further assets available for distribution in a hypothetical chapter 7 case.[14]  *See* McKesson Corp.'s Post-Trial Brief [ECF No. 190] at 7-8.  Second, McKesson points to several liquor license sales effected in the chapter 11 cases as likely additional unencumbered recovery sources for hypothetical chapter 7 administrative creditors, which raised an additional $2,578,500.00 in the chapter 11 cases.  McKesson also points to recoveries from the settlement of a class action antitrust lawsuit which it argues would have provided an additional recovery to the

---

[13] The Plaintiff contends that the trustee's statutory fee would be $880,000, based on assuming there would be approximately $29.6 million in unencumbered assets distributed.  *See* Oct. 10, 2024 Hr'g Tr. 30:5-8.  Alternatively, McKesson contends that the trustee's statutory fee would be $660,000, which is based on assuming there would be approximately a $21,000,000 distribution to section 503(b)(9) claims.  *See* McKesson Corp.'s Post-Trial Brief at 8. Similarly, the Plaintiff contends that the trustee's professional fees would have most likely come out to approximately $2.4 million.  *See* Oct. 10, 2024 Hr'g Tr. 29:13-22.  Alternatively, McKesson contends the trustee's professional fees would have been between $1 and 5 million.  *See* Trial Ex. McK 235.

[14] *See* McK 202, 208, 209 for additional information regarding these lawsuits.

18

Debtor's estates of up to $1,500,000.00.  *See* July 15, 2024 Hr'g Tr. [ECF No. 189] at 152:5-157:16.

### c.  Conclusion

Comparing the Plaintiff's calculations to McKesson's, and considering the record before the Court, the Court concludes that McKesson's administrative claim would not have been paid in full in a hypothetical chapter 7 liquidation.  As the chart below breaks down, the two biggest factors in the Court's determination on this point are: (1) the inclusion of an amount of approximately $22.7 million to the hypothetical section 503(b)(9) claims pool; and (2) the contingent and uncertain nature of the litigation  recoveries and sale proceeds actually obtained in the chapter 11 cases, when viewed from the perspective of a hypothetical chapter 7 case.  What results is essentially an approximately $50 million pool of administrative claims and trustee-related fees and expenses having to be satisfied by an unencumbered asset pool of approximately $30 million. Given that the Court believes that the $30 million asset pool estimate likely would have been even lower in a chapter 7 case due to, among other reasons, the hypothetical estate's chapter 7 designation,[15] the Court is satisfied that the approximately $20 million delta described above means that McKesson's hypothetical section 503(b)(9) claim in a chapter 7 liquidation would not have been paid in full.

Additionally, the fact that the actual chapter 11 case here is administratively insolvent provides further evidence that section 503(b)(9) claims would not have been paid in full in a

---

[15] As the Court remarked at Trial and as supported by DeVito's testimony at Trial: (i) going-concern sale proceeds will presumptively exceed those realized from the same asset in liquidation; (ii) litigation recoveries are subject to fee reductions, were contingent and uncertain at the time of filing, and would necessarily be affected by the hypothetical estate's chapter 7 designation; and (iii) the various costs and fees of liquidation, both statutory and professional, must be satisfied from the same pool of assets, and any attempt to estimate such professional fees at this point in time would be highly suspect.  *See* July 15, 2024 Hr'g Tr. [ECF No. 189] at 162:1-164:3; 174:17-176:8; 187:5-188:19.

hypothetical chapter 7 liquidation. *See, e.g.*, Joint Mot. of Debtors and Creditors' Committee for Entry of an Order Authorizing Final Resolution of Debtors' Cases and Granting Related Relief (Main Case ECF No. 4726) at ¶ 4; Debtor's Quarterly Chapter 11 Monthly Operating Report for Month Ending July 13, 2024 (Main Case ECF No. 5245 at 2); Pl.'s Post-Trial Brief [ECF No. 192] at 26 ("Administrative and 503(b)(9) claims will only be paid 20% of their value, and unsecured creditors are receiving nothing").

| Administrative Expense Claims Pool & Other Expenses in Hypothetical Chapter 7 Liquidation | Assets Available for Distribution in Hypothetical Chapter 7 Liquidation |
|---|---|
| Chapter 7 Trustee Commission and Professional Fees = $3,280,000[16] | Debtor's cash as of the Petition Date = $19,655,971.35 |
| Already-allowed but as-yet unpaid 503(b)(9) claims in the actual chapter 11 case = $11,825,385.74 | Post-petition litigation settlement amounts in the actual chapter 11 case = $10,560,540.40 |
| McKesson's not yet allowed 503(b)(9) claims in the actual chapter 11 case = $12,754,542.22 | Liquor license sales in the actual chapter 11 case = $2,578,500.00 |
| Already paid 503(b)(9) claims to Debtor's critical vendors in the actual chapter 11 case = $22,700,000 | Antitrust class action settlement amounts = $1,500,000.00 |
| Total Claims & Fees Pool = $50,559,927.96[17] | Total Assets Pool = $34,295,011.75 |

While the above analysis is not an exhaustive list of the myriad issues that arise from incomplete, *post facto* analysis using top-line funds realized and information about claims, the Court's best estimates of the trustee's statutory fee and the trustee's professional fees, the pool of section 503(b)(9) claims, and the Debtors' unencumbered assets in a hypothetical chapter 7 case, based on the documents admitted into evidence and filings on the Court's docket, lead the Court to conclude that the Debtor's hypothetical liquidation would have resulted in less-than-full

---

[16] This is the sum of an $880,000 statutory fee to the chapter 7 trustee plus $2.4 million of professional fees payable to the chapter 7 trustee's professionals, both based on assuming a $29.6 million distribution to section 503(b)(9) claims.

[17] This number would also likely be higher on account of section 503(b)(1) claims for employee wages and taxes incurred by the Debtors during the hypothetical chapter 7 case, but for which the Court is unable to ascertain a reasonable estimate for based on the record.

payment for administrative creditors. *See Moser v. Bank of Tyler (In re Bobby G. Loggins)*, 513 B.R. 682, 707-08 (Bankr. <u>E.D.TX</u>. 2014).   As such, McKesson's attempt to refute section 547(b)(5) fails, and the Plaintiff has successfully established that the transfers are *prima facie* preferential.

**B.  Were the Next-Day Payments Intended to be Contemporaneous Exchanges for New Value, as Required Under Section 547(c)(1)(a)?**

Among its preference claims, the Plaintiff seeks the avoidance and recovery of four payments totaling $4,249,724.88 (the "<u>Next-Day Payments</u>") made by the Debtor to McKesson shortly before the Filing Date.  Compl. at ¶ 14.  On August 10, 2017, McKesson filed its Answer to the Complaint (the "<u>Answer</u>"), asserting that each of the Next-Day Payments were: (i) intended as contemporaneous exchanges for new value, and (ii) in fact substantially contemporaneous exchanges, and thus shielded from preference liability under § 547(c)(1).  *See* Answer at ¶¶ 16–17.  In the 2019 MSJ, McKesson sought a determination that the alleged preferential transfers were shielded via the section 547(c)(1) defense asserted in its Answer.  *See* 2019 MSJ at 4.  The Committee filed an opposition to the 2019 MSJ [ECF No. 34], to which McKesson replied [ECF No. 40].  At a hearing held on September 16, 2019, Judge Drain granted in part and denied in part the MSJ, ruling that the Next-Day Payments were in fact substantially contemporaneous, but reserved until trial the issues of intent and coercion with respect to the defense.  *See* Sept. 16, 2019 Hr'g Tr. [ECF No. 43], at 57–59; *see also* First Amended Pretrial Order [ECF No. 168] at ¶ 46 (stipulating for Trial that "[t]he Court found that each of the Four Transfers was substantially contemporaneous with an exchange of new value given to A&P.").

Section 547(c)(1) of the Bankruptcy Code provides in pertinent part:

(c) The trustee may not avoid under this section a transfer—
    (1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.

Section 547(c)(1)'s "substantially contemporaneous exchange" defense protects a creditor from preference liability where the creditor can show that the transfer at issue was: (1) for new value given to the debtor; (2) intended to be substantially contemporaneous with the exchange of new value; and (3) in fact substantially contemporaneous with the exchange of new value. 11 U.S.C. § 547(c)(1); *Official Committee of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs., Inc. (In re 360networks Inc.)*, 338 B.R. 194, 204 (Bankr. S.D.N.Y. 2005) (citation omitted).

As Judge Drain's ruling established the first and third prongs, the sole remaining issue is whether both parties intended the four transfers to be contemporaneous exchanges. *See* Sept. 16, 2019 Hr'g Tr. [ECF No. 43] at 57–59. McKesson bears the burden of proof as to its substantially contemporaneous exchange defense and as such, must prove the element of intent to a preponderance of the evidence. *See Dribusch v. Gross Elec. (In re N.Y. Light Energy)*, No. 15-11121, Adv. No. 17-90019, 2018 Bankr. LEXIS 2976, at *10 (Bankr. N.D.N.Y. Sept. 28, 2018) (citing 11 U.S.C. ¶ 547(g) (stating that "[t]he Creditor bears the burden of proof as to all of [the] elements" of the substantially contemporaneous exchange defense.). For the sake of completeness, all three prongs of this defense will be discussed below.

### 1. Receipt of New Value

The Next-Day Payments were transfers in exchange for new value given to the Debtor. "New value" is defined in 11 U.S.C. § 547 as "money or money's worth in goods." 11 U.S.C. § 547(a)(2). Courts have interpreted the term "money's worth in goods" to include tangible goods that replenish the estate or provide measurable value. *See Wallach v. Vulcan Steam Forging (In*

22

*re D.J. Management Group)*, 161 B.R. 5, 7 (Bankr. W.D.N.Y. 1993). Additionally, payment of current obligations is indicative of a transfer for new value, whereas payment of overdue obligations indicates a payment on account of antecedent debt. *See Weisfelner v. LR2 Mgmt., K/S (In re Lyondell Chem. Co.)*, No. 09-10023 (REG), Adv. No. 10-05358 (REG), 2015 Bankr. LEXIS 3156, at *39–41 (Bankr. S.D.N.Y. Sept. 18, 2015).

Here, the goods delivered by McKesson provided the Debtor with roughly $4.25 million in new Merchandise, as accurately measured by the corresponding invoices. *See* First Amended Pretrial Order [ECF No. 168] at ¶ 45. Additionally, the Next-Day Payments were each made directly on those invoices. *See id.* Under the Modified Credit Terms, invoices became due one day after delivery, and thus the Next-Day Payments were each made on account of the previous day's invoiced shipment. *See, e.g.*, Decl. of Jenifer Towsley Direct Tr. Testimony Proffered by the McKesson Entities [ECF No. 162] at ¶ 60. The Next-Day Payments therefore satisfy the "new value" component of the 11 U.S.C. § 547(c) preference defense.

## 2. Intended Contemporaneous Exchange

For the reasons that follow, the Court concludes that McKesson and the Debtor intended the Next-Day Payments to be contemporaneous exchanges. Intent under section 547(c)(1) is a question of fact, and because "parties' testimony regarding intent after the fact can often be self-serving," courts also "look to circumstantial evidence to determine the parties' intent." *See Weisfelner*, 2015 Bankr. LEXIS 3156 at *14; *see also, Ames Merch. Corp. v. Revere Mills Inc. (In re Ames Dep't Stores, Inc.)*, 03-03951, 2010 Bankr. LEXIS 2991, at *40 (Bankr. S.D.N.Y. June 10, 2010). Therefore, the Court here will place emphasis on non-testimonial evidence of communications made at the time of contracting, and will seek to avoid relying on purely testimonial evidence regarding intent. *See In re 360networks Inc.*, 338 B.R. at 209 (citing *Peltz v.*

23

*Hartford Life Ins. Co. (In re Bridge Information Systems, Inc.*), 321 B.R. 247, 256–257 (Bankr. E.D. Mo. 2005) (finding requisite intent can be inferred from "the course of dealings between parties")).

In *Weisfelner v. LR2 Mgmt., K/S*, the trustee brought a preference action to recover a payment for the delivery of several metric tons of petroleum condensate. *Weisfelner,* 2015 Bankr. LEXIS 3156 at *16. The trustee argued that, by allowing the debtor to pay for deliveries up to three days after the petroleum condensate delivery was completed, the parties lacked the intent or contemporaneity necessary to assert a section 547(c)(1) defense. *Id*. However, the *Weisfelner* court rejected this argument, stating that the "contention that a transaction must be wholly simultaneous to be contemporaneous imposes unrealistic and unreasonable requirements on large and complex business transactions of this kind that do not further the policy goals of preference law." *Id*. Additionally, "[c]ourts have found intent under section 547(c)(1) despite delay between delivery and payment when the parties' conduct supports such a finding, including when the parties act promptly under the circumstances." *Id.*

Here, the Committee, like the *Weisfelner* trustee, contends that because the Next-Day Payments involved extensions of credit, neither party intended a contemporaneous exchange. Pl's Post-Trial Mem. of Law [ECF No. 192] at 10–11. The Committee further argues that, compliance notwithstanding, the Debtor never expressly agreed to the Modified Credit Terms, and thus could not have intended contemporaneity with respect to terms it had not agreed to. *See id.* at 13. Additionally, the Committee argues that the Next-Day Payments were not intended to be contemporaneous because McKesson capitulated to the Debtor's request for additional time to make the payments. *See id.* at 12.

24

To support its assertion that the Next-Day Payments were intended to be contemporaneous, McKesson argues that, in light of the Debtor's financial difficulties, it initially modified the credit terms to effect one-day sales outstanding, which would require same-day payment for the Merchandise delivered. *See* McKesson Corp.'s Reply Brief in Support of Mot. for Summ. Judg. [ECF No. 41] at 7. But, because of "the logistical impossibility of paying the invoices the same day the goods were delivered," McKesson agreed to two days sales outstanding and accepted payment for the Merchandise one day after delivery. *Id*. McKesson also asserts that, by complying with the Modified Credit Terms, the Debtor's conduct indicates that the payments were intended as contemporaneous exchanges for the provision of new Merchandise. *See* Post-Trial Brief Submitted by the McKesson Entities [ECF No. 190] at 27.

Here, the question is whether both of the contracting parties regarded the exchange of the delivery of Merchandise and payment of the invoices as contemporaneous, at the time the Modified Credit Terms went into effect. *See Weisfelner*, 2015 Bankr. LEXIS 3156 at *14. As evidenced by A&P's CFO, Tim Carnahan's ("Carnahan") testimony at Trial, the Debtor's conduct at the time the Modified Credit Terms went into effect supports finding that the Debtor intended the Next-Day Payments to be contemporaneous with the receipt of the underlying Merchandise. *See* July 17, 2024 Hr'g Tr. [ECF No. 189] at 68:8-69:8, 39:11-19, 70:10-15. For example, Carnahan acknowledged at Trial that he was aware of the Modified Credit Terms, and that he intended to and did in fact wire payments consistent with those new terms. *See id.* Thus, although the Debtor had not expressly agreed to the Modified Credit Terms, the Debtor "did in fact comply with" the Modified Credit Terms and acted promptly under the circumstances with respect to the payments made via wire one day after the Merchandise was delivered. *See id.*; McKesson Corp.'s Reply Brief in Support of Mot. for Summ. Judg. [ECF No. 41] at 7.

