**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

In re:

        THE GREAT ATLANTIC & PACIFIC
        TEA COMPANY, INC., *et al.*

                  Debtors.

-------------------------------------------------------------------x

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS on behalf of the bankruptcy estate of
THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., *et al.*,

                  Plaintiff,

        - against -

McKESSON CORPORATION,

                  Defendant.

-------------------------------------------------------------------x

**FOR PUBLICATION**
Chapter 11
Case No. 15-23007 (LGB)

Adv. Proc. No. 17-08264 (LGB)

**MEMORANDUM OPINION REGARDING**
**MCKESSON CORPORATION'S 503(b)(9) CLAIM ISSUES**

**APPEARANCES**

BUCHALTER
*Attorneys for McKesson Corporation*
18400 Von Karman Avenue
Irvine, CA 92612
By:    Jeffrey Garfinkle

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
*Attorneys for McKesson Corporation*
200 West 21st Street, 17th Floor
New York, NY 10036
By:    Tracy Klestadt

MILIN LAW PLLC
*Attorneys for the Official Committee of Unsecured Creditors*
*and Special Counsel for the Debtor*
18 East 12th Street, 2nd Floor
New York, NY 10003
By:    Michael Hamersky
       Richard Milin

**HON. LISA G. BECKERMAN**
**UNITED STATES BANKRUPTCY JUDGE**

After a long and winding procedural journey, this adversary proceeding (the "Primary Proceeding") between the Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of The Great Atlantic & Pacific Tea Company (the "Committee" or "Plaintiff") and McKesson Corporation d/b/a McKesson Drug Co. (the "Defendant" or "McKesson", and together with the Committee, the "Parties") comes to an end.[1]  The Court held a trial from July 12 through July 18, 2024 (the "Trial") and heard fact and expert witness testimony.  The Court heard the Parties' final legal arguments at a hearing held on October 9, 2024.  Now, the Court's decision on the surviving issues shall be set forth in a series of four interrelated opinions.[2]

This second opinion (the "Claims Opinion") shall resolve: (i) whether certain of McKesson's proofs of claim[3] were sufficiently documented or otherwise allowable in the Main Case; (ii) whether the invoices reflect the true value of the goods delivered from McKesson to the Debtor for purposes of calculating McKesson's administrative claim; and (iii) whether the purported deliveries recorded on the "355 Invoices"[4] in fact existed.

---

[1] On July 19, 2015 (the "Petition Date"), The Great Atlantic & Pacific Tea Company, Inc. and several of its affiliated entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  *In re The Great Atlantic & Pacific Tea Company, Inc.*, No. 15-23007 (Bankr. S.D.N.Y. 2015) [ECF No. 1] (the "Main Case").  The Debtors' Chapter 11 cases were jointly administered under Case No. 15-23007 (RDD). (Am. Compl. ¶ 13).  The only remaining Debtor is The Great Atlantic & Pacific Tea Company, Inc. (Am. Compl. ¶¶ 6 and 13).  On July 24, 2015, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors pursuant to § 1102 of the Bankruptcy Code. (Am. Compl. ¶ 4).  The Committee consists of (i) 1199SEIU Health Care Employees Pension Fund, (ii) Basser-Kaufman, Inc., (iii) C&S Wholesale Grocers, Inc., (iv) CBA Industries, Inc., (v) McKesson Corporation, (vi) Pension Benefit Guaranty Corporation and (vii) United Food and Commercial Workers International Union. (Am. Compl. ¶ 4).

[2] In addition to this Claims Opinion, the Court shall issue the: (i) "Preference & Stay Violations Opinion" on the docket of the Primary Proceeding, (ii) "Specialty Opinion" on the docket of Adv. Proc. No. 17-08266 (LGB) (the "Specialty Proceeding"), and (iii) "Systems Opinion" on the docket of Adv. Proc. No. 17-08265 (LGB) (the "Systems Proceeding").

[3] McKesson filed three proofs of claim in this bankruptcy case numbered 5880, 9512, and 9800.

[4] Defined in corresponding discussion *infra.*

## I.   PROCEDURAL HISTORY

### A.  McKesson's Proof of Claim

On November 24, 2015, McKesson filed its initial proof of claim in the bankruptcy case against the Debtors, including an administrative claim pursuant to § 503(b)(9) for "at least $4,943,773.12" for goods received by the Debtor during the twenty days prior to the Petition Date (the "Administrative Claim Period").  *See* Proof of Claim No. 5880; Setoff Mot. [5] at 6.  McKesson subsequently filed an amended proof of claim asserting an administrative claim pursuant to § 503(b)(9) for "at least $1,748,115.92."  *See* Proof of Claim No. 9512; Setoff Mot. at 6.  McKesson later filed a second amended proof of claim (the "Supplemental Administrative Claim"), asserting that the amount listed for the administrative claim was slightly understated and that the correct amount was $1,750,731.87.  *See* Addendum to Proof of Claim No. 9800; Claim Motion [Main Case ECF No. 5059] at 3–4.  McKesson also for the first time asserted that it was entitled to a contingent § 503(b)(9) administrative claim of up to $4,249,724.88 if any payments it received during the twenty days before the Petition Date are ultimately determined to be avoidable as a preference or otherwise.  *See* Addendum to Proof of Claim No. 9800.

Through its proofs of claim, McKesson also asserted that it had a general unsecured claim in the amount of $9,845,587.88 on account of goods delivered to the Debtors outside of the twenty days before the Petition Date and for which payment was owed.  *See* Addendum to Proof of Claim No. 5880 at ¶ 5.  McKesson subsequently filed an amended proof of claim asserting a reduced unsecured claim of $1,827,420.19.  *See* Addendum to Proof of Claim No. 9512 at ¶ 5.  McKesson appeared to later assert that this amount was slightly higher at $2,455,335.88, as set forth in its declaration in support of its motion for summary judgment on the Debtor's Claim Objections

---

[5] Defined below.

(defined below), but McKesson did not formally amend its prior proof of claim that asserted a lower amount of $1,827,420.19. *See* Decl. of Charles M. Berk in Support of Mots. for Summ. Judg. Filed by McKesson Corp. [Main Case ECF No. 5060] at Ex. C. Plaintiff has not objected to the allowance of McKesson's unsecured claim.[6] *See* Debtors' Thirteenth Omnibus Objection Claims [Main Case ECF No. 2828] at Ex. 1.

On May 20, 2016, the Debtor filed its Thirteenth Omnibus Objection to Claims ("Thirteenth Omnibus Objection"), asserting that, because McKesson failed to provide sufficient documentation in support of its administrative claim, the Debtor could not determine the validity of the claims. *See* Debtors' Thirteenth Omnibus Obj. to Claims [Main Case ECF No. 2828] at ¶ 12.[7] On June 10, 2016, McKesson filed its Response to Debtor's Thirteenth Omnibus Objection ("Thirteenth Objection Response"), asserting that it provided all documentation requested by the Debtor. *See* Response to Debtors' Thirteenth Omnibus Obj. to Claims [Main Case ECF No. 2913] at ¶¶ 12–14. The Thirteenth Omnibus Objection was scheduled to be heard on June 24, 2016, but was subsequently adjourned to a later date and time to be determined. Notice of Adj. of Hearing on Thirteenth Omnibus Obj. to Claims Solely as to Certain Claims [Main Case ECF No. 2957].