25

The evidence also indicates that check on delivery or same-day payments would be nearly impossible in practice given the volume of merchandise ordered, and the complexity of generating an accurate invoice for the merchandise shipped each day. For example, McKesson's witness Sarah Moore testified that McKesson and A&P initially discussed one-day payment terms, but both recognized the logistical burden of processing accurate invoices for large-volume shipments within hours of delivery. *See* July 16, 2024 Hr'g Tr. [ECF No. 186] at 135:2–10.

Additionally, Carnahan points out in his trial declaration that McKesson's own internal emails show that McKesson recognized that same-day payment terms would be "the hardest to achieve process-wise because of the timing" since McKesson had to extract summary level SAP data before [11 a.m.] so that A&P could internally process wires later that day. *See* Carnahan Decl. [ECF No. 170] at ¶ 117. This apparent understanding by both Parties of the impracticality of same-day payments is further supported by the fact of the Debtor's own request for, and McKesson's agreement to, payment for Merchandise on two-days-sales-outstanding basis between the initial credit modification notice on July 2, 2015, and the letter to the Debtor from McKesson on July 15, 2015. *See* McK 14, 17.

Moreover, the fact that the Debtor sent payments via instant wire transfer as required by the Modified Credit Terms, as opposed to the Debtor's standard method of payment via Automatic Clearing House, indicates further intent under section 547(c)(1). *See Ames Merch. Corp.,* 2010 Bankr. LEXIS 2991 at *23–24 (holding "that the parties had agreed that payment would be made by wired Electronic Fund Transfer, in order to address concerns about the debtor's ability to pay . . . points overwhelmingly toward the conclusion that the parties intended the exchange to be contemporaneous.").

Further, the Committee's contention that neither party intended a contemporaneous exchange because the Next-Day Payments involved extensions of credit is without merit.  As the Third Circuit discussed in *In re Hechinger Inv. Co. of Del., Inc.*, it would appear section 547(c)(1) covers little other than credit transactions, as the defense applies only to transfers that the debtor has shown are payments on an "antecedent debt" under section 547(b). *See In re Hechinger Inv. Co. of Del., Inc.*, 489 F.3d 568, 574 (3d Cir. 2007).

Finally, to the extent that the Committee attempts to argue that the Debtor did not intend for the Next-Day Payments to be contemporaneous exchanges for new value because they were effectively coerced into accepting the Modified Credit Terms, the Court rejects that argument based on the evidence before it.[18]  First, as McKesson representative Towsley stated in her Trial Declaration, A&P repeatedly acknowledged to McKesson and internally that it continued to have the viable option of signing a new contract with alternative suppliers if A&P were open to prepaying (*i.e.*, same-day payments).  *See* Decl. of Jenifer Towsley [ECF No. 162] at ¶ 64-65; McK 21.  The fact that A&P knew it always had this option suggests that it was not so pressured into accepting the Next-Day Payment terms such that it can be said to have been coerced into accepting these new terms. Rather, the evidence indicates that McKesson's offered terms might have been, in certain respects, more advantageous to A&P than those otherwise available in the market at the time.

Second, the evidence in the record suggests that the Parties' extended, back-and-forth discussions about a move from the initially proposed same-day payment terms to two-day sales outstanding payment terms was the product of collaborative, joint, and primarily logistical

---

[18] As Judge Drain noted in his 2019 MSJ Bench Ruling, issues relating to whether the Debtor was coerced into accepting the Modified Credit Terms such that any intent the Debtor had to effect a contemporaneous exchange for new value was negated by that coercion were reserved for Trial.  *See* 2019 MSJ Bench Ruling at 57-59.

discussions, rather than a request from A&P for more time to pay. *See* July 16, 2024 Hr'g Tr. [ECF No. 186] at 150:7-18. As Towsley testified to at Trial, the move from same-day terms to two-day sales outstanding terms did not result from a request from A&P for more time to pay, but rather was "purely administrative after we began the discussions around what a one-day payment would look like and how difficult that would be." *See id.* at 134:25-135:14.

Third, the parties' Supply Agreement itself expressly reserved McKesson's right "following ten (10) days written notice, to change a payment term (including imposing the requirement of next day electronic payment for Merchandise deliveries) . . . if (i) McKesson concludes there has been a material adverse change in the A&P's financial condition or an unsatisfactory payment performance; or (ii) A&P ceases to meet McKesson's credit requirements." *See* Supply Agreement at 4.H.1. The fact that the Parties agreed to a contract which expressly anticipated the type of scenario that resulted in the Next Day Payment terms further supports the view that the resulting Next-Day Payments were the product of contractually authorized modifications—not improper pressure or coercion.

In sum, the Court finds that McKesson has carried its burden of proving by a preponderance of the evidence that the Next-Day Payments were intended as contemporaneous exchanges for new value by both the Debtor and McKesson.

### 3. Actual Contemporaneous Exchange

As mentioned above, Judge Drain previously ruled that the Next-Day Payments were in fact contemporaneous. *See* Sept. 16, 2019 Hr'g Tr. [ECF No. 43] at 57–59. Determining whether an exchange is in fact contemporaneous is a flexible evaluation that considers not only the time that elapsed between the delivery of goods and the payment, "but also whether the exchange occurred within the time frame established by the parties' agreement." *In re 360networks Inc.*,

338 B.R. at 209 (quoting *In re Bridge Info. Sys., Inc.*, 321 B.R. 247, 256–257 (Bankr. E.D. Mo. 2005)). "The contemporaneous exchange defense under section 547(c)(1) protects transactions that were meant to be cash transactions, but which unavoidably involved a brief extension of credit." *In re Clinton Nurseries Inc.,* No. 17-31897 (JJT), Adv. Pro. Case No. 19-03030 (JJT), 2023 WL 2567942, at *9 (Bankr. D. Conn. 2023) (quoting *In re FBI Wind Down, Inc.*, 614 B.R. 460, 495–96 (Bankr. D. Del. 2020) (internal quotation marks omitted)); *see also Burtch v. Revchem Composites (In re Sierra Concrete Design, Inc.)*, No. 08-12029 (CSS), Adv. Pro. No. 10-52667 (CSS), 2015 WL 4381571, at *12 (Bankr. D. Del. 2015) (finding payments made eight and 11 days after delivery to be in fact contemporaneous "given the complexities inherent in generating the required paperwork").

Here, the Modified Credit Terms effectively provided for a one-day delay between the delivery of Merchandise and the payment thereon. *See* July 17, 2025 Hr'g Tr. [ECF No. 187] at 39:11-19. Due to the aforementioned impracticability of creating day-of invoices and providing cash on delivery, the Next-Day Payments involved a brief extension of credit, but no more than was required to complete the transaction. *See In re Clinton Nurseries Inc.,* 2023 WL 2567942 at *9.

In summary, the Court concludes that the Next-Day Payments were for new value, intended to be contemporaneous exchanges, and were in fact substantially contemporaneous. Coupled with Judge Drain's previous bench ruling on September 16, 2019, this finding denies the Plaintiff the rights to claim the Next-Day Payments as preferences or recover any payment on account thereof.

**C. Were Any of the Transfers Made in the Ordinary Course of Business?**

In addition to the Next-Day Payments, the Plaintiff seeks to avoid and recover 26 additional payments totaling $62,869,848.32 (the "26 Payments") made during the Preference Period. *See*

Am. Compl. [ECF No. 93] at ¶ 118.  McKesson asserts that the 26 Payments are shielded by the

"ordinary course of business" defense under section 547(c)(2), as each Transfer was either: "(A)

made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B)

made according to ordinary business terms."  11 U.S.C. § 547(c)(2).  McKesson initially put forth

this defense in its Answer, and renewed its plea in the 2019 MSJ.  Answer at ¶ 18–20; McKesson

Corp.'s Mot. for Summ. Judg. and Mem. of Facts and Law in Support Thereof [ECF No. 24] at

13–19.  At the September 2019 Hearing on the 2019 MSJ, Judge Drain declined to rule on the

applicability of the ordinary course defense and awaited the presentation of evidence at Trial.  *See*

Sept. 16, 2019 Hr'g Tr. [ECF No. 43] at 13–14.

The ordinary course of business defense generally applies when transfers are "recurring,

customary credit transactions that are incurred and paid in the ordinary course of business of the

debtor and the debtor's transferee." *Official Comm. of Unsecured Creditors of Enron Corp. v.*

*Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 459 (Bankr. S.D.N.Y.2007)

(citation omitted).  McKesson must establish the ordinary course of business defense by a

preponderance of the evidence. *See id.* at 458.  It may do so by either showing that: (1) the

payments are not avoidable under section 547(c)(2)(B)'s "subjective" test, or (ii) the payments are

not avoidable under section 547(c)(2)(C)'s "objective" test. *See* 11 U.S.C. § 547(c)(2)(B) (using

conjunction "or" between subsections (B) and (C) in section 547(c)(2)).

1.  The Subjective Test

The subjective test focuses on the business relationship or financial affairs between the

particular debtor and transferee in each case, and requires consideration of six factors:

(i)      the prior course of dealing between the parties,
(ii)     the amount of the payment,
(iii)    the timing of the payment,
(iv)    the circumstances of the payment,

30

(v)     the presence of unusual debt collection practices, and

(vi)    changes in the means of payment.

*Pereira v. UPS (In re Waterford Wedgwood USA, Inc.)*, 508 B.R. 821, 827-28 (Bankr. S.D.N.Y.

2014) (citing *Buchwald Capital Advisors LLC v. Metl-Span I., Ltd. (In re Pameco Corp.)*, 356 B.R.

327, 340 (Bankr. S.D.N.Y. 2006); *see also In re 360networks (USA) Inc.*, 338 B.R. at 210; *Hassett*,

195 B.R. at 258 (Bankr. S.D.N.Y. 1996)).

a.   The Prior Course of Dealing Between the Parties

For this factor, McKesson must establish a "baseline of dealings," demonstrating some

consistency between the Preference Period payment practices with other non-Preference Period

payment practices between the debtor and the creditor."  *See Pereira*, 508 B.R. at 828.  When

dealing with late payments made during the Preference Period, courts compare the average lateness

of payments in the pre-preference period to the average lateness of payments in the post-preference

period, to determine whether late payments made during the preference period are non-ordinary

course transfers or not.  *See id*. at 827-828.  Additionally, the pre-Preference Period course of

dealing between parties is established from a period of time "well before" the preference period to

"reduce the likelihood that the debtor's financial difficulties had already taken hold during the

historical period and thus distort otherwise 'ordinary' practices under regular financial conditions."

*Davis v. Clarklift-West, Inc. (In re Quebecor World (USA), Inc.)*, 518 B.R. 757, 762 (Bankr.

S.D.N.Y. 2014) (citations omitted).

Here, with the exception of two wire transfers in the combined amount of $4,587,431.62

paid on May 22, 2015 (the "May 22 Transfer"), the 26 Payments were made pursuant to the "same

credit terms and payment procedures that had been in place for the prior three years" under the

Supply Agreement.  *See* 2019 MSJ [ECF No. 24] at 3.  During the Preference Period, the Debtor

paid every invoice on its exact due date.  *See* Decl. of J. Towsley in Support of McKesson Corp.'s

31

Mot. for Summ. Judg. [ECF No. 25] at ¶ 9.  In the months immediately prior to the Preference Period leading up to the Petition Date, there is only evidence that the Debtors made one, single late payment, on February 27, 2015.[19]  *See* Pl. Trial Ex. ("PX") 4*;* PX 87; Decl. of Tim Carnahan [ECF No. 35] at Ex. G, H.  Thus, with the exception of the May 22 Transfer, the Court is satisfied that the Parties' course of dealing during the Preference Period is consistent with their pre-Preference Period course of dealing and pattern of payments.  As to the May 22 Transfer, the Court finds that it did not adhere to the Parties' prior course of dealing since it was made by wire transfer rather than ACH transfer, which is further analyzed in detail below.  *See* PX 58; July 16, 2024 Hr'g Tr. [ECF No. 186] at 149:22-150:2.

### b.   Amount of the Payment

The second factor, amount of the preferential payment, is a non-factor in this case.  Each and every one of the 26 Payments was equal in value to a specific invoiced amount, and that invoiced amount was due and payable to McKesson on the exact date the transfer was made. *See* Decl. of Jenifer Towsley in Support of McKesson Corp.'s Mot. for Summ. Judg. [ECF No. 25] at 6-10.

### c.   Timing of the Payments

Similarly, with the exception of the May 22 Transfer, the timing of each of the 26 Payments was entirely standard.  McKesson received each of these payment on its due date, and there was nothing unusual about the timing of these payments.  Carnahan, as A&P's CFO, carefully selected which creditors to pay during the months leading up to A&P's bankruptcy filing.  *See* Pl.'s Post-Trial Memo. of Law [ECF No. 192] at 5.  Carnahan tried to pay McKesson late at the end of

---

[19] On February 27, 2015, A&P failed to make a timely payment. This was remedied three days later through standard ACH transfer, after ignoring demands from McKesson to pay by instant wire transfer. *See* Decl. of Tim Carnahan [ECF No. 35], at Ex. G, H.

32

February, March, and May of 2015, but he only succeeded in February. *See id.* In May 2015, A&P attempted to delay outstanding payments for past deliveries by delaying an ACH transfer so that it would reach McKesson's accounts after the due date lapsed. *See* McK 10, 11. Upon learning of the impending delay, McKesson demanded that A&P cancel the ACH transfer and immediately pay the sums by wire. *See* PX 66. A&P promptly executed these directives, resulting in the underlying invoices' timely payment via the May 22 Transfer.

Although no courts in this Circuit have discussed the effect of accelerated payments on the ordinary course defense, the Third Circuit upheld a bankruptcy court's finding that a creditor did not have an ordinary course of business defense where payments were accelerated by the creditor upon learning the debtor was struggling financially. *See Burch v. Prudential Real Estate & Relocation Servs. (In re AE Liquidation, Inc.)*, 729 Fed. Appx. 153, 157–158 (3d Cir. 2018). In affirming the bankruptcy court's decision, the circuit court highlighted that the bankruptcy court did not consider the faster payment rate in isolation, but rather considered the accelerated rate "in the context of the parties' relationship, similarity of transactions, the manner in which payment was tendered, [the creditor's] unusual collection efforts during the Preference Period, and [the creditor's] actions after learning of [the debtor's] financial hardship." *Id.* at 158. Evidence considered by the bankruptcy court included: (1) an email from the creditor which gave the Debtor an ultimatum, stating that it would consider terminating the parties' relationship if the Debtor did not either accelerate the speed of payments under a payment plan, or "bring the account current"; (2) whether the creditor had given the debtor a similar ultimatum in the pre-preference period (it had not); and (3) the creditor's internal emails which revealed concerns about the debtor's liquidity. *See id.*

Here however, unlike in *AE Liquidation*, payments from the Debtor to McKesson were made on the exact date they were due throughout the entire Preference Period. This does much to work against the Plaintiff's argument that the Debtor's payments were not ordinary. *See Miller v. Perini Corp. (In re A.J. Lane & Co.)*, 164 B.R. 409, 414 (Bankr. D. Mass. 1994) ("Timely payments made in accordance with applicable payment terms are of course the quintessential examples of 'normal financial relations' devoid of 'unusual action' by either the debtor or the creditor.").