On April 12, 2022, the Committee filed a Stipulation and Order Authorizing the Committee to Prosecute the Claims Objection Against McKesson (the "Prosecution Stipulation"), asserting that the Committee should prosecute the Debtor's First, Fifth, and Thirteenth Omnibus Claim Objections (collectively, the "Claim Objections") against McKesson on behalf of the Debtor due to overlap between the Main Adversary Proceeding and the Claim Objections and to serve judicial

---

[6] Since the Debtor's bankruptcy estate is administratively insolvent in this case, unsecured claims will not receive any distributions.

[7] The Debtors filed two previous objections to McKesson's Claims [ECF Nos. 2413, 2689] but those objections are now moot and only the Thirteenth Omnibus Objection remains unresolved. *See* First Amended Pretrial Order at 2.

economy.  *See* Stip. And Order Authorizing the Comm. of Unsecured Creditors to Prosecute the Claims Objection Against McKesson Corp. [Main Case ECF No. 5055] at 2–3.

On April 26, 2022, McKesson filed its Opposition to the Prosecution Stipulation (the "Prosecution Stipulation Opposition"), asserting that the Committee does not have the power to prosecute the Claim Objections under the Order Authorizing Final Resolution of Debtors' Cases and Granting Related Relief [Main Case ECF No. 4810] (the "Case Resolution Order"), and the Committee had not proffered good cause to change the governing terms of the Case Resolution Order.  *See* Opp. To Prosecution Stip. [Main Case ECF No. 5073] at ¶¶ 4–5.  On May 9, 2022, the Committee filed its Response to McKesson's Prosecution Stipulation Opposition [Main Case ECF No. 5092] (the "Prosecution Stipulation Response"), asserting that the Committee was granted the power to prosecute the Claim Objections in the Case Resolution Order, and arguing that the interests of the Debtor and the Committee are best served by allowing the Committee to prosecute the Claim Objections. *See* Prosecution Stipulation Response at 2–6.

At a hearing on May 13, 2022, the Debtor and the Committee agreed that the Committee would withdraw the Prosecution Stipulation, and instead, the Debtor would submit another pleading directly engaging Griffin Hamersky LLP as special counsel for the Debtor.  *See* Claim Reply [Main Case ECF No. 5095] at ¶ 3.  On May 18, 2022, the Debtor filed on presentment an application to retain and employ Griffin Hamersky LLP as special counsel (the "Retention Application").  [Main Case ECF No. 5104].  In an order dated June 14, 2022, the Court approved the Retention Application, effective as of March 21, 2022. [Main Case ECF No. 5125].  In the context of this litigation, the Debtor has subsequently taken steps to prosecute the Claim Objections, including its opposition of McKesson's motion for summary judgment on the Claim Objections, described in further detail below.

**B. McKesson's 2022 Summary Judgment Motion on the Debtor's Claim Objections**

On April 15, 2022, McKesson filed its Motion for Summary Judgment on the Debtor's First, Fifth, and Thirteenth Omnibus Claim Objections Seeking to Disallow 11 U.S.C. § 503(b)(9) Claims (the "Claim Motion"), [Main Case ECF No. 5059]. On May 6, 2022, the Committee filed its opposition to the Claim Motion (the "Claim Opposition") [Main Case ECF No. 5084]; [Adv. Pro. ECF No. 126[8]], to which McKesson in turn filed a reply to on May 13, 2022. [Main Case ECF No. 5095]; [Adv. Pro. ECF No. 134].

The Claim Motion focused exclusively on McKesson's fixed administrative claim and the Debtor's Claim Objections. Claim Motion at ¶ 8. McKesson asserted that, since adjourning the hearing on the Thirteenth Omnibus Objection, the Debtor had not taken any steps toward resolving the Claim Objections and the Committee had not joined or intervened in the Debtor's Claim Objections beyond a letter submitted to the Court in the Adversary Proceeding on March 25, 2022 (the "March 2022 Letter"). [Adv. Pro. ECF No. 112].

In the March 2022 Letter, the Committee raised several arguments regarding the Claim Objections, including that: (1) the Debtor has no record of receipt of $127,692.46 in Merchandise that is included in McKesson's fixed administrative claim, and (2) the fixed administrative claim does not reflect several credits owed by McKesson to the Debtor. Claim Motion at ¶ 25; March 2022 Letter at 1–2. The Claim Opposition detailed the issues raised in the March 2022 Letter and further disputed the amount of McKesson's administrative claim on the grounds that the invoices used by McKesson to calculate the amount of its administrative claim do not reflect the true value of the goods the Debtor received during the Administrative Claim Period. Claim Opp'n. [Adv. Pro. ECF No. 126] at 9–10.

---

[8] All references to "Adv. Pro." ECF numbers in this Opinion are to those in the Primary Proceeding.

6

The Claim Opposition argued that McKesson's fixed administrative claim should be reduced by "at least $941,000" due to: (1) overstatements of the value of the Merchandise delivered by McKesson to the Debtor, totaling approximately $404,000; (2) two credits that McKesson's records reflect it owes to the Debtor, totaling $371,600; and (3) two sums improperly seized from the Debtor by McKesson, totaling approximately $157,400. Claim Opp'n. [Adv. Pro. ECF No. 126] at 1.

On January 18, 2024, the Court denied summary judgment with respect to the Thirteenth Omnibus Objection and declined to determine the amount of McKesson's fixed, allowed § 503(b)(9) claim [Adv. Pro. ECF No. 140] (the "Summary Judgment Opinion"). The Summary Judgment Opinion held that the allowed amount of McKesson's administrative claim remains in dispute with respect to whether certain deliveries were made to the Debtor, whether McKesson owes the Debtor three credits and two deductions, and whether the invoices used to calculate McKesson's administrative claim reflect the true value of the delivered Merchandise. *See id.* at 23. These issues were then included for resolution at Trial (defined below). *See* First Amended Pretrial Order [Adv. Pro. ECF No. 168] at 18.

**C. The Parties Proceed to Trial on Remaining Issues**

On July 1, 2024, McKesson filed its Opening Trial Brief [Adv. Pro. ECF No. 161]. On July 2, 2024, the Court entered the First Amended Pretrial Order [Adv. Pro. ECF No. 168], ordering that a trial be conducted (the "Trial") on all the remaining issues between the Parties across the Primary Proceeding, the Specialty Proceeding, the Systems Proceeding, and the Main Case, including the Debtor's Claim Objections against McKesson. On July 8, 2025, the Committee filed its Pre-Trial Memorandum of Law [Adv. Pro. ECF No. 169].