However, McKesson's conduct mirrors the creditor's conduct in *AE Liquidation*, in that McKesson threatened to terminate its business relationship with the Debtor and sent numerous internal emails regarding concerns over the Debtor's liquidity. *See* Preference Decl. of Timothy Carnahan: McKesson's Actions to Pressure A&P to Pay [ECF No. 170] at ¶¶ 5, 12, 13; PX 65, 67. McKesson sent emails to the Debtor threatening to suspend performance, and had numerous internal discussions during which it expressed concerns as to the Debtor's ability to make payments to McKesson, including a statement that McKesson intended to ensure that the Debtor "prioritized" its payment to McKesson. *See id.* As discussed further below, courts have found that threats and demands made by a creditor to cause a payment to occur in such circumstances can lead to a determination that such payment was made outside the ordinary course. *See Buchwald Capital Advisors LLC v. Metl-Span I., Ltd. (In re Pameco Corp.)*, 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006); *see also In re 360networks (USA) Inc.*, 338 B.R. at 199.

Thus, although the May 22 Transfer was ultimately made on its exact due date, the Court is not convinced that its "timing" was ordinary. Had McKesson not aggressively pursued immediate payment of the underlying sums by wire transfer, the May 22 Transfer would have been received by ACH after its due date. Its timely arrival was therefore solely the result of McKesson's

34

repeated demands for immediate payment via wire and cancellation of the standard ACH transfer. *See* PX 65, 66.

    d.   Circumstances of the Payment and Presence of Unusual Debt Collection Practices

The Plaintiff argues that McKesson's conduct across the entire Preference Period amounted to a coercive pressure campaign such that all 26 Payments, though timely, were the result of aggressive collection tactics. *See* Plaintiff's Post-Trial Brief [ECF No. 192] at 9. This contention was supported by the declarations and trial testimony of Carnahan and A&P's expert witness Steven Iampietro ("Iampietro"). *See*, *e.g.*, Preference Decl. of Timothy Carnahan: McKesson's Actions to Pressure A&P to Pay [ECF No. 170]; Expert Decl. of Steven A. Iampietro [ECF No. 175].

Courts have held that "[p]ayments made as a result of unusual economic pressure and unusual debt collection practices are not in the ordinary course of business." *Buchwald Capital Advisors LLC,* 356 B.R. at 340; *see also Gold Force Int'l v. Cyberrebate.com*, No. 03 CV 5982 (JG), 2004 WL 287144, at *5 (E.D.N.Y. Feb. 10, 2004).

The Court believes the circumstances of the May 22 Transfer were unusual due to McKesson's demands for immediate payment of the invoice via wire and cancellation of the standard ACH transfer. *See* PX 3. Had McKesson not made those demands, A&P's ACH would have cleared late, which would have been highly abnormal in the context of the Parties' historical business dealings.[20] Additionally, it was not the Parties' course of dealing for A&P to pay by wire transfer rather than ACH, nor had McKesson ever successfully demanded the cancellation of an

---

[20] As previously discussed, A&P had previously made only one late payment (the February 27, 2015 payment). *See* PX 31; PX 61; Pref. Decl. of Timothy Carnahan: McKesson's Actions to Pressure A&P to Pay [ECF No. 170] at ¶¶ 40-42.

initiated ACH payment. *See, e.g.*, First Amended Pretrial Order [ECF No. 168] at ¶ 67; Preference Decl. of Timothy Carnahan: McKesson's Actions to Pressure A&P to Pay [ECF No. 170] at ¶ 32; Decl. of Robin M. Page Direct Trial Testimony Proffered by the McKesson Entities [ECF No. 163] at ¶ 27.

Regarding the circumstances of the other 25 of the 26 Payments that were made via standard ACH transfer (the "ACH Transfers"), the Court finds that there was nothing unusual in the circumstances of these payments. The record shows that the ACH Transfers were made in exactly the same manner as they were made in both the weeks immediately leading up to the Preference Period, and over the course of the Parties' years-long business relationship. *See id.* For example, A&P historically initiated payment in satisfaction of an earlier delivery's invoice so that McKesson would receive the payment on the day it was due. *See id.* A&P also utilized the same systems and methods of transfer as were historically used for payments to McKesson. *See id.* Additionally, the Parties adhered to their historical delivery and payment schedule throughout the Preference Period.[21]

The Plaintiff contends that the timely ACH Transfers were not consistent with the Parties' historical practices because A&P had decided to prioritize paying McKesson's bills during the months and weeks approaching the Petition Date.[22] *See* Pl's Post-Trial Mem. of Law [ECF No. 192] at 5-6. Essentially, the Plaintiff attempts to argue that the Debtor's decision to prioritize

---

[21] As described previously, A&P historically would order its required daily supply of both Generics and Non-Generics, which would be delivered on the following day. *See* Decl. of Jenifer Towsley Direct Trial Testimony Proffered by the McKesson Entities [ECF No. 162] at ¶ 14-15. Payment for Generics was due on the Friday of the sixth week after the invoiced date (approximately 45 days post-receipt), and payment for Non-Generics was due on the Friday of the week after the invoiced date, 7-10 days post-receipt. *See* First Amended Pretrial Order [ECF No. 168] at ¶ 8-9. With the exception of the May 22 Transfer, the Parties did not deviate from this schedule during the Preference Period.

[22] "[W]e were pushing A&P's vendors both before and after May 22, 2015 to obtain more time to pay. Every week, I reviewed a list of creditors to decide which we should pay and which creditors' payments should be delayed. Fortunately, most vendors worked with us and gave us more time to pay." Pref. Decl. of Timothy Carnahan: McKesson's Actions to Pressure A&P to Pay [ECF No. 170] at ¶ 64.

McKesson's bills over certain of A&P's other vendors' bills means the 26 Payments were made outside the ordinary course. *See id.* As a threshold matter, the Court finds that, absent extenuating circumstances specific to business between particular parties, a debtor's unilateral choice to prioritize certain creditors over others in the weeks prior to the Petition Date does not prevent a prioritized creditor from successfully asserting an ordinary course of business defense under the subjective test.

As previously described, even in the absence of the other *Pereira* factors, the Plaintiff could successfully avoid transfers resulting from coercion or pressure if McKesson engaged in collection practices during the Preference Period that substantially differed from their pre-Preference Period collection practices, or if McKesson threatened A&P such that A&P had no choice but to pay on time or risk the shutdown of their business. *See Pameco*, 356 B.R. at 340*; Cyberrebate.com*, 2004 WL 287144 at *5; *see also In re Accessair, Inc.*, 314 B.R. 386, 394 (B.A.P. 8th Cir. 2004) (negating ordinary course defense where creditor threatened to cut off software support, essentially rendering debtor inoperable).

To support its contention that McKesson's post-Preference Period practices deviated significantly from earlier collection efforts, the Plaintiff primarily relies on McKesson's repeated phone and email inquiries regarding continued prompt payment, as well as the accompanying threats to discontinue supplying Merchandise to the Debtor's pharmacies if invoices went unsatisfied. *See*, *e.g.*, Pl's Post-Trial Mem. of Law [ECF No. 192] at 9; PX 168, Email from Robin Page to Eric Kanterman, dated July 9, 2015 (4:36 PM), at 1-2. In the pre-Preference Period, McKesson did not appear to have a consistent practice of asking about A&P's financial status. It also did not appear to have requested assurance of payment prior to A&P's late payment in February 2015, nor had it ever threatened to restrict Merchandise until after March of 2015 (upon

37

A&P's second attempt ever to try and delay payments). *See, e.g.,* Preference Decl. of Timothy Carnahan: McKesson's Actions to Pressure A&P to Pay [ECF No. 170] at ¶ 34. However, after the May 22 Transfer, McKesson regularly contacted A&P to demand timely payments in exchange for continuing daily Merchandise deliveries. Throughout the remainder of the prepetition period, A&P always received its daily shipment without delay.

Despite McKesson's heightened vigilance during the Preference Period, the Court is not convinced that McKesson's Preference Period conduct was so unusual or unduly coercive such that the ACH Transfers should not be afforded the ordinary course of business defense. Prior to A&P's first late payment in February 2015, McKesson never had a reason to engage in concerted collection efforts, as A&P had always been current on its payment obligations throughout the Parties' business relationship.[23]

In other cases where a creditor's phone calls were ruled to be particularly egregious, there were additional superseding factors present that would render the ordinary course defense inapplicable. For example, either: (1) the payments were already significantly late, such that they violated *Pereira*'s third factor (*i.e.*, timing of payment), (2) the creditor actually ceased supply or service until accounts were brought current; or (3) the relationship between the debtor and creditor was such that the former would cease to operate without the latter's uninterrupted support. *See Pameco*, 356 B.R. at 340-41; *Cyberrebate.com*, 2004 WL 287144 at *4-5; *Accessair*, 314 B.R. at 394. In the instant case, the ACH Transfers were all timely and McKesson continued shipments to A&P's pharmacies without pause.

---

[23] Surely, concerned creditors should be empowered to pursue collecting on their valid debts in some ways. Efforts to convince a customer to pay are certainly ordinary course to some degree, as discussed in detail *infra*.

38

Additionally, the evidentiary record does not establish that the relationship between A&P and McKesson was such that A&P would cease to operate without McKesson's uninterrupted support. As Carnahan testified, "A&P's Sale Strategy required it to sell its stores with its pharmacies intact if A&P was to maximize its value, and A&P . . . could not replace McKesson without costs and delays that would have made selling A&P's pharmacies, at a minimum, a huge challenge." Preference Decl. of Timothy Carnahan: McKesson's Actions to Pressure A&P to Pay [ECF No. 170] at ¶ 139. So while the loss of McKesson's services would have certainly impaired the going-concern sale value of A&P's stores, the record does not indicate that suspension of those services would have in fact rendered the debtor inoperable.[24] In fact, the Plaintiff's witness Iampietro acknowledged that a wholesaler like McKesson could help transition a retailer like A&P to a different wholesaler as a viable strategy for dealing with a financially distressed retailer. *See* Expert Decl. of Steven A. Iampietro [ECF No. 175], Expert Report at 9. Additionally, at Trial, McKesson's counsel also pointed out that the Plaintiff's witness Robin Page had said in an email to Carnahan that he could "have the stores ready in 36 hours" to switch suppliers if necessary, indicating that A&P itself considered it conceivable that it could replace McKesson with other pharmaceutical suppliers if needed. *See* Oct. 9, 2024 Hr'g Tr. at 94:7-22.

e.    Changes in the Means of Payment

As discussed above, the May 22 Transfer was the sole wire transfer of any of the 26 Payments, and A&P had a long-standing practice of paying McKesson's invoices via ACH transfer. This change in the means of payment method also supports finding that the May 22 Transfer is not protected by the ordinary course defense under section 547(c)(2)(A).

---

[24] Ostensibly, this feature is not unique to A&P's relationship with McKesson, nor even the pharmaceutical supply industry. Most consumer-facing stores would suffer impairment from the loss of a sector's supplier.

f. Conclusion

Thus, based on the foregoing reasoning, the Court finds that the May 22 Transfer is not shielded from avoidance by section 547(c)(2)(A) due to McKesson's demands for immediate payment and the resulting change in its payment terms from ACH transfer to wire. On the other hand, McKesson has successfully met its burden to prove that the ACH Transfers were made in the subjective ordinary course of business between the Parties, and therefore the ACH Transfers are shielded from avoidance under section 547(c)(2)(A).

2. The Objective Test

Alternatively, McKesson also asserts that the 26 Payments are unavoidable because they were made under objectively ordinary business terms. Under section 547(c)(2)(B) of the Bankruptcy Code, creditors may retain an otherwise preferential payment if it was made on terms standard to the "general practices in the industry, in particular the industry of the creditor." *Abovenet, Inc. v. Lucent Tech., Inc (In re Metromedia Fiber Network, Inc.)*, Nos. 02 B 22736 (ASH) thru 02 B 22742 (ASH), 02 B 22744 (ASH) thru 02 B 22746 (ASH), 02 B 22749 (ASH), 02 B 22751 (ASH) thru 02 B 22754 (ASH), Adv. No. 04-08564A, 2005 WL 3789133, at *5 (Bankr. S.D.N.Y. 2005). The Second Circuit has held that "ordinary business terms" should be liberally construed "and that 'only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary.'" *In re Roblin Industries, Inc.*, 78 F.3d 30, 39–40 (2nd Cir. 1996) (quoting *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993). Creditors need only show that the terms of the transaction were within the outer limits of particular industry practices, allowing for significant behavioral latitude.[25] *See Pereira*, 508 B.R. at 828-29. Moderate variance

---

[25] Put another way, the inquiry under section 547(c)(2)(B) is "whether 'a particular arrangement is so out of line with what others do' that it cannot be said to have been made in the ordinary course." *See Pereira*, 508 B.R. at 829 (citing *Leidenheimer*, 439 F.3d at 239 (quoting *In re Gulf City Seafoods*, 296 F.3d 363, 369 (5th Cir. 2002).

40

from the industry's objective norms is thus insufficient to find departure from those norms. *See id.*

McKesson bears the burden of proving by a preponderance of the evidence that the 26 Payments were made according to ordinary business terms. *See In re Conex Holdings, LLC*, 518 B.R. 269, 279 (Bankr. D. Del. 2014). Courts accept expert testimony as to industry standard business practices, witness testimony of events between the parties, and the business records and invoices of the parties, as evidence to prove this defense. *See id.* at 285–86; *Pereira v. UPS (In re Waterford Wedgwood USA, Inc.)*, 508 B.R. 821, 829-30 (Bankr. S.D.N.Y. 2014). Under this objective standard, the Parties' dealings during the Preference Period are not compared to the Parties' historical practices, but rather to a normative baseline set by a preponderance of the evidence. *See id.* Notably, the question is whether the conduct and terms employed during the Preference Period was comparable to the conduct and terms employed by similarly situated debtors and creditors facing the same or similar circumstances (*i.e.*, a debtor facing financial distress). *See Roblin*, 78 F.3d at 42 ("Restricting a creditor to courses of action typical in untroubled times leaves no room for realistic debt workout and unfairly penalizes those creditors that take conventional steps to institute a repayment plan.").

While the Parties did not devote much pre-trial briefing to providing information about generalized industry practices, both Parties brought forth fact and expert witnesses to testify to their respective positions, and the Court has reviewed the voluminous body of business documents and communications records submitted by each side. McKesson's industry expert, Timothy Kosty, asserted his beliefs that: (1) the overarching Supply Agreement contained no abnormal terms, (2) McKesson never deviated from those terms, and (3) threats of non-shipment after payment default were not necessarily out of the ordinary even in the absence of an explicit contractual provision.

*See* July 12, 2024 Hr'g Tr. [ECF No. 185] at 76-78 ("The industry perspective, if you don't pay your bill, you don't get supply.").[26]

However, the Plaintiff's own industry expert, Steven Iampietro, found McKesson's threats objectionable, declaring that McKesson "behaved as a bully" and that threats of non-shipment would have "not ordinarily been considered as part of [a] wholesalers' arsenal for dealing with struggling strategic retailers in or after 2015." *See* Expert Decl. of Steven A. Iampietro [ECF No. 175], Expert Report at 7. However, Iampietro also stated that exercising similar default terms within his own employer's credit manual would also amount to "minor bullying."[27] See July 12, 2024 Hr'g Tr. [ECF No. 185] at 153–54. Iampietro further criticized McKesson's behavior by proposing hypothetical courses of action that, in his view, would have achieved the same results without threatening to disrupt the pharmacies.[28] *See* Expert Decl. of Steven A. Iampietro [ECF No. 175], Expert Report at 9–10. Regardless of whether these suggestions were realistic (or even implementable), the relevant inquiry under section 547(c)(2)(B) is not whether McKesson could have acted differently, but rather whether its actual actions fell within the limits of industry practice. *See In re Roblin Industries, Inc.*, 78 F.3d 30, 42 (2nd Cir. 1996).