7

The Trial was held from July 12, 2024, to July 18, 2024. Following the Trial, the Court ordered the parties to submit post-trial briefing and scheduled closing arguments. *See* Order Scheduling Post-Trial Briefing and Closing Arguments [Adv. Pro. ECF No. 184]. On September 16, 2024, McKesson filed its Post-Trial Brief Submitted by the McKesson Entities [Adv. Pro. ECF No. 190], and its Request for Judicial Notice Submitted by McKesson Entities in Support of Post-Trial Brief [Adv. Pro. ECF No. 191]. On the same day, the Committee filed its Post-Trial Memorandum of Law [Adv. Pro. ECF No. 192]. The Court heard the Parties' closing arguments on October 9, 2024. *See* Oct. 9, 2024 Hr'g Tr. [Adv. Pro. ECF No. 193].

## II. RELEVANT FACTUAL BACKGROUND

### A. Contractual Relationship between the Debtor and McKesson

#### 1. The Supply Agreement

The business relationship between McKesson and the Debtor was generally governed by a Supply Agreement dated December 6, 2012 (the "Supply Agreement") and New York state law. Am. Compl. [Adv. Pro. ECF No. 93] at ¶¶ 19–20. Under the Supply Agreement, McKesson supplied the Debtor's pharmacies with "Merchandise," defined in the Supply Agreement to include "prescription drugs, over the counter drugs, health and beauty aids, and sundries" (collectively, the "Merchandise"). *See* PX 27 at § 1.A.

##### a. *Rebates*

The Supply Agreement entitled the Debtor to a rebate on certain purchases of various non-generic pharmaceuticals ("Branded Pharmaceuticals") and generic pharmaceuticals ("Generic Pharmaceuticals") if the Debtor was current on certain payment obligations to McKesson. Am. Compl. ¶¶ 20–21. The Plaintiff alleges that, pursuant to the Supply Agreement, "the Debtor paid [McKesson] for 'One Stop' generic merchandise ("OS Generic Merchandise") by a two-step

8

process: [f]irst, the Debtor paid McKesson's invoice, which was marked up by 20% over the manufacturer's invoice," and "[s]econd, [McKesson] paid a rebate of 16.667% on the Debtor's 120% payment, thereby eliminating the 20% mark-up entirely."  Claim Opp'n. [Adv. Pro. ECF No. 126] at 9.  The Supply Agreement specified the timing of the payment and rebate process, stating that the Debtor owed McKesson on the sixth following Friday for its purchases of Generic Pharmaceuticals and the Friday of the week following the date of an invoice for Branded Pharmaceuticals.  Supply Agreement § 4.A.  McKesson owed the Debtor its rebate fifteen days after the end of the month in which its purchases were made.  Claim Opp'n. [Adv. Pro. ECF No. 126] at 9.

The Debtor often received a "prebate" for all purchases during, and many before, the second half of each month, because McKesson often paid the Debtor the rebate before the Debtor was required to pay McKesson's invoice.  *See id.*  The Amended Complaint asserts that Section 21(M) was the only provision of the Supply Agreement requiring payment as a condition of the Debtor's right to rebates and did not require the Debtor to have paid for the specific merchandise on which rebates were granted as a condition of paying those rebates. Am. Compl. ¶ 22.  Rather, the Debtor was merely required to be current on the broader class of "payments due and owing to McKesson" as of the date the rebate was due.  *See id*.  Section 21(M) of the Supply Agreement states:

> Any rebate, volume incentive, or other similar payment based on A&P's purchase volume (collectively, "Rebates") are offered to A&P as an incentive for both volume purchases and prompt payment…[I]n the event that A&P on the payment date for any such Rebate ("Rebate Payment Date") is not current with respect to A&P's payments due and owing to McKesson pursuant to this Agreement as of the Rebate Payment Date McKesson shall have no obligation hereunder to pay any such rebate either on the Rebate Payment Date or at any time thereafter.

By agreeing to Section 21(M), the Plaintiff asserts that McKesson agreed to pay rebates to the Debtor for merchandise the Debtor had not yet paid for in exchange for the Debtor being current on its obligations to McKesson when they came due. Am. Compl. ¶ 23. The Amended Complaint states that the Supply Agreement gave the Debtor a contractual right to interest equivalent to 18% per year on certain sums, including rebates, that McKesson owed to the Debtor. Am. Compl. ¶ 23. The Supply Agreement stated:

> McKesson will pay A&P at the rate of .0493% per day (the equivalent to 18% per annum on a 365-day year) from the date that the amount was due under Sections 5.E, 6.B, 8.D, and 11.C until the time payment is received by A&P in immediately available funds. Payments under these Sections are due within 30 days of the end of the month in which incurred.

Am. Compl. ¶ 23; Supply Agreement § 21(V). Any late payments by the Debtor to McKesson were also subject to interest at the same rate in certain circumstances. Am. Compl. ¶ 23; Supply Agreement § 4.E.

### b. *Medturns*

The Amended Complaint states that under the Supply Agreement, McKesson had regularly credited the Debtor from 2012 through mid-July 2015 for medturns through a process whereby the Debtor's individual stores would return merchandise,[9] as permitted by the Supply Agreement, and McKesson would calculate the amount of credit the Debtor was due for the returns and permit the Debtor to use the credits to reduce the amounts paid for subsequent purchases. Am. Compl. ¶ 88. McKesson informed the Debtor via email of how much it owed for its purchases and how much it could deduct for medturns credits. *See id.*

---

[9] § 1.A of the Supply Agreement defines "Merchandise" as "all items normally stocked by McKesson drug distribution centers. . .including prescription drugs ("Rx"), over the counter drugs ("OTC"), health and beauty aids and sundries." § 7.A.2 of the Supply Agreement in turn defines what Merchandise was returnable, which included: "Saleable and Unsaleable Merchandise [defined in § 7.A.1)] that was purchased from McKesson unless otherwise blocked for return," and "McKesson Private Label Merchandise." Merchandise not eligible for return included those items not eligible for return to the manufacturer/vendor, damaged Merchandise, and Merchandise not purchased from or physically carried by McKesson. *See* Supply Agreement at § 7.A.2.

2.   The Extension Agreement

The Supply Agreement was set to expire on August 31, 2015, and by consent of the parties, the Supply Agreement was extended on an interim basis through September 8, 2015. Am. Compl. ¶ 34, 35. On September 8, 2015, the Debtor and McKesson entered into an agreement titled, Extension of Compliance with Terms of Supply Agreement (the "Extension Agreement"), pursuant to which the parties' compliance with the terms of the Supply Agreement was extended to January 31, 2016, and the Debtor paid McKesson an extension fee in the amount of $1 million to be applied to reduce McKesson's administrative claim. Am. Compl. ¶ 36; McKesson's Statement at 6; Committee's Statement at 12. The Extension Agreement states: "A&P has requested McKesson to continue to supply Merchandise to A&P under the same terms and conditions as are set forth in the Agreement, except as otherwise set forth in this Extension."