Carnahan strongly echoed Iampietro's testimony with his characterization of McKesson as a "uniquely aggressive creditor" who "behaved as a bully," but when questioned at Trial, admitted

---

[26] The Uniform Commercial Code is applicable across supplier-retailer relationships in many industries besides pharmaceutical distribution, and so its terms may assist in discerning the most basic of expectations between sophisticated firms. In the event that a buyer repudiates their obligation to pay for shipments of goods, a supplier may rightfully withhold that shipment under § 2-703(c).

[27] Iampietro worked for AmerisourceBergen's credit department for nearly two decades. AmerisourceBergen and McKesson control the pharmaceutical distribution market, along with one other competitor.

[28] These suggestions were all roundly criticized as unworkable by McKesson's witness Jenifer Towsley. *See* Decl. of Jenifer Towsley [ECF No. 162] at 24-28. For example, Towsley noted in her trial declaration that any negotiations with A&P "to reduce its financial exposure by consensual means" would likely have taken the transfers out of the ordinary course of business. *See id.* at 27.

that other major suppliers to A&P had actually curtailed shipping when Carnahan failed to pay their outstanding bills on time." *See* July 12, 2024 Hr'g Tr. [ECF No. 185] at 240–242; July 17, 2024 Hr'g Tr. [ECF No. 187] at 73–74.  On cross-examination, Carnahan also discussed his previous experience at another major retailer, which was also facing financial struggles and suppliers potentially cutting them off when bills went unpaid.  Regarding those threats, however, Carnahan averred that he "think[s] that is the standard commercially," and added, "You've got to pay for it if you're going to get it."  July 12, 2024 Hr'g Tr. [ECF No. 185] at 242.

Kosty's expert opinions, combined with the industry experiences of Carnahan and Iampietro, lead the Court to believe McKesson's conduct when collecting on the ACH Transfers did not amount to a deviation from the general practices in the industry.  *See Roblin,* 78 F.3d at 39–40.  Its contractual terms, by which the ACH Transfers were all made, contained substantially similar default provisions as those of other major pharmaceutical distributors, showing that the basic terms on which McKesson was relying were not unusual in the industry.  *See* McK 42 at 17-20.  Some of A&P's other suppliers actually cut off shipments upon non-payment, adding credence to Carnahan's opinion on the commercial standard, as does his previous experience with financially distressed retailers.  *See* July 12, 2024 Hr'g Tr. [ECF No. 185] at 242; July 17, 2024 Hr'g Tr. [ECF No. 187] at 73–74.  Had McKesson actually withheld Merchandise at any point in time, the Court would be less confident in its conclusion.  In the instant case, it appears that McKesson did no more than "sabre rattle."  July 12, 2024 Hr'g Tr. [ECF No. 185] at 165.

However, with respect to the May 22 Transfer, McKesson failed to present any non-conclusory evidence indicating pharmaceutical supply industry practices of either: (i) reducing payment terms from six weeks to one day, or (ii) altering the method of payment for customers, upon learning of a purchaser's potential financial distress.  In fact, McKesson's own difficulties in

43

implementing such short payment timelines strengthen the notion that such short payment windows were highly abnormal within its industry.[29]  Additionally, the Parties' own years-long relationship maintained terms different to those by which the May 22 Transfer was effected. *See In re Waterford*, 508 B.R. at 829-30.

Thus, based on the foregoing reasoning, the Court finds that the May 22 Transfer shall not be shielded from avoidance by way of section 547(c)(2)(B). On the other hand, McKesson has successfully met its burden to prove that the ACH Transfers were effected under objectively ordinary business terms for the applicable industry, and therefore the ACH Transfers are shielded from avoidance by way of section 547(c)(2)(B) under the objective test.

### D. To What Extent is McKesson's Preference Liability Reduced on Account of its Provision of Subsequent New Value?

In its 2022 MSJ Opinion, this Court previously ruled that McKesson's subsequent new value defense under section 547(c)(4) (the "SNV Defense") is valid to the extent of the value of the additional goods delivered by McKesson to the Debtor during the Preference Period.  *See* 2022 MSJ Opinion [ECF No. 141] at 15–16.  But the Court reserved for trial the resolution of factual disputes over the exact amount of the value of those delivered goods.  *See id.*  At Trial, the Parties disputed the proper method of valuing the invoiced merchandise delivered to A&P and whether merchandise underlying certain of the invoices was actually delivered. *See* McKesson Corp.'s Opening Trial Brief [ECF No. 161]; Pl's Pre-Trial Mem. of Law [ECF No. 169].

After considering the evidence and argument at Trial, and for the reasons discussed below, this Court concludes that for purposes of McKesson's SNV Defense: (1) the invoice price

---

[29] As one of the largest in its business, McKesson would ostensibly maintain systems capable of implementing any commonly seen business arrangement, in addition to many of the rarer scenarios.  McKesson's own emails and Towsley's testimony establish that one-day payments, while possible, would require a special, non-ordinary procedure to accurately bill A&P without estimations.  *See* McK 79; Decl. of Jenifer Towsley Direct Trial Testimony Proffered by the McKesson Entities [ECF No. 162] at ¶ 60.

establishes the value of the Merchandise actually delivered to the Debtor's pharmacies during the Preference Period; and (2) McKesson's SNV defense shall not be calculated to include the value of the Merchandise underlying the "355 Invoices" (defined below) representing an aggregate value of $127,692.46.

1. What is the Proper Method of Valuing the Invoiced Merchandise Delivered to A&P for Purposes of McKesson's SNV Defense?

Contractually agreed upon payments are generally presumed to be the "new value" furnished under section 547(c)(4). *See Off. Comm. of Unsecured Creditors of Enron Corp. v. Whalen (In re Enron Corp.)*, 357 B.R. 32, 50 (Bankr. S.D.N.Y. 2006); *Webster v. Harris Corp. (In re NETtel Corp.)*, 319 B.R. 290, 295 (Bankr. D.D.C. 2004). However, this presumption can be rebutted when there is a genuine issue of material fact, such as when there is an alleged discrepancy between the contractual amount and the actual value of the services or goods provided. *See Whalen*, 357 B.R. at 50 (holding that wages provided in consulting agreement did not establish "new value" of employee services as a matter of law due to potential lack of arms' length negotiation between parties); *see also Schlant v. Schueler (In re Buffalo Auto Glass)*, 187 B.R. 451, 454 (Bankr. W.D.N.Y. 1995) (holding amount of "new value" provided by principal of corporation in form of employment service would be measured "by the value of her services in augmenting the Debtor's estate . . . not by the amount of her pay [*i.e.*, the size of the paycheck]…because the principal of a self-owned corporation pays himself or herself whatever salary he or she wishes … [which] bears no relation to the benefits conferred by the principal on the corporation.").

Similarly, invoices are probative of the new value provided, absent contrary evidence. *See Gonzales v. Nabisco Division of Kraft Foods, Inc. (In re Furr's Supermarkets)*, 317 B.R. 423, 431–32 (10th Cir. BAP 2004); *see also Irving Trust Co. v. Commercial Factors Corp. (In re Nathan &*

*Cohen Co.*), 68 F.2d 864, 867 (2d Cir. 1934) (invoices were sufficient proof of the delivery dates of goods in the absence of contradictory evidence). "The relevant inquiry under § 547(c)(4) is whether the new value replenishes the estate" and requires the Court to determine the actual value of the goods provided, which is presumptively the invoice price. *In re Teligent, Inc.,* 315 B.R. 308, 315 (Bankr. S.D.N.Y. 2004).

Here, the invoices indicate a price paid per drug equal to the basic pricing mechanism specified in the Supply Agreement. *See, e.g.*, McK 85; Supply Agreement at § 5; Extension Agreement at § 5. Thus, the invoices reflect the contractually agreed upon value of the goods, and so the invoices presumptively indicate the new value provided by McKesson to the Debtor.

The Plaintiff then must rebut this presumption by showing that the actual value of the benefits conferred by delivery of the goods was different from the invoice price, as provided to A&P at the time of delivery. The Plaintiff asserts that the Debtor's entitlement to a number of contractually mandated rebates and discounts pursuant to the Parties' Supply Agreement means that the invoice prices are greater than the actual amount of new value McKesson provided to the Debtor.[30] *See* First Amended Pretrial Order [ECF No. 168] at 11.

The rebates here were contractual amounts credited to A&P for application against future invoices, calculated based on the total invoiced value of Merchandise delivered to pharmacies and actually paid for in a timely fashion. *See* Am. Compl. ¶¶ 20–21; Decl. of Dawn DeVito [ECF No. 127], Ex. 7 at p. 33–34 (Supply Agreement § 21(M)). The rebates were conditioned on A&P's prompt payment, and A&P forfeited the right to any rebate if due and outstanding invoices existed on the date the rebate was to be paid out. *See id.* Often, McKesson would also calculate and credit

---

[30] The Plaintiff asserts that "McKesson's SNV defense under § 547(c)(4) is…inflated by $711,415.72 for rebates on generics merchandise; $257,617.25 for rebates on branded merchandise; and $28,405.05 for contractually mandated discounts." First Amended Pretrial Order [ECF No. 168] at 16.

46

"prebates" before invoices were even due, requiring potential after-the-fact reconciliation if the underlying invoice remained unpaid after the rebate was applied to reduce A&P's cash purchase price, or if A&P returned the Merchandise on which that rebate was earned and spent. *See* Rebates Decl. of D. DeVito: McKesson's Rebates & Credits Procedures [ECF No. 172] at ¶ 36–40.

Additionally, McKesson provided various value discounts to the Debtor under the Supply Agreement. These included: markdowns of cost of branded pharmaceutical products ranging up to 5% of annual net purchase volume, quarterly rebate on mail order pharmacy merchandise based on percentage of net purchase volume of mail order "Pharmacy Rx and OTC Merchandise," a quarterly rebate on "Sunmark Private Label" purchases based on percentage of "Sunmark Private Label" purchase volume, and a quarterly upcharge based on "D.P.D. Merchandise" purchase volume subject to "Cost of Goods" markdown. *See* Supply Agreement at 5.A; 5.C; 5.E; 6.B; 7.A.8.

Here, the Plaintiff asserts that, because the Debtor received these rebates and discounts on Merchandise purchased during the Preference Period, the Debtor's actual out-of-pocket cost, and thus the "true value" of the Merchandise delivered by McKesson, was the amount of the listed invoice price less the rebate or discount linked to that specific purchase. Plaintiff's Pre-Trial Mem. Of Law [ECF No. 169] at 30. However, because new value is given at the time goods are shipped, the Court finds it inappropriate to include contingent contractual rights subject to future adjustment in that calculation. *See In re Cont'l Polymers, Inc.*, 359 B.R. 868, 881-82 (Bankr. E.D. Tenn. 2005).

The Court is convinced that the invoice price here reflects what a sophisticated, willing buyer agreed to pay to a willing seller for delivery of the underlying Merchandise at the time of delivery.[31] Rebates were calculated from the invoiced price and earned upon payment of that

---

[31] The Plaintiff offered no evidence to suggest that the other two major pharmaceutical distributors were offering the same or similar compounds at lower face values than McKesson's without its rebates. Given the industry's rigorous

invoice.  Thus, at delivery, A&P received pharmaceuticals, the estate was replenished by their value, and any future rebate would be crystallized if and only if A&P timely paid that invoice. Similarly, if McKesson allowed rebates to be applied upon purchase and A&P later failed to timely pay, A&P's future credits would be reduced by the same amount.  Similarly, the amount of credit due to A&P on account of returns was unknown at the time goods were delivered, as neither A&P nor McKesson would have known at the time of delivery which products would be returned.  The amount of the return credit itself was also subject to adjustments following the processing and verification of those returns by Inmar and McKesson.

The Court is therefore unpersuaded by the Plaintiff's attempts to use various forms of contractual discount and McKesson's wholesaler goodwill to reduce the value of the goods delivered by McKesson for purposes of McKesson's subsequent new value defense.  Thus, in this Court's calculations of the subsequent new value defense below, the invoice price establishes the value of the Merchandise actually delivered to the Debtor's pharmacies during the Preference Period.

2.   Was the Merchandise Underlying the "355 Invoices" Actually Delivered?

In its calculation of the extent of its SNV Defense, McKesson includes 355 invoices purporting to list Merchandise delivered within two weeks of the Petition Date with an aggregate value of $127,692.46 (the "355 Invoices"), which are also included in McKesson's Administrative Proof of Claim.  *See* McK 85.  The Plaintiff contends that "McKesson's SNV Defense under § 547(c)(4) is overstated…because it includes invoices for $127,692.46 in merchandise that was not delivered to A&P . . . .").  First Amended Pretrial Order [ECF No. 168] at 11.  Pursuant to § 547(g),

---

competition, extremely low profit margins (despite massive volume), and stringent governmental price regulations, this is unsurprising to the Court.

McKesson has the burden to prove the validity of its subsequent new value defense by a preponderance of the evidence. *See In re* Teligent, 315 B.R. 308, 315 (Bankr. S.D.N.Y. 2004).

McKesson first asserted the existence of the 355 Invoices in its Administrative Proof of Claim, and supplemented the factual record as to their validity through Towsley's sworn testimony that it was McKesson's practice to generate an invoice for pharmaceuticals on the day that those pharmaceuticals were delivered. *See* Decl. of Jenifer Towsley Direct Trial Testimony Proffered by the McKesson Entities [ECF No. 162] at 41.

In response, at Trial, the Plaintiff's witness Dawn DeVito ("DeVito") testified that she had searched A&P's records systems, both in preparation for the Trial and earlier throughout this case, and failed to find any proof of delivery to any of the specified receiving pharmacies. *See* July 17, 2024 Hr'g Tr. [ECF No. 186] at 205-07; ECF No. 173 at 42-50. Upon review of the 355 Invoices, the Court finds that they are facially problematic for a number of reasons: (1) all identify their shipping route as "DNS," for which the Plaintiff proffers the meaning of "do not ship"; (2) the stop along each route is coded "000"; (3) at least two of the invoices list the receiving pharmacy as "Inactive"; and (3) across all 355 Invoices, there exist only two unique (and incredibly small) orders, repeated hundreds of times. *See* McK 85.