The Extension Agreement provided that McKesson shall pay "all accrued Postpetition Rebates when due to be paid on the terms set forth in the [Supply] Agreement, including this Extension, but without regard to section 21(M) or any other provision of the [Supply] Agreement that would prohibit, condition, or suspend the payment of such Postpetition Rebates." Extension Agreement § 5.  The Extension Agreement defined Postpetition Rebates as rebates "accrued after the Petition Date in favor of A&P as a result of sales of Merchandise generated on and after the Petition Date."  Am. Compl. ¶ 40.  The Extension Agreement further provided that, "After A&P notifies McKesson that it has ceased pharmacy operations, the final Rebate amount will be expedited and paid by McKesson as soon as practicable."  Am. Compl. ¶ 42.  Further, the Extension Agreement expressly permitted McKesson to deduct "any post-petition amounts due" before returning a $2 million deposit to the Debtor, but allegedly did not permit McKesson to deduct prepetition amounts due. Am. Compl. ¶ 43; Extension Agreement § 5.

11

## III. STATEMENT OF ISSUES

This Claims Opinion will resolve the below "Issues To Be Tried" listed on the First Amended Pretrial Order [Adv. Pro. ECF No. 168].[10]  The remaining Issues to Be Tried listed on the First Amended Pretrial Order will be resolved in separately issued opinions.

1. As to the objection to the McKesson Claims,[11] were each of McKesson's Claims sufficiently documented or otherwise allowable in the Main Case?
2. To what extent are any of McKesson's Claims subject to reduction or offset?

## IV. DISCUSSION

### A. The Fixed Amount of McKesson's 503(b)(9) Claim

The issues to be resolved at trial relating to the fixed amount of McKesson's administrative claim were: (1) whether McKesson owes the Debtor a buyback credit in the amount of $327,561.90;  (2) whether McKesson owes the Debtor a return credit in the amount of $44,032.76; (3) whether McKesson owes the Debtor a series of small credits totaling $8,051.76; (4) whether McKesson improperly deducted $134,503.57 from sums it owed the Debtor; (5) whether McKesson improperly deducted $22,918.39 from its last payment to the Debtor in June 2016; (6) whether the Debtor received a delivery of $127,692.46 in Merchandise that is included in McKesson's fixed administrative claim; and (7) whether the invoices used by McKesson to calculate its administrative claim are the correct measure of the value of the merchandise delivered, or alternatively whether instead the true purchase price of the goods received by the Debtor during the relevant administrative claim period is the invoice amount less the rebate amount the Debtor was entitled to.

---

[10] This list of issues corresponds to the "Issues to be Tried" section of the First Amended Pretrial Order [ECF No. 168].

[11] "McKesson Claims" is defined in the First Amended Pretrial Order as McKesson's three filed proofs of claim numbers 5880, 9512, and 9800.

The Court first finds that, while the Plaintiff characterizes these allegedly withheld credits and improper deductions as objections to McKesson's administrative claim, or alternatively stay violations (and thus, under either theory, McKesson would have the burden of proving whether the allegedly withheld credits and improper deductions were still owed to A&P[12]), the Plaintiff's contention here is really an assertion that it has valid postpetition claims (the credits and withheld deductions) that it is entitled to set off as a defense against McKesson's § 503(b)(9) claim pursuant to § 558 of the Bankruptcy Code and A&P's setoff rights as they exist under state law.[13]

In determining whether a setoff is permitted under section 558, the bankruptcy court must first analyze the applicable state law and determine whether a setoff is permitted. *See In re Circuit City Stores, Inc.*, 2009 WL 4755253 at *3; *In re Hunt*, 250 B.R. 482, 485 (Bankr. E.D.N.Y. 2000).

---

[12] Under a claim objection analysis, "[a] proof of claim is prima facie evidence of the validity and amount of a claim, and the objector bears the initial burden of persuasion." *See Rozier v. Rescap Borrower Claims Trust (In re Residential Capital, LLC)*, 15 Civ. 3248, 2016 U.S. Dist. LEXIS 21204 at *25 (S.D.N.Y. Feb. 22, 2016) (citing *In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 Civ 2229 (DC), 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y. Jan. 22, 2010). "If the objecting party produces evidence equal in force to the prima facie case…which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency, the burden then shifts to the claimant." *See Nisselson v. Bank of the West (In re Cocoa Servs., L.L.C.)*, 17-01182-JLG, 2018 Bankr. LEXIS 1132 at *61 (Bankr. S.D.N.Y. Apr. 13, 2018) (internal quotation marks omitted) (citation omitted). The claimant must prove its claim by a preponderance of the evidence, a standard that is reached where a fact is more likely true than not true. *See In re LATAM Airlines Grp. S.A.*, 20-11254, 2022 Bankr. LEXIS 1178 at * 54 (Bankr. S.D.N.Y. Apr. 29, 2022). Likewise, under a stay violation analysis, the burden of proof lies with the Plaintiff who must prove by a preponderance of the evidence that such a violation occurred. *See In re Grinspan*, 597 B.R. 725, (Bankr. E.D.N.Y. 2019).

[13] There is a potential argument that section 558 is not the vehicle by which a debtor can seek to assert a setoff right where both the debtor's and the creditor's claims are postpetition claims (since section 558 could be interpreted as preserving only a debtor's prepetition setoff rights as to only its prepetition claims against creditors). Indeed, most cases that have discussed a debtor's setoff rights per section 558 (and specifically in the context of a proposed setoff against a creditor's postpetition § 503(b)(9) claim) have only dealt with a debtor asserting a right to set off its prepetition claim against a creditor's postpetition administrative claim against the debtor. *See, e.g.*, *In re Circuit City Stores, Inc.*, 2009 WL 4755253 (Bankr. E.D. Va. Dec. 3, 2009); *In re ADI Liquidation, Inc.*, 2014 WL 4638605 (Bankr. D. Del. May 5, 2015). However, there is legal authority for the application of section 558 where both the debtor's and the creditor's claims at issue are both postpetition claims. *See In re 1701 Commerce, LLC*, 2014 Bankr. LEXIS 3962 at *37-39 (Bankr. N.D. Tex. Sept. 17, 2014). Also, even if section 558 was not the proper vehicle by which a debtor could assert a setoff right as to debts at issue that both arose postpetition, it seems clear that a debtor in bankruptcy would be entitled to assert its postpetition setoff rights pursuant to applicable state setoff law per *Butner v. United States* (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law. Property interests are created and defined by state law."). *See Butner v. U.S.*, 440 U.S. 48, 54-55 (1979). An analysis of whether the setoff doctrine can be applied ultimately involves analyzing whether the technical requirements for setoff are met pursuant to applicable state setoff law.