When asked, McKesson did not produce any proof of shipment or delivery beyond the 355 Invoices themselves. *See* Post-Trial Brief Submitted by the McKesson Entities [ECF No. 190] at 25–26. McKesson's attempt to offer "several logical explanations" at Trial also fell flat. In fact, McKesson's witness Towsley's own declaration testimony that the Merchandise was shipped out on July 2, 3 and 7 contradicts the invoice sheets' own delivery dates, primarily listed as July 13. *See* Decl. of Jenifer Towsley Direct Trial Testimony Proffered by the McKesson Entities [ECF No. 162] at ¶ 41; McK 85. No Pathmark reports reflected the deliveries either, whether on weekly

49

reports (for the first two batches) or daily reports once A&P was on daily payment terms (for the final batch). *See* Plaintiff's Post-Trial Mem. of Law [ECF No. 192] at 19-20. The Court thus believes the factual record to be overwhelmingly one-sided on this issue, in the Plaintiff's favor. As such, McKesson's SNV Defense shall not be calculated to include the value of the Merchandise underlying the 355 Invoices.

### 3. Subsequent New Value Defense Calculations

Taking into account the above two conclusions, the Court calculates McKesson's preference exposure, net of its SNV Defenses, as follows:

| Payment Date | Payment Number | Payment Amount | Invoice Number | New Value Merchandise Received by Debtors | New Value Available | Preference Exposure, Net of Only New Value Defense |
|---|---|---|---|---|---|---|
| 4/24/2015 | 4040804 | 3,912,876.13 | 041815-NON-GEN | | | |
| 4/24/2015 | 4040805 | 908,992.97 | 031415-GEN | | | |
| | | | | 4/25/2015 – 4/30/2015 | $4,635,582.73 | $186,286.37 |
| | | | | 5/1/2015[32] | $774,381.20 | $0.00 |
| 5/1/2015 | 4041066 | 3,834,804.71 | 042515-NON-GEN | | | |
| 5/1/2015 | 4041067 | 944,591.15 | 032115-GEN | | | |
| | | | | 5/2/2015 – 5/7/2015 | $4,102,560.89 | $676,834.97 |
| | | | | 5/8/2015 | $776,996.14 | $0.00 |
| 5/8/2015 | 4041262 | 3,087,956.37 | 050215-NON-GEN | | | |
| 5/8/2015 | 4041263 | 1,197,576.26 | 032815-GEN | | | |
| | | | | 5/9/2015- 5/14/2015 | $3,921,757.61 | $363,775.02 |
| | | | | 5/15/2015 | $804,896.06 | $0 |

---

[32] The record indicates that, at least with regard to the Next-Day Payments, McKesson made deliveries of goods on Friday mornings, with payments by A&P being made on Friday afternoons. *See* Pref. Decl. of T. Carnahan: McKesson's Actions to Pressure A&P to Pay (ECF No. 170) at 40. The Court did not note any evidence indicating whether it was the Parties' normal course of business throughout their relationship to follow this morning delivery, afternoon payment schedule, other than that the Supply Agreement did require that deliveries be made by 1 p.m. the next day after orders were transmitted. *See* Decl. of Robin M. Page Dir. Tr. Testimony Proffered by the McKesson Entities [ECF 163] at ¶ 13. Thus, for purposes of the Court's analysis of McKesson's SNV Defense, where goods and payments were delivered/transmitted on the same day, the Court treats the receipt of goods by A&P as occurring before the payment from A&P to McKesson.

| | | | | | | |
|---|---|---|---|---|---|---|
| 5/15/2015 | 4041444 | 4,019,674.86 | 050915-NON-GEN | | | |
| 5/15/2015 | 4041445 | 907,446.75 | 040415-GEN | | | |
| | | | | 5/16/2015-5/21/2015 | $4,097,585.05 | $829,536.56 |
| | | | | 5/22/2025 | $813,698.06 | $15,838.50 |
| 5/22/2015 | 4041716 | 3,840,125.40 | 051615-NON-GEN | | | |
| 5/22/2015 | 4041716 | 747,306.22 | 041115-GEN | | | |
| | | | | 5/23/2015-5/28/2015 | $3,493,423.33 | $1,109,846.79 |
| | | | | 5/29/2015 | $909,118.06 | **$200,728.73**[33] |
| 5/29/2015 | 4041809 | 4,052,144.25 | 052315-NON-GEN | | | |
| 5/29/2015 | 4041810 | 793,371.37 | 041815-GEN | | | |
| | | | | 5/30/2015-6/04/2015 | $4,182,929.58 | $863,314.77 |
| | | | | 6/5/2015 | $824,426.09 | $38,888.68 |
| 6/5/2015 | 4042022 | 4,213,202.75 | 053015-NON-GEN | | | |
| 6/5/2015 | 4042021 | 807,575.46 | 042515-GEN | | | |
| | | | | 6/06/2015 – 6/11/2015 | $3,924,060.86 | $1,135,606.03 |
| | | | | 6/12/2015 | $789,712.50 | $345,893.53 |
| 6/12/2015 | 4042202 | 4,086,597.70 | 060615-NON-GEN | | | |
| 6/12/2015 | 4042201 | 1,595,482.76 | 050215-GEN | | | |
| | | | | 6/13/2015-6/18/2015 | $3,817,872.39 | $2,210,101.60 |
| | | | | 6/19/2015 | $741,785.01 | $1,468,316.59 |
| 6/19/2015 | 4042401 | 3,909,379.62 | 061315-NON-GEN | | | |
| 6/19/2015 | 4042402 | 859,882.17 | 050915-GEN | | | |
| | | | | 6/20/2015-6/25/2015 | $3,926,786.57 | $2,310,791.81 |
| | | | | 6/26/2015 | $804,111.40 | $1,506,680.41 |
| 6/26/2015 | 4042602 | 3,700,520.91 | 062015-NON-GEN | | | |
| 6/26/2015 | 4042603 | 886,529.16 | 051615-GEN | | | |
| | | | | 6/27/2015-7/02/2015 | $4,321,063.37 | $1,772,667.11 |
| | | | | 7/03/2015 | $3,430.68 | $1,769,236.43 |
| 7/3/2015 | 4042857 | 4,069,543.77 | 602715-NON-GEN | | | |
| 7/3/2015 | 4042858 | 859,138.86 | 052315-GEN | | | |
| | | | | 7/04/2015-7/09/2015 | $5,023,685.93 | $1,674,233.13 |

---

[33] This would be McKesson's maximum preference exposure with respect to the May 22 Transfer, if the Court had determined that McKesson had a valid SNV defense.

| | | | | 7/10/2015 | $896,236.61 | $777,996.52 |
|---|---|---|---|---|---|---|
| 7/10/2015 | 4043047 | 3,504,264.07 | 070415-NON-GEN | | | |
| 7/10/2015 | 4043046 | 865,317.11 | 053015-GEN | | | |
| | | | | 7/12/2015-7/13/2015 | $1,436,808.53 | $3,710,769.17 |
| 7/14/2015 | 4043222 | 1,436,808.53 | 7132015 | | | |
| | | | | 7/14/2015 | $1,098,919.73 | $4,048,657.97 |
| 7/15/2015 | 4043267 | 1,098,919.73 | 7142015 | | | |
| | | | | 7/15/2015 | $883,250.71 | $4,264,326.99 |
| 7/16/2015 | 4043333 | 883,250.71 | 7152015 | | | |
| | | | | 7/16/2015 | $830,735.91 | $4,316,841.79 |
| | | | | 7/17/2015 | $883,298.31 | $3,433,543,48 |
| 7/17/2015 | 4043354 | 830,735.91 | 7162015 | | | |
| 7/17/2015 | 4043300 | 5,000,563.27 | 071115-NON-GEN | | | |
| 7/17/2015 | 4043299 | 898,354.51[34] | 060615-GEN | | | **$10,163,197.17[35]** |

As discussed previously in this opinion, the Court has determined that all but the May 22 Transfer are shielded from avoidance by other valid section 547(c) defenses. Thus, the Court need only apply the SNV Defense to the May 22 Transfer.[36] *See In re Dots, LLC*, 562 B.R. 286, 295 (Bankr. D. N.J. 2017) (holding that in fact, in order to determine validity of new value defense under section 547(c)(4), court must necessarily undertake examination of whether transfers are unavoidable as protected by other section 547(c) affirmative defenses, such as an ordinary business terms defense). The record indicates that A&P received new value in the form of pharmaceutical goods delivered subsequent to the May 22 Transfer in the amounts of $3,493,423.33 and

---

[34] This was for payment for generic pharmaceuticals purchased six weeks earlier. So, McKesson conceded that this payment is not protected by its SNV Defense and was for Merchandise delivered outside of the 20-Day Period. *See* Decl. of Charles M. Berk in Support of Mots. For Summ. Judg. Filed by McKesson Corp. [ECF 5060] at ¶ 14.

[35] This is McKesson's maximum, or net preference exposure, assuming it had no other valid preference defenses.

[36] *See also In re IRFM, Inc.*, 52 F.3d 228, 233 at fn. 6 (9th Cir. 1995) (". . . once a creditor has successfully asserted a defense under section 547(c)(1), (2), or (3), it may not attempt to assert a defense under section 547(c)(4) for the same preferential transfer.")

$909,118.06 from May 23, 2015 to May 29, 2015.[37]  *See* Decl. of Charles M. Berk in Support of Mots. For Summ. Judg. Filed by McKesson Corp., Ex. B.  However, A&P later made otherwise unavoidable payments to McKesson on account of these new value deliveries (*i.e.*, A&P's subsequent payments to McKesson have been determined to be unavoidable because of section 547(c)(2)), thus making the SNV Defense unavailable to McKesson with respect to the May 22 Transfer.[38]  *See Dots, LLC*, 562 B.R. at 302; *In re PMC Mktg. Corp.*, 518 B.R. 150, 158-59 (1st Cir. B.A.P. 2014).[39]

### E.  Does Section 349(b) Insulate McKesson from Preference Liability?

In its post-trial brief, McKesson asserts that "to the extent this Court determines any McKesson Entity has liability under sections 547 and 550, sections 349(b)(1)(B) and (b)(2) operate to insulate McKesson from having to pay any funds to Plaintiff."  *See* McK Post-Trial Brief [ECF No. 190], at 49.[40]  Section 349(b)(1)(B) of the Bankruptcy Code states in pertinent part:

> "[u]nless the court, for cause, orders otherwise, a dismissal of a case
> other than under section 742 of this title . . . reinstates . . . any transfer

---

[37] *See In re Micro Innov Corp.*, 185 F.3d 329, 333 (5th Cir. 1999) (holding that extension of new value need not be directly connected to the preceding preference in order to shelter it) (collecting cases).

[38] Pursuant to the Supply Agreement, payment for the $909,118.06 of generic pharmaceutical goods delivered on May 29, 2015 would have been due and paid on the sixth following Friday, which was July 10, 2015.  *See* Decl. of Charles M. Berk in Support of Mots. For Summ. Judg. Filed by McKesson Corp., Ex. B.  Payment for the $3,493,423.33 of non-generic pharmaceutical goods delivered between May 23, 2015 and May 28, 2015 would have been due and paid on the following Friday, which was June 5, 2015.  *See id.*  As previously analyzed, both the payments made to McKesson on July 10, 2015 and June 5, 2015 are shielded from avoidance by McKesson's section 547(c)(2) ordinary course defense.

[39] "If the debtor has made payments for goods or services that the creditor supplied on unsecured credit after an earlier preference, and if these subsequent payments are themselves voidable as preferences (or on any other ground), then under section 547(c)(4)(B) the creditor should be able to invoke those unsecured credit extensions as a defense to the recovery of the earlier voidable preference."  *See In re PMC Mktg. Corp.*, 518 B.R. 150, 158-59 (1st Cir. B.A.P. 2014) (quoting Vern Countryman, *The Concept of a Voidable Preference in Bankruptcy*, 38 Vand. L. Rev. 713, 788 (May 1985).  Here, since A&P's payments to McKesson subsequent to the May 22 Transfer are not voidable as preferences, McKesson cannot use its unsecured credit extensions after the May 22 Transfer as a setoff to its May 22 Transfer preference exposure.

[40] McKesson in its post-trial brief further asserts that: "[T]here is no cause to support overriding the mandate of sections 349(b)(1)(B) and (2), particularly in light of McK Specialty's minimal preference exposure and the absence of any preference liability against the other McKesson Entities."  *Id.*

avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or preserved under section 510(c)(2), 522(i)(2) or 551 of this title. . .[or] vacates any order, judgment, or transfer ordered, under section 522(i)(1), 542, 550, or 553 of this title. . ."

As an initial matter, this case has not yet been dismissed, so this issue is not yet ripe. Additionally, Judge Drain already previously entered an *Order Authorizing Final Resolution of Debtors' Cases and Granting Related Relief* [Main Case ECF No. 4810] (dated May 14, 2021) (the "Case Resolution Order") providing that any reinstatements "provided for in section 349(b)(1) – (3) of the Bankruptcy Code shall not occur [upon dismissal of the bankruptcy cases], sufficient cause having been shown for such relief under section 349(b) of the Bankruptcy Code." *See* Case Resolution Order [Main Case ECF No. 4810] at ¶ 37. The Case Resolution Order also provides that once all remaining distributions and litigation in this case are completed, the case will be dismissed and closed. *See id.* at ¶¶ 38, 39.

However, in an abundance of caution, the Court will nevertheless analyze whether sufficient cause can be found here to prevent section 349(b)'s reinstatement of payments successfully avoided during this bankruptcy case. In assessing whether "cause" exists, courts consider the reliance interests that creditors and third parties have acquired during the bankruptcy case. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 466–67 (2017). As discussed in further detail below, the Court concludes that cause is established here because of the clear reliance interests that the Debtors' creditors as a whole have in this case to any ultimately avoided payments.

"The basic purpose of [Section 349(b)] is to undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case.'" *In re Kent Funding Corp.*, 290 B.R. 471, 475 (Bankr. E.D.N.Y. 2003) (quoting H.R.Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977), 1978 U.S.C.C.A.N. 5963, 6294)

54

(internal quotations omitted).   Unless otherwise ordered, "dismissal under § 349(b) returns the Debtor to its pre-bankruptcy status and the estate ceases to exist."   11 U.S.C. § 349(b); *In re Westgate Nursing Homes, Inc.*, 518 B.R. 250, 225–56 (Bankr. W.D.N.Y. 2014) (citing *Kent Funding*, 290 B.R. at 476).

Courts have noted that section 349(b) is a two-edged sword in that it operates to restore property rights to their initial positions while also enabling the court to "order otherwise for cause." *In re BSL Operating Corp.*, 57 B.R. 945, 952 (Bankr. S.D.N.Y. 1986).[41]   Indeed, "[t]he legislative history to [s]ection 349 contemplates that in some cases it would be unable to fully restore the positions of all parties when it notes that the section 'does not necessarily encompass undoing sales of property from the estate to a good faith purchaser.'"  *Mulder* at *3.   Thus, as the Supreme Court posited, section 349(b) ". . . seems designed to give courts the flexibility to protect reliance interests acquired in . . . bankruptcy[.]".  *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) (quoting H.R. Rep. No. 95-595, at 338).