13

In New York, the common law and equitable right of setoff has been codified in New York Debtor and Creditor Law ("NYDCL") § 151.[14]  *See Felton v. Noor Staffing Group, LLC (In re Corp. Res. Servs. Inc.)*, 564 B.R. 196, 200 (Bankr. S.D.N.Y. 2017) (citing *Thai Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*, 2016 WL 958640, at *2–3 (S.D.N.Y. Mar. 8, 2016)); *In re Bennett Funding Group, Inc.*, 212 B.R. 206, 212 (2d Cir. B.A.P. 1997); *In re Westchester Structures, Inc.*, 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995).  The state's law that applies to a party's setoff rights is the state where the operative facts occurred.  *See In re McLean Indus., Inc.*, 90 B.R. 614, 618 (Bankr. S.D.N.Y. 1988); *In re England Motor Co.*, 426 B.R. 178, 190 (Bankr. N.D. Miss. 2010).  Here, the operative facts occurred in New York where the Supply Agreement (and by incorporation, the Extension Agreement) expressly stated that New York law governed as to interpretation of those agreements.  *See* Supply Agreement at ¶ 21(E); Extension Agreement at ¶ 11.  Under New York law, to offset debts, they must be mutual, which involves proving that the debts are to and from the same parties in the same capacity.  *See In re Westchester Structures, Inc.*, 181 B.R. at 740.  In setoff (unlike recoupment), the debts may however arise from different transactions.  *See Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002).

Further, courts have held that for purposes of a debtor's assertion of setoff under section 558, the alleged mutual debts need not both be prepetition obligations, as required for a creditor's assertion of setoff under section 553.  *See In re Circuit City Stores, Inc.*, 2009 WL 4755253 at *3. Indeed, as the *Circuit City Stores* court noted, ". . . because § 558 preserves to the Debtor the

---

[14] Also, setoff is "not dependent on the parties' contract; rather, they are equitable remedies available independent of any contractual remedy."  *See In re Prince Sports, Inc.*, 2013 Bankr. LEXIS 5334 at *8 (Bankr. D. Del. 2013) (quoting *CDI Trust v. U.S. Electronics, Inc. (In re Commc'n Dynamics, Inc.)*, 382 B.R. 219, 226 (Bankr.D.Del. 2008) (internal quotations omitted).

14

defenses it would have had prepetition, the court must examine the transaction as though the bankruptcy had not been filed.  Doing so eliminates the prepetition/postpetition distinction and, in essence, obliterates the requirement that the mutual debts must both be prepetition obligations in a § 558 context." *See id.* (citing *In re Papercraft*, 127 B.R. 346, 350 (Bankr. W.D. Pa. 1991)).  Thus, a debtor can set off its prepetition claims against postpetition obligations it owes, or it can set off postpetition obligations it owes against its postpetition claims against creditors.  *See In re 1701 Commerce, LLC*, 2014 Bankr. LEXIS 3962 at *37-39 (Bankr. N.D. Tex. Sept. 17, 2014).

This Court previously ruled that a § 503(b)(9) claim is a postpetition claim for purposes of setoff.[15]  *See* Sept. 16, 2019 Hr'g Tr. [ECF No. 43] at 49-54, 57–58; Mem. Op. Regarding Motion for Summary Judgment [Adv. Pro. ECF No. 141] at 19.  The case law is also sufficiently clear that setoff under § 558 can involve a mix of pre- and postpetition claims, or indeed two postpetition claims, because courts are clear that a transaction between a debtor and a creditor in the context of § 558 should be examined as though the bankruptcy had not been filed (thus eliminating the prepetition/postpetition distinction).  *See id.*; *In re PSA, Inc.*, 277 B.R. 51, 53-54 (Bankr. D. Del. 2002) (prepetition/postpetition distinctions are irrelevant under § 558); *In re Circuit City Stores, Inc.*, 2009 WL 4755253 at *3 (same).

Additionally, once the technical requirements of setoff are satisfied, "the bankruptcy judge must scrutinize the right of setoff in light of the Bankruptcy Code's goals and objectives.  These goals include . . .equitable treatment of all creditors." *See In re Bennett Funding Group, Inc.*, 212 B.R. at 212 (citing *In re Ionosphere Clubs, Inc.*, 164 B.R. 839, 841 (Bankr. S.D.N.Y. 1994)).  The Court should thus favor an application of setoff rights that "is most likely to result in equal

---

[15] Cases applying a debtor's setoff rights in the particular context of § 558 have also treated § 503(b)(9) claims as postpetition claims for setoff purposes.  *See In re Circuit City Stores, Inc.*, 2009 WL 4755253, at *3 (Bankr. E.D. Va. 2009); *In re ADI Liquidation, Inc.*, 2015 Bankr. LEXIS 1611, at *9-16 (Bankr. D. Del. May 5, 2015).

15

distributions to the Debtors' creditors as a whole." *See In re Circuit City Stores, Inc.*, 2009 WL

4755253 at *4 (citing *In re Colonial Realty Co.*, 229 B.R. 567, 575 (Bankr. D. Conn. 1999).

i.    Alleged Credits Owed to the Debtor

1.    The $327k and $44k Unapplied Postpetition Credits

McKesson's accounting records describe a $327,561.90 credit owed to A&P appearing to

relate to certain of A&P's postpetition product returns processed through the service provider

intermediary Inmar. *See* Claims Decl. of Dawn DeVito: McKesson's Overstatements of its

503(b)(9) Claim and Subsequent New Value Def. [Adv. Pro. ECF No. 173] at ¶ 133. McKesson's

records also describe a number of smaller credits totaling $44,032.76 owed to A&P under the

description "RA# submission after A&P closure date." *See id.* at ¶ 136. The Plaintiff alleges that

McKesson recorded the $327k credit as due to A&P for certain sums received by McKesson from

manufacturers for returns. *See id.* at ¶ 132-33. The Plaintiff contends that all of these book entries

are evidence that McKesson received funds from manufacturers for certain of A&P's postpetition

returns which it still owes to A&P and has not paid. *See id.* at ¶ 133-34; Pl. Pre-Trial Br. [Adv.

Pro. ECF No. 169] at 23.

The Plaintiff also notes that McKesson's expert Charles Berk testified at a deposition that

he did not know about the $327k credit when calculating McKesson's § 503(b)(9) claim, and thus

did not seem to account for this credit in that calculation. *See* Claims Decl. of Dawn DeVito:

McKesson's Overstatements of its 503(b)(9) Claim and Subsequent New Value Def. [Adv. Pro.

ECF No. 173] at ¶ 125-26. The Plaintiff argues that this nonpayment amounts to a stay violation,

or in the alternative, argues that "[t]o the extent McKesson seized those sums to be applied against

its § 503(b)(9) Claim under § 7 of the Extension Agreement, McKesson has the burden of proving

that it is entitled to do so." *See* Pl. Pre-Trial Br. at 23.

16

Here, McKesson's § 503(b)(9) administrative claim is an alleged debt owed by A&P to McKesson, and the $327k and $44k credits are alleged debts owed by McKesson to A&P. Thus, mutuality of parties exists and the Plaintiff can establish a valid setoff right to the extent it can show it is validly owed the $327k and $44k credits.