The Bankruptcy Code does not expressly define "cause" for purposes of section 349(b).  *In re Viper Servs., LLC*, No. 15-11259-J11, Adv. No. 17-1010-j, 2018 WL 1801208, at *2 (Bankr. D.N.M. Apr. 13, 2018) (quoting *In re Sadler*, 935 F.2d 918, 921 (7th Cir. 1991) ("One circuit court has defined 'cause' … to mean 'an acceptable reason.'").   Courts generally agree however that finding cause "does not require the high-threshold showing of bad faith—it merely requires . . . a good reason for reallocation of the funds."  *In re Marve*, No. 19-13434, 2020 WL 11622509, at *2 (E.D. Mich. Sept 28, 2020) (rejecting notion that "for cause" cases typically involve showing

---

[41] "Section 349 does not provide absolute protection to parties and was not intended to.  It un-does the bankruptcy case only 'as far as practicable.'"  *In re Mulder*, No. 810-74217-REG, 2010 WL 4286174, at *3 (Bankr. E.D.N.Y. Oct. 26, 2010) (citing H.R.Rep. No. 95–595, at 338).

inequity or bad faith); *see also In re Haddad*, 572 B.R. 661, 676 (Bankr. E.D. Mich. 2017) (holding

that fraud or bad faith finding not required to establish cause).

Consistent with the Supreme Court's statements in *Jevic*, courts emphasize instead that

"cause" in section 349(b) is generally "geared toward protecting rights acquired in reliance upon

the bankruptcy," including rights and interests acquired by parties during the course of a case, for

example as a result of a confirmed plan. *Weise v. Cmty. Bank of Cent. Wis.*, 552 F.3d 584, 587-88

(7th Cir. 2009) (quoting *In re Wiese*, No. 06-10053-12, 2007 Bankr. LEXIS 4665 at *2–3 (Bankr.

W.D. Wisc. June 6, 2007)); *see also* H.R. Rep. No. 95–595, at 338 ("[W]here there is a question

over the scope of [] [section 349], the court will make the appropriate orders to protect rights

acquired in reliance on the bankruptcy case.").[42]

One of the Bankruptcy Code's primary purposes is to offer equitable treatment to creditors.

*Weise*, 552 F.3d at 590 (quoting *In re Derrick*, 190 B.R. at 351). Courts have thus concluded that

cause exists to preserve avoidance judgments upon dismissal in cases where the result of vacating

the judgment would benefit a party "at the expense of all unsecured creditors and the debtors" and

allow the party "to reap the benefits of its attachment contrary to code policy." *In re Toronto*, 165

B.R. 746, 757 (Bankr. D. Conn 1994) (declining to order dismissal and by implication disallowing

section 349 to operate).[43]

Here, the Debtors' creditors have relied upon potentially avoided payments as potential

sources of recovery for the benefit of the Debtors' estates. Due to the Debtors' estates being

administratively insolvent, the recovery of any ultimately avoided payments would serve to

---

[42] In the absence of such reliance interests by creditors or other third parties, the bankruptcy court should instead find that there is no basis for altering the natural impact of section 349(b). *See In re Derrick*, 190 B.R. 346, 351 (Bankr. W.D. Wis. 1995).

[43] *See also In re Marker*, 133 B.R. 340, 344–45 (Bankr.W.D.Pa.1991) (noting that dismissal is inappropriate when in interest of only one creditor and would be harmful to the debtor and remaining creditors).

increase the estates' assets and be used to satisfy the Debtors' administrative expenses, to the benefit of the Debtors' creditors.  Allowing section 349(b) to operate here would allow McKesson to retain preferential payments made to the Debtors at the expense of the Debtors' similarly situated creditors and the Debtors' estates.  As analyzed above, such a result is clearly contrary to both Congressional intent and the policy goals underlying the Bankruptcy Code.

Finally, a finding of cause here is consistent with this Court's previous orders in this case, including the very Case Resolution Order that McKesson relies on for its section 349(b) argument.  *See* McK Post-Trial Brief [ECF No. 190] at 48–49.  In the Main Case, the Debtor and the Committee jointly motioned for an order before the Court, successfully arguing that "[c]ourts have regularly allowed orders, including those approving releases and settlements, to be given continued effect after a dismissal, notwithstanding section 349 of the Bankruptcy Code."  *See* Joint Mot. of Debtors and Creditors' Committee for Entry of an Order Authorizing Final Resolution of Debtors' Cases and Granting Related Relief [Main Case ECF No. 4726] at ¶ 53.  This Court agreed and found that sufficient cause existed to give "releases, stipulations, settlements, liens, rulings, orders, and judgments" arising from the Chapter 11 cases ". . . continued effect under section 349 of the Bankruptcy Code notwithstanding the dismissal of the Chapter 11 Cases provided for herein."  Case Resolution Order*,* at ¶ C, 38.  In ordering that section 349 shall not take effect due to a sufficient finding of cause, and by ordering that "nothing herein shall exculpate or release the defendants in the McKesson Adversary Proceedings," this Court clearly intended that any preferences determined in this adversary proceeding be returned to the Debtors' estates for the benefit of all the Debtors' creditors.  *Id.* at ¶ 45.  To suggest otherwise is contrary to what was specifically predetermined by the Case Resolution Order, and would create a baseless exception for McKesson.  Indeed, the Plaintiff successfully recovered amounts through other preference and

avoidance actions it brought against various other of the Debtor's creditors in this case.[44]  It would therefore be inequitable as to those settling creditors if section 349(b) applied as to only McKesson to insulate it from preference liability upon ultimate dismissal of this case.

### F. Alleged Automatic Stay Violations

The Court will next address each alleged automatic stay violation by McKesson and resolve what amount, if any, is owed to the Debtor from McKesson.  The burden of proof lies with the Plaintiff who must prove by a preponderance of the evidence that such a violation occurred.  *See In re Grinspan*, 597 B.R. 725, (Bankr. E.D.N.Y. 2019).  "[A]ctions taken in violation of the stay are void and without effect."  *In re Arcapita Bank B.S.C.*, 648 B.R. 489, 496 (Bankr. S.D.N.Y. 2023) (quoting *In re Colonial Realty Co.*, 980 F.2d 125, 137 (2d Cir. 1992)).  Further, "[i]t is not the debtor's responsibility to take action that ensures that she receives protection of the automatic stay; rather the creditor bears the burden of seeking relief from the automatic stay before taking post petition collection actions."  *In re Braught*, 307 B.R. 399, 401 (Bankr. S.D.N.Y. 2004).

1. The $413k Medturns Credits & $166k Additional Medturns Credits for Products Returned Prepetition

The Plaintiff alleges that two prepetition "Medturns" credits,[45] worth $413,000 and $166,000, were entered as owed to the Debtors but withheld for application postpetition.  *See* Pl.

---

[44] *See, e.g.*, *Joint Mot. of Debtors and Creditors' Comm. for Entry of an Order Authorizing Final Resolution of Debtors' Cases and Granting Related Relief* [Main Case ECF No. 4726] at 7 ("To date, the aggregate amount of Litigation Proceeds from Avoidance Actions is approximately $2.4 million, approximately $600,000 of which will be available to the Debtors' estates. . ."); *Debtors' Motion for Entry of an Order Approving Settlement Agreement with Pepsi Entities* [Main Case ECF No. 4625] at 5 ("The Settlement Agreement provides in pertinent part, for the settlement of the Preference and Promotional Claims on the basis of a payment by the Pepsi Entities to the Debtors of $6,500,000. . ."); *Debtor's Motion for Entry of Order Approving Settlement Agreement with Yorktown Defendants* [Main Case ECF No. 4662] at 3–4 (Debtor stating that final partial judgment regarding avoidance claim was satisfied by defendant in amount of $660,540.40 on August 10, 2020).

[45] These "Medturns" credits are linked to certain products that were returned in May, June, and the first half of July 2015.  Am. Compl. ¶ 86.  Under the Supply Agreement, McKesson had regularly credited the Debtor from 2012 through mid-July 2015 for "medturns" through a process whereby the Debtor's individual stores would return merchandise, as permitted by the Supply Agreement, and McKesson would calculate the amount of credit the Debtor was due for the returns and permit the Debtor to use the credits to reduce the amounts paid for subsequent purchases.

58

Pretrial Br. at 3-5.   Specifically, on July 28, 2015 and later again on September 16, 2015, McKesson internally recorded these credits as due and owing, but after consulting bankruptcy counsel, diverted the credits to a holding account (#318699), where they are still recorded as due and owing to A&P.  *See id.*  The Plaintiff alleges that these withholdings amount to a violation of the automatic stay under §§ 362(a)(3), (6), and/or (7) of the Bankruptcy Code.

In order for the Court to determine whether these withholdings were a violation of the automatic stay under § 362(a)(3), the Court must determine as a threshold matter whether A&P had a contractual right to the credits, and thus whether the credits were property of A&P's estate.[46] If the Court does determine that A&P has a contractual right to these credits, then the Court must also determine: (1) whether A&P had a contractual right to the application of its credits to subsequent purchases from McKesson; and (2) whether McKesson had a right of recoupment.

The Parties dispute whether paragraph 4 or paragraph 8 of the Extension Agreement applies to the Medturns credits here.  Paragraph 4's language seems to waive A&P's right to refunds, rebates, and other similar amounts that accrued prior to the Petition Date.  On the other hand, paragraph 8 seems to specifically preserve all of A&P's credits related to refunds and exchanges, whether they originated from deliveries before or after the effective date of the Extension Agreement, which was September 8, 2015.  Paragraph 4 of the Extension Agreement reads:

---

*See id.* at ¶ 88.  McKesson informed the Debtor via email of how much it owed for its purchases and how much it could deduct for medturns credits.  *See id.*

[46] "Whether § 362(a)(3) stays an action is a two-step inquiry. First, a court must determine whether property of the estate is at issue; second, a court must determine whether the action in question constitutes an action to obtain possession of, or exercise control over, the property in question."  *See Roman Cath. Diocese of Rockville Ctr. v. Ark320 Doe (In re Roman Cath. Diocese of Rockville Ctr.)*, 651 B.R. 622, 644 (Bankr. S.D.N.Y. 2023) (quoting *In re Aearo Techs. LLC*, 642 B.R. 891, 907 (Bankr. S.D. Ind. 2022).

**Pre-Petition Rebates and Credits.**  A&P acknowledges and agrees that it does not have right to receive Rebates,[47] refunds, or other amounts which accrued prior to the Petition Date and such amounts may not be used to reduce any of McKesson's claims in the Bankruptcy Case, including its 503(b)(9) claim.

Paragraph 8 of the Extension Agreement in turn reads:

**Exchanges of Merchandise.**  During the Extension Period, McKesson agrees that it will continue to honor exchanges and returns in the ordinary course of business, as it did under the [Supply] Agreement, regardless of whether the Merchandise to be returned or exchanged was purchased before or after the Extension Effective Date but provided that such returned or exchanged Merchandise was purchased from McKesson under the [Supply] Agreement.[48]

If paragraph 4 applies, then that would mean that A&P waived its right to receive these credits, as these return credits related to products that were returned prepetition.  Alternatively, if paragraph 8 applies, then A&P is potentially still owed these credits under the Extension Agreement, since the provision specifically refers to McKesson continuing to honor exchanges and returns during the "Extension Period", and the Medturns credits specifically related to product returns.

Under New York law, the threshold question in contract interpretation is whether the terms of the contract are ambiguous. *See In re Residential Cap., LLC*, 533 B.R. 379, 398 (Bankr. S.D.N.Y. 2015) (citing *Bank of N.Y. Mellon Tr. Co., Nat'l Assoc. v. Solstice ABS CBO II, Ltd.*, 910 F.Supp.2d 629, 641 (S.D.N.Y. 2012)).  A contract is ambiguous "only if 'the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings'" and is not ambiguous "simply because the parties ask the Court to construe it differently." *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d

---

[47] "Rebate" is defined in § 21.M of the Supply Agreement as "any rebate, volume incentive or other similar payment based on A&P's purchase volume (collectively, "Rebates") [which] are offered to A&P as an incentive for both volume purchases and prompt payment."  Supply Agreement at 21.M.

[48] "Agreement" is defined in the Extension Agreement as the Supply Agreement, as amended effective as of May 1, 2013, with a scheduled expiration on August 31, 2015.

156, 168 (S.D.N.Y. 2015) (citing *Goldman Sachs Grp., Inc. v. Almah LLC*, 85 A.D.3d 424, 924

N.Y.S.2d 87, 90 (1st Dep't 2011); *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595

F.3d 458, 467 (2d Cir. 2010).

Contract interpretation under New York law requires courts to "discern the intent of the

parties, to the extent that the parties memorialized what they intended, by what they wrote," and

when the language of the contract is clear, this intent "must be gleaned from within the four corners

of the instruments, and not from extrinsic evidence." *See Residential Cap.*, 533 B.R. at 399

(internal quotation marks and citation omitted); *see also Wells Fargo Bank*, 127 F. Supp. 3d at 168

(citing *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir.1989) (stating that in

determining the meaning of a contract, courts "look to all corners of the document rather than

view[ing] sentences or clauses in isolation.") (citation and internal quotation marks omitted)).

Words and phrases of a contract "should be given their plain meaning, and the contract should be

construed so as to give full meaning and effect to all of its provisions." *See Residential Cap.*, 533

B.R. at 399 (quoting *Bank of N.Y. Mellon Tr. Co., Nat'l Assoc. v. Solstice ABS CBO II, Ltd.*, 910

F.Supp.2d 629, 641 (S.D.N.Y. 2012)).[49]  Further, "specific terms in a contract will override the

general," including when the specific and general provisions appear to conflict.  *See id.* (quoting

*Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, 520 B.R. 15, 26 (Bankr.

S.D.N.Y. 2014) (citations omitted)).

However, for a contract involving the sale of goods, New York state law permits

consideration of extrinsic evidence to divine a contract's meaning, even without a determination

that a contract is ambiguous.  *See Lion Oil Trading & Transp., Inc. v. Statoil Marketing and*

---

[49] "The rules of construction of contracts require [courts] to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect." *See Residential Cap.*, 533 B.R. at 399 (citation omitted).

61

*Trading (US) Inc*., 728 F.Supp.2d 531, 535 (S.D.N.Y. 2010) ("When considering a sale of goods contract under the U.C.C., the determination of a contract's meaning is not made in a vacuum. Rather, it is done in conjunction with evidence about course of dealing, usage of trade, and the parties' course of performance so long as that extrinsic evidence does not contradict the contract's language.").

The Court concludes that paragraph 4 applies here to these credits. Initially, it appears that paragraph 8 should apply here as it more specifically refers to honoring returns and exchanges in particular (rather than, for instance, rebates due to A&P for prompt payment or for purchase volume incentives), which these Medturns credits were issued pursuant to. However, paragraph 8 refers to Merchandise returned or exchanged before or after the "Extension Effective Date." The use of the Extension Agreement's effective date as the demarcating point here supports the notion that paragraph 8 was meant to apply exclusively to postpetition returns and deliveries, where paragraph 4 was meant to deal with refunds, rebates, and credits related to prepetition returns and deliveries. The Parties could have drafted paragraph 8 referring instead to before or after the "Petition Date," for instance, but they did not. The Parties' specific reference to before or after the "Extension Effective Date," especially where elsewhere, like in paragraph 4, the Parties refer to the Petition Date, strongly indicates an intent for paragraph 8 to apply exclusively to the Parties' postpetition course of performance. This reading of paragraph 8 as referring exclusively to postpetition returns and exchanges is further reinforced by its opening clause, which refers to McKesson honoring exchanges and returns in the ordinary course of business "during the Extension Period."[50]

---

[50] The Court notes that it appears that the term "Extension Period" was not actually defined by the Parties in the Extension Agreement, and it appears they meant to refer to the period of time of the Extension Term, which is defined as September 8, 2015 through January 31, 2016. *See* Extension Agreement at 2. Despite this oversight, it seems clear to the Court that the parties meant to refer to a period of time that was in any event exclusively postpetition.