The Plaintiff here has failed to meet its burden to show that the $327k and $44k credits are valid debts due and owing by McKesson. At Trial, the Plaintiff was not able to produce any clear evidence regarding the precise dates these returns were purportedly made. *See* July 15, 2024 Hr'g Tr. [Adv. Pro. ECF No. 189] at 102-06. The Plaintiff argues that A&P's lack of evidence might have been because McKesson had "told returns processor Inmar to withhold information about credits from A&P starting in mid-October 2015, before the relevant accounting entries and, at a minimum, the returns the $44k records." *See* DeVito Claims Decl. [Adv. Pro. ECF No. 173] at ¶ 26-27; PX 27, Ex. B; Pl. Post-Trial Br. [ECF No. 192] at 38. But the withholding of this information by Inmar would not seem to fully explain why A&P lacked any records of its own at all regarding when its stores actually submitted the returns underlying these credits.

On the other hand, McKesson was also unable to offer any other evidence related to these credits. *See* July 15, 2024 Hr'g Tr. [Adv. Pro. ECF No. 189] at 267-70. The Plaintiff's witness Dawn DeVito did however note that the $327k credit posted in September 2017, more than a year after A&P's bankruptcy, which aligns with the historical reconciliation period between Inmar and McKesson. *See* DeVito Claims Decl. [Adv. Pro. ECF No. 173] at ¶ 132-34. Further, as to the $44k credit, DeVito also testified that the abbreviation "RA" in the accounting entry stood for "Return Authorization" and the description attached to this credit related to inventory A&P sent back to McKesson after A&P closed all of its stores in November 2015. *See id.* at ¶ 138.

17

The Plaintiff's key points of evidence in support of its assertion that it has a valid postpetition claim are as follows: (1) noting the existence of the above-referenced accounting entries; (2) noting that McKesson's expert Berk did not seem to know what the $327k credit was and thus did not seem to have accounted for the credit in calculating the amount of McKesson's § 503(b)(9) claim; and (3) noting that no evidence was produced showing that a final reconciliation ever was, or has yet been done by McKesson.[16] While all of this evidence is definitely suggestive of the fact that the $327k and $44k credits might still be due and owing, the Court does not think these facts, taken together, prove, by a preponderance of the evidence, that the credits are still due and owing. In other words, the evidence does not conclusively show that it is more likely than not that the $327k and $44k credits are still due and owing. Rather, these facts show it is possible, but not probable, that the credits are still due owing. Thus, the Court finds that these credits are not still due and owing, and so McKesson's administrative claim need not be reduced on account of these allegedly withheld credits.

### 2. The $8k Miscellaneous Unpaid Credits

Similar to the $327k and $44k unapplied postpetition credits described above, McKesson's books show that several smaller credits totaling $8,051.76 are due and still owing to A&P. Though ill-defined, the Plaintiff's witness DeVito describes them as "very small, such as a $30 A&P overpayment" and "split among a large number of other accounts." DeVito Claims Decl. [Adv. Pro. ECF No. 173] at ¶ 155, 158; PX 182. The Plaintiff also notes that, as with the $327k and $44k unpaid credits, there was no evidence that McKesson has ever done a final, written reconciliation of its accounting records. At Trial, neither party was able to produce any further

---

[16] See Pl. Post-Trial Br. at 38-39. The Court notes that the Debtor could have asked for a reconciliation under the Supply Agreement and the Extension Agreement, but chose not to. See Supply Agreement at § 17; Extension Agreement at § 11.

18

evidence regarding this credit beyond the book entry itself.  For its part, McKesson simply stated that "Plaintiff relies entirely upon a misreading of accounting data to support the unsupportable claims of 'seizures.'" McK Post-Trial Br. [Adv. Pro. ECF No. 190] at 43.

Similar to the analysis in the previous section, the Court concludes that the Plaintiff's evidence of a lack of a final reconciliation, combined with the book entry itself is not sufficient to establish that the Plaintiff has a valid postpetition claim against McKesson.  While McKesson failed to produce any evidence either that proved that the $8,051.76 was already accounted for in its administrative claim, was already paid out to A&P, or was otherwise not validly owed to A&P, since the Plaintiff has the burden of proving its valid setoff rights, the Court concludes the Plaintiff has not met its burden here as the book entry coupled with the lack of a final reconciliation between the parties does not show it is more likely than not that the $8k credit was and is still due and owing.  Thus, the Court finds that this credit is also not still due and owing, and so McKesson's administrative claim need not be reduced on account of these allegedly withheld credits.

### ii.   Improperly Seized Funds

#### 1.   The $134k Overfunded Post-Petition Returns

The Plaintiff contends that McKesson wrongfully withheld $134,503.57, from a December 2015 Payment to A&P, which was for the return to A&P of the $1.5 million balance of A&P's $2 million deposit remitted earlier pursuant to the Extension Agreement.  *See* Pl. Pre-trial Br. at 7. McKesson asserts that this amount represented certain return credits issued between August and October 2015 that McKesson later determined that A&P was not entitled to because A&P allegedly failed to actually pay for that returned merchandise in the first place.  *See* Seizures Decl. [Adv. Pro. ECF No. 171] at ¶¶ 85-90; DeVito Rebates Decl. [Adv. Pro. ECF No. 172] at ¶¶ 91-112.

This deduction was based on a calculation done by McKesson's Jenifer Towsley representing so-called "overfunded returns." Towsley calculated the amount based off of a prepetition and postpetition blended returns rate applied to all outstanding prepetition invoices, for an estimated $134,503.57 excess return credit provided to prepetition A&P. *See* Towsley Decl. [Adv. Pro. ECF No. 162] at ¶ 91. McKesson contends that these overpaid credits allegedly related to "product ordered during the prebankruptcy period for which McKesson has unpaid invoices." *See* Seizures Decl. [Adv. Pro. ECF No. 171] at ¶ 87.

At Trial, it was noted that this amount was recorded in account 66828 for application against prepetition sums. The Plaintiff's witness DeVito also offered evidence to show that Towsley's calculation was flawed, including because: (1) A&P only received 85% of the return value, not the assumed 100%; (2) postpetition rates were blended for application to solely prepetition sums; (3) the total unpaid sum used by Towsley didn't consider the $1 million extension fee; and (4) the underlying product was likely purchased significantly prior to Towsley's stated windows in which she claims A&P used these un-earned credits. *See* DeVito Rebates Decl. [Adv. Pro. ECF No. 172] at ¶¶ 101-109.

DeVito's testimony raised significant questions about the validity of McKesson's calculation of these "overfunded returns." McKesson in turn did not offer any further evidence as to the legitimacy of their right to this deduction. Specifically, McKesson failed to provide any evidence at all, in the form of invoices, shipment records, or payment receipts, which might have shown whether the goods underlying the allegedly overfunded credits were ever paid for. Thus, the Court concludes that the Plaintiff has met its burden to prove that the $134k was wrongfully withheld from the December 2015 Payment to A&P because the evidence indicates that the

calculation used by McKesson to justify its withholding of the $134k was significantly flawed. So the Plaintiff has sufficiently proven it has a valid postpetition claim against McKesson.