62

Although paragraph 8 does more specifically refer to returns and exchanges in particular, paragraph 4's reference to "Rebates, refunds, *or other amounts which accrued prior to the Petition Date*" is broad enough to cover credits relating to prepetition returns and exchanges like these Medturns credits as well, and the heading of the paragraph expressly refers to "credits," which while undefined by the Supply Agreement, is both the terminology used by both parties in referring to these amounts, and is the precise term used to describe the Medturns credits in § 7.A.4 of the Supply Agreement describing how said credits are issued.[51]

Looking next at the Parties' course of dealing, it appears that McKesson may have clearly conveyed to A&P shortly after the Petition Date that it did not intend to provide the Debtor with credits that related to prepetition deliveries (including going to the lengths of reversing an already paid out prepetition rebate postpetition as discussed in the following section). Specifically, McKesson's witness Robin Page testified at Trial that she, on behalf of A&P, had a discussion shortly after the Petition Date with McKesson's Meg Mitchell, in which Mitchell conveyed that McKesson would not provide A&P with return credits based on returns that accrued before the Petition Date (*i.e.*, those credits for which A&P no longer possessed product in its stores for and for which A&P had "some kind of paperwork showing that [A&P was] waiting for credit").[52] *See* July 17, 2024 Hr'g Tr. [ECF No. 187] at 227-32; Decl. of R. Page Direct Trial Testimony Proffered by McKesson Entities [ECF No. 163] at ¶ 40 (same).

McKesson's witness Jenifer Towsley also asserted that: "[s]hortly after the Petition Date, I asked Ms. Mitchell to remind Ms. Page, A&P's representative, that McKesson would not provide

---

[51] *See, e.g.*, Pl's Post-Trial Br. [ECF No. 192] at 36; McKesson's Post-Trial Br. [ECF No. 190] at 33-34.

[52] This was also corroborated by McKesson's witness Jenifer Towsley's testimony that she had asked Meg Mitchell to tell Ms. Page that post-petition credits would not be provided for pre-petition returns. *See* Decl. of Jenifer Towsley Direct Trial Testimony Proffered by McKesson Entities [ECF No. 162] at ¶ 80.

A&P with any of the following: (a) *post-petition credit for returns based on pre-petition returns.
. .*" *See* Decl. of Jenifer Towsley Direct Trial Testimony Proffered by McKesson Entities [ECF
No. 162] at ¶ 80 (emphasis added).    If this was in fact clearly conveyed to A&P sometime after
the Petition Date, but before the Extension Agreement was entered into on September 8, 2015,
then this would be extrinsic evidence supportive of McKesson's interpretation of paragraph 4 and
8 of the Extension Agreement.

On the other hand, at Trial, McKesson was not able to point to any documentary evidence,
in the form of emails or other records, that proved that McKesson did in fact convey this point to
A&P.  The Court was not able to locate any other extrinsic evidence from the Parties 'course of
dealing that spoke definitively to the intent (or lack thereof) of the Parties to waive all prepetition
credits (including those related to returned products) per paragraph 4 and 8 of the Extension
Agreement.[53][54]   Thus, the Court concludes that ultimately the extrinsic evidence as to the Parties'
course of dealing regarding paragraph 4 and 8 of the Extension Agreement is inconclusive.

In conclusion, the Court finds that McKesson's withholding of the $413k and $166k
prepetition Medturns credits was not an automatic stay violation under § 362(a)(3), because, as

---

[53] Relatedly, as to prepetition rebates for the first half of July 2015, email records suggested that A&P (via Ms. Page)
still thought those needed to be provided to A&P as late as November 16, 2015, well after the Extension Agreement
was entered into on September 8, 2015.  *See* PX 135 (Page: "What happened to rebates from july 1 to 2 days pre
bankruptcy?"); PX 229; July 18, 2024 Hr'g Tr. [ECF No. 188] at 28-29.  This would seem to directly contradict Ms.
Page's declaration testimony at paragraph 46 of her trial declaration that Ms. Mitchell advised her shortly after the
Petition Date that "McKesson was not going to pay A&P for Rebates that accrued before the Petition Date . . ." *See*
Decl. of R. Page Direct Trial Testimony Proffered by McKesson Entities [ECF No. 163] at ¶ 46 (same).  The
disagreement between the Parties then appeared to be only as to whether the underlying product had been paid for,
and not over whether all prepetition rebates would not be provided as a blanket matter, as Mitchell's previous
conversation with Page allegedly clearly indicated  *See* PX 229 (Page: "But I thought we were on 2day terms so july
1 thru july 15 would have been paid no?" Mitchell: "Let me verify the timing . . .").

[54] At Trial, the Plaintiff also cross-examined Ms. Page regarding an internal memorandum drafted by her titled
"Pharmacy Bankruptcy Issues" dated from July 28, 2015, which states that two Medturns credits remained due and
owing.  *See* McK 19; July 17, 2024 Hr'g Tr. [ECF No. 187] at 247-250.  The Plaintiff noted that while this
memorandum states that Page had a call with McKesson's Meg Mitchell as to McKesson's intention not to provide
A&P with unpaid prepetition rebates, the memorandum does not state that such a call conveying a similar sentiment
occurred as to Medturns credits or other prepetition refunds.

64

discussed above, A&P had no contractual entitlement to these prepetition credits pursuant to paragraph 4 of the Extension Agreement by which A&P waived its right to them, and the Medturns credits therefore did not constitute property of the estate.[55]  McKesson's withholding was also not an automatic stay violation under § 362(a)(6) or (7) either because as analyzed above, A&P had no contractual right to the Medturns credits, so McKesson's application of the Medturns credits against its general unsecured claim was not: (1) an act to collect a prepetition claim against the Debtor nor (2) a setoff involving a debt owing to the debtor (the Medturns credits were not owed to the Debtor, as discussed above) being applied against a claim McKesson held against the debtor.

In the alternative, McKesson argued that it was and is entitled to hold these Medturns credits to preserve its setoff rights.  *See* McK Pre-Trial Br. [ECF No. 190] at 21.  While setoff is not permissible where a party seeks to offset a postpetition debt against a prepetition claim (or vice versa), setoff is permissible where a party seeks to offset a prepetition debt against a prepetition claim.  *See Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1036-37 (5th Cir. 1987); *In re Lehman Bros. Holdings, Inc.*, 433 B.R. 101, 107 (Bankr. S.D.N.Y. 2010).

Here, McKesson withheld the prepetition Medturns credits to offset them against its non-section 503(b)(9), general unsecured prepetition claim (assuming that unsecured claim was ultimately allowed by the Court).  The eventual setoff of these purely prepetition claims very well might have been a permissible action by McKesson, assuming McKesson sought court approval before applying that setoff.  However, since the Court has already concluded that the Medturns

---

[55] Under § 541 of the Bankruptcy Code, property of the estate consists of "all legal and equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  This includes "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, . . . [including] causes of action owned by the debtor or arising from property of the estate." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (internal quotations omitted).

65

credits are not property of the Debtor's estate, the Court has no occasion to determine whether McKesson was or was not entitled to withhold the Medturns credits to preserve its setoff rights.

### 2.   The $562k Unearned Rebate Reversal

The Plaintiff next argues that McKesson's reversal of a customary monthly rebate[56] worth $562,833.91 in November of 2015 (by way of reduction of an amount due from McKesson to A&P, under a theory of recoupment), which was initially paid by McKesson to A&P three days before the Petition Date, relating to products delivered to A&P in June of 2015, constitutes an automatic stay violation under §§ 362(a)(3), (6), and/or (7), for which the Plaintiff is entitled to damages plus interest, attorney's fees, and exemplary damages as proved justified at trial.  *See* Am. Compl. at ¶ 76-85, 158, 167-69.

In particular, the Plaintiff argues that: (1) the evidence shows that at least $150,000 of the $562,833.91 rebate was actually paid for; (2) § 4 of the Extension Agreement only waived A&P's right to unpaid, but accrued prepetition rebates; (3) under § 21(M) of the Supply Agreement, rebates were earned based on whether A&P was current on all of its payment obligations as of the date of the rebate payment, not whether underlying goods were paid for; (4) the Parties' course of performance indicates McKesson never returned a rebate, or was required to do so, before; and (5) a recoupment right did not exist here because the Supply Agreement and Extension Agreement were separate agreements.  *See* Pl. Post-Trial Br. [ECF No. 192] at 39-46.

In response, McKesson argues that: (1) under the terms of the Supply Agreement and the Parties' course of performance, McKesson had the right to rescind or adjust a previously paid-out customary monthly rebate where A&P completely failed to pay for the goods underlying the rebate

---

[56] McKesson paid the Debtor the rebate in accordance with the parties' long-established procedures in the ordinary course of their business, and without any request for such payment made by the Debtor.  *See* Am. Compl. ¶¶ 28–29.

in question; (2) § 4 of the Extension Agreement waived A&P's right to accrued prepetition rebates, whether they had been previously paid out or not; and (3) this rebate reversal was effected as a proper recoupment for which stay relief was not required. *See* McK Pre-Trial Br. at 9; McK Post-Trial Br. at 35-37.

> a. A&P's Payment for at Least Some of the Goods Underlying the June Rebate, the Terms of the Supply Agreement, and the Parties' Course of Performance Indicate That McKesson's Actions Were Not Contractually Permissible

The Court largely agrees with the Plaintiff's analysis of the relevant issues. First, McKesson witness Redwine's testimony and the June Rebate Report show that A&P paid for at least approximately $150,000, or 25% of the underlying goods. *See Redwine Decl.* 56-65; PX 144; PX 174 at 128-143, 211-12. Thus, McKesson's rescinding of the rebate in its entirety under the theory that A&P did not pay for the underlying goods does not hold up. If that were why McKesson thought it had the right to rescind the rebate, then it would have only rescinded the portion of the rebate that was not paid for, not the entire rebate.

Second, McKesson's reliance on the Extension Agreement section 4's waiver of "accrued" rebates is misplaced. As A&P's Carnahan testified at Trial: "Paragraph 4 in the amendment states we do not have the right to receive rebates [accrued] prior to the petition date. These funds had been received on July 16th, were not accrued." *Carnahan Trial Testimony*, July 17 Tr., p. 81 at 12-19. The June Rebate did not simply accrue here, but was in fact actually paid to A&P prior to the Petition Date.

Third, to be entitled to a rebate on a certain date, the Supply Agreement's § 21(M) only required A&P to be current on all of its payment obligations as of the date of the rebate payment, not whether the underlying goods were or had already been paid for. *See* Supply Agreement at §

21(M).  If, as here, no late bills existed on the date a rebate was due, McKesson always paid the rebate to A&P.  Thus, the Court finds that pursuant to § 21(M) of the Supply Agreement, the June Rebate was rightfully earned on July 15, 2015, when it was paid to A&P, rather than earned once A&P actually paid for the underlying goods in question.

Fourth, while McKesson established at Trial that it was very common for McKesson to adjust rebate amounts retroactively as part of an ongoing reconciliation on a running account, McKesson was not able to show a single instance in the Parties' course of dealing where it revoked a rebate in its entirety, either for nonpayment or other reasons.

> b.  McKesson Does Not Have a Recoupment Defense as Between the June Rebate and November 2015 Payment

Fifth, turning to the right to recoupment, the Court finds that, while the evidence suggests that the Supply Agreement and Extension Agreement should be deemed one single contract and not two separate ones, A&P's prepetition earned June Rebate is "discrete and independent" from McKesson's November 2015 payment (consisting of rebates for goods delivered from July 19, 2015 through the end of September 2015) though both arise under the single, integrated Supply Agreement and Extension Agreement respectively.

Recoupment is limited to situations where "both debts . . . arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 147 (2d Cir. 2002).  In determining whether separate instruments should be integrated to form one contract, the Second Circuit adopted the three-factor test relied on by the Eleventh Circuit: (1) whether the nature and purpose of the agreements are different; (2) whether the consideration for each agreement is separate and distinct; and (3) whether the obligations of each party to the instruments are interrelated. *In re Gardinier, Inc.*, 831 F.2d 974 (11th Cir. 1987); *In re Atl. Comput.*

68

*Sys.*, 173 B.R. 844, 854 (Bankr. S.D.N.Y. 1994); *see also In re FPSDA I, LLC*, 470 B.R. 257, 267-68 (E.D.N.Y. 2012).

The Court concludes that the Supply Agreement and Extension Agreement should be considered a single integrated contract under the case law. The nature and purpose of the Supply Agreement and Extension Agreement is a shared one: to supply the Debtor with McKesson's prescription drugs, over the counter drugs, health and beauty aids, and sundries. Additionally, the agreements' interrelatedness is evident in the fact that the Extension Agreement is reliant on the terms of the Supply Agreement. The Extension Agreement states that McKesson will "continue to supply Merchandise to A&P under the same terms and conditions as are set forth in the [Supply] Agreement, except as otherwise set forth in this Extension." *See* Extension Agreement at § 1.

Additionally, the drafted language of most of the Extension Agreement is exceedingly vague, and relies heavily on the Supply Agreement to provide even basic transaction terms.[57]  For example, the Extension Agreement depends on the Supply Agreement to set the pricing of merchandise. The Extension Agreement states:

> [P]ricing of Merchandise shall be on the same terms and conditions as set forth in the [Supply] Agreement, except only that notwithstanding anything to the contrary in the [Supply] Agreement, the pricing will not be affected by any minimum purchase volume requirement.

Extension Agreement § 5.   The integration clause of the Extension Agreement directly incorporates the Supply Agreement as well, where it states:

> 11.     **Integration**. Except as set forth above, all terms of the Agreement are incorporated into this Extension. Capitalized terms used in this Extension and not otherwise defined herein shall have meaning given to them in the [Supply] Agreement.

---

[57] Additionally, there was evidence produced that the Parties expressly contemplated language granting McKesson a recoupment right as to the sums contemplated in § 4 of the Extension Agreement but removed all mention prior to execution.  *See* McK Ex. 24-10.  This evidence is not determinative of whether McKesson had a right to recoupment or not.

Extension Agreement § 11.  On the other hand, there is language in the First Amendment to the Supply Agreement [MCK Ex. 2] that suggests the parties had, in the past, used stronger and more definitive language to connect the Supply Agreement to a later iteration. The First Amendment to the Supply Agreement states:

> This First Amendment, together with the [Supply] Agreement, embodies the entire agreement between the parties with regard to the subject matter hereof and supersedes all prior agreements, understandings, and representations with the exception of any promissory note, security agreement, or other credit or financial document(s) executed by Customer or between Customer and McKesson.

McK Ex. 2-9.  The Extension Agreement does not contain a provision similar to the provision quoted above. This leaves room for an interpretation that the Extension Agreement, unlike the First Amendment to the Supply Agreement, was not intended to form one integrated agreement with the Supply Agreement.