Next, the Court will analyze the rest of the technical requirements of setoff here. As outlined *supra*, the first step is to determine whether two valid debts are owed. Here, the Plaintiff has successfully shown that two valid debts are owed here; the $134k is owed to A&P's bankruptcy estate and the § 503(b)(9) claim, as finally calculated in this Opinion, is owed to McKesson. The second step is to determine if mutuality exists between the parties here. Mutuality requires proving that the debts are to and from the same parties in the same capacity. *See In re Westchester Structures, Inc.*, 181 B.R. at 740. The $134k is owed to the debtor's bankruptcy estate from McKesson, and McKesson's administrative claim is in turn owed to the debtor's bankruptcy estate. Thus, the parties remained in the same capacity with respect to one another (i.e., in the course of an ordinary supplier/purchaser trade relationship) when both obligations were incurred. Thus, the Court concludes that mutuality exists here.

Additionally, aside and apart from the satisfaction of the technical requirements of setoff, "the bankruptcy judge must [also] scrutinize the right of setoff in light of the Bankruptcy Code's goals and objectives. These goals include . . .equitable treatment of all creditors." *See In re Bennett Funding Group, Inc.*, 212 B.R. at 212 (citing *In re Ionosphere Clubs, Inc.*, 164 B.R. at 841). The Court should thus favor an application of setoff rights that "is most likely to result in equal distributions to the Debtors' creditors as a whole." *See In re Circuit City Stores, Inc.*, 2009 WL 4755253 at *4 (citing *In re Colonial Realty Co.*, 229 B.R. at 575).

The Court finds that the application of setoff rights here would further the equitable treatment of all creditors in this case and makes equal distributions to the Debtors' creditors as a whole more likely. Since the Plaintiff has successfully shown that the $134k is still validly owed

to the Debtor's estates by McKesson, that money would effectively accrue back to the Debtor's estate, by way of reduction of McKesson's § 503(b)(9) claim.  That will in turn increase the amount of funds available for pro rata distribution to the rest of the Debtor's creditors as a whole, thus furthering a more equitable recovery for all creditors here.

McKesson therefore owes A&P for $134,503.57, which should reduce McKesson's administrative claim.

### 2.   The $22k June 2016 Deduction

The Plaintiff argues that two amounts that McKesson deducted from its final payment due to A&P in June 2016 ($12,500 for "Equipment Charges" and $10,418.49 for a "December SGX Rebate") were insufficiently substantiated, and thus were improper deductions that should now be reinstated to reduce McKesson's administrative claim. Claim Opp'n [Adv. Pro. ECF No. 126] at 13. McKesson's records seem to indicate A&P was owed returns in the exact amount of the June Payment plus the $22k. DeVito Claims Decl. [Adv. Pro. ECF No. 173] at ¶ 144.  McKesson failed to present any further information, simply putting forth the entry descriptions of "$10,418.39 December SGX Rebate per 1.15 email" and "12,500.00 Equipment charges per 3.31 email," which DeVito testified she and Carnahan had no knowledge of. McK Post-Trial Brief [Adv. Pro. ECF No. 190] at 42; DeVito Claims Decl. [Adv. Pro. ECF No. 173] at ¶ 145.

Given the skeletal evidence presented by both parties as to these amounts, the Court does not think these facts, taken together, prove, by a preponderance of the evidence, that the amounts were not validly owed to McKesson.  Rather, the evidence indicates at most that it is only possible, but not probable, that the "Equipment Charges" and "December SGX Rebate" were not owed by A&P pursuant to the Supply Agreement and Extension Agreement.  Thus, the Court finds that

22

McKesson's administrative claim need not be reduced on account of these allegedly withheld credits.

### iii.  Unproven Deliveries

As discussed in the Preference & Stay Violations Opinion, the Court concludes that the evidence at Trial failed to show that the Debtor received delivery of certain merchandise delivered within two weeks of the Petition Date (the "355 Invoices") with an aggregate value of $127,692.46, which amount was included in McKesson's Administrative Proof of Claim.  *See* McK 85. Previously, this Court in its Summary Judgment Opinion denied McKesson summary judgment on the validity of its administrative claim on the grounds that a factual dispute existed as to whether the delivery of merchandise in question was actually received by the Debtor.  *See* Summ. Judg. Op. [Adv. Pro. ECF No. 140] at 17-18.

"A proof of claim is prima facie evidence of the validity and amount of a claim, and the objector bears the initial burden of persuasion." *See Rozier v. Rescap Borrower Claims Trust (In re Residential Capital, LLC)*, 15 Civ. 3248, 2016 U.S. Dist. LEXIS 21204 at *25 (S.D.N.Y. Feb. 22, 2016) (citing *In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 Civ 2229 (DC), 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y. Jan. 22, 2010)).  "If the objecting party produces evidence equal in force to the prima facie case…which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency, the burden then shifts to the claimant." *See Nisselson v. Bank of the West (In re Cocoa Servs., L.L.C.)*, 17-01182-JLG, 2018 Bankr. LEXIS 1132 at *61 (Bankr. S.D.N.Y. Apr. 13, 2018) (internal quotation marks omitted) (citation omitted).  The claimant must prove its claim by a preponderance of the evidence, a standard that is reached where a fact is more likely true than not true.  *See In re LATAM Airlines Grp. S.A.*, 20-11254, 2022 Bankr. LEXIS 1178 at * 54 (Bankr. S.D.N.Y. Apr. 29, 2022).

23

McKesson established the 355 Invoices' *prima facie* existence in its Administrative Proof of Claim and supplemented the factual record as to their validity through Towsley's sworn testimony that it was McKesson's practice to generate an invoice for pharmaceuticals the day the merchandise is delivered. *See* Decl. of Jenifer Towsley Direct Trial Testimony Proffered by the McKesson Entities [Adv. Pro. ECF No. 162] at 41.

In response, at Trial, the Plaintiff's witness Dawn DeVito testified that she had searched A&P's records systems, both in preparation for the Trial and earlier throughout this case, and failed to find any proof of delivery to any of the specified receiving pharmacies. *See* July 17, 2024 Hr'g Tr. [Adv. Pro. ECF No. 187] at 205-07; DeVito Claims Decl. [Adv. Pro. ECF No. 173] at ¶¶ 42-50. The Plaintiff thus met its initial burden in producing evidence at least equal in force to the *prima facie* case established by McKesson's proof of claim, and in so doing, carried its initial burden. The burden thus shifts to McKesson to prove by a preponderance of the evidence that the deliveries were received by the Debtor.

Upon review of the 355 Invoices, the Court finds that they are facially problematic for a number of reasons: (1) all identify their shipping route as "DNS," for which the Plaintiff proffers the meaning of "do not ship"; (2) the stop along each route is coded "000"; (3) at least two of the invoices list the receiving pharmacy as "Inactive"; and (3) across all 355 Invoices, there exist only two unique (and incredibly small) orders, repeated hundreds of times. *See* McK 85.