However, even if the Extension Agreement and the Supply Agreement are considered a single, integrated contract, that does not necessarily entail finding that McKesson has a right of recoupment. Recoupment claims fail where the claims are "discrete and independent units" of a single contract. *In re Malinowski*, 156 F.3d at 135 ("[W]here the contract itself contemplates the business to be transacted as discrete and independent units, even claims predicated on a single contract will be ineligible for recoupment."). Transactions are discrete and independent units where, as here, there is a broad overarching contract meant to govern a variety of transactions. *See In re Peterson Distributing, Inc.*, 82 F.3d 956, 962–63 (10th Cir. 1996) (finding overarching distributorship agreement governed many different types of sales and related activities, each of which considered separate transactions); *In re California Canners & Growers*, 62 B.R. 18 (B.A.P. 9th Cir. 1986) (where agreement did not specify specific quantities of goods, delivery, price, or payment terms, each delivery under single distribution agreement is separate and distinct).

70

Further, in bankruptcy, the recoupment doctrine should be "narrowly construed" because it violates the basic bankruptcy principle of equal distribution of creditors. *E.g., Westinghouse*, 278 F.3d at 147; *Peterson Distributing, Inc.* at 960. Thus, courts also find that for purposes of recoupment, "same transaction" is a term of art that must be narrowly defined. *See Peterson Distributing, Inc.* at 960-61 (finding recoupment doctrine applicable only where claims are so closely intertwined that allowing debtor to escape its obligation would be inequitable notwithstanding the Bankruptcy Code's tenet that all unsecured creditors share equally in the debtor's estate).

Here, the June Rebate at issue had four components: a "'SynerGx Rebate' on June generics purchases of $517,367; a 'SynerGx Secondary Price Difference' of $23,579; 'Blockbuster Price Protection' of $26,318; and $4,431 McKesson subtracted as a 'Manual Override Price Difference.'" *See* Pl. Pre-Trial Brief [ECF No. 169] at 5. The June Rebate thus appears clearly related to the "OneStop Generics Monthly Rebate" program under the Supply Agreement.

The June Rebate was deducted from a $1.8 million "Total Post-Petition Rebate" undisputed amount that McKesson admitted it owed to A&P, and which was paid out to A&P in November 2015. *See* Pl. Pre-Trial Br. at 14. This November 2015 payment consisted of rebates arising from sales of goods from July 19, 2015 through the end of September 2015. *See* McKesson Rebate Decl. [Adv. Pro. ECF 164] at 7-8. For this postpetition period, McKesson calculated a total rebate due for generics of $1,397,349.82, and a total rebate due for branded products of $458,698.35. *See id.* at 8. From these, McKesson deducted the $1 million extension fee owed to McKesson pursuant to the Extension Agreement, plus the June Rebate and an additional $7,027.11 identified as "June Credits issued." *See id.*

71

The Court concludes that the June Rebate and November 2015 payment are discrete and independent units because as outlined above, they relate, at least in part, to different rebate programs under the Supply Agreement and they relate to distinct transactional units that both arise under the same overarching Supply Agreement and Extension Agreement. Specifically, the June Rebate relates to generics goods purchased in April, May, and June 2015 whereas the rebates included in the November 2015 payment relate to both generic and branded goods purchased in July, August, and September 2015.   As discussed in *California Canners & Growers*, most recoupment cases involve "single contracts that provide[] for advance payments based on estimates of what would ultimately be owed, subject to later correction." *See California Canners & Growers* at 19.   Here, the June Rebate did not represent an overpayment of rebates issued on account of goods delivered in July, August, and September 2015; rather the June Rebate represented an alleged overpayment of rebates issued on account of goods delivered in April, May, and June 2015.   These are therefore separate and distinct transactions, albeit both transactions were made pursuant to one broad, overarching contract.   Additionally, the fact that the June Rebate was entirely related to generic products whereas the November 2015 payment related to both generic and branded products further underscores the separateness of these transactions such that recoupment is not permissible here.

Finally, no overriding equitable reason exists that compels the application of the doctrine of recoupment in this case.   Courts have noted that in addition to meeting the "single integrated transaction" test, the court should also consider the equity of parties.   *Glob. Crossing Bandwidth, Inc. v. Locus Telecomm., Inc.*, 632 F. Supp. 2d 224, 231 (W.D.N.Y. 2009) ("The court made clear that it is not enough that a counterclaim arise out of the same transaction for the doctrine to apply; the circumstances must also be such that 'it would be *inequitable* for the debtor to enjoy the

benefits of that transaction without also meeting its obligations.'" (quoting *Malinowski*, 156 F.3d at 133)). Here, even by McKesson's own admissions, A&P was indisputably owed postpetition rebates for goods that it actually paid for postpetition, so it cannot be said that A&P has not "met its obligations" required to equitably enjoy the benefits of the postpetition rebates. As to the June Rebate, as discussed previously, the key fact is that McKesson actually paid this amount to A&P prepetition, and that A&P rightfully earned the June Rebate because it was current on all its payments to McKesson as of the payment date of the June Rebate. The Debtor thus met its obligations regarding both the June Rebate and the November 2015 payment.

> c. McKesson Does Not Have a Setoff Right With Respect to the June Rebate; Even if it Did, the June Rebate Reversal Would Have Violated the Automatic Stay Under § 362(a)(7)

In the alternative, McKesson argues that it "was and is entitled to hold the credits and rebates to preserve its setoff rights." *See* McK Pre-Trial Br. at 21. However, like with the withholding of the Medturns credits for application against postpetition amounts due to A&P discussed above, McKesson has no setoff right here because it is attempting to set off a prepetition claim against a postpetition claim which is not permissible. *See Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1036-37 (5th Cir. 1987); *In re Lehman Bros. Holdings, Inc.*, 433 B.R. 101, 107 (Bankr. S.D.N.Y. 2010).

Also, as noted in the previous section, the Court concludes that the mere withholding of credits does violate the stay to the extent that such: (1) credit was in fact property of the estate and (2) such withholding deviated from the terms of the Parties' contract and the Parties' course of performance under the same. As analyzed above, the June Rebate was property of the estate, and the reversal of it by McKesson was contrary to the Parties' contract. McKesson did not have a setoff right as between the June Rebate and November 2015 Payment because it involves a

73

prepetition claim on the one hand and a postpetition claim on the other, but even if it did, McKesson's reversal of the June Rebate would have violated the automatic stay under § 362(a)(7) because setoff, unlike recoupment, requires express court permission to be valid.

> d. Conclusion: June Rebate Reversal Violated Automatic Stay Under Both §§ 362(a)(3) and (6)

Given the above discussion, the Court thus concludes that the fact that the rebate was earned and paid out prior to the Petition Date meant the automatic stay applied to enjoin any attempts to exercise control over that sum, pursuant to § 362(a)(3) of the Bankruptcy Code.[58] "Whether § 362(a)(3) stays an action is a two-step inquiry. First, a court must determine whether property of the estate is at issue; second, a court must determine whether the action in question constitutes an action to obtain possession of, or exercise control over, the property in question." *See Roman Cath. Diocese of Rockville Ctr. v. Ark320 Doe (In re Roman Cath. Diocese of Rockville Ctr.)*, 651 B.R. 622, 644 (Bankr. S.D.N.Y. 2023) (citation omitted).

Under § 541 of the Bankruptcy Code, property of the estate consists of "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This includes "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, . . . [including] causes of action owned by the debtor or arising from property of the estate." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (internal quotations omitted). Actions taken in violation of the automatic stay are void and without effect. *See In re Arcapita Bank B.S.C.*, 648 B.R. 489, 496 (Bankr. S.D.N.Y. 2023) (quoting *In re Colonial Realty Co.*, 980 F.2d 125, 137 (2d Cir. 1992)).

---

[58] The word "control" in § 362(a)(3) has been construed by the Second Circuit to mean "to exercise authority over; direct; command." *See Windstream Holdings Inc. v. Charter Comm's Operating LLC (In re Windstream Holdings, Inc.)*, 105 F.4th 488, 497 (2d Cir. 2024) (internal quotations omitted).

As discussed above, the June Rebate was earned prepetition (when A&P was current on its payment obligations as of the rebate payment date). Thus, A&P had a right to payment that arose prepetition, and was in fact paid prepetition. There is consequently little doubt that the June Rebate was property of A&P's bankruptcy estate. McKesson's subsequent postpetition reversal of the June Rebate was in turn a taking of possession and exercise of control over the estate's property because as established above, it was not contractually permissible. Thus, since McKesson had no valid right of recoupment, as discussed above, its action constituted a violation of the automatic stay.

Additionally, even if McKesson did have a legitimate claim for an overpayment that occurred prepetition (for all or a portion of the June Rebate), its action would still constitute a stay violation under § 362(a)(6) of the Bankruptcy Code, as an attempt to collect on its prepetition debt without the Court's approval. § 362(a)(6) prohibits a party from "any act to collect, assess, or recover a claim against the debtor" that arose prior to the petition date. 11 U.S.C. § 362(a)(6). Here, the overpayment claim relating to the June Rebate amount was clearly a prepetition debt, and McKesson's subsequent deduction of the June Rebate amount from postpetition sums it owed the Debtor were acts to collect on that prepetition debt.

e. No Basis to Hold McKesson in Civil Contempt Under *Windstream*

Relatedly, under *Windstream Holdings Inc. v. Charter Comm's Operating LLC (In re Windstream Holdings, Inc.)*, 105 F.4th 488 (2d Cir. 2024), the Court finds that, while McKesson clearly violated the automatic stay here and thus its reversal of the June Rebate is "void and without effect," (*i.e.*, it must return the June Rebate to the Debtor), there is no basis here to hold McKesson in civil contempt for this stay violation, such that additional damages, including costs and attorney's fees or punitive damages should be awarded here. Under *Windstream Holdings Inc.*, a

75

court may hold a party in civil contempt only where there is "no fair ground of doubt" as to whether a creditor's conduct violated the automatic stay. *See Windstream Holdings Inc. v. Charter Comm's Operating LLC (In re Windstream Holdings, Inc.)*, 105 F.4th 488, 495 (2d Cir. 2024). This standard is satisfied when there is no objectively reasonable basis for concluding that a party's conduct was lawful. *See id.*

As analyzed above, the Extension Agreement's § 4 was not entirely clear as to whether A&P had waived its right to the June Rebate with that provision. This is evidenced by the fact that the Court had to look at extrinsic evidence, such as the Parties' course of performance and the circumstances surrounding the rebate reversal, to finally determine that A&P had not waived that right.

Further, McKesson had an objectively reasonable basis to conclude it might have had a right of recoupment based on a theory that the June Rebate and the November 2015 Payment were part of a single, integrated transaction. While the Court here ultimately concludes it did not have that right of recoupment, the Court finds it hard to also conclude that this conclusion was legally certain at the time of McKesson's attempted recoupment, under the relevant recoupment case law discussed above.

The Court notes that it would have been prudent for McKesson, who was advised by experienced bankruptcy counsel, to have sought court authorization to take its actions, as opposed to exercising self-help. Indeed, as courts regularly note, "[i]t is not the debtor's responsibility to take action that ensures that she received protection of the automatic stay; rather the creditor bears the burden of seeking relief from the automatic stay before taking post-petition collection action." *In re Braught*, 307 B.R. 399, 402 (Bankr. S.D.N.Y. 2004). Despite this though, the court still concludes that, under *Windstream Holdings Inc.*, there ultimately is no basis to hold McKesson in

76

civil contempt for its reversal of the June Rebate because McKesson had an objectively reasonable basis to conclude that it had a valid right of recoupment for which relief from the automatic stay is not required. *See In re Malinowski*, 156 F.3d 131, 133 (2d Cir. 1998) (holding that recoupment is not subject to automatic stay).

In sum, the Court concludes that McKesson did not have a right to recoup the June Rebate from the November 2015 Payment, and thus the reversal of this rebate was a violation of the automatic stay imposed by § 362 of the Bankruptcy Code. The Plaintiff is consequently entitled to the return of the amount of the reversed rebate, $562,833.91, plus interest on this.

### 3.   The $7k Unearned Credits Reversal

Next, the Plaintiff argues that a further $7,027.11, identified only as "June Credits issued" was wrongfully deducted from the November 2015 Payment without explanation or evidentiary support. *See* Pl. Pre-Trial Brief at 5-6; Redwine Decl. at 21. McKesson asserts that this amount related to "$7,027.11 for unearned June credits that were paid on July 16, 2015" but was unable at Trial to produce any further evidentiary support regarding this amount. *See* McK Post-Trial Brief at 29.

The Court concludes that a stay violation did occur here because, just as discussed with regard to the June Rebate, McKesson's deduction or withholding of this amount deviated from the Parties' contractual terms and the Plaintiff has satisfied its burden to show that it was validly owed the full amount of its postpetition rebates from July 19, 2015 through the end of September 2015. Since McKesson failed to offer any evidence to controvert these findings, the Court concludes that they wrongfully withheld $7,027.11 from their November 2015 payment in violation of § 362(a)(3). The withholding is void *ab initio*. The Plaintiff is entitled to the return of $7,027.11

77

with interest, which otherwise would have been paid to the Debtor on account of rebates earned post-petition.

## V.   <u>CONCLUSION</u>

In summary, this Court rules as follows:

1. Each of the transfers in the Primary Proceeding enabled McKesson to receive more than it would have received if the Main Case were a case under chapter 7, the transfer had not been made, and McKesson received payment on such debt to the extent provided by the provisions of the Bankruptcy Code.

2. After accounting for all of McKesson's § 547(c) defenses, the Plaintiff can, pursuant to §§ 547 and 550, avoid and recover $4,587,431.62, which is the sum of the May 22 Transfer. The Next-Day Payments are shielded by McKesson's § 547(c)(1) contemporaneous exchange defense, and the remaining 26 Payments (excluding the May 22 Transfer) are shielded by McKesson's § 547(c)(2) ordinary course of business defense.

3. As to each of the Next-Day Payments, the Parties intended each of these transfers to be substantially contemporaneous with an exchange for new value given to A&P.

4. With the exception of the May 22 Transfer and the Next-Day Payments, each of the transfers in the Primary Proceeding were made in the ordinary course of business and financial affairs of the Parties.

5. With the exception of the May 22 Transfer and the Next-Day Payments, each of the transfers in the Primary Proceeding was made according to ordinary business terms.

78

6.  In calculating the extent of McKesson's SNV Defense, the invoice price establishes the value of the Merchandise actually delivered to the Debtor's pharmacies during the Preference Period.

7.  McKesson's SNV Defense under § 547(c)(4) shall not be calculated to include the value of the Merchandise underlying the 355 Invoices.

8.  The May 22 Transfer is not shielded from avoidance on account of McKesson's SNV Defense under § 547(c)(4) and McKesson's judgment amount is not reducible on account of McKesson's SNV Defense.

9.  As Judge Drain ruled in the 2019 MSJ Bench Ruling, McKesson is entitled to set off its preference exposure above against its administrative expense claim and is liable for any remaining amount of the judgment.[59]

10. McKesson must pay the amounts of $562,833.91 and $7,027.11, both with interest accrued from the date of the June Rebate reversal and withholding of the "June Credits issued," November 16, 2015, to the Debtor, on account of McKesson's automatic stay violations under § 362(a)(3), (6), and/or (7).

11. The Plaintiff is directed to submit a proposed form of judgment consistent with this Opinion.

Dated: June 17, 2026
       New York, New York

                                   /s/ Lisa G. Beckerman
                                   THE HONORABLE LISA G. BECKERMAN
                                   UNITED STATES BANKRUPTCY JUDGE

---

[59] *See* 2019 MSJ Bench Ruling at 54, 57–58.

79