When asked, McKesson refused to produce any proof of shipment or delivery beyond the 355 Invoices themselves. *See* Post-Trial Brief Submitted by the McKesson Entities [Adv. Pro. ECF No. 190] at 25–26. McKesson's attempt to offer "several logical explanations" at Trial also fell flat. In fact, McKesson's witness Towsley's own declaration testimony that the Merchandise was shipped out on July 2, 3 and 7 contradicts the invoice sheets' own delivery dates, primarily

24

listed as July 13.  *See* Decl. of Jenifer Towsley Direct Trial Testimony Proffered by the McKesson Entities [Adv. Pro. ECF No. 162] at ¶ 41; McK 85.  No Pathmark reports reflected the deliveries either, whether on weekly reports (for the first two batches) or daily reports once A&P was on daily payment terms (for the final batch).  *See* Plaintiff's Post-Trial Mem. of Law [Adv. Pro. ECF No. 192] at 19-20.

For the foregoing reasons, the Court believes the factual record to be overwhelmingly one-sided on this issue, in the Plaintiff's favor.  McKesson is thus directed to reduce its administrative claim by $127,692.46.

### iv.   Value of Merchandise Delivered by McKesson to the Debtor

Additionally, as discussed in the Preference & Stay Violations Opinion in the context of McKesson's SNV Defense, the Parties dispute whether the invoices used by McKesson to calculate its § 503(b)(9) administrative claim are the correct measure of the value of the merchandise delivered, or alternatively whether instead the true purchase price of the goods received by the Debtor during the relevant administrative claim period is the invoice amount less the rebate amount the Debtor was entitled to, highlighting that the Debtor had often received its "prebate" on a shipment of merchandise prior to paying the invoices pertaining to that same shipment.  *See* Claim Opp'n [Adv. Pro. ECF No. 126] at 9-10.  The Plaintiff seeks a further reduction of McKesson's § 503(b)(9) administrative claim in the amount of approximately $277,000 in rebates owed to A&P.

In valuing the goods underlying a § 503(b)(9) administrative claim, courts have held that while the Bankruptcy Code does not define the word "value" for purposes of that subsection, the invoice or purchase price is presumptively the best determinant of value.  *See In re Semcrude, L.P.,*

416 B.R. 399, 405 (Bankr. D. Del. 2009).[17]  This presumption can be rebutted though if there is evidence indicating that "under the facts and circumstances of a particular transaction, the purchase or invoice price is not an appropriate or relevant indicator of the 'value' obtained by the Debtors." *See id.*; *see also In re Beaulieu Group, LLC*, 2021 WL 4469928 at *45 (Bankr. N.D. Ga. Sep. 29, 2021) (holding, in evaluating a claim under 11 U.S.C. § 503(b)(9), that an allegation of overcharging made it "plausible that the invoice price is not the correct value").

Here, the invoices indicate a price paid per drug equal to the basic pricing mechanism specified in the Supply Agreement. *See, e.g.*, McK 85; Supply Agreement at § 5; Extension Agreement at § 5.  The rebates in turn were other contractual amounts credited to A&P for application against future invoices, calculated based on the total invoiced value of merchandise delivered to pharmacies and actually paid for in a timely fashion.  *See* Am. Compl. ¶¶ 20–21; Decl. of Dawn DeVito [Adv. Pro. ECF No. 127], Ex. 7 at p. 33–34 (Supply Agreement § 21(M)).  The rebates were conditioned on A&P's prompt payment, and A&P forfeited the right to any rebate if due and outstanding invoices existed on the date the rebate was to be paid out.  *See id.*  Often, McKesson would also calculate and credit "prebates" before invoices were even due, requiring potential after-the-fact reconciliation if the underlying invoice remained unpaid after the rebate was applied to reduce A&P's cash purchase price, or if A&P returned the Merchandise on which that rebate was earned and spent.  *See* Rebates Decl. of D. DeVito: McKesson's Rebates & Credits Procedures [Adv. Pro. ECF No. 172] at ¶ 36–40.

Given the contractually contingent nature of the rebates, which were subject to future adjustment, the Court is unconvinced that the appropriate value of the goods received by the Debtor

---

[17] Indeed, courts have also held that in valuing administrative claims generally, "[t]here is an initial assumption that, where a contract exists, the contractual rate is the reasonable value of the goods or services provided to the estate." *In re Bethlehem Steel Corp.*, 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003).

during the twenty days prior to the Petition Date should account for these rebates. Rebates were calculated from the invoiced price and earned upon payment of that invoice. Thus, at delivery, A&P received pharmaceuticals, the estate was replenished by their value, and any future rebate would be crystallized only if A&P timely paid that invoice. Similarly, if McKesson allowed rebates to be applied upon purchase and A&P later failed to timely pay, A&P's future credits would be reduced by the same amount. The Court therefore concludes that the presumption that the invoice price here is the best determinant of the value of the goods underlying McKesson's § 503(b)(9) administrative claim has not been sufficiently rebutted. McKesson need not reduce its administrative claim by the $277,000 adjustment for owed rebates that Plaintiff asserts is required.

## V.    CONCLUSION

In summary, this Court rules as follows:

1. McKesson must reduce its administrative claim by $134,503.57 on account of postpetition returns owed but not accounted for in its Administrative Proof of Claim.

2. McKesson must reduce its administrative claim by $127,692.46, which was an amount erroneously included in McKesson's Administrative Proof of Claim on account of the 355 Invoices.

3. Thus, in total McKesson must reduce its administrative claim by $262,196.03. Since McKesson asserts that its fixed administrative claim is $1,750,731.87, McKesson's fixed allowed administrative claim after the reductions consistent with this Opinion is $1,488,535.84.

4. McKesson has no supplemental/contingent § 503(b)(9) administrative claim as this Court held in the Preference & Stay Violations Opinion that the Next Day Payments (as defined therein) are unavoidable.

27

5. Finally, pursuant to Judge Drain's previous bench ruling,[18] McKesson is entitled to offset its preference exposure against its administrative expense claim dollar-for-dollar and is liable for any remaining amount of the preference judgment.  Since this Court resolved in the Preference & Stay Violations Opinion that McKesson's total preference exposure is $4,587,431.62, McKesson may offset this preference exposure against its remaining allowed administrative claim, and thus McKesson is ultimately ordered to pay the difference, $3,098,895.78 to the Debtor.[19]  The Plaintiff is directed to submit a proposed order allowing the Debtor's administrative claim after the application of the above-determined reductions.

Dated: June 17, 2026
      New York, New York

                              */s/ Lisa G. Beckerman*
                              THE HONORABLE LISA G. BECKERMAN
                              UNITED STATES BANKRUPTCY JUDGE

---

[18] *See* Sept. 16, 2019 Hr'g Tr. [Adv. Pro. ECF No. 43] at 54, 57–58.

[19] This amount is in addition to the amounts awarded to the Plaintiff for violations of the automatic stay in the Preference & Stay Violations Opinion.